1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF IOWA
2                      EASTERN DIVISION

3     United States of America,

4                 Plaintiff,         No. 18-CR-1023

5          vs.

6     Michael Stevenson,                Volume 1 of 3

7                 Defendant.

8                    *    *    *    *    *

9              Transcript of proceedings held at the

10    Federal Courthouse, Cedar Rapids, Iowa, on the 23rd

11    day of April, 2019, commencing at 8:47 a.m.

12                   *    *    *    *    *

13    Before:  Judge C.J. Williams

14                   *    *    *    *    *

15    Appearances:

16    John H. Lammers
      600 Fourth Street, Suite 670
17    Sioux City, Iowa 51101

18    and

19    Kyndra Lundquist
      Assistant US Attorneys
20    111 Seventh Avenue SE, Box 1
      Cedar Rapids, Iowa 52401        for USA.
21
      Cory Goldensoph
22    Attorney at Law
      425 Second Street SE, Suite 803
23    Cedar Rapids, Iowa 52401        for Defendant.

24                   *    *    *    *    *

25    Transcript ordered the 12th day of June, 2019.
      Transcript delivered the 10th day of July, 2019.

*Sarah J. Dittmer, CSR, RPR*
*1(888)388-2723*

1                        INDEX

2    <u>Witness:</u>                                    <u>Page</u>

3    CHAD LEITZEN

4      Direct Examination by Mr. Lammers.........  29

5      (Cont.) Direct Examination by Mr. Lammers.  91

6    HEIDI WOODYARD

7      Direct Examination by Mr. Lammers.........  78

8      Cross-Examination by Mr. Goldensoph.......  88

9    <u>Exhibits</u>              <u>Offered</u>              <u>Received</u>

10   All exhibits          9                    10

11   except 19 & 19A

12                    *    *    *    *    *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2                THE CLERK:  All rise.  The U.S. District

3      Court for the Northern District of Iowa is now in

4      session.  The Honorable C.J. Williams presiding.

5                THE COURT:  Please be seated.  All right.

6      The matter now before the Court is United States of

7      America versus Michael Stevenson, Criminal Case

8      Number 18-CR-1023.

9                This matter comes on for trial today.  We're

10     outside the presence of the jury.  We'll be beginning

11     jury selection here soon.

12               The United States is represented by

13     Assistant United States Attorneys Jack Lammers and

14     Kyndra Lundquist.  The defendant is personally

15     present and represented by Attorney Cory Goldensoph.

16               I did receive from the Government a

17     history -- criminal history of the jurors.  From my

18     review, it does not appear that any of these jurors

19     are disqualified based on their prior convictions,

20     except for Juror James Hillary.  Is that the

21     Government's position as well?

22               MR. LAMMERS:  It is, Your Honor.

23               THE COURT:  And, Mr. Goldensoph?

24               MR. GOLDENSOPH:  Yes, Your Honor.

25               THE COURT:  All right.  And so Mr. Hillary,

 1    I believe, has already been excused.  But if not, we

 2    will excuse him unless there's any objection by the

 3    Government.

 4            MR. LAMMERS:  I believe he already has been

 5    excused, based on the correspondence received from

 6    the clerk, Your Honor.

 7            THE COURT:  Yeah.  And that's my

 8    understanding too.  But I just want to make a good

 9    record that you don't have an objection to it.

10            MR. LAMMERS:  I have no objection.  Thank

11    you.

12            THE COURT:  Very good.

13            Mr. Goldensoph?

14            MR. GOLDENSOPH:  No objection.

15            THE COURT:  All right.  Anything else with

16    regard to the jurors or jury selection that we need

17    to talk about here this morning, Mr. Lammers?

18            MR. LAMMERS:  I don't believe so,

19    Your Honor.

20            THE COURT:  Mr. Goldensoph?

21            MR. GOLDENSOPH:  Not about that, Your Honor,

22    but I -- If you have a moment, I want to make a quick

23    record on something different.

24            THE COURT:  Certainly.  Go ahead.

25            MR. GOLDENSOPH:  Thank you, Your Honor.

1    This morning there was talks, and that's all I'll

2    label them at this point, about the potential for

3    sort of a last-minute plea to Counts 3, 4, and 5 in

4    this matter.

5            And I just kind of wanted -- You know, at

6    this point, Mr. Lammers isn't even sure he would

7    offer that.  He said he'd run it up the chain,

8    basically.

9            I conferred with Mr. Stevenson about it.

10   And ultimately what I -- I kind of want to make a

11   quick record about the fact that it's my belief.  And

12   I guess I want to make sure it's on the record, that

13   if Mr. Stevenson were found guilty of Counts 3, 4,

14   and 5 at trial and not guilty of Counts 1 and 2, he

15   would be in the exact same position that he would be

16   as if he pled guilty to just 3, 4, and 5, and

17   Counts 1 and 2 were dismissed.

18           And I just wanted to make sure that that was

19   clear.  And if -- I don't know if the Court would

20   want to opine upon that, if the Court would know.  In

21   any event, I just want to make sure that that was my

22   belief.  And I guess I would also state that it would

23   be my recommendation in this particular matter to

24   seek that plea, if possible.

25           THE COURT:  Mr. Lammers?

1          MR. LAMMERS:  I'm not sure that we're

2     offering any plea, I guess, as the initial matter.  I

3     think that's something that I would actually have to

4     go check with my office in regards to.  They are all

5     (b)(1)(C) counts, as the Court's aware.  They are --

6          I don't know that I agree with the

7     characterization that he's in the exact same

8     position.

9          I think there would be litigation in regards

10    to whether or not acceptance is even available at

11    this point since we're on the day of trial.

12         Certainly, the third level would not be

13    available.  There may be a benefit to the plea to the

14    defendant.

15         I have informed Mr. Goldensoph that if we

16    would have a contested sentencing, I believe the

17    relevant conduct on Counts 1 and 2 would still be at

18    issue for the Court regardless of whether he pled

19    only to Counts 3, 4, and 5.

20         So he potentially gains a benefit, but I'm

21    not even sure we're offering that benefit at this

22    point.

23         Again, I think I would have to -- And,

24    candidly, I told Mr. Goldensoph that I had to talk

25    about my -- I wasn't inclined to do it, wasn't going

1    to do it unless I was told that he was, in fact,

2    seeking it.

3           And that if he did, in fact, seek it, then I

4    would go downstairs and speak to the folks in my

5    office and -- to go from there.

6           So I don't know where we're at at this

7    point.  I don't know if he's asking for that or not.

8    But that's the record I would make, Your Honor.

9           THE COURT:  All right.  Thank you.

10          The Court obviously does not get involved in

11   plea negotiations between the parties.  I'm not in a

12   position to opine as to the effect of any plea that

13   would take place at this point.

14          If the defendant goes to trial and is found

15   guilty after trial, it's highly unlikely there will

16   be any reduction for acceptance of responsibility

17   under the circumstances.

18          It is possible, and I am not going to render

19   an opinion whether it would or would not be granted

20   at this time, but it is more possible that he might

21   get some reduction for acceptance of responsibility

22   were he to plead guilty now or at any time prior to

23   the jury returning a verdict.

24          The more time that goes by and the more

25   effort that the Court and time that the Court puts in

1    and the Government puts in, the less likely there
2    will be any reduction.  But there may not be any
3    reduction, even if he pled guilty now.
4          So, Mr. Goldensoph, I'm sorry, but I'm not
5    really in a position to help your client make any
6    decision here.  And I'm not going to opine as to what
7    the effect may be of his guilty plea at this time.
8          We're go to go forward with the jury trial
9    at this point.  And if the defendant decides at some
10   point he wants to plead and the Government's willing
11   to offer a plea deal that your client wants to
12   accept, then he can plead at any time until the jury
13   verdict is returned.
14         MR. GOLDENSOPH:  All right.  Thank you,
15   Your Honor.  That's all I really wanted to know.
16         THE COURT:  All right.  Mr. Lammers,
17   anything else you want to talk about regarding this
18   trial before we start jury selection?
19         MR. LAMMERS:  Yes, Your Honor, two things,
20   please.  First of all -- And, I guess, sort of sorry
21   up front for raising it, but I don't -- I know that
22   the defense attorney in this case, Mr. Goldensoph,
23   had filed a motion to withdraw.
24         And we never saw anything on ECF that the
25   Court had ruled on that motion.  I didn't see

1    minutes.

2         I know there was an ex parte hearing, but I

3    still would have thought we would have seen some sort

4    of a notation one way or the other.  I don't know if

5    that motion is still pending.  I'm assuming it's not

6    since we're here today.  But for the purposes of a

7    clean record, I wanted to raise that.

8         THE COURT:  I appreciate that.  And the --

9    We did rule on it.  I apologize if that's not been

10   reflected in the docket.  We will correct that.  But

11   the motion ultimately was denied, but it was, in many

12   ways, withdrawn.  And so Mr. Goldensoph is

13   representing Mr. Stevenson.

14        MR. LAMMERS:  I'm not trying to get into the

15   merits of the motion at all.  I just wanted to make

16   sure that we had a ruling before we proceeded.  And

17   it sounds like we do.  Thank you, Your Honor.

18        The second question I have for the Court is

19   it appears to me that there's no objection on any of

20   the exhibits, either from Mr. Goldensoph exhibits or

21   our exhibits, with the exception of 19 and 19A.

22        And we would request that those exhibits be

23   preadmitted, Your Honor, so that we can sort of use

24   them with whatever witness and whatever order since

25   they're not objected to.

 1          THE COURT:  Mr. Goldensoph?

 2          MR. GOLDENSOPH:  Sounds great to me.

 3          THE COURT:  All right.  And so every exhibit

 4   except 19 and 19A will be admitted, and the parties

 5   do not have to move them into admission.  You can

 6   simply refer to them as already admitted at this

 7   time.

 8          MR. LAMMERS:  And finally -- I'm sorry.  I

 9   did say I had two points to raise.  This is a

10   subpoint of the last one.  I think, Your Honor, that

11   you may be in a position to rule on 19 and 19A, if I

12   understand correctly.

13          So just to lay a little bit of a background.

14   I understand the jury's waiting.  And I promise I'll

15   keep this short.

16          The allegation is that Mr. Stevenson sold

17   methamphetamine on February 2nd.  We saw the vehicle

18   and -- I'm sorry.  Heroin.  Not "methamphetamine."

19   This is not a methamphetamine case or not mainly.

20          And we saw that vehicle at the traffic stop.

21   We have the recorded buy.  And the vehicle with that

22   plate number was recognized by the officers -- or

23   seen by the officers.

24          Within 33 hours or so, Mr. Stevenson was

25   stopped on an unrelated matter on a traffic stop in

1    Dubuque.  And we have a video clip -- it's

2    approximately a minute or two minutes long -- of that

3    traffic stop showing Mr. Stevenson in the vehicle.

4           And then, because I didn't want to cut

5    anything of the video out, we have the longer video

6    of the traffic stop as well.  I intended to play for

7    the jury 19A, which is the clip.

8           The purpose of this exhibit is not -- And I

9    know Mr. Goldensoph is objecting based on 402, 403,

10    and 404(b).  I don't think it's 404(b).  We're not

11    going into any other conviction.  We're using it for

12    purposes of the identification.

13           He's in the same vehicle that was at the

14    drug trafficking event 33 hours earlier.  That's the

15    purpose of it.  We believe it's relevant for those

16    reasons.

17           If the Court finds that, then we ask that

18    that be admitted at this point as well.

19           THE COURT:  Mr. Goldensoph?

20           MR. GOLDENSOPH:  Thank you, Your Honor.  I

21    guess I do object to relevance.  I mean, I understand

22    that he's in the same vehicle, but it's on a separate

23    date.  It's, at very least, alleged that he's in the

24    same vehicle.

25           And not only that, but there's some amount

1   of implication that -- I believe he got some sort of

2   a driving while suspended charge.  And so I -- And

3   that seems --

4           I would prefer -- Obviously, that has some

5   404(b) implications with regards to that.  And so

6   that particular driving charge obviously has nothing

7   to do with this particular matter.  And it's

8   prejudicial to Mr. Stevenson.  And so we would object

9   on those bases.

10          THE COURT:  All right.  I don't feel I'm in

11  a position right now to rule on the admissibility.

12  I'm going to have to see how this comes in.  I'll

13  tell you right now, it seems relevant to me.

14          Relevance is a very low burden -- or barrier

15  to admission of evidence.  It only requires that a

16  fact has any tendency to make another fact of

17  material importance more likely than not.

18          Identifying this defendant tied to a car

19  that was used in a drug transaction is relevant, it

20  appears to me.  I don't see 404(b) as being an issue.

21          And as to the 403 issue, simply the fact

22  that he committed a traffic violation does not strike

23  me initially as being unduly prejudicial.

24          And any potential prejudice could be

25  overcome simply by instructing the jury that they are

1    not to take that into account in assessing whether

2    the Government's proved the defendant's guilt on the

3    charges.

4         But I'm not going to rule in advance.  I'm

5    going to wait and see how this comes in.  And then

6    I'll rule at that time if the defendant continues to

7    object, but -- So I'm not going to help you out

8    there, Mr. Lammers.

9         MR. LAMMERS:  Thank you, Your Honor.

10        And I assume that the Court received our

11   second amended exhibit list.  We provided that.  And

12   so I just wanted to make sure that when I say that

13   the exhibits are in, it's from the second amended

14   list, not from the amended list.

15        THE COURT:  Correct.

16        MR. LAMMERS:  Thank you, Your Honor.

17        THE COURT:  All right.  Mr. Lammers, who's

18   going to be conducting voir dire in this case?

19        MR. LAMMERS:  I am, Your Honor.

20        THE COURT:  Very good.  And what about

21   opening statement?

22        MR. LAMMERS:  That's going to be

23   Ms. Lundquist, Your Honor.

24        THE COURT:  All right.  Very good.

25        All right.  Are we ready for the jury, then?

*Sarah J. Dittmer, CSR, RPR*
*1(888)388-2723*

1          MR. LAMMERS:  Yes, Your Honor.

2          MR. GOLDENSOPH:  Yes, Your Honor.

3          THE COURT:  All right.  Let's go ahead and

4    have the jury brought up.

5          MR. LAMMERS:  Your Honor, I'm going to use

6    the podium.  Do you want me to bring that in before

7    or after you do your questioning of the jury?

8          THE COURT:  Why don't we go ahead and pull

9    that in now.  We'll take care of it, Mr. Lammers.

10          MR. LAMMERS:  Thank you, Your Honor.

11          MR. GOLDENSOPH:  I'll use it as well.

12          THE COURT:  And, Mr. Lammers, to be clear

13    too, I think the autopsy report was marked as under

14    seal?

15          MR. LAMMERS:  That's correct, Your Honor.

16          THE COURT:  All right.

17          MR. LAMMERS:  I believe we -- the Court

18    granted our motion to file that under seal.

19          THE COURT:  We did.  But now we're going to

20    admit it under seal as well, as a sealed document for

21    the record.

22          MR. LAMMERS:  Thank you, Your Honor.

23          THE CLERK:  All rise.

24          (Potential jury enters.)

25          (Jury is selected.)

         THE COURT:  All right.  Thank you very much,

    ladies and gentlemen.  We're going to go ahead and

    take our lunch break now.  It is about 12:00.  I'm

    going to give you until 1:15.  So you have a little

    bit of extra time to make sure you plug your meters

    and know where to go and so forth.

         When you come back, the CSOs will escort you

    out through the jury room.  You'll come back to the

    jury room each time you come back into court.

         Remember, during this break, don't talk

    among yourselves or with anybody else about this case

    or about anybody involved with it.  You haven't seen

    any evidence or heard anything yet.  And so enjoy

    your lunch break.  And we'll see you back here at

    1:15.

         THE CLERK:  All rise.

         (Jury exits.)

         THE COURT:  All right.  Please be seated.

         All right.  Mr. Lammers, any record you need

    to be made before we take our lunch break?

         MR. LAMMERS:  Yes, Your Honor.  After the

    jurors were picked, I -- And I -- I think we need to

    make this of record because of the record on the

    Batson challenge previously so that we've got a

    complete record.

1          After the jurors were selected, Mr. Rogers

2    sort of raised his -- both hands in the air and

3    exclaimed, "Why didn't I get picked?  I'm the only

4    peer in here."

5          And then as he was leaving, he leaned over,

6    raised his right hand sort of with a closed fist,

7    looked at the defendant, and said, "Good luck, bro,"

8    and walked out the door.  I think that's important to

9    have as part of our complete record going forward.

10          THE COURT:  Thank you.

11          Mr. Goldensoph, any record you'd like to

12   make?

13          MR. GOLDENSOPH:  No.

14          THE COURT:  All right.  Anything else we

15   need to take up during the break before we break for

16   lunch?

17          Mr. Lammers?

18          MR. LAMMERS:  No.  Thank you, Your Honor.

19          THE COURT:  Mr. Goldensoph?

20          MR. GOLDENSOPH:  No, Your Honor.

21          THE COURT:  All right.  We'll see everybody

22   back here at 1:15.

23          (Recessed 12:01 p.m.; resumed 1:13 p.m.)

24          THE CLERK:  All rise.

25          THE COURT:  All right.  Is there anything we

1   need to take up outside the presence of the jury

2   before we have the jury brought in?

3           Mr. Lammers?

4           MR. LAMMERS:  None that I'm aware of.  Thank

5   you.

6           THE COURT:  All right.

7           Mr. Goldensoph?

8           MR. GOLDENSOPH:  None, Your Honor.

9           THE COURT:  All right.  Can you see if the

10  jury is ready?

11          THE CLERK:  It looks like it's going to be a

12  minute, Your Honor.  There are a couple going through

13  security.

14          THE COURT:  All right.  You can be at ease

15  until we have the jury come in.

16          (An off-the-record discussion was held.)

17          (Jury enters.)

18          THE COURT:  All right.  Please be seated.

19  Welcome back from lunch, ladies and gentlemen.  This

20  is the matter of the United States of America versus

21  Michael Stevenson, Case Number 18-CR-1023.  We're

22  back after our lunch break.

23          (Jury instructions were read.)

24          THE COURT:  All right.  Ladies and

25  gentlemen, that completes the reading of the

1 instructions in this case. We will now proceed to

2 opening statements.

3          The Government will go first and then, as I

4 mentioned in the instructions, Defendant may, but

5 does not have to, also present an opening statement.

6          So, Ms. Lundquist, are you ready for opening

7 statement?

8          MS. LUNDQUIST:  Yes, Your Honor.

9          THE COURT:  You may proceed.

10         MS. LUNDQUIST:  May it please the Court,

11 Counsel.  Members of the jury.  On February 2nd,

12 2017, Heidi Woodyard got up to start her day.  At the

13 time, she lived in Dubuque with her sons and her

14 brother, Adam Birch.

15         That morning, her ex-husband came to pick up

16 the boys.  And on his way through the house, he asked

17 Heidi if she'd seen the odd way Adam was sleeping.

18         Heidi went into Adam's room, she touched

19 him, and he was cold.  Heidi turned him over.  And

20 when she did, she saw the needle in his arm.  Heidi

21 yelled to call 911.  And she began to give Adam CPR.

22 Adam never came to.  And when the ambulance arrived

23 and took him to the hospital, he was pronounced dead.

24         Members of the Dubuque drug task force came

25 to the house and searched Adam's room.  They found

heroin, methamphetamine, syringes, and two cell
phones.

Now, Adam had struggled with drug addiction
in the past, but Heidi had hoped that it was all in
the past.  He went to work with her every day, and he
worked hard remodeling old buildings.

For Adam's family and for the police, the
questions began.  How did this happen?  Where did
Adam get the drugs?  Who gave Adam the drugs?

The same day that Adam Birch died,
Investigator Chad Leitzen with the Dubuque drug task
force spoke to John Walgren about buying drugs for
the police.

John Walgren is a drug addict.  He's bought
pills, he's bought heroin, he sold marijuana, he's
traded codeine for heroin, and he's even had his
mother send him Xanax in jail.  John knows drugs, and
John knows about drug dealing.

In 2017, John was working off potential
charges by giving information to the police.  He and
Investigator Leitzen talked about buying drugs from a
dealer John knew as Lo.

Now, the police already knew who Lo was.  An
informant, Emily Nelson, had previously sent
Investigator Leitzen a picture of Lo's driver's

1    license.  That license belonged to the defendant,

2    Michael Alanzo Stevenson.

3          John had bought heroin from Lo on several

4    occasions.  And John had actually gone with Adam

5    Birch to buy heroin from Lo.  In fact, the night

6    before Adam Birch died, he and John texted back and

7    forth about splitting a half gram of heroin.

8          That night, on February 2nd, John arranged

9    to buy drugs from Lo for the police.  He placed a

10    recorded call.  Police searched him.  They searched

11    his car.  And John went to meet Lo.  Lo showed up in

12    a blue 2002 Chevy Trailblazer with a license plate

13    EYW 304.  Lo gave John a half gram of heroin for $80.

14    And the police watched from a distance.

15          Afterwards, John gave the drugs to the

16    police.  And John was searched, and his car was

17    searched.  An hour later, after buying for the

18    police, John is trying to get drugs for himself.  And

19    he texts Lo.

20          Lo responds.  Lo wants John to call Adam.

21    He texts him over and over, "Call him.  Just call

22    him."  He's blowing up John's phone.

23          Within the hour, John finds out that Adam

24    Birch has died.  And he talks to Lo.  Lo was frantic.

25    Lo was nervous.  And he says, "I told that kid to be

          careful."  John contacts Investigator Leitzen.  John
     2    knew that Lo was Adam's heroin dealer.
     3           Eight days after Adam Birch dies,
     4    Investigator Leitzen manages to access the second of
     5    the cell phones from Adam's room.  He had to put in
     6    nearly 10,000 pass codes, five four-digit codes at a
     7    time, be locked out for 30 seconds, and then start
     8    over with five four-digit pass codes.
     9           And finally, after eight days,
    10    Investigator Leitzen gets into the phone.  Inside the
    11    phone, he finds texts between Adam and Lo about
    12    drugs, about Adam getting drugs for himself and about
    13    Adam getting drugs from Lo to sell to other people.
    14           The police continue their investigation of
    15    Lo.  In June 2017, Investigator Leitzen sits down
    16    with Emily Nelson.  Emily had bought heroin
    17    frequently from Lo, and she also knew of a partner
    18    that he had worked with.
    19           And Emily was the one who had put Adam and
    20    Lo in touch by giving Lo Adam's number.  And after
    21    Adam died, Lo felt guilty.
    22           In spite of everything, Defendant continued
    23    to sell drugs.  A few months later, on August 23rd,
    24    2017, Shannon Scholtes buys crack from Defendant for
    25    the police.

1       Before she worked for the police, Shannon
2  used to buy crack from Defendant's roommate.  But
3  sometimes she would call the roommate and he wouldn't
4  be home, and Defendant would bring the drugs.  Soon
5  she began to call Defendant.
6       On August 23rd, 2017, Defendant met with
7  Defendant [sic] to buy the crack for the police.  The
8  defendant followed -- The police followed her and
9  they recorded the buy.
10       Defendant got into her car and he pulled out
11  three bags, one of crack and two of what Shannon
12  believed to be heroin.  He sold her the crack for $50
13  that the police had given her.  And she left.
14       After Shannon left, the defendant didn't go
15  very far.  And the police wondered if he might be
16  waiting for someone.  So they waited too.  And they
17  didn't have to wait long.  After a while, someone
18  comes up to Defendant's car, Eric Steve, who the
19  police knew as a heroin user.  Eric had previously
20  overdosed on heroin -- Or Eric had overdosed on
21  heroin on six occasions.
22       The police watched Eric get into Defendant's
23  car and immediately get back out.  At that point,
24  some of the officers left and went to Eric's house to
25  wait for him.

1          And when Eric comes home, the police search

2     him.  In his pockets they find two Baggies, one

3     almost empty and one full of heroin.  They also find

4     a spoon and a needle.  And Eric admits that he used

5     $180, nine $20 bills, to buy heroin.

6          The other officers followed the defendant.

7     They pulled him over, and they searched his car.  In

8     his pocket they find two of the $20 bills that they

9     had given Shannon Scholtes to buy the crack.  And

10    they also find nine $20 bills, $180, in the car.

11         Members of the jury, after you've heard all

12    the evidence, you're going to be asked to answer

13    several questions.  One, did the defendant knowingly

14    conspire or agree with at least one other person to

15    distribute heroin or crack?  Did the defendant

16    distribute heroin to Adam Birch on February 1st,

17    2017, to John Walgren on February 2nd, 2017, and to

18    Eric Steve on August 23rd, 2017?  And did the

19    defendant distribute crack to Shannon Scholtes on

20    August 23rd, 2017?

21         We ask you to listen and carefully consider

22    the evidence in this case.  And at the end of the

23    trial, my cocounsel will come back, and he will ask

24    you to return a verdict that the evidence supports

25    and that justice demands, and that's guilty on all

```
 1    counts.  Thank you.
 2              THE COURT:  Thank you, Ms. Lundquist.
 3              Mr. Goldensoph, do you wish to present an
 4    opening statement?
 5              MR. GOLDENSOPH:  Yes, Your Honor.
 6              THE COURT:  You may proceed.
 7              MR. GOLDENSOPH:  May it please the Court.
 8    Counsel.  Michael.  Ladies and gentlemen of the jury,
 9    I think for clarity, the best way for me to do my
10    opening statement is by the counts, go count by
11    count.
12              And I'm actually going to start up with
13    Count 3.  Count 3 alleges that Michael sold heroin to
14    John Walgren on February 2nd, 2017.  Ladies and
15    gentlemen, Mr. Stevenson is going to admit to that
16    count.
17              Count 4 alleges that on August 23rd, 2017,
18    Michael sold crack to Shannon Scholtes.  Michael will
19    admit to that count.
20              Count 5 alleges that on August 23rd, 2017,
21    Michael sold heroin to Eric Steve.  Michael will
22    admit to that count.
23              Ultimately the fighting issues are going to
24    be Counts 1 and Count 2.  Now, Count 1 alleges that
25    between January of 2017 and, I believe, September of
```

1    2017, Michael was conspiring with others to sell

2    either heroin and/or crack cocaine.

3           Now, Michael will admit that he was selling

4    heroin and crack cocaine during that period of time,

5    but he was not working with anyone.

6           We believe the evidence -- any evidence

7    that's presented with regards to who he may have been

8    working with comes from very unreliable sources,

9    namely John Walgren and Emily Nelson.  And we believe

10   that their credibility will be found lacking by

11   yourselves.

12          Count 2 alleges that on or about

13   February 1st, 2017, Michael sold heroin to Adam

14   Birch.  We believe that the evidence will not support

15   this charge.  Now, there will be evidence and, in

16   fact, Michael will admit to selling heroin in the

17   past to Michael [sic] Birch.

18          But what you will see during the course of

19   this trial is that there is a clear pattern, through

20   text messages and phone calls, as to just what is

21   required to fully complete a drug transaction.

22          You'll see that.  You will see everything

23   that goes into that.  And you will see that on

24   February 1st, 2017, that wasn't there.  The full

25   transaction did not occur.  You will see that.

1          You will see another thing.  You will see

2     packaging.  What do I mean by that?  Packaging is the

3     types of packaging that drugs are contained in.  And

4     for the purposes of this case, there are going to be

5     two main types of packaging.

6          There's a torn corners of Baggies, so

7     sandwich bag.  Drug dealers will put drugs -- will

8     tear up the corner of a Baggie, sandwich Baggie, tie

9     it up, and keep the drugs in there.  That's one way

10    that drug dealers deliver drugs -- or package drugs.

11         Another type of packaging is something

12    called a gem Baggie.  And it's just like a Ziploc

13    sandwich bag, only that it's really small.  And you

14    will see there are representatives of both those

15    types of packaging in this trial.

16         And you will see that the packaging that

17    contained the heroin that Adam Birch used on

18    February 2nd, 2017, is a gem Baggie, but you'll see

19    that in the three other drug transactions involved in

20    this case -- the February 2nd drug transaction with

21    Walgren and the August 23rd drug transaction with

22    Scholtes and the August 23rd drug transaction with

23    Mr. Steve -- those all involved torn Baggies with the

24    torn corners of a sandwich bag.

25         You'll notice -- You will hear about a

difference in -- so the makeup of the heroin that's

involved with this case.  So there are three heroin

tests that would be important in this case:  The

heroin that was found during the search of

Mr. Birch's home after his death.  There was heroin

that was purchased by Mr. Walgren on February 2nd.

And there was the heroin that was purchased by

Mr. Steve on August 23rd.

What you will notice, ladies and gentlemen,

is that the heroin that Mr. Birch had on

February 2nd, it has another substance in it called

fentanyl.

And fentanyl, you will learn, is a very

potent opiate, much more powerful than heroin.  The

other two heroin Baggies, one with Walgren and the

one with Mr. Steve, does not have fentanyl in it.

You will also learn that there was more than

one drug dealer in Dubuque at that time.  And you'll

learn that heroin addicts need heroin daily.

Otherwise, they suffer symptoms that actually make

them physically ill.  And so they have to buy daily.

And so you'll learn that if they can't get

it from one place, they'll have to go somewhere else.

And you'll see that Mr. Birch clearly wasn't buying

daily from Mr. Stevenson, but -- by implying he was

1    buying from others.

2           Ladies and gentlemen, at the end of the

3    case, I'm going to come back up here, and I'm going

4    to -- I believe you will find that the evidence will

5    not have proven Michael Stevenson guilty beyond a

6    reasonable doubt to Counts 1 or 2.  And I will ask

7    you, at the end of this case, to return verdicts of

8    not guilty to those counts.  Thank you.

9           THE COURT:  Thank you, Mr. Goldensoph.

10           Ladies and gentlemen, that completes the

11    opening statements by the parties.  It's now time for

12    the evidence to be presented.  And so the Government

13    may call its first witness.

14           MR. LAMMERS:  Thank you.  I need to check

15    the hall, if I may, Your Honor.

16           THE COURT:  You may.

17           MR. LAMMERS:  I believe I have a witness who

18    is en route, but I'm prepared to call another witness

19    at this time.

20           THE COURT:  All right.

21           MR. LAMMERS:  If we could potentially,

22    Your Honor, take the other witness out of order when

23    she gets out here.  Or stop this witness's testimony

24    and take the other witness when she gets here.

25           THE COURT:  Mr. Goldensoph, do you have any

1    objection to that?

2            MR. GOLDENSOPH:  No.

3            THE COURT:  Very good.

4            MR. LAMMERS:  Thank you, Your Honor.  I'm

5    prepared.

6            Call Chad Leitzen.

7                    CHAD LEITZEN,

8    being produced, sworn as hereinafter certified, was

9    examined and testified as follows:

10            THE COURT:  Thank you.  Please have a seat.

11   And when you are comfortable, please state your name

12   and spell your name for the court reporter.

13            THE WITNESS:  Chad Leitzen.  C-H-A-D

14   L-E-I-T-Z-E-N.

15            THE COURT:  Thank you.

16            You may proceed.

17            MR. LAMMERS:  Thank you, Your Honor.

18                    EXAMINATION

19   BY MR. LAMMERS:

20   Q.      Officer Leitzen, where are you employed?

21   A.      I am a police officer with the City of

22   Dubuque.

23   Q.      And how long have you been employed as a

24   police officer with the City of Dubuque?

25   A.      16 and a half years.

```
1    Q.       Where are you currently assigned?

2    A.       I'm assigned as an investigator with the

3    Dubuque drug task force.

4    Q.       How long have you been so assigned?

5    A.       Almost six years.

6    Q.       Would you please describe for the jury, if

7    you would, your educational background and training.

8    A.       Yes.  I have a bachelor's degree in

9    education from Loras College.  I got hired with the

10   Dubuque Police Department in September of 2002.  I

11   then attended the Iowa Law Enforcement Academy from

12   September until December of 2002.

13            Once graduating the academy, I spent five

14   months completing the field training program with the

15   City of Dubuque Police Department.

16            I then spent the -- approximately the next

17   10 years on patrol.  And during that time, I was sent

18   to numerous courses -- numerous training courses,

19   most of them relating to drug investigations, such as

20   a basic narcotics investigator course by the Drug

21   Enforcement Administration, roadside interviews,

22   interrogation techniques, highway drug interdiction

23   for patrol, and courses of that nature.

24            I then was assigned, in June of 2013, to the

25   Dubuque drug task force.  And since then, I have
```

received hundreds of hours of training in the area of
narcotics, to include dismantling clandestine meth
labs, marijuana investigations, heroin overdose
investigations, handling confidential informants, and
drug interdiction courses, as well as numerous other
drug-related courses over the course of the past
several years.

I was also a member of the Dubuque tactical
entry team for 10 and a half years.

Q.      Would it be fair to say, in the course of
your experience with the task force, that you've been
involved in the investigation of heroin cases?

A.      Yes.

Q.      How many do you think you've investigated?

A.      Dozens and dozens, if not more than a
hundred.

Q.      Is Dubuque, I guess, kind of a hot spot for
heroin in the state of Iowa at this point?

A.      Yes, it is.

Q.      And are you familiar with the way that
heroin is bought and sold in and around the Dubuque
area?

A.      Yes.

Q.      Are you aware of the way it is packaged?

A.      Yes, I am.

```
 1    Q.       Are you aware of the prices that are being
 2    charged typically in Dubuque for heroin?
 3    A.       Yes.
 4    Q.       I guess, before we move on from that, what
 5    kind of amounts do typical heroin users generally
 6    purchase at a time in and around the Dubuque area?
 7    A.       Obviously, it depends on the amount of money
 8    that they can come up with, but the typical amount to
 9    buy would be either a 40 to $50 amount, which is
10    approximately two-tenths of a gram, or $80 for a half
11    gram or $160 for a full gram.
12             Some people, depending on their relationship
13    with the dealer, can get a slightly better deal on
14    those.  But the vast majority of the time, those are
15    the -- those are the dollar amounts for those -- that
16    quantity of drugs.  And it doesn't hardly vary at
17    all.
18    Q.       Do you sometimes see those amounts going up?
19    A.       Yes.  Yes.  Again, depending on the drug
20    user's relationship with the drug dealer and also
21    oftentimes the amount that the drug dealer -- the
22    amount of drugs that the drug dealer has left.
23    Sometimes they will charge more, knowing that the
24    desperate drug dealer [sic] will pay it.  I've heard
25    as much as $250 per gram, is the most that I've
```

1    heard.

2    Q.       Okay.  In general, in the course of your

3    experience with heroin trafficking in the Dubuque

4    area, is a gram of heroin consistent with

5    redistribution or more consistent with personal use?

6    A.       A gram, the vast majority of the time, would

7    be consistent with getting that amount for

8    redistribution.

9    Q.       Getting that amount to share or sell, is

10    that a fair characterization?

11    A.       That's correct.

12    Q.       And are you familiar with the way heroin is

13    ingested?

14    A.       Yes, I am.

15    Q.       Would you please describe for the jury the

16    way that heroin is generally ingested.

17    A.       The vast majority of the time, probably

18    99 percent of the time, heroin's injected with a

19    syringe.

20    Q.       When you say "the vast majority of the

21    time," are there other ways to ingest heroin that you

22    know of or have seen?

23    A.       There are.  The heroin that is used --

24    consumed in Dubuque is the type of heroin that is

25    also sometimes snorted.

1          Black tar heroin can be smoked; however, we

2     don't deal with black tar heroin in Dubuque.  And

3     I've never personally seen it.  So the type of heroin

4     that we get in Dubuque is sometimes snorted, but most

5     often injected.

6     Q.       What's it look like, the heroin we're

7     talking about in Dubuque?

8     A.       It's typically a gray or tan colored or

9     off-white colored rock or a hard clump that can be

10    broken down into a powder form.  It can also come in

11    a pure white form.  And it would just typically be

12    referred to as China white.  And with our experience

13    in Dubuque, that stuff typically has fentanyl laced

14    in it.

15    Q.       That was the next question I had for you,

16    then, Officer.  Is it common to see fentanyl show up

17    in heroin?

18    A.       Yes, it is.

19    Q.       Have you seen that routinely in Dubuque?

20    A.       Yes.

21    Q.       Have you seen it show up in heroin from --

22    Well, let me rephrase.

23             In the course of your training and

24    experience, have you had an opportunity to buy -- to

25    control buys from heroin dealers?

*Sarah J. Dittmer, CSR, RPR*
*1(888)388-2723*

```
 1    A.        Yes.

 2    Q.        Have you had an opportunity to buy heroin

 3    from heroin dealers that later learn -- you learned

 4    had fentanyl?

 5    A.        Yes.

 6    Q.        Have you had an opportunity to buy heroin

 7    from heroin dealers, the same dealers that had

 8    fentanyl, that only had heroin?

 9    A.        Yes.

10    Q.        Is that a common occurrence?

11    A.        Yes.

12    Q.        I'm going to move on off of the heroin now

13    for a minute and do some questions about crack

14    cocaine as well.  Based, again, on your training and

15    experience as an investigator with the Dubuque Police

16    Department, are you familiar with crack cocaine?

17    A.        Yes, I am.

18    Q.        Are you familiar with the way that it's

19    bought and sold in and around Dubuque?

20    A.        Yes.

21    Q.        Are you familiar with the prices that are

22    generally charged?

23    A.        Yes, I am.

24    Q.        Are you familiar with the quantities that

25    are generally purchased by end users?
```

1    A.        Yes.

2    Q.        And are you familiar with how it is

3    ingested?

4    A.        I am.

5    Q.        Would you describe for the jury, please, how

6    crack cocaine is generally ingested?

7    A.        Crack cocaine is generally smoked through a

8    metal pipe with a Brillo Pad stuffed into the end of

9    it in order to -- The Brillo Pad is stuffed into the

10   end of the metal pipe.

11          And then the crack cocaine is put on top of

12   that and lit and then smoked through the Brillo Pad.

13   So the chunk stays on top of the Brillo Pad, but the

14   smoke comes through the metal pipe to be ingested.

15   Q.        So it sort of acts as a filter?

16   A.        Correct.

17   Q.        And are you familiar, again, with another

18   type of drug, with methamphetamine?

19   A.        Yes.

20   Q.        Same question:  Do you know how that's

21   bought, sold, consumed?

22   A.        Yes, I do.

23   Q.        How is that ingested?

24   A.        Methamphetamine is very commonly smoked

25   through a glass pipe that's kind of a ball on the end

1    of the pipe with a hole in it.  Methamphetamine's

2    also injected.  It can also be snorted.  It can also

3    be eaten.

4            So I would say the majority of the time,

5    it's smoked.  But there's a fair number of IV users

6    for methamphetamine as well.

7    Q.      You talked, I think, just briefly -- Or you

8    mentioned briefly buys that you've done.  Do you know

9    what a controlled buy is?

10   A.      I do.

11   Q.      Can you describe for the jury what a

12   controlled buy is.

13   A.      A controlled buy is a -- it's a purchase of

14   drugs from a target which is controlled by law

15   enforcement.

16           And when I say "controlled," we use numerous

17   mechanisms to be sure that the person -- the person

18   that we're using to buy the drugs, typically a

19   confidential informant who is typically a drug user,

20   we do numerous things in order to maintain the

21   integrity of the investigation.

22           We search that person fully and their

23   vehicle, if they have one, for any and all forms of

24   contraband.  We make sure that there are negative

25   results with that to make sure that they are not

1    bringing drugs to us and saying somebody else gave it

2    to them because we don't want to falsely implicate

3    somebody in that manner.

4        We also place recorded phone calls to the

5    target.  And we use some type of a body wire or a

6    recording device to record the duration during the

7    transaction and conversation that comes up between

8    the two so we can hear what's going on.

9        Not only is that recorded for future

10    purposes, it's also transmitted realtime to

11    surveillance units in the area so we know what's

12    happening at the time that it's happening.

13        Once the person has been searched, they do

14    not leave our sight again.  We keep them -- We keep

15    as much of a visual surveillance as possible during

16    the controlled buy to make sure that they are

17    constantly under our control.

18        And if there is any time when they're out of

19    our sight, we still use the body wire transmitter to

20    conduct audio surveillance to make sure they're not

21    meeting with somebody else or doing something that

22    would otherwise negate the controlled buy.

23        We also give the person serialized --

24    pre-serialized money.  So we'll take the money and

25    document the serial number on that money.  And we'll

1       give that person that money.

2               We'll take all of their money from them so

3       they don't have any of their own to be able to buy

4       drugs on their own at the same time or to mix --

5       inadvertently or on purpose mix their money with our

6       money to get more drugs, which they can then take or

7       anything like that.

8               So we take that out of the equation.  We

9       take all of their money away to make sure -- we make

10      sure they only have our money.  That way, when the

11      person buys drugs from the target, then they bring --

12      We follow them to some location.  And we do all of

13      the -- essentially all of the reverse procedures.

14              We take the drugs from them.  We find out

15      from them who it is that they bought the drugs from,

16      how much money they spent on those drugs.  Sometimes

17      the dealer will give them a good deal, in which case

18      maybe they didn't spend 20 of the dollars, so they'll

19      give that money back to us.

20              So we take the drugs and if any proceeds, if

21      any, are left over back from them.  And we again

22      strip-search the confidential informant to make sure

23      that they didn't hide anything or keep anything from

24      us.  We search their vehicle again.

25              And then we conduct what's called a debrief,

1    basically having a conversa- -- a recorded

2    conversation with the confidential informant so they

3    can walk us through exactly what happened, usually --

4    with the nuts and bolts of it, I guess, getting into

5    when they actually met with the target, since we're

6    not able to be right in the car with them or in the

7    house with them or whatever the case might be.

8           So they tell us everything that happened,

9    whether they saw more drugs, whether there were more

10   people in the car, whatever the case might be, if

11   there were more people inside the house and things

12   like that.  So just anything that we think might be

13   important to be able to further the investigation or

14   tighten up the investigation that we have.

15          So we put as many controls in place as

16   possible so we know what happened and that the drugs

17   that we bought came from the person that we intended

18   to buy them from.

19   Q.      So if I understand correctly, the purpose of

20   the controlled buy is to control as many of the

21   variables as you can?

22   A.      That's correct.

23   Q.      Why don't you just send someone -- give

24   somebody some money and send them out and say, "Go

25   buy from a drug dealer and come back and give us the

1    drugs"?

2    A.        Well, obviously, there would be a lot of

3    problems with that.  The main one being that drug

4    users are not the most trustworthy people in the

5    world.

6    Q.        Well, let me stop you there.  I guess, then,

7    that leads me to another question.  Who were you

8    using to do these controlled buys?

9    A.        People that use drugs.

10   Q.        Why?

11   A.        Because they're the ones who have the

12   connection with the drug dealers.  So if you don't

13   have a connection with the drug dealer, the drug

14   dealer is not going to trust you to buy drugs.

15             So I would love to use doctors and lawyers

16   to go buy drugs for us because they're better on the

17   stand, but they're just not people that you're

18   typically able to send to a drug dealer.

19             So the drug dealers deal with drug users

20   and, therefore, we deal with drug users in order to

21   get to the drug dealer.

22   Q.        All right.  So when you're attempting to

23   control the variables, do you -- Why do these people

24   do this?  Are they compensated in some way or

25   another?

1    A.        Typically, yes.

2    Q.        What kind of compensation is generally

3    provided to people who are doing controlled buys for

4    law enforcement?

5    A.        Generally there's one of two types of

6    compensation.  Either the person has gotten in some

7    type of legal trouble, and they're working with law

8    enforcement in hopes of some type of leniency on the

9    charge that they've been charged with or will

10   possibly be charged with in the future, or the other

11   type is what we call a mercenary that just comes and

12   works in exchange for money.

13   Q.        And you have both of those types?

14   A.        Yes.

15   Q.        What happens if you find out that a person

16   that you're using to do controlled buys is buying

17   drugs outside of your control for their own benefit?

18   A.        Typically what happens is we'll obviously

19   bring them to the office and reprimand them about

20   doing that.  We understand that drug users are drug

21   users.

22             I don't have them under my control all of

23   the time.  And even though they sign an agreement

24   with the drug task force agreeing not to use drugs

25   while working with the drug task force, drug users

1    use drugs, and we understand that.

2            They get reprimanded for it.  Sometimes we

3    will not use them for a period of time.  Sometimes we

4    will stop working with them altogether.

5            Sometimes we will maybe not work with them

6    for a period of time or if, for whatever reason, they

7    were working for money, maybe they would be working

8    essentially for free in exchange for the mistake that

9    they had made by buying drugs on their own.  There's

10   a variety of different --

11   Q.      Let me stop you.  Hold on a second.  I want

12   to make sure I understand that.  So you're saying if

13   you catch them using drugs, you might have them do

14   some buys where you don't pay them in order to sort

15   of have them make up for the fact that they were

16   using on the side?

17   A.      That's correct.  That's been done.

18   Q.      Okay.  Go ahead.  I'm sorry.

19           Do you need another question?

20   A.      Yes.

21   Q.      Okay.  So on occasion, do you have these

22   folks, these drug addicts, try and get around the

23   controls that you put in place to do a controlled

24   buy?

25   A.      Yes, we do.

1    Q.        What happens when you find somebody who is

2    evading their -- the controls that you've attempted

3    to put in place?

4    A.        If they evade the control while they're

5    actually under our control doing a controlled buy,

6    they first immediately get fired.  They will not work

7    with us anymore.  And they get charged with

8    essentially stealing the drugs that they're supposed

9    to be buying for law enforcement.

10   Q.        Okay.  In the course of your experience as a

11   task force officer, as a drug officer, have you been

12   involved in proffer interviews of defendants who have

13   either been charged or believe they're going to be

14   charged with some type of drug trafficking offense?

15   A.        Yes.

16   Q.        And what is a proffer interview?

17   A.        A proffer interview is an interview that law

18   enforcement conducts with a defendant.  And typically

19   the defendant has some sort of assurances in that

20   interview that as long as they tell the truth and the

21   full truth and do not lie in any way, that the

22   information that comes from that interview will not

23   be used against them in future court proceedings as

24   stand-alone information that isn't corroborated by

25   something else.

1    Q.        So how do you check to see that somebody is

2    not just coming in and, you know, hoping to get a

3    benefit and making up a whole bunch of stories when

4    they're talking?  What kind of things would you do to

5    corroborate their information?

6    A.        Anything that a defendant tells us has to be

7    corroborated in some way.  So we'll use the

8    information -- Just depends on the information that

9    they give us.

10            But we always cross-reference it with

11   information that we already know from other

12   cooperators or other people who call in tips to law

13   enforcement.  So information we've learned from some

14   other source, we check this against that.

15            We also take the information that they give

16   and will cross-reference it with phone calls, text

17   messages.  Any type of -- any type of information.

18   We'll use traffic cameras in the -- in Dubuque or

19   maybe cameras inside of a business, if they say

20   something happened at a business.

21            So any time that they give us an event that

22   occurred and where it occurred and when it occurred,

23   we will check that to make sure that what they're

24   telling us is actually true so we can corroborate

25   their information in some way.

1   Q.      Do you corroborate their information by
2   controlled buys on occasion?
3   A.      Yes.
4   Q.      So, in other words, if somebody tells you
5   that Bill Smith is selling drugs, do you attempt to
6   buy drugs from Bill Smith?
7   A.      Yes.
8   Q.      Now, in -- This particular case is, as you
9   know, a case where Michael Stevenson has been charged
10  with a number of charges.  Do you know him?
11  A.      Yes, I do.
12  Q.      Is he here in the courtroom today?
13  A.      Yes, he is.
14  Q.      Would you please point him out.
15  A.      He is at the defendant's table in the white
16  button-down shirt and the blue tie.
17  Q.      Approximately when did he come to your
18  attention?
19  A.      Late 2016, when I was working with another
20  confidential informant, Emily Nelson.
21  Q.      And did you end up receiving an
22  identification of him?
23  A.      Yes.
24  Q.      Would you describe that for the jury.
25  A.      After learning that the subject known as Lo

was a new heroin dealer in town, Emily Nelson had
a -- an Illinois ID card with -- with Mr. Stevenson's
information on it.

Q.      And did you receive that?

A.      She asked me if I'd like her to send it -- a
picture of it to me.  And I stated yes.  So she did.

Q.      Did you see it?

A.      Yes, I did.

Q.      Was it an identification -- Illinois
identification card of Mr. Nelson [sic]?

A.      Mr. Stevenson.

Q.      I'm sorry.  Excuse me.  Mr. Stevenson?

A.      Yes, it was.

Q.      Okay.  Did you know him then -- At that
point did you know him or did you learn of him by any
nicknames?

A.      Yes, I did.

Q.      And what were they?

A.      Lo at the time was the only nickname that I
knew.  I later learned that he also goes by Mike or
Mike-Mike.

Q.      And at any point, did you do controlled buys
or participate in -- not you personally, but running
CIs in to Mr. Stevenson to do controlled buys?

A.      Yes.

1    Q.         And were those recorded?

2    A.         Yes, they were.

3    Q.         Were you able to recognize his voice on

4    those recordings?

5    A.         Yes.

6    Q.         Now, I'm going to jump ahead here to

7    February 2nd of 2017.  Were you working on that

8    particular day?

9    A.         I was.

10   Q.         And did you have an opportunity to be

11   dispatched -- or called in to Heidi Woodyard's

12   residence?

13   A.         Yes.

14   Q.         Why don't you describe for the jury what

15   happened.

16   A.         It was actually approximately a half hour

17   before my start time.  I was just preparing to go in

18   to work.  It was shortly after 8:00 a.m. that

19   Sergeant Gary Pape with the drug task force sent out

20   a message to all the members of the drug task force

21   stating that road deputies with the Dubuque County

22   Sheriff's Office were on scene at the Super 20

23   Trailer Park with a suspected heroin overdose.

24   Q.         Where is that?

25   A.         That is on the far west end of Dubuque

1    between the city of Dubuque and the city of -- the

2    town of Peosta.

3    Q.       Is that in the Northern District of Iowa?

4    A.       Yes, it is.

5    Q.       So what did you do?

6    A.       I began moving towards the trailer park in

7    my vehicle.  And shortly after starting to head that

8    way, I received information that Adam Birch was being

9    transported by ambulance to Mercy Hospital.

10           There were already other investigators who

11   were closer to the residence than I was, so they

12   continued on to the residence.  And I advised that I

13   would divert and go to Mercy Hospital to meet with

14   Adam Birch.

15   Q.       And did you?

16   A.       Yes, I did.

17   Q.       And what was Mr. Birch's condition when you

18   got to the hospital?

19   A.       When I got there, they were just bringing

20   him in on a stretcher.  And he was on an AutoPulse,

21   which is a backboard that gives automatic chest

22   compressions.

23           And they brought him directly into a room.

24   And several nurses, along with the doctor, began

25   working on him, so I stepped out of the room to let

1    them continue their lifesaving measures.

2    Q.    Did they work?

3    A.    They did not.

4    Q.    At that point, after you found out that Adam

5    Birch was deceased, what did you do next?

6    A.    I requested from the nurse that I be able to

7    collect Adam Birch's physical evidence, such as

8    clothing and items that were -- that had belonged to

9    Mr. Birch in the hospital room.  And I was allowed to

10    do so.

11    Q.    And do you know whether or not Mr. Birch's

12    blood was collected as well?  Let me ask a different

13    question.

14    Do you know whether or not a toxicology

15    report was done on his -- on Mr. Birch's bodily

16    fluids?

17    A.    Yes, there were.

18    Q.    So after you collect the items at the

19    hospital, what do you do next?

20    A.    I should back up.  Before I collected the

21    items, Adam Birch's father had showed up.  And he

22    asked if he could have a short period of time to go

23    in to say his good-byes.  So he was allowed to do so.

24    He stepped in.  I stepped in with him.  He

25    was in there for approximately 15 seconds and then

1    came back out.  And then that's when I had collected

2    those items and, along with another investigator with

3    the Dubuque County Sheriff's Office, assisted in

4    taking photos of the decedent.

5    Q.        Okay.  At some point did you go to the

6    residence?

7    A.        I did not.

8    Q.        What's next in your investigation?

9    A.        I conducted an interview at the hospital in

10   a meeting room with Mr. Birch's -- with Adam Birch's

11   father.

12             And shortly after I started -- or shortly

13   after I began that interview, Adam Birch's sister

14   with whom he lived, Heidi Woodyard, she arrived at

15   the hospital.

16             And the father really didn't have much

17   communication with his son leading up to the day and

18   didn't have much information that was helpful to the

19   investigation, so I switched and interviewed

20   Ms. Woodyard.

21   Q.        Okay.  And at some point did you seize any

22   telephones or cellular phones that you believed to

23   belong to -- belong to or be used by Adam Birch?

24   A.        Yes.

25   Q.        How did that come about?

1    A.      The officers that were on scene out at the

2    residence, at the trailer, they searched the trailer

3    and found the cell phones in the bedroom where

4    Mr. Birch was located.

5    Q.      And what cell phones were those?

6    A.      There was a ZTE brand cell phone and an

7    Alcatel One Touch brand cell phone.

8    Q.      Were you able to open either of those cell

9    phones at that point?

10    A.      Not immediately. But later on in the early

11    afternoon of February 2nd, I was able to get into the

12    ZTE phone.

13    Q.      Later that same day?

14    A.      Correct.

15    Q.      Okay. And how did you get into that phone?

16    A.      We had gone to Investigator Williams. And I

17    had gone to speak with Mr. Birch's wife and deliver

18    the death notification. And at that time we asked

19    her if she knew what the pass codes to his phone

20    were. She gave us a few different possibilities, but

21    she didn't know for sure.

22         So then once we left from meeting with her,

23    I immediately input those codes into both phones,

24    trying to unlock them, and one of them did unlock the

25    ZTE phone.

1  Q.      And when you unlocked the ZTE phone, were

2  you able to see the contacts in that phone?

3  A.      Yes.

4  Q.      Did you recognize any of the contacts in

5  that phone?

6  A.      Yes.

7  Q.      What contact did you recognize?

8  A.      There was one contact listed as Lo with a

9  Chicago area phone number.  And I looked at the rest

10  of them.  There were very few, maybe -- I think maybe

11  11 contacts total.  So there were very few.

12       And I did not recognize -- All the rest of

13  them were just first names or letters of names.  And

14  I did not recognize any of them at that time except

15  for Lo.

16  Q.      Did that appear to be the phone that was

17  Mr. Birch's main phone?

18  A.      No.

19  Q.      Why not?

20  A.      There was -- There were several gaps in time

21  with the text messages and call logs and things of

22  that nature.  That, typically, people use their phone

23  on a daily basis.  So it did not appear that that was

24  probably the one that he used most often.

25  Q.      Okay.  Now, at some point were you involved

```
1    in the recovery of drugs from -- Or did you, I guess,
2    see the drugs that were recovered from Heidi
3    Woodyard's house?
4    A.       Yes.
5    Q.       And where in the house were they recovered
6    from, if you know?
7    A.       They were recovered from the bedroom where
8    Mr. Birch was found deceased.
9    Q.       From Adam Birch's room?
10   A.       That's correct.
11   Q.       Okay.  And do you know what was recovered?
12   A.       I do.
13   Q.       Would you describe that for the jury,
14   please.
15   A.       There was a digital scale.  There was drug
16   paraphernalia to include syringes.  There was
17   marijuana.  There were small gem Baggies containing
18   methamphetamine.  There were several gem Baggies that
19   had residue inside of them.
20            And there was a pink gem Baggie that had
21   heroin in it, which tested -- field-tested positive
22   for heroin, later determined to be heroin and
23   fentanyl.
24            MR. LAMMERS:  Your Honor, may I approach?
25            THE COURT:  You may.
```

         1          MR. LAMMERS:  Have him look at the exhibit
         2     that was found at the trailer.
         3          MR. GOLDENSOPH:  Okay.
         4     BY MR. LAMMERS:
         5     Q.        Officer, I've handed you a brown paper bag.
         6     A.        Yes.
         7     Q.        There's no markings on the outside of the
         8     bag, is there?
         9     A.        No.
        10     Q.        What is that bag?
        11     A.        That is a bag containing evidence from the
        12     death scene, as well as evidence from controlled
        13     purchases of drugs.
        14     Q.        It's the bag that you used to carry the
        15     evidence here; is that fair to say?
        16     A.        Yes.  The evidence bag.  Yes.  I'm sorry.
        17     Q.        Okay.  I'd like you to please open that bag
        18     and, if you would, take out Government's Exhibit 1A.
        19     A.        Okay.
        20     Q.        You can open it, please.  Can you tell us
        21     what Government 1A is.
        22     A.        Government's Exhibit 1A is a small rock
        23     of -- it's a pink or red plastic gem Baggie
        24     containing a small rock of heroin and fentanyl.
        25               And then Government's Exhibit A, inside of

1    the glass jar, is a syringe with a bent tip which was

2    found in Mr. Birch's arm when he was located by his

3    sister.

4    Q.       Okay.  Now, was there other drugs that were

5    found in Adam Birch's room?

6    A.       Yes.

7    Q.       What else?

8    A.       There was marijuana located and there was

9    methamphetamine located.

10   Q.       Those are not part of Exhibit 1A, but were

11   those sent to the lab as well?

12   A.       The marijuana was not sent to the lab.  The

13   methamphetamine was.

14   Q.       Was it methamphetamine?

15   A.       Yes.

16   Q.       Okay.  So I want to focus a little bit now

17   for a second or two on the -- what you've described

18   as the pinkish gem Baggie.  And you said that that

19   contains heroin; is that correct?

20   A.       Correct.

21   Q.       In the course of your experience as a police

22   officer investigating heroin trafficking, have you

23   ever seen heroin sold in one of those type of bags?

24   A.       Never.

25   Q.       Have you ever seen heroin stored in one of

1   those types of bags?

2   A.      Yes.

3   Q.      Can you describe the difference between the

4   two, please.

5   A.      The -- As explained earlier, I guess, the

6   lightweight foldable sandwich bags are typically used

7   to package drugs in the corners of the bags.  So

8   powder cocaine, crack cocaine, and heroin are in

9   Dubuque always sold in the corner Baggies or the

10  bindles, in the corner of the bag -- of the plastic

11  bag.  Methamphetamine is always sold in the gem bags.

12          Oh, it just does not vary at all.  So what

13  happens is that when they put the drugs in the corner

14  of the plastic bag, they'll spin it into a tight

15  knot -- or they'll spin it into a tight thing, and

16  then they'll tie it into a knot.

17  Q.      Hold on a second.  I've got to stop you here

18  because you're doing a lot of gestures with your

19  hands.

20  A.      Okay.

21  Q.      And those don't come across very well on a

22  printed record.

23  A.      Okay.

24  Q.      So it appears to me that you were kind of

25  holding your hands a little bit apart and then doing

1    a twisting gesture to describe the spinning of the

2    bag.  Is that an accurate characterization?

3    A.       Yes.

4    Q.       Okay.

5    A.       Yeah.  Sorry.

6    Q.       Nothing against the hand gestures.  I just

7    want to make sure we got it clear on the record.

8    A.       Okay.  So they'll put the drugs in the

9    corner of the bag and spin it tight and then tie that

10   corner bag into a really tight knot.  And then

11   they'll cut that off of the plastic bag.  So what you

12   would see left over would be the plastic bag missing

13   the corner.

14          So then that bag is used to sell to the end

15   user.  And when the end user opens that bag of drugs

16   up, if they do not use all of it, it is impossible to

17   retie that bag into that knot to keep them from

18   losing their extremely small amount of drugs that

19   they have left.

20          But that extremely small amount of drugs is

21   still very important to the drug user because they

22   are going to use that later on.  So a lot of times

23   they will take gem Baggies that they have laying

24   around the house -- and they typically have a lot of

25   them -- and they will store the drugs that they took

1   out of the corner Baggie into a Baggie that they have

2   laying around so they can reseal it so they don't

3   lose it.

4   Q.        For later use or for later distribution or

5   both?

6   A.        Typically for later use, but it could be for

7   both, yes.

8   Q.        So you have never, in the course of your

9   training and experience in -- at the Dubuque Task

10  Force, never purchased heroin out of -- from a gem

11  Baggie?

12  A.        Never.

13  Q.        So back, then, to Adam Birch's room and

14  residence.  What else did you recover?

15  A.        There was the syringe with the bent tip as

16  well as gem Baggies containing crystal

17  methamphetamine or ice, as it's referred to.

18  Q.        Okay.  Did you -- Was there another phone

19  recovered as well?

20  A.        I'm sorry.  Yes, there was.

21  Q.        And what phone was that; I'm sorry?

22  A.        That was the Alcatel One Touch.

23  Q.        Were you ever able to get into the Alcatel

24  One Touch phone?

25  A.        Yes.

1   Q.        Would you describe for the jury, if you

2   would, please, what that process consisted of.

3   A.        So the Alcatel One Touch is a phone that you

4   can input -- it's -- There's four digits for the pass

5   code.  And obviously zero through nine.  So there's a

6   possibility -- there's a maximum possibility of

7   10,000 different pass codes.

8            And using that information, you can input

9   four pass codes -- or four numbers into the pass code

10  and hit "okay."  And it will let you do that five

11  times with the improper pass codes.  And then it

12  locks you out for 30 seconds.

13           And then you can start over.  And the same

14  procedure.  And put five more pass codes in.  And it

15  will lock you out for another 30 seconds.  Unlike

16  newer phones that extend that lockout time or erase

17  the phone contents after 15 tries, this does not do

18  that.

19           So I had unlimited number of tries that I

20  could do, doing five at a time and then waiting 30

21  seconds and five at a time.

22           So after trying the codes that the wife had

23  given us that didn't work, I tried numerous codes

24  that are common for people to use, such as some

25  variation of their dates of birth or some variation

1    of their Social Security number or an address or an
2    old phone number.

3           Basically I tried probably a couple hundred
4    variations of things that I could think of.  And once
5    that did not work, I decided to start a systematic
6    approach and just start at 0000 and go 0001, 0002,
7    and so on.

8           And after 0004, I get locked out for 30
9    seconds and start back over at 0005.  And I just kept
10   on doing that day after day after day.  And after
11   eight days, on February 10th, I finally got to 9656,
12   which opened the phone.

13   Q.      How much time do you suppose you spent
14   getting into that phone?

15   A.      At least 50 hours, probably more.

16   Q.      Okay.  Once you got into that phone, were
17   you able to see the text messages that were restored
18   on that phone?

19   A.      Yes.

20   Q.      All right.  So to jump ahead a little bit,
21   we're back now to February 2nd after you've recovered
22   the information that you recovered from Adam Birch's
23   residence.

24           What's your next step in the investigation
25   on February 2nd?

1    A.       Obviously, after looking at the cell phone

2    that we were able to get into, the ZTE, and seeing

3    Lo's phone number in there, that immediately got me

4    thinking he's likely the heroin source for Mr. Birch.

5            And within a very short period of time,

6    probably within the hour, I had contact with a

7    confidential informant, John Walgren, who was working

8    with the police department.  And he had actually told

9    me a week prior to this incident --

10           MR. GOLDENSOPH:  Your Honor, I'm going to

11   object.  It sounds like there may be hearsay on the

12   way.

13           THE COURT:  Mr. Lammers, do you agree it's

14   hearsay or is there an exception to it?

15           MR. LAMMERS:  I don't believe it's for the

16   truth of the matter asserted.  I think it's going to

17   the course of the investigation.

18           THE COURT:  Overruled.

19           You may proceed.

20   A.       I had learned that a subject named Lo was a

21   heroin dealer of John Walgren's prior to this event.

22   So on February 2nd, once this all occurred -- and I

23   believe Lo was the likely suspect for the

24   distribution -- we kind of switched gears.  And I

25   asked Mr. Walgren if he was able to purchase heroin

```
 1    from Lo on that date.  And he said he was.

 2    BY MR. LAMMERS:

 3    Q.       So I want to go back just very briefly.

 4    When you saw the contact on the ZTE phone that said

 5    "Lo," was that associated with a number?

 6    A.       Yes, it was.

 7    Q.       And when you, then, made contact with

 8    Mr. Walgren about purchasing heroin from the

 9    defendant, did he provide a number that he could

10    contact the defendant at?

11    A.       Yes.

12    Q.       Were they the same number?

13    A.       Yes, they were.

14    Q.       At any point did you find out who that

15    number belonged to?

16    A.       Yes, I did.

17    Q.       Would you describe that for the jury,

18    please.

19    A.       I took the phone number, which was

20    (773)703-0872.  I submitted for subscriber -- I

21    submitted to the phone company a subpoena for

22    subscriber information as well as phone tolls and

23    received that information back from the phone company

24    showing that that phone number was assigned to a

25    Michael Stevenson.
```

1   Q.      All right.  So Mr. Walgren contacts you or

2   you get in touch with Mr. Walgren to try and arrange

3   a buy of heroin on February 2nd; is that right?

4   A.      That's correct.

5   Q.      So tell us -- Well, tell us what you did.

6   Describe the investigative steps.

7   A.      Mr. Walgren came to the drug task force

8   office.  And there were actually two targets that we

9   were after that night.  And Mr. Stevenson was target

10  number two.

11          So Mr. Walgren came to the office, and I

12  strip-searched him, and other investigators searched

13  his vehicle.

14  Q.      And I'm sorry.  One second.  I want to stop

15  you and I want to follow up on some of your -- I want

16  to take these in kind of some smaller chunks of

17  information, if I could.

18          When you say you strip-searched -- I think

19  you might have told the jury this already, but I want

20  to just double-check -- you mean all the way to the

21  skin?

22  A.      That's correct.

23  Q.      Why?

24  A.      To make sure that there's no place that I

25  missed where drugs could be concealed or a likely

```
1    spot for them to be concealed.
2    Q.       Do you check under their shirt?
3    A.       Yes.
4    Q.       You check in their underwear?
5    A.       Yes, I do.
6    Q.       You check in their shoes and socks?
7    A.       Yes.
8    Q.       All right.  So you strip-search Mr. Walgren
9    on February 2nd.  Is his car searched as well?
10   A.       Yes, it is.
11   Q.       Is this also a thorough search?
12   A.       Yes, it is.
13   Q.       Okay.  So what happens next?
14   A.       He was then provided with -- excuse me --
15   $160 in pre-serialized United States currency in
16   order to try to effect a one-gram heroin purchase
17   from the first target that we were after.
18   Q.       Did that happen?
19   A.       It did not.
20   Q.       Okay.  So what did you do after that?
21   A.       After that buy was called off, because it
22   was -- we could see it was not going to happen, I had
23   Mr. Walgren drive to a parking lot.  It was an indoor
24   parking lot.
25            And once at that location, I retrieved the
```

```
1    $160 back from Mr. Walgren.  I again strip-searched
2    his person in the parking lot while another
3    investigator searched the vehicle again.
4           Even though he had not left our sight for
5    any period of time during the first attempt, we still
6    redid all of the same steps that we had conducted
7    when he first came to the office, just to be able to
8    say that we absolutely know nothing -- that nothing
9    came from somewhere else.
10   Q.     So you're doing this in a parking lot?
11   A.     That's correct.
12   Q.     Literally strip-searched him in a parking
13   lot?
14   A.     Yeah.
15   Q.     Okay.  So what happens then?
16   A.     I gave him $80 back since we were going to
17   be trying to purchase a half gram of heroin from
18   Mr. Stevenson, the subject that Mr. Walgren knows as
19   Lo.
20          And the reason for the discrepancy in the
21   money is I typically ask the drug user, "What is
22   normal for you?  What do you normally get?"  Some
23   people, they get a gram from.  Some people, they get
24   a half gram from.  Some people, they get two-tenths
25   of a gram from.
```

1          He said it was normal for him to get a half

2     a gram from Lo.  So we were trying for a half a gram

3     for $80.  I gave him that money back.  And I did not

4     actually have my recording device that records -- the

5     earpiece that records a telephone call, both sides of

6     it.

7          So what I had Mr. Walgren do was use the

8     speakerphone function on his phone and put the phone

9     call on speaker.

10          I activated the body wire, so the recorder,

11     and watched as he dialed the phone number listed in

12     his phone as Lo with the (773) phone number I

13     mentioned earlier.

14          And the -- Michael Stevenson answered the

15     phone.  And the $80 heroin deal was set up.  And the

16     location for that deal was set up.

17     Q.     Was it the same location that he had been

18     buying heroin from in the past?

19     A.     Yes.

20     Q.     And you were able to recognize -- I guess

21     subsequently, upon review, you were able to recognize

22     the voice as that of Mr. Stevenson?

23     A.     Yes.

24     Q.     And was the $80 agreed to?

25     A.     Yes.

1    Q.        Okay.  So what happens next?

2    A.        Once that took place, I had -- all of the

3    rest of the surveillance units were right in the

4    parking lot as well, right with Mr. Walgren.

5             So I had a short briefing with them, letting

6    them know where the buy was going to take place, what

7    vehicle I had learned that Mr. Stevenson would be

8    driving, and where I wanted all of the surveillance

9    units to stage in the area so we had as much of

10   360-degree coverage around the target location as

11   possible.

12   Q.        So what happened then?

13   A.        Once that was finished, all of the

14   surveillance units went to their prospective -- their

15   respective spots.  And I followed Mr. Walgren from

16   the parking lot all the way into when he stopped at

17   the intersection of Forest Lane and Nevada Street

18   right behind the car wash.

19            I then parked approximately 150 feet behind

20   him in the Happy Joe's parking lot so I could clearly

21   see his vehicle.  And this is about 6:30 at night, so

22   it's getting dark -- or it's already dark, I should

23   say, but I could clearly see his vehicle.  And so we

24   parked there.  I got out my binoculars.  So I was

25   able to see a little bit better.

1    Q.        And was this recorded, this whole thing?

2    A.        This is all audio recorded with --

3    Q.        All audio recorded.

4    A.        -- with the voice body transmitter.  From

5    the time that I turned it on in the parking lot prior

6    to the speakerphone phone call all the way until the

7    end of the transaction is all audio recorded.

8    Q.        And did you video record it?

9    A.        There was some video recording from one of

10   the surveillance units.  However, based on this

11   location, it was very difficult to get anywhere close

12   without being spotted.

13            Therefore, the surveillance unit that was

14   taking video had to actually be around the corner and

15   down the block about a half a block.

16            So although video was recorded post-buy, so

17   after the buy occurred, the only thing it captures is

18   the target vehicle driving across an intersection.

19   It's at a distance, very dark.

20            You can't even see -- you can't make out

21   what type of vehicle it is.  Or even what color of

22   vehicle it is.  And it's probably only about a half a

23   second worth of video.  So essentially, the video --

24   the video from the video recording is worthless.

25   Q.        And at any point during this entire

1    controlled buy was John Walgren out of the sight of
2    law enforcement?
3    A.        No.
4    Q.        The vehicle was watched the whole time?
5    A.        Correct.
6    Q.        Did anyone get into his vehicle at any
7    point?
8    A.        Just Mr. Stevenson.
9    Q.        Okay.  No one other than Mr. Stevenson?
10   A.        That's correct.
11   Q.        Were you able to visually ID Mr. Stevenson
12   that night?
13   A.        I was not.
14   Q.        Did you see anyone that night?
15   A.        Yes.
16   Q.        Describe your identification or what you
17   saw.
18   A.        So a short time -- probably within 10
19   seconds of Mr. Stevenson pulling up, I was -- I would
20   say maybe more like a minute, I suppose, another
21   surveillance officer had seen the blue 2002 Chevy
22   Trailblazer with the -- he saw the blue 2002 Chevy
23   Trailblazer driving up to the area, basically coming
24   up right behind me.  He advised over the radio the
25   target vehicle was on North Booth, I believe he

1    stated, heading my way.

2          And I had known, prior to this buy, that he

3    was going to -- that Mr. Stevenson was going to be

4    driving a blue 2002 Chevy Trailblazer with license

5    plate EYW 304.

6          So within seconds, that vehicle drove past

7    me.  And then I could hear by the -- my receiver for

8    the body wire that I could hear in realtime, I could

9    hear Mr. Walgren stating that he's pulling up right

10   behind me right now in that Blazer.

11   Q.        I'm sorry.  Let me reask.  Did you see --

12   Did you have binoculars that night?

13   A.        Oh, yes.  I'm sorry.  Once he pulled up, I

14   was able to use my binoculars.  I observed a black

15   male get out of the driver's seat.  And he walked

16   behind his vehicle --

17         He pulled up behind Mr. Walgren's car and

18   then got out of the driver's seat, walked behind his

19   vehicle and up along the passenger's side, and got

20   into Mr. Walgren's vehicle.

21   Q.        Okay.  And was it that same Blazer that

22   you've already described?

23   A.        Yes.

24   Q.        Was the Blazer followed after the

25   transaction?

```
 1    A.        Yes.

 2    Q.        And were you able to see the plate at that

 3    point as well?

 4    A.        Yes.

 5    Q.        Okay.  Did you ever find out who that Blazer

 6    belongs to?

 7    A.        Yes.

 8    Q.        And who is that?

 9    A.        Jessica Greenwood.

10    Q.        What's her relationship with the defendant?

11    A.        I believe girlfriend.

12    Q.        Okay.  So what happens next in the events

13    on, I guess, February 2nd after Mr. Stevenson walks

14    along the other side of the vehicle?

15    A.        He got into Mr. Walgren's vehicle and

16    immediately told Mr. Walgren, "Next time, have the

17    money in the cupholder.  That way there's no

18    hand-to-hand exchange going on inside the vehicle."

19            They then did their exchange, the money for

20    the drugs.  And Mr. Walgren got the heroin from

21    Mr. Stevenson.  And then they talked for a short time

22    about the fact that Mr. Walgren knew somebody who

23    knew how to hack computers or computer video games or

24    something to that effect, talking about video game

25    hacking.
```

 1          And after that conversation was over,

 2   Mr. Stevenson got out of the vehicle and walked

 3   basically the reverse of what he had done to get

 4   there.

 5          He walked back down the passenger side all

 6   the way to the rear of his vehicle, around in the

 7   back, and back into the driver's side of his vehicle.

 8   And at that time, both vehicles pulled away from the

 9   parking spots.

10   Q.      Was John Walgren followed?

11   A.      Yes.

12   Q.      Was he ever out of the sight of law

13   enforcement?

14   A.      No.

15   Q.      And what happened, I guess, with the -- Were

16   the drugs seized from Mr. Walgren's possession?

17   A.      Yes.

18   Q.      Where did that occur at?

19   A.      The same meeting place that we had met prior

20   to the undercover buy, in the enclosed parking lot.

21   Q.      And was he debriefed?

22   A.      Yes, he was.

23   Q.      Did he identify who sold the heroin to him?

24   A.      Yes, he did.

25   Q.      Who was that?

1    A.        He stated it was Lo.

2    Q.        So this whole thing was recorded.  Did

3    you -- Do you have a copy of that recording or have

4    you reviewed a copy of that recording?

5    A.        I have.

6    Q.        And were you able to recognize the voice of

7    Michael Stevenson in that recording?

8    A.        Yes.

9    Q.        Have you heard the -- So if I understand

10   correctly, in this recording, there's long periods of

11   either driving or waiting; is that right?

12   A.        That's right.

13   Q.        How long does the recording go in total,

14   approximately?

15   A.        How long does that one go?

16   Q.        Yeah.  Approximately, if you know.

17   A.        Could be 25 or 30 minutes.  I'm not sure

18   exactly.

19   Q.        Have you listened to the clip of the

20   recording that has the phone call and then the actual

21   buy as well?

22   A.        Yes, I have.

23   Q.        And is that an accurate representation of

24   the longer recording, but edited out the sort of

25   nonessential information?

1    A.        Yes.

2              MR. LAMMERS:  Your Honor, at this point, I'd

3    request permission to play Government Exhibit 18A.

4              THE COURT:  You may.

5              (Tape is played.)

6              THE COURT:  Mr. Lammers, it's 3:00.  Would

7    this be a good time for us to take our afternoon

8    break?

9              MR. LAMMERS:  I think so.  Thank you.

10             THE COURT:  Very good.

11             So, ladies and gentlemen, we will take our

12   afternoon break now for 15 minutes.  During this

13   break, again, remember my admonitions:

14             Don't talk about this case among yourselves

15   or with anybody else.  You -- We're only on the first

16   witness.  We have a lot more to go.

17             And so enjoy your break.  And we'll see you

18   back here in 15 minutes.

19             THE CLERK:  All rise.

20             (Jury exits.)

21             THE COURT:  All right.  Please be seated.

22             Investigator, you may step down.

23             Mr. Lammers, anything we need to take up

24   during this break?

25             MR. LAMMERS:  Your Honor, I would like to

 1   switch witnesses at this point.  She's here.  And I'd

 2   prefer to get her done and gone.  And I think we'll

 3   be able to do that after the break.

 4            This is Heidi Woodyard.  So I don't

 5   anticipate a lot of testimony.  So we could do that.

 6   With the Court's and Counsel's permission, I'd prefer

 7   to do it that way.

 8            THE COURT:  Mr. Goldensoph?

 9            MR. GOLDENSOPH:  No objection.

10            THE COURT:  Very good.  I saw your witness

11   coordinator come in, so I assume that was the case.

12   So that's fine.  So when we get back, we'll do that.

13            Anything else, Mr. Lammers?

14            MR. LAMMERS:  No, Your Honor.  Thank you.

15            THE COURT:  Mr. Goldensoph?

16            MR. GOLDENSOPH:  No, Your Honor.

17            THE COURT:  All right.  We'll see you in 15.

18            (Recessed 3:03 p.m.; resumed 3:17 p.m.)

19            THE CLERK:  All rise.

20            THE COURT:  All right.  Are we ready for the

21   jury?

22            MR. LAMMERS:  Yes, Your Honor.

23            MR. GOLDENSOPH:  Yes, Your Honor.

24            THE COURT:  Officer Andrews, you would bring

25   them in.

1          You have your witness ready?

2          MR. LAMMERS:  Yes.  She's here, Your Honor.

3          (Jury enters.)

4          THE COURT:  All right.  Please be seated.

5          And again, ladies and gentlemen, whenever

6    you walk in the courtroom, you are free to take a

7    seat.  We stand for you.  You don't need to remain

8    standing for us.

9          You heard at the beginning of the evidence

10   in this case that one of the Government's witnesses

11   had not arrived yet.  And that witness has now

12   arrived and, with the consent of the defendant in

13   this case, we're going to interrupt

14   Investigator Leitzen's testimony and have this other

15   witness testify.

16         So, Mr. Lammers, you may now call your next

17   witness.

18         MR. LAMMERS:  Thank you, Your Honor.  We

19   will call Heidi Woodyard.

20         THE COURT:  Ms. Woodyard, just step right up

21   here by the court reporter, and I will place you

22   under oath.  Please raise your right hand.

23                    HEIDI WOODYARD,

24   being produced, sworn as hereinafter certified, was

25   examined and testified as follows:

```
 1              THE COURT:  Thank you.  Please have a seat
 2    in the witness chair.  I'd like you to pull that
 3    chair up so you're really close to that microphone,
 4    and adjust the microphone as necessary so it's right
 5    in front of you.
 6              And when you are comfortable, please state
 7    your name and spell your name for the court reporter.
 8              THE WITNESS:  Heidi Woodyard.  H-E-I-D-I
 9    W-O-O-D-Y-A-R-D.
10              THE COURT:  Thank you.
11              You may proceed.
12              MR. LAMMERS:  Thank you, Your Honor.
13                    DIRECT EXAMINATION
14    BY MR. LAMMERS:
15    Q.        Ms. Woodyard, how old are you?
16    A.        36.
17    Q.        And where are you from?
18    A.        Dubuque, Iowa.
19    Q.        Have you lived there your whole life?
20    A.        Yes.
21    Q.        Are you employed?
22    A.        Yes.
23    Q.        What do you do?
24    A.        A CNA.
25    Q.        You're a CNA?
```

```
 1    A.        A CNA and maintenance.

 2    Q.        And maintenance?

 3    A.        Uh-huh.

 4    Q.        Have you worked construction in the past --

 5    or remodeling, I should say?

 6    A.        Yes.

 7    Q.        When was that?

 8    A.        About two years ago.

 9    Q.        Okay.  And do you live in Dubuque itself or

10    just outside?

11    A.        Just outside.

12    Q.        Do you have siblings?

13    A.        Yes.

14    Q.        Tell us who they are.

15    A.        Kenny Birch, Adam Birch, Beau Birch, and

16    Tiffany Birch.

17    Q.        I understand this is difficult.  If you need

18    to pause at any point, that's okay.  There's a water

19    right there in front of you.  And there's -- I think

20    behind the monitor, there's some Kleenex as well if

21    you need it.

22              Tell us about your brother, Adam Birch.  How

23    old was he?

24    A.        26.

25    Q.        And do you remember back in January of 2017?
```

1    A.        Yes.

2    Q.        Was he living with you?

3    A.        Yes.

4    Q.        Describe for the jury how that came about,

5    how come he came and stayed at your place or why he

6    was there.

7    A.        Adam was released from a jail sentence.  He

8    was out of jail probably about a week, week and a

9    half.  Just didn't really have a place to stay.

10            And when he first got out, I offered him a

11   place to stay if he didn't have anywhere.  And he

12   finally called me up and asked if he could come stay

13   with me and if I could help get him some work.

14   Q.        Okay.  And did you know your brother to have

15   a drug addiction?

16   A.        Yes.

17   Q.        Was he a heroin addict, as far as you knew?

18   A.        Yes.

19   Q.        And you knew that before he got out of jail?

20   A.        Yes.

21   Q.        Did you think that he was still using when

22   he got out?

23   A.        No.

24   Q.        Do you have children, ma'am?

25   A.        Yes.

```
 1    Q.        How many?

 2    A.        Three.

 3    Q.        And do they live with you?

 4    A.        Yes.

 5    Q.        Were they present in the home when Adam

 6    lived with you?

 7    A.        My twin eight-year-old boys were, yes.

 8    Q.        Would you have allowed Adam to come and live

 9    in your home if you knew he was still using drugs?

10    A.        No.

11    Q.        So did -- You said, I think, that he asked

12    if you could get him some work?

13    A.        Yes.

14    Q.        Did you do that?

15    A.        Yes.

16    Q.        Where?

17    A.        At the time we were working Sunset Park

18    Circle.  There were some apartment buildings that

19    were just bought by Real Recovery Sober Living out of

20    Florida and --

21    Q.        I'm sorry.  Did you say Real Recovery?

22    A.        Yes.

23    Q.        Okay.  Thank you.  Go ahead.

24    A.        And we completely gutted, remodeled these

25    apartments.  Turned it into a Sober Living unit for
```

1    men in Dubuque.

2    Q.       And when you say "we," who do you mean?

3    A.       Me and Adam.  There were some other

4    employees that worked maybe a couple days here and

5    there as needed, but it was mainly me and Adam.

6    Q.       Okay.  And what kind of construction were

7    you working -- or remodeling were you doing?

8    A.       It was everything from gutting, electrical,

9    plumbing to painting, carpet, flooring.  The whole

10   building, top to bottom.

11   Q.       Would it be fair to say that Adam's pretty

12   handy?

13   A.       Yes.

14   Q.       Is he a good worker?

15   A.       Yes.

16   Q.       Did you like working together?

17   A.       Yes.

18   Q.       So tell us how it worked.  Did he have a

19   car?

20   A.       No.

21   Q.       So what would happen, you know, during the

22   day?  Would you give him a ride or how did it work?

23   A.       Yes.  We were pretty much together 24/7

24   while he was with me.  We'd get up in the morning, go

25   to work, come back home.  And the same thing the next

1    day, get up and go to work.

2    Q.       Would you be working on occasion at separate

3    areas of the building or separate places?

4    A.       Yes.  There are four apartments in each

5    building.  For the most part, we were working in the

6    same apartment.

7    Q.       Were there times that he'd be away from the

8    jobsite?

9    A.       He'd be, like, outside the building, but

10    not -- he never left the premises.

11    Q.       Is that pretty common?

12    A.       Yeah.

13    Q.       Okay.  Did he ever take breaks?

14    A.       We took breaks whenever, yes.

15    Q.       Did you ever know Adam to be using drugs

16    when he lived in your home?

17    A.       No.

18    Q.       Is Adam -- Or was Adam secretive?

19    A.       Yes.

20    Q.       Did you ever see him, I guess, go in the

21    other rooms to make phone calls or to text back and

22    forth with other people?

23    A.       Yes.

24    Q.       I'm going to, I guess, jump ahead a little

25    bit to February 1st of 2017.  Do you remember that

1   day?

2   A.        Yes.

3   Q.        And did you and Adam go to work on

4   February 1st of 2017?

5   A.        Yes.

6   Q.        Tell us what happened.

7   A.        It was just a usual day.  We were at the

8   apartments all day until -- I believe it was about a

9   quarter to six we decided to quit.  And Adam wanted

10  me to give him a ride to one of his friends' house to

11  collect some money.

12  Q.        And who was that?

13  A.        The name's Justin Harris.

14  Q.        Did you do that?

15  A.        Yes.

16  Q.        Where was that at?  Was it in Dubuque?

17  A.        It was in Dubuque.  It was some apartments.

18  I believe Angella Street.  He met Justin outside.

19  And it was just real quick.  And we left.  And then

20  we went to my older brother's house, where he met

21  Samantha Billmeyer, my older brother's girlfriend.

22  She owed him some money.  And that was real quick

23  too.

24           And then he wanted me to take him somewhere

25  on Garfield.  I don't know the exact address, house,

1    or who lived there.  I don't know any -- anything

2    like that, except I dropped him off on the corner,

3    and he went -- dropped him off on Humboldt, the side

4    street.  He went and turned the corner onto Garfield

5    and started walking, I believe it was, to the left.

6             And for me to go home, I turned right.  So

7    where he went from there, what house, I don't know.

8    Q.        Do you know about what time this was?

9    Approximately, if you know.

10   A.        It was probably about a quarter after six,

11   20 after.

12   Q.        Okay.  And when did you see him again?

13   A.        It wasn't until that night when he got home.

14   I believe it was around midnight.

15   Q.        I'm sorry.  Did you say midnight?

16   A.        Yes.

17   Q.        And so he came back to your house?

18   A.        Yes.

19   Q.        And were you still up or did you wake up or

20   what happened?

21   A.        I was laying down, but I was still awake.

22   Q.        Did you talk to him?

23   A.        Yes.

24   Q.        Where was that?

25   A.        I talked to him in the kitchen.  He came

1    back to my room, telling me he was home.  And I got

2    up to talk to him.  Told him we saved him supper.  He

3    ate and went off to bed, and I went to bed.  That was

4    the last I talked to him.

5    Q.      You didn't talk to him again after midnight?

6    A.      I got up sometime during the night to use

7    the bathroom.  And he was coming out of the bathroom.

8    I just asked him what he was doing awake.  And he

9    said he couldn't sleep.

10   Q.      And that was the last?

11   A.      And that was it, yeah.

12   Q.      Okay.  So tell us what happened the next

13   morning, ma'am.

14   A.      We were just getting up ready for the day.

15   My twins were already up.  They were in their room

16   watching TV.  And I believe it was around 8:00.

17   Their dad had stopped by to see if they needed a ride

18   to school because me and Adam were working.

19   Sometimes we'd go in earlier.  And so he just came in

20   to see if they needed a ride.

21          He walked down the hall and saw Adam in his

22   bed in a very awkward position.  And he came and

23   asked me if I'd saw how my brother had fallen asleep.

24   And I pretty much knew right away that something bad

25   had happened.

 1         And when I went in there, his lights were

 2    still on, and he kind of had his back towards the

 3    door and sideways.  And then his upper half was kind

 4    of bent over.

 5         And I started yelling his name.  He wasn't

 6    answering.  And as soon as I touched him, he was

 7    cold.  I turned him over.  And the first thing I saw

 8    was the orange cap.

 9    Q.    What do you mean, an orange cap?

10    A.    From a needle.  And that's pretty much when

11    I knew it was heroin.  And when I completely turned

12    him over.  The needle was still stuck in his arm.

13         So I pretty -- I knew what had happened.  I

14    tried to do CPR and called 911 and told them that it

15    was heroin and --

16    Q.    What made you think it was heroin?

17    A.    Because I knew he was battling it before he

18    went into jail.  And just the needle.

19    Q.    Okay.  So you called 911 and you started

20    CPR.  Did anybody help you with the CPR?

21    A.    My ex-husband, the kids' dad, he was there.

22    He helped at times.  I had stopped to call my dad at

23    work, get him there.  And so he took over for a

24    couple minutes.

25    Q.    At some point did the -- did the emergency

 1    crews arrive?

 2    A.        Yes.

 3    Q.        Okay.  And were you present for that?

 4    A.        Yes.

 5    Q.        And were you present when the police

 6    officers arrived?

 7    A.        Yes.

 8    Q.        Were you there when they searched Adam's

 9    room?

10    A.        No.

11    Q.        And did you provide them with cellular

12    telephones that you knew Adam had used?

13    A.        Yes.  They were laying right next to him.

14    Q.        Did you know Adam was using drugs when he

15    was living with you?

16    A.        When he was living with me, no.

17              MR. LAMMERS:  Can I have a moment?

18              THE COURT:  You may.

19              MR. LAMMERS:  Thank you.  I don't have any

20    further questions.

21              THE COURT:  Any cross-examination?

22              MR. GOLDENSOPH:  Yes, Your Honor.  Thank

23    you.

24                     CROSS-EXAMINATION

25    BY MR. GOLDENSOPH:

1    Q.        Ms. Woodyard, you talked about earlier you

2    and Adam were working together at that time; correct?

3    A.        Yes.

4    Q.        And then on -- I just want to make sure I

5    get the timeline correct.  About -- On February 1st,

6    you two left about 5:45 in the evening?  Does that

7    sound about right?

8    A.        Yes.

9    Q.        And one of the stops you made along the way

10   is to Adam's friend, Justin Harris; correct?

11   A.        Yes.

12   Q.        Now, when Adam went there, he didn't

13   actually go inside Mr. Harris's house; correct?

14   A.        Correct.

15   Q.        And you observed what looked like a

16   hand-to-hand exchange of something; correct?

17   A.        Yes.

18   Q.        Now, Adam had said that he was going to pick

19   up money from Mr. Harris; correct?

20   A.        Yes.

21   Q.        But you had testified earlier that during

22   this time, he was kind of being secretive; right?

23   A.        Yes.

24   Q.        And is it safe to assume that you would have

25   been very upset with him or disappointed with him if

1   you knew he was using drugs at that time?

2   A.      Yes.

3   Q.      And so he wouldn't have let you know if that

4   was occurring; correct?

5   A.      Correct.

6   Q.      And then you -- There was a brief stop at

7   your older brother's house, Kenny; is that correct?

8   A.      Yes.

9   Q.      And then -- then you stopped off at the

10  corner of Humboldt and Garfield; is that correct?

11  A.      Yes.

12  Q.      And he left one way; you left another?

13  A.      Yes.

14  Q.      Now, a few days prior to February 1st, 2017,

15  you had dropped Adam off at that same area; is that

16  correct?

17  A.      Yes.

18  Q.      And during that time, he was gone for just a

19  few minutes, and then he returned back to your car;

20  correct?

21  A.      Yes.

22          MR. GOLDENSOPH:  Your Honor, I think that's

23  all I have.

24          THE COURT:  Any further redirect

25  examination?

1          MR. LAMMERS:  No, thank you.

2          THE COURT:  Thank you, ma'am.  You are

3     excused.

4          The Government may call its next witness.

5          MR. LAMMERS:  Thank you, Your Honor.  We

6     would re-call Officer Leitzen.

7          THE COURT:  Very good.

8          Officer Leitzen, I'll just remind you you're

9     still under oath.

10          THE WITNESS:  Yes, sir.

11          THE COURT:  Mr. Lammers, you may proceed.

12          MR. LAMMERS:  Thank you, Your Honor.

13          (CONTINUED) DIRECT EXAMINATION

14     BY MR. LAMMERS:

15     Q.      So if I remember correctly, Officer, I think

16     we finished playing the audio of the controlled buy

17     on February 2nd; is that right?

18     A.      Correct.

19     Q.      And, again, did you recognize the voice on

20     that controlled buy as that being Lo?

21     A.      Yes.

22     Q.      And John Walgren was the CI in that

23     particular case; is that right?

24     A.      That's correct.

25     Q.      Why did John Walgren start working with the

1   task force?

2   A.      On January 8th of 2017, there was another

3   overdose in Dubuque which did not cause a death, so

4   it was a serious bodily injury case where Shelby

5   Sweeney had overdosed.

6          And John Walgren was friends with Shelby

7   Sweeney.  And prior to that January 8th date, Shelby

8   Sweeney had been getting heroin from another target,

9   Greg Stapleton, in Dubuque.

10          And for whoever reason, Greg Stapleton ended

11   up cutting Shelby Sweeney off, would not deal to her

12   anymore.  However, she still wanted his heroin.  And

13   Greg Stapleton would deal with John Walgren, so

14   Shelby Sweeney and John Walgren threw in money

15   together.

16          And John Walgren went to Greg Stapleton,

17   picked up heroin, brought it back, and provided that

18   to Shelby Sweeney.  And they used together.  And she

19   overdosed.

20   Q.      Who overdosed?

21   A.      She overdosed.  He did not.

22   Q.      He did not.  You mentioned put money

23   together.  What's that commonly called?

24   A.      Throwing down.

25   Q.      Throwing down?

1    A.        Yeah.

2    Q.        Okay.  And did Mr. Walgren call 911?

3    A.        Yes, he did.

4    Q.        And in the course of the investigation, did

5    he fear he was going to be charged?

6    A.        Yes.

7    Q.        And did he agree to work with you because of

8    that fear?

9    A.        Yes.

10   Q.        So did Mr. Walgren identify some other

11   sources that he was getting heroin from?

12   A.        Yes.

13   Q.        Did you ever check Mr. Walgren's phone?

14   A.        Yes.

15   Q.        How did you do that?

16   A.        When he was working with us, he would

17   obviously bring his phone to the office.  And I would

18   visually inspect the phone, look at the text messages

19   between him and different targets, and photograph

20   those text messages.

21            And ultimately on, I believe it was,

22   February 16th, I took his phone and downloaded it

23   with the Cellebrite.

24   Q.        Describe what Cellebrite is for the jury,

25   please.

*Sarah J. Dittmer, CSR, RPR*
*1(888)388-2723*

1    A.          Cellebrite is -- it's a machine that you

2    hook a telephone or electronic device up to.  And

3    after inputting specific information for that device,

4    it will download or draw out the information from the

5    phone and make a copy of it on the computer so you

6    could scroll through the computer and pick out the

7    different tabs that you want to look at.

8              You can look at context, call logs, text

9    logs, multimedia message.  So there's numerous

10   different items that you can look at through the

11   phone.  So essentially looking at the contents of the

12   phone on the computer after it's downloaded from the

13   phone.

14   Q.          What are phone tolls?

15   A.          Phone tolls are the call log and text logs

16   from the phone company showing the existence of phone

17   calls and text messages and the date and time they

18   were made, the phone number that they were made to,

19   and the duration, if there is one.

20   Q.          Do they -- do they show content?

21   A.          No, they do not.

22   Q.          So it's simply a contact to and from a

23   phone?

24   A.          That's right.

25   Q.          And does it show incoming?

1    A.        Yes.

2    Q.        Does it show outgoing?

3    A.        Yes.

4    Q.        And did you have an opportunity in this

5    particular case to get phone tolls from targets of

6    the investigation, CIs, other folks?

7    A.        Yes.

8    Q.        So back to, I guess, John Walgren now for a

9    second.  Did he -- after this February 2nd controlled

10   buy -- And I guess this would be a good point.  Would

11   you please -- Do you have that -- the bag near you?

12   A.        Yes.

13   Q.        Do you have Exhibit 2A in that bag?

14   A.        Yes.

15   Q.        Can you tell us what that is.

16   A.        It is the bag containing the heroin that was

17   purchased from Lo by John Walgren on February 2nd,

18   2017.

19   Q.        Was it field-tested?

20   A.        Yes.

21   Q.        Was it ultimately determined to be heroin?

22   A.        Yes.

23   Q.        Now, I think on the recording you could hear

24   Mr. Walgren say, "He did a nice one."  What's that

25   mean?

1    A.       It means he put together a big bag of

2    heroin.

3    Q.       So it weighed heavier, then?

4    A.       Yes.  Just because you pay $80, thinking

5    you're going to get a half gram -- It really depends

6    on the drug dealer.  Some drug dealers will give

7    you -- I mean, it's not like the store where you're

8    going to get the exact amount every single time.

9    It's however much the drug dealer decides to give you

10   at that time.

11           So sometimes you pay $80 and you might get

12   .6 grams.  Very unlikely, because they typically go

13   down.  So if you think you're going to get a half

14   gram, sometimes they'll give you .4 grams or even .3

15   grams.  So ripping you off, essentially, for your

16   money.

17           So if it's -- if it's something that they

18   believe is -- weighs what it should weigh or maybe

19   even more, then that would be why he would make a

20   statement like, "He did a nice one."

21   Q.       Okay.  So after that controlled buy on

22   February 2nd, was there more contact between

23   Mr. Walgren and the defendant, Mr. Stevenson?

24   A.       Yes.

25   Q.       Would you describe that, please.

1    A.         We tried on several occasions over the next

2    few days, leading into a few weeks, of having

3    Mr. Walgren come to the drug task force office and --

4            I'm sorry.  I should back up before I --

5    before I go into having him come in to try and do

6    more controlled buys.

7    Q.         Let me see if I can narrow my question.

8    A.         Yes.

9    Q.         Was there more contact on February 2nd?

10   A.         Yes.

11   Q.         Would you describe that, please.

12   A.         Probably about an hour after the controlled

13   buy was completed with Mr. Walgren and he had left

14   the drug task force control, he was on his own at

15   that time.  It was probably about an hour later when

16   I got a text message from Mr. Walgren.  And it was in

17   all caps.

18           MR. GOLDENSOPH:  Your Honor, I'm going to

19   object as to potential hearsay.

20           THE COURT:  Mr. Lammers, do you agree it's

21   hearsay?  And if so, is there an exception?

22           MR. LAMMERS:  I don't believe it's hearsay

23   as it's not for the truth of the matter asserted.

24   This is going to go to the reason why they did the

25   next step in the investigation, Your Honor.

1          THE COURT:  The objection's overruled.

2          You may answer the question.

3   A.          The text message stated, "Adam Birch died,"

4   almost like a questioning matter.  And then it was

5   something to the effect of, "It was Lo" or "Lo's the

6   one who he got the heroin from" or something to that

7   effect.

8   BY MR. LAMMERS:

9   Q.          So what did you do based on that

10  information?

11  A.          Well, I had had contact with Mr. Walgren.

12  He stated that he was texting back and forth with Lo.

13  And Lo wanted him to constantly call Adam.  "Call

14  him.  Can you get ahold of him?  Just call him.  Let

15  me know when you get ahold of him," that sort of

16  thing.  So it was essentially blowing up

17  Mr. Walgren's phone.

18  Q.          And did you have an opportunity to verify

19  that?

20  A.          Yes, I did.

21  Q.          How did you do that?

22  A.          On February 6th, when he came to the drug

23  task force office, he came in to attempt another

24  undercover purchase of heroin from Mr. Stevenson.

25  And at that time, I looked at his phone, and

```
 1   photographed all of the -- the entire text message
 2   chain between Mr. Walgren and Mr. Stevenson on the
 3   night of February 2nd.
 4   Q.      And eventually did you do a Cellebrite dump
 5   as well?
 6   A.      Yes, I did.
 7   Q.      Did that reflect that same text message
 8   chain?
 9   A.      It did.
10   Q.      Okay.  I'm now going to refer you to
11   Government Exhibit 9.
12           MR. LAMMERS:  Your Honor, may I publish
13   that?
14           THE COURT:  You may.
15   BY MR. LAMMERS:
16   Q.      Can you see that on the screen in front of
17   you?
18   A.      Yes.
19   Q.      And can you tell us what that is?
20   A.      That is a Word document with text messages
21   clipped out of a full text log from a Cellebrite
22   dump.  And they are text messages between John
23   Walgren and Michael Stevenson from John Walgren's
24   phone.
25   Q.      Okay.  So I'm going to -- Do you see down
```

1    here where I've got the cursor, that -- where it says
2    "1415"?

3    A.       Yes.

4    Q.       And then it says "Lo."  And then it's sent,
5    phone, outgoing.  So if I understand you correctly,
6    that this is a text message from John Walgren to
7    Michael Stevenson?

8    A.       That's correct.  So it's Michael's -- or
9    it's John Walgren's phone.  So any outgoing texts
10   would be outgoing from John Walgren's device to the
11   receiver, in this case, Lo.

12   Q.       Okay.  I've gone to the second page of this.
13   Can you read these text messages?

14   A.       I can.

15            MR. LAMMERS:  I'm sorry.  Give me a second
16   here.  Just give me a second.  I'm sorry.  I'm a
17   little new to the mouse here on the computer.  And I
18   did it again.

19            Do you want to try?

20            Okay.  Thank you.

21   BY MR. LAMMERS:

22   Q.       All right.  Do you see this?

23   A.       Yes.

24   Q.       The top text message, who is that from?

25   A.       That is from John Walgren to Lo.

     1   Q.         To?

     2   A.         To Michael Stevenson.

     3   Q.         Okay.  And what's the question there?

     4   "What's up" -- He refers to specifically "part-time

     5   hustle."  Do you know what that means?

     6   A.         It's somebody who does not answer their

     7   phone all the time when a drug user is trying to get

     8   ahold of a drug dealer to acquire drugs.

     9   Q.         And the next one, who is that text message

    10   from?

    11   A.         That is from Michael Stevenson.

    12   Q.         Okay.  I'm going to jump ahead here to the

    13   date in question.  Do you see -- And I'm now on

    14   page four.  Do you see at the bottom the text message

    15   from, it looks like, John Walgren to Michael

    16   Stevenson?

    17   A.         Are you referring to number 2388?

    18   Q.         Yes, I am.

    19   A.         Yes.

    20   Q.         The "tell him what, bro?"  Have you take a

    21   look at that text message.

    22   A.         Yes.

    23   Q.         And did that text message correspond in time

    24   to any phone tolls that you recovered?

    25   A.         Yes.

1    Q.       Would you describe that for the jury,

2    please.

3    A.       There was a phone call between John Walgren

4    and Michael Stevenson at 1910 hours, which would be

5    7:10 p.m., that lasted, I believe, for a minute and

6    four seconds.  It predated this text message by a

7    matter of seconds.

8    Q.       Approximately 29 seconds?

9    A.       Yes.

10   Q.       Okay.  And Walgren is asking Michael

11   Stevenson, "Tell him what?"

12   A.       Correct.

13   Q.       Who did you take that to refer to?

14   A.       Adam Birch.

15   Q.       Why?

16   A.       Because I was -- During the investigation, I

17   learned that Mr. Stevenson wanted Walgren --

18   Mr. Walgren to contact Mr. Birch.

19   Q.       Okay.  And does that text message, then,

20   going to the next page, five, does that -- did that

21   string of text messages keep going?

22   A.       Yes, it does.

23   Q.       All right.  The 2930 text message where it

24   says, "Just call him," who's that from?

25   A.       It's from Lo.  It's 2390.

```
1   Q.        I'm sorry.  Not "2930."  2390.  My
2   apologies.  And is that from the defendant?
3   A.        Yes.
4   Q.        It says, "Just call him"; right?
5   A.        Correct.
6   Q.        Who did you take that to be referring to?
7   A.        Adam Birch.
8   Q.        And the outgoing text message from
9   Mr. Walgren, he refers to number 213-3018?
10  A.        Correct.
11  Q.        Whose phone was that?
12  A.        Adam Birch.
13  Q.        So it's pretty clear from context that the
14  defendant is trying to have John Walgren get ahold of
15  Adam Birch?
16  A.        That's correct.
17  Q.        All right.  How soon after that is the next
18  phone call from the defendant to John Walgren asking
19  him to call?
20  A.        The next text message is 22 seconds later.
21  Q.        And the next text message from the
22  defendant?
23  A.        10 seconds after that.
24  Q.        And the next one?
25  A.        One second later.
```

```
 1    Q.        The next?

 2    A.        Three seconds after that one.

 3    Q.        And I'm referring now to 2400.  How much

 4    time?

 5    A.        A minute and 16 seconds.

 6    Q.        And 2401?

 7    A.        12 seconds.

 8    Q.        So would you characterize this as fairly --

 9    or repeated contact?

10    A.        Yes.

11    Q.        And is this after John Walgren had learned

12    that Adam Birch died?

13    A.        This is before.

14    Q.        This is before John Walgren knew?

15    A.        Yes.

16    Q.        Okay.  And you discovered this from John

17    Walgren when he talked to you?

18    A.        That's correct.

19    Q.        And then you also independently got it from

20    the Cellebrite; is that fair to say?

21    A.        Correct.

22    Q.        Okay.  So I'm going to refer you, then, to

23    2407.  Do you see that?

24    A.        Yes.

25    Q.        Yeah.  I'm sorry.  It's on page six.  I
```

1   paged down in the interim.  "Can I come through
2   before I go home?  I need something for 60."  What's
3   that refer to?
4   A.      That is John Walgren trying to get $60 worth
5   of heroin from Michael Stevenson.
6   Q.      And what's Mr. Stevenson response?
7   A.      He just responds, "80."
8   Q.      And what does that indicate to you, based on
9   your training and experience with heroin
10  investigations?  What kind of amount are we talking
11  about?
12  A.      A half gram.
13  Q.      And is this John Walgren working outside of
14  your control to obtain heroin for himself?
15  A.      Yes.
16  Q.      This isn't part of a controlled buy?
17  A.      It is not.
18  Q.      Okay.  Did you later learn that Mr. Walgren
19  would commonly get heroin on his own?
20  A.      Yes.
21  Q.      At some point did you deactivate Mr. Walgren
22  from continuing to work as a CI?
23  A.      Yes.
24  Q.      Why?
25  A.      Because on April 12th, 2017, he conducted a

         1    controlled purchase of heroin from a different target

         2    and, in the meantime, stole one of the two bags that

         3    he purchased with drug task force funds and only

         4    turned one over to the drug task force.  And during

         5    the investigation, nine days later, that fact

         6    surfaced.

         7    Q.        How did he manage to evade the controls if

         8    he's searched before and searched after?  Why wasn't

         9    that second bag recovered?

        10    A.        Prior to making contact with the drug task

        11    force on April 12th, Mr. Walgren had contacted the

        12    target earlier that morning and texted him, asking

        13    him to split the hundred.  He was going to be --

        14    stated that he was going to be coming with $100.

        15             He asked the target to split the heroin into

        16    two separate bags because he was going to be throwing

        17    down with a buddy.

        18             He didn't want to have to split it himself.

        19    So he told the target to split it into two,

        20    "essentially so we would both have our own bag when

        21    we left."

        22             He then erased all of those text messages

        23    from his phone so we didn't know any of that.  He

        24    came up to the drug task force office.  We did all of

        25    the controls that we normally do and -- including

1  searching him, searching his vehicle, and then sent

2  him to the residence, which was inside of an

3  apartment building up on a second floor -- up a set

4  of stairs to a second floor.

5          He went up and met the subject in the

6  hallway and received heroin in exchange for the

7  money.  And on his way back down the stairs, which

8  were obviously inside of the building that we did not

9  have a visual on, he dropped one of the two bags on

10 the stairs -- on one of the stairs and left it, and

11 then returned as if the buy were normal and turned

12 over one bag of heroin which he stated he purchased

13 for the -- for the $100 on April 12th.

14 Q.      So did you deactivate him after you found

15 that out?

16 A.      Yes.

17 Q.      Did you continue to take information from

18 him?

19 A.      I did.

20 Q.      Why didn't you use him for controlled buys

21 anymore?

22 A.      After somebody steals from the drug task

23 force under our control, they can no longer work with

24 us.  And, not only that, we charged him criminally

25 for that.  They won't be -- they won't be trusted

1   again to handle any drugs or be involved in any type

2   of undercover purchases or situations like that.

3           Essentially it turns into simply taking

4   information from them as we would from any other

5   citizen who wants to provide information to the drug

6   task force reference criminal activity in Dubuque.

7           And then we take that information and

8   corroborate it in whatever other way we can.  But as

9   far as having them do active work for the drug task

10  force, we don't do it again.

11  Q.      Was he charged in this particular case?

12  A.      Yes, he was.

13  Q.      At any point, then, after February 6th -- or

14  after, I guess -- I think you testified that

15  Walgren -- you and Walgren tried to do an additional

16  controlled buy from the defendant.  Was there ever

17  one arranged?

18  A.      I'm sorry.  Was there another one arranged,

19  you asked?

20  Q.      Another one arranged, another controlled buy

21  arranged from the defendant with Mr. Walgren?

22  A.      No.  Mr. Stevenson would not take any of

23  Mr. Walgren's phone calls anymore.

24  Q.      He stopped taking his calls?

25  A.      Correct.

     1   Q.        And was that after Adam Birch's death?

     2   A.        Correct.

     3   Q.        And at some point did you ever receive

     4   information that Mr. Walgren had been able to make

     5   contact with Mr. Stevenson again?

     6   A.        Yes.

     7   Q.        Would you describe what happened there.

     8   A.        On February 12th, I believe it was about

     9   1:51 p.m., Mr. Walgren called me and stated he had

    10   just brought --

    11             MR. GOLDENSOPH:  Your Honor, I'm going to

    12   object.  Again, it sounds like we're getting into

    13   hearsay.

    14             THE COURT:  Mr. Lammers?

    15             MR. LAMMERS:  Again, Your Honor, this goes

    16   to the next step in the investigation.  And I'm

    17   laying the foundation for Exhibit 24 and why this

    18   witness gathered that exhibit.

    19             THE COURT:  Okay.  So, ladies and gentlemen,

    20   again, this won't be lodged for the truth of the

    21   matter asserted.  Rather, it's to demonstrate why the

    22   investigator took the next step.

    23             So you may answer the question.

    24   A.        He had stated that he picked up a friend

    25   named Jake from East Dubuque and brought him over to

1   the Hy-Vee parking lot on South Locust, which is just

2   south of the bridge going over to East Dubuque,

3   Illinois.

4          And he stated when he got in that parking

5   lot, Jake met with Lo inside of Mr. Walgren's vehicle

6   and purchased heroin from him.  And he stated that

7   was within the previous 15 minutes from the time that

8   he called me.

9   BY MR. LAMMERS:

10  Q.       And did you check on that information?

11  A.       I did.

12  Q.       How did you do that?

13  A.       I first started with the City of Dubuque

14  traffic cameras.  The vast majority of downtown

15  Dubuque is covered by traffic camera coverage.  And I

16  was able to go to the traffic cameras at the base of

17  the East Dubuque bridge.

18         And I looked in a very short time frame.  I

19  think between 1:30 and 1:40, something to that

20  effect, in the time frame that Mr. Walgren stated

21  that he was down at Hy-Vee for the heroin purchase

22  from Lo.

23         And I was able to find Mr. Walgren's

24  vehicle, which is very easy to pick out.  It's got a

25  giant white sticker in the back window that covers

almost the entire back window. It's a gray Acura. I
was able to find that vehicle and see that it turned
eastbound to go across the East Dubuque bridge.

I then waited. And within just a couple of
minutes, the blue 2002 Chevy Trailblazer that had
shown up on the undercover purchase 10 days earlier
also drove through that same intersection northbound.

So I took that time frame and I used that to
go to Hy-Vee. And I had the Hy-Vee manager pull up
video from outside of the store, which overlooks the
entire parking lot, including the parking lot for the
gas station, which is at the far end of the parking
lot. And he also pulled up in-store video from
inside of the gas station.

And then I was able to observe
Mr. Stevenson's vehicle, the blue Chevy Trailblazer,
enter the parking lot. And it parked. And then
Mr. Stevenson gets out of the vehicle and walks into
the gas station.

And then I was able to view -- In the gas
station, I was able to view Mr. Stevenson from
different angles, such as the camera on the height
strip of the door at enter as well as the hallway to
go into the bathroom of the gas station.

And then after approximately, oh, two

1    minutes and 45 seconds, maybe three minutes,

2    Mr. Stevenson exits the gas station back out into the

3    parking lot.  And while he was exiting the parking

4    lot, Mr. Walgren had already pulled into the parking

5    lot in his Acura.

6          And he was circling the parking lot.  And he

7    comes back around and parks on the southwest corner

8    of the gas station parking lot, just as Mr. Stevenson

9    is exiting the gas station.

10          And then somebody gets out of Mr. Walgren's

11    car and meets with Mr. Stevenson in front of the car.

12    And then they immediately turn around and get back

13    into Mr. Walgren's car.  And they're in the car for

14    approximately four and a half minutes.  And then

15    Mr. Stevenson gets out of the car, goes back to his

16    vehicle while Mr. Walgren leaves.

17          And then the blue Trailblazer kind of

18    circles around in the parking lot, stops, and goes a

19    couple of times, but then exits the parking lot out

20    of the opposite side approximately two to three

21    minutes later.

22    Q.      And were you able to -- You watched all of

23    those videos personally?

24    A.      Yes.

25    Q.      Were you able to recognize Mr. Stevenson in

1   those videos?

2   A.      Yes.

3   Q.      And you recognized Mr. Walgren's car as

4   well?

5   A.      Yes.

6   Q.      And did it correspond with the times that

7   Mr. Walgren said they were there?

8   A.      It was exact, yes.

9   Q.      So that's on February 12th; is that right?

10  A.      That's correct.

11  Q.      What's the next step in the investigation?

12  A.      As I said, we tried a couple more times to

13  conduct undercover purchases of heroin from

14  Mr. Stevenson, but Mr. Walgren was never able to get

15  ahold of him.

16          And then in April is when he ended up

17  getting caught stealing from the drug task force, in

18  which case we were no longer using him to conduct

19  controlled purchases.  At which point the

20  investigation into trying to buy heroin from

21  Mr. Stevenson ceased because I did not have a

22  confidential informant who could purchase drugs from

23  him any longer.

24  Q.      Okay.  And I guess I forgot to do this.  On

25  Exhibit 24 -- I'm not going to play that at this

1    point.  It's 17 minutes long.  And there's some dead

2    spots.  Can you describe sort of how that works,

3    what --

4             Have you seen that, by the way?

5    A.       I have.

6    Q.       And it appears there's some space where the

7    timer keeps running, but it's frozen.  Can you

8    describe why that would have happened?

9    A.       So the video from the store, which overlooks

10   the parking lot, will run the entire time.  And the

11   video inside of the gas station would, obviously,

12   coincide with that.

13            But the video inside the gas station is

14   split into four different screens.  So there's a

15   height strip screen on the -- when you first walk in

16   the doorway.  So it's on the height strip of the

17   door.

18            There's also one for the -- I believe it's

19   the point of sale area that would overlook the cash

20   register.  And then there's a hallway, a bathroom

21   hallway, and another, like, overall shot of the gas

22   station.  So they're all different areas inside the

23   gas station.  They're split into four.

24            So when I had asked the manager, who was

25   pulling up the video for me -- Basically I wanted

 1    from the time that Mr. Stevenson walked into the gas
 2    station until the time that he walked out of the gas
 3    station.
 4           I wanted all of that recorded.  So he was --
 5    It's an overall recording of all of them, but you're
 6    able to click on the different monitors and see just
 7    that screen.
 8           And after he walks in past the height strip,
 9    he's offscreen for two and a half minutes or more
10    before he comes back and leaves.  So essentially the
11    manager took from, I don't know, zero seconds to 30
12    seconds -- I'm not sure if that's the exact time, but
13    took the small amount of time that Mr. Stevenson
14    walked in and that he was on that camera view and
15    then just essentially stopped recording on that
16    camera view, just froze it because he's no longer
17    there.
18           It moved to another one.  And that one's the
19    one that runs seeing him come back through the
20    hallway into the bathroom and then back out of the
21    bathroom and then back out the door.
22           So it's an overall time for all four
23    screens, but all four screens don't necessarily play
24    for the full amount of time, if that makes sense.
25    It's just when he's captured on the video.

1   Q.      Okay.  So I think that covers, then,

2  Exhibit 24.  Let's jump forward.

3          You said you no longer had someone who could

4  get in to the defendant.  Did that ever change?

5   A.      Yes, it did.

6   Q.      And how did that change?  Or when did that

7  change?

8   A.      August of 2017.

9   Q.      Describe for us what happened next in the

10  investigation.

11   A.      I had another confidential informant named

12  Shannon Scholtes who had been working for the drug

13  task force and had advised me that she knows a guy

14  named Mike-Mike and --

15   Q.      I'm sorry.  I didn't hear that.  Say it

16  again.

17   A.      She said -- She told me she knows a guy

18  named Mike-Mike.

19   Q.      Mike-Mike?

20   A.      Correct.

21   Q.      Okay.

22   A.      Who sells crack cocaine.  And she stated she

23  thinks he sells heroin as well, but she doesn't know

24  for sure because she's not -- she's never purchased

25  it.

1    Q.        Okay.  So what did you do?

2    A.        I had her explain who Mike-Mike was because

3    at that time I didn't know she was talking about

4    Michael Stevenson.

5            But she explained that he used to live with

6    Ricky Carter at 611 University, Apartment Number 4.

7    And I knew that Michael Stevenson had lived there.

8            She stated, since then, she thought he had

9    moved to Alpine Street with his girlfriend.  And I

10   also knew that he had moved to Alpine Street with his

11   girlfriend.  So with those facts, I believed that we

12   were talking about the same person.

13           She then showed me a phone number that she

14   used to have for Mr. Stevenson.  And it was -- We've

15   got several phone numbers that had been accumulated

16   that we know Mr. Stevenson has used in the past.  And

17   that's one of them.

18           So then I showed her a photo lineup of

19   Mr. Stevenson.  She was able to pick him out of the

20   photo lineup as being the subject she knows as

21   Mike-Mike.

22   Q.        Did you eventually use her to do a

23   controlled buy?

24   A.        Yes.

25   Q.        How did that happen?

```
 1    A.        All of the same procedures were followed as
 2    any other controlled buy.  She came to the drug task
 3    force office.
 4    Q.        Let me stop you before we get to that point.
 5    How did you make arrangements for a controlled buy?
 6    Was that by telephone?
 7    A.        Yes.
 8    Q.        What number was called?
 9    A.        I believe it was --
10    Q.        If you know.
11    A.        I think it was (563)213-3916, but I can't be
12    positive without looking at my -- It's on my buy
13    report on the first page, but I'm not positive.
14    Q.        That's fine.  So did you make a recorded
15    phone call?
16    A.        Yes.
17    Q.        Okay.  And who was that with?
18    A.        With Michael Stevenson.
19    Q.        How do you know?
20    A.        Because, first of all, she referred to him
21    as Mike-Mike.  I could hear his voice and knew that
22    it was Mr. Stevenson.
23    Q.        Did you recognize the voice is what I'm
24    getting at.  I'm sorry.  It's a bad question.
25    A.        Yes.
```

1    Q.        So how did that arrangement go?

2    A.        A recorded phone call was placed to

3    Mr. Stevenson at that time.  And it was arranged for

4    Ms. Scholtes to purchase $50 worth of crack cocaine

5    from Mr. Stevenson.

6              And he advised her to go to Ricky's old

7    place, which she knew to be the place where she had

8    always met him in the past.

9    Q.        And is that -- Or what is that address?  I'm

10   sorry.  I think you told us.

11   A.        611 University Avenue, Apartment Number 4.

12   Q.        Okay.  So same procedures were followed for

13   the controlled buy that were followed with

14   Mr. Walgren?

15   A.        That's correct.  We have a female in our

16   office who conducted the strip-search of

17   Ms. Scholtes.

18   Q.        And was her car searched as well?

19   A.        Yes.

20   Q.        And what happened next?

21   A.        I searched her purse as well.  And then the

22   recording device was actually placed in her purse.

23   Q.        And what's the next step?

24   A.        The recorded phone call was placed, and the

25   undercover drug deal was set up.  She was provided

1   with $50 in pre-serialized U.S. currency, two $20

2   bills and a $10 bill.

3          And I advised her of the exact route I

4   wanted her to take from the drug task force office to

5   the target location we were going to.

6          And we were going to, obviously, stay right

7   with her.  She also didn't know when he -- When he

8   said, "Come to Ricky's old place," she didn't know

9   whether or not he was inside the apartment or if he

10  was mobile.

11         I did not want her going inside the

12  apartment.  I wanted him to come out, if at all

13  possible, so we could make a visual identification.

14         So I told her to make up an excuse that she

15  couldn't go inside.  Try and draw him out if he

16  wanted her to come in.

17         She then drove to that location.  And

18  there's a parking lot just to the east of the

19  apartment building.  It's called the Carpet Shack

20  parking lot.  It's a large parking lot.

21         There's only one way in and one way out.

22  And it sits between the building 611 University and

23  the business, the Carpet Shack, which sits east of

24  that.

25         She pulled into that parking lot and parked

1    on the east side of the building at 611 University

2    Avenue.

3    Q.      Was this recorded?

4    A.      Yes.

5    Q.      Okay.   What happened next?

6    A.      I parked up the street on University, just

7    west of the target location approximately a block to

8    a block and a half.

9          And while I was -- while I was waiting --

10   While we were waiting for the target to arrive, I

11   decided it would be a good idea to throw my phone up

12   in the -- the windshield and just hit record so we

13   could see if anybody came and went from the parking

14   lot or from that apartment.

15         So I turned it on to video and hit "record."

16   And as I was setting that up and hitting the "record"

17   button, it turned out that that blue 2002 Chevy

18   Trailblazer had just driven past our vehicle.

19         And as I was trying to get the recording all

20   set on my phone, I could see that the Trailblazer was

21   getting ready to turn into the parking lot where our

22   informant was parked.

23   Q.      Same vehicle?

24   A.      Same vehicle.

25   Q.      Same license plate?

1    A.       Yes.

2    Q.       Okay.  And what happened then?

3    A.       A short time later, they were out of my

4    visual sight.  Obviously, I could hear what was going

5    on on the body wire, but they were out of my sight

6    because they were around the corner of the building.

7    So my vision was skirted by the building.

8             And I could hear Mr. Stevenson get into

9    Ms. Scholtes' vehicle.  And they had a short

10   conversation.  She gave him $50 and he gave her a bag

11   of crack cocaine and explained to her that, in the

12   future, it probably wouldn't happen at that location

13   anymore.

14   Q.       And is that recorded?

15   A.       Yes.

16            MR. LAMMERS:  Your Honor, I'm requesting

17   permission to play Government Exhibit 20A.

18            THE COURT:  You may.

19            (Tape is played.)

20   BY MR. LAMMERS:

21   Q.       Do you recognize Mr. Stevenson's voice in

22   that recording?

23   A.       Yes.

24   Q.       And I think you mentioned this, but you

25   bought $50 worth of crack cocaine that day?

1   A.        Correct.

2   Q.        Was that recovered?

3   A.        Yes.

4   Q.        And I'm going to refer you now to Government

5   Exhibit -- I believe it is 4A.  Do you have that?

6   A.        Yes.

7   Q.        What is that?

8   A.        This is the crack cocaine purchased from

9   Mr. Stevenson by Shannon Scholtes on August 23rd,

10  2017.

11  Q.        And was that sent to the lab?

12  A.        Yes.

13  Q.        Was it initially tested for cocaine only and

14  not crack cocaine, if you know?

15  A.        Yes.

16  Q.        And was it retested?

17  A.        Yes, it was.

18  Q.        And was it, then, tested for cocaine base?

19  A.        Yes.

20  Q.        And is it, in fact, crack cocaine?

21  A.        Yes, it is.

22  Q.        Do you know why they wouldn't have tested

23  for -- If you know this.  And maybe you don't.  But

24  if they would have tested only for cocaine at the

25  lab?

1    A.        After review of the case and learning how

2    the procedures go at the lab, the item was

3    submitted -- We submit evidence from the police

4    department to be tested.  And we request the tests to

5    be done.

6              And this -- In this instance, the officer

7    that submitted this to the lab submitted it as a case

8    with the -- with the criminal offense being

9    possession of crack cocaine rather than possession --

10   or delivery of crack cocaine.  So the wrong one of

11   those.  So it was a possession rather than a delivery

12   case.

13             And when the -- And it was about a half a

14   gram -- or less than a half a gram.  So when the lab

15   receives cocaine, no matter if it's powder cocaine or

16   crack cocaine, if it's a -- from my understanding, if

17   it's a simple possession case and it's a small

18   amount, less than a gram, they just do the tests

19   required to verify that this is, in fact, cocaine,

20   some sort of cocaine.

21             But because of the small amounts, the

22   punishment doesn't get adjusted one way or the other

23   for whether it's crack cocaine or powder cocaine.

24   Q.        So they don't do the second test?

25   A.        So they don't do the second test because

1    it's more work than what's required for the charge.

2    Q.        Okay.  And then they later did the second

3    test on this?

4    A.        That's correct.

5    Q.        And it was crack?

6    A.        Correct.

7    Q.        Okay.  So after this controlled buy takes

8    place, what's next?

9    A.        As soon as Shannon Scholtes leaves the

10   parking lot, Mr. Stevenson leaves directly behind her

11   in that blue Chevy Trailblazer.  And they both head

12   towards downtown Dubuque.

13             So it was decided that -- I asked

14   Investigator Slight, Jeremy Slight, to follow Shannon

15   Scholtes while they went back to a secure location so

16   the drugs could be seized from Ms. Scholtes and she

17   could again be searched, her vehicle could be

18   searched, and all of the post-buy procedures for the

19   control could be put into effect.

20             And Investigator Slight took care of that

21   while Investigator Williams and I attempted to follow

22   Mr. Stevenson in the blue Chevy Trailblazer.  And

23   Sergeant Gary Pape and Lieutenant Dave Haupert were

24   also a two-person surveillance unit in their vehicle.

25   And they also assisted in attempting to follow

1    Mr. Stevenson post-buy to see where he went and what

2    he was doing.

3    Q.      At any point in the course of this

4    controlled buy involving Shannon Scholtes after it

5    was over, after the recording we just heard was over,

6    was Ms. Scholtes out of the sight of law enforcement?

7    A.      No.

8    Q.      At any point was Mr. Stevenson out of the

9    sight of law enforcement?

10   A.      There was a short time, when we were trying

11   to follow him in the downtown area, that he had

12   turned down some side streets and, I believe,

13   initially -- initially lost law enforcement.

14          We were trying to figure out where he was.

15   And a very short time later, Sergeant Pape and

16   Lieutenant Haupert located him on -- I believe on

17   16th Street at that point going into the gas station

18   near 16th and Kirkwood.

19   Q.      So you watched him go into the gas station?

20   A.      Yes.

21   Q.      Let me rephrase.  Law enforcement watched

22   him go into the gas station?

23   A.      That's correct.

24   Q.      Was he out of their sight after that on this

25   day?

1    A.        No.

2    Q.        Okay.  So what happened next?

3    A.        Once I was advised that Mr. Stevenson was at

4    the gas station -- or the target vehicle and the

5    target were at the gas station, we immediately headed

6    that way.  And as Investigator Williams and I were

7    coming into the area, we were actually driving past

8    the gas station as Mr. Stevenson was pulling out.

9              So he pulled right out to the edge of the

10   road, and I was the next vehicle past in the -- I was

11   in the passenger seat.  And I was able to look over

12   and clearly see Mr. Stevenson.

13             And I could clearly identify him as Michael

14   Stevenson in the driver's seat of the vehicle.  And I

15   did not see anybody else in the vehicle.

16   Q.        Was he wearing what Shannon Scholtes had

17   described?

18   A.        Yes.  He had on a white T-shirt with the

19   blue sleeves.

20   Q.        Okay.  What happened next?

21   A.        He went -- He drove from the BP gas station

22   parking lot across the street to the Dairy Queen

23   parking lot.  So the way that I can explain -- It

24   might be a little easier if I explain how that whole

25   corner is set up.

1          There's a BP gas station on the north side

2    of the street.  And then there's another gas station

3    directly across the street.  On the south side of the

4    street.  And then directly to the east of the south

5    side gas station is Dairy Queen.  And directly to the

6    east of the BP station is a Wendy's.

7          So two gas stations, a Dairy Queen, and a

8    Wendy's.  And he went from the BP station across the

9    street and into the Dairy Queen parking lot and just

10   parked and stayed in his vehicle for --

11   Q.        How long?

12   A.        -- a little over 23 minutes.

13   Q.        Okay.

14   A.        He didn't get out.  He just -- He was

15   looking around, on his phone.  And to us, it clearly

16   appeared that he was waiting for somebody to show up.

17   Q.        Okay.  And were you -- Did you personally

18   observe this?

19   A.        Yes.

20   Q.        And so you're staying in the area?

21   A.        Yes.

22   Q.        What happens next?

23   A.        At that time I was parked between the BP

24   station and the Wendy's.  And the --

25   Lieutenant Haupert and Sergeant Pape were parked

1    between the other gas station and Dairy Queen.  They

2    were video recording this the whole time parked

3    there.

4         And after the approximately 23 minutes that

5    he's parked in the Dairy Queen parking lot, he drives

6    back across the street to the gas pumps at the BP and

7    stops for just a second, and then drives around the

8    backside of the -- or the east side of Wendy's and

9    pulls into the parking lot of Wendy's and just waits

10   there.

11        At that time I could not see him because I

12   was on the west side of Wendy's, but the other

13   officers, who were videotaping, were able to see the

14   vehicle.

15   Q.    And at that point did anyone meet with the

16   defendant in that vehicle?

17   A.    Yes.

18   Q.    And was that recorded?

19   A.    Yes.

20        MR. LAMMERS:  Your Honor, I'd request

21   permission to play Government Exhibit 21.

22        THE COURT:  You may.

23        (Video is played.)

24   BY MR. LAMMERS:

25   Q.    Did you see the person that got in and/or

1    out of the defendant's vehicle?

2    A.        Yes.

3    Q.        Did he walk past you?

4    A.        He did.

5    Q.        Did you know him?

6    A.        Yes.

7    Q.        Who was it?

8    A.        Eric Steve.

9    Q.        How did you know him?

10   A.        I've dealt with him numerous times

11   especially over the past few years.  He has overdosed

12   multiple times.  And he's had friends at his house

13   who have overdosed multiple times.  So I've worked

14   multiple overdose investigations involving Eric

15   Steve.

16   Q.        As far as you know, he was a heroin addict?

17   A.        Yes.

18   Q.        So what happened next after Mr. Steve got

19   into the defendant's car and then got out of the

20   defendant's car and walked past you?

21   A.        I guess I did forget one point.  While we

22   were waiting for the -- During that 23 minutes, I had

23   contacted Ms. Scholtes by phone after she had --

24   Q.        No.  Well, just jump ahead to where we're at

25   here.

1    A.        Okay.

2    Q.        Go ahead.

3    A.        So we followed the target as he drove

4    westbound on 16th Street.  And Lieutenant Haupert and

5    Sergeant Pape attempted to find Eric Steve when he

6    went into the gas station.  So we stayed with the

7    target.

8              And he did not have a front license plate on

9    the -- on the vehicle, so we were going to use that

10   as a traffic violation reason for the stop.  We also

11   knew that he just sold drugs, so we orchestrated a

12   traffic stop with patrol.

13             And he was -- He drove to the area of 16th

14   and Main, where patrol was able to stop the vehicle.

15   Q.        And was there anyone in the vehicle other

16   than the defendant?

17   A.        No.

18   Q.        Were you present on that scene?

19   A.        Yes.

20   Q.        And what happened after the traffic stop?

21   A.        The officer making the stop made contact

22   with Mr. Stevenson.  He provided a false name to the

23   officer.  The officer then contacted me and asked

24   what his real name was.  And I advised him that it

25   was Michael Stevenson.

Case 2:18-cr-01023-CJW-MAR   Document 103   Filed 07/15/19   Page 131 of 173

              He was -- Michael Stevenson was then placed

under arrest for providing false information -- false

identification information to law enforcement.

              And during a search of his person incident

to arrest, he was found to have $107 in cash in his

pocket in the form of five $20 bills, one $5 bill,

and two $1 bills.

Q.      Let me stop you there.  I'm showing

Government's Exhibit 22.  Do you see that?

A.      Yes.

Q.      What is that?

A.      That is a photograph I took of the money

that was seized from Mr. Stevenson's pocket following

his arrest.

Q.      Is there anything significant about any of

the money in this particular photograph?

A.      Yes.  The top two $20 bills, the serial

numbers on those bills matched the two $20 bills

from -- that I had given to Shannon Scholtes in order

to purchase crack cocaine from Mr. Stevenson a short

time earlier.

Q.      So, in other words, he had law enforcement

money in his pocket?

A.      That's right.

Q.      Was there anything else recovered from the

1  defendant on that occasion?

2  A.       From his vehicle -- We used a canine to

3  conduct a free air sniff of the vehicle.  And the

4  canine indicated for the odor of narcotics on the

5  vehicle.

6         The vehicle was then searched.  And in the

7  center console of the vehicle, we found $180.  It was

8  folded in half.  And it was in the form of nine $20

9  bills.

10  Q.       Okay.  And as you are involved in this

11  traffic stop, is -- eventually does law enforcement

12  make contact with Mr. Steve?

13  A.       Yes.

14  Q.       What is recovered from his person, if

15  anything?

16  A.       It was two bags of heroin.  There was one

17  that was approximately a half gram.  And the other

18  one had a very small amount of heroin left in it.

19  And then there was a heroin syringe and spoons,

20  aluminum foil, other drug paraphernalia indicative of

21  somebody using heroin.

22  Q.       And was he -- What was the -- what was the

23  order of the contact?  Who was contacted first,

24  Mr. Steve or was Mr. -- was the defendant stopped

25  first?

1   A.          The defendant was stopped first.

2   Q.          Okay.  And the heroin that was recovered --

3   Or the suspected heroin that was recovered from

4   Mr. Steve, has that -- was that field-tested?

5   A.          Yes.

6   Q.          And was it eventually sent to the lab?

7   A.          Yes.

8   Q.          And I would ask you to please look in the

9   evidence -- or your bag there for Exhibit 3A.  Do you

10  have that?

11  A.          Yes.

12  Q.          And what is that?

13  A.          It is two separate bags.  One bag has a

14  large bag of heroin, approximately a half gram, and

15  the other one has a small amount of heroin, the

16  second bag with the much smaller amount of heroin

17  inside of it.

18  Q.          And were those bag tested at the lab?

19  A.          Yes.

20  Q.          And were they found to be heroin?

21  A.          Yes.

22  Q.          I'm going to go back now for a second.  And

23  I want to go over some of the -- I think we've

24  already talked about the call logs and the text

25  messages that you've recovered.

*Sarah J. Dittmer, CSR, RPR*
*1(888)388-2723*

1          If I understand correctly, when you got into

2     Mr. Birch's phone, you were able to recover all of

3     the text messages that were stored on the device; is

4     that right?

5     A.      Correct.

6     Q.      And which device was that?

7     A.      That was the Alcatel One Touch.

8     Q.      How many text messages were stored on that

9     device?

10    A.      4,843.

11    Q.      And did you -- In the course of your

12    investigation of that -- in the course of your

13    investigation in this case, did you review every one

14    of those messages?

15    A.      Yes.

16    Q.      In the course of your review of those text

17    messages, did you come across a number of text

18    messages going back and forth between Mr. -- or Adam

19    Birch and the defendant?

20    A.      Yes.

21    Q.      I'm going to refer you now to Government

22    Exhibit 13.  Can you tell us what this is?

23    A.      That is the -- Again, when you open the

24    Cellebrite content on the computer, it lists the type

25    of phone, the date that it was downloaded, several

         1    identifying features for that phone.  And this was
         2    one of those that I clipped and put onto a Word
         3    document to show which phone it was.
         4    Q.        And, now, on page two of that exhibit -- And
         5    what is this exhibit?
         6    A.        This is a log of all the text messages,
         7    including the content, between Adam Birch and Michael
         8    Stevenson.
         9    Q.        So I'm going to now -- If -- And I'm
        10    referring now to exhibit -- or to call 3935.  It says
        11    "in box from Lo."  Does that mean that Mr. Birch has
        12    received a text message from the defendant?
        13    A.        That's right.
        14    Q.        And then if it is a sent item, does that
        15    mean it's a text from Mr. Birch?
        16    A.        Yes.
        17    Q.        Okay.  So on January 4th, we have a text
        18    message from the defendant asking Mr. Birch to call
        19    him; is that right?
        20    A.        That's correct.
        21    Q.        Okay.  And I'm just going to scroll down.
        22    Do you see on 3674 -- What is that?
        23    A.        That is a text from Mr. Stevenson to
        24    Mr. Birch saying, "Call me.  Got something for you."
        25    Q.        What does that appear to be to you?

1  A.        It appears that Mr. Stevenson has something

2  that he wants to give to Adam Birch.

3  Q.        In context of the investigation and the --

4  your review of these phone calls, what do you believe

5  that to be?

6  A.        Heroin.

7  Q.        I'm going to scroll further down.  Do you

8  see on 3455 -- Excuse me.  I'll go up one.  On 3456,

9  what is that?

10 A.        A message to Mr. Stevenson from Mr. Birch

11 saying, "Off JFK.  I'm working, but I might" -- Oops.

12 Q.        Sorry?

13 A.        -- "I might be able to get dropped off

14 afterwards."

15 Q.        Okay.  And 3452, who is that text from?

16 A.        It is from Mr. Stevenson to Mr. Birch.

17 Q.        And what's he telling him?

18 A.        "Give me a minute.  I'm going to try to come

19 to you."

20 Q.        In your review of these text messages, did

21 you discover times when Mr. Stevenson would actually

22 travel to meet up with Adam Birch?

23 A.        Yes.

24 Q.        And I'm specifically referring now to 3450.

25 The text message goes from who to who?

```
 1   A.        It goes from Adam Birch to Michael

 2   Stevenson.

 3   Q.        And what does that text message say?

 4   A.        "Man, I really appreciate you helping me

 5   out.  I really need to get rolling again, bro.

 6   Starting off new always sucks."

 7   Q.        When was that?

 8   A.        That was January 9th, 2017, at 11:15 a.m.

 9   Q.        And to your knowledge, how long was that

10   after Mr. Birch got out of jail?

11   A.        Six days.

12   Q.        Okay.  What do you take "need to get rolling

13   again" to mean?

14   A.        Starting off again dealing drugs after

15   getting out of jail and essentially having nothing to

16   your name at that point.

17   Q.        Do you see the next message, 3449?

18   A.        Yes.

19   Q.        Who's that from?

20   A.        That is from Mr. Stevenson to Mr. Birch.

21   Q.        And what does that say?

22   A.        Mr. Stevenson says, "The quicker you grind,

23   the quicker you shine."

24   Q.        What do you take that to mean?

25   A.        It means the quicker you get to working hard
```

 1    and selling what you need to sell, the more
 2    successful you're going to be it at this business,
 3    the business of drug dealing.
 4    Q.      So again, 3434, do you see that text
 5    message?
 6    A.      Yes.
 7    Q.      And I guess I'm going to have you just sort
 8    of go through -- Or we'll scroll through.  Can you
 9    read those?
10    A.      Yes.
11    Q.      Okay.  I want you to read sort of the next
12    six or seven.  Do you see where I'm talking about,
13    from 3434 down to 3389?
14    A.      Yes.
15    Q.      What does that appear to be?
16    A.      You want me to read them out loud or to
17    myself?
18    Q.      No.  I want you to -- Have you reviewed
19    them?
20    A.      Yes.
21    Q.      Okay.  What appears to be going on there?
22    A.      It looks like Mr. Stevenson is -- or
23    Mr. Birch is telling Mr. Stevenson that he is going
24    to be off at five or 6:00.  And Mr. Stevenson is
25    saying that he's down by the library.

        1                And it looks like Mr. Birch is trying to
        2    figure out how to get a ride down to him but is
        3    unable to do so.  And then after that, it appears
        4    that Mr. Stevenson actually comes to Mr. Birch to
        5    bring him the heroin.
        6    Q.       They appear to be trying to meet?
        7    A.       Yes.
        8    Q.       I'm now referring specifically to 3206.  Do
        9    you see that?
       10    A.       Yes.
       11    Q.       What is that?
       12    A.       That is a message from Mr. Birch to
       13    Mr. Stevenson saying, "I might need you tonight.  Are
       14    you around?"
       15    Q.       Does that appear to be seeking drugs?
       16    A.       Yes.
       17    Q.       I see on 3179 -- Do you see that
       18    particular -- Well, here.  Let's -- Let me do it this
       19    way.
       20             Do you see 3180, that message?
       21    A.       Yes.
       22    Q.       And who's that from?
       23    A.       That is from Mr. Stevenson to Mr. Birch.
       24    Q.       What does that appear to be expressing?
       25    A.       Mr. Stevenson wants to know how much money

 1    Mr. Birch is looking to spend, essentially trying to
 2    figure out what quantity of drugs Mr. Birch is
 3    seeking.
 4    Q.      Okay.  And then on 3179, the response is,
 5    "At least 50."  What's a 50?
 6    A.      50's about two-tenths of a gram.
 7    Q.      Okay.  And then he refers to an HG just
 8    shortly after that.  What's that?
 9    A.      That's a half gram.
10    Q.      And then there's a discussion about player
11    deal.  What do you take that to mean?
12    A.      Player deal is a deal that a drug dealer
13    would get.  So drug dealers are obviously in the
14    business of making money.  So if they can get drugs
15    at a cheap price and sell them at a higher price,
16    they're going to make money.
17            So it's what you'd call a player deal, a
18    deal that a drug dealer would get rather than one a
19    drug user would get.
20    Q.      Do these -- In the course of your training
21    and experience, the drug dealers sometimes often use
22    themselves?
23    A.      Yes.
24    Q.      Especially in these heroin cases?
25    A.      Yes.

1  Q.      All right.  And then Mr. Stevenson's

2  response is?

3  A.      "Gotcha."

4  Q.      What do you take that to mean?

5  A.      He will do the player deal for him.

6  Q.      All right.  So I'm now going to bring up

7  some texts starting at 3032.  Do you see that?

8  A.      Yes.

9  Q.      On the top one, who is that to and who is

10 that from?  Or who's it to?  Excuse me.

11 A.      That is to Mr. Stevenson from Mr. Birch.

12 Q.      And what's he asking for here?

13 A.      A full gram of heroin.

14 Q.      And again, in the course of your training

15 and experience, is a full gram of heroin more

16 consistent with distribution quantity or user

17 quantity of drugs?

18 A.      A distribution quantity.

19 Q.      And how much does a full gram of heroin --

20 Well, here it appears to go for $140.  Is that

21 consistent with the prices that you see?

22 A.      Yes.  That's pretty cheap, but -- Typically

23 it would be 160, but 140 would be like a drug dealer

24 giving a drug user a good deal or a friend deal.

25 Q.      Okay.  So whose response, then, is the 140

```
 1    that's right below that?  3031.
 2    A.       That is from Mr. Stevenson to Mr. Birch.
 3    Q.       Okay.  And what do you take that to mean --
 4    refer to, the 140?
 5    A.       He's giving the price for the full gram.
 6    Q.       I'm sorry.  That's a terrible question.
 7             Is that money?
 8    A.       Yes.
 9    Q.       We're talking about dollars?
10    A.       Correct.  $140.
11    Q.       Okay.  Thank you.  So just below that, two
12    below, you say, "You know you still owe me 70;
13    right?"  Who's that from?
14    A.       That's from Mr. Stevenson to Mr. Birch.
15    Q.       What do you take that to mean?
16    A.       That he was -- That Mr. Stevenson had
17    fronted Mr. Birch a half a gram of heroin sometime in
18    the past and is still owed the money for that.
19    Q.       All right.  Below, I see -- On 3017, who is
20    that from?
21    A.       That is from Mr. Birch to Mr. Stevenson.
22    Q.       Okay.  And what's that referring to?
23    A.       Mr. Birch is asking if he can give
24    Mr. Stevenson an even 200 because he's not making
25    anything off of this deal.  He's just trying to help
```

1      a buddy out.

2             So there's somebody throwing in with

3      Mr. Birch to pool all of this money together.  And

4      Mr. Birch is hoping to be able to get both his drug

5      debt -- $70 drug debt paid off and get a full gram of

6      heroin for $140 and make it an even 200.  So he saves

7      himself $10 and is able to get some heroin for his

8      buddy.

9      Q.      So was that an indication that Mr. Birch is

10     actually distributing heroin?

11     A.      Yes.

12     Q.      And that message is to Mr. Stevenson?

13     A.      That's correct.

14     Q.      All right.  And what is Mr. Stevenson's

15     response?

16     A.      He says, "Yeah."

17     Q.      All right.  I'm referring now to 2980.  Do

18     you see that?

19     A.      Yes.

20     Q.      And what's the time?  And this is on what

21     date?

22     A.      This is on January 13th, 2017, at 2:19 p.m.

23     Q.      Okay.  And who is that from?

24     A.      That is from Mr. Birch to Mr. Stevenson.

25     Q.      What does it appear they're doing?

```
1   A.        It appears that they are going to be meeting
2   for a quick drug deal while Mr. Birch is at work.
3   Q.        And Mr. Stevenson's response to that is
4   what?
5   A.        "On my way, bro" -- or "OMW, bro," which
6   means "on my way."
7   Q.        All right.  Referring now to 2367.  Do you
8   see that?
9   A.        Yes.
10  Q.        What -- Who is that from?
11  A.        It is from Mr. Birch to Mr. Stevenson.
12  Q.        And what's happening here?
13  A.        Again, Mr. Birch is asking Mr. Stevenson for
14  a deal on drugs because he's not making anything off
15  of it and he's broke at the moment, so anything
16  helps.
17  Q.        So is Mr. Birch, in your opinion,
18  identifying that he's actually distributing drugs
19  here?
20  A.        Yes.
21  Q.        2344.
22  A.        Yes.
23  Q.        What appears to be happening here?
24  A.        That is from Mr. Birch to Mr. Stevenson.
25  And it looks like Mr. Birch is telling Mr. Stevenson
```

1    to please hurry because he hates waiting in the

2    meeting spot for too long.

3    Q.       Okay.  And in the subsequent text messages,

4    what appears to be happening?  I'm referring to the

5    next, let's say, five.

6    A.       It appears that the two of them are trying

7    to meet up anyway.  Mr. Stevenson's asking Mr. Birch

8    where he's at and telling him to get out of the car.

9    And then -- Yeah, that's it.  They're -- The next one

10   is a couple hours later.

11   Q.       Okay.  Specifically now, 20- -- Excuse me.

12   I want to make sure I've got the right spot.

13           Specifically now, 2044.  What is a "whole

14   one"?

15   A.       A whole one is a full gram.

16   Q.       And again, is that distribution quantity,

17   consistent with?

18   A.       Yes.

19   Q.       Now, I'm specifically referring you to 2023.

20   Do you see that?

21   A.       Yes.

22   Q.       Who is that from?

23   A.       It is from Mr. Birch to Mr. Stevenson.

24   Q.       And what does that appear to be referring

25   to?

1  A.        Mr. Birch is asking Mr. Stevenson -- or
2  telling Mr. Stevenson where he's at and stating that
3  his -- some acquaintance is on his way from Cedar
4  Rapids and will be here by 12:45, 1:00 in the
5  morning, "if you can do that full gram."
6  Q.        Is that -- What does that indicate to you,
7  that text message?
8  A.        That indicates that somebody from Cedar
9  Rapids wants heroin and knows Adam Birch and is
10  coming to Dubuque to get heroin.  In which case Adam
11  Birch is trying to get supplied heroin from his
12  supplier so he can, in turn, distribute that to his
13  friend from Cedar Rapids.
14  Q.        What is Mr. Stevenson's response?
15  A.        "That's too late.  Wish I could."
16  Q.        And does he respond again after that?
17  A.        He says, "Catch me in the morning."
18  Q.        Okay.  In the course of your investigation,
19  on February 1st -- Or in the review of these text
20  messages, did you see any contacts between the
21  defendant and Adam Birch on that day?
22  A.        On February 1st?
23  Q.        Yes.
24  A.        Yes.
25  Q.        Okay.  Do you recall when that was?

1    A.        Yes.

2    Q.        When?

3    A.        There was one text message at 4:48 p.m.,

4    there was a text message at 4:52 p.m., and a phone

5    call at 4:53 p.m.

6    Q.        All right.  I'm going to scroll ahead here.

7    Do you see at 66?

8    A.        Yes.

9    Q.        What is that?

10   A.        That is a text message from Mr. Birch to

11   Mr. Stevenson.

12   Q.        And what day is that?

13   A.        That is February 1st at 4:48 p.m.

14   Q.        And what is the next one?

15   A.        It is a text message from Mr. Stevenson back

16   to Mr. Birch.

17   Q.        And what's the time of that one?

18   A.        4:52 p.m.

19   Q.        And were you able to marry that text message

20   up with any phone calls at or near the same time?

21   A.        Yes.

22   Q.        Would you describe that for the jury,

23   please.

24   A.        They're in the call log section of the

25   Cellebrite dump.  There's a phone call -- an outgoing

```
 1    phone call.  This is an outgoing phone call from -- I
 2    take that back.
 3             I'm not sure if it was an outgoing or
 4    incoming.  But anyway, it was a phone call between
 5    Mr. Stevenson and Mr. Birch that occurred at
 6    4:53 p.m., and approximately a minute and a half
 7    long.
 8             MR. LAMMERS:  I'm, Your Honor, showing
 9    what's been marked as Government Exhibit 12.
10    BY MR. LAMMERS:
11    Q.       Officer, is this the call logs that you
12    referred to?
13    A.       Yes.
14    Q.       And I'm scrolling down here to 31.  Do you
15    see that?
16    A.       Yes.
17    Q.       And what date was that phone call?
18    A.       February 1st, 2017.
19    Q.       And who was that from?
20    A.       It was from Mr. Stevenson to Mr. Birch.
21    Q.       How long?
22    A.       One minute and 39 seconds.
23    Q.       So they talked for nearly a minute and 40
24    seconds?
25    A.       Correct.
```

```
 1    Q.        Did you ever, then, have an opportunity to
 2    compare the text messages that we've just gone
 3    through, the call log that we've just gone through,
 4    to the text messages between Mr. Birch and
 5    Mr. Walgren?
 6    A.        Yes.
 7    Q.        I'm now going to refer you to Government
 8    Exhibit 11.  Is that the text messages we're talking
 9    about?
10    A.        If you can scroll to the next page, I would
11    be able to tell you for sure.
12    Q.        Sure.
13    A.        Yes.  Text messages between Adam Birch and
14    John Walgren.
15    Q.        Okay.  Now, I'm going to go to that date.
16    Just give me a second here.  All right.  Referring
17    specifically on call number 74.  Do you see that?
18    A.        Yes.
19    Q.        What is that?
20    A.        That is a text message from John Walgren to
21    Adam Birch.
22    Q.        Okay.  What's it say?
23    A.        It says, "Okay.  What's UO?"  But he means
24    to put UP, because the next text message corrects it.
25    So "Okay.  What's up?"
```

1    Q.        Okay.  And then who was that from and who

2    was that to?

3    A.        It's from Adam Birch to John Walgren.  And

4    he just says, "Shit.  What tryna to do?"

5    Q.        Okay.  And do you see the next text message?

6    A.        Yes.

7    Q.        What's "half and half" mean?

8    A.        It means that John Walgren is asking Adam

9    Birch if he wants to throw down or pool their money

10   together in order to get a half a gram of heroin.

11   Q.        What's Mr. Birch's response?

12   A.        "I will see and" -- LUK is "let you know."

13   So "I'll see and let you know."

14   Q.        Okay.  And then does Mr. Birch, in the next

15   one, attempt to contact Mr. Walgren again?

16   A.        Yes.

17   Q.        And what's the time of that text message?

18   A.        4:55 p.m.

19   Q.        And do you see number 62?

20   A.        Yes.

21   Q.        And what time is that text message?

22   A.        At 5:01 p.m.

23   Q.        And what does that mean to you where it

24   says -- Well, I'll let you tell us.  What do you

25   think that text message means, the next one,

1    number 62?

2    A.        It says, "So 35/35.  I'm down.  He ready."

3    So essentially what Adam Birch is saying, "My $35 and

4    your $35, if you get that to me, I'm good with it.

5    And my guy's ready to sell it to us whenever."

6    Q.        And is this within -- Well, how much time is

7    this within from the phone call between Mr. Birch and

8    the defendant?

9    A.        Eight minutes -- I'm sorry.  Yes, eight

10   minutes.

11            MR. LAMMERS:  Your Honor, this might -- I

12   don't know when we're going to break, but this seems

13   it might be a good time for that.

14            THE COURT:  Very good.  It is almost 5:00.

15   And so, ladies and gentlemen, we will quit for the

16   evening.

17            As I've read to you before, my instructions,

18   what I will refer to regularly as my admonitions,

19   which is don't talk about this case among yourselves

20   or with anybody else.  Don't do any research.  Don't

21   try to look up anything about what "throwing down"

22   means or things like that.

23            Just go home and enjoy your evening.

24   Remember, tomorrow and each day after this, we're

25   going to be doing the 8:30 to 2:30 schedule with two

 1    20-minute breaks, so bring snacks.

 2            You can use the refrigerator back there and

 3    the microwave.  We'll have two 20-minute breaks kind

 4    of evenly spaced throughout our day tomorrow.

 5            So we'll be starting at 8:30 in the morning.

 6    So be here promptly ready to go by 8:30.  And then we

 7    will quit at 2:30 tomorrow afternoon.  So with that,

 8    go ahead and enjoy your evening.  And we'll see you

 9    back here tomorrow morning.

10            THE CLERK:  All rise.

11            (Jury excused.)

12            THE COURT:  All right.  Please be seated.

13            Mr. Lammers, anything we need to talk about

14    this evening in preparation for tomorrow?

15            MR. LAMMERS:  I don't think so.  And I think

16    the rest of this will go much more quickly.  I'm

17    about done with the text messages.  So just to

18    reassure the Court, we're not going to spend the next

19    three days doing that.

20            THE COURT:  No, that's fine.  No, I

21    understand how these cases go and the case agents

22    taking the laboring oar on getting most of this stuff

23    in.  And I understand how this is probably going to

24    go from here on.

25            Mr. Goldensoph, anything you think we need

1    to take up here today?

2              MR. GOLDENSOPH:  No, Your Honor.

3              THE COURT:  All right.  If anything comes

4    up, I'm in the building by seven a.m. in the morning,

5    so, you know, get ahold of me if we need to talk

6    ahead of time.

7              Mr. Lammers, I'm just reassured that old

8    dogs can learn new tricks by you figuring out how to

9    work the computer.  And so that gives me some

10   assurance at my age.

11             So unless there's something else, we'll be

12   adjourned for the evening.  And we'll see you

13   tomorrow.

14             MR. LAMMERS:  Thank you.

15             THE CLERK:  All rise.

16             (The record recessed April 23, 2019, at 5:00

17   p.m.)

18                    *    *    *    *    *

19

20

21

22

23

24

25

```
 1                     CERTIFICATE

 2              I, the undersigned, a Certified Shorthand

 3    Reporter and Notary Public of the State of Iowa, do

 4    hereby certify that I acted as the Certified

 5    Shorthand Reporter in the foregoing matter at the

 6    time and place indicated herein; that I took in

 7    shorthand the proceedings had at said time and place;

 8    that said shorthand notes were reduced to print under

 9    my supervision and direction by means of

10    computer-aided transcription; and that the foregoing

11    pages are a full and correct transcript of the

12    shorthand notes so taken.

13

14              IN WITNESS WHEREOF, I have hereunto set my

15    hand this 10th day of July, 2019.

16

17

18

19    _____

20    Sarah J. Dittmer

21    Certified Shorthand Reporter

22

23

24

25
```

## $

**$10** [2] - 120:2, 144:7
**$100** [2] - 106:14, 107:13
**$107** [1] - 132:5
**$140** [3] - 142:20, 143:10, 144:6
**$160** [3] - 32:11, 65:15, 66:1
**$180** [3] - 23:5, 23:10, 133:7
**$20** [8] - 23:5, 23:8, 23:10, 120:1, 132:6, 132:17, 132:18, 133:8
**$250** [1] - 32:25
**$35** [2] - 152:3, 152:4
**$50** [6] - 22:12, 32:9, 119:4, 120:1, 122:10, 122:25
**$60** [1] - 105:4
**$70** [1] - 144:5
**$80** [8] - 20:13, 32:10, 66:16, 67:3, 67:15, 67:24, 96:4, 96:11

## 0

**0000** [1] - 61:6
**0001** [1] - 61:6
**0002** [1] - 61:6
**0004** [1] - 61:8
**0005** [1] - 61:9

## 1

**1** [9] - 1:6, 1:20, 5:14, 5:17, 6:17, 24:24, 28:6, 132:7
**10** [6] - 2:10, 30:17, 31:9, 70:18, 103:23, 111:6
**10,000** [2] - 21:6, 60:7
**10th** [1] - 61:11
**11** [2] - 53:11, 150:8
**111** [1] - 1:20
**11:15** [1] - 138:8
**12** [2] - 104:7, 149:9
**12:00** [1] - 15:3
**12:01** [1] - 16:23
**12:45** [1] - 147:4
**12th** [6] - 1:25, 105:25, 106:11, 107:13, 109:8, 113:9
**13** [1] - 135:22
**13th** [1] - 144:22
**140** [3] - 142:23,

142:25, 143:4
**1415** [1] - 100:2
**15** [6] - 50:25, 60:17, 75:12, 75:18, 76:17, 110:7
**150** [1] - 68:19
**16** [2] - 29:25, 104:5
**160** [1] - 142:23
**16th** [5] - 93:22, 126:17, 126:18, 131:4, 131:13
**17** [1] - 114:1
**18-CR-1023** [3] - 1:4, 3:8, 17:21
**18A** [1] - 75:3
**19** [4] - 2:11, 9:21, 10:4, 10:11
**1910** [1] - 102:4
**19A** [5] - 2:11, 9:21, 10:4, 10:11, 11:7
**1:00** [1] - 147:4
**1:13** [1] - 16:23
**1:15** [3] - 15:4, 15:15, 16:22
**1:30** [1] - 110:19
**1:40** [1] - 110:19
**1:51** [1] - 109:9
**1A** [4] - 55:18, 55:21, 55:22, 56:10
**1st** [11] - 23:16, 25:13, 25:24, 83:25, 84:4, 89:5, 90:14, 147:19, 147:22, 148:13, 149:18

## 2

**2** [6] - 5:14, 5:17, 6:17, 24:24, 25:12, 28:6
**20** [4] - 39:18, 48:22, 85:11, 146:11
**20-minute** [2] - 153:1, 153:3
**200** [2] - 143:24, 144:6
**2002** [8] - 20:12, 30:10, 30:12, 70:21, 70:22, 71:4, 111:5, 121:17
**2013** [1] - 30:24
**2016** [1] - 46:19
**2017** [30] - 18:12, 19:19, 21:15, 21:24, 22:6, 23:17, 23:18, 23:20, 24:14, 24:17, 24:20, 24:25, 25:1, 25:13, 25:24, 26:18, 48:7, 79:25, 83:25, 84:4, 90:14, 92:2, 95:18, 105:25,

116:8, 123:10, 138:8, 144:22, 149:18
**2019** [4] - 1:11, 1:25, 1:25, 154:16
**2023** [1] - 146:19
**2044** [1] - 146:13
**20A** [1] - 122:17
**21** [1] - 129:21
**213-3018** [1] - 103:9
**22** [2] - 103:20, 132:9
**23** [4] - 128:12, 129:4, 130:22, 154:16
**2344** [1] - 145:21
**2367** [1] - 145:7
**2388** [1] - 101:17
**2390** [2] - 102:25, 103:1
**23rd** [11] - 1:10, 21:23, 22:6, 23:18, 23:20, 24:17, 24:20, 26:21, 26:22, 27:8, 123:9
**24** [3] - 109:17, 113:25, 116:2
**24/7** [1] - 82:23
**2400** [1] - 104:3
**2401** [1] - 104:6
**2407** [1] - 104:23
**25** [1] - 74:17
**26** [1] - 79:24
**29** [2] - 2:4, 102:8
**2930** [2] - 102:23, 103:1
**2980** [1] - 144:17
**2:19** [1] - 144:22
**2:30** [2] - 152:25, 153:7
**2A** [1] - 95:13
**2nd** [23] - 10:17, 18:11, 20:8, 23:17, 24:14, 26:18, 26:20, 27:6, 27:11, 48:7, 52:11, 61:21, 61:25, 62:22, 64:3, 65:9, 72:13, 91:17, 95:9, 95:17, 96:22, 97:9, 99:3

## 3

**3** [8] - 1:6, 5:3, 5:13, 5:16, 6:19, 24:13, 96:14
**30** [7] - 21:7, 60:12, 60:15, 60:20, 61:8, 74:17, 115:11
**3017** [1] - 143:19
**3031** [1] - 143:1
**3032** [1] - 142:7

**304** [2] - 20:13, 71:5
**31** [1] - 149:14
**3179** [2] - 140:17, 141:4
**3180** [1] - 140:20
**3206** [1] - 140:8
**33** [2] - 10:24, 11:14
**3389** [1] - 139:13
**3434** [2] - 139:4, 139:13
**3449** [1] - 138:17
**3450** [1] - 137:24
**3452** [1] - 137:15
**3455** [1] - 137:8
**3456** [1] - 137:8
**35/35** [1] - 152:2
**36** [1] - 78:16
**360-degree** [1] - 68:10
**3674** [1] - 136:22
**39** [1] - 149:22
**3935** [1] - 136:10
**3:00** [1] - 75:6
**3:03** [1] - 76:18
**3:17** [1] - 76:18
**3A** [1] - 134:9

## 4

**4** [8] - 5:3, 5:13, 5:16, 6:19, 24:17, 96:14, 117:6, 119:11
**4,843** [1] - 135:10
**40** [2] - 32:9, 149:23
**402** [1] - 11:9
**403** [2] - 11:9, 12:21
**404(b** [2] - 12:5, 12:20
**404(b)** [2] - 11:10
**425** [1] - 1:22
**45** [1] - 112:1
**4:48** [2] - 148:3, 148:13
**4:52** [2] - 148:4, 148:18
**4:53** [2] - 148:5, 149:6
**4:55** [1] - 151:18
**4A** [1] - 123:5
**4th** [1] - 136:17

## 5

**5** [6] - 5:3, 5:14, 5:16, 6:19, 24:20, 132:6
**50** [3] - 61:15, 141:5
**50's** [1] - 141:6
**51101** [1] - 1:17
**52401** [2] - 1:20, 1:23
**563)213-3916** [1] - 118:11

**5:00** [2] - 152:14, 154:16
**5:01** [1] - 151:22
**5:45** [1] - 89:6

## 6

**6** [1] - 96:12
**60** [1] - 105:2
**600** [1] - 1:16
**611** [4] - 117:6, 119:11, 120:22, 121:1
**62** [2] - 151:19, 152:1
**66** [1] - 148:7
**670** [1] - 1:16
**6:00** [1] - 139:24
**6:30** [1] - 68:21
**6th** [2] - 98:22, 108:13

## 7

**70** [1] - 143:12
**74** [1] - 150:17
**773** [1] - 67:12
**773)703-0872** [1] - 63:20
**78** [1] - 2:7
**7:10** [1] - 102:5

## 8

**80** [1] - 105:7
**803** [1] - 1:22
**88** [1] - 2:8
**8:00** [2] - 48:18, 86:16
**8:30** [3] - 152:25, 153:5, 153:6
**8:47** [1] - 1:11
**8th** [2] - 92:2, 92:7

## 9

**9** [2] - 2:10, 99:11
**91** [1] - 2:5
**911** [4] - 18:21, 87:14, 87:19, 93:2
**9656** [1] - 61:11
**99** [1] - 33:18
**9th** [2] - 1:25, 138:8

## A

**a.m** [4] - 1:11, 48:18, 138:8, 154:4
**able** [43] - 39:3, 40:6,

40:13, 41:18, 48:3, 50:6, 52:8, 52:11, 53:2, 59:23, 61:17, 62:2, 62:25, 66:7, 67:20, 67:21, 68:25, 70:11, 71:14, 72:2, 74:6, 76:3, 109:4, 110:16, 110:23, 111:2, 111:15, 111:20, 111:21, 112:22, 112:25, 113:14, 115:6, 117:19, 127:11, 129:13, 131:14, 135:2, 137:13, 144:4, 144:7, 148:19, 150:11
**absolutely** [1] - 66:8
**Academy** [1] - 30:11
**academy** [1] - 30:13
**accept** [1] - 8:12
**acceptance** [3] - 6:10, 7:16, 7:21
**access** [1] - 21:4
**account** [1] - 13:1
**accumulated** [1] - 117:15
**accurate** [2] - 58:2, 74:23
**acquaintance** [1] - 147:3
**acquire** [1] - 101:8
**acted** [1] - 155:4
**activated** [1] - 67:10
**active** [1] - 108:9
**activity** [1] - 108:6
**acts** [1] - 36:15
**actual** [1] - 74:20
**Acura** [2] - 111:1, 112:5
**Adam** [74] - 18:14, 18:17, 18:21, 18:22, 19:3, 19:9, 19:10, 20:4, 20:6, 20:20, 20:23, 21:3, 21:11, 21:12, 21:13, 21:19, 21:21, 23:16, 25:13, 26:17, 49:8, 49:14, 50:4, 50:7, 50:21, 51:10, 51:13, 51:23, 54:9, 56:5, 59:13, 61:22, 79:15, 79:22, 80:7, 81:5, 81:8, 82:3, 82:5, 83:15, 83:18, 84:3, 84:9, 86:18, 86:21, 88:12, 88:14, 89:2, 89:12, 89:18, 90:15, 98:3, 98:13, 102:14, 103:7, 103:12,

103:15, 104:12, 109:1, 135:18, 136:7, 137:2, 137:22, 138:1, 147:9, 147:10, 147:21, 150:13, 150:21, 151:3, 151:8, 152:3
**Adam's** [9] - 18:18, 18:25, 19:7, 21:2, 21:5, 21:20, 82:11, 88:8, 89:10
**addict** [3] - 19:14, 80:17, 130:16
**addiction** [2] - 19:3, 80:15
**addicts** [2] - 27:19, 43:22
**additional** [1] - 108:15
**address** [3] - 61:1, 84:25, 119:9
**adjourned** [1] - 154:12
**adjust** [1] - 78:4
**adjusted** [1] - 124:22
**Administration** [1] - 30:21
**admissibility** [1] - 12:11
**admission** [2] - 10:5, 12:15
**admit** [6] - 14:20, 24:15, 24:19, 24:22, 25:3, 25:16
**admits** [1] - 23:4
**admitted** [3] - 10:4, 10:6, 11:18
**admonitions** [2] - 75:13, 152:18
**advance** [1] - 13:4
**advised** [7] - 49:12, 70:24, 116:13, 119:6, 120:3, 127:3, 131:24
**afternoon** [4] - 52:11, 75:7, 75:12, 153:7
**afterwards** [2] - 20:15, 137:14
**age** [1] - 154:10
**agents** [1] - 153:21
**ago** [1] - 79:8
**agree** [5] - 6:6, 23:14, 62:13, 93:7, 97:20
**agreed** [1] - 67:24
**agreeing** [1] - 42:24
**agreement** [1] - 42:23
**ahead** [15] - 4:24, 14:3, 14:8, 15:2, 43:18, 48:6, 61:20, 81:23, 83:24, 101:12, 130:24,

131:2, 148:6, 153:8, 154:6
**ahold** [6] - 98:14, 98:15, 101:8, 103:14, 113:15, 154:5
**aided** [1] - 155:10
**air** [2] - 16:2, 133:3
**Alanzo** [1] - 20:2
**Alcatel** [5] - 52:7, 59:22, 59:23, 60:3, 135:7
**allegation** [1] - 10:16
**alleged** [1] - 11:23
**alleges** [5] - 24:13, 24:17, 24:20, 24:24, 25:12
**allowed** [5] - 50:9, 50:23, 81:8
**almost** [5] - 23:3, 30:5, 98:4, 111:1, 152:14
**alone** [1] - 44:24
**Alpine** [2] - 117:9, 117:10
**altogether** [1] - 43:4
**aluminum** [1] - 133:20
**ambulance** [2] - 18:22, 49:9
**amended** [3] - 13:11, 13:13, 13:14
**America** [3] - 1:3, 3:7, 17:20
**amount** [18] - 11:25, 32:7, 32:8, 32:9, 32:21, 32:22, 33:7, 33:9, 58:18, 58:20, 96:8, 105:10, 115:13, 115:24, 124:18, 133:18, 134:15, 134:16
**amounts** [4] - 32:5, 32:15, 32:18, 124:21
**Andrews** [1] - 76:24
**Angella** [1] - 84:18
**angles** [1] - 111:22
**answer** [4] - 23:12, 98:2, 101:6, 109:23
**answered** [1] - 67:14
**answering** [1] - 87:6
**anticipate** [1] - 76:5
**anyway** [2] - 146:7, 149:4
**apart** [1] - 57:25
**Apartment** [2] - 117:6, 119:11
**apartment** [7] - 81:18, 83:6, 107:3, 120:9, 120:12, 120:19, 121:14

**apartments** [4] - 81:25, 83:4, 84:8, 84:17
**apologies** [1] - 103:2
**apologize** [1] - 9:9
**appear** [10] - 3:18, 53:16, 53:23, 136:25, 139:15, 140:6, 140:15, 140:24, 144:25, 146:24
**Appearances** [1] - 1:15
**appeared** [1] - 128:16
**appreciate** [2] - 9:8, 138:4
**approach** [2] - 54:24, 61:6
**April** [6] - 1:11, 105:25, 106:11, 107:13, 113:16, 154:16
**area** [14] - 31:1, 31:22, 32:6, 33:4, 38:11, 53:9, 68:9, 70:23, 90:15, 114:19, 126:11, 127:7, 128:20, 131:13
**areas** [2] - 83:3, 114:22
**arm** [3] - 18:20, 56:2, 87:12
**arrange** [1] - 64:2
**arranged** [6] - 20:8, 108:17, 108:18, 108:20, 108:21, 119:3
**arrangement** [1] - 119:1
**arrangements** [1] - 118:5
**arrest** [3] - 132:2, 132:5, 132:14
**arrive** [2] - 88:1, 121:10
**arrived** [5] - 18:22, 51:14, 77:11, 77:12, 88:6
**asleep** [1] - 86:23
**asserted** [2] - 62:16, 97:23, 109:21
**assessing** [1] - 13:1
**assigned** [5] - 30:1, 30:2, 30:4, 30:24, 63:24
**Assistant** [2] - 1:19, 3:13
**assisted** [2] - 51:3, 125:25
**associated** [1] - 63:5

**assume** [3] - 13:10, 76:11, 89:24
**assuming** [1] - 9:5
**assurance** [1] - 154:10
**assurances** [1] - 44:19
**ate** [1] - 86:3
**attempt** [4] - 46:5, 66:5, 98:23, 151:15
**attempted** [3] - 44:2, 125:21, 131:5
**attempting** [2] - 41:22, 125:25
**attended** [1] - 30:11
**attention** [1] - 46:18
**Attorney** [2] - 1:22, 3:15
**attorney** [1] - 8:22
**Attorneys** [2] - 1:19, 3:13
**audio** [5] - 38:20, 69:2, 69:3, 69:7, 91:16
**August** [11] - 21:23, 22:6, 23:18, 23:20, 24:17, 24:20, 26:21, 26:22, 27:8, 116:8, 123:9
**automatic** [1] - 49:21
**autopsy** [1] - 14:13
**AutoPulse** [1] - 49:20
**available** [2] - 6:10, 6:13
**Avenue** [3] - 1:20, 119:11, 121:2
**awake** [2] - 85:21, 86:8
**aware** [4] - 6:5, 17:4, 31:24, 32:1
**awkward** [1] - 86:22

## B

**b)(1)(C** [1] - 6:5
**bachelor's** [1] - 30:8
**backboard** [1] - 49:21
**background** [2] - 10:13, 30:7
**backside** [1] - 129:8
**bad** [2] - 86:24, 118:24
**bag** [34] - 26:7, 26:13, 26:24, 55:5, 55:8, 55:10, 55:11, 55:14, 55:16, 55:17, 57:10, 57:11, 57:14, 58:2, 58:9, 58:10, 58:11, 58:12, 58:14, 58:15, 58:17, 95:11, 95:13,

95:16, 96:1, 106:9, 106:20, 107:12, 122:10, 134:9, 134:13, 134:14, 134:16, 134:18
**Baggie** [10] - 26:8, 26:12, 26:18, 54:20, 55:23, 56:18, 59:1, 59:11
**Baggies** [9] - 23:2, 26:6, 26:23, 27:15, 54:17, 54:18, 57:9, 58:23, 59:16
**bags** [11] - 22:11, 56:23, 57:1, 57:6, 57:7, 57:11, 106:2, 106:16, 107:9, 133:16, 134:13
**ball** [1] - 36:25
**barrier** [1] - 12:14
**base** [2] - 110:16, 123:18
**based** [7] - 3:19, 4:5, 11:9, 35:14, 69:10, 98:9, 105:8
**bases** [1] - 12:9
**basic** [1] - 30:20
**basis** [1] - 53:23
**bathroom** [6] - 86:7, 111:24, 114:20, 115:20, 115:21
**Batson** [1] - 15:24
**battling** [1] - 87:17
**Beau** [1] - 79:15
**bed** [3] - 86:3, 86:22
**bedroom** [2] - 52:3, 54:7
**began** [6] - 18:21, 19:8, 22:5, 49:6, 49:24, 51:13
**beginning** [2] - 3:10, 77:9
**behind** [9] - 68:18, 68:19, 70:24, 71:10, 71:16, 71:17, 71:18, 79:20, 125:10
**belief** [2] - 5:11, 5:22
**belong** [1] - 51:23
**belonged** [3] - 20:1, 50:8, 63:15
**belongs** [1] - 72:6
**below** [4] - 143:1, 143:11, 143:12, 143:19
**benefit** [5] - 6:13, 6:20, 6:21, 42:17, 45:3
**bent** [3] - 56:1, 59:15, 87:4
**best** [1] - 24:9

**better** [3] - 32:13, 41:16, 68:25
**between** [22] - 7:11, 21:11, 24:25, 38:7, 49:1, 57:3, 93:19, 96:22, 99:2, 99:22, 102:3, 110:19, 120:22, 128:23, 129:1, 135:18, 136:7, 147:20, 149:4, 150:4, 150:13, 152:7
**beyond** [1] - 28:5
**big** [1] - 96:1
**Bill** [2] - 46:5, 46:6
**bill** [2] - 120:2, 132:6
**Billmeyer** [1] - 84:21
**bills** [10] - 23:5, 23:8, 23:10, 120:2, 132:6, 132:7, 132:17, 132:18, 133:9
**bindles** [1] - 57:10
**binoculars** [3] - 68:24, 71:12, 71:14
**Birch** [86] - 18:14, 19:10, 20:5, 20:6, 20:24, 21:3, 23:16, 25:14, 25:17, 26:17, 27:10, 27:24, 49:8, 49:14, 50:5, 50:9, 51:23, 52:4, 54:8, 62:4, 79:15, 79:16, 79:22, 98:3, 102:14, 102:18, 103:7, 103:12, 103:15, 103:22, 135:19, 136:7, 136:11, 136:15, 136:18, 136:24, 137:2, 137:10, 137:16, 137:22, 138:1, 138:10, 138:20, 139:23, 140:1, 140:4, 140:12, 140:23, 141:1, 141:2, 142:11, 143:2, 143:14, 143:17, 143:21, 143:23, 144:3, 144:4, 144:9, 144:24, 145:2, 145:11, 145:13, 145:17, 145:24, 145:25, 146:7, 146:23, 147:1, 147:9, 147:11, 147:21, 148:10, 148:16, 149:5, 149:20, 150:4, 150:13, 150:21,

151:3, 151:9, 151:14, 152:3, 152:7
**Birch's** [19] - 27:5, 49:17, 50:7, 50:11, 50:15, 50:21, 51:10, 51:13, 52:17, 53:17, 54:9, 56:2, 56:5, 59:13, 61:22, 109:1, 135:2, 151:11
**birth** [1] - 60:25
**bit** [7] - 10:13, 15:5, 56:16, 57:25, 61:20, 68:25, 83:25
**black** [3] - 34:1, 34:2, 71:14
**Blazer** [4] - 71:10, 71:21, 71:24, 72:5
**block** [4] - 69:15, 121:7, 121:8
**blood** [1] - 50:12
**blowing** [2] - 20:22, 98:16
**blue** [12] - 20:12, 46:16, 70:21, 70:22, 71:4, 111:5, 111:16, 112:17, 121:17, 125:11, 125:22, 127:19
**bodily** [2] - 50:15, 92:4
**body** [6] - 38:5, 38:19, 67:10, 69:4, 71:8, 122:5
**bolts** [1] - 40:4
**Booth** [1] - 70:25
**bottom** [2] - 62:10, 101:14
**bought** [11] - 19:14, 19:15, 20:3, 21:16, 31:21, 35:19, 36:21, 39:15, 40:17, 81:19, 122:25
**box** [1] - 136:11
**Box** [1] - 1:20
**boys** [2] - 18:16, 81:7
**BP** [6] - 127:21, 128:1, 128:6, 128:8, 128:23, 129:6
**brand** [2] - 52:6, 52:7
**break** [14] - 15:3, 15:10, 15:14, 15:20, 16:15, 17:22, 75:8, 75:12, 75:13, 75:17, 75:24, 76:3, 152:12
**breaks** [4] - 83:13, 83:14, 153:1, 153:3
**bridge** [3] - 110:2, 110:17, 111:3
**brief** [1] - 90:6
**briefing** [1] - 68:5

**briefly** [3] - 37:7, 37:8, 63:3
**Brillo** [4] - 36:8, 36:9, 36:12, 36:13
**bring** [9] - 14:6, 22:4, 39:11, 42:19, 76:24, 93:17, 140:5, 142:6, 153:1
**bringing** [2] - 38:1, 49:19
**bro** [5] - 16:7, 101:20, 138:5, 145:5
**broke** [1] - 145:15
**broken** [1] - 34:10
**brother** [4] - 18:14, 79:22, 80:14, 86:23
**brother's** [3] - 84:20, 84:21, 90:7
**brought** [6] - 14:4, 17:2, 49:23, 92:17, 109:10, 109:25
**brown** [1] - 55:5
**buddy** [3] - 106:17, 144:1, 144:8
**building** [12] - 82:10, 83:3, 83:5, 83:9, 107:3, 107:8, 120:19, 120:22, 121:1, 122:6, 122:7, 154:4
**buildings** [2] - 19:6, 81:18
**bunch** [1] - 45:3
**burden** [1] - 12:14
**business** [6] - 45:19, 45:20, 120:23, 139:2, 139:3, 141:14
**button** [2] - 46:16, 121:17
**button-down** [1] - 46:16
**buy** [56] - 10:21, 20:5, 20:9, 22:2, 22:7, 22:9, 23:5, 23:9, 27:21, 32:9, 34:24, 35:2, 35:6, 37:9, 37:12, 37:13, 37:18, 38:16, 38:22, 39:3, 40:18, 40:20, 40:25, 41:14, 41:16, 43:24, 44:5, 46:6, 64:3, 65:21, 68:6, 69:16, 69:17, 70:1, 71:2, 73:20, 74:21, 91:16, 91:20, 95:10, 96:21, 97:13, 105:16, 107:11, 108:16, 108:20, 113:20, 117:23, 118:2, 118:5, 118:12,

119:13, 125:7, 125:18, 126:1, 126:4
**buying** [9] - 19:12, 19:21, 20:17, 27:24, 28:1, 42:16, 43:9, 44:9, 67:18
**buys** [13] - 21:24, 34:25, 37:8, 39:11, 41:8, 42:3, 42:16, 43:14, 46:2, 47:22, 47:24, 97:6, 107:20
**BY** [13] - 29:19, 55:4, 63:2, 78:14, 88:25, 91:14, 98:8, 99:15, 100:21, 110:9, 122:20, 129:24, 149:10
**byes** [1] - 50:23

# C

**C.J** [2] - 1:13, 3:4
**camera** [4] - 110:15, 111:22, 115:14, 115:16
**cameras** [4] - 45:18, 45:19, 110:14, 110:16
**candidly** [1] - 6:24
**canine** [2] - 133:2, 133:4
**cap** [2] - 87:8, 87:9
**caps** [1] - 97:17
**captured** [1] - 115:25
**captures** [1] - 69:17
**car** [25] - 12:18, 20:11, 20:16, 22:10, 22:18, 22:23, 23:7, 23:10, 40:6, 40:10, 65:9, 68:18, 71:17, 82:19, 90:19, 112:11, 112:13, 112:15, 113:3, 119:18, 130:19, 130:20, 146:8
**card** [2] - 47:2, 47:10
**care** [2] - 14:9, 125:20
**careful** [1] - 21:1
**carefully** [1] - 23:21
**Carpet** [2] - 120:19, 120:23
**carpet** [1] - 82:9
**carry** [1] - 55:14
**Carter** [1] - 117:6
**Case** [2] - 3:7, 17:21
**case** [35] - 8:22, 10:19, 13:18, 15:11, 18:1, 23:22, 26:4, 26:20, 27:2, 27:3, 28:3,

28:7, 39:17, 40:7, 40:10, 46:8, 46:9, 75:14, 76:11, 77:10, 77:13, 91:23, 92:4, 95:5, 100:11, 108:11, 113:18, 124:1, 124:7, 124:12, 124:17, 135:13, 147:10, 152:19, 153:21

**cases** [3] - 31:12, 141:24, 153:21

**cash** [2] - 114:19, 132:5

**catch** [1] - 43:13

**Catch** [1] - 147:17

**caught** [1] - 113:17

**ceased** [1] - 113:21

**Cedar** [6] - 1:10, 1:20, 1:23, 147:3, 147:8, 147:13

**cell** [8] - 19:1, 21:5, 52:3, 52:5, 52:6, 52:7, 52:8, 62:1

**Cellebrite** [8] - 93:23, 93:24, 94:1, 99:4, 99:21, 104:20, 135:24, 148:25

**cellular** [2] - 51:22, 88:11

**center** [1] - 133:7

**certainly** [2] - 4:24, 6:12

**CERTIFICATE** [1] - 155:1

**certified** [2] - 29:8, 77:24

**Certified** [3] - 155:2, 155:4, 155:21

**certify** [1] - 155:4

**CHAD** [3] - 2:3, 29:7, 29:13

**Chad** [3] - 19:11, 29:6, 29:13

**chain** [3] - 5:7, 99:2, 99:8

**chair** [2] - 78:2, 78:3

**challenge** [1] - 15:24

**change** [3] - 116:4, 116:6, 116:7

**characterization** [3] - 6:7, 33:10, 58:2

**characterize** [1] - 104:8

**charge** [6] - 12:2, 12:6, 25:15, 32:23, 42:9, 125:1

**charged** [11] - 32:2, 35:22, 42:9, 42:10, 44:7, 44:13, 44:14,

46:9, 93:5, 107:24, 108:11

**charges** [3] - 13:3, 19:20, 46:10

**cheap** [2] - 141:15, 142:22

**check** [11] - 6:4, 28:14, 45:1, 45:14, 45:23, 64:20, 65:2, 65:4, 65:6, 93:13, 110:10

**chest** [1] - 49:21

**Chevy** [9] - 20:12, 70:21, 70:22, 71:4, 111:5, 111:16, 121:17, 125:11, 125:22

**Chicago** [1] - 53:9

**children** [1] - 80:24

**China** [1] - 34:12

**chunk** [1] - 36:13

**chunks** [1] - 64:16

**CI** [2] - 91:22, 105:22

**Circle** [1] - 81:18

**circles** [1] - 112:18

**circling** [1] - 112:6

**circumstances** [1] - 7:17

**CIs** [2] - 47:24, 95:6

**citizen** [1] - 108:5

**city** [2] - 49:1

**City** [5] - 1:17, 29:21, 29:24, 30:15, 110:13

**clandestine** [1] - 31:2

**clarity** [1] - 24:9

**clean** [1] - 9:7

**clear** [5] - 5:19, 14:12, 25:19, 58:7, 103:13

**clearly** [6] - 27:24, 68:20, 68:23, 127:12, 127:13, 128:15

**clerk** [1] - 4:6

**CLERK** [9] - 3:2, 14:23, 15:16, 16:24, 17:11, 75:19, 76:19, 153:10, 154:15

**click** [1] - 115:6

**client** [2] - 8:5, 8:11

**clip** [3] - 11:1, 11:7, 74:19

**clipped** [2] - 99:21, 136:2

**close** [2] - 69:11, 78:3

**closed** [1] - 16:6

**closer** [1] - 49:11

**clothing** [1] - 50:8

**clump** [1] - 34:9

**CNA** [3] - 78:24, 78:25, 79:1

cocaine [29] - 25:2, 25:4, 35:14, 35:16, 36:6, 36:7, 36:11, 57:8, 116:22, 119:4, 122:11, 122:25, 123:8, 123:13, 123:14, 123:18, 123:20, 123:24, 124:9, 124:10, 124:15, 124:16, 124:19, 124:20, 124:23, 132:20

**cocounsel** [1] - 23:23

**code** [2] - 60:5, 60:9

**codeine** [1] - 19:16

**codes** [11] - 21:6, 21:8, 52:19, 52:23, 60:7, 60:9, 60:11, 60:14, 60:22, 60:23

**coincide** [1] - 114:12

**cold** [2] - 18:19, 87:7

**collect** [3] - 50:7, 50:18, 84:11

**collected** [3] - 50:12, 50:20, 51:1

**College** [1] - 30:9

**color** [1] - 69:21

**colored** [2] - 34:8, 34:9

**comfortable** [2] - 29:11, 78:6

**coming** [6] - 45:2, 70:23, 86:7, 106:14, 127:7, 147:10

**commencing** [1] - 1:11

**committed** [1] - 12:22

**common** [4] - 34:16, 35:10, 60:24, 83:11

**commonly** [3] - 36:24, 92:23, 105:19

**communication** [1] - 51:17

**company** [3] - 63:21, 63:23, 94:16

**compare** [1] - 150:2

**compensated** [1] - 41:24

**compensation** [2] - 42:2, 42:6

**complete** [3] - 15:25, 16:9, 25:21

**completed** [1] - 97:13

**completely** [2] - 81:24, 87:11

**completes** [2] - 17:25, 28:10

**completing** [1] - 30:14

**compressions** [1] - 49:22

computer [8] - 72:23, 94:5, 94:6, 94:12, 100:17, 135:24, 154:9, 155:10

**computer-aided** [1] - 155:10

**computers** [1] - 72:23

**concealed** [2] - 64:25, 65:1

**condition** [1] - 49:17

**conduct** [6] - 6:17, 38:20, 39:25, 113:13, 113:18, 133:3

**conducted** [4] - 51:9, 66:6, 105:25, 119:16

**conducting** [1] - 13:18

**conducts** [1] - 44:18

**conferred** [1] - 5:9

**confidential** [8] - 31:4, 37:19, 39:22, 40:2, 46:20, 62:7, 113:22, 116:11

**connection** [2] - 41:12, 41:13

**consent** [1] - 77:12

**consider** [1] - 23:21

**consisted** [1] - 60:2

**consistent** [6] - 33:4, 33:5, 33:7, 142:16, 142:21, 146:17

**console** [1] - 133:7

**conspire** [1] - 23:14

**conspiring** [1] - 25:1

**constantly** [2] - 38:17, 98:13

**construction** [2] - 79:4, 82:6

**consumed** [2] - 33:24, 36:21

**Cont** [1] - 2:5

**contact** [18] - 53:7, 53:8, 62:6, 63:4, 63:7, 63:10, 94:22, 96:22, 97:9, 98:11, 102:18, 104:9, 106:10, 109:5, 131:21, 133:12, 133:23, 151:15

**contacted** [4] - 106:11, 130:23, 131:23, 133:23

**contacts** [6] - 21:1, 53:2, 53:4, 53:11, 64:1, 147:20

**contained** [2] - 26:3, 26:17

**containing** [5] - 54:17, 55:11, 55:24, 59:16, 95:16

**contains** [1] - 56:19

**content** [3] - 94:20, 135:24, 136:7

**contents** [2] - 60:17, 94:11

**contested** [1] - 6:16

**context** [3] - 94:8, 103:13, 137:3

**continue** [3] - 21:14, 50:1, 107:17

**CONTINUED** [1] - 91:13

**continued** [2] - 21:22, 49:12

**continues** [1] - 13:6

**continuing** [1] - 105:22

**contraband** [1] - 37:24

**control** [12] - 34:25, 38:17, 40:20, 41:23, 42:17, 42:22, 44:4, 44:5, 97:14, 105:14, 107:23, 125:19

**controlled** [36] - 37:9, 37:12, 37:13, 37:14, 37:16, 38:16, 38:22, 40:20, 41:8, 42:3, 42:16, 43:23, 44:5, 46:2, 47:22, 47:24, 55:12, 70:1, 91:16, 91:20, 95:9, 96:21, 97:6, 97:12, 105:16, 106:1, 107:20, 108:16, 108:20, 113:19, 117:23, 118:2, 118:5, 119:13, 125:7, 126:4

**controls** [5] - 40:15, 43:23, 44:2, 106:7, 106:25

**conversa** [1] - 40:1

**conversation** [4] - 38:7, 40:2, 73:1, 122:10

**conviction** [1] - 11:11

**convictions** [1] - 3:19

**cooperators** [1] - 45:12

**coordinator** [1] - 76:11

**copy** [3] - 74:3, 74:4, 94:5

**corner** [15] - 26:8, 57:9, 57:10, 57:13, 58:9, 58:10, 58:13, 59:1, 69:14, 85:2, 85:4, 90:10, 112:7, 122:6, 127:25

**corners** [3] - 26:6,

26:24, 57:7
**correct** [53] - 9:10,
13:15, 14:15, 33:11,
36:16, 40:22, 43:17,
52:14, 54:10, 56:19,
56:20, 64:4, 64:22,
66:11, 70:5, 70:10,
89:2, 89:5, 89:10,
89:13, 89:14, 89:16,
89:19, 90:4, 90:5,
90:7, 90:10, 90:16,
90:20, 91:18, 91:24,
100:8, 102:12,
103:5, 103:10,
103:16, 104:18,
104:21, 108:25,
109:2, 113:10,
116:20, 119:15,
123:1, 125:4, 125:6,
126:23, 135:5,
136:20, 143:10,
144:13, 149:25,
155:11
**correctly** [6] - 10:12,
40:19, 74:10, 91:15,
100:5, 135:1
**corrects** [1] - 150:24
**correspond** [2] -
101:23, 113:6
**correspondence** [1] -
4:5
**corroborate** [4] - 45:5,
45:24, 46:1, 108:8
**corroborated** [2] -
44:24, 45:7
**Cory** [2] - 1:21, 3:15
**Counsel** [2] - 18:11,
24:8
**Counsel's** [1] - 76:6
**count** [5] - 24:10,
24:11, 24:16, 24:19,
24:22
**Count** [7] - 24:13,
24:17, 24:20, 24:24,
25:12
**counts** [4] - 6:5, 24:1,
24:10, 28:8
**Counts** [8] - 5:3, 5:13,
5:14, 5:17, 6:17,
6:19, 24:24, 28:6
**County** [2] - 48:21,
51:3
**couple** [8] - 17:12,
61:3, 82:4, 87:24,
111:4, 112:19,
113:12, 146:10
**course** [18] - 25:18,
30:20, 31:6, 31:10,
33:2, 34:23, 44:10,
56:21, 59:8, 62:17,

93:4, 126:3, 135:11,
135:12, 135:16,
141:20, 142:14,
147:18
**courses** [5] - 30:18,
30:23, 31:5, 31:6
**Court** [16] - 3:3, 3:6,
5:19, 5:20, 6:18,
7:10, 7:25, 8:25,
9:18, 11:17, 13:10,
14:17, 18:10, 24:7,
153:18
**court** [5] - 15:9, 29:12,
44:23, 77:21, 78:7
**COURT** [82] - 1:1, 3:5,
3:23, 3:25, 4:7, 4:12,
4:15, 4:20, 4:24,
5:25, 7:9, 8:16, 9:8,
10:1, 10:3, 11:19,
12:10, 13:15, 13:17,
13:20, 13:24, 14:3,
14:8, 14:12, 14:16,
14:19, 15:1, 15:18,
16:10, 16:14, 16:19,
16:21, 16:25, 17:6,
17:9, 17:14, 17:18,
17:24, 18:9, 24:2,
24:6, 28:9, 28:16,
28:20, 28:25, 29:3,
29:10, 29:15, 54:25,
62:13, 62:18, 75:4,
75:6, 75:10, 75:21,
76:8, 76:10, 76:15,
76:17, 76:20, 76:24,
77:4, 77:20, 78:1,
78:10, 88:18, 88:21,
90:24, 91:2, 91:7,
91:11, 97:20, 98:1,
99:14, 109:14,
109:19, 122:18,
129:22, 152:14,
153:12, 153:20,
154:3
**Court's** [2] - 6:5, 76:6
**Courthouse** [1] - 1:10
**courtroom** [2] - 46:12,
77:6
**coverage** [2] - 68:10,
110:15
**covered** [1] - 110:15
**covers** [2] - 110:25,
116:1
**CPR** [4] - 18:21,
87:14, 87:20
**crack** [30] - 21:24,
22:2, 22:7, 22:11,
22:12, 23:9, 23:15,
23:19, 24:18, 25:2,
25:4, 35:13, 35:16,
36:6, 36:7, 36:11,

57:8, 116:22, 119:4,
122:11, 122:25,
123:8, 123:14,
123:20, 124:9,
124:10, 124:16,
124:23, 125:5,
132:20
**credibility** [1] - 25:10
**crews** [1] - 88:1
**Criminal** [1] - 3:7
**criminal** [3] - 3:17,
108:6, 124:8
**criminally** [1] - 107:24
**cross** [3] - 45:10,
45:16, 88:21
**CROSS** [1] - 88:24
**Cross** [1] - 2:8
**cross-examination** [1]
- 88:21
**Cross-Examination**
[1] - 2:8
**CROSS-
EXAMINATION** [1] -
88:24
**cross-reference** [2] -
45:10, 45:16
**crystal** [1] - 59:16
**CSOs** [1] - 15:7
**cupholder** [1] - 72:17
**currency** [2] - 65:15,
120:1
**cursor** [1] - 100:1
**cut** [1] - 11:4, 58:11
**cutting** [1] - 92:11

## D

**dad** [3] - 86:17, 87:21,
87:22
**daily** [4] - 27:19,
27:21, 27:25, 53:23
**Dairy** [6] - 127:22,
128:5, 128:7, 128:9,
129:1, 129:5
**dark** [3] - 68:22, 69:19
**date** [9] - 11:23, 63:1,
92:7, 94:17, 101:13,
135:25, 144:21,
149:17, 150:15
**dates** [1] - 60:25
**Dave** [1] - 125:23
**days** [10] - 21:3, 21:9,
61:11, 82:4, 90:14,
97:2, 106:5, 111:6,
138:11, 153:19
**deactivate** [2] -
105:21, 107:14
**dead** [2] - 18:23, 114:1
**deal** [22] - 8:11, 32:13,

34:2, 39:17, 41:19,
41:20, 67:15, 67:16,
92:11, 92:13,
119:25, 141:11,
141:12, 141:17,
141:18, 142:5,
142:24, 143:25,
145:2, 145:14
**dealer** [22] - 19:22,
21:2, 27:18, 32:13,
32:20, 32:21, 32:22,
32:24, 39:17, 40:25,
41:13, 41:14, 41:18,
41:21, 47:1, 62:21,
96:6, 96:9, 101:8,
112:12, 141:18,
142:23
**dealers** [11] - 26:7,
26:10, 34:25, 35:3,
35:7, 41:12, 41:19,
96:6, 141:13, 141:21
**dealing** [3] - 19:18,
138:14, 139:3
**dealt** [1] - 130:10
**death** [5] - 27:5,
52:18, 55:12, 92:3,
109:1
**debrief** [1] - 39:25
**debriefed** [1] - 73:21
**debt** [2] - 144:5
**deceased** [2] - 50:5,
54:8
**decedent** [1] - 51:4
**December** [1] - 30:12
**decided** [4] - 61:5,
84:9, 121:11, 125:13
**decides** [2] - 8:9, 96:9
**decision** [1] - 8:6
**Defendant** [9] - 1:7,
1:23, 18:4, 21:22,
21:24, 22:4, 22:5,
22:6, 22:7
**defendant** [40] - 3:14,
6:14, 7:14, 8:9,
12:18, 13:6, 16:7,
20:1, 22:8, 22:10,
22:14, 23:6, 23:13,
23:15, 23:19, 44:18,
44:19, 45:6, 63:9,
63:10, 72:10, 77:12,
96:23, 103:2,
103:14, 103:18,
103:22, 108:16,
108:21, 116:4,
129:16, 131:16,
133:1, 133:24,
134:1, 135:19,
136:12, 136:18,
147:21, 152:8
**defendant's** [5] - 13:2,

46:15, 130:1,
130:19, 130:20
**Defendant's** [3] - 22:2,
22:18, 22:22
**defendants** [1] - 44:12
**defense** [1] - 8:22
**degree** [1] - 30:8
**deliver** [2] - 26:10,
52:17
**delivered** [1] - 1:25
**delivery** [2] - 124:10,
124:11
**demands** [1] - 23:25
**demonstrate** [1] -
109:21
**denied** [1] - 9:11
**department** [2] - 62:8,
124:4
**Department** [3] -
30:10, 30:15, 35:16
**deputies** [1] - 48:21
**describe** [23] - 30:6,
33:15, 36:5, 37:11,
46:24, 48:14, 54:13,
57:3, 58:1, 60:1,
63:17, 64:6, 70:16,
80:4, 93:24, 96:25,
97:11, 102:1, 109:7,
114:2, 114:8, 116:9,
148:22
**described** [3] - 56:17,
71:22, 127:17
**desperate** [1] - 32:24
**determined** [2] -
54:22, 95:21
**device** [9] - 38:6, 67:4,
94:2, 94:3, 100:10,
119:22, 135:3,
135:6, 135:9
**dialed** [1] - 67:11
**died** [6] - 19:10, 20:6,
20:24, 21:21, 98:3,
104:12
**dies** [1] - 21:3
**difference** [2] - 27:1,
57:3
**different** [13] - 4:23,
43:10, 50:12, 52:20,
60:7, 93:19, 94:7,
94:10, 106:1,
111:22, 114:14,
114:22, 115:6
**difficult** [2] - 69:11,
79:17
**digit** [2] - 21:6, 21:8
**digital** [1] - 54:15
**digits** [1] - 60:4
**dire** [1] - 13:18
**DIRECT** [2] - 78:13,
91:13

**Direct** [3] - 2:4, 2:5, 2:7
**direction** [1] - 155:9
**directly** [5] - 49:23, 125:10, 128:3, 128:4, 128:5
**disappointed** [1] - 89:25
**discover** [1] - 137:21
**discovered** [1] - 104:16
**discrepancy** [1] - 66:20
**discussion** [2] - 17:16, 141:10
**dismantling** [1] - 31:2
**dismissed** [1] - 5:17
**dispatched** [1] - 48:11
**disqualified** [1] - 3:19
**distance** [2] - 20:14, 69:19
**distribute** [4] - 23:15, 23:16, 23:19, 147:12
**distributing** [2] - 144:10, 145:18
**distribution** [5] - 59:4, 62:24, 142:16, 142:18, 146:16
**DISTRICT** [2] - 1:1, 1:1
**District** [3] - 3:2, 3:3, 49:3
**Dittmer** [1] - 155:20
**divert** [1] - 49:13
**DIVISION** [1] - 1:2
**docket** [1] - 9:10
**doctor** [1] - 49:24
**doctors** [1] - 41:15
**document** [4] - 14:20, 38:25, 99:20, 136:3
**dogs** [1] - 154:8
**dollar** [1] - 32:15
**dollars** [2] - 39:18, 143:9
**done** [7] - 37:8, 43:17, 50:15, 73:3, 76:2, 124:5, 153:17
**door** [5] - 16:8, 87:3, 111:23, 114:17, 115:21
**doorway** [1] - 114:16
**double** [1] - 64:20
**double-check** [1] - 64:20
**doubt** [1] - 28:6
**down** [26] - 21:15, 34:10, 46:16, 69:15, 73:5, 75:22, 85:21, 86:21, 92:24, 92:25, 96:13, 99:25, 105:1, 106:17, 107:7,
110:21, 126:12, 136:21, 137:7, 139:13, 139:25, 140:2, 149:14, 151:9, 152:2, 152:21
**download** [1] - 94:4
**downloaded** [3] - 93:22, 94:12, 135:25
**downstairs** [1] - 7:4
**downtown** [3] - 110:14, 125:12, 126:11
**dozens** [2] - 31:15
**draw** [2] - 94:4, 120:15
**drive** [1] - 65:23
**driven** [1] - 139:13
**driver's** [5] - 19:25, 71:15, 71:18, 73:7, 127:14
**drives** [2] - 129:5, 129:7
**driving** [8] - 12:2, 12:6, 68:8, 69:18, 70:23, 71:4, 74:11, 127:7
**dropped** [5] - 85:2, 85:3, 90:15, 107:9, 137:13
**drove** [6] - 71:6, 111:7, 120:17, 127:21, 131:3, 131:13
**drug** [85] - 11:14, 12:19, 18:24, 19:3, 19:11, 19:14, 19:18, 25:21, 26:7, 26:10, 26:19, 26:20, 26:21, 26:22, 27:18, 30:3, 30:19, 30:22, 30:25, 31:5, 31:6, 32:19, 32:20, 32:21, 32:22, 32:24, 36:18, 37:19, 40:25, 41:3, 41:12, 41:13, 41:18, 41:19, 41:20, 41:21, 42:20, 42:24, 42:25, 43:22, 44:11, 44:14, 48:19, 48:20, 54:15, 58:21, 64:7, 66:21, 80:15, 96:6, 96:9, 97:3, 97:14, 98:22, 101:7, 101:8, 106:3, 106:4, 106:10, 106:24, 107:22, 108:5, 108:9, 113:17, 116:12, 118:2, 119:25, 120:4, 133:20, 139:3, 141:12, 141:13, 141:18, 141:19,
141:21, 142:23, 142:24, 144:4, 144:5, 145:2
**Drug** [1] - 30:20
**drug-related** [1] - 31:6
**drugs** [74] - 19:9, 19:12, 19:17, 19:21, 20:9, 20:15, 20:18, 21:12, 21:13, 21:23, 22:4, 26:3, 26:7, 26:9, 26:10, 32:16, 32:22, 37:14, 37:18, 38:1, 39:4, 39:6, 39:11, 39:14, 39:15, 39:16, 39:20, 40:9, 40:16, 41:1, 41:4, 41:14, 41:16, 42:17, 42:24, 43:1, 43:9, 43:13, 44:8, 46:5, 46:6, 54:1, 54:2, 55:13, 56:4, 57:7, 57:13, 58:8, 58:15, 58:18, 58:20, 58:25, 64:25, 72:20, 73:16, 81:9, 83:15, 88:14, 90:1, 101:8, 108:1, 113:22, 125:16, 131:11, 138:14, 140:15, 141:2, 141:14, 142:17, 145:14, 145:18
**Dubuque** [48] - 11:1, 18:13, 18:24, 19:11, 27:18, 29:22, 29:24, 30:3, 30:10, 30:15, 30:25, 31:8, 31:17, 31:21, 32:2, 32:6, 33:3, 33:24, 34:2, 34:4, 34:7, 34:13, 34:19, 35:15, 35:19, 45:18, 48:21, 48:25, 49:1, 51:3, 57:9, 59:9, 78:18, 79:9, 82:1, 84:16, 84:17, 92:3, 92:9, 108:6, 109:25, 110:2, 110:13, 110:15, 110:17, 111:3, 125:12, 147:10
**dump** [3] - 99:4, 99:22, 148:25
**duration** [2] - 38:6, 94:19
**During** [2] - 102:16, 130:22
**during** [18] - 15:10, 16:15, 25:4, 25:18, 27:4, 30:17, 38:6, 38:15, 66:5, 69:25, 75:12, 75:24, 82:21,
86:6, 89:21, 90:18, 106:4, 132:4

---

## E

**early** [1] - 52:10
**earpiece** [1] - 67:5
**ease** [1] - 17:14
**easier** [1] - 127:24
**East** [4] - 109:25, 110:2, 110:17, 111:3
**east** [6] - 120:18, 120:23, 121:1, 128:4, 128:6, 129:8
**eastbound** [1] - 111:3
**EASTERN** [1] - 1:2
**easy** [1] - 110:24
**eaten** [1] - 37:3
**ECF** [1] - 8:24
**edge** [1] - 127:9
**edited** [1] - 74:24
**education** [1] - 30:9
**educational** [1] - 30:7
**effect** [8] - 7:12, 8:7, 65:16, 72:24, 98:5, 98:7, 110:20, 125:19
**effort** [1] - 7:25
**eight** [6] - 21:3, 21:9, 61:11, 81:7, 152:9
**eight-year-old** [1] - 81:7
**either** [7] - 9:20, 25:2, 32:9, 42:6, 44:13, 52:8, 74:11
**electrical** [1] - 82:8
**electronic** [1] - 94:2
**emergency** [1] - 87:25
**Emily** [7] - 19:24, 21:16, 21:19, 25:9, 46:20, 47:1
**employed** [3] - 29:20, 29:23, 78:21
**employees** [1] - 82:4
**empty** [1] - 23:3
**en** [1] - 28:18
**enclosed** [1] - 73:20
**end** [13] - 23:22, 28:2, 28:7, 35:25, 36:8, 36:10, 36:25, 46:21, 48:25, 58:14, 58:15, 69:7, 111:12
**ended** [2] - 92:10, 113:16
**enforcement** [15] - 37:15, 42:4, 42:8, 44:9, 44:18, 45:13, 70:2, 73:13, 126:6, 126:9, 126:13, 126:21, 132:3,
86:6, 89:21, 90:18, 106:4, 132:4
**Drug** [1] - 30:20
**drug-related** [1] - 31:6
**Enforcement** [2] - 30:11, 30:21
**enjoy** [4] - 15:13, 75:17, 152:23, 153:8
**enter** [2] - 111:17, 111:23
**enters** [3] - 14:24, 17:17, 77:3
**entire** [5] - 69:25, 99:1, 111:1, 111:11, 114:10
**entry** [1] - 31:9
**equation** [1] - 39:8
**erase** [1] - 60:16
**erased** [1] - 106:22
**Eric** [11] - 22:18, 22:19, 22:20, 22:22, 23:1, 23:4, 23:18, 24:21, 130:8, 130:14, 131:5
**Eric's** [1] - 22:24
**escort** [1] - 15:7
**especially** [2] - 130:11, 141:24
**essentially** [14] - 39:13, 43:8, 44:8, 69:23, 94:11, 96:15, 98:16, 106:20, 108:3, 115:10, 115:15, 138:15, 141:1, 152:3
**evade** [2] - 44:4, 106:7
**evading** [1] - 44:2
**evening** [6] - 89:6, 152:16, 152:23, 153:8, 153:14, 154:12
**evenly** [1] - 153:4
**event** [4] - 5:21, 11:14, 45:21, 62:21
**events** [1] - 72:12
**eventually** [4] - 99:4, 117:22, 133:11, 134:6
**evidence** [19] - 12:15, 15:13, 23:12, 23:22, 23:24, 25:6, 25:14, 25:15, 28:4, 28:12, 50:7, 55:11, 55:12, 55:15, 55:16, 77:9, 124:3, 134:9
**ex** [3] - 9:2, 18:15, 87:21
**ex-husband** [2] - 18:15, 87:21
**exact** [7] - 5:15, 6:7, 84:25, 96:8, 113:8, 115:12, 120:3
**exactly** [2] - 40:3,

**132:22, 133:11**
**Enforcement** [2] - 30:11, 30:21

**Examination** [4] - 2:4, 2:5, 2:7, 2:8

**examination** [2] - 88:21, 90:25

**EXAMINATION** [4] - 29:18, 78:13, 88:24, 91:13

**examined** [2] - 29:9, 77:25

**except** [5] - 2:11, 3:20, 10:4, 53:14, 85:2

**exception** [3] - 9:21, 62:14, 97:21

**exchange** [6] - 42:12, 43:8, 72:18, 72:19, 89:16, 107:6

**exclaimed** [1] - 16:3

**excuse** [5] - 4:2, 47:12, 65:14, 120:14, 142:10

**Excuse** [2] - 137:8, 146:11

**excused** [4] - 4:1, 4:5, 91:3, 153:11

**Exhibit** [18] - 55:18, 55:22, 55:25, 56:10, 75:3, 95:13, 99:11, 109:17, 113:25, 116:2, 122:17, 123:5, 129:21, 132:9, 134:9, 135:22, 149:9, 150:8

**exhibit** [8] - 10:3, 11:8, 13:11, 55:1, 109:18, 136:4, 136:5, 136:10

**Exhibits** [1] - 2:9

**exhibits** [6] - 2:10, 9:20, 9:21, 9:22, 13:13

**existence** [1] - 94:16

**exiting** [2] - 112:3, 112:9

**exits** [4] - 15:17, 75:20, 112:2, 112:19

**experience** [11] - 31:11, 33:3, 34:12, 34:24, 35:15, 44:10, 56:21, 59:9, 105:9, 141:21, 142:15

**explain** [3] - 117:2, 127:23, 127:24

**explained** [3] - 57:5, 117:5, 122:11

**expressing** [1] - 140:24

**extend** [1] - 60:16

**extra** [1] - 15:5

**extremely** [2] - 58:18, 74:18

**Examination** [4] - 2:4, 2:5, 2:7, 2:8

**examination** [2] - 88:21, 90:25

**EXAMINATION** [4] - 29:18, 78:13, 88:24, 91:13

**examined** [2] - 29:9, 77:25

**except** [5] - 2:11, 3:20, 10:4, 53:14, 85:2

**exception** [3] - 9:21, 62:14, 97:21

58:20

**EYW** [2] - 20:13, 71:5

## F

**fact** [13] - 5:11, 7:1, 7:3, 12:16, 12:21, 20:5, 25:16, 43:15, 72:22, 106:5, 123:20, 124:19

**facts** [1] - 117:11

**fair** [6] - 31:10, 33:10, 37:5, 55:15, 82:11, 104:20

**fairly** [1] - 104:8

**fallen** [1] - 86:23

**false** [3] - 131:22, 132:2

**falsely** [1] - 38:2

**familiar** [8] - 31:20, 33:12, 35:16, 35:18, 35:21, 35:24, 36:2, 36:17

**family** [1] - 19:7

**far** [6] - 22:15, 48:25, 80:17, 108:9, 111:12, 130:16

**father** [3] - 50:21, 51:11, 51:16

**fear** [2] - 93:5, 93:8

**features** [1] - 136:1

**February** [40] - 10:17, 18:11, 20:8, 23:16, 23:17, 24:14, 25:13, 25:24, 26:18, 26:20, 27:6, 27:11, 48:7, 52:11, 61:11, 61:21, 61:25, 62:22, 64:3, 65:9, 72:13, 83:25, 84:4, 89:5, 90:14, 91:17, 93:22, 95:9, 95:17, 96:22, 97:9, 98:22, 99:3, 108:13, 109:8, 113:9, 147:19, 147:22, 148:13, 149:18

**Federal** [1] - 1:10

**feet** [1] - 68:19

**felt** [1] - 21:21

**female** [1] - 119:15

**fentanyl** [9] - 27:12, 27:13, 27:16, 34:13, 34:16, 35:4, 35:8, 54:23, 55:24

**few** [9] - 21:23, 52:20, 53:10, 53:11, 90:14, 90:19, 97:2, 130:11

**field** [4] - 30:14, 54:21, 95:19, 134:4

**field-tested** [3] - 54:21, 95:19, 134:4

**fighting** [1] - 24:23

**figure** [3] - 126:14, 140:2, 141:2

**figuring** [1] - 154:8

**file** [1] - 14:18

**filed** [1] - 8:23

**filter** [1] - 36:15

**finally** [4] - 10:8, 21:9, 61:11, 80:12

**fine** [3] - 76:12, 118:14, 153:20

**finished** [2] - 68:13, 91:16

**fired** [1] - 44:6

**first** [18] - 8:20, 18:3, 28:13, 44:6, 53:13, 65:17, 66:5, 66:7, 75:15, 80:10, 87:7, 110:13, 114:15, 118:13, 118:20, 133:23, 133:25, 134:1

**fist** [1] - 16:6

**five** [11] - 21:6, 21:8, 30:13, 60:10, 60:14, 60:20, 60:21, 102:20, 132:6, 139:24, 146:5

**Fourth** [1] - 1:16

**frame** [3] - 110:18, 110:20, 111:8

**frantic** [1] - 20:24

**free** [3] - 43:8, 77:6, 133:3

**frequently** [1] - 21:17

**friend** [4] - 89:10, 109:24, 142:24, 147:13

**friends** [2] - 92:6, 130:12

**friends'** [1] - 84:10

**front** [6] - 8:21, 78:5, 79:19, 99:16, 112:11, 131:8

**fronted** [1] - 143:17

**froze** [1] - 115:16

**frozen** [1] - 114:7

**full** [14] - 23:3, 25:24, 32:11, 44:21, 99:21, 115:24, 142:13, 142:15, 142:19, 143:5, 144:5, 146:15, 147:5, 155:11

**fully** [2] - 25:21, 37:22

**function** [1] - 67:8

**funds** [1] - 106:3

**future** [4] - 38:9, 42:10, 44:23, 122:12

**floor** [2] - 107:3, 107:4

**flooring** [1] - 82:9

**Florida** [1] - 81:20

**fluids** [1] - 50:16

**focus** [1] - 56:16

**foil** [1] - 133:20

**foldable** [1] - 57:6

**folded** [1] - 133:8

**folks** [3] - 7:4, 43:22, 95:6

**follow** [6] - 39:12, 64:15, 125:14, 125:21, 125:25, 126:11

**followed** [10] - 22:8, 23:6, 68:15, 71:24, 73:10, 118:1, 119:12, 119:13, 131:3

**following** [1] - 132:13

**follows** [2] - 29:9, 77:25

**FOR** [1] - 1:1

**Force** [1] - 59:10

**force** [26] - 18:24, 19:12, 30:3, 30:25, 31:11, 42:24, 42:25, 44:11, 48:19, 48:20, 64:7, 92:1, 97:3, 97:14, 98:23, 106:3,

**foregoing** [2] - 155:5, 155:10

**Forest** [1] - 68:17

**forget** [1] - 130:21

**forgot** [1] - 113:24

**form** [4] - 34:10, 34:11, 132:6, 133:8

**forms** [1] - 37:23

**forth** [5] - 15:6, 20:7, 83:22, 98:12, 135:18

**forward** [3] - 8:8, 16:9, 116:2

**foundation** [1] - 109:17

**four** [13] - 21:6, 21:8, 60:4, 60:9, 83:4, 101:14, 102:6, 112:14, 114:14, 114:23, 115:22, 115:23

**four-digit** [2] - 21:6, 21:8

106:4, 106:11, 106:24, 107:23, 108:6, 108:10, 113:17, 116:13, 118:3, 120:4

## G

**gains** [1] - 6:20

**game** [1] - 72:24

**games** [1] - 72:23

**gaps** [1] - 53:20

**Garfield** [3] - 84:25, 85:4, 90:10

**Gary** [2] - 48:19, 125:23

**gas** [28] - 111:12, 111:14, 111:19, 111:20, 111:24, 112:2, 112:8, 112:9, 114:11, 114:13, 114:21, 114:23, 115:1, 115:2, 126:17, 126:19, 126:22, 127:4, 127:5, 127:8, 127:21, 128:1, 128:2, 128:5, 128:7, 129:1, 129:6, 131:6

**gathered** [1] - 109:18

**gears** [1] - 62:24

**gem** [11] - 26:12, 26:18, 54:17, 54:18, 54:20, 55:23, 56:18, 57:11, 58:23, 59:10, 59:16

**general** [1] - 33:2

**generally** [8] - 32:5, 33:16, 35:22, 35:25, 36:6, 36:7, 42:2, 42:5

**gentlemen** [12] - 15:2, 17:19, 17:25, 24:8, 24:15, 27:9, 28:2, 28:10, 75:11, 77:5, 109:19, 152:15

**gesture** [1] - 58:1

**gestures** [2] - 57:18, 58:6

**giant** [1] - 110:25

**girlfriend** [4] - 72:11, 84:21, 117:9, 117:11

**given** [4] - 22:13, 23:9, 60:23, 132:19

**glass** [2] - 36:25, 56:1

**GOLDENSOPH** [26] - 3:24, 4:14, 4:21, 4:25, 8:14, 10:2, 11:20, 14:2, 14:11, 16:13, 16:20, 17:8, 24:5, 24:7, 29:2, 55:3, 62:10, 76:9, 76:16, 76:23, 88:22, 88:25, 90:22, 97:18, 109:11, 154:2

**Goldensoph** [23] - 1:21, 3:15, 3:23, 4:13, 4:20, 6:15, 6:24, 8:4, 8:22, 9:12, 9:20, 10:1, 11:9, 11:19, 16:11, 16:19, 17:7, 24:3, 28:9, 28:25, 76:8, 76:15, 153:25

**Goldensoph......** [1] - 2:8

**good-byes** [1] - 50:23

**Gotcha** [1] - 142:3

**Government** [15] - 3:16, 4:3, 8:1, 18:3, 28:12, 55:21, 75:3, 91:4, 99:11, 122:17, 123:4, 129:21, 135:21, 149:9, 150:7

**Government's** [8] - 3:21, 8:10, 13:2, 55:18, 55:22, 55:25, 77:10, 132:9

**graduating** [1] - 30:13

**gram** [34] - 20:7, 20:13, 32:10, 32:11, 32:25, 33:4, 33:6, 65:16, 66:17, 66:23, 66:24, 66:25, 67:2, 96:5, 96:14, 105:12, 124:14, 124:18, 133:17, 134:14, 141:6, 141:9, 142:13, 142:15, 142:19, 143:5, 143:17, 144:5, 146:15, 147:5, 151:10

**grams** [3] - 96:12, 96:14, 96:15

**granted** [2] - 7:19, 14:18

**gray** [2] - 34:8, 111:1

**great** [1] - 10:2

**Greenwood** [1] - 72:9

**Greg** [4] - 92:9, 92:10, 92:13, 92:16

**grind** [1] - 138:22

**guess** [22] - 5:12, 5:22, 6:2, 8:20, 11:21, 31:17, 32:4, 40:4, 41:6, 54:1, 57:5, 67:20, 72:13, 73:15, 83:20, 83:24, 95:8, 95:10, 108:14, 113:24, 130:21, 139:7

**guilt** [1] - 13:2

**guilty** [11] - 5:13, 5:14, 5:16, 7:15, 7:22, 8:3,

8:7, 21:21, 23:25, 28:5, 28:8

**gutted** [1] - 81:24

**gutting** [1] - 82:8

**guy** [2] - 116:13, 116:17

**H**

**hack** [1] - 72:23

**hacking** [1] - 72:25

**half** [31] - 20:7, 20:13, 29:25, 31:9, 32:10, 48:16, 66:17, 66:24, 67:1, 67:2, 69:15, 69:22, 80:9, 87:3, 96:5, 96:13, 105:12, 112:14, 115:9, 121:8, 124:13, 124:14, 133:8, 133:17, 134:14, 141:9, 143:17, 149:6, 151:7, 151:10

**hall** [2] - 28:15, 86:21

**hallway** [5] - 107:6, 111:23, 114:20, 114:21, 115:20

**hand** [8] - 16:6, 58:6, 72:18, 77:22, 89:16, 155:15

**hand-to-hand** [2] - 72:18, 89:16

**handed** [1] - 55:5

**handle** [1] - 108:1

**handling** [1] - 31:4

**hands** [3] - 16:2, 57:19, 57:25

**handy** [1] - 82:12

**Happy** [1] - 68:20

**hard** [3] - 19:6, 34:9, 138:25

**hardly** [1] - 32:16

**Harris** [3] - 84:13, 89:10, 89:19

**Harris's** [1] - 89:13

**hates** [1] - 146:1

**Haupert** [4] - 125:23, 126:16, 128:25, 131:4

**head** [2] - 49:7, 125:11

**headed** [1] - 127:5

**heading** [1] - 71:1

**hear** [10] - 26:25, 38:8, 71:7, 71:8, 71:9, 95:23, 116:15, 118:21, 122:4, 122:8

**heard** [7] - 15:13, 23:11, 32:24, 33:1, 74:9, 77:9, 126:5

**hearing** [1] - 9:2

**hearsay** [6] - 62:11, 62:14, 97:19, 97:21, 97:22, 109:13

**heavier** [1] - 96:3

**HEIDI** [3] - 2:6, 77:23, 78:8

**Heidi** [12] - 18:12, 18:17, 18:18, 18:19, 18:20, 19:4, 48:11, 51:14, 54:2, 76:4, 77:19, 78:8

**height** [4] - 111:22, 114:15, 114:16, 115:8

**held** [2] - 1:9, 17:16

**help** [5] - 8:5, 13:7, 80:13, 87:20, 143:25

**helped** [1] - 87:22

**helpful** [1] - 51:18

**helping** [1] - 138:4

**helps** [1] - 145:16

**hereby** [1] - 155:4

**herein** [1] - 155:6

**hereinafter** [2] - 29:8, 77:24

**hereunto** [1] - 155:14

**heroin** [135] - 10:18, 19:1, 19:15, 19:16, 20:3, 20:5, 20:7, 20:13, 21:2, 21:16, 22:12, 22:19, 22:20, 22:21, 23:3, 23:5, 23:15, 23:16, 24:13, 24:21, 25:2, 25:4, 25:13, 25:16, 26:17, 27:1, 27:2, 27:4, 27:5, 27:7, 27:10, 27:14, 27:15, 27:19, 31:3, 31:12, 31:18, 31:21, 32:2, 32:5, 33:3, 33:4, 33:12, 33:16, 33:21, 33:23, 33:24, 34:1, 34:2, 34:3, 34:6, 34:17, 34:21, 34:25, 35:2, 35:3, 35:6, 35:7, 35:8, 35:12, 47:1, 48:23, 54:21, 54:22, 55:24, 56:19, 56:22, 56:23, 56:25, 57:8, 59:10, 62:4, 62:21, 62:25, 63:8, 64:3, 65:16, 66:17, 67:15, 67:18, 72:20, 73:23, 80:17, 87:11, 87:15, 87:16, 92:8, 92:12, 92:17, 93:11, 95:16, 95:21, 96:2, 98:6, 98:24, 105:5, 105:9,

105:14, 105:19, 106:1, 106:15, 107:6, 107:12, 110:6, 110:21, 113:13, 113:20, 116:23, 130:16, 133:16, 133:18, 133:19, 133:21, 134:2, 134:3, 134:14, 134:15, 134:16, 134:20, 137:6, 140:5, 141:24, 142:13, 142:15, 142:19, 143:17, 144:6, 144:7, 144:10, 147:9, 147:10, 147:11, 151:10

**heroin's** [1] - 33:18

**HG** [1] - 141:7

**hide** [1] - 39:23

**higher** [1] - 141:15

**highly** [1] - 7:15

**highway** [1] - 30:22

**Hillary** [2] - 3:20, 3:25

**himself** [5] - 20:18, 21:12, 105:14, 106:18, 144:7

**hired** [1] - 30:9

**history** [2] - 3:17

**hit** [3] - 60:10, 121:12, 121:15

**hitting** [1] - 121:16

**hold** [2] - 43:11, 57:17

**holding** [1] - 57:25

**hole** [1] - 37:1

**home** [12] - 22:4, 23:1, 27:5, 81:5, 81:9, 82:25, 83:16, 85:6, 85:13, 86:1, 105:2, 152:23

**Honor** [59] - 3:22, 3:24, 4:6, 4:19, 4:21, 4:25, 7:8, 8:15, 8:19, 9:17, 9:23, 10:10, 11:20, 13:9, 13:16, 13:19, 13:23, 14:1, 14:2, 14:5, 14:10, 14:15, 14:22, 15:21, 16:18, 16:20, 17:8, 17:12, 18:8, 24:5, 28:15, 28:22, 29:4, 29:17, 54:24, 62:10, 75:2, 75:25, 76:14, 76:16, 76:22, 76:23, 77:2, 77:18, 78:12, 88:22, 90:22, 91:5, 91:12, 97:18, 97:25, 99:12, 109:11, 109:15, 122:16,

129:20, 149:8, 152:11, 154:2

**Honorable** [1] - 3:4

**hook** [1] - 94:2

**hoped** [1] - 19:4

**hopes** [1] - 42:8

**hoping** [2] - 45:2, 144:4

**hospital** [6] - 18:23, 49:18, 50:9, 50:19, 51:9, 51:15

**Hospital** [2] - 49:9, 49:13

**hot** [1] - 31:17

**hour** [6] - 20:17, 20:23, 48:16, 62:6, 97:12, 97:15

**hours** [6] - 10:24, 11:14, 31:1, 61:15, 102:4, 146:10

**house** [16] - 18:16, 18:25, 22:24, 40:7, 40:11, 54:3, 54:5, 58:24, 84:10, 84:20, 84:25, 85:7, 85:17, 89:13, 90:7, 130:12

**Humboldt** [2] - 85:3, 90:10

**hundred** [3] - 31:16, 61:3, 106:13

**hundreds** [1] - 31:1

**hurry** [1] - 146:1

**husband** [2] - 18:15, 87:21

**hustle** [1] - 101:5

**Hy** [4] - 110:1, 110:21, 111:9

**Hy-Vee** [1] - 110:1, 110:21, 111:9

**I**

**ice** [1] - 59:17

**ID** [2] - 47:2, 70:11

**idea** [1] - 121:11

**identification** [7] - 11:12, 46:22, 47:9, 47:10, 70:16, 120:13, 132:3

**identify** [3] - 73:23, 93:10, 127:13

**identifying** [3] - 12:18, 136:1, 145:18

**ill** [1] - 27:21

**Illinois** [3] - 47:2, 47:9, 110:3

**immediately** [8] - 22:23, 44:6, 52:10, 52:23, 62:3, 72:16,

112:12, 127:5
**implicate** [1] - 38:2
**implication** [1] - 12:1
**implications** [1] - 12:5
**implying** [1] - 27:25
**importance** [1] - 12:17
**important** [4] - 16:8, 27:3, 40:13, 58:21
**impossible** [1] - 58:16
**improper** [1] - 60:11
**IN** [2] - 1:1, 155:14
**in-store** [1] - 111:13
**inadvertently** [1] - 39:5
**incident** [2] - 62:9, 132:4
**inclined** [1] - 6:25
**include** [2] - 31:2, 54:16
**including** [3] - 106:25, 111:11, 136:7
**incoming** [2] - 94:25, 149:4
**independently** [1] - 104:19
**INDEX** [1] - 2:1
**indicate** [2] - 105:8, 147:6
**indicated** [2] - 133:4, 155:6
**indicates** [1] - 147:8
**indication** [1] - 144:9
**indicative** [1] - 133:20
**indoor** [1] - 65:23
**informant** [9] - 19:24, 37:19, 39:22, 40:2, 46:20, 62:7, 113:22, 116:11, 121:22
**informants** [1] - 31:4
**information** [32] - 19:20, 44:22, 44:24, 45:5, 45:8, 45:11, 45:13, 45:15, 45:17, 45:25, 46:1, 47:3, 49:8, 51:18, 60:8, 61:22, 63:22, 63:23, 64:17, 74:25, 94:3, 94:4, 98:10, 107:17, 108:4, 108:5, 108:7, 109:4, 110:10, 132:2, 132:3
**informed** [1] - 6:15
**ingest** [1] - 33:21
**ingested** [6] - 33:13, 33:16, 36:3, 36:6, 36:14, 36:23
**initial** [1] - 6:2
**injected** [3] - 33:18, 34:5, 37:2
**injury** [1] - 92:4

**input** [3] - 52:23, 60:4, 60:8
**inputting** [1] - 94:3
**inside** [18] - 21:10, 40:11, 45:19, 54:19, 55:25, 72:18, 89:13, 107:2, 107:8, 110:5, 111:14, 114:11, 114:13, 114:22, 120:9, 120:11, 120:15, 134:17
**inspect** [1] - 93:18
**instance** [1] - 124:6
**instructing** [1] - 12:25
**instructions** [4] - 17:23, 18:1, 18:4, 152:17
**integrity** [1] - 37:21
**intended** [2] - 11:6, 40:17
**interdiction** [2] - 30:22, 31:5
**interim** [1] - 105:1
**interrogation** [1] - 30:22
**interrupt** [1] - 77:13
**intersection** [3] - 68:17, 69:18, 111:7
**interview** [7] - 44:16, 44:17, 44:20, 44:22, 51:9, 51:13
**interviewed** [1] - 51:19
**interviews** [2] - 30:21, 44:12
**investigated** [1] - 31:14
**investigating** [1] - 56:22
**investigation** [22] - 21:14, 31:12, 37:21, 40:13, 40:14, 51:8, 51:19, 61:24, 62:17, 93:4, 95:6, 97:25, 102:16, 106:5, 109:16, 113:11, 113:20, 116:10, 135:12, 135:13, 137:3, 147:18
**investigations** [5] - 30:19, 31:3, 31:4, 105:10, 130:14
**investigative** [1] - 64:6
**investigator** [7] - 30:2, 30:20, 35:15, 51:2, 66:3, 75:22, 109:22
**Investigator** [13] - 19:11, 19:21, 19:25, 21:1, 21:4, 21:10,

21:15, 52:16, 77:14, 125:14, 125:20, 125:21, 127:6
**investigators** [2] - 49:10, 64:12
**involved** [10] - 7:10, 15:12, 26:19, 26:23, 27:2, 31:12, 44:12, 53:25, 108:1, 133:10
**involving** [2] - 126:4, 130:14
**IOWA** [1] - 1:1
**Iowa** [10] - 1:10, 1:17, 1:20, 1:23, 3:3, 30:11, 31:18, 49:3, 78:18, 155:3
**issue** [3] - 6:18, 12:20, 12:21
**issues** [1] - 24:23
**item** [2] - 124:2, 136:14
**items** [5] - 50:8, 50:18, 50:21, 51:2, 94:10
**itself** [1] - 79:9
**IV** [1] - 37:5

**J**

**Jack** [1] - 3:13
**jail** [7] - 19:17, 80:7, 80:8, 80:19, 87:18, 138:10, 138:15
**Jake** [2] - 109:25, 110:5
**James** [1] - 3:20
**January** [7] - 24:25, 79:25, 92:2, 92:7, 136:17, 138:8, 144:22
**jar** [1] - 56:1
**Jeremy** [1] - 125:14
**Jessica** [1] - 72:9
**JFK** [1] - 137:11
**jobsite** [1] - 83:8
**Joe's** [1] - 68:20
**John** [54] - 1:16, 19:12, 19:14, 19:17, 19:18, 19:19, 19:22, 20:3, 20:4, 20:6, 20:8, 20:11, 20:13, 20:15, 20:16, 20:18, 20:20, 20:23, 21:1, 23:17, 24:14, 25:9, 62:7, 62:21, 70:1, 73:10, 91:22, 91:25, 92:6, 92:13, 92:14, 92:16, 95:8, 95:17, 99:22, 99:23, 100:6, 100:9, 100:10,

100:25, 101:15, 102:3, 103:14, 103:18, 104:11, 104:14, 104:16, 105:4, 105:13, 150:14, 150:20, 151:3, 151:8
**John's** [1] - 20:22
**Judge** [1] - 1:13
**July** [1] - 1:25
**jump** [6] - 48:6, 61:20, 83:24, 101:12, 116:2, 130:24
**June** [3] - 1:25, 21:15, 30:24
**Juror** [1] - 3:20
**jurors** [5] - 3:17, 3:18, 4:16, 15:22, 16:1
**jury** [37] - 3:10, 3:11, 4:16, 7:23, 8:8, 8:12, 8:18, 11:7, 12:25, 13:25, 14:4, 14:7, 14:24, 15:8, 15:9, 17:1, 17:2, 17:10, 17:15, 18:11, 23:11, 24:8, 30:6, 33:15, 36:5, 37:11, 46:24, 48:14, 54:13, 60:1, 63:17, 64:19, 76:21, 80:4, 93:24, 102:1, 148:22
**Jury** [7] - 14:25, 15:17, 17:17, 17:23, 75:20, 77:3, 153:11
**jury's** [1] - 10:14
**justice** [1] - 23:25
**Justin** [3] - 84:13, 84:18, 89:10

**K**

**keep** [7] - 10:15, 26:9, 38:14, 39:23, 58:17, 102:21
**keeps** [1] - 114:7
**Kenny** [2] - 79:15, 90:7
**kept** [1] - 61:9
**kid** [1] - 20:25
**kids'** [1] - 87:21
**kind** [17] - 5:5, 5:10, 31:17, 32:5, 36:25, 42:2, 45:4, 57:24, 62:24, 64:16, 82:6, 87:2, 87:3, 89:22, 105:10, 112:17, 153:3
**Kirkwood** [1] - 126:18
**kitchen** [1] - 85:25

**Kleenex** [1] - 79:20
**knot** [4] - 57:15, 57:16, 58:10, 58:17
**knowing** [1] - 32:23
**knowingly** [1] - 23:13
**knowledge** [1] - 138:9
**known** [2] - 46:25, 71:2
**knows** [7] - 19:17, 19:18, 66:18, 116:13, 116:17, 117:20, 147:9
**Kyndra** [2] - 1:19, 3:14

**L**

**L-E-I-T-Z-E-N** [1] - 29:14
**lab** [9] - 56:11, 56:12, 123:11, 123:25, 124:2, 124:7, 124:14, 134:6, 134:18
**label** [1] - 5:2
**laboring** [1] - 153:22
**labs** [1] - 31:3
**laced** [1] - 34:13
**lacking** [1] - 25:10
**ladies** [12] - 15:2, 17:19, 17:24, 24:8, 24:14, 27:9, 28:2, 28:10, 75:11, 77:5, 109:19, 152:15
**LAMMERS** [64] - 3:22, 4:4, 4:10, 4:18, 6:1, 8:19, 9:14, 10:8, 13:9, 13:16, 13:19, 13:22, 14:1, 14:5, 14:10, 14:15, 14:17, 14:22, 15:21, 16:18, 17:4, 28:14, 28:17, 28:21, 29:4, 29:17, 29:19, 54:24, 55:1, 55:4, 62:15, 63:2, 75:2, 75:9, 75:25, 76:14, 76:22, 77:7, 77:18, 78:12, 78:14, 88:17, 88:19, 91:1, 91:5, 91:12, 91:14, 97:22, 98:8, 99:12, 99:15, 100:15, 100:21, 109:15, 110:9, 122:16, 122:20, 129:20, 129:24, 149:8, 149:10, 152:11, 153:15, 154:14
**Lammers** [24] - 1:16, 2:5, 3:13, 4:17, 5:6,

5:25, 8:16, 13:8, 13:17, 14:9, 14:12, 15:19, 16:17, 17:3, 62:13, 75:6, 75:23, 76:13, 77:16, 91:11, 97:20, 109:14, 153:13, 154:7

**Lammers........** [2] - 2:4, 2:7

**Lane** [1] - 68:17

**large** [2] - 120:20, 134:14

**last** [4] - 5:3, 10:10, 86:4, 86:10

**last-minute** [1] - 5:3

**lasted** [1] - 102:5

**late** [2] - 46:19, 147:15

**Law** [2] - 1:22, 30:11

**law** [15] - 37:14, 42:4, 42:7, 44:9, 44:17, 45:12, 70:2, 73:12, 126:6, 126:9, 126:13, 126:21, 132:3, 132:22, 133:11

**lawyers** [1] - 41:15

**lay** [1] - 10:13

**laying** [5] - 58:23, 59:2, 85:21, 88:13, 109:17

**leading** [2] - 51:17, 97:2

**leads** [1] - 41:7

**leaned** [1] - 16:5

**learn** [8] - 27:13, 27:17, 27:19, 27:22, 35:3, 47:15, 105:18, 154:8

**learned** [7] - 35:3, 45:13, 47:20, 62:20, 68:7, 102:17, 104:11

**learning** [2] - 46:25, 124:1

**least** [4] - 11:23, 23:14, 61:15, 141:5

**leave** [1] - 38:14

**leaves** [4] - 112:16, 115:10, 125:9, 125:10

**leaving** [1] - 16:5

**left** [19] - 22:13, 22:14, 22:24, 32:22, 39:21, 52:22, 58:12, 58:19, 66:4, 83:10, 84:19, 85:5, 89:6, 90:12, 97:13, 106:21, 107:10, 133:18

**legal** [1] - 42:7

**LEITZEN** [2] - 2:3, 29:7

**Leitzen** [12] - 19:11, 19:21, 19:25, 21:1, 21:4, 21:10, 21:15, 29:6, 29:13, 29:20, 91:6, 91:8

**Leitzen's** [1] - 77:14

**leniency** [1] - 42:8

**less** [3] - 8:1, 124:14, 124:18

**letters** [1] - 53:13

**letting** [1] - 68:5

**level** [1] - 6:12

**library** [1] - 139:25

**license** [6] - 20:1, 20:12, 71:4, 121:25, 131:8

**lie** [1] - 44:21

**Lieutenant** [4] - 125:23, 126:16, 128:25, 131:4

**life** [1] - 78:19

**lifesaving** [1] - 50:1

**lights** [1] - 87:1

**lightweight** [1] - 57:6

**likely** [5] - 8:1, 12:17, 62:4, 62:23, 64:25

**lineup** [2] - 117:18, 117:20

**list** [3] - 13:11, 13:14

**listed** [2] - 53:8, 67:11

**listen** [1] - 23:21

**listened** [1] - 74:19

**lists** [1] - 135:24

**lit** [1] - 36:12

**literally** [1] - 66:12

**litigation** [1] - 6:9

**live** [4] - 79:9, 81:3, 81:8, 117:5

**lived** [7] - 18:13, 51:14, 78:19, 81:6, 83:16, 85:1, 117:7

**living** [3] - 80:2, 88:15, 88:16

**Living** [2] - 81:19, 81:25

**Lo** [46] - 19:22, 19:23, 20:3, 20:5, 20:9, 20:11, 20:13, 20:19, 20:20, 20:24, 20:25, 21:2, 21:11, 21:13, 21:15, 21:17, 21:20, 21:21, 46:25, 47:19, 53:8, 53:15, 62:20, 62:23, 63:1, 63:5, 66:19, 67:2, 67:12, 74:1, 91:20, 95:17, 98:5, 98:12, 98:13, 100:4, 100:11, 100:25, 102:25, 110:5, 110:22,

136:11

**Lo's** [3] - 19:25, 62:3, 98:5

**located** [5] - 52:4, 56:2, 56:8, 56:9, 126:16

**location** [11] - 39:12, 65:25, 67:16, 67:17, 68:10, 69:11, 120:5, 120:17, 121:7, 122:12, 125:15

**lock** [1] - 60:15

**locked** [2] - 21:7, 61:8

**lockout** [1] - 60:16

**locks** [1] - 60:12

**Locust** [1] - 110:1

**lodged** [1] - 109:20

**log** [5] - 94:15, 99:21, 136:6, 148:24, 150:3

**logs** [6] - 53:21, 94:8, 94:9, 94:15, 134:24, 149:11

**look** [10] - 34:6, 55:1, 93:18, 94:7, 94:8, 94:10, 101:21, 127:11, 134:8, 152:21

**looked** [6] - 16:7, 53:9, 89:15, 98:25, 110:18

**looking** [5] - 62:1, 94:11, 118:12, 128:15, 141:1

**looks** [5] - 17:11, 101:15, 139:22, 140:1, 145:25

**Loras** [1] - 30:9

**lose** [1] - 59:3

**losing** [1] - 58:18

**lost** [1] - 126:13

**loud** [1] - 139:16

**love** [1] - 41:15

**low** [1] - 12:14

**luck** [1] - 16:7

**LUK** [1] - 151:12

**lunch** [6] - 15:3, 15:14, 15:20, 16:16, 17:19, 17:22

**LUNDQUIST** [2] - 18:8, 18:10

**Lundquist** [5] - 1:19, 3:14, 13:23, 18:6, 24:2

---

## M

**ma'am** [3] - 80:24, 86:13, 91:2

**machine** [1] - 94:1

**Main** [1] - 131:14

**main** [3] - 26:5, 41:3, 53:17

**maintain** [1] - 37:20

**maintenance** [2] - 79:1, 79:2

**majority** [6] - 32:14, 33:6, 33:17, 33:20, 37:4, 110:14

**makeup** [1] - 27:1

**male** [1] - 71:15

**man** [1] - 138:4

**manage** [1] - 106:7

**manager** [3] - 111:9, 114:24, 115:11

**manages** [1] - 21:4

**manner** [1] - 38:3

**marijuana** [5] - 19:15, 31:3, 54:17, 56:8, 56:12

**marked** [2] - 14:13, 149:9

**markings** [1] - 55:7

**marry** [1] - 148:19

**matched** [1] - 132:18

**material** [1] - 12:17

**matter** [15] - 3:6, 3:9, 5:4, 5:23, 6:2, 10:25, 12:7, 17:20, 62:16, 97:23, 98:4, 102:7, 109:21, 124:15, 155:5

**maximum** [1] - 60:6

**mean** [17] - 11:21, 26:2, 64:20, 82:2, 87:9, 95:25, 96:7, 136:11, 136:15, 138:13, 138:24, 141:11, 142:4, 143:3, 143:15, 151:7, 151:23

**means** [9] - 96:1, 101:5, 138:25, 145:6, 150:23, 151:8, 151:25, 152:22, 155:9

**meantime** [1] - 106:2

**measures** [1] - 50:1

**mechanisms** [1] - 37:17

**meet** [6] - 20:11, 49:13, 129:15, 137:22, 140:6, 146:7

**meeting** [6] - 38:21, 51:10, 52:22, 73:19, 145:1, 146:2

**meets** [1] - 112:11

**member** [1] - 31:8

**members** [4] - 18:11, 18:24, 23:11, 48:20

**men** [1] - 82:1

**mentioned** [5] - 18:4, 37:8, 67:13, 92:22, 122:24

**mercenary** [1] - 42:11

**Mercy** [2] - 49:9, 49:13

**merits** [1] - 9:15

**message** [40] - 48:20, 94:9, 97:16, 98:3, 99:1, 99:7, 100:6, 100:24, 101:9, 101:14, 101:21, 101:23, 102:6, 102:19, 102:23, 103:8, 103:20, 103:21, 136:12, 136:18, 137:10, 137:25, 138:3, 138:17, 139:5, 140:12, 140:20, 144:12, 147:7, 148:3, 148:4, 148:10, 148:15, 148:19, 150:20, 150:24, 151:5, 151:17, 151:21, 151:25

**messages** [27] - 25:20, 45:17, 53:21, 61:17, 93:18, 93:20, 94:17, 99:20, 99:22, 100:13, 102:21, 106:22, 134:25, 135:3, 135:8, 135:14, 135:17, 135:18, 136:6, 137:20, 146:3, 147:20, 150:2, 150:4, 150:8, 150:13, 153:17

**met** [8] - 22:6, 40:5, 73:19, 84:18, 84:20, 107:5, 110:5, 119:8

**metal** [3] - 36:8, 36:10, 36:14

**meters** [1] - 15:5

**meth** [1] - 31:2

**methamphetamine** [13] - 10:17, 10:18, 10:19, 19:1, 36:18, 36:24, 37:6, 54:18, 56:9, 56:13, 56:14, 57:11, 59:17

**methamphetamine's** [1] - 37:1

**Michael** [36] - 1:6, 3:7, 17:21, 20:2, 24:8, 24:13, 24:18, 24:21, 25:1, 25:3, 25:13, 25:16, 25:17, 28:5,

46:9, 63:25, 67:14, 74:7, 99:23, 100:7, 101:2, 101:11, 101:15, 102:4, 102:10, 105:5, 117:4, 117:7, 118:18, 127:13, 131:25, 132:1, 136:7, 138:1
**Michael's** [1] - 100:8
**microphone** [2] - 78:3, 78:4
**microwave** [1] - 153:3
**midnight** [3] - 85:14, 85:15, 86:5
**might** [14] - 7:20, 22:15, 40:7, 40:10, 40:12, 43:13, 64:19, 96:11, 127:24, 137:11, 137:13, 140:13, 152:11, 152:13
**Mike** [15] - 47:20, 47:21, 116:14, 116:18, 116:19, 117:2, 117:21, 118:21
**Mike-Mike** [7] - 47:21, 116:14, 116:18, 116:19, 117:2, 117:21, 118:21
**minute** [11] - 5:3, 11:2, 17:12, 35:13, 70:20, 102:5, 104:5, 137:18, 149:6, 149:22, 149:23
**minutes** [20] - 9:1, 11:2, 74:17, 75:12, 75:18, 87:24, 90:19, 110:7, 111:5, 112:1, 112:14, 112:21, 114:1, 115:9, 128:12, 129:4, 130:22, 152:9, 152:10
**missed** [1] - 64:25
**missing** [1] - 58:12
**mistake** [1] - 43:8
**mix** [2] - 39:4, 39:5
**mobile** [1] - 120:10
**moment** [3] - 4:22, 88:17, 145:15
**money** [36] - 32:7, 38:24, 38:25, 39:1, 39:2, 39:5, 39:6, 39:9, 39:10, 39:16, 39:19, 40:24, 42:12, 43:7, 66:21, 67:3, 72:17, 72:19, 84:11, 84:22, 89:19, 92:14,

92:22, 96:16, 107:7, 132:12, 132:16, 132:23, 140:25, 141:14, 141:16, 143:7, 143:18, 144:3, 151:9
**monitor** [1] - 79:20
**monitors** [1] - 115:6
**months** [2] - 21:23, 30:14
**morning** [11] - 4:17, 5:1, 18:15, 82:24, 86:13, 106:12, 147:5, 147:17, 153:5, 153:9, 154:4
**most** [7] - 30:19, 32:25, 34:4, 41:4, 53:24, 83:5, 153:22
**mother** [1] - 19:17
**motion** [6] - 8:23, 8:25, 9:5, 9:11, 9:15, 14:18
**mouse** [1] - 100:17
**move** [3] - 10:5, 32:4, 35:12
**moved** [3] - 115:18, 117:9, 117:10
**moving** [1] - 49:6
**MR** [90] - 3:22, 3:24, 4:4, 4:10, 4:14, 4:18, 4:21, 4:25, 6:1, 8:14, 8:19, 9:14, 10:2, 10:8, 11:20, 13:9, 13:16, 13:19, 13:22, 14:1, 14:2, 14:5, 14:10, 14:11, 14:15, 14:17, 14:22, 15:21, 16:13, 16:18, 16:20, 17:4, 17:8, 24:5, 24:7, 28:14, 28:17, 28:21, 29:2, 29:4, 29:17, 29:19, 54:24, 55:1, 55:3, 55:4, 62:10, 62:15, 63:2, 75:2, 75:9, 75:25, 76:9, 76:14, 76:16, 76:22, 76:23, 77:2, 77:18, 78:12, 78:14, 88:17, 88:19, 88:22, 88:25, 90:22, 91:1, 91:5, 91:12, 91:14, 97:18, 97:22, 98:8, 99:12, 99:15, 100:15, 100:21, 109:11, 109:15, 110:9, 122:16, 122:20, 129:20, 129:24, 149:8, 149:10, 152:11, 153:15, 154:2,

154:14
**MS** [2] - 18:8, 18:10
**multimedia** [1] - 94:9
**multiple** [3] - 130:12, 130:13, 130:14

---

# N

**name** [8] - 29:11, 29:12, 78:7, 87:5, 131:22, 131:24, 138:16
**name's** [1] - 84:13
**named** [5] - 62:20, 109:25, 116:11, 116:14, 116:18
**namely** [1] - 25:9
**names** [2] - 53:13
**narcotics** [3] - 30:20, 31:2, 133:4
**narrow** [1] - 97:7
**nature** [2] - 30:23, 53:22
**near** [3] - 95:11, 126:18, 148:20
**nearly** [2] - 21:6, 149:23
**necessarily** [1] - 115:23
**necessary** [1] - 78:4
**need** [20] - 4:16, 15:19, 15:22, 16:15, 17:1, 27:19, 28:14, 43:19, 75:23, 77:7, 79:17, 79:21, 105:2, 138:5, 138:12, 139:1, 140:13, 153:13, 153:25, 154:5
**needed** [3] - 82:5, 86:17, 86:20
**needle** [5] - 18:20, 23:4, 87:10, 87:12, 87:18
**negate** [1] - 38:22
**negative** [1] - 37:24
**negotiations** [1] - 7:11
**Nelson** [6] - 19:24, 21:16, 25:9, 46:20, 47:1, 47:10
**nervous** [1] - 20:25
**Nevada** [1] - 68:17
**never** [10] - 8:24, 18:22, 34:3, 56:24, 59:8, 59:10, 59:12, 83:10, 113:14, 116:24
**new** [4] - 47:1, 100:17, 138:6, 154:8

**newer** [1] - 60:16
**Next** [1] - 72:16
**next** [47] - 30:16, 34:15, 50:5, 50:19, 51:8, 61:24, 65:13, 68:1, 72:12, 77:16, 82:25, 86:12, 88:13, 91:4, 97:1, 97:25, 101:9, 102:20, 103:17, 103:20, 103:21, 103:24, 104:1, 109:16, 109:22, 113:11, 116:9, 119:20, 119:23, 121:5, 125:8, 127:2, 127:10, 127:20, 128:22, 130:18, 138:17, 139:11, 146:5, 146:9, 148:14, 150:10, 150:24, 151:5, 151:14, 151:25, 153:18
**nice** [2] - 95:24, 96:20
**nickname** [1] - 47:19
**nicknames** [1] - 47:16
**night** [10] - 20:5, 20:8, 64:9, 68:21, 70:12, 70:14, 71:12, 85:13, 86:6, 99:3
**nine** [5] - 23:5, 23:10, 60:5, 106:5, 133:8
**none** [2] - 17:4, 17:8
**nonessential** [1] - 74:25
**normal** [3] - 66:22, 67:1, 107:11
**normally** [2] - 66:22, 106:25
**North** [1] - 70:25
**north** [1] - 128:1
**northbound** [1] - 111:7
**Northern** [2] - 3:3, 49:3
**NORTHERN** [1] - 1:1
**Notary** [1] - 155:3
**notation** [1] - 9:4
**notes** [2] - 155:8, 155:12
**nothing** [5] - 12:6, 58:6, 66:8, 138:15
**notice** [2] - 26:25, 27:9
**notification** [1] - 52:18
**number** [28] - 10:22, 21:20, 37:5, 38:25, 46:10, 53:9, 60:19, 61:1, 61:2, 62:3,

63:5, 63:9, 63:12, 63:15, 63:19, 63:24, 64:10, 67:11, 67:12, 94:18, 101:17, 103:9, 117:13, 118:8, 135:17, 150:17, 151:19, 152:1
**Number** [4] - 3:8, 17:21, 117:6, 119:11
**numbers** [3] - 60:9, 117:15, 132:18
**numerous** [8] - 30:18, 31:5, 37:16, 37:20, 60:23, 94:9, 130:10
**nurse** [1] - 50:6
**nurses** [1] - 49:24
**nuts** [1] - 40:4

---

# O

**oar** [1] - 153:22
**oath** [2] - 77:22, 91:9
**object** [6] - 11:21, 12:8, 13:7, 62:11, 97:19, 109:12
**objected** [1] - 9:25
**objecting** [1] - 11:9
**objection** [7] - 4:2, 4:9, 4:10, 4:14, 9:19, 29:1, 76:9
**objection's** [1] - 98:1
**observe** [2] - 111:15, 128:18
**observed** [2] - 71:14, 89:15
**obtain** [1] - 105:14
**obviously** [13] - 7:10, 12:6, 32:7, 41:2, 42:18, 60:5, 62:1, 93:17, 107:8, 114:11, 120:6, 122:4, 141:13
**Obviously** [1] - 12:4
**occasion** [4] - 43:21, 46:2, 83:2, 133:1
**occasions** [3] - 20:4, 22:21, 97:1
**occur** [2] - 25:25, 73:18
**occurred** [6] - 45:22, 62:22, 69:17, 149:5
**occurrence** [1] - 35:10
**occurring** [1] - 90:4
**odd** [1] - 18:17
**odor** [1] - 133:4
**OF** [1] - 1:1
**off-the-record** [1] - 17:16

off-white [1] - 34:9
offense [2] - 44:14, 124:8
offer [2] - 5:7, 8:11
Offered [1] - 2:9
offered [1] - 80:10
offering [2] - 6:2, 6:21
Office [2] - 48:22, 51:3
office [13] - 6:4, 7:5, 42:19, 64:8, 64:11, 66:7, 93:17, 97:3, 98:23, 106:24, 118:3, 119:16, 120:4
officer [14] - 29:20, 29:21, 29:24, 44:11, 55:5, 56:22, 70:21, 76:24, 124:6, 131:21, 131:23, 149:11
Officer [4] - 34:16, 91:6, 91:8, 91:15
officers [7] - 10:22, 10:23, 22:24, 23:6, 52:1, 88:6, 129:13
offscreen [1] - 115:9
often [3] - 34:5, 53:24, 141:21
oftentimes [1] - 32:21
old [8] - 19:6, 61:2, 78:15, 79:23, 81:7, 119:6, 120:8, 154:7
older [3] - 84:20, 84:21, 90:7
OMW [1] - 145:5
once [11] - 30:13, 38:13, 52:22, 61:4, 61:16, 62:22, 65:25, 68:2, 68:13, 71:13, 127:3
One [5] - 52:7, 59:22, 59:24, 60:3, 135:7
one [74] - 9:4, 10:10, 21:19, 22:11, 23:2, 23:3, 23:13, 23:14, 26:9, 27:15, 27:16, 27:18, 27:23, 37:23, 41:3, 42:5, 52:24, 53:8, 53:24, 56:23, 56:25, 64:14, 65:16, 69:9, 70:9, 74:15, 77:10, 84:10, 89:9, 90:12, 94:19, 95:24, 96:20, 98:6, 101:9, 103:24, 103:25, 104:2, 106:2, 106:4, 107:9, 107:10, 107:12, 108:17, 108:18, 108:20, 114:18, 115:18, 115:19, 117:17,

120:21, 124:10, 124:22, 130:21, 132:6, 133:16, 133:18, 134:13, 134:15, 135:13, 136:2, 137:8, 141:18, 142:9, 146:9, 146:14, 146:15, 148:3, 148:14, 148:17, 149:22, 151:15, 151:25
one's [1] - 115:18
one-gram [1] - 65:16
ones [1] - 41:11
Oops [1] - 137:11
open [4] - 52:8, 55:17, 55:20, 135:23
opened [1] - 61:12
opening [7] - 13:21, 18:2, 18:5, 18:6, 24:4, 24:10, 28:11
opens [1] - 58:15
opiate [1] - 27:14
opine [3] - 5:20, 7:12, 8:6
opinion [2] - 7:19, 145:17
opportunity [7] - 34:24, 35:2, 35:6, 48:10, 95:4, 98:18, 150:1
opposite [1] - 112:20
orange [2] - 87:8, 87:9
orchestrated [1] - 131:11
order [10] - 9:24, 28:22, 36:9, 37:20, 41:20, 43:14, 65:16, 132:19, 133:23, 151:10
ordered [1] - 1:25
otherwise [2] - 27:20, 38:22
outgoing [8] - 95:2, 100:5, 100:9, 100:10, 103:8, 148:25, 149:1, 149:3
outside [10] - 3:10, 17:1, 42:17, 55:7, 79:10, 79:11, 83:9, 84:18, 105:13, 111:10
overall [3] - 114:21, 115:5, 115:22
overcome [1] - 12:25
overdose [4] - 31:3, 48:23, 92:3, 130:14
overdosed [8] - 22:20, 92:5, 92:19, 92:20,

92:21, 130:11, 130:13
overlook [1] - 114:19
overlooks [2] - 111:10, 114:9
overruled [2] - 62:18, 98:1
owe [1] - 143:12
owed [2] - 84:22, 143:18
own [7] - 39:3, 39:4, 42:17, 43:9, 97:14, 105:19, 106:20

**P**

p.m [16] - 16:23, 76:18, 102:5, 109:9, 144:22, 148:3, 148:4, 148:5, 148:13, 148:18, 149:6, 151:18, 151:22, 154:17
package [2] - 26:10, 57:7
packaged [1] - 31:24
packaging [7] - 26:2, 26:3, 26:5, 26:11, 26:15, 26:16
Pad [4] - 36:8, 36:9, 36:12, 36:13
page [7] - 100:12, 101:14, 102:20, 104:25, 118:13, 136:4, 150:10
Page [1] - 2:2
paged [1] - 105:1
pages [1] - 155:11
paid [1] - 144:5
painting [1] - 82:9
Pape [5] - 48:19, 125:23, 126:15, 128:25, 131:5
paper [1] - 55:5
paraphernalia [2] - 54:16, 133:20
Park [2] - 48:23, 81:17
park [1] - 49:6
parked [11] - 68:19, 68:24, 111:17, 120:25, 121:6, 121:22, 128:10, 128:23, 128:25, 129:2, 129:5
parking [37] - 65:23, 65:24, 66:2, 66:10, 66:12, 68:4, 68:16, 68:20, 69:5, 73:9, 73:20, 110:1, 110:4,

111:11, 111:12, 111:17, 112:3, 112:4, 112:6, 112:8, 112:18, 112:19, 114:10, 120:18, 120:20, 120:25, 121:13, 121:21, 125:10, 127:22, 127:23, 128:9, 129:5, 129:9
parks [1] - 112:7
part [5] - 16:9, 56:10, 83:5, 101:4, 105:16
part-time [1] - 101:4
parte [1] - 9:2
participate [1] - 47:23
particular [10] - 5:23, 12:6, 12:7, 46:8, 48:8, 91:23, 95:5, 108:11, 132:16, 140:18
parties [3] - 7:11, 10:4, 28:11
partner [1] - 21:17
pass [9] - 21:6, 21:8, 52:19, 60:4, 60:7, 60:9, 60:11, 60:14
passenger [2] - 73:5, 127:11
passenger's [1] - 71:19
past [17] - 19:4, 19:5, 25:17, 31:6, 67:18, 71:6, 79:4, 115:8, 117:16, 119:8, 121:18, 127:7, 127:10, 130:3, 130:11, 130:20, 143:18
patrol [4] - 30:17, 30:23, 131:12, 131:14
pattern [1] - 25:19
pause [1] - 79:18
pay [4] - 32:24, 43:14, 96:4, 96:11
peer [1] - 16:4
pending [1] - 9:5
people [16] - 21:13, 32:12, 40:10, 40:11, 41:4, 41:9, 41:17, 41:23, 42:3, 45:12, 53:22, 60:24, 66:23, 66:24, 83:22
Peosta [1] - 49:2
per [1] - 32:25
percent [1] - 33:18
period [6] - 25:4, 43:3, 43:6, 50:22, 62:5, 62:5

periods [1] - 74:10
permission [4] - 75:3, 76:6, 122:17, 129:21
person [17] - 23:14, 37:17, 37:22, 38:13, 38:23, 39:1, 39:11, 40:17, 42:6, 42:15, 66:2, 117:12, 125:24, 129:25, 132:4, 133:14
personal [1] - 33:5
personally [5] - 3:14, 34:3, 47:23, 112:23, 128:17
phone [95] - 20:22, 21:10, 21:11, 25:20, 38:4, 45:16, 52:6, 52:7, 52:12, 52:15, 52:19, 52:25, 53:1, 53:2, 53:5, 53:9, 53:16, 53:17, 53:22, 59:18, 59:21, 59:24, 60:3, 60:17, 61:2, 61:12, 61:14, 61:16, 61:18, 62:1, 62:3, 63:4, 63:19, 63:21, 63:22, 63:23, 63:24, 67:8, 67:11, 67:12, 67:15, 69:6, 74:20, 83:21, 93:13, 93:17, 93:18, 93:22, 94:5, 94:11, 94:12, 94:13, 94:14, 94:15, 94:16, 94:18, 94:23, 95:5, 98:17, 98:25, 99:24, 100:5, 100:9, 101:7, 101:24, 102:3, 103:11, 103:18, 106:23, 108:23, 117:13, 117:15, 118:15, 119:2, 119:24, 121:11, 121:20, 128:15, 130:23, 135:2, 135:25, 136:1, 136:3, 137:4, 148:4, 148:20, 148:25, 149:1, 149:4, 149:17, 152:7
phones [8] - 19:2, 21:5, 51:22, 52:3, 52:5, 52:9, 52:23, 60:16
photo [2] - 117:18, 117:20
photograph [3] - 93:19, 132:12, 132:16
photographed [1] - 99:1

**photos** [1] - 51:4
**physical** [1] - 50:7
**physically** [1] - 27:21
**pick** [5] - 18:15, 89:18, 94:6, 110:24, 117:19
**picked** [4] - 15:22, 16:3, 92:17, 109:24
**picture** [2] - 19:25, 47:6
**pills** [1] - 19:15
**pink** [2] - 54:20, 55:23
**pinkish** [1] - 56:18
**pipe** [5] - 36:8, 36:10, 36:14, 36:25, 37:1
**place** [20] - 7:13, 27:23, 38:4, 40:15, 43:23, 44:3, 64:24, 68:2, 68:6, 73:19, 77:21, 80:5, 80:9, 80:11, 119:7, 120:8, 125:8, 155:6, 155:7
**placed** [5] - 20:9, 119:2, 119:22, 119:24, 132:1
**places** [1] - 83:3
**Plaintiff** [1] - 1:4
**plastic** [5] - 55:23, 57:10, 57:14, 58:11, 58:12
**plate** [6] - 10:22, 20:12, 71:5, 72:2, 121:25, 131:8
**play** [6] - 11:6, 75:3, 113:25, 115:23, 122:17, 129:21
**played** [3] - 75:5, 122:19, 129:23
**player** [4] - 141:10, 141:12, 141:17, 142:5
**playing** [1] - 91:16
**plea** [8] - 5:3, 5:24, 6:2, 6:13, 7:11, 7:12, 8:7, 8:11
**plead** [3] - 7:22, 8:10, 8:12
**pled** [3] - 5:16, 6:18, 8:3
**plug** [1] - 15:5
**plumbing** [1] - 82:9
**pocket** [4] - 23:8, 132:6, 132:13, 132:23
**pockets** [1] - 23:2
**podium** [1] - 14:6
**point** [41] - 5:2, 5:6, 6:11, 6:22, 7:7, 7:13, 8:9, 8:10, 11:18, 22:23, 31:18, 46:14, 47:15, 47:22, 50:4,

51:5, 51:21, 52:9, 53:25, 63:14, 69:25, 70:7, 72:3, 75:2, 76:1, 79:18, 87:25, 95:10, 105:21, 108:13, 109:3, 113:19, 114:1, 114:19, 118:4, 126:3, 126:8, 126:17, 129:15, 130:21, 138:16
**points** [1] - 10:9
**police** [25] - 19:7, 19:13, 19:20, 19:23, 20:9, 20:10, 20:14, 20:16, 20:18, 21:14, 21:25, 22:1, 22:7, 22:8, 22:13, 22:15, 22:19, 22:22, 23:1, 29:21, 29:24, 56:21, 62:8, 88:5, 124:3
**Police** [3] - 30:10, 30:15, 35:15
**pool** [2] - 144:3, 151:9
**position** [8] - 3:21, 5:15, 6:8, 7:12, 8:5, 10:11, 12:11, 86:22
**positive** [3] - 54:21, 118:12, 118:13
**possession** [5] - 73:16, 124:9, 124:11, 124:17
**possibilities** [1] - 52:20
**possibility** [2] - 60:6
**possible** [7] - 5:24, 7:18, 7:20, 38:15, 40:16, 68:11, 120:13
**possibly** [1] - 42:10
**post** [3] - 69:16, 125:18, 126:1
**post-buy** [3] - 69:16, 125:18, 126:1
**potent** [1] - 27:14
**potential** [5] - 5:2, 12:24, 14:24, 19:19, 97:19
**potentially** [2] - 6:20, 28:21
**powder** [4] - 34:10, 57:8, 124:15, 124:23
**powerful** [1] - 27:14
**pre** [3] - 38:24, 65:15, 120:1
**pre-serialized** [3] - 38:24, 65:15, 120:1
**preadmitted** [1] - 9:23
**predated** [1] - 102:6
**prefer** [3] - 12:4, 76:2, 76:6

**prejudice** [1] - 12:24
**prejudicial** [2] - 12:8, 12:23
**premises** [1] - 83:10
**preparation** [1] - 153:14
**prepared** [2] - 28:18, 29:5
**preparing** [1] - 48:17
**presence** [2] - 3:10, 17:1
**present** [7] - 3:15, 18:5, 24:3, 81:5, 88:3, 88:5, 131:18
**presented** [2] - 25:7, 28:12
**presiding** [1] - 3:4
**pretty** [8] - 82:11, 82:23, 83:11, 86:24, 87:10, 87:13, 103:13, 142:22
**previous** [1] - 110:7
**previously** [3] - 15:24, 19:24, 22:19
**price** [3] - 141:15, 143:5
**prices** [3] - 32:1, 35:21, 142:21
**print** [1] - 155:8
**printed** [1] - 57:22
**problems** [1] - 41:3
**procedure** [1] - 60:14
**procedures** [5] - 39:13, 118:1, 119:12, 124:2, 125:18
**proceed** [7] - 18:1, 18:9, 24:6, 29:16, 62:19, 78:11, 91:11
**proceeded** [1] - 9:16
**proceedings** [3] - 1:9, 44:23, 155:7
**proceeds** [1] - 39:20
**process** [1] - 60:2
**produced** [2] - 29:8, 77:24
**proffer** [3] - 44:12, 44:16, 44:17
**program** [1] - 30:14
**promise** [1] - 10:14
**promptly** [1] - 153:6
**pronounced** [1] - 18:23
**prospective** [1] - 68:14
**proved** [1] - 13:2
**proven** [1] - 28:5
**provide** [3] - 63:9, 88:11, 108:5
**provided** [6] - 13:11,

42:3, 65:14, 92:17, 119:25, 131:22
**providing** [1] - 132:2
**Public** [1] - 155:3
**publish** [1] - 99:12
**pull** [3] - 14:8, 78:2, 111:9
**pulled** [9] - 22:10, 23:7, 71:13, 71:17, 73:8, 111:13, 112:4, 120:25, 127:9
**pulling** [4] - 70:19, 71:9, 114:25, 127:8
**pulls** [1] - 129:9
**pumps** [1] - 129:6
**punishment** [1] - 124:22
**purchase** [12] - 32:6, 37:13, 62:25, 65:16, 66:17, 98:24, 106:1, 110:21, 111:6, 113:22, 119:4, 132:20
**purchased** [10] - 27:6, 27:7, 35:25, 59:10, 95:17, 106:3, 107:12, 110:6, 116:24, 123:8
**purchases** [4] - 55:13, 108:2, 113:13, 113:19
**purchasing** [1] - 63:8
**pure** [1] - 34:11
**purpose** [4] - 11:8, 11:15, 39:5, 40:19
**purposes** [4] - 9:6, 11:12, 26:4, 38:10
**purse** [2] - 119:21, 119:22
**put** [16] - 21:5, 21:19, 26:7, 36:11, 40:15, 43:23, 44:3, 57:13, 58:8, 60:14, 67:8, 92:22, 96:1, 125:19, 136:2, 150:24
**puts** [2] - 7:25, 8:1

**Q**

**quantities** [1] - 35:24
**quantity** [6] - 32:16, 141:2, 142:16, 142:17, 142:18, 146:16
**quarter** [2] - 84:9, 85:10
**Queen** [6] - 127:22, 128:5, 128:7, 128:9, 129:1, 129:5

**questioning** [2] - 14:7, 98:4
**questions** [4] - 19:8, 23:13, 35:13, 88:20
**quick** [5] - 4:22, 5:11, 84:19, 84:22, 145:2
**quicker** [3] - 138:22, 138:23, 138:25
**quickly** [1] - 153:16
**quit** [3] - 84:9, 152:15, 153:7

**R**

**radio** [1] - 70:24
**raise** [3] - 9:7, 10:9, 77:22
**raised** [2] - 16:2, 16:6
**raising** [1] - 8:21
**Rapids** [6] - 1:10, 1:20, 1:23, 147:4, 147:9, 147:13
**rather** [4] - 109:21, 124:9, 124:11, 141:18
**re** [1] - 91:6
**re-call** [1] - 91:6
**read** [6] - 17:23, 100:13, 139:9, 139:11, 139:16, 152:17
**reading** [1] - 17:25
**ready** [10] - 13:25, 17:10, 18:6, 76:20, 77:1, 86:14, 121:21, 152:2, 152:5, 153:6
**Real** [2] - 81:19, 81:21
**real** [3] - 84:19, 84:22, 131:24
**really** [10] - 8:5, 8:15, 26:13, 51:16, 58:10, 78:3, 80:9, 96:5, 138:4, 138:5
**realtime** [2] - 38:10, 71:8
**rear** [1] - 73:6
**reask** [1] - 71:11
**reason** [5] - 43:6, 66:20, 92:10, 97:24, 131:10
**reasonable** [1] - 28:6
**reasons** [1] - 11:16
**reassure** [1] - 153:18
**reassured** [1] - 154:7
**receive** [3] - 3:16, 47:4, 109:3
**Received** [1] - 2:9
**received** [7] - 4:5, 13:10, 31:1, 49:8,

**redistribution** [2] - 33:5, 33:8
**reduced** [1] - 155:8
**reduction** [4] - 7:16, 7:21, 8:2, 8:3
**refer** [10] - 10:6, 99:10, 102:13, 104:22, 105:3, 123:4, 135:21, 143:4, 150:7, 152:18
**reference** [3] - 45:10, 45:16, 108:6
**referred** [4] - 34:12, 59:17, 118:20, 149:12
**referring** [13] - 101:17, 103:6, 104:3, 136:10, 137:24, 140:8, 143:22, 144:17, 145:7, 146:4, 146:19, 146:24, 150:16
**refers** [1] - 101:4, 103:9, 141:7
**reflect** [1] - 99:7
**reflected** [1] - 9:10
**refrigerator** [1] - 153:2
**regard** [1] - 4:16
**regarding** [1] - 8:17
**regardless** [1] - 6:18
**regards** [4] - 6:4, 6:9, 12:5, 25:7
**register** [1] - 14:20
**regularly** [1] - 152:18
**related** [1] - 31:6
**relating** [1] - 10:9
**relationship** [3] - 32:12, 32:20, 72:10
**released** [1] - 80:7
**relevance** [2] - 11:21, 12:14
**relevant** [4] - 6:17, 11:15, 12:13, 12:19
**remain** [1] - 77:7
**remember** [6] - 15:10, 75:13, 79:25, 83:25, 91:15, 152:24
**remind** [1] - 91:8
**remodeled** [1] - 81:24
**remodeling** [3] - 19:6, 79:5, 82:7
**render** [1] - 7:18
**repeated** [1] - 104:9
**rephrase** [2] - 34:22, 126:21
**report** [3] - 14:13, 50:15, 118:13
**Reporter** [3] - 155:3, 155:5, 155:21
**reporter** [3] - 29:12,

**redistribution** ...

**redistribution**

**redistribution** [2] - 77:21, 78:7
**representation** [1] - 74:23
**representatives** [1] - 26:14
**represented** [2] - 3:12, 3:15
**representing** [1] - 9:13
**reprimand** [1] - 42:19
**reprimanded** [1] - 43:2
**request** [4] - 9:22, 75:3, 124:4, 129:20
**requested** [1] - 50:6
**requesting** [1] - 122:16
**required** [3] - 25:21, 124:19, 125:1
**requires** [1] - 12:15
**reseal** [1] - 59:2
**research** [1] - 152:20
**residence** [8] - 48:12, 49:11, 49:12, 51:6, 52:2, 59:14, 61:23, 107:2
**residue** [1] - 54:19
**respective** [1] - 68:15
**respond** [1] - 147:16
**responds** [2] - 20:20, 105:7
**response** [8] - 105:6, 141:4, 142:2, 142:25, 144:15, 145:3, 147:14, 151:11
**responsibility** [2] - 7:16, 7:21
**rest** [4] - 53:9, 53:12, 68:3, 153:16
**restored** [1] - 61:17
**results** [1] - 37:25
**resumed** [2] - 16:23, 76:18
**retested** [1] - 123:16
**retie** [1] - 58:17
**retrieved** [1] - 65:25
**return** [2] - 23:24, 28:7
**returned** [3] - 8:13, 90:19, 107:11
**returning** [1] - 7:23
**reverse** [2] - 39:13, 73:3
**review** [8] - 3:18, 67:21, 124:1, 135:13, 135:16, 137:4, 137:20, 147:19
**reviewed** [2] - 74:4, 139:18

**Ricky** [1] - 117:6
**Ricky's** [2] - 119:6, 120:8
**ride** [5] - 82:22, 84:10, 86:17, 86:20, 140:2
**ripping** [1] - 96:15
**rise** [8] - 3:2, 14:23, 15:16, 16:24, 75:19, 76:19, 153:10, 154:15
**road** [2] - 48:21, 127:10
**roadside** [1] - 30:21
**rock** [3] - 34:9, 55:22, 55:24
**Rogers** [1] - 16:1
**rolling** [2] - 138:5, 138:12
**room** [15] - 15:8, 15:9, 18:18, 18:25, 21:5, 49:23, 49:25, 50:9, 51:10, 54:9, 56:5, 59:13, 86:1, 86:15, 88:9
**roommate** [2] - 22:2, 22:3
**rooms** [1] - 83:21
**route** [2] - 28:18, 120:3
**routinely** [1] - 34:19
**rule** [5] - 9:9, 10:11, 12:11, 13:4, 13:6
**ruled** [1] - 8:25
**ruling** [1] - 9:16
**run** [2] - 5:7, 114:10
**running** [2] - 47:23, 114:7
**runs** [1] - 115:19

---

**S**

**safe** [1] - 89:24
**sale** [1] - 114:19
**Samantha** [1] - 84:21
**sandwich** [5] - 26:7, 26:8, 26:13, 26:24, 57:6
**Sarah** [1] - 155:20
**saved** [1] - 86:2
**saves** [1] - 144:6
**saw** [12] - 8:24, 10:17, 10:20, 18:20, 40:9, 63:4, 70:17, 70:22, 76:10, 86:21, 86:23, 87:7
**scale** [1] - 54:15
**scene** [4] - 48:22, 52:1, 55:12, 131:18
**schedule** [1] - 152:25

**Scholtes** [17] - 21:24, 23:9, 23:19, 24:18, 26:22, 116:12, 119:4, 119:17, 123:9, 125:9, 125:15, 125:16, 126:4, 126:6, 127:16, 130:23, 132:19
**Scholtes'** [1] - 122:9
**school** [1] - 86:18
**screen** [3] - 99:16, 114:15, 115:7
**screens** [3] - 114:14, 115:23
**scroll** [6] - 94:6, 136:21, 137:7, 139:8, 148:6, 150:10
**scrolling** [1] - 149:14
**SE** [2] - 1:20, 1:22
**seal** [3] - 14:14, 14:18, 14:20
**sealed** [1] - 14:20
**search** [9] - 23:1, 27:4, 37:22, 39:22, 39:24, 65:8, 65:11, 119:16, 132:4
**searched** [18] - 18:25, 20:10, 20:16, 20:17, 23:7, 38:13, 52:2, 64:12, 64:18, 65:9, 66:1, 66:3, 66:12, 88:8, 106:8, 119:18, 119:21, 125:17, 125:18, 133:6
**searching** [2] - 107:1
**seat** [7] - 29:10, 71:15, 71:18, 77:7, 78:1, 127:11, 127:14
**seated** [6] - 3:5, 15:18, 17:18, 75:21, 77:4, 153:12
**second** [24] - 9:18, 13:11, 13:13, 21:4, 43:11, 56:17, 57:17, 64:14, 69:23, 95:9, 100:12, 100:15, 100:16, 103:25, 106:9, 107:3, 107:4, 124:24, 124:25, 125:2, 129:7, 134:16, 134:22, 150:16
**Second** [1] - 1:22
**seconds** [21] - 21:7, 50:25, 60:12, 60:15, 60:21, 61:9, 70:19, 71:6, 102:6, 102:7, 102:8, 103:20, 103:23, 104:2,

**receiver** ... 63:23, 107:6, 136:12
**receiver** [2] - 71:7, 100:11
**receives** [1] - 124:15
**receiving** [1] - 46:21
**recessed** [3] - 16:23, 76:18, 154:16
**recognize** [12] - 48:3, 53:4, 53:7, 53:12, 53:14, 67:20, 67:21, 74:6, 91:19, 112:25, 118:23, 122:21
**recognized** [2] - 10:22, 113:3
**recommendation** [1] - 5:23
**record** [22] - 4:9, 4:23, 5:11, 5:12, 7:8, 9:7, 14:21, 15:19, 15:23, 15:25, 16:9, 16:11, 17:16, 38:6, 57:22, 58:7, 69:8, 121:12, 121:15, 121:16, 154:16
**recorder** [1] - 67:10
**recording** [19] - 38:6, 67:4, 69:9, 69:24, 74:3, 74:4, 74:7, 74:10, 74:13, 74:20, 74:24, 95:23, 115:5, 115:15, 119:22, 121:19, 122:22, 126:5, 129:2
**recordings** [1] - 48:4
**records** [2] - 67:4, 67:5
**recover** [2] - 59:14, 135:2
**recovered** [15] - 54:2, 54:5, 54:7, 54:11, 59:19, 61:21, 61:22, 101:24, 106:9, 123:2, 132:25, 133:14, 134:2, 134:3, 134:25
**Recovery** [2] - 81:19, 81:21
**recovery** [1] - 54:1
**red** [1] - 55:23
**redid** [1] - 66:6
**redirect** [1] - 90:24

**sells** [2] - 116:22, 116:23
**send** [5] - 9:17, 40:23, 40:24, 41:18, 47:5
**sense** [1] - 115:24
**sent** [10] - 19:24, 30:17, 48:19, 56:11, 56:12, 100:4, 107:1, 123:11, 134:6, 136:14
**sentence** [1] - 80:7
**sentencing** [1] - 6:16
**separate** [5] - 11:22, 83:2, 83:3, 106:16, 134:13
**September** [3] - 24:25, 30:10, 30:12
**Sergeant** [5] - 48:19, 125:23, 126:15, 128:25, 131:5
**serial** [2] - 38:25, 132:17
**serialized** [4] - 38:23, 38:24, 65:15, 120:1
**serious** [1] - 92:4
**session** [1] - 3:4
**set** [7] - 67:15, 67:16, 107:3, 119:25, 121:20, 127:25, 155:14
**setting** [1] - 121:16
**seven** [2] - 139:12, 154:4
**Seventh** [1] - 1:20
**several** [9] - 20:3, 23:13, 31:7, 49:24, 53:20, 54:18, 97:1, 117:15, 135:25
**Shack** [2] - 120:19, 120:23
**Shannon** [14] - 21:24, 22:1, 22:11, 22:14, 23:9, 23:19, 24:18, 116:12, 123:9, 125:9, 125:14, 126:4, 127:16, 132:19
**share** [1] - 33:9
**Shelby** [6] - 92:4, 92:6, 92:7, 92:11, 92:14, 92:18
**Sheriff's** [2] - 48:22, 51:3
**shine** [1] - 138:23
**shirt** [3] - 46:16, 65:2, 127:18
**Shit** [1] - 151:4
**shoes** [1] - 65:6
**short** [12] - 10:15,

**sells** [2] ... 50:22, 62:5, 68:5, 70:18, 72:21, 110:18, 122:3, 122:9, 126:10, 126:15, 132:20
**Shorthand** [3] - 155:2, 155:5, 155:21
**shorthand** [3] - 155:7, 155:8, 155:12
**shortly** [5] - 48:18, 49:7, 51:12, 141:8
**shot** [1] - 114:21
**show** [7] - 34:16, 34:21, 94:20, 94:25, 95:2, 128:16, 136:3
**showed** [4] - 20:11, 50:21, 117:13, 117:18
**showing** [5] - 11:3, 63:24, 94:16, 132:8, 149:8
**shown** [1] - 111:6
**siblings** [1] - 79:12
**sic** [4] - 22:7, 25:17, 32:24, 47:10
**side** [14] - 43:16, 71:19, 72:14, 73:5, 73:7, 85:3, 112:20, 121:1, 126:12, 128:1, 128:3, 128:5, 128:9, 129:12
**sides** [1] - 67:5
**sideways** [1] - 87:3
**sight** [10] - 38:14, 38:19, 66:4, 70:1, 73:12, 122:4, 122:5, 126:6, 126:9, 126:24
**sign** [1] - 42:23
**significant** [1] - 132:15
**simple** [1] - 124:17
**simply** [5] - 10:6, 12:21, 12:25, 94:22, 108:3
**single** [1] - 96:8
**Sioux** [1] - 1:17
**sister** [2] - 51:13, 56:3
**sits** [3] - 21:15, 120:22, 120:23
**situations** [1] - 108:2
**six** [7] - 22:21, 30:5, 84:9, 85:10, 104:25, 138:11, 139:12
**skin** [1] - 64:21
**skirted** [1] - 122:7
**sleep** [1] - 86:9
**sleeping** [1] - 18:17
**sleeves** [1] - 127:19
**Slight** [3] - 125:14, 125:20

**slightly** [1] - 32:13
**small** [11] - 26:13, 54:17, 55:22, 55:24, 58:18, 58:20, 115:13, 124:17, 124:21, 133:18, 134:15
**smaller** [2] - 64:16, 134:16
**Smith** [2] - 46:5, 46:6
**smoke** [1] - 36:14
**smoked** [5] - 34:1, 36:7, 36:12, 36:24, 37:5
**snacks** [1] - 153:1
**sniff** [1] - 133:3
**snorted** [3] - 33:25, 34:4, 37:2
**Sober** [2] - 81:19, 81:25
**Social** [1] - 61:1
**socks** [1] - 65:6
**sold** [15] - 10:16, 19:15, 22:12, 24:13, 24:18, 24:21, 25:13, 31:21, 35:19, 36:21, 56:23, 57:9, 57:11, 73:23, 131:11
**someone** [4] - 22:16, 22:17, 40:23, 116:3
**sometime** [2] - 86:6, 143:17
**sometimes** [13] - 22:3, 32:18, 32:23, 33:25, 34:4, 39:16, 43:2, 43:3, 43:5, 86:19, 96:11, 96:14, 141:21
**somewhere** [3] - 27:23, 66:9, 84:24
**son** [1] - 51:17
**sons** [1] - 18:13
**soon** [5] - 3:11, 22:4, 87:6, 103:17, 125:9
**sorry** [27] - 8:4, 8:20, 10:8, 10:18, 43:18, 47:12, 55:16, 58:5, 59:20, 59:21, 64:14, 71:11, 71:13, 81:21, 85:15, 97:4, 100:15, 100:16, 103:1, 104:25, 108:18, 116:15, 118:24, 119:10, 137:12, 143:6, 152:9
**sort** [16] - 5:3, 8:20, 9:3, 9:23, 12:1, 16:2, 16:6, 36:15, 43:14, 44:19, 74:24, 98:15, 114:2, 124:20, 139:7, 139:11

**sound** [1] - 89:7
**sounds** [4] - 9:17, 10:2, 62:11, 109:12
**source** [2] - 45:14, 62:4
**sources** [2] - 25:8, 93:11
**South** [1] - 110:1
**south** [3] - 110:2, 128:3, 128:4
**southwest** [1] - 112:7
**space** [1] - 114:6
**spaced** [1] - 153:4
**speaker** [1] - 67:9
**speakerphone** [2] - 67:8, 69:6
**specific** [1] - 94:3
**specifically** [7] - 101:4, 137:24, 140:8, 146:11, 146:13, 146:19, 150:17
**spell** [2] - 29:12, 78:7
**spend** [3] - 39:18, 141:1, 153:18
**spent** [4] - 30:13, 30:16, 39:16, 61:13
**spin** [3] - 57:14, 57:15, 58:9
**spinning** [1] - 58:1
**spite** [1] - 21:22
**split** [6] - 106:13, 106:15, 106:18, 106:19, 114:14, 114:23
**splitting** [1] - 20:7
**spoon** [1] - 23:4
**spoons** [1] - 133:19
**spot** [4] - 31:17, 65:1, 146:2, 146:12
**spots** [3] - 68:15, 73:9, 114:2
**spotted** [1] - 69:12
**stage** [1] - 68:9
**stairs** [4] - 107:4, 107:7, 107:10
**stand** [3] - 41:17, 44:24, 77:7
**stand-alone** [1] - 44:24
**standing** [1] - 77:8
**Stapleton** [4] - 92:9, 92:10, 92:13, 92:16
**start** [10] - 8:18, 18:12, 21:7, 24:12, 48:17, 60:13, 61:5, 61:6, 61:9, 91:25
**started** [5] - 51:12, 85:5, 87:5, 87:19, 110:13

**seeing** [2] - 62:2, 115:19
**seek** [2] - 5:24, 7:3
**seeking** [3] - 7:2, 140:15, 141:3
**seize** [1] - 51:21
**seized** [3] - 73:16, 125:16, 132:13
**selected** [2] - 14:25, 16:1
**selection** [3] - 3:11, 4:16, 8:18
**sell** [8] - 21:13, 21:23, 25:1, 33:9, 58:14, 139:1, 141:15, 152:5
**selling** [4] - 25:3, 25:16, 46:5, 139:1

**104:5, 104:7, 112:1, 115:11, 115:12, 149:22, 149:24
**secretive** [2] - 83:18, 89:22
**section** [1] - 148:24
**secure** [1] - 125:15
**Security** [1] - 61:1
**security** [1] - 17:13
**see** [83] - 8:25, 12:12, 12:20, 13:5, 15:14, 16:21, 17:9, 25:18, 25:22, 25:23, 25:25, 26:1, 26:14, 26:16, 26:18, 27:24, 32:18, 34:16, 45:1, 47:7, 53:2, 54:2, 58:12, 61:17, 65:22, 68:21, 68:23, 68:25, 69:20, 70:14, 71:11, 72:2, 75:17, 76:17, 83:20, 85:12, 86:17, 86:20, 97:7, 99:16, 99:25, 100:22, 101:13, 101:14, 104:23, 111:2, 115:6, 121:13, 121:20, 126:1, 127:12, 127:15, 129:11, 129:13, 129:25, 132:9, 136:22, 137:8, 138:17, 139:4, 139:12, 140:9, 140:17, 140:20, 142:7, 142:21, 143:19, 144:18, 145:8, 146:20, 147:20, 148:7, 149:15, 150:17, 151:5, 151:12, 151:13, 151:19, 153:8, 154:12

starting [5] - 49:7, 138:6, 138:14, 142:7, 153:5
state [4] - 5:22, 29:11, 31:18, 78:6
State [2] - 155:3
statement [6] - 13:21, 18:5, 18:7, 24:4, 24:10, 96:20
statements [2] - 18:2, 28:11
STATES [1] - 1:1
States [6] - 1:3, 3:6, 3:12, 3:13, 17:20, 65:15
stating [3] - 48:21, 71:9, 147:2
station [29] - 111:12, 111:14, 111:19, 111:21, 111:24, 112:2, 112:8, 112:9, 114:11, 114:13, 114:22, 114:23, 115:2, 115:3, 126:17, 126:19, 126:22, 127:4, 127:5, 127:8, 127:21, 128:1, 128:2, 128:5, 128:6, 128:8, 128:24, 129:1, 131:6
stations [1] - 128:7
stay [4] - 80:9, 80:11, 80:12, 120:6
stayed [3] - 80:5, 128:10, 131:6
staying [1] - 128:20
stays [1] - 36:13
stealing [2] - 44:8, 113:17
steals [1] - 107:22
step [8] - 61:24, 75:22, 77:20, 97:25, 109:16, 109:22, 113:11, 119:23
stepped [3] - 49:25, 50:24
steps [2] - 64:6, 66:6
Steve [13] - 22:18, 23:18, 24:21, 26:23, 27:8, 27:16, 130:8, 130:15, 130:18, 131:5, 133:12, 133:24, 134:4
Stevenson [117] - 1:6, 3:7, 5:9, 5:13, 9:13, 10:16, 10:24, 11:3, 12:8, 17:21, 20:2, 24:15, 27:25, 28:5, 46:9, 47:11, 47:12,

47:24, 63:25, 64:9, 66:18, 67:14, 67:22, 68:7, 70:8, 70:9, 70:11, 70:19, 71:3, 72:13, 72:21, 73:2, 74:7, 96:23, 98:24, 99:2, 99:23, 100:7, 101:2, 101:11, 101:16, 102:4, 102:11, 102:17, 105:5, 105:6, 108:22, 109:5, 111:18, 111:21, 112:2, 112:8, 112:11, 112:15, 112:25, 113:14, 113:21, 115:1, 115:13, 117:4, 117:7, 117:14, 117:16, 117:19, 118:18, 118:22, 119:3, 119:5, 122:8, 123:9, 125:10, 125:22, 126:1, 126:8, 127:3, 127:8, 127:12, 127:14, 131:22, 131:25, 132:1, 132:20, 136:8, 136:23, 137:1, 137:10, 137:16, 137:21, 138:2, 138:20, 138:22, 139:22, 139:23, 139:24, 140:4, 140:13, 140:23, 140:25, 142:11, 143:2, 143:14, 143:16, 143:21, 143:24, 144:12, 144:24, 145:11, 145:13, 145:24, 145:25, 146:23, 147:1, 147:2, 148:11, 148:15, 149:5, 149:20
Stevenson's [9] - 47:2, 111:16, 122:21, 132:13, 142:1, 144:14, 145:3, 146:7, 147:14
sticker [1] - 110:25
still [16] - 6:17, 9:3, 9:5, 38:19, 58:21, 66:5, 80:21, 81:9, 85:19, 85:21, 87:2, 87:12, 91:9, 92:12, 143:12, 143:18
stole [1] - 106:2
stop [19] - 10:20,

10:25, 11:3, 11:6, 28:23, 41:6, 43:4, 43:11, 57:17, 64:14, 90:6, 118:4, 131:10, 131:12, 131:14, 131:20, 131:21, 132:8, 133:11
stopped [9] - 10:25, 68:16, 86:17, 87:22, 90:9, 108:24, 115:15, 133:24, 134:1
stops [3] - 89:9, 112:18, 129:7
store [5] - 58:25, 96:7, 111:10, 111:13, 114:9
stored [3] - 56:25, 135:3, 135:8
stories [1] - 45:3
street [8] - 85:4, 121:6, 127:22, 128:2, 128:3, 128:4, 128:9, 129:6
Street [8] - 1:16, 1:22, 68:17, 84:18, 117:9, 117:10, 126:17, 131:4
streets [1] - 126:12
stretcher [1] - 49:20
strike [1] - 12:22
string [1] - 102:21
strip [11] - 39:22, 64:12, 64:18, 65:8, 66:1, 66:12, 111:23, 114:15, 114:16, 115:8, 119:16
strip-search [3] - 39:22, 65:8, 119:16
strip-searched [4] - 64:12, 64:18, 66:1, 66:12
struggled [1] - 19:3
stuck [1] - 87:12
stuff [2] - 34:13, 153:22
stuffed [2] - 36:8, 36:9
subject [5] - 46:25, 62:20, 66:18, 107:5, 117:20
submit [1] - 124:3
submitted [5] - 63:20, 63:21, 124:3, 124:7
subpoena [1] - 63:21
subpoint [1] - 10:10
subscriber [2] - 63:20, 63:22
subsequent [1] - 146:3
subsequently [1] -

67:21
substance [1] - 27:11
successful [1] - 139:2
sucks [1] - 138:6
suffer [1] - 27:20
Suite [2] - 1:16, 1:22
Sunset [1] - 81:17
Super [1] - 48:22
supervision [1] - 155:9
supper [1] - 86:2
supplied [1] - 147:11
supplier [1] - 147:12
support [1] - 25:14
supports [1] - 23:24
suppose [2] - 61:13, 70:20
supposed [1] - 44:8
surfaced [1] - 106:6
surveillance [10] - 38:11, 38:15, 38:20, 68:3, 68:8, 68:14, 69:10, 69:13, 70:21, 125:24
suspect [1] - 62:23
suspected [2] - 48:23, 134:3
suspended [1] - 12:2
Sweeney [6] - 92:5, 92:7, 92:8, 92:11, 92:14, 92:18
switch [1] - 76:1
switched [2] - 51:19, 62:24
sworn [2] - 29:8, 77:24
symptoms [1] - 27:20
syringe [4] - 33:19, 56:1, 59:15, 133:19
syringes [2] - 19:1, 54:16
systematic [1] - 61:5

T

T-shirt [1] - 127:18
table [1] - 46:15
tabs [1] - 94:7
tactical [1] - 31:8
talks [2] - 5:1, 20:24
tan [1] - 34:8
Tape [2] - 75:5, 122:19
tar [2] - 34:1, 34:2
target [21] - 37:14, 38:5, 39:11, 40:5, 64:9, 65:17, 68:10, 69:18, 70:25, 92:8, 106:1, 106:12, 106:15, 106:19,

120:5, 121:7, 121:10, 127:4, 127:5, 131:3, 131:7
targets [3] - 64:8, 93:19, 95:5
Task [1] - 59:9
task [26] - 18:24, 19:11, 30:3, 30:25, 31:11, 42:24, 42:25, 44:11, 48:19, 48:20, 64:7, 92:1, 97:3, 97:14, 98:23, 106:3, 106:4, 106:10, 106:24, 107:22, 108:6, 108:9, 113:17, 116:13, 118:2, 120:4
team [1] - 31:9
tear [1] - 26:8
techniques [1] - 30:22
telephone [3] - 67:5, 94:2, 118:6
telephones [2] - 51:22, 88:12
tendency [1] - 12:16
tenths [3] - 32:10, 66:24, 141:6
terrible [1] - 143:6
test [3] - 124:24, 124:25, 125:3
tested [10] - 54:21, 95:19, 123:13, 123:18, 123:22, 123:24, 124:4, 134:4, 134:18
testified [4] - 29:9, 77:25, 89:21, 108:14
testify [1] - 77:15
testimony [3] - 28:23, 76:5, 77:14
tests [3] - 27:3, 124:4, 124:18
text [65] - 25:20, 45:16, 53:21, 61:17, 83:21, 93:18, 93:20, 94:8, 94:15, 94:17, 97:16, 98:3, 99:1, 99:7, 99:20, 99:21, 99:22, 100:6, 100:13, 100:24, 101:9, 101:14, 101:21, 101:23, 102:6, 102:19, 102:21, 102:23, 103:8, 103:20, 103:21, 106:22, 134:24, 135:3, 135:8, 135:16, 135:17, 136:6, 136:12, 136:15,

136:17, 136:23,
137:15, 137:20,
137:25, 138:3,
139:4, 146:3, 147:7,
147:19, 148:3,
148:4, 148:10,
148:15, 148:19,
150:2, 150:4, 150:8,
150:20, 150:24,
151:5, 151:17,
151:21, 151:25,
153:17

**Text** [1] - 150:13

**texted** [2] - 20:6,
106:12

**texting** [1] - 98:12

**texts** [5] - 20:19,
20:21, 21:11, 100:9,
142:7

**THE** [95] - 1:1, 1:1,
3:2, 3:5, 3:23, 3:25,
4:7, 4:12, 4:15, 4:20,
4:24, 5:25, 7:9, 8:16,
9:8, 10:1, 10:3,
11:19, 12:10, 13:15,
13:17, 13:20, 13:24,
14:3, 14:8, 14:12,
14:16, 14:19, 14:23,
15:1, 15:16, 15:18,
16:10, 16:14, 16:19,
16:21, 16:24, 16:25,
17:6, 17:9, 17:11,
17:14, 17:18, 17:24,
18:9, 24:2, 24:6,
28:9, 28:16, 28:20,
28:25, 29:3, 29:10,
29:13, 29:15, 54:25,
62:13, 62:18, 75:4,
75:6, 75:10, 75:19,
75:21, 76:8, 76:10,
76:15, 76:17, 76:19,
76:20, 76:24, 77:4,
77:20, 78:1, 78:8,
78:10, 88:18, 88:21,
90:24, 91:2, 91:7,
91:10, 91:11, 97:20,
98:1, 99:14, 109:14,
109:19, 122:18,
129:22, 152:14,
153:10, 153:12,
153:20, 154:3,
154:15

**themselves** [1] -
141:22

**therefore** [2] - 41:20,
69:13

**they've** [1] - 42:9

**thinking** [2] - 62:4,
96:4

**thinks** [1] - 116:23

**third** [1] - 6:12

**thorough** [1] - 65:11

**three** [8] - 22:11,
26:19, 27:2, 81:2,
104:2, 112:1,
112:20, 153:19

**threw** [1] - 92:14

**throughout** [1] - 153:4

**throw** [2] - 121:11,
151:9

**throwing** [5] - 92:24,
92:25, 106:16,
144:2, 152:21

**tie** [4] - 26:8, 46:16,
57:16, 58:9

**tied** [1] - 12:18

**Tiffany** [1] - 79:16

**tight** [4] - 57:14,
57:15, 58:9, 58:10

**tighten** [1] - 40:14

**timeline** [1] - 89:5

**timer** [1] - 114:7

**tip** [2] - 56:1, 59:15

**tips** [1] - 45:12

**today** [4] - 3:9, 9:6,
46:12, 154:1

**together** [9] - 82:16,
82:23, 89:2, 92:15,
92:18, 92:23, 96:1,
144:3, 151:10

**tolls** [5] - 63:22, 94:14,
94:15, 95:5, 101:24

**tomorrow** [4] -
152:24, 153:4,
153:7, 153:9,
153:14, 154:13

**tonight** [1] - 140:13

**took** [14] - 18:23,
58:25, 63:19, 68:2,
83:14, 87:23, 93:22,
109:22, 111:8,
115:11, 115:13,
125:20, 132:12,
155:6

**top** [6] - 36:11, 36:13,
82:10, 100:24,
132:17, 142:9

**torn** [3] - 26:6, 26:23,
26:24

**total** [2] - 53:11, 74:13

**touch** [2] - 21:20, 64:2

**Touch** [5] - 52:7,
59:22, 59:24, 60:3,
135:7

**touched** [2] - 18:18,
87:6

**towards** [3] - 49:6,
87:2, 125:12

**town** [2] - 47:1, 49:2

**toxicology** [1] - 50:14

**traded** [1] - 19:16

**traffic** [13] - 10:20,
10:25, 11:3, 11:6,
12:22, 45:18,
110:14, 110:15,
110:16, 131:10,
131:12, 131:20,
133:11

**trafficking** [4] - 11:14,
33:3, 44:14, 56:22

**Trailblazer** [11] -
20:12, 70:22, 70:23,
71:4, 111:5, 111:16,
112:17, 121:18,
121:20, 125:11,
125:22

**Trailer** [1] - 48:23

**trailer** [4] - 49:6, 52:2,
55:2

**training** [10] - 30:7,
30:14, 30:18, 31:1,
34:23, 35:14, 59:9,
105:9, 141:20,
142:14

**transaction** [9] -
12:19, 25:21, 25:25,
25:20, 26:21, 26:22,
38:7, 69:7, 71:25

**transactions** [1] -
26:19

**Transcript** [3] - 1:9,
1:25, 1:25

**transcript** [1] - 155:11

**transcription** [1] -
155:10

**transmitted** [1] - 38:10

**transmitter** [2] -
38:19, 69:4

**transported** [1] - 49:9

**travel** [1] - 137:22

**trial** [10] - 3:9, 5:14,
6:11, 7:14, 7:15, 8:8,
8:18, 23:23, 25:19,
26:15

**tricks** [1] - 154:8

**tried** [6] - 60:23, 61:3,
87:14, 97:1, 108:15,
113:12

**tries** [2] - 60:17, 60:19

**trouble** [1] - 42:7

**true** [1] - 45:24

**trust** [1] - 41:14

**trusted** [1] - 107:25

**trustworthy** [1] - 41:4

**truth** [5] - 44:20,
44:21, 62:16, 97:23,
109:20

**try** [8] - 43:22, 64:2,
65:16, 97:5, 100:19,
120:15, 137:18,

152:21

**trying** [19] - 9:14,
20:18, 52:24, 60:22,
66:17, 67:2, 101:7,
103:14, 105:4,
113:20, 121:19,
126:10, 126:14,
140:1, 140:6, 141:1,
143:25, 146:6,
147:11

**tryna** [1] - 151:4

**turn** [3] - 112:12,
121:21, 147:12

**turned** [13] - 18:19,
69:5, 81:25, 85:4,
85:6, 87:7, 87:11,
106:4, 107:11,
111:2, 121:15,
121:17, 126:12

**turns** [1] - 108:3

**TV** [1] - 86:16

**twin** [1] - 81:7

**twins** [1] - 86:15

**twisting** [1] - 58:1

**two** [40] - 8:19, 10:9,
11:2, 19:1, 22:11,
23:2, 23:8, 26:5,
27:15, 32:10, 38:8,
42:5, 56:17, 57:4,
64:8, 64:10, 66:24,
79:8, 89:6, 106:2,
106:16, 106:19,
107:9, 111:25,
112:20, 115:9,
120:1, 125:24,
128:7, 132:7,
132:17, 132:18,
133:16, 134:13,
136:4, 141:6,
143:11, 146:6,
152:25, 153:3

**two-person** [1] -
125:24

**two-tenths** [3] - 32:10,
66:24, 141:6

**type** [15] - 26:11,
33:24, 34:3, 36:18,
38:5, 42:7, 42:8,
42:11, 44:14, 45:17,
56:23, 69:21, 108:1,
135:24

**types** [6] - 26:3, 26:5,
26:15, 42:5, 42:13,
57:1

**typical** [2] - 32:5, 32:8

**Typically** [1] - 142:22

**typically** [16] - 32:2,
34:8, 34:11, 34:13,
37:18, 37:19, 41:18,
42:1, 42:18, 44:18,

152:21

**53:22, 57:6, 58:24,
59:6, 66:21, 96:12

## U

**U.S** [2] - 3:2, 120:1

**ultimately** [5] - 5:10,
9:11, 24:23, 93:21,
95:21

**unable** [1] - 140:3

**under** [13] - 7:17,
14:13, 14:18, 14:20,
38:17, 42:22, 44:5,
65:2, 77:22, 91:9,
107:23, 132:2, 155:8

**undercover** [6] -
73:20, 98:24, 108:2,
111:6, 113:13,
119:25

**undersigned** [1] -
155:2

**underwear** [1] - 65:4

**unduly** [1] - 12:23

**unit** [3] - 69:13, 81:25,
125:24

**UNITED** [1] - 1:1

**United** [6] - 1:3, 3:6,
3:12, 3:13, 17:20,
65:15

**units** [5] - 38:11, 68:3,
68:9, 68:14, 69:10

**University** [5] - 117:6,
119:11, 120:22,
121:1, 121:6

**unless** [3] - 4:2, 7:1,
154:11

**unlike** [1] - 60:15

**unlikely** [2] - 7:15,
96:12

**unlimited** [1] - 60:19

**unlock** [1] - 52:24

**unlocked** [1] - 53:1

**unrelated** [1] - 10:25

**unreliable** [1] - 25:8

**UO** [1] - 150:23

**up** [82] - 5:7, 8:21,
14:4, 16:15, 17:1,
18:12, 18:15, 20:11,
20:22, 22:18, 24:12,
26:8, 26:9, 28:3,
32:8, 32:18, 34:16,
34:21, 38:7, 40:14,
43:15, 45:3, 46:21,
50:20, 50:21, 51:17,
58:16, 64:15, 67:15,
67:16, 70:19, 70:23,
70:24, 71:9, 71:13,
71:17, 71:19, 75:23,
77:20, 78:3, 80:12,

*Sarah J. Dittmer, CSR, RPR*
*1(888)388-2723*

Case 2:18-cr-01023-CJW-MAR   Document 103   Filed 07/15/19   Page 172 of 173

82:24, 83:1, 85:19, 86:2, 86:6, 86:14, 86:15, 89:19, 92:11, 92:17, 94:2, 97:4, 98:16, 101:4, 106:24, 107:3, 107:5, 109:24, 111:6, 111:9, 111:13, 113:16, 114:25, 119:25, 120:14, 121:6, 121:11, 121:16, 127:25, 128:16, 137:8, 137:22, 142:6, 146:7, 148:20, 150:25, 152:21, 154:1, 154:4
**UP** [1] - 150:24
**upper** [1] - 87:3
**upset** [1] - 89:25
**US** [1] - 1:19
**USA** [1] - 1:20
**user** [10] - 22:19, 37:19, 58:15, 58:21, 66:21, 101:7, 141:19, 142:16, 142:24
**user's** [1] - 32:20
**users** [9] - 32:5, 35:25, 37:5, 41:4, 41:19, 41:20, 42:20, 42:21, 42:25
**usual** [1] - 84:7

**V**

**variables** [2] - 40:21, 41:23
**variation** [2] - 60:25
**variations** [1] - 61:4
**variety** [1] - 43:10
**vary** [2] - 32:16, 57:12
**vast** [5] - 32:14, 33:6, 33:17, 33:20, 110:14
**Vee** [4] - 110:1, 110:21, 111:9
**vehicle** [60] - 10:17, 10:20, 10:21, 11:3, 11:13, 11:22, 11:24, 37:23, 39:24, 49:7, 64:13, 66:3, 68:7, 68:21, 68:23, 69:18, 69:21, 69:22, 70:4, 70:6, 70:25, 71:6, 71:16, 71:19, 71:20, 72:14, 72:15, 72:18, 73:2, 73:6, 73:7, 107:1, 110:5, 110:24, 111:2,

111:16, 111:18, 112:16, 121:18, 121:23, 121:24, 122:9, 125:17, 125:24, 127:4, 127:10, 127:14, 127:15, 128:10, 129:14, 129:16, 130:1, 131:9, 131:14, 131:15, 133:2, 133:3, 133:5, 133:6, 133:7
**vehicles** [1] - 73:8
**verdict** [3] - 7:23, 8:13, 23:24
**verdicts** [1] - 28:7
**verify** [2] - 98:18, 124:19
**versus** [2] - 3:7, 17:20
**Video** [1] - 129:23
**video** [22] - 11:1, 11:5, 69:8, 69:9, 69:14, 69:16, 69:23, 69:24, 72:23, 72:24, 111:10, 111:13, 114:9, 114:11, 114:13, 114:25, 115:25, 121:15, 129:2
**videos** [2] - 112:23, 113:1
**videotaping** [1] - 129:13
**view** [4] - 111:20, 111:21, 115:14, 115:16
**violation** [2] - 12:22, 131:10
**vision** [1] - 122:7
**visual** [4] - 38:15, 107:9, 120:13, 122:4
**visually** [2] - 70:11, 93:18
**voice** [6] - 48:3, 67:22, 69:4, 74:6, 91:19, 118:21, 118:23, 122:21
**voir** [1] - 13:18
**Volume** [1] - 1:6
**vs** [1] - 1:5

**W**

**W-O-O-D-Y-A-R-D** [1] - 78:9
**wait** [3] - 13:5, 22:17, 22:25
**waited** [2] - 22:16, 111:4

**waiting** [9] - 10:14, 22:16, 60:20, 74:11, 121:9, 121:10, 128:16, 130:22, 146:1
**waits** [1] - 129:9
**wake** [1] - 85:19
**Walgren** [81] - 19:12, 19:14, 23:17, 24:14, 25:9, 26:21, 27:6, 27:15, 62:7, 62:25, 63:8, 64:1, 64:2, 64:7, 64:11, 65:8, 65:23, 66:1, 66:18, 67:7, 68:4, 68:15, 70:1, 71:9, 72:16, 72:20, 72:22, 73:10, 91:22, 91:25, 92:6, 92:13, 92:14, 92:16, 93:2, 93:10, 95:8, 95:17, 95:24, 96:23, 97:3, 97:13, 97:16, 98:11, 99:2, 99:23, 100:6, 100:25, 101:15, 102:3, 102:10, 102:17, 102:18, 103:9, 103:14, 103:18, 104:11, 104:14, 104:17, 105:4, 105:13, 105:18, 105:21, 106:11, 108:15, 108:21, 109:4, 109:9, 110:20, 112:4, 112:16, 113:7, 113:14, 119:14, 150:5, 150:14, 150:20, 151:3, 151:8, 151:15
**Walgren's** [16] - 62:21, 71:17, 71:20, 72:15, 73:16, 93:13, 98:17, 99:23, 100:9, 100:10, 108:23, 110:5, 110:23, 112:10, 112:13, 113:3
**walk** [4] - 40:3, 77:6, 114:15, 130:3
**walked** [10] - 16:8, 71:15, 71:18, 73:2, 73:5, 86:21, 115:1, 115:2, 115:14, 130:20
**walking** [1] - 85:5
**walks** [3] - 72:13, 111:18, 115:8
**wants** [8] - 8:10, 8:11, 20:20, 108:5, 137:2,

140:25, 147:9, 151:9
**wash** [1] - 68:18
**watched** [7] - 20:14, 22:22, 67:11, 70:4, 112:22, 126:19, 126:21
**watching** [1] - 86:16
**water** [1] - 79:18
**ways** [2] - 9:12, 33:21
**wearing** [1] - 127:16
**week** [3] - 62:9, 80:8
**weeks** [1] - 97:2
**weigh** [1] - 96:18
**weighed** [1] - 96:3
**weighs** [1] - 96:18
**welcome** [1] - 17:19
**Wendy's** [6] - 128:6, 128:8, 128:24, 129:8, 129:9, 129:12
**west** [3] - 48:25, 121:7, 129:12
**westbound** [1] - 131:4
**WHEREOF** [1] - 155:14
**white** [6] - 34:9, 34:11, 34:12, 46:15, 110:25, 127:18
**whole** [10] - 45:3, 69:1, 70:4, 74:2, 78:19, 82:9, 127:24, 129:2, 146:13, 146:15
**wife** [2] - 52:17, 60:22
**Williams** [5] - 1:13, 3:4, 52:16, 125:21, 127:6
**willing** [1] - 8:10
**window** [2] - 110:25, 111:1
**windshield** [1] - 121:12
**wire** [5] - 38:5, 38:19, 67:10, 71:8, 122:5
**wish** [2] - 24:3, 147:15
**withdraw** [1] - 8:23
**withdrawn** [1] - 9:12
**Witness** [1] - 2:2
**witness** [15] - 9:24, 28:13, 28:17, 28:18, 28:22, 28:24, 75:16, 76:10, 77:1, 77:11, 77:15, 77:17, 78:2, 91:4, 109:18
**WITNESS** [4] - 29:13, 78:8, 91:10, 155:14
**witness's** [1] - 28:23
**witnesses** [2] - 76:1, 77:10
**wondered** [1] - 22:15
**WOODYARD** [2] - 2:6,

77:23
**Woodyard** [9] - 18:12, 51:14, 51:20, 76:4, 77:19, 77:20, 78:8, 78:15, 89:1
**Woodyard's** [2] - 48:11, 54:3
**Word** [2] - 99:20, 136:2
**words** [2] - 46:4, 132:22
**worker** [1] - 82:14
**works** [2] - 42:12, 114:2
**world** [1] - 41:5
**worth** [4] - 69:23, 105:4, 119:4, 122:25
**worthless** [1] - 69:24

**X**

**Xanax** [1] - 19:17

**Y**

**year** [1] - 81:7
**years** [7] - 29:25, 30:5, 30:17, 31:7, 31:9, 79:8, 130:11
**yelled** [1] - 18:21
**yelling** [1] - 87:5
**yourselves** [4] - 15:11, 25:11, 75:14, 152:19

**Z**

**zero** [2] - 60:5, 115:11
**Ziploc** [1] - 26:12
**ZTE** [6] - 52:6, 52:12, 52:25, 53:1, 62:2, 63:4