1          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF IOWA
2                   EASTERN DIVISION

3    United States of America,

4                   Plaintiff,        No. 18-CR-1023

5         vs.

6    Michael Stevenson,                Volume 3 of 3

7                   Defendant.

8                   *    *    *    *    *

9              Transcript of proceedings held at the

10   Federal Courthouse, Cedar Rapids, Iowa, on the 25th

11   day of April, 2019, commencing at 8:31 a.m.

12                   *    *    *    *    *

13   Before:  Judge C.J. Williams

14                   *    *    *    *    *

15   Appearances:

16   John H. Lammers
     600 Fourth Street, Suite 670
17   Sioux City, Iowa 51101

18   and

19   Kyndra Lundquist
     Assistant US Attorneys
20   111 Seventh Avenue SE, Box 1
     Cedar Rapids, Iowa 52401        for USA.
21
     Cory Goldensoph
22   Attorney at Law
     425 Second Street SE, Suite 803
23   Cedar Rapids, Iowa 52401        for Defendant.

24                   *    *    *    *    *

25   Transcript ordered the 12th day of June, 2019.
     Transcript delivered the 10th day of July, 2019.

*Sarah J. Dittmer, CSR, RPR*
*1(888)388-2723*

```
 1                        INDEX
 2    Witness:                                    Page
 3    CHAD LEITZEN
 4      Direct Examination by Mr. Lammers......   401
 5      Cross-Examination by Mr. Goldensoph....   404
 6    MICHAEL STEVENSON
 7      Direct Examination by Mr. Goldensoph...   421
 8      Cross-Examination by Mr. Lammers.......   434
 9      Redirect Examination by Mr. Goldensoph.   466
10      Recross-Examination by Mr. Lammers.....   468
11                    *    *    *    *    *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

<pre>
 1                    P R O C E E D I N G S
 2            THE CLERK:  All rise.  The U.S. District
 3    Court for the Northern District of Iowa is now in
 4    session.  The Honorable C.J. Williams presiding.
 5            THE COURT:  Please be seated.  We are back
 6    in the matter of United States of America versus
 7    Michael Stevenson, Criminal Case Number 18-CR-1023.
 8            We are back for trial.  We're outside the
 9    presence of the jury.  I just want to kind of figure
10    out where we are today.  When we left off last night,
11    the Government had indicated that it thought it only
12    had maybe one witness left.
13            Mr. Lammers, where are we at on your case?
14            MR. LAMMERS:  Your Honor, we have
15    Mr. Leitzen, who I will re-call very briefly.  And
16    it's my understanding the defendant -- or the defense
17    attorney wants to ask a few questions of Officer
18    Leitzen outside, potentially, of my direct.  And I
19    don't have objection to that.
20            THE COURT:  All right.  Very good.
21            Mr. Goldensoph, what do you anticipate?
22            MR. GOLDENSOPH:  Your Honor, I hate to be
23    coy, but I -- Just to be honest with you, I'm not a
24    hundred percent certain as to whether or not
25    Mr. Stevenson is going to be testifying.  I would
</pre>

1   prefer to -- after our motions, to have like just a
2   few moments to talk with him.
3           THE COURT:  Sure.  That's fine.  What I will
4   do, then, is let the jury know that -- You know,
5   we'll take a break after the Government rests its
6   case.  And then we'll kind of figure out where we
7   are.
8           And then we -- If Mr. Stevenson is going to
9   testify, we'll bring the jury back in, and we'll go
10  through that testimony.  If not, then we'll just put
11  them on a little bit longer break to give the lawyers
12  some time to get ready for closing arguments.  And
13  we'll proceed that way.
14          MR. GOLDENSOPH:  That makes sense, Your
15  Honor.
16          THE COURT:  All right.  Anything else we
17  need to take up before we bring the jury in?
18          Mr. Lammers?
19          MR. LAMMERS:  Well, just, I guess, for
20  purposes of clarity, I turned -- or gave some grand
21  jury transcripts to Mr. Goldensoph yesterday that
22  were not turned over, inadvertently.  And he has had
23  them.  And I believe we are prepared to proceed.
24          THE COURT:  Tell me a little bit more about
25  the grand jury --

                    MR. LAMMERS:  The grand jury transcripts of

1    two witnesses, of John Walgren from 2013 and of Emily

2    Nelson.  She had two:  one in 2018 and one in 2016.

3    And we provided them to Mr. Goldensoph yesterday

4    after we realized that they existed.  And I think

5    that's the record I need to make.

6                    THE COURT:  And were they -- Did they, in

7    either one of them, address the defendant?

8                    MR. LAMMERS:  The one in November of 2016

9    addressed the defendant -- or excuse me -- November

10   of 2018 said -- I believe the gist of the testimony

11   was that she was -- she knew somebody named Jackie

12   Condron who had a different source.  And I think

13   that's who the grand jury transcript was about.

14                   And when asked if she knew anyone else who

15   was dealing, she identified the defendant as someone

16   who was dealing.  And that Jackie Condron then went

17   to try and arrange a deal with him.  And it didn't

18   happen because in, I think -- The gist -- the gist of

19   it is, in the words of Emily Nelson, at that time he

20   wasn't dealing anymore.

21                   But there was a wait for, I think, a couple

22   of hours for the transaction that didn't happen after

23   that she had made contact.  I think that comports

24   with her testimony, actually, from yesterday, where

*Sarah J. Dittmer, CSR, RPR*
*1(888)388-2723*

```
 1    she said that he, at some point, quit dealing as
 2    well.
 3          But again, they were -- they were
 4    supplied -- Those transcripts were handed over.  And
 5    I informed Mr. Goldensoph of the existence of Lo in
 6    the transcript.  And then I e-mailed him copies of
 7    them.  But I wanted to make this of record before we
 8    went any further.
 9          THE COURT:  No, I appreciate that.  And this
10    was handed over after trial yesterday?
11          MR. LAMMERS:  Yes.  Yesterday, after we -- I
12    went downstairs, found out, tracked down -- actually,
13    my cocounsel tracked him down through the office of
14    our -- Linda Merch.  And then I e-mailed them to
15    Mr. Goldensoph, I think, probably 4:30 yesterday.
16          THE COURT:  All right.  Great.
17          Mr. Goldensoph, any comments or concerns you
18    have about that?
19          MR. GOLDENSOPH:  No.
20          THE COURT:  Okay.  Fair enough.  Are we
21    ready for --
22          Anything else, Mr. Lammers?
23          MR. LAMMERS:  I hope there's nothing else,
24    Your Honor.  We're prepared to proceed.
25          THE COURT:  Okay.  Mr. Goldensoph?
```

1          MR. GOLDENSOPH:  Nothing.

2          THE COURT:  All right.  Let's bring in the

3     jury.

4          THE CLERK:  All rise.

5          (Jury enters.)

6          THE COURT:  All right.  Please be seated.

7          We are back in the matter of the United

8     States of America versus Michael Stevenson, Case

9     Number 18-CR-1023.  We are back in trial.

10          When we left off yesterday afternoon, we

11     were on the Government's case.

12          And so, Mr. Lammers, the Government may

13     proceed.

14          MR. LAMMERS:  Thank you, Your Honor.

15          At this time, we would recall Officer

16     Leitzen.

17          THE COURT:  Please raise your right hand.

18                    CHAD LEITZEN,

19     being produced, sworn as hereinafter certified, was

20     examined and testified as follows:

21          THE COURT:  Thank you.  Please have a seat.

22     And just for the record, please state your name.

23          THE WITNESS:  Chad Leitzen.

24          THE COURT:  Thank you.

25          You may proceed.

1          MR. LAMMERS:  Thank you, Your Honor.

2                    DIRECT EXAMINATION

3     BY MR. LAMMERS:

4     Q.        Officer, I'm not going to go through your

5     qualifications again.  I'm sure the jury can remember

6     that conversation from a couple of days ago.  I had a

7     couple of follow-up questions in regards to some

8     issues.

9               First of all, do you recall your interview

10    with Emily Nelson in, I think it was, June of 20- --

11    2017?

12    A.        Yes, I do.

13    Q.        And there was some discussion yesterday

14    about Emily Nelson and promises to get out of jail.

15    Or not "promises."  Excuse me.  That's a bad phrase.

16    And her desire to get out of jail.

17              Do you remember that?

18    A.        Yes.

19    Q.        At any point did you tell her that if she

20    agreed to talk to you that you would let her out of

21    jail?

22    A.        No.

23    Q.        Did you tell her the opposite?

24    A.        Yes, I did.  She had asked -- I asked her if

25    she would tell me about the incident involving Adam

```
1    Birch.  And she stated that she would like to get out
2    of jail and asked me if I could get her out of jail
3    if she agreed to talk about Adam Birch.
4            And I told her I would make her no deals.
5    And she still agreed to talk to me about the case.
6    Q.      Okay.  Now, I'm going to switch topics on
7    you.  Do drug dealers resupply?
8    A.      Yes.
9    Q.      What's that referred to as?
10   A.      Re-upping.
11   Q.      Okay.  And what is that specifically?
12   A.      Re-upping is going to -- going to your
13   supplier and restocking with a larger supply of drugs
14   to bring back to wherever you're selling them at and
15   then break it down into smaller quantities and sell
16   it for -- sell it at smaller quantities in order to
17   make money.
18   Q.      How do you make money by selling it in
19   smaller quantities?
20   A.      They'll go to their supplier and buy it in
21   bulk.  Realistically, it's like the -- the Sam's Club
22   of -- of drug dealing.  They'll go buy bulk amounts
23   for a lower price and then break it down into the
24   $50, $80, $160 amounts to sell and make money.
25           So if a gram's costing $160, they may be
```

1    able to buy, say, five grams for $600, break it down

2    into $160 per gram, and make $800 off it, in which

3    case they make $200 profit.

4    Q.      Okay.  And are drug dealers able to continue

5    to sell product without re-upping?

6    A.      No.

7    Q.      Unless they manufacture their own?

8    A.      Correct.

9    Q.      Do you know anyone who manufactures heroin

10   in the Dubuque area?

11   A.      Nobody.

12   Q.      You have -- You were here, I think, when the

13   testimony -- or perhaps you even gave the testimony

14   about who the vehicle that Mr. Stevenson was driving,

15   who that was registered to.  And who was that?

16   A.      Jessica Greenwood.

17   Q.      Do you know, is she any relation to Michael

18   Greenwood who we heard of yesterday?

19   A.      They're brother and sister.

20   Q.      Okay.  And just for clarification, Mr. Birch

21   was in jail prior to January; is that right?

22   A.      That's correct.

23   Q.      Do you know how long he was in jail?

24   A.      I believe it was from August of 2016 until

25   January of 2017.

1    Q.        Do you know when in January?

2    A.        January 3rd.

3              MR. LAMMERS:  I don't think I have any

4    further questions.  Thank you.

5              THE COURT:  Thank you.  Cross-examination.

6              MR. GOLDENSOPH:  Thank you, Your Honor.

7                       CROSS-EXAMINATION

8    BY MR. GOLDENSOPH:

9    Q.        We talked a little -- You talked a little

10   bit about Ms. Nelson's interview.  Is it fair to say

11   that Ms. Nelson was quite eager to get out of jail

12   that particular day?

13   A.        Yes.

14   Q.        In fact, she went on -- She talked with you

15   about that for several minutes; correct?

16   A.        She did.

17   Q.        I want to talk real briefly about the

18   controlled crack cocaine buy that occurred on August

19   23rd, 2017, with Ms. Scholtes.

20             Ms. Scholtes, that day, didn't actually have

21   a phone number for Mr. Stevenson; correct?

22   A.        She didn't have a current phone number for

23   him.

24   Q.        So when she got there, you showed her some

25   phone numbers; correct?

1    A.        No.

2              I guess, let me -- let me -- Reask the

3    question.  What do you mean by show her?  Like

4    showing her a list of phone numbers?

5    Q.        Well, did you provide her with Ms. [sic]

6    Stevenson's old phone number?

7    A.        She had the old phone number.  I provided --

8    Q.        You know, do you suppose it would help your

9    memory if I showed you your report?

10   A.        It would.

11             MR. GOLDENSOPH:  May I approach?

12             THE COURT:  You may.

13   BY MR. GOLDENSOPH:

14   Q.        After reading your report, does that help --

15   help your memory?

16   A.        It does.  That was my mistake.  She did not

17   have his old phone number.  I provided her with his

18   old phone number.  And she stated that she recognized

19   that number as being an old phone number of his, but

20   thought he had a different one.

21   Q.        And indeed you guys did try that phone

22   number; correct?

23   A.        That's correct.

24   Q.        But it wasn't working anymore?

25   A.        That is correct.

1    Q.        So you actually provided her with the new

2    one; correct?

3    A.        That's correct.

4              MR. GOLDENSOPH:  That's all I have, Your

5    Honor.

6              THE COURT:  Any further redirect

7    examination?

8              MR. LAMMERS:  No further redirect.  Thank

9    you.

10             THE COURT:  Thank you, Investigator.  You

11   may step down.

12             Any further witnesses on behalf of the

13   United States?

14             MR. LAMMERS:  No.  The Government rests at

15   this time, Your Honor.

16             THE COURT:  All right.  Thank you.

17             Ladies and gentlemen, I have bad news for

18   you and good news for you.  The bad news is I'm going

19   to put you right back on break right now.

20             Whenever a party rests, there's some stuff I

21   have to go through.  It takes a few minutes.  We're

22   going to go through that.  And then we will bring you

23   back in.

24             The good news is we're moving much quicker

25   than we thought.  And so we fully anticipate that

we're going to get this case to you sometime today
instead of tomorrow.  And so that's the good news.

So we're going to put you on break here for
a little bit.  We'll bring you back in.  It's going
to be, oh, probably 10 minutes, 15 minutes.  If it's
going to be any longer than that, we'll let you know.

THE CLERK:  All rise.

(Jury enters.)

THE COURT:  All right.  Please be seated.

All right.  Mr. Goldensoph, do you have a
motion you'd like to make?

MR. GOLDENSOPH:  Yes, Your Honor.

At this point we would move for a judgment
of acquittal pursuant to Rule 29.  I'm going to --
I'm going to take these count by count which, of
course, makes the most sense.

So Count 1, the conspiracy charge.  Your
Honor, in this case -- Well, first of all, the
alleged co-conspirators are these vague people that
nobody knows any names for, hardly any description
for them, other than a -- I believe we heard a black
male with dreadlocks.  And that was from Mr. Walgren.
Nobody else provided a description of these other
people.

And so these descriptions are just, frankly,

1   inadequate to establish that Mr. Stevenson had

2   provided -- or had any sort of agreement or

3   understanding.  There's no indication that he had any

4   sort of agreement or understanding with this vague

5   person.

6           But even more important than that, Your

7   Honor, is the timeline here.  Now, you can correct me

8   if I'm wrong, or the record will correct me if I'm

9   wrong, but my recollection is we didn't get a single

10  date from Walgren, Scholtes, or Emily Nelson, the

11  three people who talked about these vague people --

12  we didn't get a single date from them as to when they

13  would deal with these other people.

14          So we don't know if it occurred between

15  January of 2017 and September of 2017.  And the

16  Government needs to establish that if this conspiracy

17  occurred during that -- occurred, it needs to be

18  during that timeline.

19          Not only that, but what's even more glaring

20  is, if they did establish that it occurred during

21  that timeline, they didn't establish that it occurred

22  from January 2017 to September 2017.  There's nothing

23  indicating that.  Those are just some vague dates out

24  there.

25          I -- I don't know when -- I mean, I really

1    have no concep- -- no reason, no understanding as to

2    why those dates were picked, frankly.  I mean,

3    there's no -- no way to know the -- I have no idea

4    why that starting point or that end point, but that

5    hasn't been established.

6            So we -- we believe -- Even if you do

7    believe that these vague people are co-conspirators,

8    they certainly haven't established when they were

9    co-conspirators.  And that's something that the

10   Government needs to prove.

11           Count 2.  I think the evidence is clear that

12   the type of -- of trans-  -- text and call

13   communications needed to complete a transaction was

14   firmly established throughout this trial.  And

15   when -- when I say that, I mean, a transaction

16   between Mr. Stevenson and Mr. Birch.  I think that

17   was clearly established throughout the trial.

18           And those several elements of transaction

19   did not occur on February 1st.  We just have

20   basically introductory text messages in that one

21   minute, 39 phone call, which we don't know what was

22   said during that.  And it being a mystery doesn't

23   prove beyond a reasonable doubt that a transaction

24   occurred during that telephone call.

25           There's -- there's nothing that we know

1    about that phone call.  There's no texts about how

2    much Mr. Birch is going to buy.  There's no texts

3    about how much it's going to cost.  There's no -- And

4    this is the key.  There is no texts saying, "Hey, I'm

5    pulling up.  I'm here," or anything like that.

6          So we believe that the -- even in the light

7    most favorable for the Government, the Government

8    hasn't proven the elements for Count 2.

9          And I'm going to do something a little bit

10   unusual here, Judge.  I'm not even -- I'm not even

11   going to address Counts 3, 4, or 5.  Just that's --

12   that's what I have for you.

13         THE COURT:  All right.  Thank you.

14         Mr. Lammers?

15         MR. LAMMERS:  I'm a little more comfortable

16   here than sitting at the table, so if -- with the

17   Court's permission, if I could stand here?

18         THE COURT:  Oh, of course.

19         MR. LAMMERS:  I guess in regards to the

20   conspiracy, frankly, the timeline, the testimony from

21   Shannon Scholtes was that she started buying crack

22   cocaine in December and, I think, actually into

23   January.  Or continued in December of 2016 and then

24   continued to buy.

25         Talked about the fact that she was buying

1  crack cocaine from Ricky Carter, I think was the last

2  name -- from Ricky Carter and the defendant.  And

3  sometimes she would go to Ricky Carter, and the

4  defendant would deliver.  And sometimes she would go

5  to the defendant, and Ricky Carter would deliver.

6         And that, in and of itself, establishes a

7  conspiracy.  And it establishes a conspiracy within

8  the time frame.  And as the Court's aware, those time

9  frames, while they are listed in the indictment,

10  those are on-or-about time frames.

11        And I think the grand -- the jury

12  instructions refer to that.  And I think the case law

13  in the Eighth Circuit is very, very clear that the

14  time frame is not an element, actually, of the charge

15  itself.

16        It's within a reasonable amount of time of

17  the indictment.  That's clearly within a reasonable

18  amount of time.  In fact, it's squarely within the

19  indictment.

20        In regards to the testimony of Walgren, John

21  Walgren says, "I was getting heroin from the

22  defendant.  I was getting heroin from the defendant

23  that was delivered by other people on occasion.  And

24  I was getting heroin -- In fact, after one

25  transaction, I got it from a person" -- and I think

1    Mr. Goldensoph accurately described him as a black

2    male with dreadlocks.

3          "After I got that heroin, the defendant

4    called me and said I'd shorted him on the cash."

5    That clearly established evidence of the conspiracy.

6          And, in fact, we have, during the text

7    messages from the defendant, the establishment of the

8    conspiracy as well.  We have the defendant being

9    informed that Mr. Birch is distributing drugs and

10    Mr. Stevenson agreeing to supply him.

11          That is elements of that.  That's as basic

12    as a conspiracy can get.  And that is squarely within

13    the time frame of the conspiracy.

14          Mr. Goldensoph seems to believe that the

15    conspiracy has to be shown to be going every single

16    day of the period of the conspiracy.  The jury

17    instructions tell us clearly that that's not the

18    case.

19          He has to have been involved at some point

20    within the time that the conspiracy was ongoing.

21    That's all that's required in this particular case.

22    And there's substantial evidence in the record that

23    proves it.

24          I believe there's also evidence in the

25    record from Emily Nelson, during the time frame of

1   the conspiracy when she started dealing with the

2   defendant, that, at some point or another, she

3   went -- And I think this, in fact, was the Bell

4   objection.

5        If you recall, Your Honor, this was the

6   co-conspirator hearsay statement that she went

7   through somebody else, and the defendant supplied

8   them, ultimately, but that they were all sort of

9   gathered together and worked together to obtain the

10   heroin.  That is evidence of the conspiracy as well.

11   I think that there is substantial evidence of the

12   conspiracy.  And a jury question has been engendered.

13        In regard to Count 2, Your Honor, again, for

14   the time frame, it's on or about February 1st is

15   the -- the distribution.

16        We have clear evidence in January, on

17   January 31st, that there was an actual completed

18   transaction.  In fact, that's the one with

19   Mr. Walgren, and the text messages support that.  And

20   Mr. Walgren testified to that.

21        But we also have evidence that a second

22   distribution occurred on the 1st in the evidence of

23   the two text messages and then the phone call and

24   then the defendant's panicked reaction after Adam

25   Birch is no longer there.

1          That is classic circumstantial evidence.

2     And the jury is allowed to rely on that type of

3     evidence in order to determine whether or not that

4     transaction actually occurred.

5          There is sufficient evidence in this record

6     to support the fact that a jury question has been

7     engendered.  In fact, I would go so far as to say

8     there is substantial evidence in this record that

9     shows the defendant was involved in trafficking -- in

10    the sale of heroin on that day.

11         And then we have the evidence that was found

12    from Mr. Walgren -- or excuse me -- from Mr. Birch's

13    room later.  Mr. Goldensoph has a good argument for

14    the jury, and he should certainly submit that, but it

15    doesn't -- it doesn't rise to the level of a Rule 29

16    challenge.

17         THE COURT:  Thank you.

18         In ruling on the defendant's motion on a

19    Rule 29, the Court has to consider the evidence in

20    the light most favorable to the Government.  In doing

21    so, I find that there is sufficient evidence to

22    submit this matter to a jury for -- on the

23    conspiracy.

24         Now, the conspiracy charge is a conspiracy

25    to distribute two different types of drugs:  first is

1   crack cocaine, the second is heroin.

2          The crack cocaine testimony is largely

3   through Ms. Scholtes.  And I do find that the jury

4   can choose to believe her testimony.  And if they

5   believe her testimony, it clearly established a -- a

6   conspiracy to distribute crack cocaine and during the

7   time period charged.

8          With regard to the conspiracy to distribute

9   heroin, again, looking at the evidence in the light

10  most favorable to the Government, the -- the text

11  messages can be interpreted by the jury as showing

12  the defendant's knowledge that Mr. Birch was

13  redistributing quantities of the heroin he was

14  getting from the defendant.

15         There was texts talking about people that he

16  was going in with and so forth to share the cost of

17  the heroin and to further distribute it.

18         And a conspiracy simply requires an

19  agreement between two or more people to distribute

20  a drug.  And in these circumstances, that alone is

21  sufficient.

22         In addition to that, the Government does

23  have other evidence that other people may have been

24  involved in the conspiracy and helping the defendant

25  distribute heroin from time to time.

 1          But quite frankly, it's sufficient for them

 2     simply to have established that during the charged

 3     time period that the defendant was working with

 4     Mr. Birch to supply him with heroin, that he knew

 5     that Mr. Birch was then redistributing.

 6          And that's sufficient to make a conspiracy

 7     if the jury interprets those text messages the way

 8     the Government believes that they should be

 9     interpreted.

10          With regard to Count 2, I'm also going to

11     find that there is sufficient evidence for this to go

12     to the jury.  As Mr. Lammers acknowledges,

13     Mr. Goldensoph has some -- has some argument for the

14     jury.  And the jury does not have to accept the

15     Government's evidence or its interpretation of the

16     evidence and may very well conclude that it's

17     insufficient.

18          But in the light most favorable to the

19     Government, the evidence established at this trial

20     that during the time period of January until

21     Mr. Birch's untimely death, his only source of supply

22     was heroin.

23          Now, again, the jury may not believe that,

24     and Mr. Goldensoph may be able to persuade them that

25     there are other suppliers of heroin in Dubuque and

somebody else was supplying Mr. Birch.

But there was also testimony the jury can believe that Mr. Stevenson was Mr. Birch's only supplier of heroin during this time period.

And then there is the text messages and the phone calls between the defendant and Mr. Birch about a transaction on the 1st. And I think also importantly there's then communications between Mr. Birch and Mr. -- Oh, help me out here.

MR. LAMMERS: Walgren, Your Honor.

THE COURT: Walgren. Thank you.

-- Mr. Walgren at that same time period that they were attempting to put together a shared deal that did not go through.

But in those communications that occurred at the same time, if I recall them correctly, there was an acknowledgement by Mr. Birch to Mr. Walgren that his supplier was ready to go and had the drugs available.

And then we have the concerned text messages from Mr. Walgren and the phone call about Mr. Stevenson's concern about Mr. Birch's safety after that date.

And the jury could interpret those as indicative that, in fact, Mr. Stevenson supplied

1    Mr. Birch with the heroin, and he was concerned about

2    whether Mr. Birch was going to safely take it.

3            And so I think, again, in the light most

4    favorable to the Government, there's sufficient

5    evidence for this to go to a jury and have a jury

6    decide whether, in fact, the Government has proved

7    its case beyond a reasonable doubt.

8            And so the Court's going to deny the

9    defendant's motion for Rule 29, judgment of acquittal

10   on Counts 1 and 2.  And as the record reflected, the

11   defendant did not move for a judgment of acquittal on

12   Counts 3 through 5.  So that's where we are.

13           Mr. Goldensoph, do you want a few minutes

14   with your client regarding whether he's going to

15   testify?

16           MR. GOLDENSOPH:  Please.

17           THE COURT:  Yes, of course.

18           MR. GOLDENSOPH:  Your Honor, bit of an

19   unusual request.  Mr. Stevenson does wish to testify,

20   but he actually has to use the men's room quick.

21           THE COURT:  All right.  We'll take a break

22   and allow him to use the men's room.

23           Can we let the jury know we're going to be

24   another five or 10 minutes?

25           MR. GOLDENSOPH:  Thank you.

```
 1          THE COURT:  And everybody can be at ease
 2   while we're waiting.
 3          (Recessed 9:01 a.m.; resumed 9:06 a.m.)
 4          THE COURT:  Mr. Goldensoph, are we ready for
 5   the jury?
 6          MR. GOLDENSOPH:  Yes.
 7          MR. LAMMERS:  No, Your Honor.  We have a
 8   quick record to make.
 9          It came to my attention at the break that I
10   believe Heidi Woodyard is here.  I think she's got a
11   sweatshirt on that says something about her brother
12   on the back of her sweatshirt.  And I obviously
13   didn't see that.  I've only seen the front of her.
14          And I don't know what it says specifically.
15   It says her brother's no longer with us or something.
16   And there's angels with wings.  I'm not sure if the
17   jury would have seen that.  I don't have the first
18   idea what their perspective was.  But I believe I
19   need that -- to bring that -- to bring that to the
20   Court's attention.
21          THE COURT:  Mr. Goldensoph?
22          MR. GOLDENSOPH:  To be perfectly honest,
23   I understand Ms. Woodyard, but it does make me a
24   little uncomfortable.  Again, I'm not saying she's
25   doing this to sway the jury or anything like that.
```

1    But to the extent that it could, I -- it does make me
2    a little worried.
3            THE COURT:  Ms. Woodyard, I'd ask if you
4    could either turn that inside out or take it off, and
5    that way we'll just eliminate that potential problem.
6            I don't -- because your back is to the jury,
7    I don't -- I can't imagine they would have seen you.
8    I watched, and there was no point you turned your
9    back to the jury when they were leaving, but we're
10   sympathetic, and we appreciate it.  But thank you for
11   doing that.
12           All right.  The record will reflect that
13   Ms. Woodyard has removed her sweatshirt, so I think
14   that eliminates that issue.
15           Mr. Lammers, anything else?
16           MR. LAMMERS:  No.  I think that eliminates
17   the issue.  Thank you.
18           THE COURT:  Mr. Goldensoph?
19           MR. GOLDENSOPH:  We're good, Your Honor.
20           THE COURT:  All right.  Bring in the jury,
21   please.
22           THE CLERK:  All rise.
23           (Jury enters.)
24           THE COURT:  All right.  Please be seated.
25           We are back in the United States of America

1    versus Michael Stevenson, Case Number 18-CR-1023.

2          When we left off, the Government had rested

3    its case.

4          Mr. Goldensoph, does defense wish to present

5    any witnesses?

6          MR. GOLDENSOPH:  Yes, Your Honor.  At this

7    time, we would call Michael Stevenson.

8          THE COURT:  Very good.

9          Mr. Stevenson, if you would come over here

10   to the witness stand.  Please raise your right hand.

11                    MICHAEL STEVENSON,

12   being produced, sworn as hereinafter certified, was

13   examined and testified as follows:

14         THE COURT:  Very good.  Please have a seat

15   in the witness chair.  Pull that chair up so you're

16   right up against the counter.  Adjust that

17   microphone.  And then please state your name and

18   spell your name for the record.

19         THE WITNESS:  Michael Stevenson,

20   M-I-C-H-A-E-L S-T-E-V-E-N-S-O-N.

21         THE COURT:  Thank you.

22         Mr. Goldensoph, you may proceed.

23         MR. GOLDENSOPH:  Thank you, Your Honor.

24                    DIRECT EXAMINATION

25   BY MR. GOLDENSOPH:

1    Q.        Michael, where are you a resident of?

2    A.        Dubuque, Iowa.

3    Q.        And how long have you lived in Dubuque?

4    A.        Three years.

5    Q.        I'm going to have you move a little bit

6    closer to that microphone so everybody can hear you

7    just fine.

8              I'm going to launch right into the

9    allegations.  Now, Count 1 accuses you of conspiracy

10   to distribute heroin and crack between the -- January

11   of '17 and September 2017.  Were you selling heroin

12   between January 2017 and September 2017?

13   A.        Yes.

14   Q.        Were you selling crack during that period of

15   time?

16   A.        Yes.

17   Q.        Were you working with anyone else to sell

18   those drugs during that period of time?

19   A.        Not at all.

20   Q.        So you never entered into an agreement or

21   understanding with another person to sell those

22   drugs?

23   A.        No.

24   Q.        Why didn't you work with anyone?

25   A.        Because I was a small-time distributor, and

```
 1    I wasn't -- I didn't have a big operation.  So it was
 2    enough for both handfuls that I could handle them
 3    myself.  I could handle them personally.
 4    Q.      Okay.  And when you sell those drugs, what
 5    kind of packaging do you use?
 6    A.      The corner of a plastic bag, because it's
 7    basically more economical.  So not only does you get
 8    a hundred bags for $2, you get 200 bags for $2,
 9    because you could use each corner, that corner and
10    that corner.
11    Q.      So you would never use, like, gem Baggies?
12    A.      Not at all.
13    Q.      And was that for both heroin and crack?
14    A.      Yes, sir.
15    Q.      Now, when you communicated about drug sales,
16    what forms of communication did you use?
17    A.      Cellular.
18    Q.      Phone?
19    A.      Yep.
20    Q.      Do you just call people?
21    A.      Call, text.
22    Q.      Okay.  Count 2 alleges that you sold heroin
23    to Adam Birch on February 1st, 2017.  Did you sell
24    heroin to Adam Birch on February 1st, 2017?
25    A.      No.
```

1   Q.      Had you ever sold heroin to Adam Birch?

2   A.      Yes, sir.

3   Q.      Now, when Mr. Birch would, like, come to you

4   for a sale, who would bring him?

5   A.      John Walgren.

6   Q.      Was that pretty consistent?

7   A.      Pretty consistent.

8   Q.      Do you remember the last time that you would

9   have sold heroin to Adam?

10  A.      Probably like two or three days before the

11  incident happened.  I can't recall the exact time,

12  but, like, I know it was a gap because I remember it.

13  I had remembered like, "Dang, I ain't talked to him

14  for a minute."  So I do know at this time there was a

15  gap and that I knew that I haven't talked to him in a

16  while --

17  Q.      Okay.

18  A.      -- or a small time period.

19  Q.      Okay.  Do you happen to recall -- The last

20  time that you would have met with Adam, do you happen

21  to recall where you would have met?

22  A.      Yep.  On Nevada with Walgren.

23  Q.      Was Nevada a pretty typical place for you to

24  meet with Mr. Birch?

25  A.      Very typical.  I had moved in with my

        1    girlfriend, and that was a convenient location for

        2    me.

        3    Q.        Okay.  Do you remember looking at the

        4    photos -- or the different text messages between you

        5    and Mr. Birch?

        6    A.        Yes, sir.

        7    Q.        Michael, I am going to show you -- it's

        8    Government Exhibit 13.  We've talked a lot about this

        9    exhibit.  But there, at the top of page two of that

       10    exhibit, does that -- what is -- what does that say

       11    this document is?

       12    A.        The phone calls between Birch and Lo.

       13    Q.        Is it the phone calls or the text messages?

       14    A.        The text messages.  I'm sorry.

       15    Q.        That's all right.

       16              All right.  So I am going to go to January

       17    30th.  You can't read that.  I want you to look at

       18    text number 314.  Do you see that?

       19    A.        Yes, sir.

       20    Q.        Now, what's the date of that text?

       21    A.        1-30-2017.

       22    Q.        And this -- this text, does this reflect

       23    that it's a text to or from you?

       24    A.        A text incoming from me.

       25    Q.        Okay.  And could you read what that text

1    says?

2    A.        "Meet me in the back of the car wash on

3    Nevada."

4    Q.        And did -- And so your prior testimony was

5    that that is where you ended up meeting; is that

6    correct?

7    A.        Yep.

8    Q.        Now, I want to direct your attention to

9    January 31st, the very end of the text messages here.

10   There's a series of texts here that appear to be sent

11   by Mr. Birch to you.

12             Do you see those?

13   A.        Yes, sir.

14   Q.        Do you happen to recall if a transaction

15   actually occurred that day?

16   A.        I don't think it did.

17   Q.        Do you have any idea why it didn't?

18   A.        Because we didn't set up arrival location or

19   we didn't confirm -- we didn't confirm the arrival of

20   both parties.

21   Q.        All right.  So is it fair to say that --

22   It's been a couple years.  Are you basing your

23   opinion as to whether or not a deal occurred on your

24   independent recollection or just from your review of

25   these texts?

```
 1    A.        Both independent -- my recollection and
 2    based on my instincts as a person who dealt drugs
 3    before.
 4    Q.        And so when you say we didn't have any sort
 5    of location figured out, what do you mean by that?
 6    A.        That basically we didn't stipulate where to
 7    meet, because, you know, we would want to be
 8    discreet.  So that was very important as far as
 9    parties exchanging drugs, and a exact place to meet,
10    so we wouldn't be obvious for a detective or law
11    enforcements.
12    Q.        Well, let -- let me ask you this:  I did
13    happen to notice something.  Oops.  Sorry.
14              I'm going to direct your attention to text
15    number 166.  That appears to be a text from you;
16    correct?
17    A.        Yes, sir.
18    Q.        And could you read what that text says?
19    A.        "I'm on 16 Elm."
20    Q.        And what time is that text at?
21    A.        4:41.
22    Q.        So is that a text where you're informing
23    Mr. Birch where you're at?
24    A.        It seem like he --
25    Q.        Oh, I took it off the screen.  I'm sorry.
```

1      Is that --

2      A.        Yeah.  Back and forth.  Yeah.

3      Q.        Okay.  So that occurred at 4:41.  Could you

4      read when the last text from Mr. Birch to you is?

5      A.        On the 31st or the 1st?

6      Q.        On the 31st.

7      A.        "So 130 altogether, bud.  My ride has to get

8      to school."

9      Q.        Sure.  And what time was that text?

10     A.        5:13.

11     Q.        So that was about 35 minutes later?

12     A.        From what time?

13     Q.        From your text.

14     A.        From my text?

15     Q.        If you recall, your text was at 4:41?

16     A.        So that's 4:41.  Again, could I see the

17     other one?  Yeah, about.  About.

18     Q.        So in your opinion, would that have been

19     enough time to -- Would there have been a need for

20     further communication from you or from him as to

21     where you guys can meet up?

22     A.        Yeah.  Because it was a big gap in time, and

23     you would need further instructions to be able to get

24     a stipulated agreement.

25     Q.        Okay.  And just so we're clear what we're

1    talking about with regards to those types of texts,

2    I'm going to direct your attention to January 9th

3    here at the end.

4          Can you read text --

5    A.      "I'm here."

6    Q.      -- 3374?

7    A.      Yeah.  It says, "I'm here."

8    Q.      And do you know who that's from and who it's

9    to?

10   A.      Oh, yeah.  From me.  From Lo.

11   Q.      Okay.  And what is Mr. Birch's response?

12   A.      "What car?  Where?"

13   Q.      And then how do you respond to that?

14   A.      "Blue car."

15   Q.      So what is the purpose of those texts?

16   A.      To basically stipulate to both parties of

17   arrival and know exactly, specifically where that

18   person is.

19   Q.      Okay.  All right.  So now I'm going to go to

20   February 1st.  Can you read text number 66?

21   A.      Yeah.  It says, "What up, man?  You good?"

22   Q.      And who's that to and from?

23   A.      That's from Adam Birch.

24   Q.      To you?

25   A.      Yes, sir.

1   Q.     And what's your response?

2   A.     "What you tryna do?"

3   Q.     And what does that mean?

4   A.     Basically, like, what type of -- what

5   quantity of drug that you was trying to purchase.

6   Q.     Okay.  Now, I'm going to show you Government

7   Exhibit 12.  Can you read here at the top of page two

8   what this exhibit is?

9   A.     "Call log between Adam Birch and Michael

10  Stevenson, aka Lo."

11  Q.     All right.  So I'm going to direct your

12  attention to telephone call number 31.

13         What's the date of that?

14  A.     2-1-2017.

15  Q.     And who's that call from, and who's it to?

16  A.     The call is from Lo.  Yeah.

17  Q.     So it's from you?

18  A.     Yes, sir.

19  Q.     Is it to Mr. Birch?

20  A.     Yes, sir.

21  Q.     And we talked about that.  But how long is

22  that call?

23  A.     One minute.  One minute, 39 seconds.

24  Q.     What did you guys talk about during that

25  call?

```
1    A.        He had texted me.  And basically he didn't
2    give me a reply back as to, you know, what he was
3    doing, you know.  In previous deals, he texted me and
4    basically asked, you know, what -- where you at -- I
5    mean, what you was trying to do or basically figure
6    out a -- basically figure out what he was trying to
7    get.
8              So when he didn't text me back -- He texted
9    one time.  And I texted.  And when I had texted -- I
10   mean -- I apologize.  I'm sorry.  I'm sorry.
11             So basically it was two texts.  And then he
12   never texted back.  And then I called.  And when I
13   had called, I basically asked what he wanted to do.
14   He said he don't know right now.  He had to figure it
15   out.  And when he had it figured out, he would call
16   me and let me know.
17   Q.        Did he ever respond back to you that day?
18   A.        No, sir.
19   Q.        Was the communication that you had with
20   Mr. Birch that day, on February 1st, 2017, was that
21   enough to complete a drug transaction?
22   A.        No, sir.
23   Q.        And why not?
24   A.        Because it would -- it would have
25   basically -- basically stipulate three things:  So
```

1    first, the drug quantity; then two, the location; and
2    three, the arrival.  And there was neither of those.
3    Q.     Okay.  So there's been some conversation
4    about some text messages that you sent to Mr. Walgren
5    on February 2nd about Mr. Birch and telephone calls
6    as well.
7           Why were you trying to get ahold of -- Why
8    did you want Mr. Walgren to get ahold of Mr. Birch
9    that day?
10   A.     Because he wasn't answering my calls.  And
11   Walgren was somebody close to him that, you know, I
12   thought he was pick -- he was somebody close to him
13   that I thought he might pick up for.
14          So instead, I used him, because I know if,
15   you know, they came together and joined up, that he
16   would pick up.  He would pick up for Walgren a lot
17   faster than he would pick up for me because he owed
18   me a debt.
19          So he might have been trying to duck me for
20   a while because he had a debt.
21   Q.     So Mr. Birch owed you a debt?
22   A.     Yep.  Yep.
23   Q.     Were you trying to collect on that debt?
24   A.     Not at all.
25   Q.     So why -- why were you trying to get ahold

1    of him?

2    A.       Basically -- basically to let him know that

3    if you continue to do business with me, and if you

4    buy drugs from me today, that basically you could owe

5    that debt at a later time just as long as you

6    purchase drugs from me today, just as long as you --

7    just as long as you continue to buy drugs from me.

8    Q.       Okay.  There's been a little bit of

9    conversation about this debt before, but I'm going to

10   direct your attention to January 30th text messages,

11   basically 320 all throughout the rest of this page.

12           Is that you having a conversation with

13   Mr. Birch about that drug debt?

14   A.       Yeah.  Basically he was letting me know that

15   he was going to cash his check or whatever and that,

16   you know, he wasn't trying to be shady and that, you

17   know, as soon as -- as soon as he cashed his check,

18   he was going to give me my money.

19   Q.       Did he ever settle that debt on the 30th?

20   A.       No.

21   Q.       I think at this time I kind of want to turn

22   my attention to Count 3.  Count 3 alleges that you

23   sold heroin to John Walgren on February 2nd, 2017.

24           Did you sell Mr. Walgren heroin on that

25   date?

1   A.       Yes, sir.

2   Q.       Count 4 alleges that on August 23rd, 2017,

3   you sold crack to Ms. Scholtes.

4            Did you sell her crack on that date?

5   A.       Yes, sir.

6   Q.       And finally, Count 5 alleges that you sold

7   heroin to Eric Steve on August 23rd, 2017.

8            Did you sell him heroin on that day?

9   A.       Yes, sir.

10           MR. GOLDENSOPH:  Your Honor, I think that's

11  all I have.

12           THE COURT:  Cross-examination.

13           MR. LAMMERS:  Thank you, Your Honor.

14                    CROSS-EXAMINATION

15  BY MR. LAMMERS:

16  Q.       Mr. Stevenson, drug dealers have to be

17  resupplied by their suppliers, don't they?

18  A.       Yep.

19  Q.       In fact, they call that re-upping, don't

20  they?

21  A.       Yes, sir.

22  Q.       And you re-up, don't you?

23  A.       Yes, sir.

24  Q.       In fact, you go to Chicago to get your

25  source of heroin, don't you?

1    A.        Yes, sir.

2    Q.        In fact, these text messages show that in

3    January you went to Chicago to re-up your source of

4    supply, didn't you?

5    A.        It probably was somewhere up over there, but

6    I don't recall.

7    Q.        Okay.  If I showed you the text messages,

8    might --

9    A.        Yes, sir.

10   Q.        -- that refresh your recollection?

11   A.        Yes, sir.

12   Q.        Okay.  Let's try that.  Now, do you see here

13   at 1496, where it says question mark?  What's that

14   mean?  "I'm in town."

15            And I guess I'll scroll up a little bit to

16   put it in context.  It looks to me like on January

17   22nd, from Mr. Birch to you, he says, "What up, bud?

18   I need if you're around."

19            What does that mean?

20   A.        That basically that, if you're around, I

21   need to buy some drugs off you.

22   Q.        Yeah.  It means that he wants heroin from

23   you, doesn't it?

24   A.        Yes.

25   Q.        And then you say, "IT."  And then you

1    correct that with "OT."

2            And that means "out of town," doesn't it?

3    A.      Yes, sir.

4    Q.      Okay.  So you were out of town on the 22nd;

5    correct?

6    A.      Yep.

7    Q.      And then Mr. -- As you continue down,

8    Mr. Walgren -- or excuse me -- Mr. Birch continues to

9    try to get ahold of you.  And you tell him things

10   like, still out of town.  And this is at 1355; right?

11   A.      Yeah.

12   Q.      "Still OT"?

13   A.      Yes, sir.

14   Q.      Okay.  And then you give him a thumbs up.

15   He asks you about tomorrow maybe.  You say, "Yeah."

16   He says, "I need a whole pizza when you're around,

17   bro."

18           That's a gram of heroin; right?

19   A.      Yes, sir.

20   Q.      You were selling grams of heroin on

21   occasion, weren't you?

22   A.      Yep.  Yes, sir.

23   Q.      And when you would re-up, you would get a

24   pretty big amount of heroin, wouldn't you?

25   A.      Nope.  Small.  Small amount.

1    Q.       10, 15 grams?

2    A.       Yeah.  Around that.

3    Q.       Around that.  So you knew that you were

4    getting quantities for redistribution, didn't you?

5    A.       Yes, sir.

6    Q.       Nobody buys 15 grams for their personal use,

7    do they?

8    A.       No, sir.

9    Q.       In fact, the people that were selling you

10   that 15 grams of heroin know that nobody's buying it

11   for personal use; right?

12   A.       He don't know.  He just sell it to you.

13   Q.       He just sells it to you?

14   A.       Yes, sir.

15   Q.       But fair to say, in your business, that 15

16   grams of heroin is absolutely not a personal-use

17   amount?

18   A.       No, sir.

19   Q.       Is that right?

20   A.       Yep.

21   Q.       Okay.  So you're selling grams.  And then

22   you go out of town.  Would you agree this text series

23   shows that you were out of town?

24   A.       Yes.

25   Q.       And you were out of town to get more heroin

1    to sell, weren't you?

2    A.        Yes, sir.

3    Q.        And, in fact, when you get back in town, you

4    tell your customers that you've got heroin for sale,

5    don't you?

6    A.        Yes, sir.

7    Q.        In fact, that's what that text -- "hot tasty

8    pizza," best ingredients -- or "fresh ingredients"

9    best for you, whatever it says -- that's what it

10   means, doesn't it?

11   A.        What it was, that you was trying to regain

12   business.  So you let people know that, you know,

13   you're back.

14   Q.        It means you're back and you've got drugs

15   for sale?

16   A.        Well, I'm back and, you know, you need to

17   come shop with me because you would miss out, you

18   know.

19   Q.        Okay.  So they can't shop with you unless

20   you have drugs to sell; right?

21   A.        Yeah.

22   Q.        So it means, "Hey, I'm back in business;"

23   fair to say?

24   A.        Fair to say.

25   Q.        Okay.  Thank you.  So in that particular

```
 1    case, that happened here, didn't it?
 2            You went out of town; you came back; "back
 3    in business"?
 4    A.      Yep.
 5    Q.      Now, you testified on direct examination
 6    that, generally, during this time frame, when Adam
 7    Birch came to get drugs from you, that he came with
 8    John Walgren?
 9    A.      Yes, sir.
10    Q.      That's not true, is it?
11    A.      Say that again?
12    Q.      I said, "That's not true, is it?"
13    A.      What's not true?
14    Q.      It's not true that he generally came with
15    John Walgren.
16    A.      So you're saying that that's not --
17            Could you restate that question?
18    Q.      Yes, I sure can.
19            It's not accurate that Adam Birch came to
20    you most times to get heroin during this period with
21    John Walgren?
22    A.      What period?  What period?
23    Q.      The period in the text messages we're
24    talking about.
25    A.      And what date is that?
```

```
 1    Q.        I'm talking about the time from he got out
 2    of jail and first contacted you, or the first time
 3    you guys made contact, which was January 6th, until
 4    he died on February 1st or February 2nd.
 5              During that 28 days or so, or 26 days, most
 6    of the time he didn't come with John Walgren, did he?
 7    A.        Most the time, he did.
 8    Q.        You think he did?
 9    A.        He did.
10    Q.        None of these times where he walked and met
11    you was he with John Walgren, was he?
12    A.        It was times -- it was times where he did.
13    And in the beginning, it was times where he walked.
14    Q.        Did you look through these text messages?
15    A.        Yeah.
16    Q.        The deal on the 20 -- or the deal on the
17    15th, he's walking, isn't he?
18    A.        That's the beginning of when he got out.
19    Q.        He got out on the 3rd.  First time you guys
20    were in contact with one another was on the 6th.
21    First time that you have a sale is on the 9th; is
22    that fair to say?
23    A.        Say that again.
24    Q.        He got out of jail on the 3rd.  Will you
25    agree?
```

1    A.        I -- I don't know.  If that's what the paper

2    say, that's what it say.

3    Q.        Does that sound right?

4    A.        The 3rd?

5    Q.        Were you talking to him before the -- before

6    the 6th?  Let's put it that way.

7    A.        No.

8    Q.        Okay.  So you talk to him on the 6th.  The

9    first deal you have with him is on the 9th; right?

10   A.        I think so.

11   Q.        Sound right?

12   A.        If I could see a paper.  If you could bring

13   it up --

14   Q.        Sure.

15   A.        -- because I don't recall.

16   Q.        If you don't recall, I'll show you the text

17   messages.

18   A.        Okay.

19   Q.        Will that help you recall?

20   A.        Yes, sir.

21   Q.        Okay.  Give me a second here.

22             Okay.  So let's start with some of these

23   text messages.  Right?

24             You're the one that tried to get ahold of

25   him, aren't you?

1    A.        No.

2    Q.        No?  Want to look at the -- at the text

3    message?

4    A.        Emily Nelson called me with the Birch

5    number.

6    Q.        So she called you with his number?

7    A.        Yes, sir.

8    Q.        But he didn't call you?

9    A.        Not initially.

10   Q.        No.  In fact, you texted him right away

11   after he got out of jail, didn't you?

12   A.        After I got the number.  No, not right away.

13   Q.        Not right away?

14   A.        Not right away.

15   Q.        Okay.  So I would refer you at 3935.  These

16   are Adam -- This is Adam Birch's phone.  And this is

17   a text message from you on January 4th saying, "Call

18   me," right?

19             Do you remember doing that?

20   A.        What day is this?

21   Q.        Right there at the top of the screen, or the

22   one right below, it says January 4th.  Do you see it?

23   3935.

24   A.        Yes.

25   Q.        It says that the phone -- It's to Adam

```
 1    Birch.
 2    A.        Yes.
 3    Q.        It's from you.  It says, "Call me"?
 4    A.        Right.
 5    Q.        That's the first phone contact, isn't it?
 6    A.        Yes.
 7    Q.        Okay.  So you were the one who reached out
 8    to him, weren't you?
 9    A.        Through this -- through these text messages,
10    but I got -- I got a -- a call from Emily Nelson.
11    And Emily Nelson gave me his number through text
12    message.  And that's how I called him.
13    Q.        I understand that.  But my point is is you
14    were the one that called him; is that right?
15              This shows that, doesn't that?
16    A.        No.  That wasn't your first question.  Could
17    you state your initial question?  You -- you
18    rephrased it.
19    Q.        I'm not trying to confuse anybody here.  My
20    point is --
21    A.        Okay.
22    Q.        -- simply, the text messages show that you
23    were the one that texted him first; correct?
24    A.        Correct.
25    Q.        And after you texted him first, you then
```

```
 1   said, "Call me.  Got something for you"?

 2   A.        Yeah.

 3   Q.        Yep.  It meant that you had heroin for him,

 4   didn't it?

 5   A.        Yeah.

 6   Q.        You guys weren't friends?

 7   A.        Yeah.  I liked Adam.

 8   Q.        You liked him.  You didn't hang out?

 9   A.        A little bit.  We talked a little, but not a

10   good friend, a best friend.

11   Q.        In fact, you knew Adam from before, didn't

12   you?

13   A.        From before he went to jail?

14   Q.        Uh-huh.

15   A.        Yes, sir.

16   Q.        In fact, you guys went to Chicago together

17   to pick up heroin, didn't you?

18   A.        Yes, sir.

19   Q.        You did, in fact?

20   A.        Yes.

21   Q.        And got arrested there?

22             Or one of you got a ticket or arrested;

23   correct?

24   A.        He dropped me off.  He got arrested.

25   Q.        He got arrested.  But he was taking you to
```

```
 1    get heroin, wasn't he?

 2    A.        No, sir.

 3    Q.        You just said the three -- or the two of you

 4    went to Chicago to get heroin.

 5    A.        I never said that.

 6    Q.        Okay.  So you both went to Chicago?

 7    A.        Yes, sir.

 8    Q.        He got arrested?

 9    A.        Yes, sir.

10    Q.        You were going to pick up heroin?

11    A.        No, sir.

12    Q.        No.  And you knew Adam was selling drugs,

13    didn't you?

14    A.        No, sir.

15    Q.        You know what a throwdown is, don't you?

16    A.        Not really, but I could figure it out.

17    Q.        So you're telling me, when somebody says in

18    a text message to you they're going to throw down,

19    that you just sort of don't respond?

20    A.        That -- That's really like drug abuser's

21    slang for each other.  That's not the slang that I

22    would use.

23    Q.        But you know what it means?

24    A.        I -- I can make it out.  I can --

25    Q.        You know it means two people are going
```

1   together to get heroin from you because they don't

2   have enough money to get a bigger amount?

3   A.        I never heard that.  An abuser never --

4   never said that to me.

5   Q.        No one has ever said to you about a

6   throwdown?

7   A.        Throwdown?  No.

8   Q.        Did you see the messages that we've gone

9   through at trial here?

10  A.        Yeah.

11  Q.        Let me answer -- ask the question before you

12  answer, and I promise I'll let you finish before I

13  start another one.

14            Do you remember the text messages from John

15  Walgren where -- or excuse me -- the text messages

16  later on in this from Adam Birch where he tells you

17  that they're going to throw down?

18  A.        Could restate that question again?

19  Q.        I can.  Do you remember the text messages on

20  January 31st where Adam Birch says to you that he has

21  130, but only needs a 50, because he is going to

22  throw down with his ride?

23  A.        I don't remember it.  That's -- That -- that

24  was vague to me.

25  Q.        That was vague to you?

1    A.        Yeah.

2    Q.        How long have you been in the drug business,

3    sir?

4    A.        Not that long.

5    Q.        Not that long?  How long?

6    A.        I don't know.  Like two or three years.

7    Q.        Okay.  Now, do you know who Michael

8    Greenwood is?

9    A.        Yes.

10   Q.        Is that the brother of your girlfriend?

11   A.        Yes.

12   Q.        And the car you were driving during these

13   drug deals, that's registered to your girlfriend;

14   right?

15   A.        Yes.

16   Q.        What's her name?

17   A.        Jessica Greenwood.

18   Q.        What's that?

19   A.        Jessica Greenwood.

20   Q.        Jessica Greenwood.  Is she here?

21   A.        Yes.

22   Q.        Okay.  Now, I think you testified on direct

23   examination that you tried to get ahold of Adam.  You

24   tried to call him about a drug debt.  And then, when

25   you couldn't get ahold of him, that that's why you

1    got ahold of John Walgren and said, "Call him";

2    correct?

3    A.       Yes, sir.

4    Q.       Are you aware that there are no phone calls

5    on either of Adam's phones after that last phone call

6    between the two of you?

7    A.       Say that again?

8    Q.       On January 1st -- excuse me -- January 2nd,

9    after -- I'm saying "January."  I'm sorry.

10           On February 2nd, after the minute-and-a-half

11   phone call that you had with Adam Birch, there's no

12   more phone calls from you.  Are you aware of that?

13   A.       Well, on that, that was February 1st.

14   Q.       On February 1st you had the phone calls?

15   A.       It wasn't February 2nd.

16   Q.       It wasn't February 2nd, was it?

17   A.       No.

18   Q.       And yet the phone that -- You blowing up

19   John Walgren's phone was February 2nd; right?

20   A.       Yep.

21   Q.       In fact, that was because you knew, or you

22   had heard, that Adam was dead, and you were trying to

23   verify it through John Walgren, weren't you?

24   A.       No.  No.

25   Q.       In fact, you were panicked about that fact,

1    and you wanted to get ahold of him because you were

2    hoping it wasn't true?

3    A.        No.

4    Q.        Now, you testified, I believe, that that was

5    in relation to a drug debt.  In these text messages,

6    there's a number of times that -- that Adam Birch has

7    a drug debt with you, isn't there?

8    A.        It was -- it was really the same day, but it

9    kept on -- I kept on giving him breaks to, you know,

10   make up and -- as long as he could continued to

11   purchase drugs from me.

12   Q.        Okay.  My point, sir, is that there were

13   other times in the month of January that Adam Birch

14   owed you money; right?

15   A.        It was stemming from one debt.

16   Q.        It was?

17   A.        (Indicating by nodding.)

18   Q.        Do you remember?

19   A.        No.  It was kind of vague -- kind of vague

20   in my mind.

21   Q.        Do you remember when you tell him, "Didn't I

22   just give you a 50 the other day?"

23             Let me see if I can find it here.  Hold on a

24   second.  This is taking me a minute.  Okay.

25             So on 340, "Wanna do another 50.  I'll give

1    you 80.  If not, no big."  "I'll likely when I got

2    your 50."

3            Doesn't that indicate that you had fronted

4    him drugs and he owed you $50?

5    A.      It could have been that he just -- he

6    basically wanted -- wanted me to come out.  Or, yeah,

7    it could -- it could have meant that "I probably owed

8    him some money."

9    Q.      And later on -- Or earlier on in the texts,

10   doesn't -- when you talk about getting -- Do you

11   remember the testimony where he's talking about

12   getting -- he wants to get one for 140, and you tell

13   him that he still owes you 70?

14           Do you remember that?

15   A.      Can you refresh my memory?

16   Q.      I can.  It could take me a minute to scroll

17   through the texts.  Be patient.  Just give me a

18   minute here.

19           Okay.  Do you see here at three -- oh, I'll

20   highlight it.  All right.

21           Right here at 3032, he says, "Shit.  What

22   you gonna want for a full one?"  You say, "140."

23           And that's a full gram of heroin that you're

24   selling, isn't it?

25   A.      Yes, sir.

1    Q.        And you're going to just charge him $140?

2    A.        Yes, sir.

3    Q.        You're giving him a price break?

4    A.        Say that again.

5    Q.        You're giving him a break on the price.  You

6    can get more than $140, usually?

7    A.        Not -- not from him.

8    Q.        From other people, though?

9    A.        It depends.

10   Q.        Okay.  And then he says, "Can I give" -- You

11   say, "You know you still owe me 70; right"?

12             Do you see that below?

13   A.        Yeah.

14   Q.        Jump down two.

15   A.        Yeah, I see it.

16   Q.        Okay.  So he still owed you $70 probably

17   from another half gram, didn't he?

18   A.        Probably so.

19   Q.        Okay.  And you didn't call John Walgren's

20   phone that day and blow up his phone nine times over

21   a drug debt, did you?

22   A.        No.

23   Q.        And then you say, "Can I give you" -- He

24   says, "Can I give an even $200, bro?  I ain't making

25   shit.  Trying to help a buddy out."

```
1              That means he's getting some heroin for
2     somebody else, doesn't it?
3     A.        I don't know what he doing.
4     Q.        Can you read that?
5     A.        It says --
6     Q.        Read it to yourself.
7              Did you read it?
8     A.        Yeah.
9     Q.        Are you telling me that you don't know that
10    that means that he's going to be providing heroin to
11    someone else?
12    A.        Yeah.  They come up with lies all the time
13    just to get extra drugs.
14    Q.        Okay.  Do you remember the text messages
15    where he said that he needed a whole gram because he
16    had people coming from Cedar Rapids?
17    A.        I remember a little bit.
18    Q.        You remember that.  And you know that meant
19    he was supplying other people, don't you?
20    A.        Could have been.
21    Q.        Yeah.  That's the way it sounds, doesn't it?
22    A.        Yeah.
23    Q.        Yeah.  So I'm going to do a little -- What
24    do you -- What did you talk about on the phone call
25    on February 1st with Adam Birch?
```

1    A.       Basically that -- to figure out what he

2    wanted to do.  And that when he get his money

3    together, that he would basically call me and let me

4    know what he wanted to do.

5    Q.       Okay.  So you told him, "Let me know what

6    you want, how many you want, and then we'll talk

7    later"?

8    A.       "When you figure out what you want to do."

9    Because he didn't have his mind made up at that

10   point.  So I said, "When you figure out what you

11   gonna do, just call me back."

12   Q.       Okay.  And that's the -- that's the entirety

13   of that the conversation?  Does that sound right?

14   A.       That's the entirety of it.

15   Q.       Okay.  Well, I'm going to start my watch

16   here at a quarter after.  15 seconds.  Starting now.

17            All right.  That's a minute and 29 seconds.

18   Any reason to disagree with that?

19   A.       Huh-uh.

20   Q.       That's how long your phone conversation was

21   with Adam Birch on February 1st.  Any reason to

22   disagree with that?

23   A.       Huh-uh.

24   Q.       That's plenty of time to arrange a drug

25   deal, isn't it?

```
 1   A.        Drug deals.  But not the content between me

 2   and Birch.

 3   Q.        You're not a user of heroin, are you?

 4   A.        No.

 5   Q.        Why not?

 6   A.        I'm not trust the drug.

 7   Q.        It's dangerous, isn't it?

 8   A.        I think so.

 9   Q.        What's that?

10   A.        Yes, sir.

11   Q.        And, in fact, you knew -- After blowing up

12   John Walgren's phone, you knew that something had

13   gone wrong with Adam Birch?

14   A.        No.

15   Q.        And yet you still went ahead, when John

16   Walgren wanted to purchase heroin, and said "$80,"

17   didn't you?

18   A.        Did I say $80?

19   Q.        You did.

20   A.        Can you refresh my memory?

21   Q.        You bet.  He said something about a price.

22   Hold on.  Hold on a second.  I'm going to get to the

23   page, and then I'm going to have a question for you.

24            All right.  So first of all, this is

25   February 2nd.  Do you see that in front of you?
```

```
1    A.        February 2nd?

2    Q.        Yeah.

3    A.        Yeah.

4    Q.        Would you agree that these are the text

5    messages between you and Mr. Walgren?

6    A.        Yes, sir.

7    Q.        Okay.  And this is where -- I'm going to

8    scroll up a little bit.  Apparently you two had a

9    phone call.  See that?  At 2388 when Mr. Walgren asks

10   you, "Tell him what, bro?"

11             You had a phone call before that, didn't

12   you?

13   A.        Before the text message?

14   Q.        Before the text message at 2388, you had a

15   phone call with John Walgren?

16   A.        That says text message.

17   Q.        This is the text.  I'm saying -- I'm telling

18   you that you had a --

19   A.        It's vague.  I don't -- I don't remember.

20   Q.        Okay.  If I showed you the call logs, would

21   that refresh your recollection?

22   A.        Yes, sir.

23   Q.        Okay.  Right here.  Do you see what I'm

24   talking about on the -- on February 2nd?

25             You had a phone call, a minute and four
```

1    seconds, with John Walgren.  Do you agree with that?

2    A.       Yes, sir.

3    Q.       Okay.  And then, shortly after that, you had

4    text messages back and forth with him, didn't you?

5    A.       Can you refresh my memory?

6    Q.       Sure.  That's -- Well, I'll just pull it up

7    so we're all on the same page.

8             "Tell him what, bro?"

9             Right down here at the bottom when he texts

10   you.  This is after that phone call.  And he texts

11   you and says, "Tell him what?"

12   A.       Yeah.

13   Q.       You -- If I understand -- Is that right?

14   A.       Yeah.

15   Q.       If I understand correctly, you called John

16   Walgren and said, "Get ahold of Adam Birch --

17   A.       No.

18   Q.       -- you didn't?

19   A.       We had a conversation.  And we talked about

20   Birch.

21   Q.       And you wanted him to get ahold of Adam,

22   didn't you?

23   A.       Yeah.  But that wasn't my main concern.

24   Q.       I'm not asking what your main concern was.

25   What I'm asking is, did you ask John Walgren to get

1    ahold of Adam Birch in that phone call?

2    A.        That's right.

3    Q.        And, in fact, then he texts you and says,

4    "Tell him what, bro"; right?

5    A.        Right.

6    Q.        And then you blow up his phone, don't you?

7    A.        Yeah.  I sent him instantaneously text

8    messages.

9    Q.        You bet.  "Just call him."  And then he

10   tells the number he has.  And you say -- and this is

11   at 2392 -- "You call him.  I want you to call him."

12            And you give him the thumbs up.  And then

13   you give him three thumbs up.  And then you say, "You

14   call him right now, and call me back."

15            That all happened; right?

16   A.        Yes, sir.

17   Q.        Okay.  And then, after that, there's some

18   discussion, right where Walgren says, "I hit him up

19   on Facebook too.  Hasn't been on in nine hours, it

20   says."  And then he says, "You think something

21   happened?"

22            So you knew at that point -- Even if you

23   didn't know that Adam was dead, you knew that

24   something had happened to Adam, didn't you?

25   A.        No, sir.

```
1    Q.       Pretty good assumption, isn't it?

2    A.       Pretty what?  What's a --

3    Q.       It's a pretty good assumption that something

4    happened, isn't it?

5    A.       No, sir.

6    Q.       And then, after that, even with all of that

7    information, John Walgren says, "Can I come through

8    and get heroin?"

9    A.       Yes.  He said that.

10   Q.       He didn't say "heroin."  He says, "Can I

11   come through before I get home?  I need something for

12   60"; correct?

13   A.       Yes, sir.

14   Q.       And what was your response?

15   A.       "80."

16   Q.       80.  You said, "Nah.  60's not enough.  I

17   need 80 for that."  You didn't say that.  That's your

18   thought process.  You wanted to get an extra $20,

19   didn't you?

20   A.       No.  Because he was like -- He was a person

21   that really was in and out and was like a shady kind

22   of person.  So, you know, I was stern with him.

23   Q.       Sure.  Now, at some point then, you learned

24   Adam died, didn't you?

25   A.       Yeah.
```

```
 1    Q.        Yeah.  Shortly after this?

 2    A.        What -- what would you call "shortly"?

 3    Q.        Well, you knew it before, and that's why you

 4    were blowing up his phone?

 5    A.        No, sir.

 6    Q.        But according to you, you learned it later?

 7    A.        Yes, sir.

 8    Q.        Day or so later?

 9    A.        More like two -- two or three days.

10    Q.        Two or three days later?

11    A.        Yes.

12    Q.        Yet you continued to sell heroin, didn't

13    you?

14    A.        Yes, sir.

15    Q.        In fact, you sold heroin again on February

16    12th?

17    A.        No, sir.  Yes, sir, I did.  I apologize.

18    Yes, sir.

19    Q.        You did.

20    A.        I apologize.  Yes.

21    Q.        At the Hy-Vee?

22    A.        Yes, sir.

23    Q.        You were going through John -- John and

24    Angie -- is that their name -- the people over in

25    East Dubuque?
```

```
 1   A.        They got nicknames, but that's probably
 2   their names.
 3   Q.        Maybe Jake.  I'm sorry.  Jake and Angie.
 4   A.        Yeah, Jake.
 5   Q.        But you know them?
 6   A.        Yeah.
 7   Q.        You sold them heroin too?
 8   A.        Yeah.
 9   Q.        In fact, you sold heroin to them and some to
10   Walgren that day, didn't you?
11   A.        I don't know about Walgren, but he was
12   there.
13   Q.        He was there?
14   A.        Yeah.
15   Q.        Have you been convicted of a robbery charge?
16   A.        Yes, sir.
17   Q.        Was that in -- I think you were released in
18   2015; does that sound right?
19   A.        No, sir.
20   Q.        Got a plea on a robbery conviction?
21   A.        Yes, sir.
22   Q.        And a vehicle hijacking?
23   A.        Yes, sir.
24   Q.        Now, you heard Shannon Scholtes testify
25   yesterday about a guy by the name of Ricky?
```

```
 1    A.        Yes, sir.

 2    Q.        You know Ricky?

 3    A.        I heard of him.

 4    Q.        You lived with him?

 5    A.        Yeah, I lived with him.

 6    Q.        Yeah, you lived with him.  You didn't just

 7    hear of him.  You were roommates.  True?

 8    A.        For a small amount of time.

 9    Q.        And while you lived with him, you were

10    selling crack cocaine to Shannon Scholtes, weren't

11    you?

12    A.        No, sir.

13    Q.        No?

14    A.        No, sir.

15    Q.        She made that up out of thin air that she

16    knew Ricky?

17    A.        Yes, sir.

18    Q.        And when you got back from Chicago, after

19    you re-upped over January, let's say, 22nd until you

20    got back into town on the 25th -- right?

21    A.        Can you restate those dates?

22    Q.        Sure.  You left about the 22nd; does that

23    sound right?

24    A.        Oh, that's very vague.  I don't remember it.

25    That was like two or three years ago.
```

1    Q.        I understand that.  We just went through

2    these text messages a few minutes ago, and I showed

3    you where it said "OT."  And you agreed that that

4    meant "out of town"?

5    A.        It was still vague.  And that specific date,

6    I wouldn't -- it wouldn't be something that would be,

7    you know --

8    Q.        Okay.

9    A.        -- you know, at the top of my -- you know,

10   top of my --

11   Q.        I understand.  Would you agree with me that

12   you went out of town in January to get more heroin?

13   A.        Would you refresh my memory?

14   Q.        I sure can.

15             All right.  Remember this?  We talked about

16   it just a couple minutes ago where Mr. Birch said to

17   you, "Need it if you're around."

18             Your response is -- Or excuse me.  "Need you

19   if you're around."

20             Your response is, "IT."  And then

21   immediately after that, you correct it to say, "OT."

22             And you agreed that that meant "out of

23   town"?

24   A.        Yes.

25   Q.        And that's on what day?

1   A.          January 22nd.

2   Q.          Okay.  And then on -- I'm going to jump down

3   to the bottom when he asks you, "Any news?"

4               You say -- See on the bottom there.  Take a

5   look at the screen.  "Tomar," which I assume means"

6   "tomorrow"; is that right?

7   A.          Yes, sir.

8   Q.          Okay.  And then he gets ahold of you on the

9   25th and says, "Please tell me you're back.  I fucked

10  my hand up at work.  It hurts so bad."

11              And your response then is what?  "20

12  minutes"?

13  A.          Yes, sir.

14  Q.          It means you're in town, doesn't it?

15  A.          Yes, sir.

16  Q.          So it looks, from this, like you were gone

17  from the 22nd to the 25th --

18  A.          Yes, sir.

19  Q.          -- is that fair?

20  A.          Yes, sir.

21  Q.          Okay.  And then you jump right back into the

22  heroin-selling business?

23  A.          Yes, sir.

24  Q.          Does that refresh your recollection?

25  A.          Yeah.

```
1    Q.        So you would agree with me, would you not,
2    that not only did you need to re-up on heroin, but
3    you had to re-up on crack too, didn't you?
4    A.        Yes, sir.
5    Q.        Because you sold them both?
6    A.        Yes, sir.
7    Q.        And you would go to a source of supply out
8    of town for both of those?
9    A.        Yes, sir.
10   Q.        Same person?
11   A.        No.
12   Q.        You'd go to two different people?
13   A.        Mostly it was from one.
14   Q.        Mostly from one, but sometimes you had
15   others?
16   A.        Yeah.
17   Q.        You had other bigger dealers than you?
18   A.        Probably one only time.
19   Q.        You had bigger dealers than you that you
20   dealt with --
21   A.        Yes.
22   Q.        -- to get drugs to resupply the people in
23   Dubuque that needed them?
24   A.        Yes, sir.
25   Q.        At any rate -- So the reason I bring up the
```

```
1    fact that you went out of town is you got a different
2    kind or a different brand of heroin when you came
3    back, didn't you?
4    A.        I didn't know that.  I didn't know what
5    my -- what my supplier had, what type of drugs it
6    was.
7    Q.        You don't know?
8    A.        No.
9    Q.        Because you don't use?
10   A.        No.
11   Q.        I'd like you to take a look, if you would,
12   please, at line 434.  Do you see where my cursor is?
13   A.        Yes, sir.
14   Q.        And that's from you, isn't it?
15   A.        Yes, sir.
16   Q.        And that says, "Okay.  But I was -- just
17   wanted you to try this new shit"?
18   A.        Yes, sir.
19   Q.        You knew you had a new different batch?
20   A.        No, sir.
21   Q.        When you lived with Ricky and you were
22   selling crack cocaine, sometimes people would call
23   you, and Ricky would hand them the crack, wouldn't
24   he?
25   A.        No, sir.
```

1 Q.        And sometimes would call Ricky, and you

2 would hand them the crack?

3 A.        No, sir.

4 Q.        And when you were selling heroin, there were

5 times that you would, in fact, have somebody else

6 deliver the heroin and bring the money back to you?

7 A.        Not at all.

8 Q.        Not at all?

9 A.        No, sir.

10        MR. LAMMERS:  Okay.  I don't have any

11 further questions.

12        THE COURT:  Further redirect examination?

13        MR. GOLDENSOPH:  Your Honor, just really

14 briefly to clear something up.

15                    REDIRECT EXAMINATION

16 BY MR. GOLDENSOPH:

17 Q.        There was a little bit of conversation

18 between you and Mr. Lammers about the phone call that

19 you had with Mr. Walgren prior to those texts.

20        And I'm going to show you those phone calls.

21 That's Government Exhibit 8.  I believe that is phone

22 call number 132.

23        Do you see that?

24 A.        It's very -- it's very -- I can't see it.

25 Q.        Oh, I'm sorry.  Yeah.  It's really hard to

1    see.  Is that better?

2    A.       Yeah.

3    Q.       Okay.  Would you agree that -- What time was

4    that phone call?  It says 1910.  Would you have any

5    disagreement with me if I told you that's military

6    time for 7:10?

7    A.       You take 12 off; right?

8    Q.       Correct.

9    A.       Yes, sir.

10    Q.       All right.  And who's that call from?

11    A.       Is this my call log?

12    Q.       No.  This is Mr. Walgren's call log.

13    A.       Oh.  From -- from me.

14    Q.       Does that say "outgoing"?

15    A.       Yes, sir.

16    Q.       Does that generally mean the call is going

17    from Mr. Walgren to somebody?

18    A.       Would you say that again?

19    Q.       Sure.  This -- These phone calls are -- Let

20    me just show you another example.  Some of these

21    calls are incoming calls; correct?

22    A.       Yes, sir.

23    Q.       Would you agree with me that those are calls

24    going to Mr. Walgren?

25    A.       Yes, sir.

1    Q.        So if it says "outgoing call," that would be

2    calls --

3    A.        From Mr. Walgren.

4    Q.        Thank you.

5              So going back to that phone call that we

6    were just talking about, what kind of call is that?

7    A.        Outgoing.

8    Q.        So that's from who to who?

9    A.        From Walgren to me.

10   Q.        From Walgren to you; right?

11   A.        Yeah.  I'm sorry.  I apologize.

12   Q.        No.  That's cool.

13             And how long is that call?

14   A.        One minute and four seconds.

15             MR. GOLDENSOPH:  That's all I have, Your

16   Honor.

17             THE COURT:  Recross-examination?

18                      RECROSS-EXAMINATION

19   BY MR. LAMMERS:

20   Q.        Perhaps I made a mistake on my original

21   cross-examination saying that you called Mr. Walgren,

22   but let me ask you a question about the call.

23             The call, where there was a conversation

24   between you and Mr. Walgren, is immediately before

25   the text from Mr. Walgren to you where he says, "You

1    want me to" ask him what, referring to Mr. Birch.   Or

2    "You want me to tell him what?"

3             Do you remember that?

4    A.       Could you restate that question?

5    Q.       Yes.   Do you remember when we talked on

6    cross-examination about the blowing up of Walgren's

7    phone that you did?

8    A.       Yeah.

9    Q.       And I said that was preceded or that was --

10   Before the phone was blown up, there was a phone

11   call?

12   A.       Yes.

13   Q.       And I think I said that you called Walgren.

14   But, in fact, as Mr. Goldensoph's pointed out,

15   Walgren called you, didn't he?

16   A.       Yes, sir.

17   Q.       And yet, you still talked about Adam Birch

18   in that phone call; correct?

19   A.       No, sir.

20   Q.       You told us on cross-examination --

21   A.       Not about his death.

22   Q.       I didn't say his death.

23   A.       Oh.

24   Q.       I said you talked about Adam Birch.   Because

25   that's what you told us on cross-examination just a

1  few minutes ago, didn't you?

2  A.     Yes.  I was trying to get in contact with

3  him.

4  Q.     You were trying to get in contact with him.

5  And then shortly after that -- In fact, immediately

6  after that is the text message where Walgren says to

7  you, "Tell him what, bro?"

8  A.     Right.

9         MR. LAMMERS:  Okay.  Thank you.  Nothing

10  further.

11         The COURT:  All right.  Mr. Goldensoph, are

12  you going to have any other witnesses?

13         MR. GOLDENSOPH:  No, Your Honor.

14         THE COURT:  Does Defense rest?

15         MR. GOLDENSOPH:  Yes, Your Honor.

16         THE COURT:  All right.  Ladies and

17  gentlemen --

18         Mr. Lammers, actually, do you anticipate any

19  rebuttal evidence?

20         MR. LAMMERS:  No, Your Honor.

21         THE COURT:  All right.  So ladies and

22  gentlemen, as when the Government rests, when the

23  defense rests, I have some things I have to do.  And

24  both sides are done presenting evidence now.  And so

25  the next step in the process will be the parties will

1     present closing arguments.

2            And so we're going to put you on your

3     20-minute break this morning.  And then when you come

4     back, we will have closing arguments, I'll have a

5     couple more instructions from [sic] you, and then we

6     will submit the case to you.

7            You are going to get a benefit from this

8     because we'll order lunch for you today, because once

9     you start to deliberate, we -- you have to stay

10    together for the time period until the end of the day

11    if you haven't reached a verdict.  And so we'll

12    supply lunch.  So you get a free lunch on the

13    Government here today as well.

14           So we'll be on break for 20 minutes.  And

15    remember my admonition:  Don't talk about this case

16    yet among yourselves until we're all done with the

17    closing arguments.

18           THE CLERK:  All rise.

19           (Jury exits.)

20           THE COURT:  Please be seated.  You can move

21    the defendant back.

22           All right.  First couple of things.  One is,

23    this courtroom can get a little cold, and I notice

24    Ms. Woodyard was trying to cover up a little bit with

25    her sweatshirt.

```
 1          Does anybody mind if she wears the
 2   sweatshirt as long as she keeps her back away from
 3   the jury?
 4          Mr. Goldensoph?
 5          MR. GOLDENSOPH:  Unfortunately, I feel like
 6   we'd be a little bit still uncomfortable.  Perhaps if
 7   the sweatshirt got turned inside out?
 8          THE COURT:  Okay.
 9          MR. LAMMERS:  Maybe they could move to this
10   side of the courtroom, because from that angle, there
11   would be no way that the jury could see her back.
12          THE COURT:  Mr. Goldensoph?
13          MR. GOLDENSOPH:  Yeah.  I mean, I don't know
14   that the angle necessarily matters.
15          THE COURT:  All right.  There's enough of a
16   question, so I'm not going to push it.  I'm
17   sympathetic, Ms. Woodyard.  It's a little cold in
18   this courtroom, and I'm sorry for that, but I
19   appreciate your cooperation on this.
20          All right.  Mr. Goldensoph, do you wish to
21   renew your motion?
22          MR. GOLDENSOPH:  Yeah.  Your Honor, I'm not
23   going to rehash everything that I said, but we would
24   certainly renew our Rule 29 motion at this time.
25          THE COURT:  Thank you.
```

1          Mr. Lammers?

2          MR. LAMMERS:  I renew my resistance, Your

3   Honor.  I think the Court has the evidence squarely

4   in front of him.

5          THE COURT:  The Court's ruling will remain

6   the same.  I think this is a jury question, and so

7   this matter will go to the jury.

8          Anything we need to take up, Mr. Lammers, on

9   behalf of the United States before we take our break

10  here?

11         MR. LAMMERS:  No, Your Honor.  Thank you.

12         THE COURT:  Mr. Goldensoph?

13         MR. GOLDENSOPH:  No, Your Honor.

14         THE COURT:  All right.  We'll be on break

15  for 20.  I want to give you guys 20 minutes and the

16  court reporter 20 minutes.  So we'll come back in at

17  10:35.  That's 20 minutes, isn't it?

18         MR. LAMMERS:  You want to run the clock 20

19  minutes to see?

20         THE COURT:  Yeah.  Let's not do that.  All

21  right.  We're going to be on break for 20 minutes.

22  If you could let the jury know that we'll be bringing

23  them back in at 10:35, that would be great.

24         All right.  We're in recess.

25         (Recessed 10:15 a.m.; resumed 10:35 a.m.)

```
 1              THE COURT:  All right.  Are we ready for the
 2   jury?
 3              MR. LAMMERS:  Yes, Your Honor.
 4              MR. GOLDENSOPH:  I am, Your Honor.
 5              THE COURT:  All right.  Bring in the jury,
 6   please.
 7              MR. LAMMERS:  Is this the time the Court
 8   reads the final instructions or is that at the end?
 9              THE COURT:  That's the end.  I just have two
10   instructions to read.  So closing's first.
11              MR. LAMMERS:  Okay.  Thank you.
12              (Jury enters.)
13              THE COURT:  All right.  Please be seated.
14              We are back in the matter of United States
15   of America versus Michael Stevenson, Case Number
16   18-CR-1023.
17              As we noted when we took our break, all the
18   evidence is now complete.  And this is the time for
19   the parties to give their closing arguments, during
20   which, if you'll recall from my initial instructions,
21   this is the time where the lawyers will interpret and
22   explain what they believe the evidence shows to you.
23              Neither one of these lawyers will
24   intentionally misstate the evidence to you.  But they
25   may recall the evidence differently than you do.  And
```

       1      if that happens, it's going to be your recollection

       2      of what the evidence was that matters, not what their

       3      recollection was.

       4            And so the Government, as I mentioned, has

       5      the burden of proof.  And so in a closing argument,

       6      the Government will go first.  Then the defendant

       7      will have an opportunity to give a closing argument.

       8            And then, because the Government has the

       9      burden of proof, it will then have a chance to

      10      present a rebuttal closing argument.

      11            All right.  So with that, Mr. Lammers, you

      12      may proceed.

      13            MR. LAMMERS:  Thank you, Your Honor.

      14            May it please the Court.  Counsel.

      15            Ladies and gentlemen of the jury, the

      16      defendant is a drug dealer.  Of that, there is no

      17      doubt.  He is an admitted drug dealer.  He told you

      18      today that he is a drug dealer.  Of that, there is no

      19      doubt.

      20            He is a dealer of heroin.  He is a dealer of

      21      crack cocaine.  And again, there is no doubt.  But

      22      he's not just dealing heroin.  He's not just dealing

      23      crack cocaine.

      24            He's also dealing in his own greed, and he's

      25      dealing in other people's misery.  You heard

1    testimony about the dangers of heroin and about how
2    it ruins lives and about how it causes people to be
3    so sick if they don't have it that they'll do
4    virtually anything to get it.

5           The defendant himself admitted that he
6    didn't use heroin.  And I asked him why.  And his
7    response was -- Or I asked if the reason was because
8    it was dangerous, and he said yes.

9           He doesn't just deal in heroin.  He doesn't
10   just deal in cocaine.  He deals in human misery.

11          Now, let's talk specifically about the five
12   counts in the indictment.  Counts 3, 4, and 5.
13   Clearly, go back to the jury room, talk with one
14   another, deliberate as the Court instructs you, and
15   then you can pull out your jury verdicts, and you can
16   mark guilty, guilty, guilty.

17          The defendant admitted it.  The evidence
18   showed it.  The controlled buys show it.  Eric Steve
19   tells you about the heroin buy.  The crack buy
20   Shannon Scholtes tell you about.  The heroin buy John
21   Walgren tells you about.  Those three are proven
22   beyond a reasonable doubt.

23          And when you do that, and after you
24   deliberate, then I want you to go to Counts 1 and 2.
25   And I'm going to ask you, of course, to count guilty

1   on both of those as well because the evidence is
2   beyond a reasonable doubt.  The evidence is beyond a
3   reasonable doubt on both of those counts also.
4           In regards to the conspiracy count, ladies
5   and gentlemen of the jury, the Government has to
6   prove three things.  And Instruction Number 11 is
7   going to tell you what these three things are.
8           And you can follow along now or you can wait
9   until you get back to the jury room.  That's up to
10  you.  But it's pretty simple, really.
11          Instruction Number 11 simply says, in order
12  to prove conspiracy, the Government has to prove that
13  two or more persons reached an agreement or came to
14  an understanding to distribute heroin and/or cocaine
15  base.
16          Clearly.  Absolutely.  Did the defendant
17  come to an understanding to distribute both heroin
18  and cocaine base?  Of course he did.
19          And how do we know that?  We know that out
20  of his own mouth.  We know that from the evidence.
21  We know that out of his own thumbs with the text
22  messages.  We know that from the testimony of all of
23  the witnesses.  All of them.  We know that based on
24  the fact that he went to Chicago to re-up.
25          He went to get dealer amounts for

1    redistribution.  That, folks, is a conspiracy.

2    That's it.  That's it.

3         That is an agreement or understanding

4    between two or more persons to distribute heroin or

5    cocaine base.  When he gets dealer amounts and comes

6    back and redistributes it, that is a conspiracy.

7         He voluntarily and intentionally joined in

8    the agreement or understanding either at the time it

9    was first reached or at some later time while it was

10   still in effect.

11        Did he join the conspiracy voluntarily?  Of

12   course he did.  He was selling drugs.  He was going

13   back voluntarily to get more drugs.  It was how he

14   made his money.

15        It's very interesting.  On a conspiracy

16   count, I don't even have to prove to you that he

17   actually sold the drugs.  All I have to prove is that

18   he agreed to sell the drugs.  But you can use the

19   sale of drugs to prove the agreement.  And we have

20   that here, don't we?

21        We have the sale of drugs.  We have the

22   admission of the conspiracy.  Not only do we have the

23   admissions of this conspiracy from the defendant who

24   says he went to re-up, we have the admissions of the

25   conspiracy from the defendant in the text messages.

1          Regardless of the testimony that he gave
2     talking about he didn't know what Adam meant or, you
3     know, he wasn't sure, the evidence is clear.  Adam
4     says to him in the text messages, "My people are
5     coming.  I need."  "My people from CR are coming.  I
6     need."  He says, "Going together with a buddy."
7          He says, at the other point on the $200 buy,
8     if you remember this, "$140 for the gram."  And then
9     the defendant says, "You still owe me 70."  And he
10    later says, "Can I give you 200?"
11         "So instead of 210, can I give you 200?  I'm
12    not trying to make shit off of this.  Just helping a
13    buddy out."
14         The evidence is no clearer that he is, in
15    fact, redistributing heroin.  And the defendant knows
16    that.  And if the defendant knows that he's
17    redistributing heroin, guess what?  That proves the
18    conspiracy.
19         Did he voluntarily and intentionally join
20    this particular conspiracy?  Of course.  At the time
21    the defendant joined in the agreement or
22    understanding, he knew the purpose of the agreement
23    or understanding.
24         Did he know the purpose of the agreement?
25    Yes.  He's a drug dealer.  The purpose of agreeing

1    with other people to sell drugs is to make money

2    because you're a drug dealer.

3            Now, there's no requirement of making money.

4    And there is no requirement of actually selling for

5    money.  It's just distribution.  But he, in fact, is

6    in it for the money.  He's in it for greed.  He's not

7    in it to feed his habit.  He's in it to feed his

8    wallet.

9            Ladies and gentlemen of the jury, in order

10   to convict the defendant of the conspiracy -- again,

11   now, this is further instruction, Instruction Number

12   12.  We've gone through the three things that are

13   required for the conspiracy.  You also have to look

14   at this in conjunction with Number 12.

15           Did he reach an agreement or understanding

16   with at least one other person?  It makes no

17   difference whether that other person is a defendant

18   or named in the indictment as long as you find beyond

19   a reasonable doubt there was at least one other

20   co-conspirator.

21           Was there at least one other co-conspirator?

22   Yes.  There's a number of other co-conspirators.

23   There's the -- Folks, I think he said mostly one, but

24   some other people, maybe, on occasion, in Chicago who

25   was supplying him with heroin and crack.

1          There is Ricky Carter.  Ricky Carter, who he
2     lived there, and who Shannon Scholtes tells us "Ricky
3     Carter is the one who I started going to.  And then
4     eventually I would call Ricky Carter, and sometimes
5     the defendant would distribute; or I would call the
6     defendant, and sometimes Ricky Carter would
7     distribute."
8          That's a conspiracy, folks.  That's an
9     agreement.  Is there one other person?  Yes.  Only
10     has to be one.  And we're already up to two.
11          John Walgren tells us that when he's getting
12     heroin from the defendant, he's getting heroin from
13     the defendant on occasion, and other people are
14     bringing him the heroin.
15          Do you remember the testimony where he said
16     on at least one occasion -- or "on the one occasion I
17     got heroin from -- I contacted Lo; somebody else
18     brought me the heroin."  I think he said "an
19     African-American male with dreadlocks brought me the
20     heroin.  And a minute or so after I left" -- "a
21     minute or so after I left, Lo called me and said,
22     'Hey, you're $5 short'"?
23          That, folks, is another person involved in
24     the defendant's drug-dealing enterprise.  The
25     agreement or understanding need not be an expressed

1    or formal agreement or in writing or cover all of the
2    details of how it is to be carried out.  And why is
3    that?  Because that's not how drug dealers work.
4          Drug dealers don't send a text message --
5    They're not particularly clever about their codes, as
6    you see in this particular case.  But they don't send
7    a text message saying, "Hello, Adam.  This is Michael
8    Stevenson.  I am available for the purchase of heroin
9    if you would like to show up at my place in five
10   minutes."
11         They don't have an expressed agreement or
12   understanding.  They don't have to have an expressed
13   agreement or understanding by the terms of the jury
14   instructions.
15         There doesn't have to be a written agreement
16   with his supplier in Chicago saying, "I agree to sell
17   you 15 grams of heroin and, in return, you will pay
18   me X amount of money, and you will turn -- turn
19   around and redistribute that heroin."  It doesn't
20   have to be the case, because that's not how it works.
21         And why doesn't it work that way?  Because
22   drug dealers don't want to write this stuff down.
23   They don't want to give a road map for their
24   business.
25         So you don't have to find that.  You simply

Case 2:18-cr-01023-CJW-MAR   Document 105   Filed 07/15/19   Page 89 of 187

       1     have to find whether or not there was an agreement.

       2     And was there an agreement here?  Of course there

       3     was.

       4            A person may join an agreement or

       5     understanding as required by this element -- and I'm

       6     sorry.  I've jumped down to the bottom paragraph of

       7     the page -- as required by this element without

       8     knowing all the details of the agreement or

       9     understanding and without knowing who all the other

      10     members are.

      11            So it doesn't matter at all whether the

      12     defendant, Lo or Mike-Mike or Michael Stevenson, or

      13     however he's referred to -- it doesn't matter at all

      14     whether or not he knows that Adam is selling to

      15     certain people.  Doesn't matter.

      16            If he knows Adam is selling, that's enough.

      17     If he knows Adam is redistributing, that's enough.

      18     There is an agreement to distribute drugs.  And we

      19     know that to be the case.

      20            How do we know that to be the case?  Well,

      21     we have -- First of all, how we know that to be the

      22     case is that we are instructed that we can use -- and

      23     when I say "we," I'm sorry -- you are instructed that

      24     you can use your reason and your common sense.

      25            In fact, that is such an important phrase

1    that it is used in three separate jury instructions.

2    You are told about your reason and common sense in

3    Instruction Number 3.  You're told about reason and

4    common sense in Instruction Number 4.  And

5    Instruction Number 10, reason and common sense.

6         We don't give that up.  You don't give that

7    up when you walk in the door and when you sit in the

8    jury box.  You bring your life experiences with you

9    as you are evaluating this evidence.  And I ask you

10   to do that in this particular case.

11        So using your reason and common sense, what

12   does it sound like when it says, "Man, I really

13   appreciate you helping me out.  I really need to get

14   rolling again, bro.  Starting off new always sucks."

15        And then the defendant says, "The quicker

16   you grind, the quicker you shine.  Just got to work.

17   Be patient and smart."

18        That's Adam Birch getting back into drug

19   dealing after he got out of jail.  That's not Adam

20   Birch simply saying, "Hey, I need some heroin."  Or

21   "Hey, I need some H."  Or "I need."

22        That's Adam Birch saying, "I really need to

23   get rolling again."  And the defendant clearly

24   understood what he meant because he says in response,

25   the quicker you grind, "The quicker you shine.

1    You've got to be patient and smart."

2         The text message chain where he talks about

3    the 140 for a full one.  He talks about 140 for a

4    full one.  And then the defendant says, "You still

5    owe me 70."  And then he -- which is $210.

6         And then he says that he wants to get --

7    When I say "he," I mean Adam Birch.  He says, "Can I

8    give you an even 200, bro?  I ain't making shit.

9    Just trying to help a buddy out."

10        "Just trying to help out a friend to get him

11   some drugs."  Is there any other way to interpret

12   that?  No.  So does the defendant know that Adam

13   Birch is turning around and reselling some of the

14   heroin that he's getting?  Yes.

15        And did you hear the testimony from Officer

16   Leitzen?  Gram quantities often -- often -- in fact,

17   more often than not are consistent with

18   redistribution.

19        And a person who's in the drug game for

20   three years, a person who makes his money selling

21   drugs, who is a self-admitted heroin dealer, knows

22   exactly how it works.  You might say he's an expert

23   in it.

24        So when Adam Birch asks, "Can you help a

25   buddy out," what's the response?  "Yeah."  Later on

1    in those same text messages, at 2023 I think is the

2    number of the text message, Adam Birch says to the

3    defendant, "I'm by my crib, but my people who need on

4    way from CR.  Will be at 12:45 to you if you can make

5    it for sure, if so."

6            And in context, he's asking for a gram of

7    heroin.  I believe that's further up in the text.

8    And even the defendant said, "Yeah.  Sounds like he's

9    redistributing."

10           He didn't use that exact phrase, but he

11   agreed to that.  Why?  Because you admit what you

12   have to admit.  And you deny what you can admit.

13           And that's what the defendant's doing.  He

14   can't deny that one because it's so clear.  Because

15   all the others he's going to deny, and, "Oh, it's

16   vague."  Or "No, I'm not sure about that.  No, I

17   didn't have any agreement."  The evidence is clear

18   that he did.

19           So as you go back to the jury room, and as

20   you deliberate -- Now, we have, on Counts 2, 3 -- or

21   excuse me -- 3, 4, and 5, take your jury verdict

22   forms and, again, after you deliberate, check the

23   guilty box.

24           And after you deliberate again -- If you go

25   back up to 1 and 2, "Was the defendant in a

conspiracy to distribute crack cocaine and/or heroin?" And you don't have to find both. You can find one or the other. I submit to you that both -- he is guilty of both, but either one works. Guilty.

The evidence is clear in regards to that. The evidence is clear that he's working with someone above him. The evidence is clear that he's working with people below him. The evidence is clear that he has agreements. The evidence is clear that he recruits customers.

Conspiracy is basically a business. It's an agreement. He's recruiting customers in this case. He's sending out advertisements, for goodness sakes. "Fresh hot tasty pizza."

The question then becomes Count 2. Did the defendant distribute heroin on February 1st? The answer to that is yes. The defendant distributed heroin to Adam Birch on February 1st.

How do we know the defendant distributed heroin to Adam Birch on February 1st?

Well, we talked about circumstantial evidence in voir dire, if you remember. And the circumstances can point to a conclusion. And, in fact, you've been given an instruction in regards to this. You've been given an instruction to regards in

1    how it's considered.

2         I'm sorry.  I don't have the exact one, but

3    you'll have it in your packet, or it is in your

4    packet.  And the Court will instruct you, or has

5    instructed you, that you are allowed to give whatever

6    weight to circumstantial evidence that you feel it

7    deserves.

8         In fact, you can give it the same weight as

9    direct evidence.  There's no -- The law doesn't make

10   a distinction between the two.  You decide.

11        Well, what are the circumstances that show

12   that the defendant distributed heroin to Adam Birch?

13   I anticipate you're going to hear "timeline's wrong."

14   Look at all those text messages and every other buy.

15        Look at the different -- the different

16   things that are happening.  Look at the fact that

17   there's heroin and fentanyl, where, in the past, it's

18   only heroin.

19        Let's talk about each one of those.

20   Timeline's not wrong.  The timeline is right on the

21   money.  The timeline is Adam Birch and the defendant

22   have two text messages somewhere around 4:50 or so.

23   And I don't have the times right in front of me.  You

24   will.  You'll have the exhibits.  Somewhere around

25   4:50 or so in the afternoon.

*Sarah J. Dittmer, CSR, RPR*
*1(888)388-2723*

          1              Compare that, then, to the text messages

          2     from Adam Birch and John Walgren wanting to go

          3     together, wanting to split -- throw down 35 for half

          4     and half.

          5              They marry up exactly.  And, in fact, Adam

          6     Birch says, after -- after contacting the

          7     defendant -- something like four minutes after

          8     contacting the defendant -- says, "My guy's ready."

          9     So the timeline fits.

         10              Now, Defendant says, "No.  No.  No.  No.

         11     No.  You would see it in the text messages.  You

         12     would have to have an agreement."  But they have a

         13     minute-and-39-second phone call.  A minute and 39

         14     seconds.

         15              I shorted you in my demonstration where we

         16     went a minute and 29 seconds.  I was off by 10.  The

         17     phone call was a minute and 39 seconds.  And you-all

         18     saw how long that actually is.

         19              Is it impossible that they made arrangements

         20     to do the drug deal in that long period of time?  Of

         21     course it's not.  And, in fact, that actually matches

         22     up -- matches up with the other stuff that you know.

         23              Matches up with the other things that you

         24     know.  Matches up with the other buys that we have,

         25     doesn't it?  The buy with John Walgren.  Right?

1          There's two text messages on the controlled
2    buy.  Two text messages, then a phone call.  There's
3    not 20 -- this string of 20 text messages.  It's not
4    out of character.

5          The difference is Adam Birch walks.  And
6    they need to make perhaps more arrangements.  On this
7    particular case, Adam Birch is at work.  We know that
8    to be true.

9          We have the testimony from his sister who
10   says he was there.  That's where he was.  They left
11   shortly thereafter, but he's arranging the drug deal.
12   And we have the phone call.

13         What else do we have circumstantially to
14   show that Adam Birch is involved or that the
15   defendant sold to Adam Birch?  We have the panicked
16   reaction.  We have the panicked reaction afterwards.

17         The defendant owed drug debts [sic] -- Or
18   Mr. Birch owed drug debts to Adam Birch [sic] before,
19   and you can see that in the text messages.

20         But never, never is there nine or 10 text
21   messages in a row from the defendant blowing up
22   somebody's phone saying "Getting ahold of me, get
23   ahold of me, get ahold of me right now.  Get ahold of
24   me right now, and call me back."  That doesn't
25   happen.

1          Why does it happen?  Because he knows he was
2    dead, and he was panicked.  But he wasn't so worried
3    about that that he wouldn't continue to sell heroin.
4          So we have that circumstance.  We have the
5    circumstance afterwards where he calls -- or John
6    Walgren calls, they talk to one another, and John
7    Walgren says, "Yeah, he said, 'I told that kid to be
8    careful.'"
9          In context, what does that mean?  "Yeah, I
10   had some responsibility for it, but it wasn't my
11   fault.  I told him to be careful."  That matches with
12   our timeline as well.
13         And it also matches with our timeline that
14   for a while after the death he's not contacting John
15   Walgren.  He's not getting back in touch with John
16   Walgren.  They tried.  He wouldn't pick up the phone.
17   He won't answer the phone.
18         Why is that?  Because the death occurred.
19   And he knows that John Walgren and Adam Birch were
20   friends.  And he decided to lay low.  And it's only
21   after they go through someone else, only after they
22   go through Jake and Angie, that he gets back into it
23   again with John Walgren.
24         So we know that he distributed on that day.
25   We know it again because of the text messages.  We

1    know it because of the phone call.  And we know it

2    because of the circumstances.  We also know it

3    because of the testimony of the investigating

4    officers in this particular case.

5              Again, folks, I apologize.  When I say "we

6    know it," you know it.  The officer who testified

7    says, "I went through 4,800, approximately, text

8    messages -- 4,800 text messages on Adam Birch's

9    phone, and he didn't have another source."

10             He didn't have somebody else who was

11   supplying him heroin.  That does not exist on his

12   phone.  Doesn't exist on his XTE phone; doesn't exist

13   on the Alcatel phone.  It's not there.

14             If, in fact, he had another source of

15   supply, wouldn't there be a record of that?  That's a

16   circumstance, again, that leads us to the conclusion.

17             Did he distribute -- "he" being the

18   defendant -- distribute to Adam Birch that night?

19   Yes.

20             Did the defendant distribute to Adam Birch?

21   John Walgren says that the defendant, at the time --

22   in this January time period -- at the time, Adam only

23   went to the defendant.  That's another circumstance

24   that you can consider in making that determination.

25             We have the testimony of Emily Nelson.  For

1    whatever you find that to be worth, we have Emily

2    Nelson's testimony.  One thing Emily Nelson said,

3    that -- And she was all over the board.  But one

4    thing Emily Nelson said was that she got heroin from

5    the defendant on February 11th, used it, and

6    overdosed.

7          Now, on cross-examination, again, she was

8    bouncing all over the place, but one thing she didn't

9    move from was the defendant provided her heroin; she

10   overdosed.

11         She used a whole bunch of other drugs on

12   that day, obviously.  I think she talked about Xanax,

13   and she talked about heroin, another heroin, and she

14   talked about smoking crack cocaine, I believe.

15         But she says Defendant was selling heroin.

16   She also says that the two of them -- she and the

17   defendant -- sort of got together to give the number

18   to Adam Birch.

19         She didn't want to give Adam Birch the

20   defendant's number because, you know, she didn't want

21   to feel bad about it.  She thought he was recovering.

22         But she went ahead and turned around and

23   gave the number the other way.  But she says, if you

24   remember, that the defendant felt bad about Adam's

25   overdose.  That's a circumstance, again, that you can

1    consider, that you can take into account.

2         If the defendant felt -- feels bad, that's

3    subject to a couple of interpretations.  Perhaps he

4    feels guilty.  Perhaps he just liked Adam and felt

5    bad.  But again, it doesn't stop him from continuing

6    to sell heroin.  Eric Steve overdosed six times -- at

7    least six times.  Defendant continued to sell him

8    heroin.

9         What does the defendant feel bad mean in

10   this context?  It means that he knew that he sold him

11   the heroin.

12        Ladies and gentlemen of the jury, I

13   encourage you to review the physical evidence in this

14   particular case.  And when I say "physical evidence,"

15   I mean the text messages and the phone tolls and that

16   evidence.

17        Don't review the physical evidence -- Or

18   don't open the bags, of course, of the heroin and the

19   crack cocaine.  Leave those firmly sealed.

20        But take a look at the evidence in this

21   particular case.  Take a look at the evidence of the

22   contacts between the defendant and Adam Birch.  Take

23   a look at the evidence of -- of the contacts between

24   Adam Birch and John Walgren and the timing of them.

25        Take a look at the lack of evidence of the

1  phone calls that the defendant claimed that he made

2  to Adam Birch that night when they were just trying

3  to collect a drug -- drug debt.

4         He testified on direct that he had tried to

5  call Adam Birch. Doesn't exist. Take a look at all

6  of that. Take a look at all of -- or recall all of

7  the testimony that you heard from the cooperating

8  defendants [sic].

9         And you're going to be instructed about the

10 cooperating defendants as well. Or you already have

11 been. View their -- view their testimony carefully.

12 The Court instructs you, and you should do so. I

13 encourage you to do so as well.

14        But when you view their testimony, view

15 their testimony in context and in light of the

16 evidence that you can use to corroborate their

17 testimony.

18        The defendant himself, in fact, corroborates

19 their testimony. Eric Steve takes the stand and say,

20 "I bought heroin. I bought it from Lo." And the

21 defendant admitted -- corroborated it.

22        John Walgren tells you what happened. John

23 Walgren's got problems, obviously. John Walgren's

24 got a lot of issues. But his testimony is

25 corroborated by independent evidence.

1          It's corroborated by the videotape.  He says
2   February 12th we went to the Hy-Vee, bought heroin.
3   Videotape shows that transaction occurred.  Defendant
4   admits it.  John Walgren's testimony is corroborated
5   independently.
6          Shannon Scholtes' testimony.  Corroborated.
7   Corroborated by the controlled buy.  Corroborated by
8   the observations of the police officers.  It's
9   corroborated.  You're not being asked to rely solely
10  on the unsupported testimony of heroin addicts.
11         You have corroborated testimony of other
12  people that support what they saw, what they know,
13  and what happened in this particular case.
14         And you have the text messages.  And you
15  have the phone tolls.  That is independent
16  corroboration of their testimony.
17         Ladies and gentlemen of the jury, after
18  you've deliberated, I ask you to reach the just
19  verdict in this case, the verdict that the evidence
20  overwhelmingly supports and that justice demands, and
21  that is that the defendant is guilty of Count 1,
22  conspiracy to distribute heroin or crack cocaine;
23  guilty of Count 2, distribution of heroin on February
24  2nd; and, of course, as we've already stated, guilty
25  of Counts 3, 4, and 5.

1          Thank you very much.

2          THE COURT:  Thank you, Mr. Lammers.

3          Now is the time for the defense closing

4    argument.

5          Mr. Goldensoph, you may proceed.

6          MR. GOLDENSOPH:  Thank you, Your Honor.

7          May it please the Court.  Counsel.  Michael.

8          Ladies and gentlemen of the jury, I'm just

9    going to talk about Counts 1 and 2 today.  Obviously,

10   3, 4, and 5 are pretty easily decided by you.  But

11   before we get into talking about them, I want to talk

12   about the standard of proof in this case, the

13   standard of proof in every criminal matter in the

14   United States:  proof beyond a reasonable doubt.

15         I'd like to talk about this because this is

16   not a subject that I believe most laypeople really

17   deal with very often.  So it's kind of a vague

18   concept.

19         You'll see in the instruction, among other

20   things, it says, "Proof beyond a reasonable doubt is

21   proof of such a convincing character that a

22   reasonable person, after careful consideration, would

23   not hesitate to rely and act upon that proof in

24   life's most important decisions."

25         Now, during jury selection, I talked

 1    about -- And by the way -- I'm sorry -- that's

 2    Instruction Number 10.  I should have said that.

 3            During jury selection, I talked about

 4    getting married.  Because I think everybody would

 5    agree that that is one of life's most important

 6    decisions.

 7            And that's what this is.  This is on that

 8    level, this case.  That's how important this decision

 9    is.  And the amount of evidence that you would

10    require to get married, that's the amount of evidence

11    that's required in this sort of case.  It's a big

12    decision.

13            So, you know, proof beyond a reasonable

14    doubt obviously means if you have a reasonable doubt

15    about something, that hasn't been proven.

16            And so another way to think about that is

17    that the Government's version of events for a

18    particular thing has to be the only reasonable

19    explanation for something; otherwise, it's not proof

20    beyond a reasonable doubt.

21            Because if you've got another reasonable

22    explanation for something occurring, then that's

23    reasonable doubt.

24            I mean, you could -- you could even think --

25    you could literally think to yourself, "Well, the

1  Government's version does make more sense, but I'm
2  not firmly convinced because there's another
3  reasonable explanation for this."
4          I mean, if that's what you think about
5  something, then you have to acquit Mr. Stevenson.
6  You cannot find him guilty under those circumstances.
7          Now, keeping that in mind, I want to turn to
8  Count 1.  That's the conspiracy charge.  First, the
9  Government needs to -- We're left with this question.
10  Who is this conspiracy with?  You've got some
11  nameless people from Walgren and Emily Nelson and
12  Shannon Scholtes.
13          Let's face it.  How much stock will you
14  really place in Emily Nelson's testimony?  She's,
15  frankly, quite incredible.  And we're going to talk
16  about her a little bit more later on.
17          But Walgren as well.  His testimony's --
18  It's -- it's clear this guy is not adverse to lying.
19  He's going behind the police's back doing a drug deal
20  to steal heroin from the police.  That's the extent
21  that this guy will go to do something for himself.
22          In fact, in talking with the U.S. attorney,
23  I think it was earlier this week, he was deceptive
24  about his methamphetamine dealings.  That's the
25  length this guy will go to protect himself, to help

1   himself.

2         And what's he doing here?  What's his

3   motivation for being here?  It's to help himself.  So

4   his credibility is minimal, at best.  And we'll talk

5   more about him later on as well.

6         Now, there is discussion -- Or there is,

7   however -- So they say that these vague people were

8   helping out Mr. Stevenson with selling drugs.  But

9   compare and contrast that to Eric Steve's testimony.

10         Eric Steve is here for the same reason.  He

11   wants a cut in his sentence.  He doesn't have the

12   same baggage.  He didn't go behind the police's back.

13   He didn't -- be deceptive in talking with the U.S.

14   attorney.

15         He's just -- He's trying to get a cut in his

16   sentence.  I mean, so he's got that, but he doesn't

17   have all that other baggage.

18         And when he testified that -- He said he

19   purchased from Mr. Stevenson 45 to 50 times.  And in

20   all those times, nobody else dealt with him.  It was

21   always Mr. Stevenson.  And if -- if Michael's got

22   people working for him, wouldn't Eric Steve have run

23   into one of those guys?

24         The other thing, ladies and gentlemen, is

25   the timeline, January 2017 to September 2017.  We

1   don't have any testimony as to when Shannon Scholtes

2   or any of these other people met up with these other

3   nameless people.  And if they did it, it was for a

4   few times and certainly not during that entire time.

5           So at this point, I'm going to turn to Count

6   2.  In -- So this is the allegation that on February

7   1st, 2017, Michael sold to Adam Birch.  It is clear,

8   crystal clear, that he didn't.

9           How do we know that?  We saw lots of

10  completed sales through those text messages.  They

11  all included things like, "What you tryna do?"

12  Meaning "How much you want?"

13          And then there is a discussion about price.

14  And then there was a discussion about "Where are you

15  going to be at; where can we meet up?"  And then, at

16  the very end, there's always, "Hey, I'm outside.  I'm

17  in the red car, blue car," whatever.

18          There's always texts like that.  There's

19  communication like that.  And that's -- that's how

20  the transactions between Mr. Birch and Mr. Stevenson

21  went.  That's the common way for things like that to

22  occur between the two of them.

23          And that just didn't occur on February 1st.

24  And I guess I want to back up here a bit.  And, you

25  know, there are -- Like I said, there are a lot of

1    examples of when the completed sales occurred.

2           There's also a lot of examples of when the

3    sales didn't occur.  There's a few days there where

4    Mr. Birch doesn't even -- there's not even

5    communication between the two.

6           And there's situations where they try to do

7    a deal, but in the end, they're just not able to

8    complete one.  One, of course, ends with Michael

9    telling Mr. Birch, "Nah, that's too late.  I don't

10   want to do that."  And so they don't conclude the

11   deal that time.

12          Here's the point.  And, unfortunately,

13   Mr. Birch, in addition to apparently selling heroin,

14   he's also a heroin addict.  And we had a lot of

15   testimony from people who are addicted to heroin, who

16   say you've got to use every day.  And if you don't

17   use every day, then you have this horrible reaction.

18          I believe -- I believe it was Ms. Nelson who

19   called it dying a slow death.  You want to avoid

20   that.  And so you want to get more heroin.

21          But if they didn't talk -- If Mr. Birch and

22   Michael didn't have a deal on a particular day,

23   where's he getting his heroin?

24          We have the testimony of Mr. Leitzen saying

25   that he reviewed these texts, and there was no other

1    deals.  But, unfortunately, you don't have the luxury

2    of looking at those texts.  You don't have the

3    ability to look at them yourselves to know.

4          But common sense tells us that If Mr. Birch,

5    being a heroin addict, goes without heroin for more

6    than a day, he's going to start getting that

7    sickness, and he's going to need heroin.  And if he's

8    not getting it from Mr. Stevenson, he's got to get it

9    from somewhere else.

10         And, frankly, all of the people who are

11   addicted to heroin who testified, all of them, every

12   single one of them, said, "Yeah, sometimes you've got

13   to bounce around from dealer to dealer.  You know,

14   sometimes somebody won't have any, so you've got to

15   go with someone else."

16        Does it make sense that Mr. Birch was an

17   exception to that rule?  He clearly had to go

18   somewhere else.

19        Now, at this point, I want to dive a little

20   bit more into February 1st.  I sort of got into it a

21   little -- I got ahead of myself earlier.

22        All of the other transactions that obviously

23   occurred required at least more than 10 texts between

24   the two of them.  And this, there's two texts and a

25   phone call.

1          Now, Mr. Lammers timed out the length of
2     that phone call.  Well, that's all well and good.  It
3     was a -- It felt like a long time; right?  And so
4     what was all said?

5          Well, that was a little over two years ago.
6     Mr. Stevenson doesn't have a perfect memory.  And so
7     perhaps there were some pleasantries that were
8     discussed.  "How you doin'," stuff like that.  Those
9     happen in telephone calls.  Perhaps other stuff was
10    discussed.  We don't know.

11         Basically, Mr. Stevenson was left with the
12    impression that, "Hey, I'm going to try to put
13    something together.  You good to go?"  Or, I mean,
14    you know, "What's going on"; right?

15         And that's reflected in the text that
16    Mr. Birch sends to Mr. Walgren after that.  "Hey, my
17    guy's ready.  35 and 35."  Something like that;
18    right?

19         The problem is, after that, there's another
20    text from Mr. Birch to Mr. Walgren saying, "Hey, we
21    going to do this?"  And then silence.  Nothing;
22    right?

23         There's no further text from Mr. Walgren to
24    Mr. Birch saying, "Yeah, let's do this."  In fact, he
25    said, no, that deal fell through.  He testified that

1    deal fell through.  That deal didn't even occur.

2            And the other evidence that we have that

3    that deal didn't occur is there's no subsequent,

4    "Hey, I'm here.  Where are you at?"  There's no text

5    like that.  There's not even a telephone call like

6    that.

7            Now, the Government may try to argue that,

8    well, Mr. Stevenson could have been told during that

9    telephone call that, "Hey, I'm at work.  Can you come

10   drop me -- drop it off here;" right?

11           The problem is, you have other texts where

12   Mr. Birch was at work where there's clearly a deal

13   made, and there's those texts that say, "Where you

14   at?  I'm walking out," stuff like that.  That didn't

15   happen on this day.  It just -- There are -- Just

16   wasn't enough planning.

17           Now, I don't know if the Government's going

18   to argue this, but because he gets to go again, I

19   just wanted to make sure that this is clear.  The

20   Government may try to argue that, "Well, we only need

21   to prove that this happened on or about February 1st,

22   2017."

23           Because it's clear -- it's crystal clear

24   that there was no deal that happened on the 1st, so

25   they might want to say, "Well, it actually happened

1    on the 31st."

2         But first of all, that's -- "It -- it

3    happened on the 31st."  It's not a situation like,

4    well, it happened around midnight, and so we don't

5    know exactly what time -- what particular day it

6    occurred, because it could have happened at 11:57

7    p.m. or 12:03 a.m., and so it's going to be one of

8    those two days, but we don't know for sure.  That's

9    not this sort of situation.

10         But the -- It's clear, that on the 31st,

11    it's very unlikely that any deal occurred.

12         And here's how we know.  These are the texts

13    between Mr. Stevenson and Mr. Birch on the 31st.  And

14    here at the bottom, we got one sent from Mr. Birch to

15    Mr. Stevenson, "Hey, bud.  10 minutes."  And that's

16    at 4:35 p.m.  The last text by Mr. Stevenson to

17    Mr. Birch is about six minutes later, where he says,

18    "I'm on 16 Elm."

19         And then you've got all these texts that I

20    know I hammered like a dead horse, where Mr. Birch is

21    trying to connect with Mr. Stevenson.  All these

22    texts saying, "Where do I go?"  Four minutes.  "Only

23    need the 50."

24         But you'll see in all of these texts during

25    this time period, Mr. Birch is trying to impress upon

1    Mr. Stevenson, "Hey, my ride's in a hurry."  And

2    the -- the last one, in fact, says, "My ride has to

3    get to school."

4            And then there's one earlier on that says,

5    "I got to be quick.  I try to be quick.  My ride

6    won't wait."  So he's in a hurry.  But you'll see

7    that the last communication from Mr. Stevenson to

8    Mr. Birch on that day is 4:41, almost 4:42.  And the

9    last communication between the two of them was at

10   5:13, 35 minutes later, that ride was in a hurry.

11           I submit to you that that ride was more than

12   likely Mr. Walgren.  And he had testified that there

13   was one day, shortly before Mr. Birch's death, that

14   Mr. Birch had tapped on his window and said, "Hey, I

15   need a ride."

16           Now, Mr. Walgren said that they drove to

17   meet up.  I don't -- You'll remem- -- You'll go with

18   your memory, not mine, but I don't specifically

19   recall him saying that we did, in fact, meet up with

20   Mr. Stevenson.  But it's pretty clear from those

21   texts nothing happened.

22           Mr. Walgren's apparently in a hurry, and

23   there's just no response.  There's no communication.

24   "There's none of those texts, "Well, I'm here.  The

25   blue car."  There's nothing like that.

1          And let's just consider this:  Let's say
2     Walgren is the guy who gave him the ride that day.
3     Walgren knows other drug dealers.  Couldn't he have
4     contacted one of his other heroin suppliers and said,
5     "Hey, our guys fell through.  Can you help us out?"
6          I mean, I'm not saying that's exactly what
7     happened.  But is that reasonably possible?  Yeah.
8     Yeah.  Why not?
9          So it's pretty clear that the last drug
10    transaction that occurred between Mr. Birch and
11    Mr. Stevenson is on the 30th.  But even after the
12    30th drug transaction occurs, on the 31st, Mr. Birch
13    is, yet again, seeking heroin.
14          That's why they were trying to do this.  So
15    he still needs some.  And whether he gets some from
16    Mr. Stevenson on that day or not, on February 1st,
17    he's, yet again, seeking more heroin.
18          So he's out.  He needs some.  He needs to
19    get some from somewhere.  And as we've discussed
20    earlier, it's clear he didn't get it from
21    Mr. Stevenson that particular day.
22          And just a quick commentary.  Mr. Lammers
23    earlier argued that this telephone call that happened
24    on the 1st between the two of them lasting a minute,
25    39, he argued "Is it impossible that a drug

1   transaction was completed in that minute, 39?"

2          Well, I submit to you, no, that's certainly

3   not impossible.  In the realm of possibil- --

4   possible things, that is certainly possible.  Right?

5   That's not the standard of proof here.

6          Standard of proof is, he has to prove it

7   happened beyond a reasonable doubt.  He's trying to

8   flip the standard.  He can't.  He doesn't get to

9   prove that it's not impossible that something

10  happened.

11         He has to prove that it's so possible that

12  there's no other reasonable doubt there.  Don't let

13  him flip the standard.

14         What we do know about February 1st is that

15  Mr. Birch purchased methamphetamine from Ron Cole.

16  How do we know that?  Investigator Leitzen testified

17  to that.

18         There was more than 20 texts between the

19  two.  And there was texts about -- And, you know, you

20  don't the benefit of these texts, either, but you

21  have his testimony that there were texts about price

22  negotiations and "how much," "where."  And there was

23  texts about, "I'm arriving."  That's pretty typical

24  for Adam, pretty clearly.

25         I mean, that happened with the Coles.  Or, I

Case 2:18-cr-01023-CJW-MAR   Document 105   Filed 07/15/19   Page 116 of 187

1   mean, Ronnie Cole.  And that happened with

2   Mr. Stevenson.  That's how he does those drug deals.

3   I mean, they all include that sort of information.

4           So it's pretty clear that on February 1st he

5   purchased methamphetamine from Ronnie Cole.

6   Investigator -- Investigator Leitzen also testified

7   that in Dubuque, meth is sold in gem Baggies.  Okay?

8   Heroin in the torn corners of sandwich Baggies, meth

9   in gem Baggies.

10          The heroin that Adam Birch had on February

11   2nd, 2017, in that video was in a gem Baggie.  Okay?

12   Now, Investigator Leitzen says he's never seen heroin

13   sold in that way before, but even he admitted that

14   he's not a party to every drug transaction in

15   Dubuque, Iowa.

16          That would be impossible.  In fact, I submit

17   to you that even all of the drug task force employees

18   are only part of just a miniscule amount of those

19   transactions necessarily.

20          So is it possible that a meth dealer was

21   trying to branch out into heroin?  Is it reasonably

22   possible?  That's a standard I can use to provide

23   doubt.  Is it reasonably possible that a meth dealer,

24   a guy selling drugs, wants to try something new?

25          You heard testimony from all the people who

1    use drugs that they know drug dealers who sell more
2    than one type of drug.  Frankly, Mr. Stevenson sold
3    more than one type of drug.  So it's not unusual.
4         When their house was searched, they didn't
5    find heroin, but they found -- When Mr. Cole's house
6    was searched, heroin wasn't found, true.  True
7    enough.  But other stuff -- other pills were found.
8         So they weren't restricting their sales
9    strictly to meth.  But it's certainly -- certainly a
10   possibility that a meth dealer wanted to try
11   something new, is accustomed to bagging his drugs in
12   a gem Baggie -- And we know he used gem Baggies.
13        Not only did Investigator Leitzen say that,
14   that's how they are commonly distributed in Dubuque,
15   the Baggies that held the methamphetamine that
16   Mr. Birch had were gem Baggies.  You saw them.
17        There was one that had a dollar sign on it.
18   I submit to you that that's -- those gem Baggies came
19   from Mr. Cole.  And it's not unreasonable to think
20   that that heroin came from him as well.
21        So that explains the similarity in the
22   packaging.  I mean, Mr. Stevenson certainly didn't
23   use gem Baggies.  You know that because of the -- all
24   the other transactions that were held with
25   Mr. Stevenson was just the torn corner of the Baggie,

1     not a gem Baggie.

2            Not only that, ladies and gentlemen, but

3     it -- it also explains the different consistencies of

4     heroin.  The heroin that was found in Mr. Birch's

5     home not only had heroin it, it had fentanyl in it.

6            But that same day -- that same day,

7     Mr. Stevenson sold heroin to Mr. Walgren in a

8     controlled buy.  And it had no fentanyl in it.

9            Now, there -- Mr. Lammers may talk a little

10    bit on his rebuttal about there being hot spots.

11    "Hot spot" being something to the effect of there's

12    portions in a lump of heroin that this lump, this

13    portion over here, has fentanyl, but the rest doesn't

14    or something like that.

15           Now, that requires you to speculate that

16    there was a hot spot in this.  And I encourage you to

17    not do that, because speculation is not proof beyond

18    a reasonable doubt.

19           But the other thing to think about, ladies

20    and gentlemen, is that you'll see, in the

21    Government's exhibit -- Exhibit 1 is the exhibit that

22    has the -- the lab report that includes the heroin

23    that was found with Mr. Birch.

24           And you'll see that the quantity of heroin

25    is .05 grams.  It's a tiny, tiny amount.  Yet in that

1    tiny, tiny amount, the lab was able to find fentanyl.

2            Now, compare and contrast it to the heroin

3    that was found that Mr. Walgren purchased that same

4    day.  It was .5 grams, half a gram.  If my math is

5    correct -- and I'm not a mathematician, so I

6    apologize.  But if my math is correct, that's 10

7    times more the heroin.  And in 10 times more the

8    heroin, the lab wasn't able to find any fentanyl.

9            The reason why there's a difference in the

10   quality, the makeup of that fentanyl, is -- it's

11   because it's from different sources.  It's not -- The

12   heroin with fentanyl didn't come from Michael.  It's

13   an add-on.

14           So -- But also -- Just a real brief

15   commentary on quality of product.  Mr. Walgren -- I

16   asked him about him saying previously to somebody

17   else that Michael's heroin was garbage.

18           He said that to somebody else.  "Garbage,"

19   of course, meaning it's not as potent.  I mean, if

20   Michael had heroin that was -- had fentanyl in it,

21   you wouldn't say that.

22           He would say something else, because

23   fentanyl is obviously much more potent, much more

24   bang for your buck there.  He said it was garbage.

25           Now, he tried to play it off by saying

1    something like, "Oh, I was just trying to make this
2    other dealer feel good about himself."  Making a
3    dealer feel good about himself by saying somebody
4    else's stuff is garbage?  Wouldn't it make the other
5    dealer feel better if you said, "Lo's stuff is pretty
6    good, but yours is better"?
7         The fact of the matter is he just didn't
8    like Michael Stevenson's stuff.  He thought he was
9    all skimpy as fuck on the bags.  That's why, on
10   February 2nd, he says, "Oh, he did a good one."
11        He was generally surprised that Michael
12   provided them with a actual good-size bag of heroin.
13   He wasn't being skimpy as fuck like he said in that
14   previous text.
15        Shows where his mind was on those texts.  He
16   meant it.  He meant the stuff was garbage, and he
17   meant skimpy.  But on the stand, he tried to weasel
18   out of that.  That's the level of his testimony.
19        So what do we say about these texts and
20   phone calls on February 2nd between Mr. Stevenson and
21   Mr. Walgren where Stevenson is saying, "Hey, get
22   ahold of Adam"?  Now, the Government had -- would
23   have you believe that that's a sign of a guilty
24   conscious.
25        Does that make sense, though?  Like, Michael

         1    finds out that Mr. Birch passed away.  And he asks
         2    Walgren, "Call him.  Call him.  Give him a call."
         3    Why?  If he knows he -- Mr. Birch is dead, why call?
         4    That doesn't make any sense at all.  But not only
         5    that, how would Michael find out about it before
         6    Mr. Birch [sic]?
         7         Now, Michael testified that they were
         8    friendly, Mr. Birch and him were friendly, but they
         9    weren't really friends.  Mr. Birch and Mr. Walgren,
        10    though, were friends.
        11         And Mr. Walgren himself didn't find out
        12    about the death until after these text
        13    communications.  How is it that Michael found out
        14    before him?  That doesn't make any sense either.
        15         Now, I guess the other thing I want to point
        16    out is that -- Well, let's talk about the drug debt.
        17    Michael's explanation does make sense.  And, "Hey,
        18    listen.  I think this guy's trying to evade me, so I
        19    need to get ahold of him, because he hasn't called me
        20    since last time we talked," which would have been
        21    February 1st, that one telephone call, where it would
        22    have been left off, "Hey, I'll call you back.  I'll
        23    let you know."  And nothing happens after that.
        24         And so the next day, Walgren -- Walgren
        25    calls Michael.  And that telephone call lasts -- I'm

 1    going to say it was a minute and four seconds, or
 2    something a little over that.  Right?  And that's
 3    Walgren calling Michael.
 4         I submit to you it's probably to talk about
 5    a drug deal.  "I want to buy some heroin from you,"
 6    because that's about -- around about the time that
 7    they're discussing that.
 8         And after that, once they're done talking
 9    about that, perhaps Michael just casually put in
10    there, "Hey, could you call Adam, talk to him?"
11    Because he was worried that Adam was avoiding him
12    because of that drug debt.
13         Now, by the way, I want to just quickly
14    comment on what Mr. Walgren said about that test- --
15    about that phone call yesterday.
16         He said it was really quick.  He said
17    Michael called him and said, "Hey, get ahold of
18    Adam," and then hung up right away.  That's what
19    Walgren said that telephone call went like.
20         Well, first of all, it was him calling
21    Michael.  That's clearly not true at all.  Not only
22    that, it listed a minute and four seconds.
23         Now, I concede, that's not a minute and a
24    half, like Mr. Lammers timed out for us, but a minute
25    and four seconds is not, "Hey, call" Michael -- or,

1    "Hey, call Adam."  That's not a minute and four
2    seconds.
3            So clearly, he's not telling the truth about
4    what happened in that telephone call.  Keep in mind,
5    he's trying to help himself.  He's trying to do what
6    he thinks the Government wants him to do.
7            He can say, "I'm just here to tell the
8    truth," but you've got to look at his testimony.
9    Find out, is he?  He's out for himself.
10           And then there's Emily Nelson.  Did she say
11   something to the effect of, "I got heroin and
12   overdosed from Michael"?  Did she say that or did she
13   dream it?  She's kind of all over the place.
14           You'll remember, on cross-examination, I
15   asked her about six days after her overdose.  She was
16   talking with Investigator Leitzen.
17           What she said then was that "I got" -- "I
18   went over to Scott Winkelman's house.  He put
19   something in my coffee.  I felt woozy.  And then he
20   loaded up a syringe of heroin, and then I shot up,
21   and I overdosed."  That was, you know, six days
22   after.
23           Now, more than two years later or whatever,
24   she's saying, "No, I overdosed with Michael's."  How
25   does that make sense?  And six days after, she was

1    asked who she was getting heroin from.

2          She didn't mention Michael.  She said, "The

3    last time I bought heroin from Lo, Michael Stevenson,

4    was a month and a half, two months later."

5          Her testimony's not the truth.  It's -- I

6    mean, I hate to say it, but I -- I don't mean to be

7    mean or anything like that, but it's clearly -- She

8    was not acting as --

9          Her -- her thoughts were not as well

10   formulated as I think a lot of people's thoughts

11   would be.  She was very confused.  I don't know what

12   that's from, but it's clearly -- Her testimony is

13   suspect, at best.

14          And she said something about Michael feeling

15   bad.  But the only reason why she talked about that,

16   to begin with, was back -- it would have been four

17   months, or something like that, after Mr. Birch

18   passed away, she's arrested.  She's in jail.

19          She wants to get out of jail.  And she has

20   this long conversation.  And Investigator Leitzen

21   brings up, "Hey, I want to talk to you about Adam

22   Birch's death and Michael Stevenson."

23          Right there, she knows what he wants to talk

24   about.  She knows what direction she can -- what she

25   can do to help him out.  And she goes on and on and

1    on about getting out of jail.

2         Now, Mr. Leitzen -- Investigator Leitzen

3    made her no promises about that, but she knew that if

4    anyone can help her get out of jail, it's this guy.

5    And he wants to hear about Michael's involvement with

6    the death.  So I'm going to give him what he wants.

7         Her testimony's just uncredible.  There's

8    no -- no credit to be given with regards to that.

9    And it's important that we have credible evidence.

10   This is an important issue.  It's a big deal.  We

11   can't rely on uncredible evidence.

12        What -- what happened to Mr. Birch is

13   obviously very terrible.  And I -- It -- it -- It's

14   horrible.  The thing is, though, we need to get this

15   right.  We need to figure out is Mr. Stevenson that

16   guy.  Is he the one that sold the heroin to

17   Mr. Birch.

18        And the evidence does not prove that he was,

19   certainly not proof beyond a reasonable doubt.

20   There's many other reasonable explanations for this.

21        Ladies and gentlemen, for those reasons,

22   we're going to ask you to return a verdict of not

23   guilty on both Counts 1 and 2.  Thank you.

24        THE COURT:  Thank you, Mr. Goldensoph.

25        Now is the time for the Government to

1    present its rebuttal closing argument.

2            Mr. Lammers.

3            MR. LAMMERS:  Your Honor, prior to that, may

4    we approach?

5            THE COURT:  Yes.

6            (At sidebar, outside the presence of the

7    jury.)

8            MR. LAMMERS:  So I did not object.  I didn't

9    want to interrupt Mr. Goldensoph.  I have a question

10   before I try to get -- Mr. Goldensoph raised an issue

11   in his opinion in his closing argument saying

12   something about all of the other text messages, that

13   the jury didn't have the luxury to see all of those

14   other text messages, that they weren't exhibits, and

15   who knows what was in them.

16           I wish to inform the jury that

17   Mr. Goldensoph had a copy of the -- or the defense

18   had a copy of all of those text messages, as they

19   did, and inform them that he had the ability to put

20   that evidence in had he chosen to do so.

21           This is similar to the defendant standing up

22   and saying "Why wasn't this person subpoenaed?"  Or

23   "Why wasn't that person subpoenaed?"  And, as the

24   Court knows, that's fair comment for us to say they

25   had the ability to do this too.

1          The defendant had the ability to put this
2    evidence in.  He chose not to do it.  For him to
3    comment the jury doesn't have the luxury to see it, I
4    think, is -- gives a misleading impression.
5          THE COURT:  Mr. Goldensoph?
6          MR. GOLDENSOPH:  Well, Your Honor, I think
7    it's a fair comment because, in fact, the jury didn't
8    have the luxury to see them.  So I was merely
9    commenting on the fact that to compare and
10   contrast -- that they're the finders of the facts.
11   And all that we have with regards to that particular
12   issue is what Investigator Leitzen said.
13         So that was merely where I was going with
14   it.  That was the only intent that I had there.  So I
15   don't -- I don't believe that that opened any sort of
16   can of worms.
17         THE COURT:  I don't doubt, Mr. Goldensoph,
18   that your intent was not to suggest the Government
19   was hiding something from the jury, but the jury may
20   have the impression that the Government was trying to
21   hide something from the jury by not putting into
22   evidence the texts that you referenced.
23         And so I think it's a fair comment by the
24   Government to mention that Mr. Goldensoph had access
25   to those and either can put them into evidence or

1    could have cross-examined the agent about them.

2            But, Mr. Lammers, don't suggest in any way

3    the comments by Mr. Goldensoph was trying to mislead

4    the jury, because I don't think that he was.

5            MR. LAMMERS:  I don't either.  I want to be

6    clear.  I don't think he was intending to mislead the

7    jury or create a false impression.  I think it

8    happened through perhaps an inadvertent comment or it

9    came in a little different than maybe he intended.

10   And I don't intend to allege that he was trying to

11   pull the wool over their eyes.

12           I simply want to raise the comment that they

13   had the ability, as well, to present evidence.  They

14   were provided this evidence.  And it was not

15   presented.

16           THE COURT:  All right.  I think that's fair.

17           And I want to alert the parties, too, that

18   I'm going to put the jury on break as soon as we are

19   done with closing arguments.

20           I realize, as I was looking over the verdict

21   form, that our verdict form did not have a ballot for

22   them to choose between objects of the conspiracy.

23           So Mr. Thompson has fixed that.  We're going

24   to have new copies done.  I want you to have a chance

25   to look at it and proof it before we have the new

1    copies of the new verdict form submitted to the jury.

2            So I'll put them on a short break.  I'll

3    explain that we need to give the court reporter a

4    rest before I give the final jury instructions to

5    them.

6            MR. LAMMERS:  That's after rebuttal?

7            THE COURT:  After rebuttal.

8            MR. LAMMERS:  Thank you.

9            (In the presence of the jury.)

10           THE COURT:  All right.  Mr. Lammers, you

11   may --

12           MR. LAMMERS:  Thank you.

13           THE COURT:  You may present your rebuttal

14   closing argument.

15           MR. LAMMERS:  Thank you, Your Honor.

16           I want to address a couple of matters

17   with -- with you, ladies and gentlemen:  a couple of

18   comments made by the defendant.  And I want to

19   address a couple of things that the evidence shows.

20   And I want to address a couple of things that aren't

21   in the exhibits.

22           First of all, I want to talk briefly about

23   the fact that the defendant claims there was no drug

24   deal that occurred on the 31st.  You have the text

25   messages.  Take a look through there.

1                It appears clear that arrangements were

2       being made, prices were being made.  The defendant --

3       or Mr. Birch said, on -- near the end, "I have the

4       130."  And then he says, "We're throwing down."

5                View that in context as well.  Remember when

6       the defendant took the stand and claimed, "Well, I

7       don't know what that means."  That's not a credible

8       statement.  You get to decide his credibility just

9       like every other witness's credibility.  That's not a

10      credible statement.  But at any rate, it appears a

11      drug deal did take place on that particular day.

12               It also appears -- And it doesn't just

13      appear.  It's beyond a reasonable doubt that a drug

14      deal happened on February 1st.

15               Defense counsel has said that you don't have

16      the luxury of seeing all of these other text

17      messages, these other 4,800 text messages that

18      Investigator Leitzen testified as to his review of

19      them.

20               You don't have the luxury.  You don't have

21      them in front of you.  But the defendant also had

22      access to those text messages.  And the defendant

23      also had the ability to put in the exhibits and

24      present testimony.  So take that into consideration

25      as well, ladies and gentlemen.

1          Take into consideration, as we are talking

2     about the timeline -- The defendant talks about

3     timeline.  It doesn't fit the timeline; it doesn't

4     fit the pattern; it doesn't fit the way all this

5     other stuff happened.  Let's talk about the timeline.

6          The first time they had any contact, any

7     actual real contact, is January 6th.  January 6th the

8     defendant reaches out to Adam Birch.  The first drug

9     deal takes place January 9th.

10          And that drug deal, there's a bunch of text

11     messages, but how much of them are actually going to

12     the nuts and bolts of the deal?  How many of them?

13          Take a look and see.  A lot of them are just

14     talking about price.  A lot of them is Adam Birch

15     saying, "Hey, thanks for getting me rolling again."

16     A lot of them are just sort of a reintroduction;

17     right?  That's what a lot of those are.

18          And then when you get to the actual

19     logistics of it, there's six or seven text messages.

20     And match them up with the calls.  There's not a lot

21     of calls.  So they may use text more than they call?

22     Fine.  Fine.  But that doesn't change the timeline

23     any.

24          Talk about the other two buys that we have

25     that we know how it works.  Right?  The buy with John

Walgren. What is that? One call? "Hey, you got
any?" "What do you need?" "80." "Okay. Show up at
the car wash."

He shows up at the car wash. There was two
text messages or so before that. He shows up at the
car wash, Lo showed up. There's not this huge string
of text messages. That's not the way it works.
That's not the way it did work. That's not the way
it worked with Shannon Scholtes.

We have more text messages because Adam's
walking. True. That's true. But not in every case.
We have more text messages because they're more
deeply involved, because they're both sellers,
because it's a buyer/seller/seller relationship.
This defendant is selling to Adam, who's turning
around and selling to other people.

So they talk about prices. And they talk
about Adam throwing down with people. And they talk
about Adam going to his people in Cedar Rapids -- or
his people in Cedar Rapids are coming to get. That's
why there's more text messages. And again, that's
earlier on. Later on -- later on, as we go forward,
they refine their procedure.

What do they need? They need two text
messages and a phone call. So what don't we have?

1  What don't we have?  We don't have any other calls.
2  None.  Zero.
3       Not any other calls between Adam Birch and
4  another heroin dealer.  Not any other text messages
5  between Adam Birch and another heroin dealer.
6       So then the theory somehow becomes, oh, it
7  had to be this methamphetamine dealer.  This
8  methamphetamine dealer, Mr. Cole, he has to be the
9  guy.  That's probably who it is.  That's got to be
10  the guy.
11       His house is searched.  There is no evidence
12  of heroin.  None.  No evidence of heroin trafficking.
13  And you can't say he cleaned the place out and got
14  rid of everything.  You can't say that.  Why?
15  Because he still had methamphetamine.  And he still
16  had the paraphernalia for methamphetamine dealing.
17       If he had decided, "Oh, my goodness.
18  Something's gone wrong.  I've got to get rid of all
19  of this stuff," he's not going to keep the
20  methamphetamine.  He's not a heroin dealer.
21       Defendant says, "Well, it's gem bags.  The
22  gem bag proves that there was another source," even
23  though every witness who testified -- And granted,
24  your officers are not going to be involved in every
25  drug transaction.  And thank goodness for that.

1    They'd be busy 24/7 every day.  They're not going to
2    be involved in all of them.

3         However, in every one they've been involved
4    in, in the hundreds of them, heroin was never, never
5    sold in gem bags.  The defendant said it's never sold
6    in gem bags.

7         It's not economical.  It doesn't make any
8    sense.  So somebody's going to break into the
9    business and start doing things that aren't
10   economical.  I suppose that's a possibility.

11        But you get to use your reason and common
12   sense.  And a possibility -- You can have a
13   possibility, folks, and still be beyond a reasonable
14   doubt.  Remember, it's not beyond all possible doubt
15   is the standard.

16        Did Ron Cole sell Adam Birch the heroin that
17   night?  No.  No.  And again, what explanation do we
18   have for the gem bag?  And this was clear testimony.
19   This was clear testimony from the officer.

20        "Have you ever seen people who sell heroin
21   in gem bags?"  He says no.  "Have you ever seen
22   heroin users who use gem bags?"  "Yes."  "Why?"

23        "Well, because they get their heroin in
24   these knotted-up bags, and they tear them open or cut
25   them open.  And once they open them, you can't seal

1     them again.

2            "But they don't always use all of their

3     heroin right away.  And it's valuable to them.  It's

4     extremely valuable to them.  So they put it back into

5     a resealable bag so they can get at it again."  And

6     that fits with the pattern of what we have here.

7            We have five-hundredths of a gram of heroin.

8     Right?  Five-hundredths of a gram of heroin, but, by

9     golly, that was still -- that was still important.

10    That was still valuable.

11           It was still valuable to Adam.  And that's

12    why he used a gem bag.  And maybe it was a gem bag he

13    had because he was also selling methamphetamine.

14    That's possible.  But he wanted to make sure that he

15    wasn't going to lose that crumb of heroin because it

16    was important to him.  It was his life's blood.

17           That's the explanation for the gem bag.  We

18    have no evidence of other heroin traffickers that

19    Adam was dealing with.  No phone calls.  No nothing.

20           Do you remember in closing argument when the

21    defense attorney said about the blowing up the phone?

22    And he said, "You know, it just makes sense.  What --

23    what happened just makes sense.

24           "See, what happened was that the defendant

25    was trying to get ahold of Adam Birch, and then it

1    just made sense to get ahold of John Walgren

2    afterwards and find out what was going on."

3            Well, that might sense, except that there

4    are no calls.  There are no calls.  And there are no

5    text messages -- none -- between the defendant and

6    Adam Birch.  None.  You can't -- Doesn't happen.

7    They're not there.  So that explanation doesn't wash.

8    That explanation isn't true.

9            Let's talk a little bit about the -- about

10   the Government's witnesses.  I want you to consider

11   their testimony skeptically.  That's important.  It's

12   important that you look at their testimony and have a

13   healthy sense of "let's -- let's examine this

14   closely."

15           But you also have to follow the Court's

16   instructions that say "consider the other things."

17   Consider the corroboration.  Consider the other

18   testimony that you've heard and believe.  Consider

19   all of these other factors.  And I'd like you to do

20   that as well.  Right?

21           Is John Walgren's testimony corroborated by

22   text messages?  Yes.  Is it corroborated by call

23   logs?  Yes.

24           Is Eric Steve's testimony corroborated?

25   Yes.  It's corroborated by the officers'

1    observations.  It's corroborated by the fact that
2    heroin was taken out of his pocket.

3         Is Emily Nelson's testimony corroborated?
4    It's corroborated by the fact that the phone tolls
5    show that the defendant is the one that got ahold of
6    Adam Birch just like she said.  Just like she said,
7    she was the one that gave the number to Lo to get
8    ahold of Adam Birch.  That is a corroboration.

9         Does she have a problem with her testimony?
10   Of course.  Should you rely on her testimony alone?
11   Of course not.  And remember, you don't have to.  You
12   don't have to rely on her testimony alone.

13        Remember, when we did our list in voir dire,
14   we talked about how someone would prove who they say
15   that they are in order to have proof beyond a
16   reasonable doubt?  And we talked about -- And we
17   said, you know, at some point, you would say, "All
18   right.  A driver's license is enough."  Right?

19        Some people might still be skeptical.  And
20   then you could show another form of ID.  And then
21   most people would say, "Okay.  Yep.  You know what?
22   They've got two forms of ID.  I'm convinced."

23        But even if they're still skeptical, I could
24   bring in a witness to say that I was who I said I
25   was.  Right?

1          At some point, as you go down a list of
2     evidence of proof that you are who you say you are,
3     it no longer becomes reasonable to doubt.  In this
4     case, as we go down through a list of the evidence
5     that you have in front of you, it's no longer
6     reasonable to doubt.

7          It's no longer reasonable to doubt that he
8     was in a conspiracy to distribute heroin and crack
9     cocaine.  It's no longer reasonable to doubt that he
10    actually distributed heroin on February 1st.

11         It's no longer reasonable because we have
12    witness testimony, witnesses who participated in the
13    drug transactions with him.

14         And if you look at the witnesses, and you
15    say, "Well, I'm mostly convinced, but I'd like some
16    more."  Fine.  Then let's look at more.  Let's look
17    at the testimony of the expert witness, the officer
18    who said this is how the drug transactions occur.

19         "This is the investigations that we did.
20    This is what we observed.  This is what we saw.  This
21    is how things work in the heroin world."

22         Then you might say, "Well, yeah.  I'm a
23    little more convinced."  Then you have the phone
24    tolls.  You have the text messages.  You have all of
25    the other evidence that you have in this case.

1         You have the actual heroin that we seized.
2    You have, in fact, the testimony of the defendant.
3    The testimony of the defendant where he admits being
4    involved in a drug conspiracy.
5         He doesn't use those words, but he admits he
6    was going to re-up and come back here and sell.  And
7    eventually he even admitted that he knew that Adam
8    was -- you know, based on the text, maybe
9    redistributing as well.
10        That's your recollection characterization of
11   the testimony, not mine.  But recall what he said.
12   And he admitted it.  So you put him on the list.  And
13   you start going down.  And you say, "Okay.  Now, as
14   we look at all of the evidence, we don't have to rely
15   on Emily Nelson.  We can rely on the totality of the
16   evidence that the" Court -- or that the jury has
17   heard to make our determination.  And as we go down
18   the list, there is no other conclusion.
19        It would be wonderful if we didn't have to
20   rely on the Emily Nelsons of the world, but we didn't
21   pick the witnesses in this particular case.  He
22   picked the witnesses.
23        He picked the witnesses because those are
24   the folks that he decided to align himself with, that
25   he decided to sell heroin to, that he decided to sell

1    crack cocaine to.  He picked those witnesses.

2            So why -- Defense counsel said, "Why -- why

3    would -- why would he call afterwards?  Why would he

4    call -- or want somebody to contact Adam Birch if he

5    knew he was dead?"

6            Well, he might have heard he was dead, and

7    he was hoping it wasn't true.  And he thought, "Hold

8    on a second.  I'm not calling that phone.  I'm going

9    to distance myself from this.  I'm going to back away

10   from this.

11           "But let's have John Walgren do it.  Let's

12   have John Walgren do that."  That makes sense.  That

13   is within our reason and common sense.  It does not

14   make sense to say he's trying to collect a drug debt,

15   because he's never done it like that in the past.

16           Ladies and gentlemen of the jury, you've

17   heard the testimony.  You've heard the evidence.  The

18   evidence is clear.  I ask again that you return the

19   verdict that the evidence supports and that justice

20   demands:

21           And that is that this defendant is guilty of

22   a conspiracy to distribute heroin, guilty of a

23   conspiracy to distribute crack cocaine, guilty of a

24   conspir- -- or of distribution of heroin on -- on or

25   about February 1st of 2017.

1          Again, you don't have to find him guilty of
2     both crack cocaine and heroin, but the evidence amply
3     supports both of those.
4          Thank you, ladies and gentlemen of the jury.
5          THE COURT:  Thank you, Mr. Lammers.
6          That completes all of the closing arguments
7     in this case.
8          I do have some instructions for you, but our
9     court reporter has been plugging away here nonstop,
10    so I'm going to put you on a five-, maybe 10-minute
11    break, probably a five-minute break to give her a
12    little bit of a rest.
13          And then we'll have you back.  I'll read a
14    very short series of jury instructions to you that
15    will take about 10 minutes.  And then we'll submit
16    the case to you for deliberations.
17          And so we'll be on -- in recess for about
18    five, maybe 10 minutes.
19          THE CLERK:  All rise.
20          (Jury exits.)
21          THE COURT:  All right.  Please be seated.
22          Patrick, do we have the --
23          THE CLERK:  Sali should be on her way down
24    any minute.
25          THE COURT:  Okay.  We'll have these revised

Case 2:18-cr-01023-CJW-MAR   Document 105   Filed 07/15/19   Page 142 of 187

1    jury instructions -- or the verdict form down here.

2    We have not changed the jury instructions themselves,

3    but we have added a interrogatory after the verdict

4    form number one.  Everything else should be the same.

5            THE CLERK:  The final instruction includes

6    reference now to the interrogatory form.

7            THE COURT:  Instruction Number 23.

8            THE CLERK:  Yeah.

9            THE COURT:  Yeah.  All right.  And

10   Mr. Thompson reminded me, too, that Instruction

11   Number 23 will be changed because it does reference

12   the interrogatory form in addition to the verdict

13   forms.  So hopefully we'll have that for you in a

14   minute.

15           While we're waiting for Ms. VanWeelden to

16   get down here, Mr. Lammers, any other record that we

17   need made before we do final jury instructions?

18           MR. LAMMERS:  I don't think so, Your Honor.

19           THE COURT:  Mr. Goldensoph?

20           MR. GOLDENSOPH:  None that I know.

21           THE COURT:  All right.

22           MR. GOLDENSOPH:  Thank you.

23           MR. LAMMERS:  Thank you.

24           (An off-the-record discussion was held.)

25           THE COURT:  All right.  Let's go back on the

1   record.  And we're still outside the presence of the
2   jury in United States versus Stevenson, 18-CR-1023.
3           Mr. Lammers, has the Government had an
4   opportunity to review the revised final jury
5   instructions verdict form and interrogatory?
6           MR. LAMMERS:  Yes, Your Honor.
7           THE COURT:  Any objection?
8           MR. LAMMERS:  No, Your Honor.
9           THE COURT:  Thank you.
10          Mr. Goldensoph, have you and your client had
11  sufficient time to review them?
12          MR. GOLDENSOPH:  Yes, Your Honor.
13          THE COURT:  Any objection?
14          MR. GOLDENSOPH:  None.
15          THE COURT:  Thank you.
16          Any further record need to be made?
17          Mr. Lammers?
18          MR. LAMMERS:  No, Your Honor.
19          THE COURT:  Mr. Goldensoph?
20          MR. GOLDENSOPH:  No, Your Honor.
21          THE COURT:  All right.  Let's see if the
22  jury is ready to come back.
23          THE CLERK:  All rise.
24          (Jury enters.)
25          THE COURT:  All right.  Please be seated.

1        At this time I'll ask Mr. Thompson to pass

2   out to you the final jury instructions and verdict

3   forms.

4        (Jury instructions were read.)

5        THE COURT:  Ladies and gentlemen, that

6   completes the reading of the final instructions, the

7   verdict forms, and the interrogatory form.

8        It is now time for you to deliberate.  If

9   you recall, during jury selection, I told you that 12

10  jurors will decide the case.  And there is one

11  alternate.  And so we'll only have 12 of you actually

12  go back and deliberate in this case.  And one of you

13  is an alternate.  And that person is Nikki Lown, up

14  here in the upper left-hand corner.

15       If each of the rest of you feel that you are

16  healthy and nothing has come up that would keep you

17  from deliberating in this case, then we will excuse

18  Ms. Lown.  If one of you have some issue that would

19  keep you from deliberating, then Ms. Lown may step in

20  for you.

21       So with respect to any of the rest of you,

22  raise your hand if anything has come up that would

23  keep you from deliberating in this case.  I see no

24  hands.

25       So, Ms. Lown, you will be excused as a juror

1    in this case.  I will ask you, until the verdict

2    comes in, not to discuss this case with anybody else.

3    Don't do any research.

4           If, during deliberations, somebody was to

5    get sick or something like that, we may call upon you

6    to come back in.  We will let you know when the

7    verdict comes in.  And then you will be excused from

8    the admonitions I've previously composed on you.

9           If you are curious, we can also let you know

10   what the outcome of the verdict was.  When you go

11   back with the rest of the jurors into the jury room

12   in just a minute, please gather up your belongings,

13   and then you are free to leave.

14          But don't talk about your observations or

15   anything else with your fellow jurors.  You can say

16   goodbye to them, but don't talk about the case, if

17   you would.

18          All right.  Now, we've been going, as you

19   know, on an 8:30-to-2:30 schedule.  Once we give the

20   case over to the jury for deliberations, they set

21   their own schedule within the hours of the courthouse

22   hours.

23          And so if you want, as a jury, you can leave

24   at 2:30 today or you can deliberate until 5:00.  If

25   you choose to deliberate past 2:30, and up to 5:00

1    today, then you'll have to leave at 5:00, because the
2    courthouse closes down then.

3         And we have you come back the next morning
4    at 9:00 a.m., or 8:30, if you want to, to continue
5    your deliberations if you don't reach a verdict
6    today.

7         With that, we will send you back for your
8    deliberations at this time.

9         THE CLERK:  All rise.

10        (Jury exits.)

11        THE COURT:  Please be seated.

12        Mr. Lammers, any record we need to make?

13        MR. LAMMERS:  Yes, Your Honor.  I'm sorry I
14   didn't raise this earlier.  We forgot to make a
15   record on the 801(d)(2)(E).

16        There was only one, I believe.  That was the
17   testimony by -- I believe it was Emily Nelson, who
18   said something about the defendant using someone else
19   to distribute heroin.

20        And she gave some very vague testimony about
21   hearing from someone that Mr. Lo was delivering to
22   someone else, and then, frankly, it was half
23   incoherent.

24        But it was clearly, in my view, 801(d)(2)(E)
25   testimony about the source of drugs in the case.  And

1    so I think we need to make a record in regards to

2    that.

3              THE COURT:  Very good.

4              Mr. Goldensoph?

5              MR. GOLDENSOPH:  Well, recognizing, at this

6    point, it's a little too late, my recollection of

7    what Ms. Nelson says, she heard from one of her

8    friends that somebody else was working with

9    Mr. Stevenson.  And that one of the friends is not a

10   co-conspirator.  It's just -- just one of her

11   friends.

12             So I don't believe that qualifies.  And

13   so -- and so -- Yeah.  But again, I recognize, at

14   this point, I think, it's a little too late.

15             THE COURT:  Well, it wouldn't necessarily be

16   too late.  I mean, the rem- -- one of the remedies,

17   if it's not a correct co-conspirator statement, is to

18   either give further instructions to the jury or to do

19   a mistrial.  And so it's not too late.  We could

20   certainly address it.

21             Mr. Lammers, do you have a -- any response

22   to that?

23             MR. LAMMERS:  I don't.  Well, the record's

24   going to reflect what the record reflects.  I don't

25   want to go too much off of my recollection, but the

 1    idea that someone who was involved with Mr. Stevenson
 2    in drug trafficking and then tells another person who
 3    was involved with Mr. Stevenson in drug trafficking
 4    and is not a co-conspirator is not accurate.  And
 5    they don't have to be charged in the indictment.
 6    They don't have to be involved in any other way.
 7              The source of drugs is, in the Eighth
 8    Circuit, very clearly -- coming from someone who's
 9    involved in it, very clearly co-conspirator hearsay.
10              So when I talk to, for example, cocounsel,
11    if we were involved in drug cases, and I said, "Hey,
12    my supplier is Mr. Stevenson," that is classic
13    co-conspirator hearsay.
14              If Emily Nelson hears from someone else
15    who's involved with Mr. Stevenson, that's
16    co-conspirator hearsay.  It's almost the definition
17    of it.
18              THE COURT:  All right.
19              MR. GOLDENSOPH:  Your Honor, if I could just
20    respond to that.
21              THE COURT:  Yeah.
22              MR. GOLDENSOPH:  That -- That's not exactly
23    what I was saying.  I was saying that the alleged
24    co-conspirator said to Emily Nelson's friend, "Hey,
25    I'm working with Stevenson now."  And then the friend

1   said to Emily that, "Hey, this guy's working with Lo

2   now." And what I'm saying is that the -- there's no

3   exception for what the friend told to Ms. Nelson.

4          That's my recollection. I could be way off

5   base, but that's -- that's the way I recall it.

6          THE COURT: Very good. First of all, I'm

7   not so sure that is even hearsay. My recall of the

8   testimony was, the questions were being put to her to

9   have her explain how the connection was made up

10  ultimately with the defendant in this case.

11         And so it wasn't necessarily offered for the

12  truth of the matter asserted as much as to establish

13  how the connections were made and, ultimately, any

14  future transactions took place.

15         But even if it was a statement that would

16  fall under the hearsay definition, I find that it

17  does qualify as a co-conspirator statement. The

18  original statement was clearly made -- Even if there

19  was an intermediary, it was made by a person who was

20  involved in the drug trade with the defendant as part

21  of a chain of people involved in distributing and

22  buying drugs.

23         As Mr. Lammers notes, the Eighth Circuit is

24  very clear that identifying the source of supply is a

25  statement made within the course of and in

1    furtherance of the drug conspiracy because it allows

2    members to find out who they can get their drugs from

3    and who a source of supply might be.

4          The intermediary that may have passed on the

5    information from the friend to Ms. Nelson, from the

6    circumstantial evidence, there wouldn't have been a

7    motive for that person to have passed on that

8    information unless they, too, were involved in the

9    use of heroin.

10         And my recollection was -- is vague on this,

11    but my recollection was, under the circumstances of

12    that conversation, that was certainly implied that

13    that person was involved.

14         But even if that person was not involved,

15    they were merely passing on a message from somebody

16    who made the co-conspirator statement on to Ms.

17    Nelson.

18         And so that intermediary that Ms. Nelson

19    testified to was not -- her statement was not being

20    offered for the truth of the matter asserted.  It's

21    the underlying statement that would have been offered

22    if there is even a truth in the matter asserted, the

23    truth being that the defendant is the source of

24    supply for heroin.

25         So under the Bell analysis, I find that it

 1    was a statement made -- If it is hearsay, I find that
 2    it's a statement made by a co-conspirator during the
 3    course of the conspiracy and in furtherance of the
 4    conspiracy.  So that will be my Bell ruling.
 5            All right.  Mr. Lammers, anything else?
 6            MR. LAMMERS:  No, Your Honor.  I'm sorry I
 7    didn't bring that to the Court's attention earlier.
 8            THE COURT:  And it was even in my notes.
 9    And it was my responsibility to bring that up, but
10    I forgot to do it at the right time.  So --
11            Mr. Goldensoph, anything further?
12            MR. GOLDENSOPH:  No, Your Honor.
13            THE COURT:  All right.  Mr. Stevenson, I
14    have no idea how the jury's going to come out on
15    this, but I think you should be very pleased.  I
16    think your attorney did an outstanding job in
17    representing you in this case.  And you couldn't have
18    asked for a better counsel.
19            THE DEFENDANT:  I agree.
20            THE COURT:  All right.  And the case was
21    well-tried on both sides.  And so I appreciate how
22    well everybody tried the case and how efficiently it
23    was done.
24            If you could make sure that you remain
25    within a 10-minutes' arrival time to the courthouse

 1     in case we have a question.  I don't want to keep the

 2     jury waiting.  And then, also, make sure that you get

 3     contact information, cell phone numbers, to

 4     Mr. Thompson so that we can get you -- get in touch

 5     with you promptly.

 6              And then, Mr. Lammers, here's your notebook.

 7     I'll give it back to recycle with the Government's

 8     exhibits so that the Government saves money.

 9              MR. LAMMERS:  Thank you, Your Honor.

10              THE COURT:  All right.  Thank you.

11              We're in recess.

12              (Recessed 12:32 p.m.; resumed 3:31 p.m.)

13              THE COURT:  All right.  Counsel, have you

14     had enough time to review this?

15              MR. GOLDENSOPH:  Yes, Your Honor.

16              THE COURT:  Okay.  So let's go on the record

17     in the United States of America versus Michael

18     Stevenson, Case Number 18-CR-1023.  We are outside

19     the presence of the jury.

20              At about 3:15 we received a note from the

21     jury that has a question.  The question reads, "Can

22     we get a clarification of, quote, on or about, end

23     quote, question mark."  And then it says, I think,

24     "EX" -- meaning "example" -- "two to three paths'

25     window around midnight or within a one- to two-day

1    period, question mark."  Or I'm sorry.  "Two or three

2    hours' window around midnight or within a one- to

3    two-day period, question mark.

4         "If it is in reference to days, then

5    distinction between Counts 2 and 3 with overlapping

6    days, question mark."  And it's signed by Sean

7    Stelken.  And I guess I don't have the chart anymore,

8    but apparent -- and perhaps another juror above that.

9    It looks like two signatures.

10        I have also handed out to counsel a copy of

11   the note, but also a draft of my proposed response,

12   which is:  "I have received your note, a copy of

13   which is attached.  Please reread the instructions

14   and continue to deliberate."

15        Mr. Lammers, what are your thoughts?

16        MR. LAMMERS:  I have a couple of thoughts.

17   Number one, I -- I agree that we should not define

18   the "on or about."  It is defined in the jury

19   instruction.

20        But I also think that we could explain to

21   them that there are two distinct distributions

22   alleged.  They're asking, is the distribution on

23   February 2nd the same as the distribution of February

24   1.  And that may not be accurate with the drafting,

25   but I think it could be interpreted that way.  It

1    could be the splash over that way.

2         So I think we can tell them both "I received

3    your note, a copy of which is attached.  Please read

4    the instructions again and continue to deliberate.

5    As to the second part of your question, there are two

6    distinct distributions alleged in the indictment."

7         But I can't say that I'm strongly advocating

8    that.  I -- I don't know.  I -- I don't know.

9    It's -- it's -- it's a little bit of a confusing

10   note, frankly.

11        Perhaps, on reflection, the best way to do

12   it is, is do it the way you proposed and just say "Go

13   back and read the instruction."

14        THE COURT:  Mr. Goldensoph?

15        MR. GOLDENSOPH:  To be honest with you, I

16   kind of like Mr. Lammers' idea about to clarify that

17   there are two distinct distributions alleged.  I -- I

18   agree with Mr. Lammers that I'm not entirely certain

19   how you would craft that response, but it does seem

20   like -- appropriate.

21        MR. LAMMERS:  And my only problem with --

22   Even though I did suggest it, my only problem with

23   it, as I look at this note again, then, it -- it

24   means we're -- we are defining a time for them.

25        Because they reference that, saying, "Is

 1   it" -- "If it is in days, then is there the overlap?"

 2   And then we end up having to answer that question,

 3   even though it's inadvertent, rather than having the

 4   jury instruction answer the question.

 5           And so based on that, I think I would

 6   withdraw my suggestion.  I think sending them back

 7   and saying, "Reread the jury instruction" is the

 8   appropriate way to go at this point.  And then,

 9   perhaps, if we -- they come out again with -- with

10   another question, we may have to look at crafting

11   something else.

12           THE COURT:  Mr. Goldensoph?

13           That is -- Just to share with you

14   my thoughts, that was my concern as well, is because

15   the second sentence references the first sentence,

16   which requests us to define "on or about."  And so --

17   because they say, "if it is in reference to days."

18           And so if we then try to tell them that

19   Counts 2 and 3 are distinct counts, and try to

20   emphasize that in some way, it appears to be

21   attempting to give them a further definition of "on

22   or about," which we've already defined in the

23   instructions.  So I'm hesitant to do anything more

24   than what I've proposed.

25           But, Mr. Goldensoph, what are your thoughts?

1          MR. GOLDENSOPH:  Well, I -- I -- I guess I
2     still like the idea of putting that in there.  It --
3     I -- It seems to me like there would be a way to do
4     that without, like, making it seem like we're
5     defining "on or about."
6          Again, I apologize.  I don't have any great
7     ideas other than maybe, you know, the thing that
8     keeps popping in my mind would be maybe to say
9     something like -- Again, I -- maybe this is too --
10    too much, but perhaps something like to clarify there
11    are -- Counts 2 and 3 are two distinct allegations.
12    I don't know.
13         THE COURT:  Well, I -- I don't think that we
14    should attempt to further define this.  And it's
15    clear that Counts 2 and 3 are two distinct
16    allegations.  They have separate verdict forms for
17    them.  They're in separate counts.
18         I don't know how much more separate we can
19    tell them that there already are two different
20    allegations being made on two distinct assertions of
21    distribution.
22         So as -- as puzzling as this note seems, I
23    think the only appropriate remedy will be to send
24    this back as I proposed and just tell them to go back
25    and reread the instructions and continue to

1   deliberate.  So that's my ruling.

2            Mr. Lammers or Mr. Goldensoph, either one of

3   you, if you want to make a record voicing an

4   objection to my ruling, that's fine.

5            Mr. Lammers?

6            MR. LAMMERS:  No.  I've come completely

7   around.  I think that's the appropriate way to go.

8   And I have no objection.

9            THE COURT:  Mr. Goldensoph?

10           MR. GOLDENSOPH:  Any -- any -- Yes.

11  Objection just based on what I've previously stated.

12           THE COURT:  Very good.

13           All right.  So I have signed this additional

14  jury instruction and dated it 25th of April, 2019.

15  And I'll have Mr. Thompson, then, deliver this to the

16  jury.

17           Anything else, Mr. Lammers?

18           MR. LAMMERS:  No.  Thank you.

19           THE COURT:  Mr. Goldensoph?

20           MR. GOLDENSOPH:  No, Your Honor.

21           THE COURT:  All right.  We will be in

22  recess.

23           (Recessed 3:42 p.m.; resumed 4:19 p.m.)

24           THE COURT:  All right.  Counsel, are we

25  ready for the jury?

1        MR. GOLDENSOPH:  Yes, Your Honor.

2        MR. LAMMERS:  Yes, Your Honor.

3        (Jury enters.)

4        THE COURT:  All right.  Please be seated.

5        We are back in the matter of United States

6    of America versus Michael Stevenson, Case Number

7    18-CR-1023.

8        I understand that the jury has a verdict; is

9    that correct?

10        JURY FOREPERSON:  It is, Your Honor.

11        THE COURT:  All right.  And I see -- Is it

12    Mr. Hansen?

13        JURY FOREPERSON:  Correct.

14        THE COURT:  All right.  Appears to be

15    holding the folder.  So Mr. Thompson will retrieve

16    that from you.

17        All right.  I am now going to read the

18    verdict.

19        "Verdict Form Count 1:  We, the jury,

20    unanimously find the defendant, Michael Stevenson,

21    guilty of the crime charged in Count 1 of the

22    indictment.

23        "Interrogatory Form Count 1:  As to the

24    question, we, the jury, unanimously and beyond a

25    reasonable doubt find that the object of the

1    conspiracy, as committed by the defendant, Michael

2    Stevenson, was to distribute:"  and both heroin and

3    cocaine base have been checked.

4         "Verdict Form Count 2:  We, the jury,

5    unanimously find the defendant, Michael Stevenson,

6    guilty of the crime charged in Count 2 of the

7    indictment.

8         "Verdict Form Count 3:  We, the jury,

9    unanimously find the defendant, Michael Stevenson,

10   guilty of the crime charged in Count 3 of the

11   indictment.

12        "Verdict Form Count 4:  We, the jury,

13   unanimously find the defendant, Michael Stevenson,

14   guilty of the crime charged in Count 4 of the

15   indictment."

16        And "Verdict Form Count 5:  We, the jury,

17   unanimously find the defendant, Michael Stevenson,

18   guilty of the crime charged in Count 5 of the

19   indictment."

20        Now, ladies and gentlemen of the jury, I'm

21   going to do what's called polling the jury.  What

22   that means is I'm going to go through and read out

23   your names, and I'm going to ask you if these

24   verdicts of guilty on all counts in the interrogatory

25   form was, in fact, your verdict just to make sure we

```
1    don't have any mistakes.

2              And so, Ms. Davis, was this your verdict?

3              JUROR DAVIS:  Yes.

4              THE COURT:  And, Mr. Bodensteiner, is that

5    your verdict?

6              JUROR BODENSTEINER:  Yes.

7              THE COURT:  And, Ms. Gerard, is that your

8    verdict?

9              JUROR GERARD:  Yes.

10             THE COURT:  Mr. Hansen, was this your

11   verdict?

12             JUROR HANSEN:  Yes.

13             THE COURT:  Ms. Gorter, was this your

14   verdict?

15             JUROR GORTER:  Yes.

16             THE COURT:  Ms. -- Or, Mr. Stelken, was that

17   your verdict?

18             JUROR STELKEN:  Yes.

19             THE COURT:  And, Ms. Stephenson, was this

20   your verdict?

21             JUROR STEPHENSON:  Yes.

22             THE COURT:  Ms. Koch, was this your verdict?

23             JUROR KOCH:  Yes.

24             THE COURT:  Ms. Francik, was this your

25   verdict?
```

```
1            JUROR FRANCIK:  Yes.

2            THE COURT:  Mr. Elzey, is this your verdict?

3            JUROR ELZEY:  Yes.

4            THE COURT:  And, Ms. Freitag, was this your

5    verdict?

6            JUROR FREITAG:  Yes.

7            THE COURT:  And, Ms. Mooney, was this your

8    verdict?

9            JUROR MOONEY:  Yes.

10            THE COURT:  All right.  Thank you, ladies

11   and gentlemen of the jury.  You have now completed

12   your service as jurors.

13            We deeply -- The Court deeply appreciates

14   your service in this case.  The admonition I

15   previously imposed on you is now lifted.  You are

16   free to talk to anybody you want or nobody about this

17   case.

18            There is a local rule that prohibits the

19   parties from contacting you, so you won't be getting

20   any calls from the lawyers, or anything like that,

21   asking you questions.

22            But you're free to talk to anybody you want

23   to about this case, look up anything you want to from

24   here on.  You're lifted from all the admonitions.

25            I do thank you for your service.  I do have
```

1   questionnaires that I hand out to jurors after

2   trials.  The questions ask you things about the way

3   we do work in this courtroom to try to make jury

4   service a little bit better.

5           You -- They're self-addressed stamped

6   envelopes.  You don't have to fill them out.  But I

7   like to hand those out afterwards.  But you're

8   actually free to leave now.

9           If you can stick around for a few minutes, I

10  have some things I have to take care in the

11  courtroom, and then I'll come back and hand these

12  out.  But you don't have to stick around.  You're

13  free just to take off right now if you like.

14          If you stick around for a few minutes, it

15  shouldn't take more than five minutes, and I'll be

16  back there to hand out these questionnaires.  But

17  again, thank you very much for your service in this

18  case.  And you are now discharged as jurors.

19          THE CLERK:  All rise.

20          (Jury exits.)

21          THE COURT:  All right.  Please be seated.

22          The Court accepts the verdicts by the jury.

23          Mr. Stevenson, let me talk to you about

24  what's going to happen next.  The probation office

25  will now draft up a Presentence Investigation Report.

1    They'll thoroughly investigate this case and your

2    background, and they'll draft up a report that

3    they'll then submit to both you and the Government.

4           This draft report, it's very important that

5    you go over it carefully with Mr. Goldensoph and

6    point out to him any errors or mistakes you see in it

7    so he can bring those to the attention of the

8    probation office to get them corrected.

9           Because at the time of sentencing, I'm going

10   to rely very heavily on what's written in that report

11   to try to figure out what the most appropriate

12   sentence should be.  So it's in your best interest to

13   work closely with Mr. Goldensoph to make sure that

14   any errors are corrected.

15          Once the probation office makes -- corrects

16   any errors, then the probation officer will issue a

17   final Presentence Investigation Report.  You'll get a

18   copy again, as will the Government.  And then this

19   matter will be set -- I'll get a copy, and then I'll

20   schedule the matter for a sentencing hearing.

21          Between now and the time that that

22   Presentence Investigation Report comes out -- and it

23   usually takes 60 to 70 days or so -- you may not hear

24   much from Mr. Goldensoph.  And it's not because he's

25   suddenly given up on you or doesn't care about you or

1   is not working for you.  There's just not much for

2   him to do between now and the time that that report

3   comes out.

4           So when you get close to trial, attorneys

5   work very closely, and they're almost in constant

6   contact with their clients.  And then that's going to

7   fall off here for a little bit.  And that's just

8   because there's not much that Mr. Goldensoph has to

9   communicate.

10          But I guarantee Mr. Goldensoph will

11  communicate with you about anything that happens in

12  court; any motions that are filed, or anything like

13  that, he'll be in touch with you.  And then when that

14  report comes out, he'll go over it very thoroughly

15  with you at that time.

16          All right.  Mr. Lammers, anything further on

17  behalf of the United States?

18          MR. LAMMERS:  No.  Thank you, Your Honor.

19          THE COURT:  Mr. Goldensoph?

20          MR. GOLDENSOPH:  Nothing, Your Honor.

21          THE COURT:  All right.  Thank you.

22          This matter is in recess.

23          (The record concluded April 25, 2019, at

24  4:27 p.m.)

25                  *    *    *    *    *

```
 1                    CERTIFICATE
 2           I, the undersigned, a Certified Shorthand
 3    Reporter and Notary Public of the State of Iowa, do
 4    hereby certify that I acted as the Certified
 5    Shorthand Reporter in the foregoing matter at the
 6    time and place indicated herein; that I took in
 7    shorthand the proceedings had at said time and place;
 8    that said shorthand notes were reduced to print under
 9    my supervision and direction by means of
10    computer-aided transcription; and that the foregoing
11    pages are a full and correct transcript of the
12    shorthand notes so taken.
13
14           IN WITNESS WHEREOF, I have hereunto set my
15    hand this 10th day of July, 2019.
16
17
18
19    _____
20    Sarah J. Dittmer
21    Certified Shorthand Reporter
22
23
24
25
```

*Sarah J. Dittmer, CSR, RPR*
*1(888)388-2723*

## $

**$140** [3] - 451:1, 451:6, 479:8
**$160** [3] - 402:24, 402:25, 403:2
**$20** [1] - 458:18
**$200** [3] - 403:3, 451:24, 479:7
**$210** [1] - 485:5
**$50** [2] - 402:24, 450:4
**$600** [1] - 403:1
**$70** [1] - 451:16
**$80** [3] - 402:24, 454:16, 454:18
**$800** [1] - 403:2

## '

**'17** [1] - 422:11
**'Hey** [1] - 481:22

## 0

**05** [1] - 512:25

## 1

**1** [15] - 394:20, 407:17, 418:10, 422:9, 476:24, 486:25, 496:21, 497:9, 499:8, 512:21, 519:23, 547:24, 552:19, 552:21, 552:23
**1-30-2017** [1] - 425:21
**10** [13] - 407:5, 418:24, 437:1, 484:5, 489:16, 490:20, 498:2, 503:23, 506:15, 513:6, 513:7, 535:15, 535:18
**10-minute** [1] - 535:10
**10-minutes'** [1] - 545:25
**10:15** [1] - 473:25
**10:35** [3] - 473:17, 473:23, 473:25
**11** [2] - 477:6, 477:11
**111** [1] - 394:20
**11:57** [1] - 506:6
**11th** [1] - 493:5
**12** [6] - 430:7, 467:7, 480:12, 480:14, 538:9, 538:11

**12:03** [1] - 506:7
**12:32** [1] - 546:12
**12:45** [1] - 486:4
**12th** [3] - 394:25, 459:16, 496:2
**13** [1] - 425:8
**130** [3] - 428:7, 446:21, 524:4
**132** [1] - 466:22
**1355** [1] - 436:10
**140** [4] - 450:12, 450:22, 485:3
**1496** [1] - 435:13
**15** [7] - 407:5, 437:1, 437:6, 437:10, 437:15, 453:16, 482:17
**15th** [1] - 440:17
**16** [2] - 427:19, 506:18
**166** [1] - 427:15
**18-CR-1023** [8] - 394:4, 396:7, 400:9, 421:1, 474:16, 537:2, 546:18, 552:7
**1910** [1] - 467:4
**1st** [31] - 409:19, 413:14, 413:22, 417:7, 423:23, 423:24, 428:5, 429:20, 431:20, 440:4, 448:8, 448:13, 448:14, 452:25, 453:21, 487:16, 487:18, 487:20, 501:7, 501:23, 503:20, 505:21, 505:24, 508:16, 508:24, 509:14, 510:4, 515:21, 524:14, 532:10, 534:25

## 2

**2** [22] - 409:11, 410:8, 413:13, 416:10, 418:10, 423:8, 423:22, 476:24, 486:20, 486:25, 487:15, 496:23, 497:9, 501:6, 519:23, 547:5, 549:19, 550:11, 550:15, 553:4, 553:6
**2-1-2017** [1] - 430:14
**20** [13] - 401:10, 440:16, 463:11, 471:14, 473:15, 473:16, 473:17, 473:18, 473:21, 490:3, 509:18
**20-minute** [1] - 471:3
**200** [4] - 423:8, 479:10, 479:11, 485:8
**2013** [1] - 398:2
**2015** [1] - 460:18
**2016** [4] - 398:3, 398:9, 403:24, 410:23
**2017** [22] - 401:11, 403:25, 404:19, 408:15, 408:22, 422:11, 422:12, 423:23, 423:24, 431:20, 433:23, 434:2, 434:7, 500:25, 501:7, 505:22, 510:11, 534:25
**2018** [2] - 398:3, 398:11
**2019** [5] - 394:11, 394:25, 394:25, 551:14, 558:23
**2023** [1] - 486:1
**210** [1] - 479:11
**22nd** [6] - 435:17, 436:4, 461:19, 461:22, 463:1, 463:17
**23** [2] - 536:7, 536:11
**2388** [2] - 455:9, 455:14
**2392** [1] - 457:11
**23rd** [3] - 404:19, 434:2, 434:7
**24/7** [1] - 528:1
**25** [1] - 558:23
**25th** [5] - 394:10, 461:20, 463:9, 463:17, 551:14
**26** [1] - 440:5
**28** [1] - 440:5
**29** [7] - 407:14, 414:15, 414:19, 418:9, 453:17, 472:24, 489:16
**2:30** [2] - 539:24, 539:25
**2nd** [16] - 432:5, 433:23, 440:4, 448:8, 448:10, 448:15, 448:16, 448:19, 454:25, 455:1, 455:24, 496:24, 510:11, 514:10, 514:20, 547:23

## 3

**3** [18] - 394:6, 410:11, 418:12, 433:22, 476:12, 484:3, 486:20, 486:21, 496:25, 497:10, 547:5, 549:19, 550:11, 550:15, 553:8, 553:10
**3032** [1] - 450:21
**30th** [5] - 425:17, 433:10, 433:19, 508:11, 508:12
**31** [1] - 430:12
**314** [1] - 425:18
**31st** [11] - 413:17, 426:9, 428:5, 428:6, 446:20, 506:1, 506:3, 506:10, 506:13, 508:12, 523:24
**320** [1] - 433:11
**3374** [1] - 429:6
**340** [1] - 449:25
**35** [5] - 428:11, 489:3, 504:17, 507:10
**39** [6] - 409:21, 430:23, 489:13, 489:17, 508:25, 509:1
**3935** [2] - 442:15, 442:23
**3:15** [1] - 546:20
**3:31** [1] - 546:12
**3:42** [1] - 551:23
**3rd** [4] - 404:2, 440:19, 440:24, 441:4

## 4

**4** [9] - 410:11, 434:2, 476:12, 484:4, 486:21, 496:25, 497:10, 553:12, 553:14
**4,800** [3] - 492:7, 492:8, 524:17
**401** [1] - 395:4
**404** [1] - 395:5
**421** [1] - 395:7
**425** [1] - 394:22
**434** [2] - 395:8, 465:12
**45** [1] - 500:19
**466** [1] - 395:9
**468** [1] - 395:10
**4:19** [1] - 551:23

**4:27** [1] - 558:24
**4:30** [1] - 399:15
**4:35** [1] - 506:16
**4:41** [3] - 427:21, 428:3, 428:15, 428:16, 507:8
**4:42** [1] - 507:8
**4:50** [2] - 488:22, 488:25
**4th** [2] - 442:17, 442:22

## 5

**5** [11] - 410:11, 418:12, 434:6, 476:12, 481:22, 486:21, 496:25, 497:10, 513:4, 553:16, 553:18
**50** [6] - 446:21, 449:22, 449:25, 450:2, 500:19, 506:23
**51101** [1] - 394:17
**52401** [2] - 394:20, 394:23
**5:00** [3] - 539:24, 539:25, 540:1
**5:13** [2] - 428:10, 507:10

## 6

**60** [2] - 458:12, 557:23
**60's** [1] - 458:16
**600** [1] - 394:16
**66** [1] - 429:20
**670** [1] - 394:16
**6th** [6] - 440:3, 440:20, 441:6, 441:8, 525:7

## 7

**70** [5] - 450:13, 451:11, 479:9, 485:5, 557:23
**7:10** [1] - 467:6

## 8

**8** [1] - 466:21
**80** [5] - 450:1, 458:15, 458:16, 458:17, 526:2
**801(d)(2)(E** [1] - 540:24

**801(d)(2)(E)** [1] - 540:15
**803** [1] - 394:22
**8:30** [1] - 540:4
**8:30-to-2:30** [1] - 539:19
**8:31** [1] - 394:11

# 9

**9:00** [1] - 540:4
**9:01** [1] - 419:3
**9:06** [1] - 419:3
**9th** [5] - 394:25, 429:2, 440:21, 441:9, 525:9

# A

**a.m** [7] - 394:11, 419:3, 473:25, 506:7, 540:4
**ability** [6] - 503:3, 520:19, 520:25, 521:1, 522:13, 524:23
**able** [7] - 403:1, 403:4, 416:24, 428:23, 502:7, 513:1, 513:8
**absolutely** [2] - 437:16, 477:16
**abuser** [1] - 446:3
**abuser's** [1] - 445:20
**accept** [1] - 416:14
**accepts** [1] - 556:22
**access** [2] - 521:24, 524:22
**according** [1] - 459:6
**account** [1] - 494:1
**accurate** [3] - 439:19, 542:4, 547:24
**accurately** [1] - 412:1
**accuses** [1] - 422:9
**accustomed** [1] - 511:11
**acknowledgement** [1] - 417:17
**acknowledges** [1] - 416:12
**acquit** [1] - 499:5
**acquittal** [3] - 407:14, 418:9, 418:11
**act** [1] - 497:23
**acted** [1] - 559:4
**acting** [1] - 518:8
**actual** [5] - 413:17, 514:12, 525:7, 525:18, 533:1
**Adam** [97] - 401:25,

402:3, 413:24, 423:23, 423:24, 424:1, 424:9, 424:20, 429:23, 430:9, 439:6, 439:19, 442:16, 442:25, 444:7, 444:11, 445:12, 446:16, 446:20, 447:23, 448:11, 448:22, 449:6, 449:13, 452:25, 453:21, 454:13, 456:16, 456:21, 457:1, 457:23, 457:24, 458:24, 469:17, 469:24, 479:2, 479:3, 482:7, 483:14, 483:16, 483:17, 484:18, 484:19, 484:22, 485:7, 485:12, 485:24, 486:2, 487:18, 487:20, 488:12, 488:21, 489:2, 489:5, 490:5, 490:7, 490:14, 490:15, 490:18, 491:19, 492:8, 492:18, 492:20, 492:22, 493:18, 493:19, 494:4, 494:22, 494:24, 495:2, 495:5, 501:7, 509:24, 510:10, 514:22, 516:10, 516:11, 516:18, 517:1, 518:21, 525:8, 525:14, 526:15, 526:18, 526:19, 527:3, 527:5, 528:16, 529:11, 529:19, 529:25, 530:6, 531:6, 531:8, 533:7, 534:4
**Adam's** [3] - 448:5, 493:24, 526:10
**add** [1] - 513:13
**add-on** [1] - 513:13
**added** [1] - 536:3
**addict** [2] - 502:14, 503:5
**addicted** [2] - 502:15, 503:11
**addicts** [1] - 496:10
**addition** [3] - 415:22, 502:13, 536:12
**additional** [1] - 551:13
**address** [6] - 398:8,

410:11, 523:16, 523:19, 523:20, 541:20
**addressed** [2] - 398:10, 556:5
**adjust** [1] - 421:16
**admission** [1] - 478:22
**admissions** [2] - 478:23, 478:24
**admit** [3] - 486:11, 486:12
**admits** [3] - 496:4, 533:3, 533:5
**admitted** [8] - 475:17, 476:5, 476:17, 485:21, 495:21, 510:13, 533:7, 533:12
**admonition** [2] - 471:15, 555:14
**admonitions** [2] - 539:8, 555:24
**adverse** [1] - 499:18
**advertisements** [1] - 487:13
**advocating** [1] - 548:7
**African** [1] - 481:19
**African-American** [1] - 481:19
**afternoon** [2] - 400:10, 488:25
**afterwards** [5] - 490:16, 491:5, 530:2, 534:3, 556:7
**agent** [1] - 522:1
**ago** [6] - 401:6, 461:25, 462:2, 462:16, 470:1, 504:5
**agree** [13] - 437:22, 440:25, 455:4, 456:1, 462:11, 464:1, 467:3, 467:23, 482:16, 498:5, 545:19, 547:17, 548:18
**agreed** [7] - 401:20, 402:3, 402:5, 462:3, 462:22, 478:18, 486:11
**agreeing** [2] - 412:10, 479:25
**agreement** [27] - 408:2, 408:4, 415:19, 422:20, 428:24, 477:13, 478:3, 478:8, 478:19, 479:21, 479:22, 479:24, 480:15, 481:9,

481:25, 482:1, 482:11, 482:13, 482:15, 483:1, 483:2, 483:4, 483:8, 483:18, 486:17, 487:12, 489:12
**agreements** [1] - 487:9
**ahead** [3] - 454:15, 493:22, 503:21
**ahold** [24] - 432:7, 432:8, 432:25, 436:9, 441:24, 447:23, 447:25, 448:1, 449:1, 456:16, 456:21, 457:1, 463:8, 490:22, 490:23, 514:22, 515:19, 516:17, 529:25, 530:1, 531:5, 531:8
**aided** [1] - 559:10
**ain't** [3] - 424:13, 451:24, 485:8
**air** [1] - 461:15
**aka** [1] - 430:10
**Alcatel** [1] - 492:13
**alert** [1] - 522:17
**align** [1] - 533:24
**allegation** [1] - 501:6
**allegations** [4] - 422:9, 550:11, 550:16, 550:20
**allege** [1] - 522:10
**alleged** [5] - 407:19, 542:23, 547:22, 548:6, 548:17
**alleges** [4] - 423:22, 433:22, 434:2, 434:6
**allow** [1] - 418:22
**allowed** [2] - 414:2, 488:5
**allows** [1] - 544:1
**almost** [3] - 507:8, 542:16, 558:5
**alone** [3] - 415:20, 531:10, 531:12
**alternate** [2] - 538:11, 538:13
**altogether** [1] - 428:7
**America** [7] - 394:3, 396:6, 400:8, 420:25, 474:15, 546:17, 552:6
**American** [1] - 481:19
**amount** [13] - 411:16, 411:18, 436:24, 436:25, 437:17, 446:2, 461:8, 482:18, 498:9,

498:10, 510:18, 512:25, 513:1
**amounts** [4] - 402:22, 402:24, 477:25, 478:5
**amply** [1] - 535:2
**analysis** [1] - 544:25
**angels** [1] - 419:16
**Angie** [3] - 459:24, 460:3, 491:22
**angle** [2] - 472:10, 472:14
**answer** [6] - 446:11, 446:12, 487:17, 491:17, 549:2, 549:4
**answering** [1] - 432:10
**anticipate** [4] - 396:21, 406:25, 470:18, 488:13
**apologize** [7] - 431:10, 459:17, 459:20, 468:11, 492:5, 513:6, 550:6
**apparent** [1] - 547:8
**appear** [2] - 426:10, 524:13
**Appearances** [1] - 394:15
**appreciate** [5] - 399:9, 420:10, 472:19, 484:13, 545:21
**appreciates** [1] - 555:13
**approach** [2] - 405:11, 520:4
**appropriate** [5] - 548:20, 549:8, 550:23, 551:7, 557:11
**April** [3] - 394:11, 551:14, 558:23
**area** [1] - 403:10
**argue** [3] - 505:7, 505:18, 505:20
**argued** [2] - 508:23, 508:25
**argument** [10] - 414:13, 416:13, 475:5, 475:7, 475:10, 497:4, 520:1, 520:11, 523:14, 529:20
**arguments** [7] - 397:12, 471:1, 471:4, 471:17, 474:19, 522:19, 535:6
**arrange** [2] - 398:18, 453:24

arrangements [3] - 489:19, 490:6, 524:1
arranging [1] - 490:11
arrested [6] - 444:21, 444:22, 444:24, 444:25, 445:8, 518:18
arrival [5] - 426:18, 426:19, 429:17, 432:2, 545:25
arriving [1] - 509:23
asserted [3] - 543:12, 544:20, 544:22
assertions [1] - 550:20
Assistant [1] - 394:19
assume [1] - 463:5
assumption [2] - 458:1, 458:3
attached [2] - 547:13, 548:3
attempt [1] - 550:14
attempting [2] - 417:13, 549:21
attention [10] - 419:9, 419:20, 426:8, 427:14, 429:2, 430:12, 433:10, 433:22, 545:7, 557:7
attorney [5] - 396:17, 499:22, 500:14, 529:21, 545:16
Attorney [1] - 394:22
attorneys [1] - 558:4
Attorneys [1] - 394:19
August [4] - 403:24, 404:18, 434:2, 434:7
available [2] - 417:19, 482:8
Avenue [1] - 394:20
avoid [1] - 502:19
avoiding [1] - 516:11
aware [3] - 411:8, 448:4, 448:12

**B**

background [1] - 557:2
bad [10] - 401:15, 406:17, 406:18, 463:10, 493:21, 493:24, 494:2, 494:5, 494:9, 518:15
bag [8] - 423:6, 514:12, 527:22, 528:18, 529:5, 529:12, 529:17
baggage [2] - 500:12,

500:17
Baggie [4] - 510:11, 511:12, 511:25, 512:1
Baggies [9] - 423:11, 510:7, 510:8, 510:9, 511:12, 511:15, 511:16, 511:18, 511:23
bagging [1] - 511:11
bags [10] - 423:8, 494:18, 514:9, 527:21, 528:5, 528:6, 528:21, 528:22, 528:24
ballot [1] - 522:21
bang [1] - 513:24
base [5] - 477:15, 477:18, 478:5, 543:5, 553:3
based [5] - 427:2, 477:23, 533:8, 549:5, 551:11
basic [1] - 412:11
basing [1] - 426:22
batch [1] - 465:19
becomes [3] - 487:15, 527:6, 532:3
begin [1] - 518:16
beginning [2] - 440:13, 440:18
behalf [3] - 406:12, 473:9, 558:17
behind [2] - 499:19, 500:12
believes [1] - 416:8
Bell [3] - 413:3, 544:25, 545:4
belongings [1] - 539:12
below [3] - 442:22, 451:12, 487:8
benefit [2] - 471:7, 509:20
best [7] - 438:8, 438:9, 444:10, 500:4, 518:13, 548:11, 557:12
bet [2] - 454:21, 457:9
better [5] - 467:1, 514:5, 514:6, 545:18, 556:4
between [36] - 408:14, 409:16, 415:19, 417:6, 417:8, 422:10, 422:12, 425:4, 425:12, 430:9, 448:6, 454:1, 455:5, 466:18, 468:24, 478:4,

488:10, 494:22, 494:23, 501:20, 501:22, 502:5, 503:23, 506:13, 507:9, 508:10, 508:24, 509:18, 514:20, 522:22, 527:3, 527:5, 530:5, 547:5, 557:21, 558:2
beyond [18] - 409:23, 418:7, 476:22, 477:2, 480:18, 497:14, 497:20, 498:13, 498:20, 509:7, 512:17, 519:19, 524:13, 528:13, 528:14, 531:15, 552:24
big [6] - 423:1, 428:22, 436:24, 450:1, 498:11, 519:10
bigger [3] - 446:2, 464:17, 464:19
Birch [128] - 402:1, 402:3, 403:20, 409:16, 410:2, 412:9, 413:25, 415:12, 416:4, 416:5, 417:1, 417:6, 417:9, 417:17, 418:1, 418:2, 423:23, 423:24, 424:1, 424:3, 424:24, 425:5, 425:12, 426:11, 427:23, 428:4, 429:23, 430:9, 430:17, 431:20, 432:5, 432:8, 432:21, 433:13, 435:17, 436:8, 439:7, 439:19, 442:4, 443:1, 446:16, 446:20, 448:11, 449:6, 449:13, 452:25, 453:21, 454:2, 454:13, 456:16, 456:20, 457:1, 462:16, 469:1, 469:17, 469:24, 484:18, 484:20, 484:22, 485:7, 485:13, 485:24, 486:2, 487:18, 487:20, 488:12, 488:21, 489:2, 489:6, 490:5, 490:7, 490:14, 490:15, 490:18, 491:19, 492:18, 492:20,

493:18, 493:19, 494:22, 494:24, 495:2, 495:5, 501:7, 501:20, 502:4, 502:9, 502:13, 502:21, 503:4, 503:16, 504:16, 504:20, 504:24, 505:12, 506:13, 506:14, 506:17, 506:20, 506:25, 507:8, 507:14, 508:10, 508:12, 509:15, 510:10, 511:16, 512:23, 515:1, 515:3, 515:6, 515:8, 515:9, 518:17, 519:12, 519:17, 524:3, 525:8, 525:14, 527:3, 527:5, 528:16, 529:25, 530:6, 531:6, 531:8, 534:4
Birch's [10] - 414:12, 416:21, 417:3, 417:22, 429:11, 442:16, 492:8, 507:13, 512:4, 518:22
bit [24] - 397:11, 397:24, 404:10, 407:4, 410:9, 418:18, 422:5, 433:8, 435:15, 444:9, 452:17, 455:8, 466:17, 471:24, 472:6, 499:16, 501:24, 503:20, 512:10, 530:9, 535:12, 548:9, 556:4, 558:7
black [2] - 407:21, 412:1
blood [1] - 529:16
blow [2] - 451:20, 457:6
blowing [6] - 448:18, 454:11, 459:4, 469:6, 490:21, 529:21
blown [1] - 469:10
blue [3] - 429:14, 501:17, 507:25
board [1] - 493:3
Bodensteiner [1] - 554:4
BODENSTEINER [1] - 554:6
bolts [1] - 525:12

bottom [5] - 456:9, 463:3, 463:4, 483:6, 506:14
bought [4] - 495:20, 496:2, 518:3
bounce [1] - 503:13
bouncing [1] - 493:8
Box [1] - 394:20
box [2] - 484:8, 486:23
branch [1] - 510:21
brand [1] - 465:2
break [22] - 397:5, 397:11, 402:15, 402:23, 403:1, 406:19, 407:3, 418:21, 419:9, 451:3, 451:5, 471:3, 471:14, 473:9, 473:14, 473:21, 474:17, 522:18, 523:2, 528:8, 535:11
breaks [1] - 449:9
brief [1] - 513:14
briefly [4] - 396:15, 404:17, 466:14, 523:22
bring [19] - 397:9, 397:17, 400:2, 402:14, 406:22, 407:4, 419:19, 420:20, 424:4, 441:12, 464:25, 466:6, 474:5, 484:8, 531:24, 545:7, 545:9, 557:7
bringing [2] - 473:22, 481:14
brings [1] - 518:21
bro [8] - 436:17, 451:24, 455:10, 456:8, 457:4, 470:7, 484:14, 485:8
brother [3] - 403:19, 419:11, 447:10
brother's [1] - 419:15
brought [2] - 481:18, 481:19
buck [1] - 513:24
bud [3] - 428:7, 435:17, 506:15
buddy [5] - 451:25, 479:6, 479:13, 485:9, 485:25
bulk [2] - 402:21, 402:22
bunch [2] - 493:11, 525:10
burden [2] - 475:5, 475:9
business [10] - 433:3,

437:15, 438:12,
438:22, 439:3,
447:2, 463:22,
482:24, 487:11,
528:9
**busy** [1] - 528:1
**buy** [20] - 402:20,
402:22, 403:1,
404:18, 410:2,
410:24, 433:4,
433:7, 435:21,
476:19, 476:20,
479:7, 488:14,
489:25, 490:2,
496:7, 512:8, 516:5,
525:25
**buyer/seller/seller** [1]
- 526:14
**buying** [4] - 410:21,
410:25, 437:10,
543:22
**buys** [4] - 437:6,
476:18, 489:24,
525:24
**BY** [7] - 401:3, 404:8,
405:13, 421:25,
434:15, 466:16,
468:19

# C

**C.J** [2] - 394:13, 396:4
**cannot** [1] - 499:6
**car** [10] - 426:2,
429:12, 429:14,
447:12, 501:17,
507:25, 526:3,
526:4, 526:6
**care** [2] - 556:10,
557:25
**careful** [3] - 491:8,
491:11, 497:22
**carefully** [2] - 495:11,
557:5
**carried** [1] - 482:2
**Carter** [9] - 411:1,
411:2, 411:3, 411:5,
481:1, 481:3, 481:4,
481:6
**Case** [6] - 396:7,
400:8, 421:1,
474:15, 546:18,
552:6
**case** [56] - 396:13,
397:6, 400:11,
402:5, 403:3, 407:1,
407:18, 411:12,
412:18, 412:21,
418:7, 421:3, 439:1,
471:6, 471:15,

482:6, 482:20,
483:19, 483:20,
483:22, 484:10,
487:12, 490:7,
492:4, 494:14,
494:21, 496:13,
496:19, 497:12,
498:8, 498:11,
526:11, 532:4,
532:25, 533:21,
535:7, 535:16,
538:10, 538:12,
538:17, 538:23,
539:1, 539:2,
539:16, 539:20,
540:25, 543:10,
545:17, 545:20,
545:22, 546:1,
555:14, 555:17,
555:23, 556:18,
557:1
**cases** [1] - 542:11
**cash** [2] - 412:4,
433:15
**cashed** [1] - 433:17
**casually** [1] - 516:9
**causes** [1] - 476:2
**Cedar** [6] - 394:10,
394:20, 394:23,
452:16, 526:19,
526:20
**cell** [1] - 546:3
**cellular** [1] - 423:17
**certain** [3] - 396:24,
483:15, 548:18
**certainly** [12] - 409:8,
414:14, 472:24,
501:4, 509:2, 509:4,
511:9, 511:22,
519:19, 541:20,
544:12
**CERTIFICATE** [1] -
559:1
**certified** [2] - 400:19,
421:12
**Certified** [3] - 559:2,
559:4, 559:21
**certify** [1] - 559:4
**CHAD** [2] - 395:3,
400:18
**Chad** [1] - 400:23
**chain** [2] - 485:2,
543:21
**chair** [2] - 421:15
**challenge** [1] - 414:16
**chance** [2] - 475:9,
522:24
**change** [1] - 525:22
**changed** [2] - 536:2,
536:11

**character** [2] - 490:4,
497:21
**characterization** [1] -
533:10
**charge** [6] - 407:17,
411:14, 414:24,
451:1, 460:15, 499:8
**charged** [8] - 415:7,
416:2, 542:5,
552:21, 553:6,
553:10, 553:14,
553:18
**chart** [1] - 547:7
**check** [3] - 433:15,
433:17, 486:22
**checked** [1] - 553:3
**Chicago** [9] - 434:24,
435:3, 444:16,
445:4, 445:6,
461:18, 477:24,
480:24, 482:16
**choose** [3] - 415:4,
522:22, 539:25
**chose** [1] - 521:2
**chosen** [1] - 520:20
**Circuit** [2] - 411:13,
542:8, 543:23
**circumstance** [5] -
491:4, 491:5,
492:16, 492:23,
493:25
**circumstances** [6] -
415:20, 487:23,
488:11, 492:2,
499:6, 544:11
**circumstantial** [4] -
414:1, 487:21,
488:6, 544:6
**circumstantially** [1] -
490:13
**City** [1] - 394:17
**claimed** [2] - 495:1,
524:6
**claims** [1] - 523:23
**clarification** [2] -
403:20, 546:22
**clarify** [2] - 548:16,
550:10
**clarity** [1] - 397:20
**classic** [2] - 414:1,
542:12
**cleaned** [1] - 527:13
**clear** [31] - 409:11,
411:13, 413:16,
428:25, 466:14,
479:3, 486:14,
486:17, 487:5,
487:6, 487:7, 487:8,
487:9, 499:18,
501:7, 501:8,

505:19, 505:23,
506:10, 507:20,
508:9, 508:20,
510:4, 522:6, 524:1,
528:18, 528:19,
534:18, 543:24,
550:15
**clearer** [1] - 479:14
**clearly** [19] - 409:17,
411:17, 412:5,
412:17, 415:5,
476:13, 477:16,
484:23, 503:17,
505:12, 509:24,
516:21, 517:3,
518:7, 518:12,
540:24, 542:8,
542:9, 543:18
**CLERK** [12] - 396:2,
400:4, 407:7,
420:22, 471:18,
535:19, 535:23,
536:5, 536:8,
537:23, 540:9,
556:19
**clever** [1] - 482:5
**client** [2] - 418:14,
537:10
**clients** [1] - 558:6
**clock** [1] - 473:18
**close** [3] - 432:11,
432:12, 558:4
**closely** [3] - 530:14,
557:13, 558:5
**closer** [1] - 422:6
**closes** [1] - 540:2
**closing** [15] - 397:12,
471:1, 471:4,
471:17, 474:19,
475:5, 475:7,
475:10, 497:3,
520:1, 520:11,
522:19, 523:14,
529:20, 535:6
**closing's** [1] - 474:10
**Club** [1] - 402:21
**co** [17] - 407:19,
409:7, 409:9, 413:6,
480:20, 480:21,
480:22, 541:10,
541:17, 542:4,
542:9, 542:13,
542:16, 542:24,
543:17, 544:16,
545:2
**co-conspirator** [13] -
413:6, 480:20,
480:21, 541:10,
541:17, 542:4,
542:9, 542:13,

542:16, 542:24,
543:17, 544:16,
545:2
**co-conspirators** [4] -
407:19, 409:7,
409:9, 480:22
**cocaine** [23] - 404:18,
410:22, 411:1,
415:1, 415:2, 415:6,
461:10, 465:22,
475:21, 475:23,
476:10, 477:14,
477:18, 478:5,
487:1, 493:14,
494:19, 496:22,
532:9, 534:1,
534:23, 535:2, 553:3
**cocounsel** [2] -
399:13, 542:10
**codes** [1] - 482:5
**coffee** [1] - 517:19
**cold** [2] - 471:23,
472:17
**Cole** [6] - 509:15,
510:1, 510:5,
511:19, 527:8,
528:16
**Cole's** [1] - 511:5
**Coles** [1] - 509:25
**collect** [3] - 432:23,
495:3, 534:14
**comfortable** [1] -
410:15
**coming** [4] - 452:16,
479:5, 526:20, 542:8
**commencing** [1] -
394:11
**comment** [7] - 516:14,
520:24, 521:3,
521:7, 521:23,
522:8, 522:12
**commentary** [2] -
508:22, 513:15
**commenting** [1] -
521:9
**comments** [3] -
399:17, 522:3,
523:18
**committed** [1] - 553:1
**common** [9] - 483:24,
484:2, 484:4, 484:5,
484:11, 501:21,
503:4, 528:11,
534:13
**commonly** [1] -
511:14
**communicate** [2] -
558:9, 558:11
**communicated** [1] -
423:15

**communication** [8] - 423:16, 428:20, 431:19, 501:19, 502:5, 507:7, 507:9, 507:23

**communications** [4] - 409:13, 417:8, 417:15, 515:13

**compare** [4] - 489:1, 500:9, 513:2, 521:9

**complete** [4] - 409:13, 431:21, 474:18, 502:8

**completed** [5] - 413:17, 501:10, 502:1, 509:1, 555:11

**completely** [1] - 551:6

**completes** [2] - 535:6, 538:6

**comports** [1] - 398:24

**composed** [1] - 539:8

**computer** [1] - 559:10

**computer-aided** [1] - 559:10

**concede** [1] - 516:23

**concep** [1] - 409:1

**concept** [1] - 497:18

**concern** [4] - 417:22, 456:23, 456:24, 549:14

**concerned** [2] - 417:20, 418:1

**concerns** [1] - 399:17

**conclude** [2] - 416:16, 502:10

**concluded** [1] - 558:23

**conclusion** [3] - 487:23, 492:16, 533:18

**Condron** [2] - 398:13, 398:17

**confirm** [2] - 426:19

**confuse** [1] - 443:19

**confused** [1] - 518:11

**confusing** [1] - 548:9

**conjunction** [1] - 480:14

**connect** [1] - 506:21

**connection** [1] - 543:9

**connections** [1] - 543:13

**conscious** [1] - 514:24

**consider** [9] - 414:19, 492:24, 494:1, 508:1, 530:10, 530:16, 530:17, 530:18

**consideration** [3] -

497:22, 524:24, 525:1

**considered** [1] - 488:1

**consistencies** [1] - 512:3

**consistent** [3] - 424:6, 424:7, 485:17

**conspir** [1] - 534:24

**conspiracy** [52] - 407:17, 408:16, 410:20, 411:7, 412:5, 412:8, 412:12, 412:13, 412:15, 412:16, 412:20, 413:1, 413:10, 413:12, 414:23, 414:24, 415:6, 415:8, 415:18, 415:24, 416:6, 422:9, 477:4, 477:12, 478:1, 478:6, 478:11, 478:15, 478:22, 478:23, 478:25, 479:18, 479:20, 480:10, 480:13, 481:8, 487:1, 487:11, 496:22, 499:8, 499:10, 522:22, 532:8, 533:4, 534:22, 534:23, 544:1, 545:3, 545:4, 553:1

**conspirator** [13] - 413:6, 480:20, 480:21, 541:10, 541:17, 542:4, 542:9, 542:13, 542:16, 542:24, 543:17, 544:16, 545:2

**conspirators** [4] - 407:19, 409:7, 409:9, 480:22

**constant** [1] - 558:5

**contact** [11] - 398:24, 440:3, 440:20, 443:5, 470:2, 470:4, 525:6, 525:7, 534:4, 546:3, 558:6

**contacted** [3] - 440:2, 481:17, 508:4

**contacting** [4] - 489:6, 489:8, 491:14, 555:19

**contacts** [2] - 494:22, 494:23

**content** [1] - 454:1

**context** [6] - 435:16, 486:6, 491:9,

494:10, 495:15, 524:5

**continue** [9] - 403:4, 433:3, 433:7, 436:7, 491:3, 540:4, 547:14, 548:4, 550:25

**continued** [5] - 410:23, 410:24, 449:10, 459:12, 494:7

**continues** [1] - 436:8

**continuing** [1] - 494:5

**contrast** [3] - 500:9, 513:2, 521:10

**controlled** [5] - 404:18, 476:18, 490:1, 496:7, 512:8

**convenient** [1] - 425:1

**conversation** [11] - 401:6, 432:3, 433:9, 433:12, 453:13, 453:20, 456:19, 466:17, 468:23, 518:20, 544:12

**convict** [1] - 480:10

**convicted** [1] - 460:15

**conviction** [1] - 460:20

**convinced** [4] - 499:2, 531:22, 532:15, 532:23

**convincing** [1] - 497:21

**cool** [1] - 468:12

**cooperating** [2] - 495:7, 495:10

**cooperation** [1] - 472:19

**copies** [3] - 399:6, 522:24, 523:1

**copy** [7] - 520:17, 520:18, 547:10, 547:12, 548:3, 557:18, 557:19

**corner** [6] - 423:6, 423:9, 423:10, 511:25, 538:14

**corners** [1] - 510:8

**correct** [31] - 403:8, 403:22, 404:15, 404:21, 404:25, 405:22, 405:23, 405:25, 406:2, 406:3, 408:7, 408:8, 426:6, 427:16, 436:1, 436:5, 443:23, 443:24, 444:23, 448:2, 458:12, 462:21,

467:8, 467:21, 469:18, 513:5, 513:6, 541:17, 552:9, 552:13, 559:11

**corrected** [2] - 557:8, 557:14

**correctly** [2] - 417:16, 456:15

**corrects** [1] - 557:15

**corroborate** [1] - 495:16

**corroborated** [16] - 495:21, 495:25, 496:1, 496:4, 496:6, 496:7, 496:9, 496:11, 530:21, 530:22, 530:24, 530:25, 531:1, 531:3, 531:4

**corroborates** [1] - 495:18

**corroboration** [3] - 496:16, 530:17, 531:8

**Cory** [1] - 394:21

**cost** [2] - 410:3, 415:16

**costing** [1] - 402:25

**counsel** [5] - 524:15, 534:2, 545:18, 547:10, 551:24

**Counsel** [3] - 475:14, 497:7, 546:13

**count** [6] - 407:15, 434:2, 476:25, 477:4, 478:16

**Count** [26] - 407:17, 409:11, 410:8, 413:13, 416:10, 422:9, 423:22, 433:22, 434:6, 487:15, 496:21, 496:23, 499:8, 501:5, 552:19, 552:21, 552:23, 553:4, 553:6, 553:8, 553:10, 553:12, 553:14, 553:16, 553:18

**counter** [1] - 421:16

**counts** [6] - 476:12, 477:3, 549:19, 550:17, 553:24

**Counts** [12] - 410:11, 418:10, 418:12, 476:24, 486:20, 496:25, 497:9, 519:23, 547:5, 549:19, 550:11,

550:15

**couple** [13] - 398:22, 401:6, 401:7, 426:22, 462:16, 471:5, 471:22, 494:3, 523:16, 523:17, 523:19, 523:20, 547:16

**course** [17] - 407:16, 410:18, 418:17, 476:25, 477:18, 478:12, 479:20, 483:2, 489:21, 494:18, 496:24, 502:8, 513:19, 531:10, 531:11, 543:25, 545:3

**COURT** [121] - 394:1, 396:5, 396:20, 397:3, 397:16, 397:24, 398:7, 399:9, 399:16, 399:20, 399:25, 400:2, 400:6, 400:17, 400:21, 400:24, 404:5, 405:12, 406:6, 406:10, 406:16, 407:9, 410:13, 410:18, 414:17, 417:11, 418:17, 418:21, 419:1, 419:4, 419:21, 420:3, 420:18, 420:20, 420:24, 421:8, 421:14, 421:21, 434:12, 466:12, 468:17, 470:11, 470:14, 470:16, 470:21, 471:20, 472:8, 472:12, 472:15, 472:25, 473:5, 473:12, 473:14, 473:20, 474:1, 474:5, 474:9, 474:13, 497:2, 519:24, 520:5, 521:5, 521:17, 522:16, 523:7, 523:10, 523:13, 535:5, 535:21, 535:25, 536:7, 536:9, 536:19, 536:21, 536:25, 537:7, 537:9, 537:13, 537:15, 537:19, 537:21, 537:25, 538:5, 540:11, 541:3, 541:15, 542:18,

credibility [3] - 500:4, 524:8, 524:9
credible [3] - 519:9, 524:7, 524:10
credit [1] - 519:8
crib [1] - 486:3
crime [5] - 552:21, 553:6, 553:10, 553:14, 553:18
criminal [1] - 497:13
Criminal [1] - 396:7
cross [9] - 404:5, 434:12, 468:21, 469:6, 469:20, 469:25, 493:7, 517:14, 522:1
Cross [2] - 395:5, 395:8
CROSS [2] - 404:7, 434:14
Cross-Examination [2] - 395:5, 395:8
cross-examination [8] - 404:5, 434:12, 468:21, 469:6, 469:20, 469:25, 493:7, 517:14
CROSS-EXAMINATION [2] - 404:7, 434:14
cross-examined [1] - 522:1
crumb [1] - 529:15
crystal [2] - 501:8, 505:23
curious [1] - 539:9
current [1] - 404:22
cursor [1] - 465:12
customers [3] - 438:4, 487:10, 487:12
cut [3] - 500:11, 500:15, 528:24

days [16] - 401:6, 424:10, 440:5, 459:9, 459:10, 502:3, 506:8, 517:15, 517:21, 517:25, 547:4, 547:6, 549:1, 549:17, 557:23
dead [7] - 448:22, 457:23, 491:2, 506:20, 515:3, 534:5, 534:6
deal [32] - 398:18, 408:13, 417:13, 426:23, 440:16, 441:9, 453:25, 476:9, 476:10, 489:20, 490:11, 497:17, 499:19, 502:7, 502:11, 502:22, 504:25, 505:1, 505:3, 505:12, 505:24, 506:11, 516:5, 519:10, 523:24, 524:11, 524:14, 525:9, 525:10, 525:13
dealer [23] - 475:16, 475:17, 475:18, 475:20, 477:25, 478:5, 479:25, 480:2, 485:21, 503:13, 510:20, 510:23, 511:10, 514:2, 514:3, 514:5, 527:4, 527:5, 527:7, 527:8, 527:20
dealers [10] - 402:7, 403:4, 434:16, 464:17, 464:19, 482:3, 482:4, 482:22, 508:3, 511:1
dealing [14] - 398:16, 398:17, 398:21, 399:1, 402:22, 413:1, 475:22, 475:24, 475:25, 481:24, 484:19, 527:16, 529:19
dealings [1] - 499:24
deals [7] - 402:4, 431:3, 447:13, 454:1, 476:10, 503:1, 510:2
dealt [3] - 427:2, 464:20, 500:20
death [10] - 416:21, 469:21, 469:22, 491:14, 491:18,

502:19, 507:13, 515:12, 518:22, 519:6
debt [17] - 432:18, 432:20, 432:21, 432:23, 433:5, 433:9, 433:13, 433:19, 447:24, 449:5, 449:7, 449:15, 451:21, 495:3, 515:16, 516:12, 534:14
debts [2] - 490:17, 490:18
December [2] - 410:22, 410:23
deceptive [2] - 499:23, 500:13
decide [4] - 418:6, 488:10, 524:8, 538:10
decided [6] - 491:20, 497:10, 527:17, 533:24, 533:25
decision [2] - 498:8, 498:12
decisions [2] - 497:24, 498:6
deeply [3] - 526:13, 555:13
DEFENDANT [1] - 545:19
Defendant [4] - 394:7, 394:23, 489:10, 493:15
defendant [102] - 396:16, 398:8, 398:10, 398:16, 411:2, 411:4, 411:5, 411:22, 412:3, 412:7, 412:8, 413:2, 413:7, 414:9, 415:14, 415:24, 416:3, 417:6, 418:11, 417:21, 475:6, 475:16, 476:5, 476:17, 477:16, 478:23, 478:25, 479:9, 479:15, 479:16, 479:21, 480:10, 480:17, 481:5, 481:6, 481:12, 481:13, 483:12, 484:15, 484:23, 485:4, 485:12, 486:3, 486:8, 486:25, 487:16, 487:17, 487:19, 488:12, 488:21,

489:7, 489:8, 490:15, 490:17, 490:21, 492:18, 492:20, 492:21, 492:23, 493:5, 493:9, 493:17, 493:24, 494:2, 494:7, 494:9, 494:22, 495:1, 495:18, 495:21, 496:3, 496:21, 520:21, 521:1, 523:18, 523:23, 524:2, 524:6, 524:21, 524:22, 525:2, 525:8, 526:15, 527:21, 528:5, 529:24, 530:5, 531:5, 533:2, 533:3, 534:21, 540:18, 543:10, 543:20, 544:23, 552:20, 553:1, 553:5, 553:9, 553:13, 553:17
defendant's [7] - 413:24, 414:18, 415:12, 418:9, 481:24, 486:13, 493:20
defendants [2] - 495:8, 495:10
defense [7] - 396:16, 421:4, 470:23, 497:3, 520:17, 524:15, 529:21
Defense [2] - 470:14, 534:2
define [3] - 547:17, 549:16, 550:14
defined [2] - 547:18, 549:22
defining [2] - 548:24, 550:5
definition [3] - 542:16, 543:16, 549:21
deliberate [13] - 471:9, 476:14, 476:24, 486:20, 486:22, 486:24, 538:8, 538:12, 539:24, 539:25, 547:14, 548:4, 551:1
deliberated [1] - 496:18
deliberating [3] - 538:17, 538:19, 538:23
deliberations [5] - 535:16, 539:4,

542:21, 543:6, 545:8, 545:13, 545:20, 546:10, 546:13, 546:16, 548:14, 549:12, 550:13, 551:9, 551:12, 551:19, 551:21, 551:24, 552:4, 552:11, 552:14, 554:4, 554:7, 554:10, 554:13, 554:16, 554:19, 554:22, 554:24, 555:2, 555:4, 555:7, 555:10, 556:21, 558:19, 558:21
Court [13] - 396:3, 414:19, 473:3, 474:7, 475:14, 476:14, 488:4, 495:12, 497:7, 520:24, 533:16, 555:13, 556:22
court [4] - 473:16, 523:3, 535:9, 558:12
Court's [7] - 410:17, 411:8, 418:8, 419:20, 473:5, 530:15, 545:7
courthouse [3] - 539:21, 540:2, 545:25
Courthouse [1] - 394:10
courtroom [5] - 471:23, 472:10, 472:18, 556:3, 556:11
cover [2] - 471:24, 482:1
coy [1] - 396:23
CR [2] - 479:5, 486:4
crack [28] - 404:18, 410:21, 411:1, 415:1, 415:2, 415:6, 422:10, 422:14, 423:13, 434:3, 434:4, 461:10, 464:3, 465:22, 465:23, 466:2, 475:21, 475:23, 476:19, 480:25, 487:1, 493:14, 494:19, 496:22, 532:8, 534:1, 534:23, 535:7, 486:4
craft [1] - 548:19
crafting [1] - 549:10
create [1] - 522:7

## D

Dang [1] - 424:13
dangerous [2] - 454:7, 476:8
dangers [1] - 476:1
date [9] - 408:10, 408:12, 417:23, 425:20, 430:13, 433:25, 434:4, 439:25, 462:5
dated [1] - 551:14
dates [3] - 408:23, 409:2, 461:21
Davis [1] - 554:2
DAVIS [1] - 554:3

539:20, 540:5, 540:8
**deliver** [4] - 411:4, 411:5, 466:6, 551:15
**delivered** [2] - 394:25, 411:23
**delivering** [1] - 540:21
**demands** [2] - 496:20, 534:20
**demonstration** [1] - 489:15
**deny** [4] - 418:8, 486:12, 486:14, 486:15
**described** [1] - 412:1
**description** [2] - 407:20, 407:23
**descriptions** [1] - 407:25
**deserves** [1] - 488:7
**desire** [1] - 401:16
**details** [2] - 482:2, 483:8
**detective** [1] - 427:10
**determination** [2] - 492:24, 533:17
**determine** [1] - 414:3
**died** [2] - 440:4, 458:24
**difference** [3] - 480:17, 490:5, 513:9
**different** [14] - 398:13, 405:20, 414:25, 425:4, 464:12, 465:1, 465:2, 465:19, 488:15, 512:3, 513:11, 522:9, 550:19
**differently** [1] - 474:25
**dire** [2] - 487:22, 531:13
**Direct** [2] - 395:4, 395:7
**DIRECT** [2] - 401:2, 421:24
**direct** [10] - 396:18, 426:8, 427:14, 429:2, 430:11, 433:10, 439:5, 447:22, 488:9, 495:4
**direction** [2] - 518:24, 559:9
**disagree** [2] - 453:18, 453:22
**disagreement** [1] - 467:5
**discharged** [1] - 556:18
**discreet** [1] - 427:8
**discuss** [1] - 539:2
**discussed** [3] - 504:8,

504:10, 508:19
**discussing** [1] - 516:7
**discussion** [6] - 401:13, 457:18, 500:6, 501:13, 501:14, 536:24
**distance** [1] - 534:9
**distinct** [7] - 547:21, 548:6, 548:17, 549:19, 550:11, 550:15, 550:20
**distinction** [2] - 488:10, 547:5
**distribute** [24] - 414:25, 415:6, 415:8, 415:17, 415:19, 415:25, 422:10, 477:14, 477:17, 478:4, 481:5, 481:7, 483:18, 487:1, 487:16, 492:17, 492:18, 492:20, 496:22, 532:8, 534:22, 534:23, 546:19, 553:2
**distributed** [6] - 487:17, 487:19, 488:12, 491:24, 511:14, 532:10
**distributing** [2] - 412:9, 543:21
**distribution** [8] - 413:15, 413:22, 480:5, 496:23, 534:24, 547:22, 547:23, 550:21
**distributions** [3] - 547:21, 548:6, 548:17
**distributor** [1] - 422:25
**District** [2] - 396:2, 396:3
**DISTRICT** [2] - 394:1, 394:1
**Dittmer** [1] - 559:20
**dive** [1] - 503:19
**DIVISION** [1] - 394:2
**document** [1] - 425:11
**doin'** [1] - 504:8
**dollar** [1] - 511:17
**done** [7] - 470:24, 471:16, 516:8, 522:19, 522:24, 534:15, 545:23
**door** [1] - 484:7
**doubt** [30] - 409:23, 418:7, 475:17, 475:19, 475:21,

476:22, 477:2, 477:3, 480:19, 497:14, 497:20, 498:14, 498:20, 498:23, 509:7, 509:12, 510:23, 512:18, 519:19, 521:17, 524:13, 528:14, 531:16, 532:3, 532:6, 532:7, 532:9, 552:25
**down** [26] - 399:12, 399:13, 402:15, 402:23, 403:1, 406:11, 436:7, 445:18, 446:17, 446:22, 451:14, 456:9, 463:2, 482:22, 483:6, 489:3, 524:4, 526:18, 532:1, 532:4, 533:13, 533:17, 535:23, 536:1, 536:16, 540:2
**downstairs** [1] - 399:12
**draft** [4] - 547:11, 556:25, 557:2, 557:4
**drafting** [1] - 547:24
**dreadlocks** [3] - 407:22, 412:2, 481:19
**dream** [1] - 517:13
**driver's** [1] - 531:18
**driving** [2] - 403:14, 447:12
**drop** [2] - 505:10
**dropped** [1] - 444:24
**drove** [1] - 507:16
**drug** [66] - 402:7, 402:22, 403:4, 415:20, 423:15, 430:5, 431:21, 432:1, 433:13, 434:16, 445:20, 447:2, 447:13, 447:24, 449:5, 449:7, 451:21, 453:24, 454:1, 454:6, 475:16, 475:17, 475:18, 479:25, 480:2, 481:24, 482:3, 482:4, 482:22, 484:18, 485:19, 489:20, 490:11, 490:17, 490:18, 495:3, 499:19, 508:3, 508:9, 508:12, 508:25,

510:2, 510:14, 510:17, 511:1, 511:2, 511:3, 515:16, 516:5, 516:12, 523:23, 524:11, 524:13, 525:8, 525:10, 527:25, 532:13, 532:18, 533:4, 534:14, 542:2, 542:3, 542:11, 543:20, 544:1
**drug-dealing** [1] - 481:24
**drugs** [41] - 402:13, 412:9, 414:25, 417:18, 422:18, 422:22, 423:4, 427:2, 427:9, 433:4, 433:6, 433:7, 435:21, 438:14, 438:20, 439:7, 445:12, 449:11, 450:4, 452:13, 464:22, 465:5, 478:12, 478:13, 478:17, 478:18, 478:19, 478:21, 480:1, 483:18, 485:11, 485:21, 493:11, 500:8, 510:24, 511:1, 511:11, 540:25, 542:7, 543:22, 544:2
**Dubuque** [9] - 403:10, 416:25, 422:2, 422:3, 459:25, 464:23, 510:7, 510:15, 511:14
**duck** [1] - 432:19
**during** [27] - 408:17, 408:18, 408:20, 409:22, 409:24, 412:6, 412:25, 415:6, 416:2, 416:20, 417:4, 422:14, 422:18, 430:24, 439:6, 439:20, 440:5, 447:12, 474:19, 497:25, 498:3, 501:4, 505:8, 506:24, 538:9, 539:4, 545:2
**dying** [1] - 502:19

---

**E**

**e-mailed** [2] - 399:6, 399:14

**eager** [1] - 404:11
**ease** [1] - 419:1
**easily** [1] - 497:10
**East** [1] - 459:25
**EASTERN** [1] - 394:2
**economical** [3] - 423:7, 528:7, 528:10
**effect** [3] - 478:10, 512:11, 517:11
**efficiently** [1] - 545:22
**Eighth** [3] - 411:13, 542:7, 543:23
**either** [11] - 398:8, 420:4, 448:5, 478:8, 487:4, 509:20, 515:14, 521:25, 522:5, 541:18, 551:2
**element** [2] - 411:14, 483:5, 483:7
**elements** [3] - 409:18, 410:8, 412:11
**eliminate** [1] - 420:5
**eliminates** [2] - 420:14, 420:16
**Elm** [2] - 427:19, 506:18
**elzey** [1] - 555:2
**ELZEY** [1] - 555:3
**Emily** [23] - 398:2, 398:20, 401:10, 401:14, 408:10, 412:25, 442:4, 443:10, 443:11, 492:25, 493:1, 493:2, 493:4, 499:11, 499:14, 517:10, 531:3, 533:15, 533:20, 540:17, 542:14, 542:24, 543:1
**emphasize** [1] - 549:20
**employees** [1] - 510:17
**encourage** [3] - 494:13, 495:13, 512:16
**end** [10] - 404:9, 426:9, 429:3, 471:10, 474:8, 474:9, 501:16, 502:7, 524:3, 546:22, 549:2
**ended** [1] - 426:5
**ends** [1] - 502:8
**enforcements** [1] - 427:11
**engendered** [2] - 413:12, 414:7
**entered** [1] - 422:20

**enterprise** [1] - 481:24
**enters** [6] - 400:5,
407:8, 420:23,
474:12, 537:24,
552:3
**entire** [1] - 501:4
**entirely** [1] - 548:18
**entirety** [2] - 453:12,
453:14
**envelopes** [1] - 556:6
**Eric** [8] - 434:7,
476:18, 494:6,
495:19, 500:9,
500:10, 500:22,
530:24
**errors** [3] - 557:6,
557:14, 557:16
**establish** [5] - 408:1,
408:16, 408:20,
408:21, 543:12
**established** [8] -
409:5, 409:8,
409:14, 409:17,
412:5, 415:5, 416:2,
416:19
**establishes** [2] -
411:6, 411:7
**establishment** [1] -
412:7
**evade** [1] - 515:18
**evaluating** [1] - 484:9
**events** [1] - 498:17
**eventually** [2] - 481:4,
533:7
**evidence** [84] -
409:11, 412:5,
412:22, 412:24,
413:10, 413:11,
413:16, 413:21,
413:22, 414:1,
414:3, 414:5, 414:8,
414:11, 414:19,
414:21, 415:9,
415:23, 416:11,
416:15, 416:16,
416:19, 418:5,
470:19, 470:24,
473:3, 474:18,
474:22, 474:24,
474:25, 475:2,
476:17, 477:1,
477:2, 477:20,
479:3, 479:14,
484:9, 486:17,
487:5, 487:6, 487:7,
487:8, 487:9,
487:22, 488:6,
488:9, 494:13,
494:14, 494:16,
494:17, 494:20,

494:21, 494:23,
494:25, 495:16,
495:25, 496:19,
498:9, 498:10,
505:2, 519:9,
519:11, 519:18,
520:20, 521:2,
521:22, 521:25,
522:13, 522:14,
523:19, 527:11,
527:12, 529:18,
532:2, 532:4,
532:25, 533:14,
533:16, 534:17,
534:18, 534:19,
535:2, 544:6
**EX** [1] - 546:24
**exact** [4] - 424:11,
427:9, 486:10, 488:2
**exactly** [6] - 429:17,
485:22, 489:5,
506:5, 508:6, 542:22
**examination** [13] -
404:5, 406:7,
434:12, 439:5,
447:23, 466:12,
468:17, 468:21,
469:6, 469:20,
469:25, 493:7,
517:14
**Examination** [6] -
395:4, 395:5, 395:7,
395:8, 395:9, 395:10
**EXAMINATION** [6] -
401:2, 404:7,
421:24, 434:14,
466:15, 468:18
**examine** [1] - 530:13
**examined** [3] -
400:20, 421:13,
522:1
**example** [3] - 467:20,
542:10, 546:24
**examples** [2] - 502:1,
502:2
**except** [1] - 530:3
**exception** [2] -
503:17, 543:3
**exchanging** [1] -
427:9
**excuse** [9] - 398:10,
401:15, 414:12,
436:8, 446:15,
448:8, 462:18,
486:21, 538:17
**excused** [2] - 538:25,
539:7
**Exhibit** [4] - 425:8,
430:7, 466:21,
512:21

**exhibit** [5] - 425:9,
425:10, 430:8,
512:21
**exhibits** [5] - 488:24,
520:14, 523:21,
524:23, 546:8
**exist** [4] - 492:11,
492:12, 495:5
**existed** [1] - 398:5
**existence** [1] - 399:5
**exits** [4] - 471:19,
535:20, 540:10,
556:20
**experiences** [1] -
484:8
**expert** [2] - 485:22,
532:17
**explain** [4] - 474:22,
523:3, 543:9, 547:20
**explains** [2] - 511:21,
512:3
**explanation** [8] -
498:19, 498:22,
499:3, 515:17,
528:17, 529:17,
530:7, 530:8
**explanations** [1] -
519:20
**expressed** [3] -
481:25, 482:11,
482:12
**extent** [2] - 420:1,
499:20
**extra** [2] - 452:13,
458:18
**extremely** [1] - 529:4
**eyes** [1] - 522:11

---

# F

**face** [1] - 499:13
**Facebook** [1] - 457:19
**fact** [57] - 404:14,
410:25, 411:18,
411:24, 412:6,
413:3, 413:18,
414:6, 414:7,
417:25, 418:6,
434:19, 434:24,
435:2, 437:9, 438:3,
438:7, 442:10,
444:11, 444:16,
444:19, 448:21,
448:25, 454:11,
457:3, 459:15,
460:9, 465:1, 466:5,
469:14, 470:5,
477:24, 479:15,
480:5, 483:25,

485:16, 487:24,
488:8, 488:16,
489:5, 489:21,
492:14, 495:18,
499:22, 504:24,
507:2, 507:19,
510:16, 514:7,
521:7, 521:9,
523:23, 531:1,
531:4, 533:2, 553:25
**factors** [1] - 530:19
**facts** [1] - 521:10
**fair** [12] - 399:20,
404:10, 426:21,
437:15, 438:23,
438:24, 440:22,
463:19, 520:24,
521:7, 521:23,
522:16
**fall** [2] - 543:16, 558:7
**false** [1] - 522:7
**far** [2] - 414:7, 427:8
**faster** [1] - 432:17
**fault** [1] - 491:11
**favorable** [5] - 410:7,
414:20, 415:10,
416:18, 418:4
**February** [44] -
409:19, 413:14,
423:23, 423:24,
429:20, 431:20,
432:5, 433:23,
440:4, 448:10,
448:13, 448:14,
448:15, 448:16,
448:19, 452:25,
453:21, 454:25,
455:1, 455:24,
459:15, 487:16,
487:18, 487:20,
493:5, 496:2,
496:23, 501:6,
501:23, 503:20,
505:21, 508:16,
509:14, 510:4,
510:10, 514:10,
514:20, 515:21,
524:14, 532:10,
534:25, 547:23
**Federal** [1] - 394:10
**feed** [2] - 480:7
**fell** [3] - 504:25, 505:1,
508:5
**fellow** [1] - 539:15
**felt** [5] - 493:24, 494:2,
494:4, 504:3, 517:19
**fentanyl** [10] - 488:17,
512:5, 512:8,
512:13, 513:1,
513:3, 513:10,

513:12, 513:20,
513:23
**few** [10] - 396:17,
397:2, 406:21,
418:13, 462:2,
470:1, 501:4, 502:3,
556:9, 556:14
**figure** [1] - 396:9,
397:6, 431:5, 431:6,
431:14, 445:16,
453:1, 453:8,
453:10, 519:15,
557:11
**figured** [1] - 427:5,
431:15
**filed** [1] - 558:12
**fill** [1] - 556:6
**final** [4] - 474:8, 523:4,
536:5, 536:17,
537:4, 538:2, 538:6,
557:17
**finally** [1] - 434:6
**finders** [1] - 521:10
**fine** [5] - 397:3, 422:7,
525:22, 532:16,
551:4
**Fine** [1] - 525:22
**finish** [1] - 446:12
**firmly** [3] - 409:14,
494:19, 499:2
**First** [1] - 483:21
**first** [27] - 401:9,
407:18, 414:25,
419:17, 432:1,
440:2, 440:19,
440:21, 441:9,
443:5, 443:16,
443:23, 443:25,
454:24, 471:22,
474:10, 475:6,
478:9, 499:8, 506:2,
516:20, 523:22,
525:6, 525:8, 543:6,
549:15
**fit** [3] - 525:3, 525:4
**fits** [2] - 489:9, 529:6
**five** [10] - 403:1,
418:24, 476:11,
482:9, 529:7, 529:8,
535:10, 535:11,
535:18, 556:15
**five-hundredths** [2] -
529:7, 529:8
**five-minute** [1] -
535:11
**fixed** [1] - 522:23
**flip** [2] - 509:8, 509:13
**folder** [1] - 552:15
**folks** [6] - 478:1,
481:8, 481:23,

492:5, 528:13, 533:24
**Folks** [1] - 480:23
**follow** [3] - 401:7, 477:8, 530:15
**follow-up** [1] - 401:7
**follows** [2] - 400:20, 421:13
**FOR** [1] - 394:1
**force** [1] - 510:17
**foregoing** [2] - 559:5, 559:10
**FOREPERSON** [2] - 552:10, 552:13
**forgot** [2] - 540:14, 545:10
**Form** [6] - 552:19, 552:23, 553:4, 553:8, 553:12, 553:16
**form** [11] - 522:21, 523:1, 531:20, 536:1, 536:4, 536:6, 536:12, 537:5, 538:7, 553:25
**formal** [1] - 482:1
**forms** [7] - 423:16, 486:22, 531:22, 536:13, 538:3, 538:7, 550:16
**formulated** [1] - 518:10
**forth** [3] - 415:16, 428:2, 456:4
**forward** [1] - 526:22
**four** [9] - 455:25, 468:14, 489:7, 506:22, 516:1, 516:22, 516:25, 517:1, 518:16
**Fourth** [1] - 394:16
**frame** [6] - 411:8, 411:14, 412:13, 412:25, 413:14, 439:6
**frames** [2] - 411:9, 411:10
**Francik** [1] - 554:24
**FRANCIK** [1] - 555:1
**frankly** [9] - 407:25, 409:2, 410:20, 416:1, 499:15, 503:10, 511:2, 540:22, 548:10
**free** [6] - 471:12, 539:13, 555:16, 555:22, 556:8, 556:13
**freitag** [1] - 555:4
**FREITAG** [1] - 555:6

**fresh** [2] - 438:8, 487:14
**friend** [7] - 444:10, 485:10, 542:24, 542:25, 543:3, 544:5
**friendly** [2] - 515:8
**friends** [7] - 444:6, 491:20, 515:9, 515:10, 541:8, 541:9, 541:11
**front** [6] - 419:13, 454:25, 473:4, 488:23, 524:21, 532:5
**fronted** [1] - 450:3
**fuck** [2] - 514:9, 514:13
**fucked** [1] - 463:9
**full** [5] - 450:22, 450:23, 485:3, 485:4, 559:11
**fully** [1] - 406:25
**furtherance** [2] - 544:1, 545:3
**future** [1] - 543:14

### G

**game** [1] - 485:19
**gap** [3] - 424:12, 424:15, 428:22
**garbage** [5] - 513:17, 513:18, 513:24, 514:4, 514:16
**gather** [1] - 539:12
**gathered** [1] - 413:9
**gem** [20] - 423:11, 510:7, 510:9, 510:11, 511:12, 511:16, 511:18, 511:23, 512:1, 527:21, 527:22, 528:5, 528:6, 528:18, 528:21, 528:22, 529:12, 529:17
**generally** [4] - 439:6, 439:14, 467:16, 514:11
**gentlemen** [20] - 406:17, 470:17, 470:22, 475:15, 477:5, 480:9, 494:12, 496:17, 497:8, 500:24, 512:2, 512:20, 519:21, 523:17, 524:25, 534:16, 535:4, 538:5,

553:20, 555:11
**Gerard** [1] - 554:7
**GERARD** [1] - 554:9
**girlfriend** [3] - 425:1, 447:10, 447:13
**gist** [3] - 398:11, 398:19
**given** [4] - 487:24, 487:25, 519:8, 557:25
**glaring** [1] - 408:19
**Goldensoph** [23] - 394:21, 395:9, 397:21, 398:4, 412:1, 412:14, 416:13, 416:24, 520:9, 520:10, 520:17, 521:5, 521:17, 521:24, 522:3, 549:25, 551:2, 557:5, 557:13, 557:24, 558:8, 558:10, 558:19
**goldensoph** [29] - 396:21, 399:5, 399:15, 399:17, 399:25, 407:10, 414:13, 418:13, 419:4, 419:21, 420:18, 421:4, 421:22, 470:11, 472:4, 472:12, 472:20, 473:12, 497:5, 519:24, 536:19, 537:10, 537:19, 541:4, 545:11, 548:14, 549:12, 551:9, 551:19
**GOLDENSOPH** [48] - 396:22, 397:14, 399:19, 400:1, 404:6, 404:8, 405:11, 405:13, 406:4, 407:12, 418:16, 418:18, 418:25, 419:6, 419:22, 420:19, 421:6, 421:23, 421:25, 434:10, 466:13, 466:16, 468:15, 470:13, 470:15, 472:5, 472:13, 472:22, 473:13, 474:4, 497:6, 521:6, 536:20, 536:22, 537:12, 537:14, 537:20, 541:5,

542:19, 542:22, 545:12, 546:15, 548:15, 550:1, 551:10, 551:20, 552:1, 558:20
**goldensoph's** [1] - 469:14
**Goldensoph..** [1] - 395:7
**Goldensoph...** [1] - 395:5
**golly** [1] - 529:9
**gonna** [2] - 450:22, 453:11
**good-size** [1] - 514:12
**goodbye** [1] - 539:16
**goodness** [3] - 487:13, 527:17, 527:25
**Gorter** [1] - 554:13
**GORTER** [1] - 554:15
**Government** [39] - 396:11, 397:5, 400:12, 406:14, 408:16, 409:10, 410:7, 414:20, 415:10, 415:22, 416:8, 416:19, 418:4, 418:6, 421:2, 425:8, 430:6, 466:21, 470:22, 471:13, 475:4, 475:6, 475:8, 477:5, 477:12, 499:9, 505:7, 505:20, 514:22, 517:6, 519:25, 521:18, 521:20, 521:24, 537:3, 546:8, 557:3, 557:18
**Government's** [8] - 400:11, 416:15, 498:17, 499:1, 505:17, 512:21, 530:10, 546:7
**gram** [11] - 403:2, 436:18, 450:23, 451:17, 452:15, 479:8, 485:16, 486:6, 513:4, 529:7, 529:8
**gram's** [1] - 402:25
**grams** [10] - 403:1, 436:20, 437:1, 437:6, 437:10, 437:16, 437:21, 482:17, 512:25, 513:4
**grand** [5] - 397:20, 397:25, 398:1,

398:14, 411:11
**granted** [1] - 527:23
**great** [3] - 399:16, 473:23, 550:6
**greed** [2] - 475:24, 480:6
**Greenwood** [6] - 403:16, 403:18, 447:8, 447:17, 447:19, 447:20
**grind** [2] - 484:16, 484:25
**guarantee** [1] - 558:10
**guess** [9] - 397:19, 405:2, 410:19, 435:15, 479:17, 501:24, 515:15, 547:7, 550:1
**guilty** [24] - 476:16, 476:25, 486:23, 487:4, 494:4, 496:21, 496:23, 496:24, 499:6, 514:23, 519:23, 534:21, 534:22, 534:23, 535:1, 552:21, 553:6, 553:10, 553:14, 553:18, 553:24
**guy** [10] - 460:25, 499:18, 499:21, 499:25, 508:2, 510:24, 519:4, 519:16, 527:9, 527:10
**guys** [10] - 405:21, 428:21, 430:24, 440:3, 440:19, 444:6, 444:16, 473:15, 500:23, 508:5

### H

**habit** [1] - 480:7
**half** [8] - 448:10, 451:17, 489:3, 489:4, 513:4, 516:24, 518:4, 540:22
**hammered** [1] - 506:20
**hand** [12] - 400:17, 421:10, 463:10, 465:23, 466:2, 538:14, 538:22, 556:1, 556:7, 556:11, 556:16, 559:15
**handed** [3] - 399:4,

399:10, 547:10
**handfuls** [1] - 423:2
**handle** [2] - 423:2, 423:3
**hands** [1] - 538:24
**hang** [1] - 444:8
**Hansen** [2] - 552:12, 554:10
**HANSEN** [1] - 554:12
**hard** [1] - 466:25
**hardly** [1] - 407:20
**hate** [2] - 396:22, 518:6
**healthy** [2] - 530:13, 538:16
**hear** [6] - 422:6, 461:7, 485:15, 488:13, 519:5, 557:23
**heard** [15] - 403:18, 407:21, 446:3, 448:22, 460:24, 461:3, 475:25, 495:7, 510:25, 530:18, 533:17, 534:6, 534:17, 541:7
**hearing** [2] - 540:21, 557:20
**hears** [1] - 542:14
**hearsay** [7] - 413:6, 542:9, 542:13, 542:16, 543:7, 543:16, 545:1
**heavily** [1] - 557:10
**Heidi** [1] - 419:10
**held** [4] - 394:9, 511:15, 511:24, 536:24
**Hello** [1] - 482:7
**help** [15] - 405:8, 405:14, 405:15, 417:9, 441:19, 451:25, 485:9, 485:10, 485:24, 499:25, 500:3, 508:5, 517:5, 518:25, 519:4
**helping** [4] - 415:24, 479:12, 484:13, 500:8
**hereby** [1] - 559:4
**herein** [1] - 559:6
**hereinafter** [2] - 400:19, 421:12
**hereunto** [1] - 559:14
**heroin** [178] - 403:9, 411:21, 411:22, 411:24, 412:3, 413:10, 414:10, 415:1, 415:9,

415:13, 415:17, 415:25, 416:4, 416:22, 416:25, 417:4, 418:1, 422:10, 422:11, 423:13, 423:22, 423:24, 424:1, 424:9, 433:23, 433:24, 434:7, 434:8, 434:25, 435:22, 436:18, 436:20, 436:24, 437:10, 437:16, 437:25, 438:4, 439:20, 444:3, 444:17, 445:1, 445:4, 445:10, 446:1, 450:23, 452:1, 452:10, 454:3, 454:16, 458:8, 458:10, 459:12, 459:15, 460:7, 460:9, 462:12, 463:22, 464:2, 465:2, 466:4, 466:6, 475:20, 475:22, 476:1, 476:6, 476:9, 476:19, 476:20, 477:14, 477:17, 478:4, 479:15, 479:17, 480:25, 481:12, 481:14, 481:17, 481:18, 481:20, 482:8, 482:17, 482:19, 484:20, 485:14, 485:21, 486:7, 487:2, 487:16, 487:18, 487:20, 488:12, 488:17, 488:18, 491:3, 492:11, 493:4, 493:9, 493:13, 493:15, 494:6, 494:8, 494:11, 494:18, 495:20, 496:2, 496:10, 496:22, 496:23, 499:20, 502:13, 502:14, 502:15, 502:20, 502:23, 503:5, 503:7, 503:11, 508:4, 508:13, 508:17, 510:8, 510:10, 510:12, 510:21, 511:5, 511:6, 511:20, 512:4, 512:5, 512:7, 512:12, 512:22,

512:24, 513:2, 513:7, 513:8, 513:12, 513:17, 513:20, 514:12, 516:5, 517:11, 517:20, 518:1, 518:3, 519:16, 527:4, 527:5, 527:12, 527:20, 528:4, 528:16, 528:20, 528:22, 528:23, 529:3, 529:7, 529:8, 529:15, 529:18, 531:2, 532:8, 532:10, 532:21, 533:1, 533:25, 534:22, 534:24, 535:2, 540:19, 544:9, 544:24, 553:2
**heroin-selling** [1] - 463:22
**hesitant** [1] - 549:23
**hesitate** [1] - 497:23
**hide** [1] - 521:21
**hiding** [1] - 521:19
**highlight** [1] - 450:20
**hijacking** [1] - 460:22
**himself** [12] - 476:5, 495:18, 499:21, 499:25, 500:1, 500:3, 514:2, 514:3, 515:11, 517:5, 517:9, 533:24
**hit** [1] - 457:18
**hold** [3] - 449:23, 454:22
**Hold** [1] - 534:7
**holding** [1] - 552:15
**home** [2] - 458:11, 512:5
**honest** [3] - 396:23, 419:22, 548:15
**Honor** [56] - 396:14, 396:22, 397:15, 399:24, 400:14, 401:1, 404:6, 406:5, 406:15, 407:12, 407:18, 408:7, 413:5, 413:13, 417:10, 418:18, 419:7, 420:19, 421:6, 421:23, 434:10, 434:13, 466:13, 468:16, 470:13, 470:15, 470:20, 472:22, 473:3, 473:11, 473:13, 474:3, 474:4, 475:13,

497:6, 520:3, 521:6, 523:15, 536:18, 537:6, 537:8, 537:12, 537:18, 537:20, 540:13, 542:19, 545:6, 545:12, 546:9, 546:15, 551:20, 552:1, 552:2, 552:10, 558:18, 558:20
**Honorable** [1] - 396:4
**hope** [1] - 399:23
**hopefully** [1] - 536:13
**hoping** [2] - 449:2, 534:7
**horrible** [2] - 502:17, 519:14
**horse** [1] - 506:20
**hot** [4] - 438:7, 487:14, 512:10, 512:16
**Hot** [1] - 512:11
**hours** [4] - 398:23, 457:19, 539:21, 539:22
**hours'** [1] - 547:2
**house** [4] - 511:4, 511:5, 517:18, 527:11
**huge** [1] - 526:6
**human** [1] - 476:10
**hundred** [2] - 396:24, 423:8
**hundreds** [1] - 528:4
**hundredths** [2] - 529:7, 529:8
**hung** [1] - 516:18
**hurry** [4] - 507:1, 507:6, 507:10, 507:22
**hurts** [1] - 463:10
**Hy** [2] - 459:21, 496:2
**Hy-Vee** [2] - 459:21, 496:2

462:21, 468:24, 470:5
**implied** [1] - 544:12
**important** [13] - 408:6, 427:8, 483:25, 497:24, 498:5, 498:8, 519:9, 519:10, 529:9, 529:16, 530:11, 530:12, 557:4
**importantly** [1] - 417:8
**imposed** [1] - 555:15
**impossible** [5] - 489:19, 508:25, 509:3, 509:9, 510:16
**impress** [1] - 506:25
**impression** [4] - 504:12, 521:4, 521:20, 522:7
**IN** [2] - 394:1, 559:14
**inadequate** [1] - 408:1
**inadvertent** [2] - 522:8, 549:3
**inadvertently** [1] - 397:22
**incident** [2] - 401:25, 424:11
**include** [1] - 510:3
**included** [1] - 501:11
**includes** [2] - 512:22, 536:5
**incoherent** [1] - 540:23
**incoming** [2] - 425:24, 467:21
**incredible** [1] - 499:15
**indeed** [1] - 405:21
**independent** [4] - 426:24, 427:1, 495:25, 496:15
**independently** [1] - 496:5
**INDEX** [1] - 395:1
**indicate** [1] - 450:3
**indicated** [2] - 396:11, 559:6
**indicating** [1] - 408:23
**Indicating** [1] - 449:17
**indication** [1] - 408:3
**indicative** [1] - 417:25
**indictment** [12] - 411:9, 411:17, 411:19, 476:12, 480:18, 542:5, 548:6, 552:22, 553:7, 553:11, 553:15, 553:19
**inform** [2] - 520:16, 520:19
**information** [5] -

**I**

**ID** [2] - 531:20, 531:22
**idea** [7] - 409:3, 419:18, 426:17, 542:1, 545:14, 548:16, 550:2
**ideas** [1] - 550:7
**identified** [1] - 398:16
**identifying** [1] - 543:24
**imagine** [1] - 420:7
**immediately** [3] -

458:7, 510:3, 544:5, 544:8, 546:3
**informed** [2] - 399:5, 412:9
**informing** [1] - 427:22
**ingredients** [2] - 438:8
**initial** [2] - 443:17, 474:20
**inside** [2] - 420:4, 472:7
**instantaneously** [1] - 457:7
**instead** [3] - 407:2, 432:14, 479:11
**instincts** [1] - 427:2
**instruct** [1] - 488:4
**instructed** [4] - 483:22, 483:23, 488:5, 495:9
**Instruction** [7] - 477:6, 480:11, 484:3, 484:4, 484:5, 498:2, 536:10
**instruction** [12] - 477:11, 480:11, 487:24, 487:25, 497:19, 536:5, 536:7, 547:19, 548:13, 549:4, 549:7, 551:14
**instructions** [25] - 411:12, 412:17, 428:23, 471:5, 474:8, 474:10, 474:20, 482:14, 484:1, 523:4, 530:16, 535:8, 535:14, 536:1, 536:2, 536:17, 537:5, 538:2, 538:4, 538:6, 541:18, 547:13, 548:4, 549:23, 550:25
**instructs** [2] - 476:14, 495:12
**insufficient** [1] - 416:17
**intend** [1] - 522:10
**intended** [1] - 522:9
**intending** [1] - 522:6
**intent** [2] - 521:14, 521:18
**intentionally** [3] - 474:24, 478:7, 479:19
**interest** [1] - 557:12
**interesting** [1] - 478:15
**intermediary** [3] - 543:19, 544:4,

544:18
**interpret** [3] - 417:24, 474:21, 485:11
**interpretation** [1] - 416:15
**interpretations** [1] - 494:3
**interpreted** [3] - 415:11, 416:9, 547:25
**interprets** [1] - 416:7
**Interrogatory** [1] - 552:23
**interrogatory** [6] - 536:3, 536:6, 536:12, 537:5, 538:7, 553:24
**interrupt** [2] - 520:9
**interview** [2] - 401:9, 404:10
**introductory** [1] - 409:20
**investigate** [1] - 557:1
**investigating** [1] - 492:3
**Investigation** [3] - 556:25, 557:17, 557:22
**investigations** [1] - 532:19
**Investigator** [10] - 406:10, 509:16, 510:6, 510:12, 511:13, 517:16, 518:20, 519:2, 521:12, 524:18
**investigator** [1] - 510:6
**involved** [21] - 412:19, 414:9, 415:24, 481:23, 490:14, 526:13, 527:24, 528:2, 528:3, 533:4, 542:1, 542:3, 542:6, 542:9, 542:11, 542:15, 543:20, 543:21, 544:8, 544:13, 544:14
**involvement** [1] - 519:5
**involving** [1] - 401:25
**IOWA** [1] - 394:1
**Iowa** [8] - 394:10, 394:17, 394:20, 394:23, 396:3, 422:2, 510:15, 559:3
**issue** [7] - 420:14, 420:17, 519:10, 520:10, 521:12, 538:18, 557:16

**issues** [2] - 401:8, 495:24
**IT** [2] - 435:25, 462:20
**itself** [2] - 411:6, 411:15

---

**J**

**Jackie** [2] - 398:12, 398:17
**jail** [17] - 401:14, 401:16, 401:21, 402:2, 403:21, 403:23, 404:11, 440:2, 440:24, 442:11, 444:13, 484:19, 518:18, 518:19, 519:1, 519:4
**Jake** [4] - 460:3, 460:4, 491:22
**January** [34] - 403:21, 403:25, 404:1, 404:2, 408:15, 408:22, 410:23, 413:16, 413:17, 416:20, 422:10, 422:12, 425:16, 426:9, 429:2, 433:10, 435:3, 435:16, 440:3, 442:17, 442:22, 446:20, 448:8, 448:9, 449:13, 461:19, 462:12, 463:1, 492:22, 500:25, 525:7, 525:9
**Jessica** [4] - 403:16, 447:17, 447:19, 454:12, 454:15, 455:15, 456:1, 456:15, 456:25, 458:7, 459:23, 476:20, 489:2, 489:25, 491:5, 491:6, 491:14, 491:15, 491:19, 491:23, 492:21, 494:24, 495:22, 495:23, 496:4,
**job** [1] - 545:16
**john** [1] - 481:11
**John** [44] - 394:16, 398:2, 411:20, 424:5, 433:23, 439:8, 439:15, 439:21, 440:6, 440:11, 446:14, 448:1, 448:19, 448:23, 451:19, 454:12, 454:15, 455:15, 456:1, 456:15, 456:25, 458:7, 459:23, 476:20, 489:2, 489:25, 491:5, 491:6, 491:14, 491:15, 491:19, 491:23, 492:21, 494:12, 496:17, 497:8, 497:25, 498:3, 502:7, 520:13,

525:25, 530:1, 530:21, 534:11, 534:12
**join** [3] - 478:11, 479:19, 483:4
**joined** [3] - 432:15, 478:7, 479:21
**Judge** [2] - 394:13, 410:10
**judgment** [3] - 407:13, 418:9, 418:11
**July** [1] - 394:25
**jump** [3] - 451:14, 463:2, 463:21
**jumped** [1] - 483:6
**June** [2] - 394:25, 401:10
**JUROR** [12] - 554:3, 554:6, 554:9, 554:12, 554:15, 554:18, 554:21, 554:23, 555:1, 555:3, 555:6, 555:9
**juror** [2] - 538:25, 547:8
**jurors** [6] - 538:10, 539:11, 539:15, 555:12, 556:1, 556:18
**jury** [116] - 396:9, 397:4, 397:9, 397:17, 397:21, 397:25, 398:1, 398:14, 400:3, 400:5, 401:5, 411:11, 412:16, 413:12, 414:2, 414:6, 414:14, 414:22, 415:3, 415:11, 416:7, 416:12, 416:14, 416:23, 417:2, 417:24, 418:5, 418:23, 419:5, 419:17, 419:25, 420:6, 420:9, 420:20, 420:23, 472:3, 472:11, 473:6, 473:7, 473:22, 474:2, 474:5, 474:12, 475:15, 476:13, 476:15, 477:5, 477:9, 480:9, 482:13, 484:1, 484:8, 486:19, 486:21, 494:12, 496:17, 497:8, 497:25, 498:3, 502:7, 520:13,
**Jury** [4] - 407:8, 471:19, 538:4, 556:20
**JURY** [2] - 552:10, 552:13
**jury's** [1] - 545:14
**justice** [2] - 496:20, 534:19

---

**K**

**Keep** [1] - 517:4
**keep** [5] - 527:19, 538:16, 538:19, 538:23, 546:1
**keeping** [1] - 499:7
**keeps** [2] - 472:2, 550:8
**kept** [2] - 449:9
**key** [1] - 410:4
**kid** [1] - 491:7
**kind** [12] - 396:9, 397:6, 423:5, 433:21, 449:19, 458:21, 465:2, 468:6, 497:17, 517:13, 548:16
**knotted** [1] - 528:24
**knotted-up** [1] - 528:24
**knowing** [2] - 483:8, 483:9
**knowledge** [1] - 415:12

520:16, 521:3, 521:7, 521:19, 521:21, 522:4, 522:7, 522:18, 523:1, 523:4, 523:9, 533:16, 534:16, 535:4, 535:14, 535:20, 536:1, 536:2, 536:17, 537:2, 537:4, 537:22, 537:24, 538:2, 538:9, 539:11, 539:20, 539:23, 540:10, 541:18, 546:2, 546:19, 546:21, 547:18, 549:4, 549:7, 551:14, 551:16, 551:25, 552:3, 552:8, 552:19, 552:24, 553:4, 553:8, 553:12, 553:16, 553:20, 553:21, 555:11, 556:3, 556:22

**knows** [15] - 407:20,
479:15, 479:16,
483:14, 483:16,
483:17, 485:21,
491:1, 491:19,
508:3, 515:3,
518:23, 518:24,
520:15, 520:24
**Koch** [1] - 554:22
**KOCH** [1] - 554:23
**Kyndra** [1] - 394:19

**L**

**lab** [3] - 512:22, 513:1,
513:8
**lack** [1] - 494:25
**ladies** [20] - 406:17,
470:16, 470:21,
475:15, 477:4,
480:9, 494:12,
496:17, 497:8,
500:24, 512:2,
512:19, 519:21,
523:17, 524:25,
534:16, 535:4,
538:5, 553:20,
555:10
**LAMMERS** [53] -
396:14, 397:19,
398:1, 398:9,
399:11, 399:23,
400:14, 401:1,
401:3, 404:3, 406:8,
406:14, 410:15,
410:19, 417:10,
419:7, 420:16,
434:13, 434:15,
466:10, 468:19,
470:9, 470:20,
472:9, 473:2,
473:11, 473:18,
474:3, 474:7,
474:11, 475:13,
520:3, 520:8, 522:5,
523:6, 523:8,
523:12, 523:15,
536:18, 536:23,
537:6, 537:8,
537:18, 540:13,
541:23, 545:6,
546:9, 547:16,
548:21, 551:6,
551:18, 552:2,
558:18
**Lammers** [36] -
394:16, 396:13,
397:18, 399:22,
400:12, 410:14,
416:12, 420:15,
466:18, 470:18,
473:1, 473:8,
475:11, 497:2,
504:1, 508:22,
512:9, 516:24,
520:2, 522:2,
523:10, 535:5,
536:16, 537:3,
537:17, 540:12,
541:21, 543:23,
545:5, 546:6,
547:15, 548:18,
551:2, 551:5,
551:17, 558:16
**Lammers'** [1] - 548:16
**Lammers....** [1] -
395:10
**Lammers.....** [1] -
395:4
**Lammers......** [1] -
395:8
**largely** [1] - 415:2
**larger** [1] - 402:13
**last** [13] - 396:10,
411:1, 424:8,
424:19, 428:4,
448:5, 506:16,
507:2, 507:7, 507:9,
508:9, 515:20, 518:3
**lasting** [1] - 508:24
**lasts** [1] - 515:25
**late** [5] - 502:9, 541:6,
541:14, 541:16,
541:19
**launch** [1] - 422:8
**law** [3] - 411:12,
427:10, 488:9
**Law** [1] - 394:22
**lawyers** [4] - 397:11,
474:21, 474:23,
555:20
**lay** [1] - 491:20
**laypeople** [1] - 497:16
**leads** [1] - 492:16
**learned** [2] - 458:23,
459:6
**least** [6] - 480:16,
480:19, 480:21,
481:16, 494:7,
503:23
**leave** [5] - 494:19,
539:13, 539:23,
540:1, 556:8
**leaving** [1] - 420:9
**left** [12] - 396:10,
396:12, 400:10,
421:2, 461:22,
481:20, 481:21,
490:10, 499:9,
504:11, 515:22,
538:14
**left-hand** [1] - 538:14
**LEITZEN** [2] - 395:3,
400:18
**Leitzen** [16] - 396:15,
396:18, 400:16,
400:23, 485:16,
502:24, 509:16,
510:6, 510:12,
511:13, 517:16,
518:20, 519:2,
521:12, 524:18
**length** [2] - 499:25,
504:1
**letting** [1] - 433:14
**level** [3] - 414:15,
498:8, 514:18
**license** [1] - 531:18
**lies** [1] - 452:12
**life** [1] - 484:8
**life's** [3] - 497:24,
498:5, 529:16
**lifted** [2] - 555:15,
555:24
**light** [6] - 410:6,
414:20, 415:9,
416:18, 418:3,
495:15
**likely** [2] - 450:1,
507:12
**Linda** [1] - 399:14
**line** [1] - 465:12
**list** [6] - 405:4, 531:13,
532:1, 532:4,
533:12, 533:18
**listed** [2] - 411:9,
516:22
**listen** [1] - 515:18
**literally** [1] - 498:25
**lived** [7] - 422:3,
461:4, 461:5, 461:6,
461:9, 465:21, 481:2
**lives** [1] - 476:2
**Lo** [14] - 399:5,
425:12, 429:10,
430:10, 430:16,
481:17, 481:21,
483:12, 495:20,
518:3, 526:6, 531:7,
540:21, 543:1
**Lo's** [1] - 514:5
**loaded** [1] - 517:20
**local** [1] - 555:18
**location** [4] - 425:1,
426:18, 427:5, 432:1
**log** [3] - 430:9, 467:11,
467:12
**logistics** [1] - 525:19
**logs** [2] - 455:20,
530:23
**look** [28] - 425:17,
440:14, 442:2,
463:5, 465:11,
480:13, 488:14,
488:15, 488:16,
494:20, 494:21,
494:23, 494:25,
495:5, 495:6, 503:3,
517:8, 522:25,
523:25, 525:13,
530:12, 532:14,
532:16, 533:14,
548:23, 549:10,
555:23
**looking** [4] - 415:9,
425:3, 503:2, 522:20
**looks** [3] - 435:16,
463:16, 547:9
**lose** [1] - 529:15
**low** [1] - 491:20
**lower** [1] - 402:23
**Lown** [2] - 538:13,
538:25
**lown** [2] - 538:18,
538:19
**lump** [2] - 512:12
**lunch** [3] - 471:8,
471:12
**Lundquist** [1] - 394:19
**luxury** [6] - 503:1,
520:13, 521:3,
521:8, 524:16,
524:20
**lying** [1] - 499:18

**M**

**mailed** [2] - 399:6,
399:14
**main** [2] - 456:23,
456:24
**makeup** [1] - 513:10
**male** [3] - 407:22,
412:2, 481:19
**man** [1] - 429:21
**Man** [1] - 484:12
**manufacture** [1] -
403:7
**manufactures** [1] -
403:9
**map** [1] - 482:23
**mark** [6] - 435:13,
476:16, 546:23,
547:1, 547:3, 547:6
**married** [2] - 498:4,
498:10
**marry** [1] - 489:5
**match** [1] - 525:20
**matches** [6] - 489:21,
489:22, 489:23,
489:24, 491:11,
491:13
**math** [2] - 513:4,
513:6
**mathematician** [1] -
513:5
**matter** [18] - 396:6,
400:7, 414:22,
473:7, 474:14,
483:11, 483:13,
483:15, 497:13,
514:7, 543:12,
544:20, 544:22,
552:5, 557:19,
557:20, 558:22,
559:5
**matters** [3] - 472:14,
475:2, 523:16
**mean** [30] - 405:3,
408:25, 409:2,
409:15, 427:5,
430:3, 431:5,
431:10, 435:14,
435:19, 467:16,
472:13, 485:7,
491:9, 494:9,
494:15, 498:24,
499:4, 500:16,
504:13, 508:6,
509:25, 510:1,
510:3, 511:22,
513:19, 518:6,
518:7, 541:16
**meaning** [3] - 501:12,
513:19, 546:24
**means** [17] - 435:22,
436:2, 436:10,
438:14, 438:22,
445:23, 445:25,
452:1, 452:10,
463:5, 463:14,
494:10, 498:14,
524:7, 548:24,
553:22, 559:9
**meant** [10] - 444:3,
450:7, 452:18,
462:4, 462:22,
479:2, 484:24,
514:16, 514:17
**meet** [8] - 424:24,
426:2, 427:7, 427:9,
428:21, 501:15,
507:17, 507:19
**meeting** [1] - 426:5
**members** [2] - 483:10,
544:2
**memory** [8] - 405:9,
405:15, 450:15,
454:20, 456:5,

462:13, 504:6, 507:18

**men's** [2] - 418:20, 418:22

**mention** [2] - 518:2, 521:24

**mentioned** [1] - 475:4

**Merch** [1] - 399:14

**merely** [3] - 521:8, 521:13, 544:15

**message** [13] - 442:3, 442:17, 443:12, 445:18, 455:13, 455:14, 455:16, 470:6, 482:4, 482:7, 485:2, 486:2, 544:15

**messages** [70] - 409:20, 412:7, 413:19, 413:23, 415:11, 416:7, 417:5, 417:20, 425:4, 425:13, 425:14, 426:9, 432:4, 433:10, 435:2, 435:7, 439:23, 440:14, 441:17, 441:23, 443:9, 443:22, 446:8, 446:14, 446:15, 446:19, 449:5, 452:14, 455:5, 456:4, 457:8, 462:2, 477:22, 478:25, 479:4, 486:1, 488:14, 488:22, 489:1, 489:11, 490:1, 490:2, 490:3, 490:19, 490:21, 491:25, 492:8, 494:15, 496:14, 501:10, 520:12, 520:14, 520:18, 523:25, 524:17, 524:22, 525:11, 525:19, 526:5, 526:7, 526:10, 526:12, 526:21, 526:25, 527:4, 530:5, 530:22, 532:24

**met** [4] - 424:20, 424:21, 440:10, 501:2

**meth** [6] - 510:7, 510:8, 510:20, 510:23, 511:9, 511:10

**methamphetamine** [10] - 499:24, 509:15,

510:5, 511:15, 527:7, 527:8, 527:15, 527:16, 527:20, 529:13

**Michael** [45] - 394:6, 396:7, 400:8, 403:17, 421:1, 421:7, 421:19, 422:1, 425:7, 430:9, 447:7, 474:15, 482:7, 483:12, 497:7, 501:7, 502:8, 502:22, 513:12, 513:20, 514:8, 514:11, 514:25, 515:5, 515:7, 515:13, 515:25, 516:3, 516:9, 516:17, 516:21, 516:25, 517:12, 518:2, 518:3, 518:14, 518:22, 546:17, 552:6, 552:20, 553:1, 553:5, 553:9, 553:13, 553:17

**MICHAEL** [3] - 395:6, 421:11, 421:20

**Michael's** [5] - 500:21, 513:17, 515:17, 517:24, 519:5

**microphone** [2] - 421:17, 422:6

**midnight** [3] - 506:4, 546:25, 547:2

**might** [10] - 432:13, 432:19, 435:8, 485:22, 505:25, 530:3, 531:19, 532:22, 534:6, 544:3

**Mike** [2] - 483:12

**Mike-Mike** [1] - 483:12

**military** [1] - 467:5

**mind** [7] - 449:20, 453:9, 472:1, 499:7, 514:15, 517:4, 550:8

**mine** [2] - 507:18, 533:11

**minimal** [1] - 500:4

**miniscule** [1] - 510:18

**minute** [27] - 409:21, 424:14, 430:23, 448:10, 449:24, 450:16, 450:18, 453:17, 455:25, 468:14, 481:20, 481:21, 489:13, 489:16, 489:17, 508:24, 509:1, 516:1, 516:22,

516:23, 516:24, 517:1, 535:11, 535:24, 536:14, 539:12

**minute-and-39-second** [1] - 489:13

**minute-and-a-half** [1] - 448:10

**minutes** [28] - 404:15, 406:21, 407:5, 418:13, 418:24, 428:11, 462:2, 462:16, 463:12, 470:1, 471:14, 473:15, 473:16, 473:17, 473:19, 473:21, 482:10, 489:7, 506:15, 506:17, 506:22, 507:10, 535:15, 535:18, 556:9, 556:14, 556:15

**misery** [2] - 475:25, 476:10

**mislead** [2] - 522:3, 522:6

**misleading** [1] - 521:4

**miss** [1] - 438:17

**misstate** [1] - 474:24

**mistake** [2] - 405:16, 468:20

**mistakes** [2] - 554:1, 557:6

**mistrial** [1] - 541:19

**moments** [1] - 397:2

**money** [18] - 402:17, 402:18, 402:24, 433:18, 446:2, 449:14, 450:8, 453:2, 466:6, 478:14, 480:1, 480:3, 480:5, 480:6, 482:18, 485:20, 488:21, 546:8

**month** [2] - 449:13, 518:4

**months** [2] - 518:4, 518:17

**mooney** [1] - 555:7

**MOONEY** [1] - 555:9

**morning** [2] - 471:3, 540:3

**most** [13] - 407:16, 410:7, 414:20, 415:10, 416:18, 418:3, 439:20, 440:5, 497:16, 497:24, 498:5, 531:21, 557:11

**Most** [1] - 440:7

**mostly** [4] - 464:13, 464:14, 480:23, 532:15

**motion** [5] - 407:11, 414:18, 418:9, 472:21, 472:24

**motions** [2] - 397:1, 558:12

**motivation** [1] - 500:3

**motive** [1] - 544:7

**mouth** [1] - 477:20

**move** [6] - 407:13, 418:11, 422:5, 471:20, 472:9, 493:9

**moved** [1] - 424:25

**moving** [1] - 406:24

**MR** [101] - 396:14, 396:22, 397:14, 397:19, 398:1, 398:9, 399:11, 399:19, 399:23, 400:1, 400:14, 401:1, 401:3, 404:3, 404:6, 404:8, 405:11, 405:13, 406:4, 406:8, 406:14, 407:12, 410:15, 410:19, 417:10, 418:16, 418:18, 418:25, 419:6, 419:7, 419:22, 420:16, 420:19, 421:6, 421:23, 421:25, 434:10, 434:13, 434:15, 466:10, 466:13, 466:16, 468:15, 468:19, 470:9, 470:13, 470:15, 470:20, 472:5, 472:9, 472:13, 472:22, 473:2, 473:11, 473:13, 473:18, 474:3, 474:4, 474:7, 474:11, 475:13, 497:6, 520:3, 520:8, 521:6, 522:5, 523:6, 523:8, 523:12, 523:15, 536:18, 536:20, 536:22, 536:23, 537:6, 537:8, 537:12, 537:14, 537:18, 537:20, 540:13, 541:5, 541:23, 542:19, 542:22, 545:6, 545:12, 546:9, 546:15, 547:16, 548:15,

548:21, 550:1, 551:6, 551:10, 551:18, 551:20, 552:1, 552:2, 558:18, 558:20

**mystery** [1] - 409:22

**N**

**Nah** [2] - 458:16, 502:9

**name** [7] - 400:22, 411:2, 421:17, 421:18, 447:16, 459:24, 460:25

**named** [2] - 398:12, 480:18

**nameless** [2] - 499:11, 501:3

**names** [3] - 407:20, 460:2, 553:23

**near** [1] - 524:3

**necessarily** [4] - 472:14, 510:19, 541:15, 543:11

**Need** [1] - 462:17

**need** [39] - 397:17, 398:6, 419:19, 428:19, 428:23, 435:18, 435:21, 436:16, 438:16, 458:11, 458:17, 462:18, 464:2, 473:8, 479:5, 479:6, 481:25, 484:13, 484:20, 484:21, 484:22, 486:3, 490:6, 503:7, 505:20, 506:23, 507:15, 515:19, 519:14, 519:15, 523:3, 526:2, 526:24, 536:17, 537:16, 540:12, 541:1

**needed** [3] - 409:13, 452:15, 464:23

**needs** [8] - 408:16, 408:17, 409:10, 446:21, 499:9, 508:15, 508:18

**negotiations** [1] - 509:22

**Nelson** [24] - 398:3, 398:20, 401:10, 401:14, 404:11, 408:10, 412:25, 442:4, 443:10, 443:11, 492:25, 493:2, 493:4,

499:11, 502:18, 517:10, 533:15, 540:17, 541:7, 542:14, 543:3, 544:5, 544:17, 544:18

**Nelson's** [5] - 404:10, 493:2, 499:14, 531:3, 542:24

**Nelsons** [1] - 533:20

**Nevada** [3] - 424:22, 424:23, 426:3

**never** [14] - 422:20, 423:11, 431:12, 445:5, 446:3, 446:4, 490:20, 510:12, 528:4, 528:5, 534:15

**new** [9] - 406:1, 465:17, 465:19, 484:14, 510:24, 511:11, 522:24, 522:25, 523:1

**news** [6] - 406:17, 406:18, 406:24, 407:2, 463:3

**next** [4] - 470:25, 515:24, 540:3, 556:24

**nicknames** [1] - 460:1

**night** [4] - 396:10, 492:18, 495:2, 528:17

**Nikki** [1] - 538:13

**nine** [3] - 451:20, 457:19, 490:20

**nobody** [6] - 403:11, 407:20, 407:23, 437:6, 500:20, 555:16

**nobody's** [1] - 437:10

**none** [8] - 440:10, 507:24, 527:2, 527:12, 530:5, 530:6, 536:20, 537:14

**nonstop** [1] - 535:9

**Northern** [1] - 396:3

**NORTHERN** [1] - 394:1

**Notary** [1] - 559:3

**note** [7] - 546:20, 547:11, 547:12, 548:3, 548:10, 548:23, 550:22

**notebook** [1] - 546:6

**noted** [1] - 474:17

**notes** [4] - 543:23, 545:8, 559:8, 559:12

**nothing** [12] - 399:23, 400:1, 408:22,

409:25, 470:9, 504:21, 507:21, 507:25, 515:23, 529:19, 538:16, 558:20

**notice** [2] - 427:13, 471:23

**November** [2] - 398:9, 398:10

**number** [28] - 404:21, 404:22, 405:6, 405:7, 405:17, 405:18, 405:19, 405:22, 425:18, 427:15, 429:20, 430:12, 442:5, 442:6, 442:12, 443:11, 449:6, 457:10, 466:22, 480:22, 486:2, 493:17, 493:20, 493:23, 531:7, 536:4, 547:17

**Number** [16] - 396:7, 400:9, 421:1, 474:15, 477:6, 477:11, 480:11, 480:14, 484:3, 484:4, 484:5, 498:2, 536:7, 536:11, 546:18, 552:6

**numbers** [3] - 404:25, 405:4, 546:3

**nuts** [1] - 525:12

## O

**object** [2] - 520:8, 552:25

**objection** [7] - 396:19, 413:4, 537:7, 537:13, 551:4, 551:8, 551:11

**objects** [1] - 522:22

**observations** [3] - 496:8, 531:1, 539:14

**observed** [1] - 532:20

**obtain** [1] - 413:9

**obvious** [1] - 427:10

**obviously** [8] - 419:12, 493:12, 495:23, 497:9, 498:14, 503:22, 513:23, 519:13

**occasion** [6] - 411:23, 436:21, 480:24, 481:13, 481:16

**occur** [7] - 409:19, 501:22, 501:23, 502:3, 505:1, 505:3,

532:18

**occurred** [21] - 404:18, 408:14, 408:17, 408:20, 408:21, 409:24, 413:22, 414:4, 417:15, 426:15, 426:23, 428:3, 491:18, 496:3, 502:1, 503:23, 506:6, 506:11, 508:10, 523:24

**occurring** [1] - 498:22

**occurs** [1] - 508:12

**OF** [1] - 394:1

**off-the-record** [1] - 536:24

**offered** [3] - 543:11, 544:20, 544:21

**office** [4] - 399:13, 556:24, 557:8, 557:15

**Officer** [3] - 396:17, 400:15, 485:15

**officer** [5] - 401:4, 492:6, 528:19, 532:17, 557:16

**officers** [2] - 492:4, 496:8, 527:24

**officers'** [1] - 530:25

**often** [4] - 485:16, 485:17, 497:17

**old** [5] - 405:6, 405:7, 405:17, 405:18, 405:19

**on-or-about** [1] - 411:10

**once** [5] - 471:8, 516:8, 528:25, 539:19, 557:15

**one** [87] - 396:12, 398:3, 398:8, 398:9, 405:20, 406:2, 409:20, 411:24, 413:18, 428:17, 430:23, 431:9, 440:20, 441:24, 442:22, 443:7, 443:14, 443:23, 444:22, 446:5, 446:13, 449:15, 450:12, 450:22, 464:13, 464:14, 464:18, 468:14, 471:22, 474:23, 476:13, 480:16, 480:19, 480:21, 480:23, 481:3, 481:9, 481:10, 481:16, 485:3,

485:4, 486:14, 487:3, 487:4, 488:2, 488:19, 491:6, 493:2, 493:3, 493:8, 498:5, 500:23, 502:8, 503:12, 506:7, 506:14, 507:2, 507:4, 507:13, 508:4, 511:2, 511:3, 511:17, 514:10, 515:21, 519:16, 526:1, 528:3, 531:5, 531:7, 536:4, 538:10, 538:12, 538:18, 540:16, 541:7, 541:9, 541:10, 541:16, 546:25, 547:2, 547:17, 551:2

**ongoing** [1] - 412:20

**oops** [1] - 427:13

**open** [4] - 494:18, 528:24, 528:25

**opened** [1] - 521:15

**operation** [1] - 423:1

**opinion** [3] - 426:23, 428:18, 520:11

**opportunity** [2] - 475:7, 537:4

**opposite** [1] - 401:23

**order** [6] - 402:16, 414:3, 471:8, 477:11, 480:9, 531:15

**ordered** [1] - 394:25

**original** [2] - 468:20, 543:18

**OT** [4] - 436:1, 436:12, 462:3, 462:21

**otherwise** [1] - 498:19

**outcome** [1] - 539:10

**outgoing** [3] - 467:14, 468:1, 468:7

**outside** [6] - 396:8, 396:18, 501:16, 520:6, 537:1, 546:18

**outstanding** [1] - 545:16

**overdose** [2] - 493:25, 517:15

**overdosed** [6] - 493:6, 493:10, 494:6, 517:12, 517:21, 517:24

**overlap** [1] - 549:1

**overlapping** [1] - 547:5

**overwhelmingly** [1] - 496:20

**owe** [4] - 433:4, 451:11, 479:9, 485:5

**owed** [8] - 432:17, 432:21, 449:14, 450:4, 450:7, 451:16, 490:17, 490:18

**owes** [1] - 450:13

**own** [5] - 403:7, 475:24, 477:20, 477:21, 539:21

## P

**p.m** [7] - 506:7, 506:16, 546:12, 551:23, 558:24

**packaging** [2] - 423:5, 511:22

**packet** [2] - 488:3, 488:4

**Page** [1] - 395:2

**page** [6] - 425:9, 430:7, 433:11, 454:23, 456:7, 483:7

**pages** [1] - 559:11

**panicked** [5] - 413:24, 448:25, 490:15, 490:16, 491:2

**paper** [2] - 441:1, 441:12

**paragraph** [1] - 483:6

**paraphernalia** [1] - 527:16

**part** [3] - 510:18, 543:20, 548:5

**participated** [1] - 532:12

**particular** [18] - 404:12, 412:21, 438:25, 479:20, 482:6, 484:10, 490:7, 492:4, 494:14, 494:21, 496:13, 498:18, 502:22, 506:5, 508:21, 521:11, 524:11, 533:21

**particularly** [1] - 482:5

**parties** [7] - 426:20, 427:9, 429:16, 470:25, 474:19, 522:17, 555:19

**party** [2] - 406:20, 510:14

**pass** [1] - 538:1

**passed** [3] - 515:1, 518:18, 544:4, 544:7

**passing** [1] - 544:15

*Sarah J. Dittmer, CSR, RPR*
*1(888)388-2723*

past [3] - 488:17, 534:15, 539:25
paths' [1] - 546:24
patient [3] - 450:17, 484:17, 485:1
Patrick [1] - 535:22
pattern [2] - 525:4, 529:6
pay [1] - 482:17
people [47] - 407:19, 407:24, 408:11, 408:13, 409:7, 411:23, 415:15, 415:19, 415:23, 423:20, 437:9, 438:12, 445:25, 451:8, 452:16, 452:19, 459:24, 464:12, 464:22, 465:22, 476:2, 479:4, 479:5, 480:1, 480:24, 481:13, 483:15, 486:3, 487:8, 496:12, 499:11, 500:7, 500:22, 501:2, 501:3, 502:15, 503:10, 510:25, 526:16, 526:18, 526:19, 526:20, 528:20, 531:19, 531:21, 543:21
people's [2] - 475:25, 518:10
per [1] - 403:2
percent [1] - 396:24
perfect [1] - 504:6
perfectly [1] - 419:22
perhaps [14] - 403:13, 468:20, 472:6, 490:6, 494:3, 494:4, 504:7, 504:9, 516:9, 522:8, 547:8, 548:11, 549:9, 550:10
period [19] - 412:16, 415:7, 416:3, 416:20, 417:4, 417:12, 422:14, 422:18, 424:18, 439:20, 439:22, 439:23, 471:10, 489:20, 492:22, 506:25, 547:1, 547:3
permission [1] - 410:17
person [24] - 408:5, 411:25, 422:21, 427:2, 429:18, 458:20, 458:22,

464:10, 480:16, 480:17, 481:9, 481:23, 483:4, 485:19, 485:20, 497:22, 520:22, 520:23, 538:13, 542:2, 543:19, 544:7, 544:13, 544:14
personal [3] - 437:6, 437:11, 437:16
personal-use [1] - 437:16
personally [1] - 423:3
persons [2] - 477:13, 478:4
perspective [1] - 419:18
persuade [1] - 416:24
phone [77] - 404:21, 404:22, 404:25, 405:4, 405:6, 405:7, 405:17, 405:18, 405:19, 405:21, 409:21, 410:1, 413:23, 417:6, 417:21, 423:18, 425:12, 425:13, 442:16, 442:25, 443:5, 448:4, 448:5, 448:11, 448:12, 448:14, 448:18, 448:19, 451:20, 452:24, 453:20, 454:12, 455:9, 455:11, 455:15, 455:25, 456:10, 457:1, 457:6, 459:4, 466:18, 466:20, 466:21, 467:4, 467:19, 468:5, 469:7, 469:10, 469:18, 489:13, 489:17, 490:2, 490:12, 490:22, 491:16, 491:17, 492:1, 492:9, 492:12, 492:13, 494:15, 495:1, 496:15, 503:25, 504:2, 514:20, 516:15, 526:25, 529:19, 529:21, 531:4, 532:23, 534:8, 546:3
phones [1] - 448:5
photos [1] - 425:4
phrase [3] - 401:15, 483:25, 486:10
physical [3] - 494:13,

494:14, 494:17
pick [9] - 432:12, 432:13, 432:16, 432:17, 444:17, 445:10, 491:16, 533:21
picked [4] - 409:2, 533:22, 533:23, 534:1
pills [1] - 511:7
pizza [3] - 436:16, 438:8, 487:14
place [12] - 424:23, 427:9, 482:9, 493:8, 499:14, 517:13, 524:11, 525:9, 527:13, 543:14, 559:6, 559:7
Plaintiff [1] - 394:4
planning [1] - 505:16
plastic [1] - 423:6
play [1] - 513:25
plea [1] - 460:20
pleasantries [1] - 504:7
pleased [1] - 545:15
plenty [1] - 453:24
plugging [1] - 535:9
pocket [1] - 531:2
point [26] - 399:1, 401:19, 407:13, 409:4, 412:19, 413:2, 420:8, 443:13, 443:20, 449:12, 453:10, 457:22, 458:23, 479:7, 487:23, 501:5, 502:12, 503:19, 515:15, 531:17, 532:1, 541:6, 541:14, 549:8, 557:6
pointed [1] - 469:14
police [2] - 496:8, 499:20
police's [2] - 499:19, 500:12
polling [1] - 553:21
popping [1] - 550:8
portion [1] - 512:13
portions [1] - 512:12
possibil [1] - 509:3
possibility [4] - 511:10, 528:10, 528:12, 528:13
possible [9] - 508:7, 509:4, 509:11, 510:20, 510:22, 510:23, 528:14, 529:14

potent [2] - 513:19, 513:23
potential [1] - 420:5
potentially [1] - 396:18
preceded [1] - 469:9
prefer [1] - 397:1
prepared [2] - 397:23, 399:24
presence [5] - 396:9, 520:6, 523:9, 537:1, 546:19
present [7] - 421:4, 471:1, 475:10, 520:1, 522:13, 523:13, 524:24
presented [1] - 522:15
Presentence [3] - 556:25, 557:17, 557:22
presiding [1] - 470:24
presiding [1] - 396:4
pretty [15] - 424:6, 424:7, 424:23, 436:24, 458:1, 458:2, 458:3, 477:10, 497:10, 507:20, 508:9, 509:23, 509:24, 510:4, 514:5
previous [2] - 431:3, 514:14
previously [4] - 513:16, 539:8, 551:11, 555:15
price [7] - 402:23, 451:3, 451:5, 454:21, 501:13, 509:21, 525:14
prices [2] - 524:2, 526:17
print [1] - 559:8
probation [4] - 556:24, 557:8, 557:15, 557:16
problem [6] - 420:5, 504:19, 505:11, 531:9, 548:21, 548:22
problems [1] - 495:23
procedure [1] - 526:23
proceed [8] - 397:13, 397:23, 399:24, 400:13, 400:25, 421:22, 475:12, 497:5
proceedings [2] - 394:9, 559:7
process [2] - 458:18,

470:25
produced [2] - 400:19, 421:12
product [2] - 403:5, 513:15
profit [1] - 403:3
prohibits [1] - 555:18
promise [1] - 446:12
promises [3] - 401:14, 401:15, 519:3
promptly [1] - 546:5
Proof [1] - 497:20
proof [16] - 475:5, 475:9, 497:12, 497:13, 497:14, 497:21, 497:23, 498:13, 498:19, 509:5, 509:6, 512:17, 519:19, 522:25, 531:15, 532:2
proposed [4] - 547:11, 548:12, 549:24, 550:24
protect [1] - 499:25
prove [14] - 409:10, 409:23, 477:6, 477:12, 478:16, 478:17, 478:19, 505:21, 509:6, 509:9, 509:11, 519:18, 531:14
proved [1] - 418:6
proven [3] - 410:8, 476:21, 498:15
proves [3] - 412:23, 479:17, 527:22
provide [2] - 405:5, 510:22
provided [9] - 398:4, 405:7, 405:17, 406:1, 407:23, 408:2, 493:9, 514:12, 522:14
providing [1] - 452:10
Public [1] - 559:3
pull [4] - 421:15, 456:6, 476:15, 522:11
pulling [1] - 410:5
purchase [5] - 430:5, 433:6, 449:11, 454:16, 482:8
purchased [4] - 500:19, 509:15, 510:5, 513:3
purpose [4] - 429:15, 479:22, 479:24, 479:25
purposes [1] - 397:20

**pursuant** [1] - 407:14
**push** [1] - 472:16
**put** [20] - 397:10, 406:19, 407:3, 417:13, 435:16, 441:6, 471:2, 504:12, 516:9, 517:18, 520:19, 521:1, 521:25, 522:18, 523:2, 524:23, 529:4, 533:12, 535:10, 543:8
**putting** [2] - 521:21, 550:2
**puzzling** [1] - 550:22

## Q

**qualifications** [1] - 401:5
**qualifies** [1] - 541:12
**qualify** [1] - 543:17
**quality** [2] - 513:10, 513:15
**quantities** [6] - 402:15, 402:16, 402:19, 415:13, 437:4, 485:16
**quantity** [3] - 430:5, 432:1, 512:24
**quarter** [1] - 453:16
**questionnaires** [2] - 556:1, 556:16
**questions** [7] - 396:17, 401:7, 404:4, 466:11, 543:8, 555:21, 556:2
**quick** [6] - 418:20, 419:8, 507:5, 508:22, 516:16
**quicker** [5] - 406:24, 484:15, 484:16, 484:25
**quickly** [1] - 516:13
**quit** [1] - 399:1
**quite** [3] - 404:11, 416:1, 499:15
**quote** [2] - 546:22, 546:23

## R

**raise** [5] - 400:17, 421:10, 522:12, 538:22, 540:14
**raised** [1] - 520:10
**Rapids** [6] - 394:10, 394:20, 394:23,

452:16, 526:19, 526:20
**rate** [2] - 464:25, 524:10
**rather** [1] - 549:3
**re** [14] - 396:15, 402:10, 402:12, 403:5, 434:19, 434:22, 435:3, 436:23, 461:19, 464:2, 464:3, 477:24, 478:24, 533:6
**re-call** [1] - 396:15
**re-up** [8] - 434:22, 435:3, 436:23, 464:2, 464:3, 477:24, 478:24, 533:6
**re-upped** [1] - 461:19
**re-upping** [4] - 402:10, 402:12, 403:5, 434:19
**reach** [3] - 480:15, 496:18, 540:5
**reached** [4] - 443:7, 471:11, 477:13, 478:9
**reaches** [1] - 525:8
**reaction** [4] - 413:24, 490:16, 502:17
**read** [17] - 425:17, 425:25, 427:18, 428:4, 429:4, 429:20, 430:7, 452:4, 452:6, 452:7, 474:10, 535:13, 538:4, 548:3, 548:13, 552:17, 553:22
**reading** [2] - 405:14, 538:6
**reads** [2] - 474:8, 546:21
**ready** [9] - 397:12, 399:21, 417:18, 419:4, 474:1, 489:8, 504:17, 537:22, 551:25
**real** [3] - 404:17, 513:14, 525:7
**realistically** [1] - 402:21
**realize** [1] - 522:20
**realized** [1] - 398:5
**really** [15] - 408:25, 445:16, 445:20, 449:8, 458:21, 466:13, 466:25, 477:10, 484:12,

484:13, 484:22, 497:16, 499:14, 515:9, 516:16
**realm** [1] - 509:3
**Reask** [1] - 405:2
**reason** [15] - 409:1, 453:18, 453:21, 464:25, 476:7, 483:24, 484:2, 484:3, 484:5, 484:11, 500:10, 513:9, 518:15, 528:11, 534:13
**reasonable** [32] - 409:23, 411:16, 411:17, 418:7, 476:22, 477:2, 477:3, 480:19, 497:14, 497:20, 497:22, 498:13, 498:14, 498:18, 498:20, 498:21, 498:23, 499:3, 509:7, 509:12, 512:18, 519:19, 519:20, 524:13, 528:13, 531:16, 532:3, 532:6, 532:7, 532:9, 532:11, 552:25
**reasonably** [3] - 508:7, 510:21, 510:23
**reasons** [1] - 519:21
**rebuttal** [7] - 470:19, 475:10, 512:10, 520:1, 523:6, 523:7, 523:13
**received** [3] - 546:20, 547:12, 548:2
**recess** [5] - 473:24, 535:17, 546:11, 551:22, 558:22
**Recessed** [2] - 419:3, 473:25
**recessed** [2] - 546:12, 551:23
**recognize** [1] - 541:13
**recognized** [1] - 405:18
**recognizing** [1] - 541:5
**recollection** [14] - 408:9, 426:24, 427:1, 435:10, 455:21, 463:24, 475:1, 475:3, 533:10, 541:6, 541:25, 543:4, 544:10, 544:11

**record** [24] - 398:6, 399:7, 400:22, 408:8, 412:22, 412:25, 414:5, 414:8, 418:10, 419:8, 420:12, 421:18, 492:15, 536:16, 536:24, 537:1, 537:16, 540:12, 540:15, 541:1, 541:24, 546:16, 551:3, 558:23
**record's** [1] - 541:23
**recovering** [1] - 493:21
**recross** [1] - 468:17
**Recross** [1] - 395:10
**RECROSS** [1] - 468:18
**Recross-Examination** [1] - 395:10
**recross-examination** [1] - 468:17
**RECROSS-EXAMINATION** [1] - 468:18
**recruiting** [1] - 487:12
**recruits** [1] - 487:10
**recycle** [1] - 546:7
**red** [1] - 501:17
**redirect** [3] - 406:6, 406:8, 466:12
**REDIRECT** [1] - 466:15
**Redirect** [1] - 395:9
**redistribute** [1] - 482:19
**redistributes** [1] - 478:6
**redistributing** [7] - 415:13, 416:5, 479:15, 479:17, 483:17, 486:9, 533:9
**redistribution** [3] - 437:4, 478:1, 485:18
**reduced** [1] - 559:8
**refer** [2] - 411:12, 442:15
**reference** [5] - 536:6, 536:11, 547:4, 548:25, 549:17
**referenced** [1] - 521:22
**references** [1] - 549:15
**referred** [2] - 402:9, 483:13
**referring** [1] - 469:1

**refine** [1] - 526:23
**reflect** [3] - 420:12, 425:22, 541:24
**reflected** [2] - 418:10, 504:15
**reflection** [1] - 548:11
**reflects** [1] - 541:24
**refresh** [7] - 435:10, 450:15, 454:20, 455:21, 456:5, 462:13, 463:24
**regain** [1] - 438:11
**regard** [3] - 413:13, 415:8, 416:10
**regarding** [1] - 418:14
**regardless** [1] - 479:1
**regards** [11] - 401:7, 410:19, 411:20, 429:1, 477:4, 487:5, 487:24, 487:25, 519:8, 521:11, 541:1
**registered** [2] - 403:15, 447:13
**rehash** [1] - 472:23
**reintroduction** [1] - 525:16
**relation** [2] - 403:17, 449:5
**relationship** [1] - 526:14
**released** [1] - 460:17
**rely** [10] - 414:2, 496:9, 497:23, 519:11, 531:10, 531:12, 533:14, 533:15, 533:20, 557:10
**rem** [1] - 541:16
**remain** [2] - 473:5, 545:24
**remedies** [1] - 541:16
**remedy** [1] - 550:23
**remem** [1] - 507:17
**remember** [32] - 401:5, 401:17, 424:8, 424:12, 425:3, 442:19, 446:14, 446:19, 446:23, 449:18, 449:21, 450:11, 450:14, 452:14, 452:17, 452:18, 455:19, 461:24, 462:15, 469:3, 469:5, 471:15, 479:8, 481:15, 487:22, 493:24, 517:14, 524:5, 528:14, 529:20, 531:11, 531:13

**remembered** [1] - 424:13

**reminded** [1] - 536:10

**removed** [1] - 420:13

**renew** [3] - 472:21, 472:24, 473:2

**rephrased** [1] - 443:18

**reply** [1] - 431:2

**Report** [3] - 556:25, 557:17, 557:22

**report** [8] - 405:9, 405:14, 512:22, 557:2, 557:4, 557:10, 558:2, 558:14

**Reporter** [3] - 559:3, 559:5, 559:21

**reporter** [2] - 473:16, 523:3, 535:9

**representing** [1] - 545:17

**request** [1] - 418:19

**requests** [1] - 549:16

**require** [1] - 498:10

**required** [6] - 412:21, 480:13, 483:5, 483:7, 498:11, 503:23

**requirement** [2] - 480:3, 480:4

**requires** [2] - 415:18, 512:15

**reread** [2] - 547:13, 550:25

**Reread** [1] - 549:7

**resealable** [1] - 529:5

**research** [1] - 539:3

**reselling** [1] - 485:13

**resident** [1] - 422:1

**resistance** [1] - 473:2

**respect** [1] - 538:21

**respond** [4] - 429:13, 431:17, 445:19, 542:20

**response** [13] - 429:11, 430:1, 458:14, 462:18, 462:20, 463:11, 476:7, 484:24, 485:25, 507:23, 541:21, 547:11, 548:19

**responsibility** [2] - 491:10, 545:9

**rest** [8] - 433:11, 470:14, 512:13, 523:4, 535:12, 538:15, 538:21, 539:11

**restate** [4] - 439:17,

446:18, 461:21, 469:4

**rested** [1] - 421:2

**restocking** [1] - 402:13

**restricting** [1] - 511:8

**rests** [5] - 397:5, 406:14, 406:20, 470:22, 470:23

**resumed** [4] - 419:3, 473:25, 546:12, 551:23

**resupplied** [1] - 434:17

**resupply** [2] - 402:7, 464:22

**retrieve** [1] - 552:15

**return** [3] - 482:17, 519:22, 534:18

**review** [7] - 426:24, 494:13, 494:17, 524:18, 537:4, 537:11, 546:14

**reviewed** [1] - 502:25

**revised** [2] - 535:25, 537:4

**Ricky** [15] - 411:1, 411:2, 411:3, 411:5, 460:25, 461:2, 461:16, 465:21, 465:23, 466:1, 481:1, 481:2, 481:4, 481:6

**rid** [2] - 527:14, 527:18

**ride** [8] - 428:7, 446:22, 507:2, 507:5, 507:10, 507:11, 507:15, 508:2

**ride's** [1] - 507:1

**rise** [10] - 396:2, 400:4, 407:7, 414:15, 420:22, 471:18, 535:19, 537:23, 540:9, 556:19

**road** [1] - 482:23

**robbery** [2] - 460:15, 460:20

**rolling** [3] - 484:14, 484:23, 525:15

**Ron** [2] - 509:15, 528:16

**Ronnie** [2] - 510:1, 510:5

**room** [7] - 414:13, 418:20, 418:22, 476:13, 477:9, 486:19, 539:11

**roommates** [1] - 461:7

**row** [1] - 490:21

**ruins** [1] - 476:2

**rule** [2] - 503:17, 555:18

**Rule** [5] - 407:14, 414:15, 414:19, 418:9, 472:24

**ruling** [5] - 414:18, 473:5, 545:4, 551:1, 551:4

**run** [2] - 473:18, 500:22

---

## S

**S-T-E-V-E-N-S-O-N** [1] - 421:20

**safely** [1] - 418:2

**safety** [1] - 417:22

**sakes** [1] - 487:13

**sale** [7] - 414:10, 424:4, 438:4, 438:15, 440:21, 478:19, 478:21

**sales** [5] - 423:15, 501:10, 502:1, 502:3, 511:8

**Sali** [1] - 535:23

**Sam's** [1] - 402:21

**sandwich** [1] - 510:8

**Sarah** [1] - 559:20

**saves** [1] - 546:8

**saw** [5] - 489:18, 496:12, 501:9, 511:16, 532:20

**schedule** [3] - 539:19, 539:21, 557:20

**Scholtes** [13] - 404:19, 404:20, 408:10, 410:21, 415:3, 434:3, 460:24, 461:10, 476:20, 481:2, 499:12, 501:1, 526:9

**Scholtes'** [1] - 496:6

**school** [2] - 428:8, 507:3

**Scott** [1] - 517:18

**screen** [3] - 427:25, 442:21, 463:5

**scroll** [3] - 435:15, 450:16, 455:8

**SE** [2] - 394:20, 394:22

**seal** [1] - 528:25

**sealed** [1] - 494:19

**Sean** [1] - 547:6

**searched** [3] - 511:4,

511:6, 527:11

**seat** [2] - 400:21, 421:14

**seated** [11] - 396:5, 400:6, 407:9, 420:24, 471:20, 474:13, 535:21, 537:25, 540:11, 552:4, 556:21

**second** [8] - 413:21, 415:1, 441:21, 449:24, 454:22, 534:8, 548:5, 549:15

**Second** [1] - 394:22

**seconds** [12] - 430:23, 453:16, 453:17, 456:1, 468:14, 489:14, 489:16, 489:17, 516:1, 516:22, 516:25, 517:2

**see** [38] - 419:13, 425:18, 426:12, 428:16, 435:12, 441:12, 442:22, 446:8, 449:23, 450:19, 451:12, 451:15, 454:25, 455:9, 455:23, 465:12, 466:23, 466:24, 467:1, 472:11, 473:19, 482:6, 489:11, 490:19, 497:19, 506:24, 507:6, 512:20, 512:24, 520:13, 521:3, 521:8, 525:13, 529:24, 537:21, 538:23, 552:11, 557:6

**See** [1] - 463:4

**seeing** [1] - 524:16

**seeking** [2] - 508:13, 508:17

**seem** [3] - 427:24, 548:19, 550:4

**seized** [1] - 533:1

**selection** [3] - 497:25, 498:3, 538:9

**self** [2] - 485:21, 556:5

**self-addressed** [1] - 556:5

**self-admitted** [1] - 485:21

**sell** [27] - 402:15, 402:16, 402:24, 403:5, 422:17, 422:21, 423:4, 423:23, 433:24,

434:4, 434:8, 437:12, 438:1, 438:20, 459:12, 478:18, 480:1, 482:16, 491:3, 494:6, 494:7, 511:1, 528:16, 528:20, 533:6, 533:25

**sellers** [1] - 526:13

**selling** [25] - 402:14, 402:18, 422:11, 422:14, 436:20, 437:9, 437:21, 445:12, 450:24, 461:10, 463:22, 465:22, 466:4, 478:12, 480:4, 483:14, 483:16, 485:20, 493:15, 500:8, 502:13, 510:24, 526:15, 526:16, 529:13

**sells** [1] - 437:13

**send** [4] - 482:4, 482:6, 540:7, 550:23

**sending** [2] - 487:13, 549:6

**sends** [1] - 504:16

**sense** [25] - 397:14, 407:16, 483:24, 484:2, 484:4, 484:5, 484:11, 499:1, 503:4, 503:16, 514:25, 515:4, 515:14, 515:17, 517:25, 528:8, 528:12, 529:22, 529:23, 530:1, 530:3, 530:13, 534:12, 534:13, 534:14

**sent** [4] - 426:10, 432:4, 457:7, 506:14

**sentence** [5] - 500:11, 500:16, 549:15, 557:12

**sentencing** [2] - 557:9, 557:20

**separate** [4] - 484:1, 550:16, 550:17, 550:18

**September** [5] - 408:15, 408:22, 422:11, 422:12, 500:25

**series** [3] - 426:10, 437:22, 535:14

**service** [5] - 555:12, 555:14, 555:25, 556:4, 556:17

session [1] - 396:4
set [4] - 426:18, 539:20, 557:19, 559:14
settle [1] - 433:19
seven [1] - 525:19
Seventh [1] - 394:20
several [2] - 404:15, 409:18
shady [1] - 433:16, 458:21
Shannon [9] - 410:21, 460:24, 461:10, 476:20, 481:2, 496:6, 499:12, 501:1, 526:9
share [2] - 415:16, 549:13
shared [1] - 417:13
shine [2] - 484:16, 484:25
Shit [1] - 450:21
shit [4] - 451:25, 465:17, 479:12, 485:8
shop [2] - 438:17, 438:19
short [2] - 523:2, 535:14
short' [1] - 481:22
shorted [2] - 412:4, 489:15
Shorthand [3] - 559:2, 559:5, 559:21
shorthand [3] - 559:7, 559:8, 559:12
shortly [6] - 456:3, 459:1, 459:2, 470:5, 490:11, 507:13
shot [1] - 517:20
show [15] - 405:3, 425:7, 430:6, 435:2, 441:16, 443:22, 466:20, 467:20, 476:18, 482:9, 488:11, 490:14, 526:2, 531:5, 531:20
showed [7] - 404:24, 405:9, 435:7, 455:20, 462:2, 476:18, 526:6
showing [2] - 405:4, 415:11
shown [1] - 412:15
shows [9] - 414:9, 437:23, 443:15, 474:22, 496:3, 514:15, 523:19, 526:4, 526:5
sic [5] - 405:5, 471:5,

490:17, 490:18, 515:6
sic] [1] - 495:8
sick [2] - 476:3, 539:5
sickness [1] - 503:7
side [1] - 472:10
sidebar [1] - 520:6
sides [2] - 470:24, 545:21
sign [2] - 511:17, 514:23
signatures [1] - 547:9
signed [2] - 547:6, 551:13
silence [1] - 504:21
similar [1] - 520:21
similarity [1] - 511:21
simple [1] - 477:10
simply [7] - 415:18, 416:2, 443:22, 477:11, 482:25, 484:20, 522:12
single [4] - 408:9, 408:12, 412:15, 503:12
Sioux [1] - 394:17
sister [2] - 403:19, 490:9
sit [1] - 484:7
sitting [1] - 410:16
situation [2] - 506:3, 506:9
situations [1] - 502:6
six [7] - 494:6, 494:7, 506:17, 517:15, 517:21, 517:25, 525:19
size [1] - 514:12
skeptical [2] - 531:19, 531:23
skeptically [1] - 530:11
skimpy [3] - 514:9, 514:13, 514:17
slang [2] - 445:21
slow [1] - 502:19
small [5] - 422:25, 424:18, 436:25, 461:8
small-time [1] - 422:25
smaller [3] - 402:15, 402:16, 402:19
smart [2] - 484:17, 485:1
smoking [1] - 493:14
sold [21] - 423:22, 424:1, 424:9, 433:23, 434:3, 434:6, 459:15,

460:7, 460:9, 464:5, 478:17, 490:15, 494:10, 501:7, 510:7, 510:13, 511:2, 512:7, 519:16, 528:5
solely [1] - 496:9
someone [12] - 398:16, 452:11, 487:6, 491:21, 503:15, 531:14, 540:18, 540:21, 540:22, 542:1, 542:8, 542:14
something's [1] - 527:18
sometime [1] - 407:1
sometimes [9] - 411:3, 411:4, 464:14, 465:22, 466:1, 481:4, 481:6, 503:12, 503:14
somewhere [6] - 435:5, 488:22, 488:24, 503:9, 503:18, 508:19
soon [3] - 433:17, 522:18
sorry [17] - 425:14, 427:13, 427:25, 431:10, 448:9, 460:3, 466:25, 468:11, 472:18, 483:6, 483:23, 488:2, 498:1, 540:13, 545:6, 547:1
sort [12] - 408:2, 408:4, 413:8, 427:4, 445:19, 493:17, 498:11, 503:20, 506:9, 510:3, 521:15, 525:16
sound [6] - 441:3, 441:11, 453:13, 460:18, 461:23, 484:12
sounds [2] - 452:21, 486:8
source [13] - 398:13, 416:21, 434:25, 435:3, 464:7, 492:9, 492:14, 527:22, 540:25, 542:7, 543:24, 544:3, 544:23
sources [1] - 513:11
specific [1] - 462:5
specifically [5] - 402:11, 419:14, 429:17, 476:11,

507:18
speculate [1] - 512:15
speculation [1] - 512:17
spell [1] - 421:18
splash [1] - 548:1
split [1] - 489:3
spot [2] - 512:11, 512:16
spots [1] - 512:10
squarely [3] - 411:18, 412:12, 473:3
stamped [1] - 556:5
stand [5] - 410:17, 421:10, 495:19, 514:17, 524:6
standard [8] - 497:12, 497:13, 509:5, 509:6, 509:8, 509:13, 510:22, 528:15
standing [1] - 520:21
start [7] - 441:22, 446:13, 453:15, 471:9, 503:6, 528:9, 533:13
started [3] - 410:21, 413:1, 481:3
starting [3] - 409:4, 453:16, 484:14
State [1] - 559:3
state [3] - 400:22, 421:17, 443:17
statement [13] - 413:6, 524:8, 524:10, 541:17, 543:15, 543:17, 543:18, 543:25, 544:16, 544:19, 544:21, 545:1, 545:2
STATES [1] - 394:1
States [12] - 394:3, 396:6, 400:8, 406:13, 420:25, 473:9, 474:14, 497:14, 537:2, 546:17, 552:5, 558:17
stay [1] - 471:9
steal [1] - 499:20
STELKEN [1] - 554:18
Stelken [2] - 547:7, 554:16
stemming [1] - 449:15
step [3] - 406:11, 470:25, 538:19
Stephenson [1] - 554:19
STEPHENSON [1] - 554:21

stern [1] - 458:22
Steve [6] - 434:7, 476:18, 494:6, 495:19, 500:10, 500:22
Steve's [2] - 500:9, 530:24
STEVENSON [2] - 395:6, 421:11
Stevenson [68] - 394:6, 396:7, 396:25, 397:8, 400:8, 403:14, 404:21, 408:1, 409:16, 412:10, 417:3, 417:25, 418:19, 421:1, 421:7, 421:9, 421:19, 430:10, 434:16, 474:15, 482:8, 483:12, 499:5, 500:8, 500:19, 500:21, 501:20, 503:8, 504:6, 504:11, 505:8, 506:13, 506:15, 506:16, 506:21, 507:1, 507:7, 507:20, 508:11, 508:16, 508:21, 510:2, 511:2, 511:22, 512:7, 514:20, 514:21, 518:3, 518:22, 519:15, 537:2, 541:9, 542:1, 542:3, 542:12, 542:15, 542:25, 545:13, 546:18, 552:6, 552:20, 553:2, 553:5, 553:9, 553:13, 553:17, 556:23
Stevenson's [3] - 405:6, 417:22, 514:8
stick [3] - 556:9, 556:12, 556:14
still [25] - 402:5, 436:10, 436:12, 450:13, 451:11, 451:16, 454:15, 462:5, 469:17, 472:6, 478:10, 479:9, 485:4, 508:15, 527:15, 528:13, 529:9, 529:10, 529:11, 531:19, 531:23, 537:1, 550:2

**stipulate** [3] - 427:6, 429:16, 431:25
**stipulated** [1] - 428:24
**stock** [1] - 499:13
**stop** [1] - 494:5
**Street** [2] - 394:16, 394:22
**strictly** [1] - 511:9
**string** [2] - 490:3, 526:6
**strongly** [1] - 548:7
**stuff** [13] - 406:20, 482:22, 489:22, 504:8, 504:9, 505:14, 511:7, 514:4, 514:5, 514:8, 514:16, 525:5, 527:19
**subject** [2] - 494:3, 497:16
**submit** [11] - 414:14, 414:22, 471:6, 487:3, 507:11, 509:2, 510:16, 511:18, 516:4, 535:15, 557:3
**submitted** [1] - 523:1
**subpoenaed** [2] - 520:22, 520:23
**subsequent** [1] - 505:3
**substantial** [3] - 412:22, 413:11, 414:8
**sucks** [1] - 484:14
**suddenly** [1] - 557:25
**sufficient** [8] - 414:5, 414:21, 415:21, 416:1, 416:6, 416:11, 418:4, 537:11
**suggest** [3] - 521:18, 522:2, 548:22
**suggestion** [1] - 549:6
**Suite** [2] - 394:16, 394:22
**supervision** [1] - 559:9
**supplied** [3] - 399:4, 413:7, 417:25
**supplier** [7] - 402:13, 402:20, 417:4, 417:18, 465:5, 482:16, 542:12
**suppliers** [3] - 416:25, 434:17, 508:4
**supply** [11] - 402:13, 412:10, 416:4, 416:21, 435:4, 464:7, 471:12,

492:15, 543:24, 544:3, 544:24
**supplying** [4] - 417:1, 452:19, 480:25, 492:11
**support** [3] - 413:19, 414:6, 496:12
**supports** [3] - 496:20, 534:19, 535:3
**suppose** [2] - 405:8, 528:10
**surprised** [1] - 514:11
**suspect** [1] - 518:13
**sway** [1] - 419:25
**sweatshirt** [6] - 419:11, 419:12, 420:13, 471:25, 472:2, 472:7
**switch** [1] - 402:6
**sworn** [2] - 400:19, 421:12
**sympathetic** [2] - 420:10, 472:17
**syringe** [1] - 517:20

## T

**table** [1] - 410:16
**talks** [3] - 485:2, 485:3, 525:2
**tapped** [1] - 507:14
**task** [1] - 510:17
**tasty** [2] - 438:7, 487:14
**tear** [1] - 528:24
**telephone** [11] - 409:24, 430:12, 432:5, 504:9, 505:5, 505:9, 508:23, 515:21, 515:25, 516:19, 517:4
**terms** [1] - 482:13
**terrible** [1] - 519:13
**test** [1] - 516:14
**testified** [18] - 400:20, 413:20, 421:13, 439:5, 447:22, 449:4, 492:6, 495:4, 500:18, 503:11, 504:25, 507:12, 509:16, 510:6, 515:7, 524:18, 527:23, 544:19
**testify** [4] - 397:9, 418:15, 418:19, 460:24
**testifying** [1] - 396:25
**testimony** [66] - 397:10, 398:11,

398:25, 403:13, 410:20, 411:20, 415:2, 415:4, 415:5, 417:2, 426:4, 450:11, 476:1, 477:22, 479:1, 481:15, 485:15, 490:9, 492:3, 492:25, 493:2, 495:7, 495:11, 495:14, 495:15, 495:17, 495:19, 495:24, 496:4, 496:6, 496:10, 496:11, 496:16, 499:14, 500:9, 501:1, 502:15, 502:24, 509:21, 510:25, 514:18, 517:8, 518:12, 524:24, 528:18, 528:19, 530:11, 530:12, 530:18, 530:21, 530:24, 531:3, 531:9, 531:10, 531:12, 532:12, 532:17, 533:2, 533:3, 533:11, 534:17, 540:17, 540:20, 540:25, 543:8
**testimony's** [3] - 499:17, 518:5, 519:7
**text** [116] - 409:12, 409:20, 412:6, 413:19, 413:23, 415:10, 416:7, 417:5, 417:20, 423:21, 425:4, 425:13, 425:14, 425:18, 425:20, 425:22, 425:23, 425:24, 425:25, 426:9, 427:14, 427:15, 427:18, 427:20, 427:22, 428:4, 428:9, 428:13, 428:14, 428:15, 429:4, 429:20, 431:8, 432:4, 433:10, 435:2, 435:7, 437:22, 438:7, 439:23, 440:14, 441:16, 441:23, 442:2, 442:17, 443:9, 443:11, 443:22, 445:18, 446:14, 446:15, 446:19, 449:5, 452:14, 455:4,

455:13, 455:14, 455:16, 455:17, 456:4, 457:7, 462:2, 468:25, 470:6, 477:21, 478:25, 479:4, 482:4, 482:7, 485:2, 486:1, 486:2, 486:7, 488:14, 488:22, 489:1, 489:11, 490:1, 490:2, 490:3, 490:19, 490:20, 491:25, 492:7, 492:8, 494:15, 496:14, 501:10, 504:15, 504:20, 504:23, 505:4, 506:16, 514:14, 515:12, 520:12, 520:14, 520:18, 523:24, 524:16, 524:17, 524:22, 525:10, 525:19, 525:21, 526:5, 526:7, 526:10, 526:12, 526:21, 526:24, 527:4, 530:5, 530:22, 532:24, 533:8
**texted** [9] - 431:1, 431:3, 431:8, 431:9, 431:12, 442:10, 443:23, 443:25
**texts** [36] - 410:1, 410:2, 410:4, 415:15, 426:10, 426:25, 429:1, 429:15, 431:11, 450:9, 450:17, 456:9, 456:10, 457:3, 466:19, 501:18, 502:25, 503:2, 503:23, 503:24, 505:11, 505:13, 506:12, 506:19, 506:22, 506:24, 507:21, 507:24, 509:18, 509:19, 509:20, 509:21, 509:23, 514:15, 514:19, 521:22
**THE** [136] - 394:1, 394:1, 396:2, 396:5, 396:20, 397:3, 397:16, 397:24, 398:7, 399:9, 399:16, 399:20, 399:25, 400:2, 400:4, 400:6, 400:17, 400:21,

400:23, 400:24, 404:5, 405:12, 406:6, 406:10, 406:16, 407:7, 407:9, 410:13, 410:18, 414:17, 417:11, 418:17, 418:21, 419:1, 419:4, 419:21, 420:3, 420:18, 420:20, 420:22, 420:24, 421:8, 421:14, 421:19, 421:21, 434:12, 466:12, 468:17, 470:14, 470:16, 470:21, 471:18, 471:20, 472:8, 472:12, 472:15, 472:25, 473:5, 473:12, 473:14, 473:20, 474:1, 474:5, 474:9, 474:13, 497:2, 519:24, 520:5, 521:5, 521:17, 522:16, 523:7, 523:10, 523:13, 535:5, 535:19, 535:21, 535:23, 535:25, 536:5, 536:7, 536:8, 536:9, 536:19, 536:21, 536:25, 537:7, 537:9, 537:13, 537:15, 537:19, 537:21, 537:23, 537:25, 538:5, 540:9, 540:11, 541:3, 541:15, 542:18, 542:21, 543:6, 545:8, 545:13, 545:19, 545:20, 546:10, 546:13, 546:16, 548:14, 549:12, 550:13, 551:9, 551:12, 551:19, 551:21, 551:24, 552:4, 552:11, 552:14, 554:4, 554:7, 554:10, 554:13, 554:16, 554:19, 554:22, 554:24, 555:2, 555:4, 555:7, 555:10, 556:19, 556:21, 558:19, 558:21
**themselves** [1] - 536:2
**theory** [1] - 527:6

**thereafter** [1] - 490:11
**they've** [2] - 528:3, 531:22
**thin** [1] - 461:15
**thinks** [1] - 517:6
**Thompson** [6] - 522:23, 536:10, 538:1, 546:4, 551:15, 552:15
**thoroughly** [2] - 557:1, 558:14
**thoughts** [6] - 518:9, 518:10, 547:15, 547:16, 549:14, 549:25
**three** [20] - 408:11, 422:4, 424:10, 431:25, 432:2, 445:3, 447:6, 450:19, 457:13, 459:9, 459:10, 461:25, 476:21, 477:6, 477:7, 480:12, 484:1, 485:20, 546:24, 547:1
**throughout** [3] - 409:14, 409:17, 433:11
**throw** [4] - 445:18, 446:17, 446:22, 489:3
**throwdown** [3] - 445:15, 446:6, 446:7
**throwing** [2] - 524:4, 526:18
**thumbs** [4] - 436:14, 457:12, 457:13, 477:21
**ticket** [1] - 444:22
**timed** [2] - 504:1, 516:24
**timeline** [15] - 408:7, 408:18, 408:21, 410:20, 488:20, 488:21, 489:9, 491:12, 491:13, 500:25, 525:2, 525:3, 525:5, 525:22
**timeline's** [2] - 488:13, 488:20
**timing** [1] - 494:24
**tiny** [4] - 512:25, 513:1
**today** [11] - 396:10, 407:1, 433:4, 433:6, 471:8, 471:13, 475:18, 497:9, 539:24, 540:1, 540:6
**together** [12] - 413:9, 417:13, 432:15,

444:16, 446:1, 453:3, 471:10, 479:6, 489:3, 493:17, 504:13
**tolls** [4] - 494:15, 496:15, 531:4, 532:24
**Tomar** [1] - 463:5
**tomorrow** [3] - 407:2, 436:15, 463:6
**took** [5] - 427:25, 474:17, 524:6, 543:14, 559:6
**top** [5] - 425:9, 430:7, 442:21, 462:9, 462:10
**topics** [1] - 402:6
**torn** [3] - 510:8, 511:25
**totality** [1] - 533:15
**touch** [3] - 491:15, 546:4, 558:13
**town** [16] - 435:14, 436:2, 436:4, 436:10, 437:22, 437:23, 437:25, 438:3, 439:2, 461:20, 462:4, 462:12, 462:23, 463:14, 464:8, 465:1
**tracked** [2] - 399:12, 399:13
**trade** [1] - 543:20
**traffickers** [1] - 529:18
**trafficking** [4] - 414:9, 527:12, 542:2, 542:3
**trans** [1] - 409:12
**transaction** [17] - 398:23, 409:13, 409:15, 409:18, 409:23, 411:25, 413:18, 414:4, 417:7, 426:14, 431:21, 496:3, 508:10, 508:12, 509:1, 510:14, 527:25
**transactions** [7] - 501:20, 503:22, 510:19, 511:24, 532:13, 532:18, 543:14
**transcript** [3] - 398:14, 399:6, 559:11
**Transcript** [3] - 394:9, 394:25, 394:25
**transcription** [1] - 559:10
**transcripts** [3] - 397:21, 398:1, 399:4

**trial** [8] - 396:8, 399:10, 400:9, 409:14, 409:17, 416:19, 446:9, 558:4
**trials** [1] - 556:2
**tried** [9] - 441:24, 447:23, 447:24, 491:16, 495:4, 513:25, 514:17, 545:21, 545:22
**true** [14] - 439:10, 439:12, 439:13, 439:14, 449:2, 461:7, 490:8, 511:6, 516:21, 526:11, 530:8, 534:7
**trust** [1] - 454:6
**truth** [7] - 517:3, 517:8, 518:5, 543:12, 544:20, 544:22, 544:23
**try** [17] - 398:18, 405:21, 435:12, 436:9, 465:17, 502:6, 504:12, 505:7, 505:20, 507:5, 510:24, 511:10, 520:10, 549:18, 549:19, 556:3, 557:11
**trying** [34] - 430:5, 431:5, 431:6, 432:7, 432:19, 432:23, 432:25, 433:16, 438:11, 443:19, 448:22, 451:25, 470:2, 470:4, 471:24, 479:12, 485:9, 485:10, 495:2, 500:15, 506:21, 506:25, 508:14, 509:7, 510:21, 514:1, 515:18, 517:5, 521:20, 522:3, 522:10, 529:25, 534:14
**tryna** [2] - 430:2, 501:11
**turn** [6] - 420:4, 433:21, 482:18, 499:7, 501:15
**turned** [5] - 397:20, 397:22, 420:8, 472:7, 493:22
**turning** [2] - 485:13, 526:15
**two** [57] - 398:2, 398:3, 413:23, 414:25, 415:19,

424:10, 425:9, 430:7, 431:11, 432:1, 445:3, 445:25, 447:6, 448:6, 451:14, 455:8, 459:9, 459:10, 461:25, 464:12, 474:9, 477:13, 478:4, 481:10, 488:10, 488:22, 490:1, 490:2, 493:16, 501:22, 502:5, 503:24, 504:5, 506:8, 507:9, 508:24, 509:19, 517:23, 518:4, 525:24, 526:4, 526:24, 531:22, 546:24, 546:25, 547:1, 547:3, 547:9, 547:21, 548:5, 548:17, 550:11, 550:15, 550:19, 550:20
**two-day** [2] - 546:25, 547:3
**type** [6] - 409:12, 414:2, 430:4, 465:5, 511:2, 511:3
**types** [2] - 414:25, 429:1
**typical** [3] - 424:23, 424:25, 509:23

---

# U

**U.S** [3] - 396:2, 499:22, 500:13
**ultimately** [3] - 413:8, 543:10, 543:13
**unanimously** [6] - 552:20, 552:24, 553:5, 553:9, 553:13, 553:17
**uncomfortable** [2] - 419:24, 472:6
**uncredible** [2] - 519:7, 519:11
**under** [5] - 499:6, 543:16, 544:11, 544:25, 559:8
**underlying** [1] - 544:21
**undersigned** [1] - 559:2
**understood** [1] - 484:24
**unfortunately** [3] - 472:5, 502:12, 503:1

**UNITED** [1] - 394:1
**United** [12] - 394:3, 396:6, 400:7, 406:13, 420:25, 473:9, 474:14, 497:14, 537:2, 546:17, 552:5, 558:17
**unless** [2] - 403:7, 438:19, 544:8
**unlikely** [1] - 506:11
**unreasonable** [1] - 511:19
**unsupported** [1] - 496:10
**untimely** [1] - 416:21
**unusual** [3] - 410:10, 418:19, 511:3
**up** [93] - 397:17, 401:7, 410:5, 421:15, 421:16, 426:5, 426:18, 428:21, 429:21, 432:13, 432:15, 432:16, 432:17, 434:22, 435:3, 435:5, 435:15, 435:17, 436:14, 436:23, 441:13, 444:17, 445:10, 448:18, 449:10, 451:20, 452:12, 453:9, 454:11, 455:8, 456:6, 457:6, 457:12, 457:13, 457:18, 459:4, 461:15, 463:10, 464:2, 464:3, 464:25, 466:14, 469:6, 469:10, 471:24, 473:8, 477:9, 477:24, 478:24, 481:10, 482:9, 484:6, 484:7, 486:7, 486:25, 489:5, 489:22, 489:23, 489:24, 490:21, 491:16, 501:2, 501:15, 501:24, 507:17, 507:19, 516:18, 517:20, 518:21, 520:21, 525:20, 526:2, 526:4, 526:5, 526:6, 528:24, 529:21, 533:6, 538:13, 538:16, 538:22, 539:12, 539:25, 543:9, 545:9, 549:2,

555:23, 556:25, 557:2, 557:25
**upped** [1] - 461:19
**upper** [1] - 538:14
**upping** [4] - 402:10, 402:12, 403:5, 434:19
**US** [1] - 394:19
**USA** [1] - 394:20
**user** [1] - 454:3
**users** [1] - 528:22

---

**V**

---

**vague** [17] - 407:19, 408:4, 408:11, 408:23, 409:7, 446:24, 446:25, 449:19, 455:19, 461:24, 462:5, 486:16, 497:17, 500:7, 540:20, 544:10
**valuable** [4] - 529:3, 529:4, 529:10, 529:11
**VanWeelden** [1] - 536:15
**Vee** [2] - 459:21, 496:2
**vehicle** [2] - 403:14, 460:22
**verdict** [39] - 471:11, 486:21, 496:19, 519:22, 522:20, 522:21, 523:1, 534:19, 536:1, 536:3, 536:12, 537:5, 538:2, 538:7, 539:1, 539:7, 539:10, 540:5, 550:16, 552:8, 552:18, 552:19, 553:4, 553:8, 553:12, 553:25, 554:2, 554:5, 554:8, 554:11, 554:14, 554:17, 554:20, 554:22, 554:25, 555:2, 555:5, 555:8
**Verdict** [1] - 553:16
**verdicts** [3] - 476:15, 553:24, 556:22
**verify** [1] - 448:23
**version** [2] - 498:17, 499:1
**versus** [7] - 396:6, 400:8, 421:1, 474:15, 537:2, 546:17, 552:6

**video** [1] - 510:11
**videotape** [2] - 496:1, 496:3
**view** [6] - 495:11, 495:14, 524:5, 540:24
**virtually** [1] - 476:4
**voicing** [1] - 551:3
**voir** [2] - 487:22, 531:13
**Volume** [1] - 394:6
**voluntarily** [4] - 478:7, 478:11, 478:13, 479:19
**vs** [1] - 394:5

---

**W**

---

**wait** [3] - 398:22, 477:8, 507:6
**waiting** [3] - 419:2, 536:15, 546:2
**Walgren** [91] - 398:2, 407:22, 408:10, 411:20, 411:21, 413:19, 413:20, 414:12, 417:10, 417:11, 417:12, 417:17, 417:21, 424:5, 424:22, 432:4, 432:8, 432:11, 432:16, 433:23, 433:24, 436:8, 439:8, 439:15, 439:21, 440:6, 440:11, 446:15, 448:1, 448:23, 454:16, 455:5, 455:9, 455:15, 456:1, 456:16, 456:25, 457:18, 458:7, 460:10, 460:11, 466:19, 467:17, 467:24, 468:3, 468:9, 468:10, 468:21, 468:24, 468:25, 469:13, 469:15, 470:6, 476:21, 481:11, 489:2, 489:25, 491:6, 491:7, 491:15, 491:16, 491:19, 491:23, 492:21, 494:24, 495:22, 499:11, 499:17, 504:16, 504:20, 504:23, 507:12, 507:16, 508:2, 508:3, 512:7,
513:3, 513:15, 514:21, 515:2, 515:9, 515:11, 515:24, 516:3, 516:14, 516:19, 526:1, 530:1, 534:11, 534:12
**Walgren's** [10] - 448:19, 451:19, 454:12, 467:12, 469:6, 495:23, 496:4, 507:22, 530:21
**walk** [1] - 484:7
**walked** [2] - 440:10, 440:13
**walking** [3] - 440:17, 505:14, 526:11
**walks** [1] - 490:5
**wallet** [1] - 480:8
**Wanna** [1] - 449:25
**wants** [11] - 396:17, 435:22, 450:12, 485:6, 500:11, 510:24, 517:6, 518:19, 518:23, 519:5, 519:6
**wash** [5] - 426:2, 526:3, 526:4, 526:6, 530:7
**watch** [1] - 453:15
**watched** [1] - 420:8
**wears** [1] - 472:1
**weasel** [1] - 514:17
**week** [1] - 499:23
**weight** [2] - 488:6, 488:8
**well-tried** [1] - 545:21
**WHEREOF** [1] - 559:14
**whole** [3] - 436:16, 452:15, 493:11
**Williams** [2] - 394:13, 396:4
**window** [3] - 507:14, 546:25, 547:2
**wings** [1] - 419:16
**Winkelman's** [1] - 517:18
**wish** [4] - 418:19, 421:4, 472:20, 520:16
**withdraw** [1] - 549:6
**witness** [7] - 396:12, 421:10, 421:15, 527:23, 531:24, 532:12, 532:17
**WITNESS** [3] - 400:3, 421:19, 559:14
**Witness** [1] - 395:2

**witness's** [1] - 524:9
**witnesses** [12] - 398:2, 406:12, 421:5, 470:12, 477:23, 530:10, 532:12, 532:14, 533:21, 533:22, 533:23, 534:1
**wonderful** [1] - 533:19
**Woodyard** [6] - 419:10, 419:23, 420:3, 420:13, 471:24, 472:17
**wool** [1] - 522:11
**woozy** [1] - 517:19
**words** [2] - 398:20, 533:5
**works** [5] - 482:20, 485:22, 487:4, 525:25, 526:7
**world** [2] - 532:21, 533:20
**worms** [1] - 521:16
**worried** [3] - 420:2, 491:2, 516:11
**worth** [1] - 493:1
**write** [1] - 482:22
**writing** [1] - 482:1
**written** [2] - 482:15, 557:10

---

**X**

---

**Xanax** [1] - 493:12
**XTE** [1] - 492:12

---

**Y**

---

**years** [7] - 422:4, 426:22, 447:6, 461:25, 485:20, 504:5, 517:23
**yesterday** [11] - 397:21, 398:4, 398:25, 399:10, 399:11, 399:15, 400:10, 401:13, 403:18, 460:25, 516:15
**you-all** [1] - 489:17
**yourself** [2] - 452:6, 498:25
**yourselves** [2] - 471:16, 503:3

---

**Z**

---

**zero** [1] - 527:2