```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF IOWA
 2

 3   UNITED STATES OF AMERICA,    )
                                  )
 4               Plaintiff,       )
                                  )
 5        VS.                     )    18-CR-1023
                                  )
 6   MICHAEL STEVENSON,           )
                                  )
 7               Defendant.       )

 8

 9                     APPEARANCES:

10   ATTORNEY JOHN H. LAMMERS, United States Attorney's
     Office, 600 4th Street, Suite 670, Sioux City,
11   Iowa 51101,
                              AND
12   ATTORNEY KYNDRA LUNDQUIST, United States Attorney's
     Office, 111 Seventh Avenue S.E., Box 1, Cedar Rapids,
13   Iowa 52401, appeared on behalf of the United States.

14   ATTORNEY MICHAEL K. LAHAMMER, Lahammer Law Firm,
     425 Second Street S.E., Suite 1010, Cedar Rapids,
15   Iowa 52401, appeared on behalf of the Defendant.

16

17                   SENTENCING HEARING,

18           HELD BEFORE THE HON. C.J. WILLIAMS,

19   on the 7th day of October, 2019, at 111 Seventh Avenue
     S.E., Cedar Rapids, Iowa, commencing at 8:59 a.m., and
20   reported by Patrice A. Murray, Certified Shorthand
     Reporter, using machine shorthand.
21
     Transcript Ordered:  10/16/19
22   Transcript Completed:  11/1/19

23             Patrice A. Murray, CSR, RPR, RMR, FCRR
                  United States District Court
24               111 Seventh Avenue S.E., Box 4
                  Cedar Rapids, Iowa 52401-2101
25                      (319) 286-2338
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR Document 123 Filed 11/01/19 Page 1 of 101

**INDEX OF WITNESSES**

|  | **E X A M I N A T I O N** | | | | |
|---|---|---|---|---|---|
|  | **D** | **C** | **RD** | **RC** | **VD** |
| Chad Leitzen | 14 | 32 | 42 | 43 | |

**INDEX OF GOVERNMENT EXHIBITS**

Exhibits 1 and 2      11

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

```
 1              (The following proceedings were held in open court.)

 2                   THE COURT:  The matter now before the Court is

 3     United States of America versus Michael Stevenson,

 4     Criminal Case Number 18-CR-1023.  This matter comes on

 5     for a sentencing hearing.  The United States is

 6     represented by Assistant United States Attorneys Jack

 7     Lammers and Kyndra Lundquist.  The defendant is

 8     personally present and represented by Attorney Michael

 9     Lahammer.  We have Pat Korth, who is the United States

10     probation officer, appearing by telephone.  He is the

11     author of the presentence investigation report that's

12     been filed at docket number 108 in the court's file.

13              On April 25, 2019, the defendant was found guilty

14     after a jury trial of five counts.  Count 1 charged him

15     with conspiracy to distribute a controlled substance in

16     violation of Title 21 United States Code Section

17     841(a)(1) and 841(b)(1)(C) and 846.  Count 2 charged the

18     defendant with distribution of a controlled substance in

19     violation of Title 21 United States Code Sections

20     841(a)(1), 841(b)(1)(C).  Count 3 charged the defendant

21     with distribution of a controlled substance in violation

22     of those same statutes.  Count 4 charged the defendant

23     with distribution of a controlled substance in violation

24     of the same statutes.  And Count 5 did the same.

25              Those crimes are punishable, each of them, by up to
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 3 of 101

 1   20 years in prison without the possibility of parole, so

 2   for a total of 100 years without parole.  After the

 3   defendant has been -- served his prison sentence, the

 4   Court can place him on a term, and will place him on a

 5   term, of supervised release of at least 3 years and it

 6   can be up to life on supervised release.

 7       The Court can impose a fine of up to $1 million on

 8   each count, for a total of $5 million.  And the Court

 9   must impose a $100 mandatory special assessment on each

10   count for a total of $500.

11       Mr. Lammers, on behalf of the United States, have

12   you had a full and fair opportunity to review the

13   presentence report in this case?

14           MR. LAMMERS:  I have, Your Honor.

15           THE COURT:  Does the government have any

16   objections to the calculation of the advisory guidelines

17   or anything else in that report?

18           MR. LAMMERS:  No objections, Your Honor.

19           THE COURT:  Thank you.  Mr. Lahammer, on behalf

20   of Mr. Stevenson, did you and your client have a full and

21   fair opportunity to review the presentence report in this

22   case?

23           MR. LAHAMMER:  We have, Your Honor.

24           THE COURT:  There are a number of objections

25   the defendant has lodged to the presentence report.  I'm

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 4 of 101

```
 1   not going to go through every one of the objections, but
 2   there's a number of objections to some of the offense
 3   conduct statements, to the victim impact, obstruction
 4   under both the threat and to the false testimony, and
 5   acceptance.
 6        For purposes of the guidelines, the defendant is
 7   objecting at paragraph 31 to the base offense level; at
 8   paragraph 32 to the enhancement for an aggravating role;
 9   to paragraph 34, for the probation office affording --
10   well, I'm sorry, I should back up.  32 is aggravating
11   role with regard to threat, witness intimidation.  34 is
12   the aggravating role with regard to being an organizer,
13   manager, supervisor of others.  And then the defendant
14   had objected at paragraphs 29 -- I'm sorry, 27 through 29
15   to the probation office not awarding him with a reduction
16   for acceptance of responsibility.  Then there's a number
17   of objections to narratives and other arrests at
18   paragraphs 51 through 61.  The defendant has objected to
19   107, which is restitution; and then to 114, which is the
20   probation office identifying various grounds for an
21   upward departure.
22        Generally, have I identified all the objections that
23   the defendant has to the presentence report,
24   Mr. Lahammer?
25             MR. LAHAMMER:  You have, Your Honor.
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 5 of 101

1           THE COURT:  And the defendant's maintaining all

2    those objections I trust today?

3           MR. LAHAMMER:  He is.

4           THE COURT:  Very good.  We will have evidence

5    and hear argument on each of the objected guideline

6    issues in the course of this hearing today.

7       Mr. Lahammer, could you make a brief statement of

8    how you went through this report with your client.

9           MR. LAHAMMER:  Yes, Your Honor.  As the Court

10   is aware, I did not represent Mr. Stevenson during the

11   trial.  I was appointed after the trial.  We participated

12   in the interview with probation; subsequently received a

13   draft report in June of 2019.  I mailed a copy to my

14   client at the Iowa County Jail.  I met with him on

15   several occasions after that.  Based on those meetings, I

16   filed objections to the draft presentence report.

17      Upon receipt of the final report August 12th of

18   2019, I again mailed a copy to my client.  We went

19   through it thoroughly.  And based upon that last meeting

20   and subsequent conversations I've had with him, we filed

21   our sentencing memorandum and brief identifying those

22   areas where we still objected to, both legally and

23   factually.

24      I would note, Mr. Stevenson is a very hands-on

25   defendant, very involved in all decisions made in regards

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 6 of 101

1  to sentencing and objections.  And based upon our

2  sentencing memorandum and brief, as well as the variance,

3  we are satisfied that we have presented all of the legal

4  and factual arguments that we want to make to the Court.

5          THE COURT:  Thank you, Mr. Lahammer.

6      Mr. Stevenson, I note from the presentence report

7  that you have earned your GED, and so I trust that you

8  were able to read through this presentence report on your

9  own, sir?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Do you feel like you've had enough

12  time to go through this report with your attorney?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  When you met with Mr. Lahammer, was

15  he able to answer all the questions you had about the

16  report?

17          THE DEFENDANT:  There was one in particular.

18          THE COURT:  I'm sorry?

19          THE DEFENDANT:  There was one in particular

20  that we had a problem with.

21          THE COURT:  Okay.  But he was able to answer

22  any questions you had about the report?

23          THE DEFENDANT:  Yeah, yep.

24          THE COURT:  Okay.  Very good.  Do you have any

25  questions today about this report?

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 7 of 101

1    THE DEFENDANT:  No.

2    THE COURT:  All right.  Then let's go through

3 the calculation of the advisory guidelines as set out in

4 the report.  Those begin at page 13, paragraph 31.  The

5 defendant -- the probation office has assessed the

6 defendant with a base offense level of 26 based on a

7 converted drug quantity of between 400 and 700 kilograms

8 of converted drug weight.  The defendant has objected to

9 that, as I noted.

10    At paragraph 32, the probation office has assessed

11 the defendant with a 2-level enhancement for an

12 aggravated role related to witness intimidation,

13 tampering, or destruction of evidence, or otherwise

14 obstructing justice in connection with the investigation

15 or prosecution.  The defendant has objected to that and

16 we'll take that up as well.

17    At paragraph 34 there is a 3-level upward adjustment

18 because the probation office has determined the defendant

19 was a manager or supervisor but not an organizer or

20 leader of criminal activity involving five or more

21 participants.  The defendant, again, has objected to

22 that, and we'll take that up.

23    The probation office at paragraph 35 [sic] has not

24 awarded the defendant with any reduction for acceptance

25 of responsibility.  And so the adjusted offense level as

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 8 of 101

1   calculated by the probation office is 29 [sic].

2       I'm sorry, I should back up.  At 35, there was a

3   determination that the defendant did obstruct justice but

4   that has otherwise been taken into account in the upward

5   adjustments for 2D1.1(b)(16)(D), which was the specific

6   offense level [sic] at 32, so there's no increase there.

7   It's at 38 that the probation office has determined the

8   defendant is not entitled to a reduction for acceptance

9   of responsibility.  So that gives us a total offense

10   level of 31.

11       The defendant does have some criminal history which

12   the probation office has scored beginning at paragraph 40

13   and through paragraph 46.  The defendant has a total of 4

14   criminal history points.  That places him in criminal

15   history category III.  So that gives us an adjust -- with

16   a total offense level of 31, a criminal history category

17   III, an advisory guideline range of imprisonment of 135

18   to 168 months.

19       In preparation for today's sentencing hearing, I

20   have reviewed in detail the presentence investigation

21   report and its attachments.  I've reviewed the

22   defendant's sentencing memorandum that was filed at 1 --

23   document 111 and the defendant's motion for a downward

24   variance, which is filed at document 112.  I've also

25   reviewed the government's sentencing memorandum; that was

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 9 of 101

     1    filed at document 114.  Attached to that sentencing

     2    memorandum are two exhibits, marked Exhibits 1 and 2.

     3         Mr. Lammers, are you moving those into evidence?

     4              MR. LAMMERS:  Yes, Your Honor.

     5              THE COURT:  And I assume under seal.

     6              MR. LAMMERS:  Yes, Your Honor.

     7              THE COURT:  I note that at least in the version

     8    that was filed with the court, the last three pages of

     9    Exhibit 2 appear to be duplicates of Exhibit 1.  Is that

    10    the same as what you have, Mr. Lammers?

    11              MR. LAMMERS:  Excuse me one second, Your Honor.

    12              THE COURT:  I want to make sure I'm not missing

    13    something.

    14              MR. LAMMERS:  I think that's right.  I think

    15    those were attached inadvertently.  I apologize.  What we

    16    intended to have as exhibits were, 1, the proffer from

    17    Mr. Bower; and the other is the proffer from Mr. Walgren.

    18    It looks like Mr. Bower's proffer was attached again to

    19    Mr. Walgren's.  That was inadvertent.

    20              THE COURT:  That's fine.  And that was my

    21    assumption too, but I wanted to make sure I wasn't

    22    missing something or you intended to file something

    23    differently on those pages, so that was my take.

    24    Exhibits 1 and 2 will be -- I'm sorry, any objection,

    25    Mr. Lahammer?

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 10 of 101

```
 1          MR. LAHAMMER:  No, Your Honor.

 2          THE COURT:  Exhibits 1 and 2 will be admitted

 3   and filed under seal.

 4       (Whereupon, Exhibits 1 and 2 were received.)

 5          THE COURT:  And also, in preparation for

 6   today's sentencing hearing, I did go back and review the

 7   transcript of testimony from the trial.  I was the judge

 8   that presided at the trial in this matter, and I have a

 9   good recall of the trial, but just to refresh my

10   recollection of the trial, I went back and reviewed the

11   transcript that has been generated of the trial

12   testimony.

13       There are, as noted, a number of objections to the

14   calculation of the guidelines here.  There is a motion

15   from the defendant for a downward variance; there's a

16   motion from the government for an upward departure from

17   the guidelines.  I'd like to take up the guidelines

18   issues first.  Then I want to address the issue of

19   restitution I think, which will follow from the

20   resolution of the guideline issues.  And then we'll take

21   up the variance motion and hear argument from the parties

22   as to the sentence the parties believe I should impose.

23       I want to get a sense, Mr. Lammers, are there any

24   victims who wish to speak here today?

25          MR. LAMMERS:  I will ask the Court -- we've got
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 11 of 101

```
1   Mr. Birch's father and sister, they're here.  Frankly, I
2   didn't get a definitive answer whether they wanted to
3   address the Court or not, so I think we could take that
4   up with them.  Mr. -- Mr. Birch's father said to me this
5   morning that he felt that the victim impact statement
6   that he submitted probably spoke for what he wanted the
7   Court to know, but he didn't specifically say that he
8   didn't wish to address the Court; and I don't have the
9   answer from his sister.  I think they were thinking about
10  it as of this morning.
11          THE COURT:  That's perfectly fine, and they can
12  continue to think about it as we go through the hearing.
13  Here's the order in which I intend to take things up
14  then.  We'll hear evidence and argument regarding the
15  guideline issues and restitution.  Then I will hear at
16  that point from the defendant any evidence and from the
17  government any evidence it has regarding the variance and
18  argument on the variance, and, at the same time, I'll
19  hear from the lawyers argument regarding the ultimate
20  disposition in this case.  Then I'll hear from any
21  victims who wish to speak, if they wish to speak at all.
22  Then I'll hear from the defendant in allocution.  And
23  then I'll pronounce sentence.  We will probably take a
24  break midmorning to give the court reporter a rest, so
25  that will be kind of the order in which we proceed.
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 12 of 101

```
 1        Mr. Lammers, the burden is on the government on all
 2   the guideline issues here, except for acceptance of
 3   responsibility.  And so I'll hear first from you any
 4   evidence you wish to present on this case.
 5            MR. LAMMERS:  Yes, Your Honor.  How did you
 6   wish to proceed on the guideline issues?  I have evidence
 7   primarily in regards to drug quantity, and I guess some
 8   evidence in regards to obstruction.  In regards to role,
 9   I think that the evidence of the role is within the
10   transcript -- the trial transcript, and I intend to rely
11   on the trial transcript and argument in regards to that.
12   And in regards to acceptance of responsibility, I don't
13   believe that that is something that we present testimony
14   on.  I think that's going to be, again, from the trial
15   transcript and argument.
16        So how would you wish to proceed in regards to the
17   order of the guideline calculation?
18            THE COURT:  Well, I think first let's hear any
19   evidence you have on any guideline issues.  I'll hear
20   first from the government if they have any evidence, then
21   from the defense any evidence on any of the guideline
22   issues.  And then what I want to do is take up the
23   guideline issues, for argument in the order in which they
24   appear in the presentence report.  So we'll start with
25   argument on drug quantity and move on from there.
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 13 of 101

1          MR. LAMMERS:  Thank you, Your Honor.  At this

2    point I would call officer Chad Leitzen.

3                      CHAD LEITZEN,

4    called as a witness, being first duly sworn or affirmed,

5    was examined and testified as follows:

6          THE COURT:  Thank you, please have a seat,

7    Officer; and then pull that chair up and adjust the

8    microphone accordingly.  And when you are comfortable,

9    please state your name.

10         THE WITNESS:  Chad Leitzen, C-H-A-D

11   L-E-I-T-Z-E-N.

12         THE COURT:  Thank you.  You may proceed.

13         MR. LAMMERS:  Thank you.

14                   DIRECT EXAMINATION

15   BY MR. LAMMERS:

16   Q.   Officer, we've already gone through I think at the

17   trial and I'm not going to belabor the point with your

18   qualifications, but would you just briefly tell us where

19   you are employed?

20   A.   I'm employed as a police officer with the City of

21   Dubuque Police Department, currently assigned as an

22   investigator with the Dubuque Drug Task Force.

23   Q.   Do you work on heroin cases, among other things?

24   A.   Yes, I do.

25   Q.   Are you familiar with the way heroin is bought and

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 14 of 101

1  sold in and around the Dubuque area?

2  A.   Yes, I am.

3  Q.   Are you familiar with the prices that users pay for

4  heroin?

5  A.   Yes, I am.

6  Q.   And are you familiar with how drug traffickers are

7  resupplied or reupped or obtain quantities for resale?

8  A.   Yes.

9  Q.   Are you familiar with the defendant in this

10 particular case?

11 A.   I am.

12 Q.   Were you involved in an investigation in regards to

13 the defendant in this particular case?

14 A.   Yes, I was.

15 Q.   Okay.  Now, again, you've testified at the trial in

16 regards to the controlled buys, but I want to go back and

17 sort of start with individual information that you

18 received from cooperating witnesses about drugs in this

19 case.  Have you reviewed your reports in this particular

20 case?

21 A.   Yes, I have.

22 Q.   And are you familiar with cooperating individuals

23 who have provided information in regards to this

24 particular defendant?

25 A.   Yes.

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 15 of 101

1    Q.    Okay.  Do you know who William Robert Bower is?

2    A.    Yes.

3    Q.    Who is Mr. Bower?

4    A.    Mr. Bower is a subject who was a heroin user in the

5    Dubuque area and spent some time in jail in Dubuque.

6    Q.    Okay.  And did Mr. Bower provide information to you

7    or other members of the task force?

8    A.    Yes.

9    Q.    And do you recall when that was?

10   A.    That was September 5th of 2017.

11   Q.    September 5th of 2017.  At that point, had

12   Mr. Stevenson been federally indicted?

13   A.    No.

14   Q.    All right.  So tell us how that came about, that

15   Mr. Bower provided information to you in regards to

16   Mr. Stevenson.

17   A.    Mr. Bower was spending time in the Dubuque County

18   Jail and sent an inmate request form out of the jail,

19   requesting to speak to someone from the Dubuque Drug Task

20   Force.  And I took that inmate request form and did meet

21   with Mr. Bower on the jail floor.

22   Q.    Okay.  And is that in Dubuque County?

23   A.    Yes.

24   Q.    All right.  And did Mr. Bower identify Mr. Stevens

25   [sic]?

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 16 of 101

1   A.   Yes, he did.

2   Q.   Excuse me, Mr. Stevenson.

3   A.   He did.  He did not identify him as Mr. Stevenson.

4   He identified him by his nickname of Lo.

5   Q.   Did you know who he meant?

6   A.   Yes.

7   Q.   Okay.  And how did he identify Lo?

8   A.   He identified him by telling me he was in the same

9   pod as Lo in the Dubuque County Jail.  Also, provided me

10  with Lo's current phone number at that time, which was

11  the 773-746-0928 phone number.

12  Q.   Let me stop you there.  When you say that was the

13  number, why is that significant?

14  A.   That was the current phone number that Mr. Stevenson

15  was using and it was the phone number that Shannon

16  Scholtes used to contact Mr. Stevenson on August 23rd

17  when we conducted a controlled purchase of crack cocaine

18  from him.

19  Q.   So the phone number he gave you in the jail was the

20  same phone number that you later learned that he was

21  actually using to do drug transactions?

22  A.   That's correct.

23  Q.   Did he provide you that phone number from a device

24  or from memory, or how did that work?

25  A.   It was from memory.

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 17 of 101

1    Q.    Okay.  And did Mr. Bower tell you about his drug

2    dealing activity with the person he identified as Lo?

3    A.    Yes.

4    Q.    What did he tell you?

5    A.    He told me that he had been purchasing heroin nearly

6    every day or almost every day for the past two years from

7    Lo, and stated that he had also made trips to Madison

8    with Lo in order to meet his supplier named Brandon, who

9    would go into Chicago and get the heroin.  Bower also

10   stated that he would go with Lo oftentimes to Brandon's

11   house in Dubuque in order to -- in order for

12   Mr. Stevenson to reup his supply.

13   Q.    And did you find that information -- or were you

14   able to corroborate elements of the information that he

15   gave you?

16   A.    Yes.

17   Q.    Like what?

18   A.    The subject he identified as Brandon, he provided

19   the -- he provided the location where Brandon lived.

20   That was new information to me that I did not know;

21   however, he described the vehicle that Brandon was

22   driving.  And at that point, I -- I knew for sure who he

23   was talking about, as well as the subject going by the

24   name Brandon that the Dubuque Drug Task Force knew

25   independently of this investigation.

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 18 of 101

1  Q.   Who was that?

2  A.   His name is Andre Johnson.

3  Q.   Okay.  Did you ever determine whether the address

4  that Mr. Bower gave you was, in fact, the residence that

5  Andre Johnson lived at?

6  A.   He did not give me the address that I knew of.  And

7  the address that he gave, he did not give an actual

8  address.  He gave an area near Lincoln Elementary School.

9  He was able to point out a possible address but that was

10 never verified as Brandon's address.

11 Q.   Did you verify the vehicle?

12 A.   Yes.

13 Q.   And how else were you able to corroborate the

14 information that Mr. Bower gave you?

15 A.   Mr. Bower also provided Lo's previous phone number

16 that he was using, and also provided that from memory,

17 that being -- he stated that he knew it was either

18 563-213-3916 or 563-495-3916.  He could not remember the

19 prefix.  However, the 213-3916 was actually the phone

20 number that John Walgren had used to attempt to contact

21 Mr. Stevenson in March of 2017, so six months before the

22 conversation I had with Mr. Bower on the jail floor.

23 Mr. Bower also advised me that Lo lived with his

24 girlfriend on Alpine Street closer to the alley, and we

25 knew that to be correct.  She lived on the alley side of

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/04/19  Page 19 of 101

1   735 Alpine Street. And he said that Lo also would drive

2   around in a light blue -- or he said a blue SUV

3   registered to his girlfriend, and he stated that it was

4   the one that Lo had just been arrested in on August 23rd

5   when he got arrested, and we knew that to be correct

6   because he was arrested in his girlfriend's blue Chevy

7   Trailblazer, and his girlfriend being Jessica Greenwood.

8   Q.   So that's the same Trailblazer we saw discussed at

9   the trial; is that correct?

10   A.   That's correct.

11   Q.   And his girlfriend is, in fact, the registered owner

12   of that vehicle?

13   A.   Yes, she is.

14   Q.   Okay. Did you have any other corroboration of what

15   Mr. Bower told you?

16   A.   Not that's coming immediately to mind.

17   Q.   Did you know Mr. Bower to be a heroin user?

18   A.   He advised me he was a heroin user. I did not know

19   him before that meeting.

20   Q.   Did you know him to be -- eventually, did you

21   believe him to be involved in the distribution of heroin?

22   A.   Yes.

23   Q.   Okay. Let's talk a little bit then about some of

24   the other -- well, I guess, before we go any further, did

25   you find his information about the fact that he was

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 20 of 101

1  getting between a gram to 2 grams of heroin almost every

2  day from Mr. Stevenson to be credible?

3  A.   Yes, I did.

4  Q.   Okay.  Did that fit with what you -- your experience

5  is in the investigation of drug trafficking or heroin

6  trafficking in the Dubuque area?

7  A.   Yes, it does.

8  Q.   Now, let's talk about Emily Nelson.  You were

9  present when Emily Nelson testified; is that fair to say?

10  A.   Yes.

11  Q.   You saw her testimony?

12  A.   I did.

13  Q.   Not to put too fine a point on it, she was a little

14  bit all over the board as a witness, wasn't she?

15  A.   Yes, she was.

16  Q.   Did you talk to her prior to her testimony?  And I'm

17  referring specifically to when she was in custody.

18  A.   Yes.

19  Q.   And did she request to talk to you?

20  A.   She -- yes, she did.

21  Q.   Okay.  Did she give you any information about

22  Mr. Stevenson and his drug trafficking?

23  A.   Yes.

24  Q.   Would you describe that for the Court.

25  A.   She had initially told me that Mr. Stevenson was a

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 21 of 101

1  drug dealer in Dubuque, and that was in October of --

2  October or November of 2016, I believe.  And then in the

3  meeting that I had with her in June of 2017, she advised

4  that she purchases heroin from Mr. Stevenson, and I

5  believe she said she does so regularly and also had

6  purchased heroin around the time of Adam Birch's death

7  from Mr. Stevenson, and believed that she purchased some

8  of the stuff from the same batch that Mr. Birch had

9  purchased from; and she had told me that she overdosed

10 from the same stuff, although she also advised that she

11 had gotten some drugs from another person that day.  She

12 stated that she had used the stuff from Mr. Stevenson

13 first and felt like she had used way too much of that,

14 and it was very strong to begin with, and she felt that

15 was what had caused her overdose.  She also stated that

16 after that point, she had purchased from -- heroin from

17 Mr. Stevenson, I believe she said another 12 to 13 times.

18 Q.   Did she say approximately how many times she got

19 heroin from Mr. Stevenson?

20 A.   I believe she said about 50 times.

21 Q.   And was that a conservative estimate?

22 A.   Yes.

23 Q.   And did she say what quantities she was receiving

24 from Mr. Stevenson?

25 A.   I -- I think she said a half a gram each time, but

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 22 of 101

1  I'd have to review my notes just to be sure.

2  Q.   Did she ever talk about getting gram amounts on

3  occasion?

4  A.   Yes.

5  Q.   Okay.  So would it be fair to say on a conservative

6  basis we're talking about 25 grams of heroin that Emily

7  Nelson received from the defendant?

8  A.   Yes.

9  Q.   Did you have the opportunity then to be involved in

10  the review of the text messages between Mr. Walgren and

11  Mr. Stevenson, and Mr. Birch and Mr. Stevenson, from

12  approximately, let's say, June 3rd to the night of

13  Mr. Birch's death in February?  Excuse me, January 3rd.

14  A.   Yes.

15  Q.   Okay.  Were you able to determine approximately how

16  many times it appeared from those text messages that

17  Mr. Birch, himself, was receiving heroin from the

18  defendant?

19  A.   It appeared to me that 10 transactions had taken

20  place between Mr. Birch and Mr. Stevenson.

21  Q.   And what was the time period on that?

22  A.   That was between January 9, 2017, and February 1,

23  2017.

24  Q.   And was there a period of at least three days in

25  that where Mr. Stevenson was out of town reupping?

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 23 of 101

1  A.    Yes.

2  Q.    Do you recall those dates?

3  A.    I believe it was January 22nd until the 25th.

4  Q.    So over the course of approximately two-and-a-half

5  weeks or so, there appeared to be at least 10

6  transactions between the defendant and Adam Birch?

7  A.    That's correct.

8  Q.    Is that consistent with your, I guess, understanding

9  of heroin users and how often they need to purchase

10  heroin?

11  A.    Yes.

12  Q.    Were you able to determine how many times

13  Mr. Walgren purchased heroin from the defendant during

14  that period of time?  And let's talk now first about how

15  many times did Mr. Walgren purchase heroin from the

16  defendant during that period of time at your request?

17  A.    At my request, he purchased heroin from

18  Mr. Stevenson one time.

19  Q.    Okay.  Could you tell how many times he purchased

20  heroin on his own?

21  A.    I can't recall the exact number without looking at

22  the text messages again to count the numbers.

23  Q.    That's fine.  But I guess I'm looking for more of a

24  pattern here.  Were there multiple transactions over the

25  course of this time period, heroin transactions, between

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 24 of 101

1   just these two people?

2   A.    Yes.

3   Q.    Is that common with the way heroin is trafficked?

4   A.    Yes.

5   Q.    Did you know Mr. Stevenson to be employed?

6   A.    I did not.

7   Q.    And how do you know whether he was employed or not?

8   A.    There's no record that I am aware of, at least in

9   the Dubuque Police Department, of any employment that I

10  know of.  And I don't -- I guess, anybody that I've

11  talked to about Mr. Stevenson, the heroin users that

12  being, nobody has ever mentioned any employment that he

13  has or that they have to wait until he gets off work in

14  order to purchase heroin or anything like that.  It's

15  whenever they called, they would be able to get it.

16  Q.    Now, I think the testimony at trial was that

17  Mr. Stevenson was self-admitted to being a drug

18  trafficker for the last two to three years.  Did you have

19  any reason to disagree with that assessment?

20  A.    I do not.

21  Q.    And I -- if I understand correctly, and Mr. Lahammer

22  can correct me if I'm wrong, but it's my understanding

23  that they believe that the proper relevant conduct here

24  is more along the lines of 45 grams of heroin over that

25  timeframe.  Do you believe that to be a reasonable

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 25 of 101

1   estimate of the amount of heroin that this defendant was

2   trafficking?

3   A.    I do not.

4   Q.    Why not?

5   A.    45 grams over the course of two to three years is an

6   extremely small amount, that being approximately -- it

7   would average out I suppose to 15 to 22-and-a-half grams

8   per year, which normal -- normal heroin users typically

9   have to get their fix of heroin every -- every day.  At

10  the most, they can go typically every other day, but

11  oftentimes heroin users will certainly seek out heroin

12  every single day to get it.  And when they get a supplier

13  who is a regular supplier for them, they will typically

14  go to that person.  And typical heroin users are getting

15  about a half a gram a day for themselves.  So at that

16  estimation, in my head, would be about 15 grams a month

17  for one person.  Even if it were every other day, it

18  would still be 7-and-a-half grams just for one person for

19  one month.  And if we were going on the low end by saying

20  every other day, at 7-and-a-half grams a month, that's

21  still 90 grams a year for one person.  So if it were two

22  to three years, it would be 180 to 270 grams, and that's

23  only if you had one client.  And we know Mr. Stevenson

24  had certainly more than that; probably many more that I

25  don't even know about.  But estimating it, 45 grams I

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 26 of 101

 1   think is insanely low.

 2   Q.   Now, I think there's testimony that a number of

 3   these people had lots of sources, not just Mr. Stevenson.

 4   I think Mr. Walgren said he had a number of different

 5   folks, and it sounded like Emily Nelson maybe had some

 6   other people too; is that accurate?

 7   A.   Yes.

 8   Q.   Does that change your opinion as to whether or not

 9   the drug quantity of 45 grams over two to three years is

10   warranted?

11   A.   It does not.

12   Q.   Why?

13   A.   Typically, heroin users certainly have more than one

14   dealer, because if one dealer doesn't have what they need

15   for that day, they still need to get their fix, so they

16   will find it from somebody else.  And oftentimes people

17   will try and get as many of those sources as they can in

18   order to make sure they never go without.  However, when

19   they find a drug dealer who is very reliable, oftentimes

20   they will stick with that person or that will be their

21   main supplier.  And oftentimes when they -- when they

22   show loyalty to somebody by going to them, more often

23   they will get a better deal on price or maybe get a

24   larger bag so more -- more product in the bag from the

25   person, trying to garner favor from their main supplier

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 27 of 101

1    by going to that person as often as possible.

2    Q.   Now, I'm going to switch topics a little bit.  Did

3    you know the defendant's paramour or his girlfriend to be

4    employed?

5    A.   I do not know much about her employment status at

6    all.

7    Q.   Okay.  So if -- and I guess to go back to our

8    45 grams over two to three years, what's the price of a

9    gram of heroin approximately in Dubuque, Iowa?

10   A.   It's approximately $160 per gram.

11   Q.   Okay.  Have you been able to determine sort of --

12   what kind of margins heroin traffickers have?  In other

13   words, if you are buying larger quantities and breaking

14   it down and selling it in smaller quantities, how much

15   money are they making per gram approximately in your

16   experience?

17   A.   It depends on the level you are in the organization.

18   So if -- for instance, some of the users oftentimes are

19   middlemen as well, so . . . that meaning they will have a

20   few people who come to them looking for heroin and give

21   that person the money, and then that person will go to

22   their supplier and get it.  They can usually get a little

23   bit of a break on price or get more product in order to

24   be able to skim some off the top themselves and still

25   pass it out to the people under them who paid for it.

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 28 of 101

1    The supplier themselves, if they are going into a

2    larger city, such as Chicago, which is commonly the place

3    to go reup if you are from Dubuque, they get quite a bit

4    of a break on the price of heroin.  And the number that

5    I've heard is that people can buy it for between 70 and

6    $80 a gram in Chicago, bring it back to Dubuque, and they

7    typically sell it for $160 a gram.  Even if they are

8    giving their drug users under them a good deal, that good

9    deal is typically no more than 140 to $150 a gram, so

10   either way, they are almost doubling their money from

11   what they purchased it in Chicago for.

12   Q.   So they are roughly doubling their money per gram?

13   A.   That's correct.

14   Q.   So to be generous, let's say that they're -- I think

15   you said if they buy it for 70 and they sell it for 160,

16   to be generous, $90 a gram?

17   A.   Yes.

18   Q.   So I guess then Mr. Stevenson is claiming to have

19   made less than 45 -- less than $4,500 over the course of

20   that two to three years?

21   A.   That would be correct.

22   Q.   Now, let's talk a little bit about your proffer of

23   John Walgren.  Do you recall that?

24   A.   Yes, I do.

25   Q.   You talked to him a number of times; is that fair to

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 29 of 101

1  say?

2  A.   Yes.

3  Q.   I'm referring specifically to the proffer now in

4  December of 2018.  Do you remember that?

5  A.   Yes, I do.

6  Q.   And did Mr. Walgren speak to you about the defendant

7  threatening him in the jail?

8  A.   Yes.

9  Q.   What did he tell you?

10  A.   He told me that as he was walking past

11  Mr. Stevenson's cell, another inmate was looking out the

12  window or the cell door, and yelled for Lo to come here.

13  And Lo did come to the door and saw Mr. Walgren outside

14  of his cell; and at that time, he stated that Lo told him

15  "You're going to get it," and also stated, "You're a hot

16  mother fucker."  And also -- he stated that Lo asked him

17  if he remembered who he was, and Mr. Walgren told him he

18  did not, and then walked away.  And then I followed up

19  with the question of asking him if he does, in fact,

20  remember or know who Lo is, and he stated yes.

21  Q.   Now, I'm going to switch topics here and talk about

22  crack cocaine a little bit.  Do you remember Shannon

23  Scholtes?

24  A.   Yes.

25  Q.   Do you remember talking to her prior to the

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 30 of 101

1  controlled buys?

2  A.    Yes.

3  Q.    Did she identify the defendant?

4  A.    Yes, she did.

5  Q.    Did she identify the defendant as working with

6  anyone else?

7  A.    Yes, she did.

8  Q.    Who did she identify the defendant as working with?

9  A.    Ricky Carter.

10  Q.    Did you ever determine where Ricky Carter lived?

11  A.    Yes.

12  Q.    Where was that?

13  A.    611 University, Apartment Number 4.

14  Q.    Did Ricky Carter and the defendant live together at

15  some point?

16  A.    Yes, they did.

17  Q.    Do you remember talking to Mr. Steve?

18  A.    Yes.

19  Q.    What kind of quantities was Mr. Steve purchasing

20  from the defendant, do you recall?

21  A.    He stated that he would purchase either half a gram

22  or a gram from Mr. Stevenson, but he stated most of the

23  time it was a gram quantity that he would purchase.

24  Q.    On the day of the buy that we saw the video of in

25  the trial, how much heroin did Mr. Steve get on that

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 31 of 101

```
 1   particular day?

 2   A.    A gram.

 3            MR. LAMMERS:  Your Honor, may I have a moment?

 4            THE COURT:  You may.

 5        (Brief pause.)

 6            MR. LAMMERS:  No further questions.  Thank you.

 7            THE COURT:  Thank you.  Cross-examination.

 8            MR. LAHAMMER:  Thank you, Your Honor.

 9                      CROSS-EXAMINATION

10   BY MR. LAHAMMER:

11   Q.    Officer Leitzen, good morning.

12   A.    Good morning.

13   Q.    How many heroin dealers were in Dubuque between

14   September 2015 and September 2017?

15   A.    How many heroin dealers total in Dubuque.

16   Q.    Yes.

17   A.    I don't know.

18   Q.    Fair to say more than one?

19   A.    Yes.

20   Q.    Let's talk about your testimony in regards to

21   William Bower.  He was a heavy heroin user, correct?

22   A.    From my understanding, yes.

23   Q.    When you talked to him at the jail on September 5,

24   2017, he was going through withdrawal, correct?

25   A.    He may have been.  Not visibly that I could tell,
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 32 of 101

1    but I don't know if he was mentally withdrawing or not.

2    Q.    Your testimony is these users have to have it every

3    day or every other day, correct?

4    A.    That's correct.

5    Q.    Do you know how long Mr. Bower had been in custody

6    as of September 5, 2017, when you talked to him?

7    A.    I don't, unless that's reflected in my report that I

8    would have to review.

9    Q.    He had been locked up a total of three months in

10   2017, isn't that correct?

11   A.    To my understanding, yes.

12   Q.    Fair to say, if they need it every day or every

13   other day and he had been locked up for a period of time,

14   fair to say he would have been suffering from withdrawal,

15   right?

16   A.    Not necessarily.  People go through withdrawals at

17   the beginning, but they eventually get over the physical

18   symptoms of the withdrawal, and I don't know how long he

19   had been in jail prior to me speaking to him.  But as I

20   said, he wasn't exhibiting any physical signs of

21   withdrawal that I could tell at the time.

22   Q.    But he wanted to talk to you in order to make a deal

23   for him to get released, correct?

24   A.    Correct.

25   Q.    Did he get out as a result of giving information?

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 33 of 101

1  A.   Yes, he did.

2  Q.   What other sources for heroin did William Bower

3  have?

4  A.   He had said that after Lo got locked up, that

5  Brandon contacted him directly and wanted to know if

6  Bower would take over basically where Lo left off, being

7  a lower-level supplier below Brandon to -- or lower-level

8  dealer below Brandon to take care of Lo's clients.

9  Q.   Other than Brandon Lee, who else did he identify as

10 a source?

11 A.   I believe he said he got some a couple of times from

12 Lo's girlfriend, Jessica.

13 Q.   Any other sources?

14 A.   Not that are coming immediately to mind.

15 Q.   Were you aware that William Bower was locked up for

16 four months in 2016?

17 A.   I am not.

18 Q.   That would have been a total of seven months between

19 2016 and 2017 Mr. Bower was locked up, tending to show

20 that his statement that he bought every day for two years

21 is -- lacked some credibility, wouldn't you agree?

22 A.   Certainly couldn't buy while he would be in jail.

23 Q.   Also, you talked about in your testimony

24 Mr. Stevenson going at least on one occasion in January

25 of 2017, I believe 22nd, for three days to Chicago,

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 34 of 101

1  correct?

2  A.    Correct.

3  Q.    Do you know who William Bower's supplier was during

4  that three-day period?

5  A.    I do not.

6  Q.    Likely he didn't go without when Mr. Stevenson was

7  out of town though, fair to say?

8  A.    Probably not.

9  Q.    You stated Brandon Lee lived in Madison, as well as

10  Dubuque; is that right?

11  A.    I don't think I said Brandon lives in Madison.  I

12  stated that Lo would drive -- he went with Lo to Madison

13  to meet with Brandon.  From my understanding, Brandon

14  would go to Chicago to get from his supplier, and then

15  meet Lo in Madison to give it to him.  Why the exchange

16  took place there, I don't know.

17  Q.    Because you testified Brandon Lee, at least as far

18  as the information you had, stayed at the Andre Johnson

19  residence, correct?

20  A.    No.  The person that I know as Brandon in Dubuque,

21  or the person I know who goes by Brandon, is Andre

22  Johnson.  Mr. Bower never mentioned him as Andre Johnson.

23  Q.    Mr. Bower is currently a fugitive, isn't he?

24  A.    He's got warrants in Dubuque, but he's currently

25  locked up in Phoenix, Arizona.

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 35 of 101

1  Q.   He's got warrants, you say in Dubuque?

2  A.   Correct, he's got warrants in Dubuque County.

3  Q.   What's he locked up in Phoenix for?

4  A.   Theft.

5  Q.   He has a number of theft convictions, doesn't he?

6  A.   From my understanding, he does.

7  Q.   Does Mr. Bower work at all?

8  A.   Not that I am aware of.

9  Q.   And you indicated that a gram of heroin runs about

10  $160, correct?

11  A.   Correct.

12  Q.   Half gram would have been about 60 to $80, correct?

13  A.   Correct.

14  Q.   How did Mr. Bower -- what did he tell you regarding

15  how he afforded 60 to $80 a day for his heroin habit?

16  A.   He had stated that, obviously, people come to him

17  looking for the heroin, the middleman-type situation,

18  where they give him the money and he goes and gets it and

19  brings it back to them.

20  Q.   Mr. Bower never provided you with any locations

21  where he met Lo and got his half gram or gram a day, did

22  he?

23  A.   I don't recall him providing a location, unless it's

24  on the report.

25  Q.   If I told you there was no specific places in your

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 36 of 101

 1    report, any reason to disagree with that?

 2    A.    No.

 3    Q.    Never provided you with specific dates, correct?

 4    A.    Correct.

 5    Q.    So there's a complete lack of specificity as far as

 6    dates, times, locations for any of the transactions

 7    Mr. Bower purported to have with Mr. Stevenson, correct?

 8    A.    Lack of specificity in regards to those points.

 9    Q.    Further, Mr. Bower also -- he didn't tell you

10    everything during his interview, did he?

11    A.    He did not.

12    Q.    He told you information regarding Mr. Stevenson and

13    a few other people, but he also said he's going to keep

14    some things in his back pocket for later, correct?

15    A.    That's correct.

16    Q.    Did you ever find out what those were?

17    A.    I did not.

18    Q.    So as far as you know, they could have been other

19    sources for heroin that Mr. Bower was utilizing, correct?

20    A.    It's possible.

21    Q.    Mr. Bower was also a dealer and a middle person,

22    isn't that true?

23    A.    From my understanding, he would middle deals.

24    Q.    How do you know he would middle deals?

25    A.    He'd advise me that people would bring him money,

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 37 of 101

1   and he would go get the drugs and bring it back to them

2   and keep some for himself.

3   Q.    And in regards to Emily Nelson, you testified about

4   quantities she said she obtained.  She also testified

5   during trial that she had a hard time distinguishing

6   dreams from reality.  Do you recall that?

7   A.    Yes.

8   Q.    She also testified that she had no deals with

9   Mr. Stevenson for two months, after Adam Birch's

10  overdose.  Do you remember that?

11  A.    I think that is what she testified.

12  Q.    So you would agree there's conflicting testimony --

13  or statements from Emily Nelson as to whether or not she

14  in fact got any heroin from Mr. Stevenson on

15  February 11th, correct?

16  A.    Yes.

17  Q.    And I asked you about, I believe, Mr. Bower's

18  employment.  You indicated you knew of no employment by

19  Mr. Bower.  What about Mr. Walgren, any employment you

20  are aware of?

21  A.    I don't recall if he was employed or not.

22  Q.    What about Mr. Birch?

23  A.    Mr. Birch actually worked with his sister, doing

24  construction-type work.

25  Q.    Now, you talked about text messages between

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 38 of 101

1    Mr. Walgren and Mr. Stevenson, as well as Mr. Birch and

2    Mr. Stevenson.  Every time they texted, did they, in

3    fact, have a hand-to-hand heroin deal?

4    A.    Not every time.

5    Q.    Fair to say, Adam Birch also had other sources for

6    his heroin, correct?

7    A.    During the three weeks that I could -- or during the

8    four weeks of the text messages that I looked at, I did

9    not see anything in there that indicated anyone else

10   being a source of heroin for him.

11   Q.    Emily Nelson was also on Suboxone during this

12   timeframe; is that true?

13   A.    She could have been.  I can't recall if she was or

14   not.

15   Q.    And that's through a drug program, to get off

16   heroin, correct?

17   A.    That's correct.

18   Q.    As far as Mr. Walgren is concerned, you utilized him

19   for some controlled buys, correct?

20   A.    Correct.

21   Q.    In fact, during one controlled buy, he stole a

22   number of baggies of heroin that he did not turn over to

23   the task force, correct?

24   A.    One bag.

25   Q.    You found out about nine days later, that he, in

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/04/19  Page 39 of 101

1 fact, had kept those, correct?

2 A.    Correct.

3 Q.    That's one that you found out about, correct?

4 A.    Correct.

5 Q.    You're not aware of how many other times he may have

6 done that?

7 A.    I am not.

8 Q.    You talked about threats that Mr. Walgren testified

9 that he received, and, specifically, you said

10 Mr. Stevenson told him "You are going to get it.  You're

11 a hot MF."  Isn't that the statement that he gave?

12 A.    Yes.

13 Q.    Is that a direct threat, like "I'm going to kick

14 your ass"?

15 A.    Mr. Walgren said he took that as a threat, that he

16 was -- that Mr. Stevenson was going to be after him.

17 Q.    But you don't know if that's what the intent was

18 from Mr. Stevenson, if that was said, do you?

19 A.    I would certainly think that's the intent.

20 Q.    Did he tell you what threats he made to

21 Mr. Stevenson?

22 A.    He did not.

23 Q.    Shannon Scholtes you testified about.  Wasn't there

24 a controlled buy with Shannon Scholtes where she didn't

25 have a present phone number for Mr. Stevenson?

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 40 of 101

```
 1   A.    Yes.

 2   Q.    Did you provide her with that number?

 3   A.    I did.

 4   Q.    And that also happened on one occasion with William

 5   Bower, isn't that true?

 6   A.    What happened with William Bower?  I'm sorry.

 7   Q.    He didn't have the current number.  You don't recall

 8   that?

 9   A.    No, he had the current number that he gave me.

10   Q.    Did Shannon Scholtes also tell you that Ricky Carter

11   had his own sources for heroin, other than Mr. Stevenson?

12   A.    Could you say that one more time?

13   Q.    Sure.  Ricky Carter had his own supplier for his own

14   distributions, didn't he?

15   A.    I don't know.

16   Q.    You talked about Mr. Steve and some buys that he was

17   purported to have with Mr. Stevenson.  Was Mr. Steve

18   employed?

19   A.    Yes.

20   Q.    Where was he working?

21   A.    He was working for his dad at a -- his dad owns a

22   plumbing business.

23   Q.    What other sources for heroin did he have?

24   A.    I don't know.

25   Q.    And again, fair to say, there were a number of
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 41 of 101

1  heroin suppliers in Dubuque, correct?

2  A.    Correct.

3  Q.    And there were periods of time when Mr. Stevenson

4  was locked up in 2016, in fact, a period of four months,

5  correct?

6  A.    I don't know without reviewing paperwork that shows

7  that.

8  Q.    Well, let's assume he was.  Fair to say that these

9  heroin users would have a number of other resources they

10 could go to to get heroin, correct?

11 A.    Presumably, yes.

12 Q.    Well, they didn't wait for four months until

13 Mr. Stevenson got out of jail, did they?

14 A.    Presumably, they did not.

15 Q.    Thank you, Officer Leitzen.

16        MR. LAHAMMER:  Nothing further, Your Honor.

17        THE COURT:  Thank you.  Any further redirect

18 examination?

19        MR. LAMMERS:  Yes, thank you.

20                REDIRECT EXAMINATION

21 BY MR. LAMMERS:

22 Q.    Was Mr. Stevenson in jail in 2016 or 2017, as far as

23 you know?

24 A.    As far as I know, 2017.

25 Q.    Perhaps counsel misspoke, but you're not aware of

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 42 of 101

1  any time he was in jail in 2016?

2  A.   Not that I am aware of.  He was not in custody in

3  Dubuque County that I am aware of, because we did not

4  have a photo on file of him.

5  Q.   Okay.  And he did, what, three months --

6  A.   Correct.

7  Q.   -- in jail in 2017?

8  A.   Correct, August until November of 2017.

9  Q.   Okay.  I guess, based on your training and

10  experience and your investigation of this particular

11  case, including your discussions with all of the

12  cooperating witnesses, is there any way that the

13  defendant, while he was selling heroin, was involved in

14  less than an ounce of heroin a month?

15  A.   In my opinion, no.

16  Q.   Could 15 grams a month have covered what we are

17  talking about here?

18  A.   No.

19        MR. LAMMERS:  I don't have any other questions.

20        THE COURT:  Thank you.  Any further recross?

21        MR. LAHAMMER:  Briefly, Your Honor.

22                    RECROSS EXAMINATION

23  BY MR. LAHAMMER:

24  Q.   Officer, Mr. Stevenson was sent to prison

25  October 20th of 2015 and didn't discharge until the

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 43 of 101

```
 1  middle of February 2016.  Were you aware of that?
 2  A.   No.
 3           MR. LAHAMMER:  Paragraph 42 of the PSI, Your
 4  Honor.  Nothing further, Judge.
 5           THE COURT:  Thank you.  Officer, you may step
 6  down.
 7       Any further evidence on behalf of the United States?
 8           MR. LAMMERS:  I guess I have a question for the
 9  Court, do I need to make the trial transcript an exhibit?
10  I believe there's -- you can take judicial notice of it.
11  And beyond the trial transcript, I have no further
12  evidence.
13           THE COURT:  To answer your question, no, you
14  don't need to make the trial transcript -- it's part of
15  the record of this court.  I was the trial judge, I did
16  hear that evidence, and that is all part of the relevant
17  criminal conduct for purposes of this sentencing hearing.
18       And so, Mr. Lahammer, any evidence you wish to
19  present?
20           MR. LAHAMMER:  No, Your Honor.
21           THE COURT:  All right.  I'll hear argument then
22  regarding the sentencing guideline issues.  First, we'll
23  deal with drug quantity.  And so, Mr. Lammers, do you
24  wish to be heard?
25           MR. LAMMERS:  Yes, Your Honor.  The testimony
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 44 of 101

from the officer is clear.  45 grams as put forward by

the defendant just simply doesn't work.  The math doesn't

work.  $4,500 doesn't work for a drug trafficker over the

course of, by his own admission, two to three years; and

he testified to that at trial, that he was a drug dealer

for two to three years.  What does work and what is

consistent are the quantities that, as you extrapolate it

out, that Mr. Bower talks about.  We're talking about 1

to 2 grams a day.  And conservatively -- I think

probation handled this actually very conservatively, and

appropriately so, holding him accountable for 360 grams

of heroin from Mr. Bower, which should probably be

substantially more; holding him accountable for 25 grams

of heroin from Mr. Steve, which again should probably be

more.  And we know that because at the time Mr. Steve was

arrested, he had just purchased a gram of heroin.  But

again, to be on the safe side because, as the Court well

knows, there's -- there's some discrepancies between drug

traffickers, drug consumers, on quantities.  So it's

appropriate when Eric Steve says "I bought between 45 and

55 times."  Usually it was a gram but, you know,

sometimes it was a half a gram, but hold him accountable

for the half a gram, but the defendant is receiving

probably a break based on that.  And I would note, he is

not contesting those particular drug quantities.

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 45 of 101

1    In regards to then the text messages, what is more

2   corroborative of the text messages?  The kinds of

3   quantities Mr. Bower is talking about or the kinds of

4   quantities the defendant is talking about?  The kinds of

5   quantities Mr. Bower is talking about are supported by

6   the fact Adam Birch, in the course of January 9th to

7   February 2nd, purchased at least 5 grams of heroin,

8   probably more, supported by the text messages; and that's

9   over a three-week period that the defendant was actually

10  gone for three days while he was reupping.  So that's

11  over the course of, that we know of, over the course of

12  approximately, again, two-and-a-half weeks, a

13  conservative amount of 5 grams of heroin.  And yet the

14  defendant wants us to understand or believe that he was

15  involved in trafficking 5 grams -- or 45 grams of heroin

16  over the course of two to three years.  It doesn't make

17  any sense.

18    I would argue, Your Honor, you can also rely on

19  Mr. Bower's drug quantities in this particular case,

20  because he says, "Hey, I know this guy.  Here's his phone

21  number."  Lo and behold, that matches.  He gives it off

22  his memory.  He says, "Here's his other phone number."

23  Lo and behold, that matches what we have later as well.

24  Again, out of his memory.  And says, "Here's where he

25  lived, here's what he drove, and it's registered to the

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 46 of 101

girlfriend," and we were able to corroborate all of those
facts at a later date.  It matches within the rest of
what we know, it matches within the course of the
conspiracy, and it matches the expert testimony of the
officer, who says 45 grams, it doesn't work.  It's -- I
don't recall the word he used, but the modifier of low,
was that it was just almost absurdly low to think that's
all the quantity he's involved in.  And on top of it, it
doesn't match what the defendant himself says.  He's gone
on the 22nd to the 25th of January and then on
cross-examination, he said -- he admitted he was there to
reup.  He admitted he was there to -- to get heroin.  And
then I asked him, I think the question was, "And how much
did you get?  At least 10, 15 grams?"  And he says,
"Yes."  Now, that's a third of what he supplied, that he
got on those three days, is a third of what he supplied
over the course of two to three years?  That just -- it
doesn't pass the smell test, and it doesn't fit with the
evidence that the Court has heard, and it doesn't fit
with the way people traffic drugs.  The defendant is a
self-admitted drug dealer and he is responsible for the
quantities that the PSR noted.  And, frankly, those are
conservative quantities and I think the Court would be
justified on relying on them.  I think the PSR has
adequately scored this and appropriately scored this as a

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 47 of 101

1  base offense level 26.

2      Did the Court wish me to address the other guideline

3  issues at this point?

4          THE COURT:  Yes, why don't we go ahead and hear

5  on all the guideline issues and then we'll hear from the

6  defense on them.

7          MR. LAMMERS:  In regards to the obstruction of

8  justice, in this particular case I think the Court can

9  find this in a number of ways.  First of all, the Court

10 can find this based on the fact he threatened John

11 Walgren.  John Walgren said to the officer at the time of

12 the proffer in December that the defendant called him in

13 the jail "a hot mother fucker" and told him he was going

14 to get it.  That in and of itself is obstruction.  And

15 John Walgren then testified, if the Court recalls, that

16 he was threatened.  And we didn't delve specifically into

17 what the threats were, but he did testify that the

18 defendant had threatened him in December of 20' -- I

19 think it was 2018 in the jail.  So we have his sworn

20 testimony that the Court can rely on.  And we have his

21 proffer interview with the defendant that the Court can

22 rely on as well.

23      We also have in regards to obstruction of justice

24 the defendant's numerous lies when he testified at trial.

25 And the Court -- I will point a few of them out to the

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 48 of 101

Court.  First of all, when he starts his testimony, he's

adamant.  He says he never agreed with anyone.  He never

was involved with anyone else in his drug -- in his drug

trafficking.  And that is at -- excuse me for one second,

Your Honor.  That's the -- some of the first responses on

direct examination, with -- with his attorney.

Specifically, on page 422, "Were you selling crack during

that time?"  This is at Line 14, "Were you selling crack

during that period of time?

    "Yes.

    "Were you working with anyone else to sell those

drugs during that period of time?

    "Not at all."

    We know that's false.  We know that's false because

Shannon Scholtes says "He was working with Ricky.  In

fact, that's how I got to know him.  I was getting from

Ricky, and sometimes I would call Ricky and he would give

me crack cocaine.  And then later, when I would call

Mr. Stevenson, Ricky would give me crack cocaine."  We

know they were working together.

    And if the Court can remember the testimony on

cross-examination, the defendant then intentionally tried

to distance himself from Ricky, specifically, when I

asked him if he knew Ricky Carter, he said, "Oh, I heard

of him."

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 49 of 101

1    "You didn't hear of him.  You lived with him."  And

2    then he had to admit, yes, he did in fact live with him,

3    I think he said "for a minute."  But in fact, the drug

4    transactions were occurring out of that apartment, so he

5    tried to distance himself from the agreement.  He denied

6    the conspiracy, and he denied being involved in a

7    conspiracy and the jury convicted him of that.  I

8    understand that simply a conviction is not enough

9    necessarily; however, if the Court determines he

10   testified falsely, that is enough for obstruction of

11   justice, and I think you can find that based on these

12   facts.

13       You can also find that based on his denial of the

14   distribution to Adam Birch.  The jury believed that he

15   distributed to Adam Birch on the night that Adam Birch

16   died, and the defendant was adamant.  Defendant came in,

17   and I guess it's a classic case of admit what you can't

18   deny and deny what you can't admit.  So he can't admit to

19   the conspiracy, so he says, "No, no, no, I never worked

20   with anyone," although the evidence shows very clearly he

21   did.  And then he says, "No, no, no, I never sold to Adam

22   Birch the night he died.  Yeah, I sold to John Walgren on

23   those controlled buys you caught me on.  Yeah, I sold to

24   Shannon Scholtes on those controlled buys you caught me

25   on.  But I wasn't involved in this other stuff."  The

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 50 of 101

jury didn't buy that story, and the Court shouldn't buy
the story either.  And he testified falsely when he
denied his involvement in those events.

     So in regards to the obstruction, I believe we
proved the obstruction based on his threats to Walgren,
based on his false testimony at trial, and I think
there's ample evidence in the record for the Court to
find that guideline enhancement.

     Next, I guess would be I think role in the offense.
And I'm not sure if I have these in order or not, but I
believe these are the guideline issues.  In regards to
role in the offense, I would specifically point the Court
to the testimony that you heard throughout the trial.  I
think the first thing we have to show is five people were
involved in this particular conspiracy.  I think the
evidence is clear from the trial.  We've got the
defendant, we've got Mr. Walgren, we've got Mr. Steve,
we've got Adam Birch, we've got Emily Nelson, we've got
Shannon Scholtes.  We've got -- if you recall John
Walgren's testimony, he said after Adam Birch died, the
way he got back in touch with the defendant was that he
ran into him I think at a gas station when he was with
his friends Angie and Jake, who were getting drugs from
the defendant, and then he was getting the drugs from
them because Mr. Stevenson was not supplying Mr. Walgren

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 51 of 101

1   after Adam Birch died, and that -- that's how he got back

2   involved with him.  Then he was involved as well with

3   Ricky, and he was involved with this other I believe it's

4   called -- the testimony was "an unknown black male" who

5   delivered drugs to John Walgren months after the death of

6   Adam Birch.  Mr. Walgren would contact the defendant, the

7   defendant would tell him where to show up, Mr. Walgren

8   would show up, and then he had someone deliver the drugs

9   for him or the heroin for him.  And if the Court recalls

10  this particular bit of testimony -- and I think this is

11  telling in regards to the next portion of the 3-level

12  role increase.  Not only do we have to show five people

13  were involved, but we have to show the defendant

14  controlled someone or directed someone during the course

15  of the conspiracy.  Mr. Walgren's testimony, if the Court

16  recalls, is on five occasions after Adam Birch died, the

17  defendant had someone else deliver the drugs for him.

18  And on one of those occasions, after John Walgren paid

19  for his heroin, the defendant immediately called him.  He

20  paid for his heroin to another person, received his

21  heroin from another person, and within 5 minutes of that,

22  it was the defendant who called Mr. Walgren and told him

23  that he was $5 short on the heroin buy.  In other words,

24  the defendant counted the money after his runner had

25  brought the drugs to Mr. Walgren and determined that he

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 52 of 101

1    was short. That is enough to establish role in the

2    offense in this particular case.

3        I think probably, Your Honor, it's not necessary --

4    we can't establish role at the time of the crack -- at

5    the time of the crack selling, because basically they're

6    going back and forth. Ricky Carter sometimes delivers,

7    the defendant sometimes delivers. That doesn't sound

8    like one is managing the other. That sounds like they're

9    partners in the operation. The heroin trafficking, on

10   the other hand, the defendant actually sent a runner,

11   checked the money after he got the money, and then called

12   the customer and said, "You still owe me money. Make it

13   up on the next transaction." That's enough, and that

14   supports role in this particular case.

15       And I think as the Court's aware, and I think

16   it's -- I think the case is *Vasquez-Rubio;* I'm sorry I

17   don't have a cite for the Court. But if there are five

18   or more participants in the conspiracy and the Court

19   finds that the defendant acted as a manager or supervisor

20   or leader or organizer or in some way controlled another,

21   the Court doesn't have any discretion. It has to find a

22   3-level role increase. If there are under five persons,

23   you could find a 2-level role increase, but here I think

24   the evidence is clear there's more than five people that

25   are involved in this particular conspiracy. That

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR Document 123 Filed 11/01/19 Page 53 of 101

1  supports the 3-level role increase in this particular

2  case, Your Honor.

3     Unless I'm missing something, I think that covers

4  the contested guideline issues, with the exception of our

5  request for an upward departure, which is I guess a

6  guideline issue as well.

7        THE COURT:  Let's take up the upward departure

8  here in a minute; but I think that addresses all the

9  contested guideline issues at this point, and so I will

10  hear from Mr. Lahammer now.

11        MR. LAHAMMER:  Thank you, Your Honor.  Your

12  Honor, I won't take a lot of time.  I think we briefed

13  this pretty thoroughly; been through the trial record.

14  We would just ask the Court to take note of the

15  ambiguities and discrepancies in the trial testimony and

16  the contradicting testimony.

17     One of the things about Mr. Bower, it just is not

18  credible.  He provides no specifics on any of the

19  distributions or quantities or anything like that, place,

20  time.  Further, it's clear from the PSI Mr. Stevenson was

21  locked up October of 2015 through February of 2016, and

22  yet, Mr. Bower said that, "Oh, from September of 2015,

23  for two years, I got it every day from Mr. Stevenson."

24  And that doesn't account for Mr. Bower's own time being

25  locked up.  He clearly had motivation to lie.  He

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 54 of 101

provided information.  He was a heroin addict, needed to get out of jail to get back to his habits, and told a story to investigators and got out.  Kept information in his pocket, we don't know what that information is, but it's clear Mr. Bower's testimony is not credible.

As far as working with Ricky Carter, we don't know the type of relationship there, whether that was just a partnership as well.  It doesn't necessarily mean they were working together.  But as far as the quantities, it's our position that, because of the lack of specific information, that the Court should look at those quantities with some reservation.

As far as the obstruction, again, "You're going to get it.  You're a hot MF," we would submit is not a threat, if it was stated.  We would also note that there were times Mr. Stevenson has proffered that there are times when Mr. Walgren would taunt and threaten him as well while in the jail.  We don't believe obstruction applies.

As far as the testimony, we do acknowledge and respect the jury's verdict; however, jurors get it wrong sometimes.  Mr. Stevenson testified.  He submits he testified truthfully, and that would not amount to obstruction.

As far as the role in the offense, again, it's a

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 55 of 101

 1   lack of proof that there was any control or direction of

 2   anybody else.  Whether these people were middling,

 3   whether they were partners, whether it was a buyer/seller

 4   relationship, we submit is an open question.  And we did

 5   note in our objections there was another instance in the

 6   chapel when Mr. Stevenson found himself with another

 7   cooperator, and immediately informed guards and was

 8   removed from there and informed his counsel.

 9       As far as acceptance, Mr. Stevenson would submit

10   that he testified truthfully and acknowledged

11   distributing both heroin and crack cocaine, and we would

12   rely on our brief, as well as that fact to justify the

13   acceptance.  Thank you, Your Honor.

14           THE COURT:  Thank you, Mr. Lahammer.

15           MR. LAMMERS:  Excuse me, Your Honor, I did not

16   address acceptance.  I think that we talked about all the

17   others but I didn't talk about that.  Did the Court want

18   me to address that or not?

19           THE COURT:  I don't believe I'll need that.

20   Thank you.

21           MR. LAMMERS:  Thank you.

22           THE COURT:  All right.  Addressing the drug

23   quantity issue first, these are difficult cases.  Drug

24   dealers don't keep records of how much they buy, and

25   particularly drug users don't keep track of how much

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 56 of 101

drugs they buy from a defendant -- or from another person
at any given time.  And so any time they're providing
statements to law enforcement officers, they are at best
estimates.

I am confident that the law enforcement officers are
trying to elicit from the suspects the most conservative
estimates possible so the drug quantities are not
overstated or inflated in any way.  And then they do
their best to provide the government, and then ultimately
the government provides the Court, their best estimates
of drug quantity.  But they are difficult under these
circumstances when drugs are not seized but we're going
off of historic drug quantities.  They are inherently
difficult calculations to make, and they are always going
to be to some degree estimates.

In this case, there's no doubt by even the
defendant's own admissions that for two to three years he
was a heroin dealer and was distributing quantities of
heroin.  He would have that quantity at 45 grams, which I
agree is unrealistic.  The probation office, based on the
information gathered by the government, has estimated
drug quantity of, converted drug quantity, of
463 kilograms.  The cutoff for the guideline for level 26
is 400, so it's 400 to 700 kilograms of converted drug
weight.  A lot of that drug weight is premised on the

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 57 of 101

1 information provided by Mr. Bower.  Of the 428 grams of

2 heroin attributed to the defendant, 365 of that comes

3 from Mr. Bower, Bower's statement.  Mr. Bower did not

4 testify at trial.  Mr. Bower gave a broad estimate over a

5 two-year period of buying a gram to 2 grams every day.

6 The probation office and the government has estimated it

7 on the low side of 1 gram every day, but the information

8 was nearly every day.  And then the information and the

9 evidence before the Court is clear that the defendant and

10 Mr. Bower, at least for some period of time during that

11 two-year period of time, was in custody.

12   So the probation office is taking the estimate of

13 1 gram a day for one year, so basically cutting the drug

14 quantity in half, to take into account the idea that for

15 some period of time during that time period Mr. Bower was

16 not actually buying heroin from the defendant every

17 single day.  Had the probation office and the government

18 held the defendant accountable for literally 1 gram every

19 day for two years, I would find that to be overstated.

20 But in this case, the drug quantity has been cut in half.

21   I agree that Mr. Bower's information provided to the

22 law enforcement officer was lacking in specific detail

23 about when, where, and exactly how much, and did not --

24 Mr. Bower did not account for the days that he might have

25 been in custody, and the same thing with the defendant.

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 58 of 101

But the way that the probation office has conservatively

estimated the drug quantity for Mr. Bower, I find that a

total weight of 463 grams -- kilograms converted weight,

at a level 26, is a reasonable estimate of the drug

quantity the defendant was responsible for during the

time period of the conspiracy. And so I am overruling

the defendant's objection to drug quantity in this case.

As far as the adjustment for aggravating role and

the threat or intimidation of a witness in this case, I

do recall the testimony of Mr. Walgren during the trial.

The government alerted the Court that it was going to

elicit this testimony in advance of the testimony. And

in order to minimize the prejudice to the defendant as to

the circumstances and so forth, what was brought out at

trial was simply that there was a threat made to

Mr. Walgren from the defendant. That came in essentially

uncontested; there was no cross-examination on it. That

is supported by the more detailed statement provided to

law enforcement officers before the trial regarding the

nature of that threat.

I find when the defendant says "You are going to get

it," under these circumstances, there's no other way to

interpret that other than it's a threat. And so I

overrule the defendant's objection to paragraph 32 of the

presentence report.

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 59 of 101

       Even if I were to sustain that objection, I would find the defendant obstructed justice in providing false testimony during the trial.  I find that his testimony at trial was false in two regards.  One, with regard to whether he was involved with others in the distribution of heroin and crack cocaine.  And the evidence before the Court during the trial was quite convincing.  The defendant was involved with others; was not simply acting alone, going to Chicago, for example, getting heroin, and then selling it to people without any other involvement with any other people.  So I find that was false.

       I also find the evidence was beyond a reasonable doubt that defendant distributed the heroin to Adam Birch on the day that Adam Birch died.  The defendant explicitly vehemently denied that.  I think the evidence, particularly supported by the testimony and the text messages, shows that to be false, and so I find the defendant obstructed justice by knowingly perjuring himself during the trial in this case.

       So either way I would find an upward adjustment for obstruction, either under section 2D1.1(b)(16)(D) or under 3C1.1.

       As far as the role in the offense, I do find that this conspiracy involved five or more people.  Those five -- or those five or more people include John

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 60 of 101

Walgren, Ricky Carter, Adam Birch, William Bower, Brandon
Lee, the defendant's girlfriend Jessica, Andre Johnson,
Eric Steve, Shannon Scholtes, Emily Nelson, Angie and
Jake last names unknown, and an unknown black male, and
the defendant.  So even if I'm wrong on any one of those
individuals, this clearly involved five or more people.

     The more difficult question is whether the defendant
occupied a supervisory role to some degree over one or
more people.  And I agree with the government, that --
and, really, the only evidence that I could find that was
hard evidence, but certainly enough for preponderance of
the evidence in the sentencing hearing, of direct control
was Walgren's testimony regarding the defendant
distributing heroin to him through another person, and in
particular with regard to the incident where he was $5
short.  All that certainly suggests the defendant was
intentionally trying to distance himself from Walgren
after Adam Birch's death, was having a go-between deal
with him, but that the defendant was, in fact, the one in
control of the transaction.  And I think that evidence is
sufficient under the preponderance of the evidence
standard to find the defendant occupied a supervisory
role with regard to at least one other person in a
criminal activity that involved five or more people.
Again, even if I'm wrong on the five or more people, that

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 61 of 101

1   application also applies if the organization is otherwise

2   extensive and I find that it was otherwise extensive.  So

3   I overrule the defendant's objection to paragraph 34.

4        With regard to acceptance of responsibility, the

5   guidelines provide when a defendant obstructs justice, as

6   I have found that he does here, that he is not entitled

7   to a reduction for acceptance of responsibility, except

8   for rare circumstances.  *United States versus Honken* sets

9   forth a number of factors to take into account in

10  determining if a person who has obstructed justice is

11  also entitled to acceptance of responsibility.  Here, I

12  find that the defendant simply is not entitled to it.  He

13  went to trial.  He made the government prove up their

14  case.  Even though he admitted a number of the counts at

15  trial, he denied being a part of the conspiracy, denied

16  distributing to Adam Birch, made the government prove

17  that up at trial, and then on top of it, obstructed

18  justice by committing perjury at trial, let alone the

19  threat to Mr. Welch [sic] ahead of time.  So I find the

20  defendant is not entitled to acceptance of responsibility

21  and I overrule his objections to 27, 28, and 29.

22       So that leaves us with a total offense level of 31,

23  criminal history category III, for an advisory guideline

24  range of 135 to 168 months.

25       All right.  We have an upward -- a motion for an

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 62 of 101

```
1   upward departure for causing the death of another person
2   and overdose of another person, and so I'll hear argument
3   regarding that or any evidence you wish to present.
4       Mr. Lammers, do you have any evidence you wish to
5   present on that issue?
6           MR. LAMMERS:  Your Honor, I simply have the
7   government exhibit.  I think we have the autopsy.  And,
8   I'm sorry, I don't have the exhibit number off the top of
9   my head, but it is -- it was an exhibit admitted at trial
10  that showed that Mr. Birch died of a mixed-drug overdose.
11  And I'd request that the Court take that into
12  consideration in this particular case.  And other than
13  that, I have simply argument, Your Honor.
14          THE COURT:  All right.  Mr. Lahammer, do you
15  have any evidence you wish to present on that issue?
16          MR. LAHAMMER:  No, Your Honor.
17          THE COURT:  All right.  I'll hear argument
18  then, Mr. Lammers.
19          MR. LAMMERS:  Thank you, Your Honor.  Your
20  Honor, in this particular case, I'm requesting the upward
21  departure, and I think the Court should depart
22  substantially up from the top of the guideline range for
23  a couple of reasons.  Number one, the defendant knew that
24  the drugs were dangerous, and I think his testimony, in
25  fact, was -- if you recall, I asked him if he was a
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 63 of 101

 1   heroin user and he said no.  And I asked him why that

 2   was, why he didn't use heroin, if it was because he

 3   believed it was dangerous.  And he said, yeah, he would

 4   think that it was dangerous, and that's why he didn't --

 5   that's why he didn't use it.  Yet he certainly didn't

 6   mind selling it.  And, in fact, on this particular

 7   occasion, shortly before Mr. Birch died, the defendant

 8   was reaching out to people saying that he had a "hot new

 9   fresh tasty batch" for them to try, and basically

10   indicated that he had some new product for them to try.

11       And if that in and of itself is not dangerous

12   enough -- and we know the result of that was Mr. Birch's

13   death.  But if that in and of itself was not dangerous

14   enough, the defendant continued to sell heroin even after

15   he knew Adam Birch died.  I would submit to the Court

16   that the defendant knew within hours -- and it's based on

17   Mr. Walgren's testimony about the phone blowing up and

18   him sort of panicked, about reaching out to Mr. Birch --

19   that he knew Mr. Birch died.  Yet, even after that, that

20   same evening, he was willing to sell John Walgren heroin

21   again.  But let's assume -- let's assume in a

22   conservative scenario that he didn't know until a day or

23   two later.  He still continued to sell heroin.  He still

24   continued to sell heroin up until months after Mr. Birch

25   died, as evidenced by, well, Mr. Walgren's testimony, but

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 64 of 101

 1    by the defendant's own admission.  On the stand in

 2    cross-examination, he admitted that he continued to sell

 3    heroin after Adam Birch's death.

 4        So the dangerous nature of his behavior, I would

 5    submit that the behavior was incredibly dangerous before

 6    Adam Birch died.  It was so dangerous that the defendant

 7    wouldn't use the product, for whatever reason.  Maybe he

 8    just doesn't like drugs.  I don't know.  But he knew it

 9    was dangerous and he knew he shouldn't be doing it, yet

10    he continued to do it.  But the fact he continued it even

11    after the death makes this simply much more egregious,

12    and it makes his behavior at the very least reckless, and

13    I think that's probably understating the case.

14        I don't think there's any way in the world that he

15    intended for Adam Birch to die.  I don't believe that to

16    be the case.  I don't think he was hoping Adam Birch

17    died.  I don't believe that to be the case either.  He

18    wanted to maintain his customer base.  Yet he was at the

19    very least indifferent to the fact that Adam Birch died

20    based on his actions and he continued to sell heroin.  In

21    fact, he at least had some belief -- and I would admit or

22    stipulate that Emily Nelson was a wreck and her testimony

23    was all over the board.  But there was evidence that he

24    continued to sell heroin to her after she had an overdose

25    as well.  Whether or not she overdosed on the heroin that

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 65 of 101

1  the defendant sold her I think is an open question.  When

2  she was lucid in the jail, that's what she said.  When

3  she was a wreck on the stand, she tried to protect the

4  defendant; I think that came across.  But at any rate,

5  even if he didn't sell some of the heroin that caused her

6  to overdose, he continued to sell heroin and knew that

7  that was potentially a foreseeable result.

8       So I think that an upward departure in this

9  particular case based on his reckless indifference to

10  other people's lives is warranted and appropriate, and

11  I'd request the Court depart substantially above the top

12  of the guideline range.

13            THE COURT:  Thank you, Mr. Lammers.

14       Mr. Lahammer.

15            MR. LAHAMMER:  Thank you, Your Honor.  We

16  obviously resist the upward departure.  We would note in

17  our brief under 5K2.1, it indicates "Loss of life does

18  not automatically suggest a sentence at or near the

19  statutory maximum, and the judge must give consideration

20  to matters that normally distinguish among levels of

21  homicide, such as state of mind and degree of planning or

22  preparation."  We would submit in this case this was at

23  most reckless conduct.  Certainly a tragedy, but reckless

24  conduct would not, we would submit, justify an upward

25  departure.  Thank you.

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 66 of 101

```
 1            THE COURT:  Thank you.  All right.  Regarding
 2    the causation issue here, I do recall the autopsy report
 3    from the trial, and heroin was a contributing factor.  It
 4    was not a but-for cause of Adam Birch's death, but it was
 5    a contributing factor to his death of his polysubstance
 6    overdose.
 7            Regarding the causation of Ms. Nelson's overdose, I
 8    cannot find from the evidence before the Court that the
 9    defendant distributed heroin to her that caused her
10    overdose.  She was, as the government characterized her
11    testimony at trial, a wreck and she was all over the
12    place.  She -- I have no doubt that she, in fact, told
13    Officer Leitzen what she told Officer Leitzen and what he
14    testified to.  But it's also clear that under oath before
15    the Court and the jury, she denied getting the heroin
16    from the defendant that caused her overdose.  And based
17    on that, I cannot find that the defendant's distribution
18    caused her overdose.
19            Whether an upward departure is justified for the
20    defendant's distribution of heroin to Adam Birch that
21    caused his overdose, I find that an upward departure is
22    warranted under those grounds.  The defendant did know --
23    this is different from a lot of the cases that are before
24    the Court involving heroin overdoses.  In many of the
25    cases, there's no direct evidence that the person
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 67 of 101

1   distributing the heroin knew or believed it was

2   particularly potent or dangerous.  A very, very small

3   amount of heroin is capable of killing somebody.  It

4   could be as a result of the condition of the person who

5   is using the heroin, they could have health issues, they

6   could have a dozen other drugs in their system; and

7   oftentimes we find cases where the -- a defendant is

8   distributing heroin, somebody dies, and there's no

9   particular evidence the defendant knew that the heroin

10   was dangerous or deadly or was going to pose a particular

11   danger to somebody.

12       Here, the defendant -- the evidence before the Court

13   is the defendant knew that his heroin was dangerous.  I

14   think most compelling, to the Court anyway, is the

15   evidence of the defendant's reaction after Adam Birch was

16   not heard from.  And the defendant -- I do find his

17   reaction in his text messages to Walgren, his

18   communications, his attempt to reach out, was a panic by

19   him.

20       I have no doubt that Mr. Stevenson did not intend to

21   cause Adam Birch's death, did not want him to die.  I

22   find that he did have a sincere concern about Adam

23   Birch's health and the health of other customers of his.

24   He -- I found the evidence at trial was that defendant

25   warned Nelson about the drugs and told her to be careful

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 68 of 101

1    in the use of the drugs or else he wasn't going to sell

2    to her.  So this defendant had a concern for his

3    customers that they not overdose.  At the same time, he

4    knew he was dealing with a drug that was particularly

5    deadly, was particularly dangerous, and then even after

6    Adam Birch died -- and I find the defendant was

7    responsible for that death, in part, and knew he was

8    responsible for Adam Birch's death, in part -- he still

9    continued to distribute heroin even afterwards.

10       And so that does support an upward departure under

11   5K2.1.  The degree of upward departure I'm going to hold

12   off on trying to determine at this point, because I want

13   to hear argument regarding the variance motion, I want to

14   hear any victim impact statement, and then use both the

15   departure and the variance and factors under 3553(a) to

16   arrive at a sentence.  But when I do so, I will

17   distinguish between the upward departure and any variance

18   upward or downward from the guidelines at that time.

19       So, in short, the Court grants the government's

20   motion for an upward departure under 5K2.1 and I'll

21   announce the degree of upward departure later in this

22   hearing.

23       All right.  It strikes me, Mr. Lammers, that perhaps

24   now might be a good time to have any statement by any

25   victim in this case.  It's 10:35 right now.  I think this

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/04/19  Page 69 of 101

might be a good time for us to take our morning break.
Maybe you can talk with your victims during the break,
and then we'll come back.  At that time, if they wish to
speak, I'll hear from any of the victims who would like
to speak.  Then I'll hear argument from the government
regarding the sentence it believes the Court should
impose and any argument it has regarding the defendant's
variance motion; and then I'll hear from Mr. Lahammer on
a downward variance motion; I'll hear from Mr. Stevenson
if he wishes to speak; and then I'll pronounce sentence
at that time.

     MR. LAMMERS:  Thank you, Your Honor.

     THE COURT:  Thank you.  So we'll be in recess
until 10:55.  Thank you.

    (Whereupon, a brief recess was taken.)

     THE COURT:  We are back in the matter of United
States of America versus Michael Stevenson, Criminal Case
Number 18-CR-1023.  We had taken a break after hearing
evidence and argument regarding the guidelines issues.

    Mr. Lammers, do any of the victims wish to make a
statement here today?

     MR. LAMMERS:  I have spoken to Mr. Birch's
father and sister, and they do not wish to make a
statement to the Court.  Mr. Birch's father is relying on
the victim impact statement that's previously been

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 70 of 101

submitted.  I think you already heard from Mr. Birch's
sister as well in this case when she testified at trial,
and she's not prepared to allocute today.  Thank you.

THE COURT:  All right.  Thank you very much.
And I do recall Ms. Birch's testimony from trial, and I
do have the victim impact statement filled out by
Mr. Birch's father.  That is at pages 3 through 11 of the
presentence report attached at 108-2.  So I have reviewed
that statement.

All right.  So, Mr. Lammers, we're at a point now in
the hearing where I am ready to hear from the government
regarding the sentence it believes I should impose and
any response you have to the defendant's motion for a
downward variance.

MR. LAMMERS:  Yes, thank you, Your Honor.  I
would also request to address the restitution portion.  I
don't believe the defendant -- obviously, he's challenged
whether or not Mr. Birch's father and sister are victims,
but he's not challenging the amounts, is my
understanding.  So I don't believe there's a factual
dispute as to Paragraph 107 in the presentence report,
just a matter of whether the Court characterizes
Mr. Birch's father as a victim in the case.

THE COURT:  Thank you.  Let me interrupt your
presentation then.  I appreciate that, and I meant to

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 71 of 101

```
 1    take up restitution as part of the guidelines issues.
 2         Mr. Lahammer, that was my interpretation of the
 3    defendant's objection as well, is that the objection went
 4    to whether, in fact, Adam Birch was a victim, not that
 5    he's contesting the amount of restitution; is that
 6    correct?
 7              MR. LAHAMMER:  It is, Your Honor.
 8              THE COURT:  All right.  So I do find
 9    restitution proper because I do find Adam Birch to be a
10    victim of the case.  And the amount of restitution is not
11    in dispute, so the Court will award an order of
12    restitution as part of the judgment in this case.
13         Thank you, Mr. Lammers.  And so you may proceed.
14              MR. LAMMERS:  Thank you, Your Honor.  Your
15    Honor, I am requesting the Court do an upward departure
16    in this particular case.  I think you've already
17    determined that an upward departure is warranted.  I'm
18    asking the Court to go from the top of the guideline
19    range and that's -- the defendant's at an offense level
20    31, criminal history category III.  And I'm asking the
21    Court to depart upwards 2 levels to a level 33, criminal
22    history category III, 168 to 210 months, and I'm asking
23    the Court go to the middle or high end of that range, of
24    a sentence of no less than 200 months in this particular
25    case.
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 72 of 101

     1          As the Court has already noted, the defendant's
     2     conduct was dangerous.  I don't think I need to reargue
     3     the facts of the upward departure.  I think we just need
     4     to determine where is the appropriate jumping-off point
     5     if the Court determines a variance is warranted.  And I
     6     think a 200-month sentence is substantially -- a
     7     200-month or above sentence is substantially warranted
     8     based on the facts of this particular case and, again,
     9     based on the defendant's reckless indifference to not
    10     only Mr. Birch but to the other folks he continued to
    11     sell heroin to after Mr. Birch's death.  And I think that
    12     is a very reasonable upward departure, as it's only, I
    13     think, if my math is correct, 32 months from the top of
    14     the range that he is currently on, and that's if you go
    15     to 200 months.  If you go above that, obviously, it's
    16     higher.  And it's still below the otherwise statutory
    17     maximum in this particular case.  Frankly, the statutory
    18     maximum would be warranted here, but I think a sentence
    19     at 200 months is appropriate and warranted.
    20          In regards to the request for a downward variance, I
    21     would submit to the Court that there's simply no grounds
    22     that outweigh -- no mitigating circumstances that
    23     outweigh the aggravating circumstances in this particular
    24     case.  I'm not going to belabor the point on the
    25     dangerous nature of the defendant's conduct, but here's a

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 73 of 101

1   defendant who has chosen to be unemployed and simply

2   support himself by selling drugs.  There's nothing in his

3   background that -- while he comes from a difficult

4   background, clearly, there is nothing that outweighs the

5   choices that he's made, that outweighs the fact that he's

6   chosen to be unemployed and to deal drugs to support

7   himself, and that he's chosen to participate in that

8   lifestyle and that dangerous behavior.  So I see nothing

9   in this record -- while there may be some mitigating

10  circumstances in his background, there's nothing in this

11  record that outweighs the aggravating circumstances, and

12  I would request the Court deny any type of downward

13  variance in this particular case.

14      I would also request that if the Court does do an

15  upward departure, as you've indicated was warranted, that

16  the Court would also make the alternative finding that

17  under the 3553(a) factors, that an upward variance to

18  wherever the Court determines is -- or the ultimate

19  sentence, an upward variance to that would be -- an

20  alternative sentence would be what the Court would do

21  even without the departure because I think that's

22  warranted under the facts of the case as well.

23          THE COURT:  Thank you, Mr. Lammers.

24      Mr. Lahammer.

25          MR. LAHAMMER:  Thank you, Your Honor.  We

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 74 of 101

 1  acknowledge the Court's decision to depart upward.  We

 2  ask for starting at the bottom of the range, if the Court

 3  is inclined to go the 2 levels that the government is

 4  asking for.  Just to touch on a couple things in our

 5  downward variance request, we would rely for the most

 6  part on everything we filed with the Court and ask the

 7  Court to take those things into consideration,

 8  particularly, Mr. Stevenson's age at 29 and a sentence

 9  that will release him in his mid 40s or above.  We ask

10  that the Court take into consideration the polysubstance

11  nature of the cause of death in this case for Mr. Birch.

12  And in particular, the history and characteristics of

13  Mr. Stevenson as set forth in our motion for a variance.

14      Again, we believe a sentence of 168 months is

15  appropriate in this case, which would be the bottom of

16  the range with a 2-level upward departure.  If the Court

17  is inclined not to go with the bottom of the range, we

18  would ask for a sentence no greater than 180 months.

19  Thank you.

20          THE COURT:  Thank you.  Mr. Stevenson, this is

21  the time in the hearing where you have an opportunity to

22  speak to me directly to tell me anything you'd like me to

23  take into account in determining your sentence.  You

24  don't have to say anything.  And if you choose not to say

25  anything, I won't hold that against you in any way.

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/04/19  Page 75 of 101

```
 1              THE DEFENDANT:  No, I will not.  I would rather
 2    not.
 3              THE COURT:  I'm sorry?
 4              THE DEFENDANT:  I would rather not make a
 5    comment.
 6              THE COURT:  All right, very good,
 7    Mr. Stevenson.  Thank you.
 8         All right.  In arriving at a sentence that is
 9    sufficient but not greater than necessary to achieve the
10    goals of sentencing, I have taken into account all the
11    factors set forth at Title 18 United States Code Section
12    3553(a).  Even if I do not mention each of them in my
13    comments here today, I have taken them into account.
14         Turning first to the nature and circumstances of the
15    offense conduct, I think I've kind of summarized it
16    already in making my guideline findings, but this is a
17    defendant who has not been gainfully employed; he's been
18    making his living selling drugs for a number of years.
19    He has a GED, could be employed, but has chosen not to do
20    so.  His only employment, and it's unverified, was
21    temporary employment through staffing agencies for
22    periods of time between 2016 and 2017, and as a janitor
23    for some unknown period of time in 2015 in Chicago.  His
24    reported earnings that are reflected at paragraph 81 of
25    the presentence report suggest as well the defendant has
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 76 of 101

 1    not done anything to earn a lawful living.  He has only

 2    reported income of $817 in 2013, $1,900 in 2014, and $173

 3    in 2018, according to the Social Security Administration.

 4         The evidence instead is that the defendant has been

 5    selling drugs to support himself in the Dubuque area.  He

 6    was selling heroin.  I'd note that the defendant himself

 7    is not a heroin user.  He testified to that at trial and

 8    he also indicated that to the probation office at

 9    paragraph 71, 72, and 73.  The only controlled substance

10    the defendant admitted using was marijuana for a period

11    of time when he was 16 to 18 -- I'm sorry, 19 years old.

12    So this is somebody who is peddling drugs on the street

13    purely for profit, not somebody who was doing so to

14    support his own habit, but basically just doing it to

15    make a living instead of earning a living through a

16    legitimate job.

17         He distributed heroin to a number of addicts in the

18    Dubuque area.  He knew -- the testimony at trial was he

19    knew of their addiction, knew what it -- the effect it

20    was on -- it had on the victims, that they needed the fix

21    on a regular basis, and exploited that to make money off

22    of these people who became addicted for whatever reason

23    to heroin.  And as noted, I find that his distribution of

24    heroin to Adam Birch was a contributing factor to Adam

25    Birch's death in this case.

1     Turning to the defendant's history and
2  characteristics, he did grow up in what he described as
3  an unstable family setting.  His father is incarcerated.
4  His parents apparently do not appear to have been married
5  at any point.  His mother suffers from bipolar disorder.
6  And so the defendant certainly had a disadvantaged
7  upbringing.
8     As the defense notes in -- in its motion for -- in
9  his motion for downward variance, despite that, the
10  defendant did work hard to try to get a degree.  He
11  dropped out in the eleventh grade.  There was one
12  suspension for a physical altercation sometime during his
13  high school, but then the defendant went on to earn his
14  GED while incarcerated with the Illinois Department of
15  Corrections, and took some classes, some college classes,
16  in 2011 and 2013.  I found it noteworthy that there, when
17  he applied himself, he had a GPA of 2.69, so
18  Mr. Stevenson is an intelligent man and, when he applies
19  himself, can do well.
20     The defendant, as I noted, has some history of
21  substance abuse and marijuana, but that's it.  He has no
22  real history of alcohol abuse.  He did drink underage
23  beginning at age 18, but does not consume alcohol in a
24  manner that has gotten him in trouble with the law or
25  otherwise impacted his life or others.  The defendant is

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 78 of 101

1  in good physical health, has no history of serious

2  medical or mental illness at all.  That's reflected at

3  paragraph 69 and 70 of the presentence report.

4       Turning to the defendant's criminal history, his

5  first offense was at the age of 17, involved vehicle

6  hijacking.  The defendant was placed on probation for two

7  years and was terminated unsatisfactorily.  The

8  defendant's next conviction, at 19, was armed robbery,

9  where the defendant robbed a person at gunpoint of his

10  cash, ATM card, Social Security card, and other

11  miscellaneous identification, and struck the defendant --

12  I'm sorry, struck the victim, in the right eye with a

13  small caliber weapon.  He was sentenced to eight years in

14  prison in 2010, was paroled in 2013, and his parole was

15  revoked in 2015.  The defendant also has a conviction for

16  criminal damage to property and unlawful use of a

17  firework at the age of 28.

18       So it's by no means the most serious criminal

19  history this Court's ever seen, but it does show the

20  defendant has a history of violence.  It also shows the

21  defendant has not done well on parole or probation in the

22  past, at least when he was a teenager.  The defendant is

23  now 29 years old, and so perhaps he's matured some and

24  may do better under supervision by this Court, but he

25  will be under supervision by this Court for a number of

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 79 of 101

1    years.

2         And I'll tell you right now, Mr. Stevenson, that

3    you're going to be under close supervision by the

4    probation office.  Violations of supervised release will

5    not be tolerated.  And if you violate the terms of

6    supervised release, the Court can send you back to prison

7    for any -- for any time you otherwise would be on

8    supervised release with this Court.  So it's going to be

9    important when you get out that you not perform like you

10   have in the past and make sure you comply with the terms

11   and conditions of supervision.

12        As I noted, I do find an upward departure in this

13   case to be appropriate.  5K2.1 indicates that loss of

14   life does not automatically suggest a sentence at or near

15   the statutory maximum.  The Court should take into

16   account a number of matters in determining an upward

17   departure under that guideline provision.  In this case,

18   I find the government's request for a 2-level upward

19   departure to be reasonable.  I could very easily, and I

20   think the case law would support it, find an upward

21   departure to the statutory maximum for one of the counts,

22   which is 20 years; but I think the government's upward

23   departure motion for a 2-level enhancement -- or upward

24   departure would be appropriate.  The defendant is

25   criminal history category III.  An upward departure to

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 80 of 101

1  level 33 would put the defendant at 168 to 210 months.

2  So I'm going to grant the government's motion for an

3  upward departure in that amount and arrive at a sentence

4  under the 3553(a) factors based on an advisory guideline

5  range of 168 to 210 months.

6      Regarding the defendant's motion for a downward

7  variance, there are some mitigating factors.  As I

8  indicated, the defendant's childhood was less than ideal,

9  but outside of his childhood, I see very little else here

10  that is mitigating.  Going into my arrival at the level

11  of departure in this case, I took into account the

12  defendant, what I believe to be a sincere concern over

13  the health of his customers, albeit it's a little bit

14  like selling a dangerous device out there to the

15  consumers knowing it's dangerous, recognizing that your

16  customers can be hurt severely or killed by it, and yet

17  wanting to make enough money off of it that you don't

18  care that your clients may be -- you don't care enough

19  that your clients may be harmed by it that you're not

20  willing to make money off of it and sell it to them.  So

21  his concern over Adam Birch's health and other customers'

22  health is tempered by his greed, and I think that came

23  clear.  So other than his unfortunate upbringing, which

24  is by no means the worst I have ever seen, there really

25  isn't anything mitigating in the defendant's history that

Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 81 of 101

1  I can find that would warrant a downward variance in this

2  case.  And so although I recognize I have the ability to

3  vary downward, I am declining to vary downward in this

4  case, finding that the -- any mitigating factors in this

5  case are outweighed by the aggravating factors I've

6  already identified with regard to the offense conduct and

7  the defendant's criminal history.

8      So we are left then with an advisory guideline range

9  of 168 to 210 months.  I do find a sentence of 200 months

10 to be sufficient but not greater than necessary to

11 achieve the goals of sentencing in this case.  So after

12 considering all the factors set forth at Title 18 United

13 States Code Section 3553(a), I find a sentence outside of

14 the -- I'm sorry, within the advisory guideline range is

15 appropriate as adjusted by the upward departure in this

16 case.  It is the judgment of this Court, Mr. Stevenson,

17 that you are hereby committed to the custody of the

18 Bureau of Prisons to be imprisoned for a term of

19 200 months.  I do note that I would find that a sentence

20 of 200 months would be an appropriate sentence in this

21 case under the 3553(a) factors, even if I erred in any of

22 the calculations of the guidelines or in the granting or

23 the extent of my departure under 5K2.1.  It is

24 recommended that you be designated to a Bureau of Prisons

25 facility in close proximity to your family, which is

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/04/19  Page 82 of 101

1  commensurate with your security and custody

2  classification needs.  I also recommend that you

3  participate in the Bureau of Prisons 500-hour

4  Comprehensive Residential Drug Abuse Treatment Program or

5  an alternate substance abuse treatment program if you

6  qualify.

7      Upon release from imprisonment, you will be placed

8  on a term of supervised release of three years.  While on

9  supervised release you must comply with the following

10  mandatory conditions: you must not commit another

11  federal, state, or local crime; you must not unlawfully

12  possess a controlled substance; you must refrain from any

13  unlawful use of a controlled substance; and you must

14  cooperate in the collection of a DNA sample as directed

15  by your probation officer.

16      In addition, you must comply with the standard

17  conditions of supervision which will be set out in my

18  judgment order and with all of the special conditions set

19  forth at paragraphs 95 through 100 of the presentence

20  report.

21      It is ordered that you pay to the United States a

22  special assessment of $500, which will be due

23  immediately.  I find you do not have the ability to pay a

24  fine or community restitution, so none is ordered.  It is

25  ordered that you make restitution in the amount of

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 83 of 101

1  $13,194.59 to K.B.  Payment must be made to the United

2  States Clerk of Court for the Northern District of Iowa

3  for distribution to the victim in this case.  If any of

4  your court-ordered financial obligations are still owed

5  while you are incarcerated, you must make monthly

6  payments in accordance with the Bureau of Prisons

7  Financial Responsibility Program.  The amount of monthly

8  payments will not exceed 50 percent of the funds

9  available to you through institution or non-institution

10 resources and will be at least $25 per quarter.  If you

11 still owe any portion of the financial obligations at the

12 time of release from imprisonment, you must pay it as a

13 condition of your supervision, and the United States

14 Probation Office will pursue collection of the amount due

15 pursuant to a payment schedule approved by the Court.

16     You must notify the United States Attorney for the

17 Northern District of Iowa within 30 days of any change of

18 your mailing or residence address that occurs while any

19 portion of your financial obligation remains unpaid.

20     I find you do not have the ability to pay interest,

21 and so I'll waive the interest requirement in this case.

22     You are hereby remanded to the custody of the United

23 States Marshal.

24     Mr. Lammers, there's no counts to be dismissed in

25 this case; is that correct?

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 84 of 101

1          MR. LAMMERS:  That's correct, Your Honor.

2          THE COURT:  Before I advise Mr. Stevenson of

3    his right to appeal, is there anything else on behalf of

4    the United States?

5          MR. LAMMERS:  No, thank you, Your Honor.

6          THE COURT:  Officer Korth?

7          PROBATION OFFICER:  No, Your Honor.

8          THE COURT:  And Mr. Lahammer?

9          MR. LAHAMMER:  We would ask for placement at

10   Oxford, Wisconsin, Your Honor.

11         THE COURT:  Thank you, Mr. Lahammer.  It's been

12   my practice not to make a recommendation to a specific

13   location on behalf of defendants absent extraordinary

14   circumstances.  And the reason for that, Mr. Stevenson,

15   is the Bureau of Prisons -- and I'm familiar with them;

16   and just as recently as a few weeks ago, visited a number

17   of locations, including Oxford, and spoke with members of

18   the Bureau of Prisons.  And they do their best to try to

19   place you in a facility where it's going to be best for

20   you, for your programming needs, your requests for

21   training.  I know that you wanted to train in some HVAC,

22   for example.  Some facilities have that, others don't.

23   And so they take all that into account in trying to

24   figure out what's best for you and still try to get you

25   close to your family.  When a judge makes a specific

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 85 of 101

```
1   recommendation for a placement, the Bureau of Prisons
2   tries to honor that.  That's sometimes at the expense of
3   what may be best for the -- for the inmate and what
4   they're trying to achieve through training and all that
5   kind of stuff.  And so what I've come to conclude is that
6   when the Court makes recommendations, sometimes it
7   interferes with the Bureau of Prisons's assessment of
8   what's best for you and trying to get you to the best
9   place possible for what you are trying to achieve, and so
10  it's been my practice not to make those recommendations.
11  I'm going to follow that practice in this case.
12       Mr. Stevenson, let me talk to you about your rights
13  to appeal, sir.  If you disagree with the sentence I just
14  imposed, you have the right to appeal that sentence to a
15  higher court.  That court is called the Eighth Circuit
16  Court of Appeals.  To appeal to that court, you would
17  have to file a written notice of appeal with the Clerk of
18  Court for the Northern District of Iowa here in
19  Cedar Rapids, Iowa, within the next 14 days.  If you fail
20  to file a written notice of appeal with the Clerk in the
21  next 14 days, you give up forever your right to appeal
22  the sentence I've just imposed.  If you would like to
23  appeal and you cannot afford the services of an attorney
24  to do so, then I would appoint an attorney to represent
25  you on appeal at no expense to you.  Do you understand
```

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 86 of 101

1   your rights to appeal, sir?

2            THE DEFENDANT:  Yes, sir.

3            THE COURT:  Do you have any questions about

4   anything we've done here today, sir?

5            THE DEFENDANT:  No, sir.

6            THE COURT:  Mr. Lahammer, anything further on

7   behalf of Mr. Stevenson?

8            MR. LAHAMMER:  No, Your Honor.

9            THE COURT:  Mr. Lammers?

10           MR. LAMMERS:  No, thank you, Your Honor.

11           THE COURT:  Thank you.  That concludes the

12  hearing.

13       (Proceedings concluded at 11:19 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 87 of 101

1                    C E R T I F I C A T E

2        I, Patrice A. Murray, a Certified Shorthand
Reporter of the State of Iowa, do hereby certify that at

3  the time and place heretofore indicated, a hearing was
held before the Honorable C.J. Williams; that I reported

4  in shorthand the proceedings of said hearing, reduced the
same to print to the best of my ability by means of

5  computer-assisted transcription under my direction and
supervision, and that the foregoing transcript is a true

6  record of all proceedings had on the taking of said
hearing at the above time and place.

7

8        I further certify that I am not related to or
employed by any of the parties to this action, and

9  further, that I am not a relative or employee of any
attorney or counsel employed by the parties hereto or
financially interested in the action.

10

11      IN WITNESS WHEREOF, I have set my hand this 1st day
of November, 2019.

12

13             /s/ Patrice A. Murray
              Patrice A. Murray, CSR, RPR, RMR, FCRR

14            United States District Court, NDIA
            111 Seventh Avenue S.E., Box 4

15            Cedar Rapids, Iowa 52401-2101

16

17

18

19

20

21

22

23

24

25

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/04/19   Page 88 of 101

## $

**$1,900** [1] - 77:2
**$100** [1] - 4:9
**$13,194.59** [1] - 84:1
**$150** [1] - 29:9
**$160** [3] - 28:10, 29:7, 36:10
**$173** [1] - 77:2
**$25** [1] - 84:10
**$4,500** [2] - 29:19, 45:3
**$500** [2] - 4:10, 83:22
**$80** [3] - 29:6, 36:12, 36:15
**$817** [1] - 77:2
**$90** [1] - 29:16

## /

**/s** [1] - 88:12

## 1

**1** [16] - 1:12, 2:8, 3:14, 4:7, 9:22, 10:2, 10:9, 10:16, 10:24, 11:2, 11:4, 23:22, 45:8, 58:7, 58:13, 58:18
**10** [3] - 23:19, 24:5, 47:14
**10/16/19** [1] - 1:21
**100** [2] - 4:2, 83:19
**1010** [1] - 1:14
**107** [2] - 5:19, 71:21
**108** [1] - 3:12
**108-2** [1] - 71:8
**10:35** [1] - 69:25
**10:55** [1] - 70:14
**11** [2] - 2:8, 71:7
**11/1/19** [1] - 1:22
**111** [5] - 1:12, 1:19, 1:24, 9:23, 88:14
**112** [1] - 9:24
**114** [2] - 5:19, 10:1
**11:19** [1] - 87:13
**11th** [1] - 38:15
**12** [1] - 22:17
**12th** [1] - 6:17
**13** [2] - 8:4, 22:17
**135** [2] - 9:17, 62:24
**14** [4] - 2:4, 49:8, 86:19, 86:21
**140** [1] - 29:9
**15** [4] - 26:7, 26:16, 43:16, 47:14
**16** [1] - 77:11
**160** [1] - 29:15
**168** [7] - 9:18, 62:24, 72:22, 75:14, 81:1, 81:5, 82:9
**17** [1] - 79:5
**18** [4] - 76:11, 77:11, 78:23, 82:12
**18-CR-1023** [3] - 1:5, 3:4,

70:18
**180** [2] - 26:22, 75:18
**19** [2] - 77:11, 79:8
**1st** [1] - 88:10

## 2

**2** [12] - 2:8, 3:17, 10:2, 10:9, 10:24, 11:2, 11:4, 21:1, 45:9, 58:5, 72:21, 75:3
**2-level** [5] - 8:11, 53:23, 75:16, 80:18, 80:23
**2.69** [1] - 78:17
**20** [3] - 4:1, 48:18, 80:22
**200** [6] - 72:24, 73:15, 73:19, 82:9, 82:19, 82:20
**200-month** [2] - 73:6, 73:7
**2010** [1] - 79:14
**2011** [1] - 78:16
**2013** [3] - 77:2, 78:16, 79:14
**2014** [1] - 77:2
**2015** [6] - 32:14, 43:25, 54:21, 54:22, 76:23, 79:15
**2016** [9] - 22:2, 34:16, 34:19, 42:4, 42:22, 43:1, 44:1, 54:21, 76:22
**2017** [17] - 16:10, 16:11, 19:21, 22:3, 23:22, 23:23, 32:14, 32:24, 33:6, 33:10, 34:19, 34:25, 42:22, 42:24, 43:7, 43:8, 76:22
**2018** [3] - 30:4, 48:19, 77:3
**2019** [5] - 1:19, 3:13, 6:13, 6:18, 88:11
**20th** [1] - 43:25
**21** [2] - 3:16, 3:19
**210** [4] - 72:22, 81:1, 81:5, 82:9
**213-3916** [1] - 19:19
**22-and-a-half** [1] - 26:7
**22nd** [1] - 24:3, 34:25, 47:10
**23rd** [2] - 17:16, 20:4
**25** [3] - 3:13, 23:6, 45:13
**25th** [2] - 24:3, 47:10
**26** [4] - 8:6, 48:1, 57:23, 59:4
**27** [2] - 5:14, 62:21
**270** [1] - 26:22
**28** [2] - 62:21, 79:17
**286-2338** [1] - 1:25
**29** [6] - 5:14, 9:1, 62:21, 75:8, 79:23
**2D1.1(b)(16)(D** [2] - 9:5, 60:21
**2nd** [1] - 46:7

## 3

**3** [3] - 3:20, 4:5, 71:7
**3-level** [4] - 8:17, 52:11, 53:22, 54:1

**30** [1] - 84:17
**31** [6] - 5:7, 8:4, 9:10, 9:16, 62:22, 72:20
**319** [1] - 1:25
**32** [7] - 2:4, 5:8, 5:10, 8:10, 9:6, 59:24, 73:13
**33** [2] - 72:21, 81:1
**34** [4] - 5:9, 5:11, 8:17, 62:3
**35** [2] - 8:23, 9:2
**3553(a** [5] - 69:15, 74:17, 81:4, 82:13, 82:21
**3553(a)** [1] - 76:12
**360** [1] - 45:11
**365** [1] - 38:2
**38** [1] - 9:7
**3C1.1** [1] - 60:22
**3rd** [2] - 23:12, 23:13

## 4

**4** [5] - 1:24, 3:22, 9:13, 31:13, 88:14
**40** [1] - 9:12
**400** [3] - 8:7, 57:24
**40s** [1] - 75:9
**42** [2] - 2:4, 44:3
**422** [1] - 49:7
**425** [1] - 1:14
**428** [1] - 58:1
**43** [1] - 2:4
**45** [11] - 25:24, 26:5, 26:25, 27:9, 28:8, 29:19, 45:1, 45:20, 46:15, 47:5, 57:19
**46** [1] - 9:13
**463** [2] - 57:23, 59:3
**4th** [1] - 1:10

## 5

**5** [10] - 3:24, 4:8, 32:23, 33:6, 46:7, 46:13, 46:15, 52:21, 52:23, 61:15
**50** [2] - 22:20, 84:8
**500-hour** [1] - 83:3
**51** [1] - 5:18
**51101** [1] - 1:11
**52401** [2] - 1:13, 1:15
**52401-2101** [2] - 1:24, 88:14
**55** [1] - 45:21
**563-213-3916** [1] - 19:18
**563-495-3916** [1] - 19:18
**5K2.1** [5] - 66:17, 69:11, 69:20, 80:13, 82:23
**5th** [2] - 16:10, 16:11

## 6

**60** [2] - 36:12, 36:15
**600** [1] - 1:10

## 7

**7-and-a-half** [2] - 26:18, 26:20
**70** [3] - 29:5, 29:15, 79:3
**700** [2] - 8:7, 57:24
**71** [1] - 77:9
**72** [1] - 77:9
**73** [1] - 77:9
**735** [1] - 20:1
**773-746-0928** [1] - 17:11
**7th** [1] - 1:19

## 8

**81** [1] - 76:24
**841(a)(1** [2] - 3:17, 3:20
**841(b)(1)(C** [1] - 3:17
**841(b)(1)(C)** [1] - 3:20
**846** [1] - 3:17
**8:59** [1] - 1:19

## 9

**9** [1] - 23:22
**90** [1] - 26:21
**95** [1] - 83:19
**9th** [1] - 46:6

## A

**a.m** [2] - 1:19, 87:13
**ability** [4] - 82:2, 83:23, 84:20, 88:4
**able** [12] - 7:8, 7:15, 7:21, 18:14, 19:9, 19:13, 23:15, 24:12, 25:15, 28:11, 28:24, 47:1
**absent** [1] - 85:13
**absurdly** [1] - 47:7
**abuse** [3] - 78:21, 78:22, 83:5
**Abuse** [1] - 83:4
**acceptance** [13] - 5:5, 5:16, 8:24, 9:8, 13:2, 13:12, 56:9, 56:13, 56:16, 62:4, 62:7, 62:11, 62:20
**accordance** [1] - 84:6
**according** [1] - 77:3
**accordingly** [1] - 14:8
**account** [11] - 9:4, 54:24, 58:14, 58:24, 62:9, 75:23, 76:10, 76:13, 80:16, 81:11, 85:23

**accountable** [4] - 45:11, 45:13, 45:22, 58:18
**accurate** [1] - 27:6
**achieve** [4] - 76:9, 82:11, 86:4, 86:9
**acknowledge** [2] - 55:20, 75:1
**acknowledged** [1] - 56:10
**acted** [1] - 53:19
**acting** [1] - 60:8
**action** [2] - 88:8, 88:9
**actions** [1] - 65:20
**activity** [3] - 8:20, 18:2, 61:24
**actual** [1] - 19:7
**Adam** [37] - 22:6, 24:6, 38:9, 39:5, 46:6, 50:14, 50:15, 50:21, 51:18, 51:20, 52:1, 52:6, 52:16, 60:13, 60:14, 61:1, 61:18, 62:16, 64:15, 65:3, 65:6, 65:15, 65:16, 65:19, 67:4, 67:20, 68:15, 68:21, 68:22, 69:6, 69:8, 72:4, 72:9, 77:24, 81:21
**adamant** [2] - 49:2, 50:16
**addict** [1] - 55:1
**addicted** [1] - 77:22
**addiction** [1] - 77:19
**addicts** [1] - 77:17
**addition** [1] - 83:16
**address** [14] - 11:18, 12:3, 12:8, 19:3, 19:6, 19:7, 19:8, 19:9, 19:10, 48:2, 56:16, 56:18, 71:16, 84:18
**addresses** [1] - 54:8
**addressing** [1] - 56:22
**adequately** [1] - 47:25
**adjust** [2] - 9:15, 14:7
**adjusted** [2] - 8:25, 82:15
**adjustment** [3] - 8:17, 59:8, 60:20
**adjustments** [1] - 9:5
**Administration** [1] - 77:3
**admission** [2] - 45:4, 65:1
**admissions** [1] - 57:17
**admit** [5] - 50:2, 50:17, 50:18, 65:21
**admitted** [9] - 11:2, 25:17, 47:11, 47:12, 47:21, 62:14, 63:9, 65:2, 77:10
**advance** [1] - 59:12
**advise** [2] - 37:25, 85:2
**advised** [4] - 19:23, 20:18, 22:3, 22:10
**advisory** [7] - 4:16, 8:3, 9:17, 62:23, 81:4, 82:8, 82:14
**affirmed** [1] - 14:4
**afford** [1] - 86:23
**afforded** [1] - 36:15
**affording** [1] - 5:9
**afterwards** [1] - 69:9

**age** [4] - 75:8, 78:23, 79:5, 79:17
**agencies** [1] - 76:21
**aggravated** [1] - 8:12
**aggravating** [7] - 5:8, 5:10, 5:12, 59:8, 73:23, 74:11, 82:5
**ago** [1] - 85:16
**agree** [5] - 34:21, 38:12, 57:20, 58:21, 61:9
**agreed** [1] - 49:2
**agreement** [1] - 50:5
**ahead** [2] - 48:4, 62:19
**albeit** [1] - 81:13
**alcohol** [2] - 78:22, 78:23
**alerted** [1] - 59:11
**alley** [2] - 19:24, 19:25
**allocate** [1] - 71:3
**allocution** [1] - 12:22
**almost** [4] - 18:6, 21:1, 29:10, 47:7
**alone** [2] - 60:9, 62:18
**Alpine** [1] - 19:24, 20:1
**altercation** [1] - 78:12
**alternate** [1] - 83:5
**alternative** [2] - 74:16, 74:20
**ambiguities** [1] - 54:15
**AMERICA** [1] - 1:3
**America** [2] - 3:3, 70:17
**amount** [11] - 26:1, 26:6, 46:13, 55:23, 68:3, 72:5, 72:10, 81:3, 83:25, 84:7, 84:14
**amounts** [2] - 23:2, 71:19
**ample** [1] - 51:7
**AND** [1] - 1:11
**Andre** [6] - 19:2, 19:5, 35:18, 35:21, 35:22, 61:2
**Angie** [2] - 51:23, 61:3
**announce** [1] - 69:21
**answer** [5] - 7:15, 7:21, 12:2, 12:9, 44:13
**anyway** [1] - 68:14
**apartment** [1] - 50:4
**Apartment** [1] - 31:13
**apologize** [1] - 10:15
**appeal** [10] - 85:3, 86:13, 86:14, 86:16, 86:17, 86:20, 86:21, 86:23, 86:25, 87:1
**Appeals** [1] - 86:16
**appear** [3] - 10:9, 13:24, 78:4
**APPEARANCES** [1] - 1:9
**appeared** [5] - 1:13, 1:15, 23:16, 23:19, 24:5
**appearing** [1] - 3:10
**application** [1] - 62:1
**applied** [1] - 78:17
**applies** [3] - 55:19, 62:1, 78:18
**appoint** [1] - 86:24
**appointed** [1] - 6:11
**appreciate** [1] - 71:25

**appropriate** [9] - 45:20, 66:10, 73:4, 73:19, 75:15, 80:13, 80:24, 82:15, 82:20
**appropriately** [2] - 45:11, 47:25
**approved** [1] - 84:15
**April** [1] - 3:13
**area** [6] - 15:1, 16:5, 19:8, 21:6, 77:5, 77:18
**areas** [1] - 6:22
**argue** [1] - 46:18
**argument** [17] - 6:5, 11:21, 12:14, 12:18, 12:19, 13:11, 13:15, 13:23, 13:25, 44:21, 63:2, 63:13, 63:17, 69:13, 70:5, 70:7, 70:19
**arguments** [1] - 7:4
**Arizona** [1] - 35:25
**armed** [1] - 79:8
**arrested** [4] - 20:4, 20:5, 20:6, 45:16
**arrests** [1] - 5:17
**arrival** [1] - 81:10
**arrive** [2] - 69:16, 81:3
**arriving** [1] - 76:8
**ass** [1] - 40:14
**assessed** [2] - 8:5, 8:10
**assessment** [4] - 4:9, 25:19, 83:22, 86:7
**assigned** [1] - 14:21
**Assistant** [1] - 3:6
**assisted** [1] - 88:5
**assume** [4] - 10:5, 42:8, 64:21
**assumption** [1] - 10:21
**ATM** [1] - 79:10
**attached** [4] - 10:1, 10:15, 10:18, 71:8
**attachments** [1] - 9:21
**attempt** [2] - 19:20, 68:18
**Attorney** [2] - 3:8, 84:16
**ATTORNEY** [3] - 1:10, 1:12, 1:14
**attorney** [5] - 7:12, 49:6, 86:23, 86:24, 88:9
**Attorney's** [2] - 1:10, 1:12
**Attorneys** [1] - 3:6
**attributed** [1] - 58:2
**August** [4] - 6:17, 17:16, 20:4, 43:8
**author** [1] - 3:11
**automatically** [2] - 66:18, 80:14
**autopsy** [2] - 63:7, 67:2
**available** [1] - 84:9
**Avenue** [4] - 1:12, 1:19, 1:24, 88:14
**average** [1] - 26:7
**award** [1] - 72:11
**awarded** [1] - 8:24
**awarding** [1] - 5:15

**aware** [11] - 6:10, 25:8, 34:15, 36:8, 38:20, 40:5, 42:25, 43:2, 43:3, 44:1, 53:15

**B**

**background** [3] - 74:3, 74:4, 74:10
**bag** [3] - 27:24, 39:24
**baggies** [1] - 39:22
**base** [4] - 5:7, 8:6, 48:1, 65:18
**based** [19] - 6:15, 6:19, 7:1, 8:6, 43:9, 45:24, 48:10, 50:11, 50:13, 51:5, 51:6, 57:20, 64:16, 65:20, 66:9, 67:16, 73:8, 73:9, 81:4
**basis** [2] - 23:6, 77:21
**batch** [2] - 22:8, 64:9
**became** [1] - 77:22
**BEFORE** [1] - 1:18
**begin** [2] - 8:4, 22:14
**beginning** [3] - 9:12, 33:17, 78:23
**behalf** [8] - 1:13, 1:15, 4:11, 4:19, 44:7, 85:3, 85:13, 87:7
**behavior** [4] - 65:4, 65:5, 65:12, 74:8
**behold** [2] - 46:21, 46:23
**belabor** [2] - 14:17, 73:24
**belief** [1] - 65:21
**believes** [2] - 70:6, 71:12
**below** [3] - 34:7, 34:8, 73:16
**best** [10] - 57:3, 57:9, 57:10, 85:18, 85:19, 85:24, 86:3, 86:8, 88:4
**better** [2] - 27:23, 79:24
**between** [16] - 8:7, 21:1, 23:10, 23:20, 23:22, 24:6, 24:25, 29:5, 32:13, 34:18, 38:25, 45:18, 45:20, 61:18, 69:17, 76:22
**beyond** [2] - 44:11, 60:12
**bipolar** [1] - 78:5
**Birch** [41] - 22:8, 23:11, 23:17, 23:20, 24:6, 38:22, 38:23, 39:1, 39:5, 46:6, 50:14, 50:15, 50:22, 51:18, 51:20, 52:1, 52:6, 52:16, 60:13, 60:14, 61:1, 62:16, 63:10, 64:7, 64:15, 64:18, 64:19, 64:24, 65:6, 65:15, 65:16, 65:19, 67:20, 68:15, 69:6, 72:4, 72:9, 73:10, 75:11, 77:24
**Birch's** [22] - 12:1, 12:4, 22:6, 23:13, 38:9, 61:18, 64:12, 65:3, 67:4, 68:21, 68:23, 69:8, 70:22, 70:24, 71:1, 71:5, 71:7, 71:18, 71:23, 73:11, 77:25, 81:21

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR Document 123 Filed 11/01/19 Page 90 of 101

# C

**bit** [9] - 20:23, 21:14, 28:2, 28:23, 29:3, 29:22, 30:22, 52:10, 81:13
**black** [2] - 52:4, 61:4
**blowing** [1] - 64:17
**blue** [3] - 20:2, 20:6
**board** [2] - 21:14, 65:23
**bottom** [3] - 75:2, 75:15, 75:17
**bought** [3] - 14:25, 34:20, 45:20
**Bower** [51] - 10:17, 16:1, 16:3, 16:4, 16:6, 16:15, 16:17, 16:21, 16:24, 18:1, 18:9, 19:4, 19:14, 19:15, 19:22, 19:23, 20:15, 20:17, 32:21, 33:5, 34:2, 34:6, 34:15, 34:19, 35:22, 35:23, 36:7, 36:14, 36:20, 37:7, 37:9, 37:19, 37:21, 38:19, 41:5, 41:6, 45:8, 45:12, 46:3, 46:5, 54:17, 54:22, 58:1, 58:3, 58:4, 58:10, 58:15, 58:24, 59:2, 61:1
**Bower's** [8] - 10:18, 35:3, 38:17, 46:19, 54:24, 55:5, 58:3, 58:21
**Box** [3] - 1:12, 1:24, 88:14
**Brandon** [17] - 18:8, 18:18, 18:19, 18:21, 18:24, 34:5, 34:7, 34:8, 34:9, 35:9, 35:11, 35:13, 35:17, 35:20, 35:21, 61:1
**Brandon's** [2] - 18:10, 19:10
**break** [7] - 12:24, 28:23, 29:4, 45:24, 70:1, 70:2, 70:18
**breaking** [1] - 28:13
**brief** [6] - 6:7, 6:21, 7:2, 56:12, 66:17, 70:15
**Brief** [1] - 32:5
**briefed** [1] - 54:12
**briefly** [2] - 14:18, 43:21
**bring** [3] - 29:6, 37:25, 38:1
**brings** [1] - 36:19
**broad** [1] - 58:4
**brought** [2] - 52:25, 59:14
**burden** [1] - 13:1
**Bureau** [8] - 82:18, 82:24, 83:3, 84:6, 85:15, 85:18, 86:1, 86:7
**business** [1] - 41:22
**but-for** [1] - 67:4
**buy** [11] - 29:5, 29:15, 31:24, 34:22, 39:21, 40:24, 51:1, 52:23, 56:24, 57:1
**buyer/seller** [1] - 56:3
**buying** [3] - 28:13, 58:5, 58:16
**buys** [6] - 15:16, 31:1, 39:19, 41:16, 50:23, 50:24
**BY** [4] - 14:15, 32:10, 42:21, 43:23

**C.J** [2] - 1:18, 88:3
**calculated** [1] - 9:1
**calculation** [4] - 4:16, 8:3, 11:14, 13:17
**calculations** [2] - 57:14, 82:22
**caliber** [1] - 79:13
**call** [3] - 14:2, 49:17, 49:18
**called** [8] - 14:4, 25:15, 48:12, 52:4, 52:19, 52:22, 53:11, 86:15
**cannot** [3] - 67:8, 67:17, 86:23
**capable** [1] - 68:3
**card** [2] - 79:10
**care** [3] - 34:8, 81:18
**careful** [1] - 68:25
**Carter** [3] - 31:9, 31:10, 31:14, 41:10, 41:13, 49:24, 53:6, 55:6, 61:1
**case** [58] - 4:13, 4:22, 12:20, 13:4, 15:10, 15:13, 15:19, 15:20, 43:11, 46:19, 48:8, 50:17, 53:2, 53:14, 53:16, 54:2, 57:16, 58:20, 59:7, 59:9, 60:19, 62:14, 63:12, 63:20, 65:13, 65:16, 65:17, 66:9, 66:22, 69:25, 71:2, 71:23, 72:10, 72:12, 72:16, 72:25, 73:8, 73:17, 73:24, 74:13, 74:22, 75:11, 75:15, 77:25, 80:13, 80:17, 80:20, 81:11, 82:2, 82:4, 82:5, 82:11, 82:16, 82:21, 84:3, 84:21, 84:25, 86:11
**Case** [2] - 3:4, 70:17
**cases** [4] - 14:23, 56:23, 67:23, 67:25, 68:7
**cash** [1] - 79:10
**category** [6] - 9:15, 9:16, 62:23, 72:20, 72:22, 80:25
**caught** [2] - 50:23, 50:24
**causation** [2] - 67:2, 67:7
**caused** [6] - 22:15, 66:5, 67:9, 67:16, 67:18, 67:21
**causing** [1] - 63:1
**Cedar** [6] - 1:12, 1:14, 1:19, 1:24, 86:19, 88:14
**cell** [3] - 30:11, 30:12, 30:14
**certainly** [10] - 26:11, 26:24, 27:13, 34:22, 40:19, 61:11, 61:16, 64:5, 66:23, 78:6
**Certified** [1] - 1:20, 88:2
**certify** [1] - 88:2, 88:7
**CHAD** [2] - 14:3, 14:10
**Chad** [3] - 2:4, 14:2, 14:10
**chair** [1] - 14:7
**challenged** [1] - 71:17
**challenging** [1] - 71:19

**change** [2] - 27:8, 84:17
**chapel** [1] - 56:6
**characteristics** [2] - 75:12, 78:2
**characterized** [1] - 67:10
**characterizes** [1] - 71:22
**charged** [4] - 3:14, 3:17, 3:20, 3:22
**checked** [1] - 53:11
**Chevy** [1] - 20:6
**Chicago** [8] - 18:9, 29:2, 29:6, 29:11, 34:25, 35:14, 60:9, 76:23
**childhood** [2] - 81:8, 81:9
**choices** [1] - 74:5
**choose** [1] - 75:24
**chosen** [4] - 74:1, 74:6, 74:7, 76:19
**Circuit** [1] - 86:15
**circumstances** [10] - 57:12, 59:14, 59:22, 62:8, 73:22, 73:23, 74:10, 74:11, 76:14, 85:14
**cite** [1] - 53:17
**City** [2] - 1:10, 14:20
**city** [1] - 29:2
**claiming** [1] - 29:18
**classes** [2] - 78:15
**classic** [1] - 50:17
**classification** [1] - 83:2
**clear** [8] - 45:1, 51:16, 53:24, 54:20, 55:5, 58:9, 67:14, 81:23
**clearly** [4] - 50:20, 54:25, 61:6, 74:4
**Clerk** [3] - 84:2, 86:17, 86:20
**client** [5] - 4:20, 6:8, 6:14, 6:18, 26:23
**clients** [3] - 34:8, 81:18, 81:19
**close** [3] - 80:3, 82:25, 85:25
**closer** [1] - 19:24
**cocaine** [6] - 17:17, 30:22, 49:18, 49:19, 56:11, 60:6
**Code** [3] - 3:16, 3:19, 76:11, 82:13
**collection** [2] - 83:14, 84:14
**college** [1] - 78:15
**comfortable** [1] - 14:8
**coming** [2] - 20:16, 34:14
**commencing** [1] - 1:19
**commensurate** [1] - 83:1
**comment** [1] - 76:5
**comments** [1] - 76:13
**commit** [1] - 83:10
**committed** [1] - 82:17
**committing** [1] - 62:18
**common** [1] - 25:3
**commonly** [1] - 29:2
**communications** [1] - 68:18
**community** [1] - 83:24

**compelling** [1] - 68:14
**complete** [1] - 37:5
**Completed** [1] - 1:22
**comply** [3] - 80:10, 83:9, 83:16
**Comprehensive** [1] - 83:4
**computer** [1] - 88:5
**computer-assisted** [1] - 88:5
**concern** [4] - 68:22, 69:2, 81:12, 81:21
**concerned** [1] - 39:18
**conclude** [1] - 86:5
**concluded** [1] - 87:13
**concludes** [1] - 87:11
**condition** [2] - 68:4, 84:13
**conditions** [4] - 80:11, 83:10, 83:17, 83:18
**conduct** [9] - 5:3, 25:23, 44:17, 66:23, 66:24, 73:2, 73:25, 76:15, 82:6
**conducted** [1] - 17:17
**confident** [1] - 57:5
**conflicting** [1] - 38:12
**connection** [1] - 8:14
**conservative** [6] - 22:21, 23:5, 46:13, 47:23, 57:6, 64:22
**conservatively** [3] - 45:9, 45:10, 59:1
**consideration** [4] - 63:12, 66:19, 75:7, 75:10
**considering** [1] - 82:12
**consistent** [2] - 24:8, 45:7
**conspiracy** [12] - 3:15, 47:4, 50:6, 50:7, 50:19, 51:15, 52:15, 53:18, 53:25, 59:6, 60:24, 62:15
**construction** [1] - 38:24
**construction-type** [1] - 38:24
**consume** [1] - 78:23
**consumers** [2] - 45:19, 81:15
**contact** [3] - 17:16, 19:20, 52:6
**contacted** [1] - 34:5
**contested** [2] - 54:4, 54:9
**contesting** [2] - 45:25, 72:5
**continue** [1] - 12:12
**continued** [11] - 64:14, 64:23, 64:24, 65:2, 65:10, 65:20, 65:24, 66:6, 69:9, 73:10
**contradicting** [1] - 54:16
**contributing** [3] - 67:3, 67:5, 77:24
**control** [3] - 56:1, 61:12, 61:20
**controlled** [17] - 3:15, 3:18, 3:21, 3:23, 15:16, 17:17, 31:1,

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR Document 123 Filed 11/01/19 Page 91 of 101

39:19, 39:21, 40:24, 50:23, 50:24, 52:14, 53:20, 77:9, 83:12, 83:13
**conversation** [1] - 19:22
**conversations** [1] - 6:20
**converted** [5] - 8:7, 8:8, 57:22, 57:24, 59:3
**convicted** [1] - 50:7
**conviction** [3] - 50:8, 79:8, 79:15
**convictions** [1] - 36:5
**convincing** [1] - 60:7
**cooperate** [1] - 83:14
**cooperating** [3] - 15:18, 15:22, 43:12
**cooperator** [1] - 56:7
**copy** [2] - 6:13, 6:18
**correct** [51] - 17:22, 19:25, 20:5, 20:9, 20:10, 24:7, 25:22, 29:13, 29:21, 32:21, 32:24, 33:3, 33:4, 33:10, 33:23, 33:24, 35:1, 35:2, 35:19, 36:2, 36:10, 36:11, 36:12, 36:13, 37:3, 37:4, 37:7, 37:14, 37:15, 37:19, 38:15, 39:6, 39:16, 39:17, 39:19, 39:20, 39:23, 40:1, 40:2, 40:3, 40:4, 42:1, 42:2, 42:5, 42:10, 43:6, 43:8, 72:6, 73:13, 84:25, 85:1
**Corrections** [1] - 78:15
**correctly** [1] - 25:21
**corroborate** [3] - 18:14, 19:13, 47:1
**corroboration** [1] - 20:14
**corroborative** [1] - 46:2
**counsel** [3] - 42:25, 56:8, 88:9
**Count** [5] - 3:14, 3:17, 3:20, 3:22, 3:24
**count** [3] - 4:8, 4:10, 24:22
**counted** [1] - 52:24
**counts** [4] - 3:14, 62:14, 80:21, 84:24
**County** [6] - 6:14, 16:17, 16:22, 17:9, 36:2, 43:3
**couple** [3] - 34:11, 63:23, 75:4
**course** [13] - 6:6, 24:4, 24:25, 26:5, 29:19, 45:4, 46:6, 46:11, 46:16, 47:3, 47:17, 52:14
**COURT** [57] - 1:1, 3:2, 4:15, 4:19, 4:24, 6:1, 6:4, 7:5, 7:11, 7:14, 7:18, 7:21, 7:24, 8:2, 10:5, 10:7, 10:12, 10:20, 11:2, 11:5, 12:11, 13:18, 14:6, 14:12, 32:4, 32:7, 42:17, 43:20, 44:5, 44:13, 44:21, 48:4, 54:7, 56:14, 56:19, 56:22, 63:14, 63:17, 66:13, 67:1, 70:13, 70:16, 71:4, 71:24, 72:8, 74:23, 75:20,

76:3, 76:6, 85:2, 85:6, 85:8, 85:11, 87:3, 87:6, 87:9, 87:11
**Court** [84] - 1:23, 3:2, 4:4, 4:7, 4:8, 6:9, 7:4, 11:25, 12:3, 12:7, 12:8, 21:24, 44:9, 45:17, 47:19, 47:23, 48:2, 48:8, 48:9, 48:15, 48:20, 48:21, 48:25, 49:1, 49:21, 50:9, 51:1, 51:7, 51:12, 52:9, 52:15, 53:17, 53:18, 53:21, 54:14, 55:11, 56:17, 57:10, 58:9, 59:11, 60:7, 63:11, 63:21, 64:15, 66:11, 67:8, 67:15, 67:24, 68:12, 68:14, 69:19, 70:6, 70:24, 71:22, 72:11, 72:15, 72:18, 72:21, 72:23, 73:11, 73:5, 73:21, 74:12, 74:14, 74:16, 74:18, 74:20, 75:2, 75:6, 75:7, 75:10, 75:16, 79:24, 79:25, 80:6, 80:8, 80:15, 82:16, 84:2, 84:15, 86:6, 86:16, 86:18, 88:13
**court** [8] - 3:1, 10:8, 12:24, 44:15, 84:4, 86:15, 86:16
**court's** [1] - 3:12
**Court's** [3] - 53:15, 75:1, 79:19
**court-ordered** [1] - 84:4
**covered** [1] - 43:16
**covers** [1] - 54:3
**crack** [7] - 17:17, 30:22, 49:7, 49:8, 49:18, 49:19, 53:4, 53:5, 56:11, 60:6
**credibility** [1] - 34:21
**credible** [3] - 21:2, 54:18, 55:5
**crime** [1] - 83:11
**crimes** [1] - 3:25
**Criminal** [2] - 3:4, 70:17
**criminal** [15] - 8:20, 9:11, 9:14, 9:16, 44:17, 61:24, 62:23, 72:20, 72:21, 79:4, 79:16, 79:18, 80:25, 82:7
**cross** [5] - 32:7, 47:11, 49:22, 59:17, 65:2
**CROSS** [1] - 32:9
**cross-examination** [5] - 32:7, 47:11, 49:22, 59:17, 65:2
**CROSS-EXAMINATION** [1] - 32:9
**CSR** [2] - 1:23, 88:13
**current** [4] - 17:10, 17:14, 41:7, 41:9
**custody** [8] - 21:17, 33:5, 43:2, 58:11, 58:25, 82:17, 83:1, 84:22
**customer** [2] - 53:12, 65:18
**customers** [4] - 68:23, 69:3, 81:13, 81:16
**customers'** [1] - 81:21
**cut** [1] - 58:20

**cutoff** [1] - 57:23
**cutting** [1] - 58:13

## D

**dad** [2] - 41:21
**damage** [1] - 79:16
**danger** [1] - 68:11
**dangerous** [18] - 63:24, 64:3, 64:4, 64:11, 64:13, 65:4, 65:5, 65:6, 65:9, 68:2, 68:10, 68:13, 69:5, 73:2, 73:25, 74:8, 81:14, 81:15
**date** [1] - 47:2
**dates** [3] - 24:2, 37:3, 37:6
**days** [9] - 23:24, 34:25, 39:25, 46:10, 47:16, 58:24, 84:17, 86:19, 86:21
**deadly** [2] - 68:10, 69:5
**deal** [8] - 27:23, 29:8, 29:9, 33:22, 39:3, 44:23, 61:18, 74:6
**dealer** [9] - 22:1, 27:14, 27:19, 34:8, 37:21, 45:5, 47:21, 57:18
**dealers** [3] - 32:13, 32:15, 56:24
**dealing** [2] - 18:2, 69:4
**deals** [3] - 37:23, 37:24, 38:8
**death** [16] - 22:6, 23:13, 52:5, 61:18, 63:1, 64:13, 65:3, 65:11, 67:4, 67:5, 68:21, 69:7, 69:8, 73:11, 75:11, 77:25
**December** [3] - 30:4, 48:12, 48:18
**decision** [1] - 75:1
**decisions** [1] - 6:25
**declining** [1] - 82:3
**defendant** [133] - 3:7, 3:13, 3:18, 3:20, 3:22, 4:3, 4:25, 5:6, 5:13, 5:18, 5:23, 6:25, 8:5, 8:6, 8:8, 8:11, 8:15, 8:18, 8:21, 8:24, 9:3, 9:8, 9:11, 9:13, 11:15, 12:16, 12:22, 15:9, 15:13, 15:24, 23:7, 23:18, 24:6, 24:13, 24:16, 26:1, 30:6, 31:3, 31:5, 31:8, 31:14, 31:20, 43:13, 45:2, 45:23, 46:4, 46:9, 46:14, 47:9, 47:20, 48:12, 48:18, 48:21, 49:22, 50:16, 51:17, 51:21, 51:24, 52:6, 52:7, 52:13, 52:17, 52:19, 52:22, 52:24, 53:7, 53:10, 53:19, 57:1, 58:2, 58:9, 58:16, 58:18, 58:25, 59:5, 59:13, 59:16, 59:21, 60:2, 60:8, 60:13, 60:14, 60:18, 61:5, 61:7, 61:13, 61:16, 61:19, 61:22, 62:5, 62:12, 62:20, 63:23, 64:7, 64:14, 64:16, 65:6, 66:1, 66:4,

67:9, 67:16, 67:22, 68:7, 68:9, 68:12, 68:13, 68:16, 68:24, 69:2, 69:6, 71:17, 74:1, 76:17, 76:25, 77:4, 77:6, 77:10, 78:6, 78:10, 78:13, 78:20, 78:25, 79:6, 79:9, 79:11, 79:15, 79:20, 79:21, 79:22, 80:24, 81:1, 81:12
**DEFENDANT** [10] - 7:10, 7:13, 7:17, 7:19, 7:23, 8:1, 76:1, 76:4, 87:2, 87:5
**Defendant** [2] - 1:7, 1:15
**defendant's** [28] - 6:1, 9:22, 9:23, 28:3, 48:24, 57:17, 59:7, 59:24, 61:2, 62:3, 65:1, 67:17, 67:20, 68:15, 70:7, 71:13, 72:3, 72:19, 73:1, 73:9, 73:25, 78:1, 79:4, 79:8, 81:6, 81:8, 81:25, 82:7
**defendants** [1] - 85:13
**defense** [3] - 13:21, 48:6, 78:8
**definitive** [1] - 12:2
**degree** [6] - 57:15, 61:8, 66:21, 69:11, 69:21, 78:10
**deliver** [2] - 52:8, 52:17
**delivered** [1] - 52:5
**delivers** [2] - 53:6, 53:7
**delve** [1] - 48:16
**denial** [1] - 50:13
**denied** [7] - 50:5, 50:6, 51:3, 60:15, 62:15, 67:15
**deny** [3] - 50:18, 74:12
**depart** [4] - 63:21, 66:11, 72:21, 75:1
**Department** [3] - 14:21, 25:9, 78:14
**departure** [35] - 5:21, 11:16, 54:5, 54:7, 63:1, 63:21, 66:8, 66:16, 66:25, 67:19, 67:21, 69:10, 69:11, 69:15, 69:17, 69:20, 69:21, 72:15, 72:17, 73:3, 73:12, 74:15, 74:21, 75:16, 80:12, 80:17, 80:19, 80:21, 80:23, 80:24, 80:25, 81:3, 81:11, 82:15, 82:23
**depends** [1] - 28:17
**describe** [1] - 21:24
**described** [2] - 18:21, 78:2
**designated** [1] - 82:24
**despite** [1] - 78:9
**destruction** [1] - 8:13
**detail** [2] - 9:20, 58:22
**detailed** [1] - 59:18
**determination** [1] - 9:3
**determine** [7] - 19:3, 23:15, 24:12, 28:11, 31:10, 69:12, 73:4
**determined** [4] - 8:18, 9:7, 52:25, 72:17
**determines** [3] - 50:9, 73:5, 74:18

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript*
Case 2:18-cr-01023-CJW-MAR Document 123 Filed 11/01/19 Page 92 of 101

**determining** [3] - 62:10, 75:23, 80:16
**device** [2] - 17:23, 81:14
**die** [2] - 65:15, 68:21
**died** [15] - 50:16, 50:22, 51:20, 52:1, 52:16, 60:14, 63:10, 64:7, 64:15, 64:19, 64:25, 65:6, 65:17, 65:19, 69:6
**dies** [1] - 68:8
**different** [2] - 27:4, 67:23
**differently** [1] - 10:23
**difficult** [5] - 56:23, 57:11, 57:14, 61:7, 74:3
**DIRECT** [1] - 14:14
**direct** [4] - 40:13, 49:6, 61:12, 67:25
**directed** [2] - 52:14, 83:14
**direction** [2] - 56:1, 88:5
**directly** [2] - 34:5, 75:22
**disadvantaged** [1] - 78:6
**disagree** [3] - 25:19, 37:1, 86:13
**discharge** [1] - 43:25
**discrepancies** [2] - 45:18, 54:15
**discretion** [1] - 53:21
**discussed** [1] - 20:8
**discussions** [1] - 43:11
**dismissed** [1] - 84:24
**disorder** [1] - 78:5
**disposition** [1] - 12:20
**dispute** [2] - 71:21, 72:11
**distance** [3] - 49:23, 50:5, 61:17
**distinguish** [2] - 66:20, 69:17
**distinguishing** [1] - 38:5
**distribute** [2] - 3:15, 69:9
**distributed** [4] - 50:15, 60:13, 67:9, 77:17
**distributing** [6] - 56:11, 57:18, 61:14, 62:16, 68:1, 68:8
**distribution** [10] - 3:18, 3:21, 3:23, 20:21, 50:14, 60:5, 67:17, 67:20, 77:23, 84:3
**distributions** [2] - 41:14, 54:19
**District** [5] - 1:23, 84:2, 84:17, 86:18, 88:13
**DISTRICT** [2] - 1:1, 1:1
**DNA** [1] - 83:14
**docket** [1] - 3:12
**document** [3] - 9:23, 9:24, 10:1
**done** [4] - 40:6, 77:1, 79:21, 87:4
**door** [2] - 30:12, 30:13
**doubling** [2] - 29:10, 29:12
**doubt** [4] - 57:16, 60:13,

67:12, 68:20
**down** [2] - 28:14, 44:6
**downward** [13] - 9:23, 11:15, 69:18, 70:9, 71:14, 73:20, 74:12, 75:5, 78:9, 81:6, 82:1, 82:3
**dozen** [1] - 68:6
**draft** [2] - 6:13, 6:16
**dreams** [1] - 38:6
**drink** [1] - 78:22
**drive** [2] - 20:1, 35:12
**driving** [1] - 18:22
**dropped** [1] - 78:11
**drove** [1] - 46:25
**Drug** [4] - 14:22, 16:19, 18:24, 83:4
**drug** [43] - 8:7, 8:8, 13:7, 13:25, 15:6, 17:21, 18:1, 21:5, 21:22, 22:1, 25:17, 27:9, 27:19, 29:8, 39:15, 44:23, 45:3, 45:5, 45:18, 45:19, 45:25, 46:19, 47:21, 49:3, 50:3, 56:22, 56:23, 56:25, 57:7, 57:11, 57:13, 57:22, 57:24, 57:25, 58:13, 58:20, 59:2, 59:4, 59:7, 63:10, 69:4
**drugs** [23] - 15:18, 22:11, 38:1, 47:20, 49:12, 51:23, 51:24, 52:5, 52:8, 52:17, 52:25, 57:1, 57:12, 63:24, 65:8, 68:6, 68:25, 69:1, 74:2, 74:6, 76:18, 77:5, 77:12
**Dubuque** [28] - 14:21, 14:22, 15:1, 16:5, 16:17, 16:19, 16:22, 17:9, 18:11, 18:24, 21:6, 22:1, 25:9, 28:9, 29:3, 29:6, 32:13, 32:15, 35:10, 35:20, 35:24, 36:1, 36:2, 42:1, 43:3, 77:5, 77:18
**due** [2] - 83:22, 84:14
**duly** [1] - 14:4
**duplicates** [1] - 10:9
**during** [26] - 6:10, 24:13, 24:16, 35:3, 37:10, 38:5, 39:7, 39:11, 39:21, 49:7, 49:9, 49:12, 52:14, 58:10, 58:15, 59:5, 59:10, 60:3, 60:7, 60:19, 70:2, 78:12

**E**

**earn** [2] - 77:1, 78:13
**earned** [1] - 7:7
**earning** [1] - 77:15
**earnings** [1] - 76:24
**easily** [1] - 80:19
**effect** [1] - 77:19
**egregious** [1] - 65:11
**eight** [1] - 79:13
**Eighth** [1] - 86:15
**either** [7] - 19:17, 29:10,

31:21, 51:2, 60:20, 60:21, 65:17
**Elementary** [1] - 19:8
**elements** [1] - 18:14
**eleventh** [1] - 78:11
**elicit** [2] - 57:6, 59:12
**Emily** [10] - 21:8, 21:9, 23:6, 27:5, 38:3, 38:13, 39:11, 51:18, 61:3, 65:22
**employed** [11] - 14:19, 14:20, 25:5, 25:7, 28:4, 38:21, 41:18, 76:17, 76:19, 88:8, 88:9
**employee** [1] - 88:8
**employment** [8] - 25:9, 25:12, 28:5, 38:18, 38:19, 76:20, 76:21
**end** [2] - 26:19, 72:23
**enforcement** [4] - 57:3, 57:5, 58:22, 59:19
**enhancement** [4] - 5:8, 8:11, 51:8, 80:23
**entitled** [6] - 9:8, 62:6, 62:11, 62:12, 62:20
**Eric** [2] - 45:20, 61:3
**erred** [1] - 82:21
**essentially** [1] - 59:16
**establish** [2] - 53:1, 53:4
**estimate** [5] - 22:21, 26:1, 58:4, 58:12, 59:4
**estimated** [3] - 57:21, 58:6, 59:2
**estimates** [2] - 57:4, 57:7, 57:10, 57:15
**estimating** [1] - 26:25
**estimation** [1] - 26:16
**evening** [1] - 64:20
**events** [1] - 51:3
**eventually** [2] - 20:20, 33:17
**evidence** [43] - 6:4, 8:13, 10:3, 12:14, 12:16, 12:17, 13:4, 13:6, 13:8, 13:9, 13:19, 13:20, 13:21, 44:7, 44:12, 44:16, 44:18, 47:19, 50:20, 51:7, 51:16, 53:24, 58:9, 60:6, 60:12, 60:15, 61:10, 61:11, 61:12, 61:20, 61:21, 63:3, 63:4, 63:15, 65:23, 67:8, 67:25, 68:9, 68:12, 68:15, 68:24, 70:19, 77:4
**evidenced** [1] - 64:25
**exact** [1] - 24:21
**exactly** [1] - 58:23
**EXAMINATION** [4] - 14:14, 32:9, 42:20, 43:22
**examination** [7] - 32:7, 42:18, 47:11, 49:6, 49:22, 59:17, 65:2
**examined** [1] - 14:5
**example** [2] - 60:9, 85:22
**exceed** [1] - 84:8
**except** [2] - 13:2, 62:7

**exception** [1] - 54:4
**exchange** [1] - 35:15
**excuse** [5] - 10:11, 17:2, 23:13, 49:4, 56:15
**exhibit** [4] - 44:9, 63:7, 63:8, 63:9
**Exhibit** [2] - 10:9
**exhibiting** [1] - 33:20
**exhibits** [2] - 10:2, 10:16
**EXHIBITS** [1] - 2:7
**Exhibits** [5] - 2:8, 10:2, 10:24, 11:2, 11:4
**expense** [2] - 86:2, 86:25
**experience** [3] - 21:4, 28:16, 43:10
**expert** [1] - 47:4
**explicitly** [1] - 60:15
**exploited** [1] - 77:21
**extensive** [2] - 62:2
**extent** [1] - 82:23
**extraordinary** [1] - 85:13
**extrapolate** [1] - 45:7
**extremely** [1] - 26:6
**eye** [1] - 79:12

**F**

**facilities** [1] - 85:22
**facility** [2] - 82:25, 85:19
**fact** [24] - 19:4, 20:11, 20:25, 30:19, 38:14, 39:3, 39:21, 40:1, 42:4, 46:6, 48:10, 49:16, 50:2, 50:3, 56:12, 61:19, 63:25, 64:6, 65:10, 65:19, 65:21, 67:12, 72:4, 74:5
**factor** [3] - 67:3, 67:5, 77:24
**factors** [10] - 62:9, 69:15, 74:17, 76:11, 81:4, 81:7, 82:4, 82:5, 82:12, 82:21
**facts** [5] - 47:2, 50:12, 73:3, 73:8, 74:22
**factual** [2] - 7:4, 71:20
**factually** [1] - 6:23
**fail** [1] - 86:19
**fair** [12] - 4:12, 4:21, 21:9, 23:5, 29:25, 32:18, 33:12, 33:14, 35:7, 39:5, 41:25, 42:8
**false** [8] - 5:4, 49:14, 51:6, 60:2, 60:4, 60:11, 60:17
**falsely** [2] - 50:10, 51:2
**familiar** [6] - 14:25, 15:3, 15:6, 15:9, 15:22, 85:5
**family** [3] - 78:3, 82:25, 85:25
**far** [14] - 35:17, 37:5, 37:18, 39:18, 42:22, 42:24, 55:6, 55:9, 55:13, 55:20, 55:25, 56:9, 59:8, 60:23
**father** [8] - 12:1, 12:4, 70:23, 70:24, 71:7, 71:18, 71:23, 78:3

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 93 of 101

**favor** [1] - 27:25
**FCRR** [2] - 1:23, 88:13
**February** [6] - 23:13, 23:22, 38:15, 44:1, 46:7, 54:21
**federal** [1] - 83:11
**federally** [1] - 16:12
**feel** [1] - 7:11
**felt** [3] - 12:5, 22:13, 22:14
**few** [4] - 28:20, 37:13, 48:25, 85:16
**figure** [1] - 85:24
**file** [5] - 3:12, 10:22, 43:4, 86:17, 86:20
**filed** [9] - 3:12, 6:16, 6:20, 9:22, 9:24, 10:1, 10:8, 11:3, 75:6
**filled** [1] - 71:6
**final** [1] - 6:17
**financial** [3] - 84:4, 84:11, 84:19
**Financial** [1] - 84:7
**financially** [1] - 88:9
**find** [46] - 18:13, 20:25, 27:16, 27:19, 37:16, 48:9, 48:10, 50:11, 50:13, 51:8, 53:21, 53:23, 58:19, 59:2, 59:21, 60:2, 60:3, 60:11, 60:12, 60:17, 60:20, 60:23, 61:10, 61:22, 62:2, 62:12, 62:19, 67:8, 67:17, 67:21, 68:7, 68:16, 68:22, 69:6, 72:8, 72:9, 77:23, 80:12, 80:18, 80:20, 82:1, 82:9, 82:13, 82:19, 83:23, 84:20
**finding** [2] - 74:16, 82:4
**findings** [1] - 76:16
**finds** [1] - 53:19
**fine** [6] - 4:7, 10:20, 12:11, 21:13, 24:23, 83:24
**firework** [1] - 79:17
**Firm** [1] - 1:14
**first** [15] - 11:18, 13:3, 13:18, 13:20, 14:4, 22:13, 24:14, 44:22, 48:9, 49:1, 49:5, 51:14, 56:23, 76:14, 79:5
**fit** [3] - 21:4, 47:18, 47:19
**five** [14] - 3:14, 8:20, 51:14, 52:12, 52:16, 53:17, 53:22, 53:24, 60:24, 60:25, 61:6, 61:24, 61:25
**fix** [3] - 26:9, 27:15, 77:20
**floor** [2] - 16:21, 19:22
**folks** [2] - 27:5, 73:10
**follow** [2] - 11:19, 86:11
**followed** [1] - 30:18
**following** [2] - 3:1, 83:9
**follows** [1] - 14:5
**FOR** [1] - 1:1
**Force** [3] - 14:22, 16:20, 18:24
**force** [2] - 16:7, 39:23
**foregoing** [1] - 88:5

**foreseeable** [1] - 66:7
**forever** [1] - 86:21
**form** [2] - 16:18, 16:20
**forth** [7] - 53:6, 59:14, 62:9, 75:13, 76:11, 82:12, 83:19
**forward** [1] - 45:1
**four** [4] - 34:16, 39:8, 42:4, 42:12
**frankly** [3] - 12:1, 47:22, 73:17
**fresh** [1] - 64:9
**friends** [1] - 51:23
**fucker** [2] - 30:16, 48:13
**fugitive** [1] - 35:23
**full** [2] - 4:12, 4:20
**funds** [1] - 84:8

## G

**gainfully** [1] - 76:17
**garner** [1] - 27:25
**gas** [1] - 51:22
**gathered** [1] - 57:21
**GED** [3] - 7:7, 76:19, 78:14
**generally** [1] - 5:22
**generated** [1] - 11:11
**generous** [2] - 29:14, 29:16
**get** [37] - 11:23, 12:2, 18:9, 25:15, 26:9, 26:12, 27:15, 27:17, 27:23, 28:22, 28:23, 29:3, 30:15, 31:25, 33:17, 33:23, 33:25, 35:14, 38:1, 39:15, 40:10, 42:10, 47:12, 47:14, 48:14, 55:2, 55:14, 55:21, 59:21, 78:10, 80:9, 85:24, 86:8
**gets** [2] - 25:13, 36:18
**getting** [8] - 21:1, 23:2, 26:14, 49:16, 51:23, 51:24, 60:9, 67:15
**girlfriend** [8] - 19:24, 20:3, 20:7, 20:11, 28:3, 34:12, 47:1, 61:2
**girlfriend's** [1] - 20:6
**give** [11] - 12:24, 19:6, 19:7, 21:21, 28:20, 35:15, 36:18, 49:17, 49:19, 66:19, 86:21
**given** [1] - 57:2
**gives** [3] - 9:9, 9:15, 46:21
**giving** [2] - 29:8, 33:25
**go-between** [1] - 61:18
**goals** [2] - 76:10, 82:11
**government** [19] - 4:15, 11:16, 12:17, 13:1, 13:20, 57:9, 57:10, 57:21, 58:6, 58:17, 59:11, 61:9, 62:13, 62:16, 63:7, 67:10, 70:5, 71:11, 75:3
**GOVERNMENT** [1] - 2:7
**government's** [5] - 9:25, 69:19, 80:18, 80:22, 81:2

**GPA** [1] - 78:17
**grade** [1] - 78:11
**gram** [28] - 21:1, 22:25, 23:2, 26:15, 28:9, 28:10, 28:15, 29:6, 29:7, 29:9, 29:12, 29:16, 31:21, 31:22, 31:23, 32:2, 36:9, 36:12, 36:21, 45:16, 45:21, 45:22, 45:23, 58:5, 58:7, 58:13, 58:18
**grams** [28] - 21:1, 23:6, 25:24, 26:5, 26:7, 26:16, 26:18, 26:20, 26:21, 26:22, 26:25, 27:9, 28:8, 43:16, 45:1, 45:9, 45:11, 45:13, 46:7, 46:13, 46:15, 47:5, 47:14, 57:19, 58:1, 58:5, 59:3
**grant** [1] - 81:2
**granting** [1] - 82:22
**grants** [1] - 69:19
**greater** [3] - 75:18, 76:9, 82:10
**greed** [1] - 81:22
**Greenwood** [1] - 20:7
**grounds** [5] - 5:20, 67:22, 73:21
**grow** [1] - 78:2
**guards** [1] - 56:7
**guess** [12] - 13:7, 20:24, 24:8, 24:23, 25:10, 28:7, 29:18, 43:9, 44:8, 50:17, 51:9, 54:5
**guideline** [28] - 6:5, 9:17, 11:20, 12:15, 13:2, 13:6, 13:17, 13:19, 13:21, 13:23, 44:22, 48:2, 48:5, 51:8, 51:11, 54:4, 54:6, 54:9, 57:23, 62:23, 63:22, 66:12, 72:18, 76:16, 80:17, 81:4, 82:8, 82:14
**guidelines** [11] - 4:16, 5:6, 8:3, 11:14, 11:17, 62:5, 69:18, 70:19, 72:1, 82:22
**guilty** [1] - 3:13
**gunpoint** [1] - 79:9
**guy** [1] - 46:20

## H

**habit** [2] - 36:15, 77:14
**habits** [1] - 55:2
**half** [11] - 22:25, 24:4, 26:15, 31:21, 36:12, 36:21, 45:22, 45:23, 46:12, 58:14, 58:20
**hand** [4] - 39:3, 53:10, 88:10
**hand-to-hand** [1] - 39:3
**handled** [1] - 45:10
**hands** [1] - 6:24
**hands-on** [1] - 6:24
**happened** [2] - 41:4, 41:6
**hard** [3] - 38:5, 61:11, 78:10
**harmed** [1] - 81:19
**head** [2] - 26:16, 63:9

**health** [7] - 68:5, 68:23, 79:1, 81:13, 81:21, 81:22
**hear** [25] - 6:5, 11:21, 12:14, 12:15, 12:19, 12:20, 12:22, 13:3, 13:18, 13:19, 44:16, 44:21, 48:4, 48:5, 50:1, 54:10, 63:2, 63:17, 69:13, 69:14, 70:4, 70:5, 70:8, 70:9, 71:11
**heard** [7] - 29:5, 44:24, 47:19, 49:24, 51:13, 68:16, 71:1
**HEARING** [1] - 1:17
**hearing** [15] - 3:5, 6:6, 9:19, 11:6, 12:12, 44:17, 61:12, 69:22, 70:18, 71:11, 75:21, 87:12, 88:3, 88:4, 88:6
**heavy** [1] - 32:21
**HELD** [1] - 1:18
**held** [3] - 3:1, 58:18, 88:3
**hereby** [3] - 82:17, 84:22, 88:2
**hereto** [1] - 88:9
**heretofore** [1] - 88:3
**heroin** [114] - 14:23, 14:25, 15:4, 16:4, 18:5, 18:9, 20:17, 20:18, 20:21, 21:1, 21:5, 22:4, 22:6, 22:16, 22:19, 23:6, 23:17, 24:9, 24:10, 24:13, 24:15, 24:17, 24:20, 24:25, 25:3, 25:11, 25:14, 25:24, 26:1, 26:8, 26:9, 26:11, 26:14, 27:13, 28:9, 28:12, 28:20, 29:4, 31:25, 32:13, 32:15, 32:21, 34:2, 36:9, 36:15, 36:17, 37:19, 38:14, 39:3, 39:6, 39:10, 39:16, 39:22, 41:11, 41:23, 42:1, 42:9, 42:10, 43:13, 43:14, 45:12, 45:14, 45:16, 46:7, 46:13, 46:15, 47:12, 52:9, 52:19, 52:20, 52:21, 52:23, 53:9, 55:1, 56:11, 57:18, 57:19, 58:2, 58:16, 60:6, 60:9, 60:13, 61:14, 64:1, 64:2, 64:14, 64:20, 64:23, 64:24, 65:3, 65:20, 65:24, 65:25, 66:5, 66:6, 67:3, 67:9, 67:15, 67:20, 67:24, 68:1, 68:3, 68:5, 68:8, 68:9, 68:13, 69:9, 73:11, 77:6, 77:7, 77:17, 77:23, 77:24
**high** [2] - 72:23, 78:13
**higher** [2] - 73:16, 86:15
**hijacking** [1] - 79:6
**himself** [14] - 23:17, 38:2, 47:9, 49:23, 50:5, 56:6, 60:19, 61:17, 74:2, 74:7, 77:5, 77:6, 78:17, 78:19
**historic** [1] - 57:13
**history** [18] - 9:11, 9:14, 9:15, 9:16, 62:23, 72:20, 72:22, 75:12, 78:1, 78:20, 78:22, 79:1, 79:4, 79:19,

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 94 of 101

79:20, 80:25, 81:25, 82:7
**hold** [3] - 45:22, 69:11, 75:25
**holding** [2] - 45:11, 45:13
**homicide** [1] - 66:21
**HON** [1] - 1:18
**Honken** [1] - 62:8
**Honor** [44] - 4:14, 4:18, 4:23, 5:25, 6:9, 10:4, 10:6, 10:11, 11:1, 13:5, 14:1, 32:3, 32:8, 42:16, 43:21, 44:4, 44:20, 44:25, 46:18, 49:5, 53:3, 54:2, 54:11, 54:12, 56:13, 56:15, 63:6, 63:13, 63:16, 63:19, 63:20, 66:15, 70:12, 71:15, 72:7, 72:14, 72:15, 74:25, 85:1, 85:5, 85:7, 85:10, 87:8, 87:10
**honor** [1] - 86:2
**Honorable** [1] - 88:3
**hoping** [1] - 65:16
**hot** [5] - 30:15, 40:11, 48:13, 55:14, 64:8
**hours** [1] - 64:16
**house** [1] - 18:11
**hurt** [1] - 81:16
**HVAC** [1] - 85:21

**I**

**idea** [1] - 58:14
**ideal** [1] - 81:8
**identification** [1] - 79:11
**identified** [6] - 5:22, 17:4, 17:8, 18:2, 18:18, 82:6
**identify** [7] - 16:24, 17:3, 17:7, 31:3, 31:5, 31:8, 34:9
**identifying** [2] - 5:20, 6:21
**Ill** [6] - 9:15, 9:17, 62:23, 72:20, 72:22, 80:25
**Illinois** [1] - 78:14
**illness** [1] - 79:2
**immediately** [5] - 20:16, 34:14, 52:19, 56:7, 83:23
**impact** [5] - 5:3, 12:5, 69:14, 70:25, 71:6
**impacted** [1] - 78:25
**important** [1] - 80:9
**impose** [5] - 4:7, 4:9, 11:22, 70:7, 71:12
**imposed** [2] - 86:14, 86:22
**imprisoned** [1] - 82:18
**imprisonment** [3] - 9:17, 83:7, 84:12
**IN** [2] - 1:1, 88:10
**inadvertent** [1] - 10:19
**inadvertently** [1] - 10:15
**incarcerated** [3] - 78:3, 78:14, 84:5
**incident** [1] - 61:15
**inclined** [2] - 75:3, 75:17
**include** [1] - 60:25

**including** [2] - 43:11, 85:17
**income** [1] - 77:2
**increase** [5] - 9:6, 52:12, 53:22, 53:23, 54:1
**incredibly** [1] - 65:5
**independently** [1] - 18:25
**INDEX** [2] - 2:1, 2:7
**indicated** [8] - 36:9, 38:18, 39:9, 64:10, 74:15, 77:8, 81:8, 88:3
**indicates** [2] - 66:17, 80:13
**indicted** [1] - 16:12
**indifference** [2] - 66:9, 73:9
**indifferent** [1] - 65:19
**individual** [1] - 15:17
**individuals** [2] - 15:22, 61:6
**inflated** [1] - 57:8
**information** [22] - 15:17, 15:23, 16:6, 16:15, 18:13, 18:14, 18:20, 19:14, 20:25, 21:21, 33:25, 35:18, 37:12, 55:1, 55:3, 55:4, 55:11, 57:21, 58:1, 58:7, 58:8, 58:21
**informed** [2] - 56:7, 56:8
**inherently** [1] - 57:13
**inmate** [4] - 16:18, 16:20, 30:11, 86:3
**insanely** [1] - 27:1
**instance** [2] - 28:18, 56:5
**instead** [2] - 77:4, 77:15
**institution** [2] - 84:9
**intelligent** [1] - 78:18
**intend** [3] - 12:13, 13:10, 68:20
**intended** [3] - 10:16, 10:22, 65:15
**intent** [2] - 40:17, 40:19
**intentionally** [2] - 49:22, 61:17
**interest** [2] - 84:20, 84:21
**interested** [1] - 88:9
**interferes** [1] - 86:7
**interpret** [1] - 59:23
**interpretation** [1] - 72:2
**interrupt** [1] - 71:24
**interview** [3] - 6:12, 37:10, 48:21
**intimidation** [3] - 5:11, 8:12, 59:9
**investigation** [7] - 3:11, 8:14, 9:20, 15:12, 18:25, 21:5, 43:10
**investigator** [1] - 14:22
**investigators** [1] - 55:3
**involved** [22] - 6:25, 15:12, 20:21, 23:9, 43:13, 46:15, 47:8, 49:3, 50:6, 50:25, 51:15, 52:2, 52:3, 52:13, 53:25, 60:5, 60:8, 60:24, 61:6, 61:24, 79:5
**involvement** [2] - 51:3, 60:10

**involving** [2] - 8:20, 67:24
**IOWA** [1] - 1:1
**Iowa** [13] - 1:11, 1:13, 1:15, 1:19, 1:24, 6:14, 28:9, 84:2, 84:17, 86:18, 86:19, 88:2, 88:14
**issue** [6] - 11:18, 54:6, 56:23, 63:5, 63:15, 67:2
**issues** [18] - 6:6, 11:18, 11:20, 12:15, 13:2, 13:6, 13:19, 13:22, 13:23, 44:22, 48:3, 48:5, 51:11, 54:4, 54:9, 68:5, 70:19, 72:1
**itself** [3] - 48:14, 64:11, 64:13

**J**

**Jack** [1] - 3:6
**jail** [18] - 16:5, 16:18, 16:21, 17:19, 19:22, 30:7, 32:23, 33:19, 34:22, 42:13, 44:22, 43:1, 43:7, 48:13, 48:19, 55:2, 55:18, 66:2
**Jail** [3] - 6:14, 16:18, 17:9
**Jake** [2] - 51:23, 61:4
**janitor** [1] - 76:22
**January** [2] - 23:13, 23:22, 24:3, 34:24, 46:6, 47:10
**Jessica** [2] - 20:7, 34:12, 61:2
**job** [1] - 77:16
**John** [11] - 19:20, 29:23, 48:10, 48:11, 48:15, 50:22, 51:19, 52:5, 52:18, 60:25, 64:20
**JOHN** [1] - 1:10
**Johnson** [6] - 19:2, 19:5, 35:18, 35:22, 61:2
**Judge** [1] - 44:4
**judge** [4] - 11:7, 44:15, 66:19, 85:25
**judgment** [3] - 72:12, 82:16, 83:18
**judicial** [1] - 44:10
**jumping** [1] - 73:4
**jumping-off** [1] - 73:4
**June** [3] - 6:13, 22:3, 23:12
**jurors** [1] - 55:21
**jury** [5] - 3:14, 50:7, 50:14, 51:1, 67:15
**jury's** [1] - 55:21
**justice** [10] - 8:14, 9:3, 48:8, 48:23, 50:11, 60:2, 60:18, 62:5, 62:10, 62:18
**justified** [2] - 47:24, 67:14
**justify** [2] - 56:12, 66:24

**K**

**K.B** [1] - 84:1
**keep** [4] - 37:13, 38:2, 56:24, 56:25
**kept** [2] - 40:1, 55:3
**kick** [1] - 40:13
**killed** [1] - 81:16
**killing** [1] - 68:3
**kilograms** [4] - 8:7, 57:23, 57:24, 59:3
**kind** [5] - 12:25, 28:12, 31:19, 76:15, 86:5
**kinds** [3] - 46:2, 46:3, 46:4
**knowing** [1] - 81:15
**knowingly** [1] - 60:18
**knows** [1] - 45:18
**Korth** [2] - 3:9, 85:6
**KYNDRA** [1] - 1:12
**Kyndra** [1] - 3:7

**L**

**L-E-I-T-Z-E-N** [1] - 14:11
**lack** [4] - 37:5, 37:8, 55:10, 56:1
**lacked** [1] - 34:21
**lacking** [1] - 58:22
**LAHAMMER** [20] - 1:14, 4:23, 5:25, 6:3, 6:9, 11:1, 32:8, 32:10, 42:16, 43:21, 43:23, 44:3, 44:20, 54:11, 63:16, 66:15, 72:7, 74:25, 85:9, 87:8
**Lahammer** [20] - 1:14, 3:9, 4:19, 5:24, 6:7, 7:5, 7:14, 10:25, 25:21, 44:18, 54:10, 56:14, 63:14, 66:14, 70:8, 72:2, 74:24, 85:8, 85:11, 87:6
**Lammers** [17] - 3:7, 4:11, 10:3, 10:10, 11:23, 13:1, 44:23, 63:4, 63:18, 66:13, 69:23, 70:20, 71:10, 72:13, 74:23, 84:24, 87:9
**LAMMERS** [31] - 1:10, 4:14, 4:18, 10:4, 10:6, 10:11, 10:14, 11:25, 13:5, 14:1, 14:13, 14:15, 32:3, 32:6, 42:19, 42:21, 43:19, 44:8, 44:25, 48:7, 56:15, 56:21, 63:6, 63:19, 70:12, 70:22, 71:15, 72:14, 85:1, 85:5, 87:10
**larger** [3] - 27:24, 28:13, 29:2
**last** [4] - 6:19, 10:8, 25:18, 61:4
**Law** [1] - 1:14
**law** [6] - 57:3, 57:5, 58:22, 59:19, 78:24, 80:20
**lawful** [1] - 77:1

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*
Case 2:18-cr-01023-CJW-MAR  Document 123  Filed 11/01/19  Page 95 of 101

**lawyers** [1] - 12:19
**leader** [2] - 8:20, 53:20
**learned** [1] - 17:20
**least** [16] - 4:5, 10:7, 23:24, 24:5, 25:8, 34:24, 35:17, 46:7, 47:14, 58:10, 61:23, 65:12, 65:19, 65:21, 79:22, 84:10
**leaves** [1] - 62:22
**Lee** [4] - 34:9, 35:9, 35:17, 61:2
**left** [2] - 34:6, 82:8
**legal** [1] - 7:3
**legally** [1] - 6:22
**legitimate** [1] - 77:16
**Leitzen** [7] - 2:4, 14:2, 14:10, 32:11, 42:15, 67:13
**LEITZEN** [1] - 14:3
**less** [5] - 29:19, 43:14, 72:24, 81:8
**level** [17] - 5:7, 8:6, 8:25, 9:6, 9:10, 9:16, 28:17, 34:7, 48:1, 57:23, 59:4, 62:22, 72:19, 72:21, 81:1, 81:10
**levels** [3] - 66:20, 72:21, 75:3
**lie** [1] - 54:25
**lies** [1] - 48:24
**life** [4] - 4:6, 66:17, 78:25, 80:14
**lifestyle** [1] - 74:8
**light** [1] - 20:2
**likely** [1] - 35:6
**Lincoln** [1] - 19:8
**Line** [1] - 49:8
**lines** [1] - 25:24
**literally** [1] - 58:18
**live** [2] - 31:14, 50:2
**lived** [8] - 18:19, 19:5, 19:23, 19:25, 31:10, 35:9, 46:25, 50:1
**lives** [2] - 35:11, 66:10
**living** [4] - 76:18, 77:1, 77:15
**lo** [2] - 46:21, 46:23
**Lo** [21] - 17:4, 17:7, 17:9, 18:2, 18:7, 18:8, 18:10, 19:23, 20:1, 20:4, 30:12, 30:13, 30:14, 30:16, 30:20, 34:4, 34:6, 35:12, 35:15, 36:21
**Lo's** [4] - 17:10, 19:15, 34:8, 34:12
**local** [1] - 83:11
**location** [3] - 18:19, 36:23, 85:13
**locations** [3] - 36:20, 37:6, 85:17
**locked** [10] - 33:9, 33:13, 34:4, 34:15, 34:19, 35:25, 36:3, 42:4, 54:21, 54:25
**lodged** [1] - 4:25
**look** [1] - 55:11
**looked** [1] - 39:8

**looking** [5] - 24:21, 24:23, 28:20, 30:11, 36:17
**looks** [1] - 10:18
**Loss** [1] - 66:17
**loss** [1] - 80:13
**low** [5] - 26:19, 27:1, 47:6, 47:7, 58:7
**lower** [2] - 34:7
**lower-level** [1] - 34:7
**loyalty** [1] - 27:22
**lucid** [1] - 66:2
**Lundquist** [1] - 3:7
**LUNDQUIST** [1] - 1:12

## M

**machine** [1] - 1:20
**made** [9] - 6:25, 18:7, 29:19, 40:20, 59:15, 62:13, 62:16, 74:5, 84:1
**Madison** [1] - 18:7, 35:9, 35:11, 35:12, 35:15
**mailed** [2] - 6:13, 6:18
**mailing** [1] - 84:18
**main** [2] - 27:21, 27:25
**maintain** [1] - 65:18
**maintaining** [1] - 6:1
**make** [24] - 6:7, 7:4, 10:12, 10:21, 27:18, 33:22, 44:9, 44:14, 46:16, 53:12, 57:14, 70:20, 70:23, 74:16, 76:4, 77:15, 77:21, 80:10, 81:17, 81:20, 83:25, 84:5, 85:12, 86:10
**makes** [4] - 65:11, 65:12, 85:25, 86:6
**making** [3] - 28:15, 76:16, 76:18
**male** [2] - 52:4, 61:4
**man** [1] - 78:18
**manager** [3] - 5:13, 8:19, 53:19
**managing** [1] - 53:8
**mandatory** [2] - 4:9, 83:10
**manner** [1] - 78:24
**March** [1] - 19:21
**margins** [1] - 28:12
**marijuana** [2] - 77:10, 78:21
**marked** [1] - 10:2
**married** [1] - 78:4
**Marshal** [1] - 84:23
**match** [1] - 47:9
**matches** [5] - 46:21, 46:23, 47:2, 47:3, 47:4
**math** [1] - 45:2, 73:13
**matter** [5] - 3:2, 3:4, 11:8, 70:16, 71:22
**matters** [2] - 66:20, 80:16
**matured** [1] - 79:23
**maximum** [5] - 66:19, 73:17, 73:18, 80:15, 80:21

**mean** [1] - 55:8
**meaning** [1] - 28:19
**means** [3] - 79:18, 81:24, 88:4
**meant** [2] - 17:5, 71:25
**medical** [1] - 79:2
**meet** [4] - 16:20, 18:8, 35:13, 35:15
**meeting** [3] - 6:19, 20:19, 22:3
**meetings** [1] - 6:15
**members** [2] - 16:7, 85:17
**memorandum** [5] - 6:21, 7:2, 9:22, 9:25, 10:2
**memory** [5] - 17:24, 17:25, 19:16, 46:22, 46:24
**mental** [1] - 79:2
**mentally** [1] - 33:1
**mention** [1] - 76:12
**mentioned** [2] - 25:12, 35:22
**messages** [10] - 23:10, 23:16, 24:22, 38:25, 39:8, 46:1, 46:2, 46:8, 60:17, 68:17
**met** [3] - 6:14, 7:14, 36:21
**MF** [2] - 40:11, 55:14
**MICHAEL** [2] - 1:6, 1:14
**Michael** [3] - 3:3, 3:8, 70:17
**microphone** [1] - 14:8
**mid** [1] - 75:9
**middle** [5] - 37:21, 37:23, 37:24, 44:1, 72:23
**middleman** [1] - 36:17
**middleman-type** [1] - 36:17
**middlemen** [1] - 28:19
**middling** [1] - 56:2
**midmorning** [1] - 12:24
**might** [3] - 58:24, 69:24, 70:1
**million** [2] - 4:7, 4:8
**mind** [4] - 20:16, 34:14, 64:6, 66:21
**minimize** [1] - 59:13
**minute** [2] - 50:3, 54:8
**minutes** [1] - 52:21
**miscellaneous** [1] - 79:11
**missing** [3] - 10:12, 10:22, 54:3
**misspoke** [1] - 42:25
**mitigating** [6] - 73:22, 74:9, 81:7, 81:10, 81:25, 82:4
**mixed** [1] - 63:10
**mixed-drug** [1] - 63:10
**modifier** [1] - 47:6
**moment** [1] - 32:3
**money** [13] - 28:15, 28:21, 29:10, 29:12, 36:18, 37:25, 52:24, 53:11, 53:12, 77:21, 81:17, 81:20
**month** [5] - 26:16, 26:19, 26:20, 43:14, 43:16
**monthly** [2] - 84:5, 84:7
**months** [25] - 9:18, 19:21,

33:9, 34:16, 34:18, 38:9, 42:4, 42:12, 43:5, 52:5, 62:24, 64:24, 72:22, 72:24, 73:13, 73:15, 73:19, 75:14, 75:18, 81:1, 81:5, 82:9, 82:19, 82:20
**morning** [5] - 12:5, 12:10, 32:11, 32:12, 70:1
**most** [7] - 26:10, 31:22, 57:6, 66:23, 68:14, 75:5, 79:18
**mother** [3] - 30:16, 48:13, 78:5
**motion** [16] - 9:23, 11:14, 11:16, 11:21, 62:25, 69:13, 69:20, 70:8, 70:9, 71:13, 75:13, 78:8, 78:9, 80:23, 81:2, 81:6
**motivation** [1] - 54:25
**move** [1] - 13:25
**moving** [1] - 10:3
**MR** [49] - 4:14, 4:18, 4:23, 5:25, 6:3, 6:9, 10:4, 10:6, 10:11, 10:14, 11:1, 11:25, 13:5, 14:1, 14:13, 14:15, 32:3, 32:6, 32:8, 32:10, 42:16, 42:19, 42:21, 43:19, 43:21, 43:23, 44:3, 44:8, 44:20, 44:25, 48:7, 54:11, 56:15, 56:21, 63:6, 63:16, 63:19, 66:15, 70:12, 70:22, 71:15, 72:7, 72:14, 74:25, 85:1, 85:5, 85:9, 87:8, 87:10
**multiple** [1] - 24:24
**Murray** [5] - 1:20, 1:23, 88:2, 88:12, 88:13
**must** [12] - 4:9, 66:19, 83:9, 83:10, 83:11, 83:12, 83:13, 83:16, 84:1, 84:5, 84:12, 84:16

## N

**name** [3] - 14:9, 18:24, 19:2
**named** [1] - 18:8
**names** [1] - 61:4
**narratives** [1] - 5:17
**nature** [5] - 59:20, 65:4, 73:25, 75:11, 76:14
**NDIA** [1] - 88:13
**near** [3] - 19:8, 66:18, 80:14
**nearly** [2] - 18:5, 58:8
**necessarily** [3] - 33:16, 50:9, 55:8
**necessary** [3] - 53:3, 76:9, 82:10
**need** [9] - 24:9, 27:14, 27:15, 33:12, 44:9, 44:14, 56:19, 73:2, 73:3
**needed** [2] - 55:1, 77:20
**needs** [2] - 83:2, 85:20
**Nelson** [11] - 21:8, 21:9, 23:7, 27:5, 38:3, 38:13, 39:11,

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript*

Case 2:18-cr-01023-CJW-MAR Document 123 Filed 11/01/19 Page 96 of 101

51:18, 61:3, 65:22, 68:25
**Nelson's** [1] - 67:7
**never** [9] - 19:10, 27:18, 35:22, 36:20, 37:3, 49:2, 50:19, 50:21
**new** [3] - 18:20, 64:8, 64:10
**next** [6] - 51:9, 52:11, 53:13, 79:8, 86:19, 86:21
**nickname** [1] - 17:4
**night** [3] - 23:12, 50:15, 50:22
**nine** [1] - 39:25
**nobody** [1] - 25:12
**non** [1] - 84:9
**non-institution** [1] - 84:9
**none** [1] - 83:24
**normal** [2] - 26:8
**normally** [1] - 66:20
**NORTHERN** [1] - 1:1
**Northern** [3] - 84:2, 84:17, 86:18
**note** [10] - 6:24, 7:6, 10:7, 45:24, 54:14, 55:15, 56:5, 66:16, 77:6, 82:19
**noted** [7] - 8:9, 11:13, 47:22, 73:1, 77:23, 78:20, 80:12
**notes** [2] - 23:1, 78:8
**noteworthy** [1] - 78:16
**nothing** [6] - 42:16, 44:4, 74:2, 74:4, 74:8, 74:10
**notice** [3] - 44:10, 86:17, 86:20
**notify** [1] - 84:16
**November** [3] - 22:2, 43:8, 88:11
**number** [39] - 3:12, 4:24, 5:2, 5:16, 11:13, 17:10, 17:11, 17:13, 17:14, 17:15, 17:19, 17:20, 17:23, 19:15, 19:20, 24:21, 27:2, 27:4, 29:4, 29:25, 36:5, 39:22, 40:25, 41:2, 41:7, 41:9, 41:25, 42:9, 46:21, 46:22, 48:9, 62:9, 62:14, 63:8, 76:18, 77:17, 79:25, 80:16, 85:16
**Number** [4] - 3:4, 31:13, 63:23, 70:18
**numbers** [1] - 24:22
**numerous** [1] - 48:24

## O

**oath** [1] - 67:14
**objected** [7] - 5:14, 5:18, 6:5, 6:22, 8:8, 8:15, 8:21
**objecting** [1] - 5:7
**objection** [7] - 10:24, 59:7, 59:24, 60:1, 62:3, 72:3
**objections** [13] - 4:16, 4:18, 4:24, 5:1, 5:2, 5:17, 5:22, 6:2, 6:16, 7:1, 11:13, 56:5, 62:21

**obligation** [1] - 84:19
**obligations** [2] - 84:4, 84:11
**obstruct** [1] - 9:3
**obstructed** [4] - 60:2, 60:18, 62:10, 62:17
**obstructing** [1] - 8:14
**obstruction** [12] - 5:3, 13:8, 48:7, 48:14, 48:23, 50:10, 51:4, 51:5, 55:13, 55:18, 55:24, 60:21
**obstructs** [1] - 62:5
**obtain** [1] - 15:7
**obtained** [1] - 38:4
**obviously** [4] - 36:16, 66:16, 71:17, 73:15
**occasion** [4] - 23:3, 34:24, 41:4, 64:7
**occasions** [3] - 6:15, 52:16, 52:18
**occupied** [2] - 61:8, 61:22
**occurring** [1] - 50:4
**occurs** [1] - 84:18
**October** [5] - 1:19, 22:1, 22:2, 43:25, 54:21
**OF** [4] - 1:1, 1:3, 2:1, 2:7
**offense** [18] - 5:2, 5:7, 8:6, 8:25, 9:6, 9:9, 9:16, 48:1, 51:9, 51:12, 53:2, 55:25, 60:23, 62:22, 72:19, 76:15, 79:5, 82:6
**Office** [3] - 1:10, 1:12, 84:14
**office** [17] - 5:9, 5:15, 5:20, 8:5, 8:10, 8:18, 8:23, 9:1, 9:7, 9:12, 57:20, 58:6, 58:12, 58:17, 59:1, 77:8, 80:4
**Officer** [2] - 14:7, 14:16, 32:11, 42:15, 67:13, 85:6
**officer** [10] - 3:10, 14:2, 14:20, 43:24, 44:5, 45:1, 47:5, 48:11, 58:22, 83:15
**OFFICER** [1] - 85:7
**officers** [2] - 57:3, 57:5, 59:19
**often** [3] - 24:9, 27:22, 28:1
**oftentimes** [7] - 18:10, 26:11, 27:16, 27:19, 27:21, 28:18, 68:7
**old** [2] - 77:11, 79:23
**one** [33] - 5:1, 7:17, 7:19, 10:11, 20:4, 24:18, 26:17, 26:18, 26:19, 26:21, 26:23, 27:13, 27:14, 32:18, 34:24, 39:21, 39:24, 40:3, 41:4, 41:12, 49:4, 52:18, 53:8, 54:17, 58:13, 60:4, 61:5, 61:8, 61:19, 61:23, 63:23, 78:11, 80:21
**open** [3] - 3:1, 56:4, 66:1
**operation** [1] - 53:9
**opinion** [2] - 27:8, 43:15
**opportunity** [4] - 4:12, 4:21, 23:9, 75:21

**order** [15] - 12:13, 12:25, 13:17, 13:23, 18:8, 18:11, 25:14, 27:18, 28:23, 33:22, 51:10, 59:13, 72:11, 83:18
**ordered** [4] - 83:21, 83:24, 83:25, 84:4
**Ordered** [1] - 1:21
**organization** [2] - 28:17, 62:1
**organizer** [3] - 5:12, 8:19, 53:20
**otherwise** [7] - 8:13, 9:4, 62:1, 62:2, 73:16, 78:25, 80:7
**ounce** [1] - 43:14
**outside** [3] - 30:13, 81:9, 82:13
**outweigh** [3] - 73:22, 73:23
**outweighed** [1] - 82:5
**outweighs** [3] - 74:4, 74:5, 74:11
**overdose** [13] - 22:15, 38:10, 63:2, 63:10, 65:24, 66:6, 67:6, 67:7, 67:10, 67:16, 67:18, 67:21, 69:3
**overdosed** [2] - 22:9, 65:25
**overdoses** [1] - 67:24
**overrule** [3] - 59:24, 62:3, 62:21
**overruling** [1] - 59:6
**overstated** [2] - 57:8, 58:19
**owe** [2] - 53:12, 84:11
**owed** [1] - 84:4
**own** [10] - 7:9, 24:20, 41:11, 41:13, 45:4, 54:24, 57:17, 65:1, 77:14
**owner** [1] - 20:11
**owns** [1] - 41:21
**Oxford** [2] - 85:10, 85:17

## P

**page** [2] - 8:4, 49:7
**pages** [3] - 10:8, 10:23, 71:7
**paid** [3] - 28:25, 52:18, 52:20
**panic** [1] - 68:18
**panicked** [1] - 64:18
**paperwork** [1] - 42:6
**paragraph** [15] - 5:7, 5:8, 5:9, 8:4, 8:10, 8:17, 8:23, 9:12, 9:13, 44:3, 59:24, 62:3, 76:24, 77:9, 79:3
**Paragraph** [1] - 71:21
**paragraphs** [3] - 5:14, 5:18, 83:19
**paramour** [1] - 28:3
**parents** [1] - 78:4
**parole** [4] - 4:1, 4:2, 79:14, 79:21
**paroled** [1] - 79:14
**part** [8] - 44:14, 44:16, 62:15, 69:7, 69:8, 72:1, 72:12, 75:6

**participants** [2] - 8:21, 53:18
**participate** [2] - 74:7, 83:3
**participated** [1] - 6:11
**particular** [31] - 7:17, 7:19, 15:10, 15:13, 15:19, 15:24, 32:1, 43:10, 45:25, 46:19, 48:8, 51:15, 52:10, 53:2, 53:14, 53:25, 54:1, 61:15, 63:12, 63:20, 64:6, 66:9, 68:9, 68:10, 72:16, 72:24, 73:8, 73:17, 73:23, 74:13, 75:12
**particularly** [6] - 56:25, 60:16, 68:2, 69:4, 69:5, 75:8
**parties** [4] - 11:21, 11:22, 88:8, 88:9
**partners** [2] - 53:9, 56:3
**partnership** [1] - 55:8
**pass** [2] - 28:25, 47:18
**past** [4] - 18:6, 30:10, 79:22, 80:10
**Pat** [1] - 3:9
**Patrice** [5] - 1:20, 1:23, 88:2, 88:12, 88:13
**pattern** [1] - 24:24
**pause** [1] - 32:5
**pay** [5] - 15:3, 83:21, 83:23, 84:12, 84:20
**Payment** [1] - 84:1
**payment** [1] - 84:15
**payments** [2] - 84:6, 84:8
**peddling** [1] - 77:12
**people** [26] - 25:1, 27:3, 27:6, 27:16, 28:20, 28:25, 29:5, 33:16, 36:16, 37:13, 37:25, 47:20, 51:14, 52:12, 53:24, 56:2, 60:10, 60:11, 60:24, 60:25, 61:6, 61:9, 61:24, 61:25, 64:8, 77:22
**people's** [1] - 66:10
**per** [5] - 26:8, 28:10, 28:15, 29:12, 84:10
**percent** [1] - 84:8
**perfectly** [1] - 12:11
**perform** [1] - 80:9
**perhaps** [3] - 42:25, 69:23, 79:23
**period** [19] - 23:21, 23:24, 24:14, 24:16, 24:25, 33:13, 35:4, 42:4, 46:9, 49:9, 49:12, 58:5, 58:10, 58:11, 58:15, 59:6, 76:23, 77:10
**periods** [2] - 42:3, 76:22
**perjuring** [1] - 60:18
**perjury** [1] - 62:18
**person** [25] - 18:2, 22:11, 26:14, 26:17, 26:18, 26:21, 27:20, 27:25, 28:1, 28:21, 35:20, 35:21, 37:21, 52:20, 52:21, 57:1, 61:14, 61:23, 62:10, 63:1, 63:2, 67:25, 68:4, 79:9
**personally** [1] - 3:8

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR Document 123 Filed 11/01/19 Page 97 of 101

**persons** [1] - 53:22
**Phoenix** [2] - 35:25, 36:3
**phone** [13] - 17:10, 17:11, 17:14, 17:15, 17:19, 17:20, 17:23, 19:15, 19:19, 40:25, 46:20, 46:22, 64:17
**photo** [1] - 43:4
**physical** [4] - 33:17, 33:20, 78:12, 79:1
**place** [11] - 4:4, 23:20, 29:2, 35:16, 54:19, 67:12, 85:19, 86:9, 88:3, 88:6
**placed** [2] - 79:6, 83:7
**placement** [2] - 85:9, 86:1
**places** [2] - 9:14, 36:25
**Plaintiff** [1] - 1:4
**planning** [1] - 66:21
**plumbing** [1] - 41:22
**pocket** [2] - 37:14, 55:4
**pod** [1] - 17:9
**point** [18] - 12:16, 14:2, 14:17, 16:11, 18:22, 19:9, 21:13, 22:16, 31:15, 48:3, 48:25, 51:12, 54:9, 69:12, 71:10, 73:4, 73:24, 78:5
**points** [2] - 9:14, 37:8
**police** [1] - 14:20
**Police** [2] - 14:21, 25:9
**polysubstance** [2] - 67:5, 75:10
**portion** [4] - 52:11, 71:16, 84:11, 84:19
**pose** [1] - 68:10
**position** [1] - 55:10
**possess** [1] - 83:12
**possibility** [1] - 4:1
**possible** [5] - 19:9, 28:1, 37:20, 57:7, 86:9
**potent** [1] - 68:2
**potentially** [1] - 66:7
**practice** [3] - 85:12, 86:10, 86:11
**prefix** [1] - 19:19
**prejudice** [1] - 59:13
**premised** [1] - 57:25
**preparation** [3] - 9:19, 11:5, 66:22
**prepared** [1] - 71:3
**preponderance** [2] - 61:11, 61:21
**present** [9] - 3:8, 13:4, 13:13, 21:9, 40:25, 44:19, 63:3, 63:5, 63:15
**presentation** [1] - 71:25
**presented** [1] - 7:3
**presentence** [16] - 3:11, 4:13, 4:21, 4:25, 5:23, 6:16, 7:6, 7:8, 9:20, 13:24, 59:25, 71:8, 71:21, 76:25, 79:3, 83:19
**presided** [1] - 11:8

**presumably** [2] - 42:11, 42:14
**pretty** [1] - 54:13
**previous** [1] - 19:15
**previously** [1] - 70:25
**price** [4] - 27:23, 28:8, 28:23, 29:4
**prices** [1] - 15:3
**primarily** [1] - 13:7
**print** [1] - 88:4
**prison** [5] - 4:1, 4:3, 43:24, 79:14, 80:6
**Prisons** [7] - 82:18, 82:24, 83:3, 84:6, 85:15, 85:18, 86:1
**Prisons's** [1] - 86:7
**probation** [23] - 3:10, 5:9, 5:15, 5:20, 6:12, 8:5, 8:10, 8:18, 8:23, 9:1, 9:7, 9:12, 45:10, 57:20, 58:6, 58:12, 58:17, 59:1, 77:8, 79:6, 79:21, 80:4, 83:15
**PROBATION** [1] - 85:7
**Probation** [1] - 84:14
**problem** [1] - 7:20
**proceed** [5] - 12:25, 13:6, 13:16, 14:12, 72:13
**proceedings** [3] - 3:1, 88:4, 88:6
**Proceedings** [1] - 87:13
**product** [4] - 27:24, 28:23, 64:10, 65:7
**proffer** [7] - 10:16, 10:17, 10:18, 29:22, 30:3, 48:12, 48:21
**proffered** [1] - 55:16
**profit** [1] - 77:13
**program** [2] - 39:15, 83:5
**Program** [2] - 83:4, 84:7
**programming** [1] - 85:20
**pronounce** [2] - 12:23, 70:10
**proof** [1] - 56:1
**proper** [2] - 25:23, 72:9
**property** [1] - 79:16
**prosecution** [1] - 8:15
**protect** [1] - 66:3
**prove** [2] - 62:13, 62:16
**proved** [1] - 51:5
**provide** [5] - 16:6, 17:23, 41:2, 57:9, 62:5
**provided** [13] - 15:23, 16:15, 17:9, 18:18, 18:19, 19:15, 19:16, 36:20, 37:3, 55:1, 58:1, 58:21, 59:18
**provides** [2] - 54:18, 57:10
**providing** [3] - 36:23, 57:2, 60:2
**provision** [1] - 80:17
**proximity** [1] - 82:25
**PSI** [2] - 44:3, 54:20
**PSR** [2] - 47:22, 47:24
**pull** [1] - 14:7

**punishable** [1] - 3:25
**purchase** [6] - 17:17, 24:9, 24:15, 25:14, 31:21, 31:23
**purchased** [10] - 22:6, 22:7, 22:9, 22:16, 24:13, 24:17, 24:19, 29:11, 45:16, 46:7
**purchases** [1] - 22:4
**purchasing** [2] - 18:5, 31:19
**purely** [1] - 77:13
**purported** [2] - 37:7, 41:17
**purposes** [2] - 5:6, 44:17
**pursuant** [1] - 84:15
**pursue** [1] - 84:14
**put** [3] - 21:13, 45:1, 81:1

## Q

**qualifications** [1] - 14:18
**qualify** [1] - 83:6
**quantities** [21] - 15:7, 22:23, 28:13, 28:14, 31:19, 38:4, 45:7, 45:19, 45:25, 46:3, 46:4, 46:5, 46:19, 47:22, 47:23, 54:19, 55:9, 55:12, 57:7, 57:13, 57:18
**quantity** [17] - 8:7, 13:7, 13:25, 27:9, 31:23, 44:23, 47:8, 56:23, 57:11, 57:19, 57:22, 58:14, 58:20, 59:2, 59:5, 59:7
**quarter** [1] - 84:10
**questions** [6] - 7:15, 7:22, 7:25, 32:6, 43:19, 87:3
**quite** [2] - 29:3, 60:7

## R

**ran** [1] - 51:22
**range** [13] - 9:17, 62:24, 63:22, 66:12, 72:19, 72:23, 73:14, 75:2, 75:16, 75:17, 81:5, 82:8, 82:14
**Rapids** [6] - 1:12, 1:14, 1:19, 1:24, 86:19, 88:14
**rare** [1] - 62:8
**rate** [1] - 66:4
**rather** [2] - 76:1, 76:4
**RC** [1] - 2:3
**RD** [1] - 2:3
**reach** [1] - 68:18
**reaching** [2] - 64:8, 64:18
**reaction** [2] - 68:15, 68:17
**read** [1] - 7:8
**ready** [1] - 71:11
**real** [1] - 78:22
**reality** [1] - 38:6
**really** [2] - 61:10, 81:24
**reargue** [1] - 73:2
**reason** [5] - 25:19, 37:1, 65:7, 77:22, 85:14

**reasonable** [5] - 25:25, 59:4, 60:12, 73:12, 80:19
**reasons** [1] - 63:23
**receipt** [1] - 6:17
**received** [6] - 6:12, 11:4, 15:18, 23:7, 40:9, 52:20
**receiving** [2] - 22:23, 23:17, 45:23
**recently** [1] - 85:16
**recess** [2] - 70:13, 70:15
**reckless** [5] - 65:12, 66:9, 66:23, 73:9
**recognize** [1] - 82:2
**recognizing** [1] - 81:15
**recollection** [1] - 11:10
**recommend** [1] - 83:2
**recommendation** [2] - 85:12, 86:1
**recommendations** [2] - 86:6, 86:10
**recommended** [1] - 82:24
**record** [7] - 25:8, 44:15, 51:7, 54:13, 74:9, 74:11, 88:6
**records** [1] - 56:24
**recross** [1] - 43:20
**RECROSS** [1] - 43:22
**redirect** [1] - 42:17
**REDIRECT** [1] - 42:20
**reduced** [1] - 88:4
**reduction** [4] - 5:15, 8:24, 9:8, 62:7
**referring** [2] - 21:17, 30:3
**reflected** [3] - 33:7, 76:24, 79:2
**refrain** [1] - 83:12
**refresh** [1] - 11:9
**regard** [7] - 5:11, 5:12, 60:4, 61:15, 61:23, 62:4, 82:6
**regarding** [17] - 12:14, 12:17, 12:19, 36:14, 37:12, 44:22, 59:19, 61:13, 63:3, 67:1, 67:7, 69:13, 70:6, 70:7, 70:19, 71:12, 81:6
**regards** [22] - 6:25, 13:7, 13:8, 13:11, 13:12, 13:16, 15:12, 15:16, 15:23, 16:15, 32:20, 37:8, 38:3, 46:1, 48:7, 48:23, 51:4, 51:11, 52:11, 60:4, 73:20
**registered** [3] - 20:3, 20:11, 46:25
**regular** [2] - 26:13, 77:21
**regularly** [1] - 22:5
**related** [2] - 8:12, 88:7
**relationship** [2] - 55:7, 56:4
**relative** [1] - 88:8
**release** [10] - 4:5, 4:6, 75:9, 80:4, 80:6, 80:8, 83:7, 83:8, 83:9, 84:12
**released** [1] - 33:23
**relevant** [2] - 25:23, 44:16

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR Document 123 Filed 11/01/19 Page 98 of 101

reliable [1] - 27:19
rely [6] - 13:10, 46:18, 48:20, 48:22, 56:12, 75:5
relying [2] - 47:24, 70:24
remains [1] - 84:19
remanded [1] - 84:22
remember [8] - 19:18, 30:4, 30:20, 30:22, 30:25, 31:17, 38:10, 49:21
remembered [1] - 30:17
removed [1] - 56:8
report [29] - 3:11, 4:13, 4:17, 4:21, 4:25, 5:23, 6:8, 6:13, 6:16, 6:17, 7:6, 7:8, 7:12, 7:16, 7:22, 7:25, 8:4, 9:21, 13:24, 33:7, 36:24, 37:1, 59:25, 67:2, 71:8, 71:21, 76:25, 79:3, 83:20
reported [4] - 1:20, 76:24, 77:2, 88:3
reporter [1] - 12:24
Reporter [2] - 1:20, 88:2
reports [1] - 15:19
represent [2] - 6:10, 86:24
represented [2] - 3:6, 3:8
request [14] - 16:18, 16:20, 21:19, 24:16, 24:17, 54:5, 63:11, 66:11, 71:16, 73:20, 74:12, 74:14, 75:5, 80:18
requesting [3] - 16:19, 63:20, 72:15
requests [1] - 85:20
requirement [1] - 84:21
resale [1] - 15:7
reservation [1] - 55:12
residence [3] - 19:4, 35:19, 84:18
Residential [1] - 83:4
resist [1] - 66:16
resolution [1] - 11:20
resources [2] - 42:9, 84:10
respect [1] - 55:21
response [1] - 71:13
responses [1] - 49:5
responsibility [9] - 5:16, 8:25, 9:9, 13:3, 13:12, 62:4, 62:7, 62:11, 62:20
Responsibility [1] - 84:7
responsible [4] - 47:21, 59:5, 69:7, 69:8
rest [2] - 12:24, 47:2
restitution [11] - 5:19, 11:19, 12:15, 71:16, 72:1, 72:5, 72:9, 72:10, 72:12, 83:24, 83:25
result [4] - 33:25, 64:12, 66:7, 68:4
resupplied [1] - 15:7
reup [3] - 18:12, 29:3, 47:12
reupped [1] - 15:7
reupping [2] - 23:25, 46:10
review [6] - 4:12, 4:21, 11:6,

23:1, 23:10, 33:8
reviewed [6] - 9:20, 9:21, 9:25, 11:10, 15:19, 71:8
reviewing [1] - 42:6
revoked [1] - 79:15
Ricky [5] - 31:9, 31:10, 31:14, 41:10, 41:13, 49:15, 49:17, 49:19, 49:23, 49:24, 52:3, 53:6, 55:6, 61:1
rights [2] - 86:12, 87:1
RMR [2] - 1:23, 88:13
robbed [1] - 79:9
robbery [1] - 79:8
Robert [1] - 16:1
role [20] - 5:8, 5:11, 5:12, 8:12, 13:8, 13:9, 51:9, 51:12, 52:12, 53:1, 53:4, 53:14, 53:22, 53:23, 54:1, 55:25, 59:8, 60:23, 61:8, 61:23
roughly [1] - 29:12
RPR [2] - 1:23, 88:13
Rubio [1] - 53:16
runner [2] - 52:24, 53:10
runs [1] - 36:9

S

S.E [5] - 1:12, 1:14, 1:19, 1:24, 88:14
safe [1] - 45:17
sample [1] - 83:14
satisfied [1] - 7:3
saw [4] - 20:8, 21:11, 30:13, 31:24
scenario [1] - 64:22
schedule [1] - 84:15
Scholtes [9] - 17:16, 30:23, 40:23, 40:24, 41:10, 49:15, 50:24, 51:19, 61:3
school [1] - 78:13
School [1] - 19:8
scored [9] - 9:12, 47:25
seal [2] - 10:5, 11:3
seat [1] - 14:6
Second [1] - 1:14
second [2] - 10:11, 49:4
Section [3] - 3:16, 76:11, 82:13
section [1] - 60:21
Sections [1] - 3:19
security [1] - 83:1
Security [2] - 77:3, 79:10
see [3] - 39:9, 74:8, 81:9
seek [1] - 26:11
seized [1] - 57:12
self [2] - 25:17, 47:21
self-admitted [2] - 25:17, 47:21
sell [15] - 29:7, 29:15, 49:11, 64:14, 64:20, 64:23, 64:24, 65:2, 65:20, 65:24, 66:5, 66:6,

selling [12] - 28:14, 43:13, 49:7, 49:8, 53:5, 60:10, 64:6, 74:2, 76:18, 77:5, 77:6, 81:14
send [1] - 80:6
sense [2] - 11:23, 46:17
sent [5] - 16:18, 43:24, 53:10
sentence [28] - 4:3, 11:22, 12:23, 66:18, 69:16, 70:6, 70:10, 71:12, 72:24, 73:6, 73:7, 73:18, 74:19, 74:20, 75:8, 75:14, 75:18, 75:23, 76:8, 80:14, 81:3, 82:9, 82:13, 82:19, 82:20, 86:13, 86:14, 86:22
sentenced [1] - 79:13
sentencing [14] - 3:5, 6:21, 7:1, 7:2, 9:19, 9:22, 9:25, 10:1, 11:6, 44:17, 44:22, 61:12, 76:10, 82:11
SENTENCING [1] - 1:17
September [7] - 16:10, 16:11, 32:14, 32:23, 33:6, 54:22
serious [2] - 79:1, 79:18
served [1] - 4:3
services [1] - 86:23
set [7] - 8:3, 75:13, 76:11, 82:12, 83:17, 83:18, 88:10
sets [1] - 62:8
setting [1] - 78:3
seven [1] - 34:18
Seventh [4] - 1:12, 1:19, 1:24, 88:14
several [1] - 6:15
severely [1] - 81:16
Shannon [9] - 17:15, 30:22, 40:23, 40:24, 41:10, 49:15, 50:24, 51:19, 61:3
short [4] - 52:23, 53:1, 61:16, 69:19
Shorthand [2] - 1:20, 88:2
shorthand [2] - 1:20, 88:4
shortly [1] - 64:7
show [8] - 27:22, 34:19, 51:14, 52:7, 52:8, 52:12, 52:13, 79:19
showed [1] - 63:10
shows [4] - 42:6, 50:20, 60:17, 79:20
sic [4] - 8:23, 9:6, 16:25, 62:19
sic] [1] - 9:1
side [3] - 19:25, 45:17, 58:7
significant [1] - 17:13
signs [1] - 33:20
simply [10] - 45:2, 50:8, 59:15, 60:8, 62:12, 63:6, 63:13, 65:11, 73:21, 74:1
sincere [2] - 68:22, 81:12
single [2] - 26:12, 58:17
Sioux [1] - 1:10

sister [6] - 12:1, 12:9, 38:23, 70:23, 71:2, 71:18
situation [1] - 36:17
six [1] - 19:21
skim [1] - 28:24
small [3] - 26:6, 68:2, 79:13
smaller [1] - 28:14
smell [1] - 47:18
Social [2] - 77:3, 79:10
sold [5] - 15:1, 50:21, 50:22, 50:23, 66:1
someone [5] - 16:19, 52:8, 52:14, 52:17
sometime [1] - 78:12
sometimes [7] - 45:22, 49:17, 53:6, 53:7, 55:22, 86:2, 86:6
sorry [12] - 5:10, 5:14, 7:18, 9:2, 10:24, 41:6, 53:16, 63:8, 76:3, 77:11, 79:12, 82:14
sort [3] - 15:17, 28:11, 64:18
sound [1] - 53:7
sounded [1] - 27:5
sounds [1] - 53:8
source [2] - 34:10, 39:10
sources [8] - 27:3, 27:17, 34:2, 34:13, 37:19, 39:5, 41:11, 41:23
speaking [1] - 33:19
special [3] - 4:9, 83:18, 83:22
specific [7] - 9:5, 36:25, 37:3, 55:10, 58:22, 85:12, 85:25
specifically [8] - 12:7, 21:17, 30:3, 40:9, 48:16, 49:7, 49:23, 51:12
specificity [2] - 37:5, 37:8
specifics [1] - 54:18
spending [1] - 16:17
spent [1] - 16:5
spoken [1] - 70:22
staffing [1] - 76:21
stand [2] - 65:1, 66:3
standard [2] - 61:22, 83:16
start [2] - 13:24, 15:17
starting [1] - 75:2
starts [1] - 49:1
state [3] - 14:9, 66:21, 83:11
State [1] - 88:2
statement [13] - 6:7, 12:5, 34:20, 40:11, 58:3, 59:18, 69:14, 69:24, 70:21, 70:24, 70:25, 71:6, 71:9
statements [3] - 5:3, 38:13, 57:3
STATES [2] - 1:1, 1:3
States [23] - 1:10, 1:12, 1:13, 1:23, 3:3, 3:5, 3:6, 3:9, 3:16, 3:19, 4:11, 44:7, 62:8, 70:17, 76:11, 82:13, 83:21, 84:2,

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR Document 123 Filed 11/01/19 Page 99 of 101

84:13, 84:16, 84:23, 85:4, 88:13

**station** [1] - 51:22
**status** [1] - 28:5
**statutes** [2] - 3:22, 3:24
**statutory** [5] - 66:19, 73:16, 73:17, 80:15, 80:21
**stayed** [1] - 35:18
**step** [1] - 44:5
**Steve** [10] - 31:17, 31:19, 31:25, 41:16, 41:17, 45:14, 45:15, 45:20, 51:17, 61:3
**Stevens** [1] - 16:24
**STEVENSON** [1] - 1:6
**Stevenson** [74] - 3:3, 4:20, 6:10, 6:24, 7:6, 16:12, 16:16, 17:2, 17:3, 17:14, 17:16, 18:12, 19:21, 21:2, 21:22, 21:25, 22:4, 22:7, 22:12, 22:17, 22:19, 22:24, 23:11, 23:20, 23:25, 24:18, 25:5, 25:11, 25:17, 26:23, 27:3, 29:18, 31:22, 34:24, 35:6, 37:7, 37:12, 38:9, 38:14, 39:1, 39:2, 40:10, 40:16, 40:18, 40:21, 40:25, 41:11, 41:17, 42:3, 42:13, 42:22, 43:24, 49:19, 51:25, 54:20, 54:23, 55:16, 55:22, 56:6, 56:9, 68:20, 70:9, 70:17, 75:13, 75:20, 76:7, 78:18, 80:2, 82:16, 85:2, 85:14, 86:12, 87:7
**Stevenson's** [2] - 30:11, 75:8
**stick** [1] - 27:20
**still** [13] - 6:22, 26:18, 26:21, 27:15, 28:24, 53:12, 64:23, 69:8, 73:16, 84:4, 84:11, 85:24
**stipulate** [1] - 65:22
**stole** [1] - 39:21
**stop** [1] - 17:12
**story** [3] - 51:1, 51:2, 55:3
**street** [1] - 77:12
**Street** [4] - 1:10, 1:14, 19:24, 20:1
**strikes** [1] - 69:23
**strong** [1] - 22:14
**struck** [2] - 79:11, 79:12
**stuff** [5] - 22:8, 22:10, 22:12, 50:25, 86:5
**subject** [3] - 16:4, 18:18, 18:23
**submit** [8] - 55:14, 56:4, 56:9, 64:15, 65:5, 66:22, 66:24, 73:21
**submits** [1] - 55:22
**submitted** [2] - 12:6, 71:1
**Suboxone** [1] - 39:11
**subsequent** [1] - 6:20
**subsequently** [1] - 6:12

**substance** [9] - 3:15, 3:18, 3:21, 3:23, 77:9, 78:21, 83:5, 83:12, 83:13
**substantially** [5] - 45:13, 63:22, 66:11, 73:6, 73:7
**suffering** [1] - 33:14
**suffers** [1] - 78:5
**sufficient** [3] - 61:21, 76:9, 82:10
**suggest** [3] - 66:18, 76:25, 80:14
**suggests** [1] - 61:16
**Suite** [2] - 1:10, 1:14
**summarized** [1] - 76:15
**supervised** [7] - 4:5, 4:6, 80:4, 80:6, 80:8, 83:8, 83:9
**supervision** [7] - 79:24, 79:25, 80:3, 80:11, 83:17, 84:13, 88:5
**supervisor** [3] - 5:13, 8:19, 53:19
**supervisory** [2] - 61:8, 61:22
**supplied** [2] - 47:15, 47:16
**supplier** [11] - 18:8, 26:12, 26:13, 27:21, 27:25, 28:22, 29:1, 34:7, 35:3, 35:14, 41:13
**suppliers** [1] - 42:1
**supply** [1] - 18:12
**supplying** [1] - 51:25
**support** [6] - 69:10, 74:2, 74:6, 77:5, 77:14, 80:20
**supported** [4] - 46:5, 46:8, 59:18, 60:16
**supports** [2] - 53:14, 54:1
**suppose** [1] - 26:7
**suspects** [1] - 57:6
**suspension** [1] - 78:12
**sustain** [1] - 60:1
**SUV** [1] - 20:2
**switch** [2] - 28:2, 30:21
**sworn** [2] - 14:4, 48:19
**symptoms** [1] - 33:18
**system** [1] - 68:6

### T

**talk** [13] - 20:23, 21:8, 21:16, 21:19, 23:2, 24:14, 29:22, 30:21, 32:20, 33:22, 56:17, 70:2, 86:12
**talked** [9] - 25:11, 29:25, 32:23, 33:6, 34:23, 38:25, 40:8, 41:16, 56:16
**talking** [9] - 18:23, 23:6, 30:25, 31:17, 43:17, 45:8, 46:3, 46:4, 46:5
**talks** [1] - 45:8
**tampering** [1] - 8:13
**Task** [3] - 14:22, 16:19, 18:24
**task** [2] - 16:7, 39:23

**tasty** [1] - 64:9
**taunt** [1] - 55:17
**teenager** [1] - 79:22
**telephone** [1] - 3:10
**tell** [15] - 14:18, 16:14, 18:1, 18:4, 24:19, 30:9, 32:25, 33:21, 36:14, 37:9, 40:20, 41:10, 52:7, 75:22, 80:2
**telling** [2] - 17:8, 52:11
**tempered** [1] - 81:22
**temporary** [1] - 76:21
**tending** [1] - 34:19
**term** [4] - 4:4, 4:5, 82:18, 83:8
**terminated** [1] - 79:7
**terms** [2] - 80:5, 80:10
**test** [1] - 47:18
**testified** [21] - 14:5, 15:15, 21:9, 35:17, 38:3, 38:4, 38:8, 38:11, 40:8, 40:23, 45:5, 48:15, 48:24, 50:10, 51:2, 55:22, 55:23, 56:10, 67:14, 71:2, 77:7
**testify** [2] - 48:17, 58:4
**testimony** [41] - 5:4, 11:7, 11:12, 13:13, 21:11, 21:16, 25:16, 27:2, 32:20, 33:2, 34:23, 38:12, 44:25, 47:4, 48:20, 49:1, 49:21, 51:6, 51:13, 51:20, 52:4, 52:10, 52:15, 54:15, 54:16, 55:5, 55:20, 59:10, 59:12, 60:3, 60:16, 61:13, 63:24, 64:17, 64:25, 65:22, 67:11, 71:5, 77:18
**text** [10] - 23:10, 23:16, 24:22, 38:25, 39:8, 46:1, 46:2, 46:8, 60:16, 68:17
**texted** [1] - 39:2
**THE** [70] - 1:1, 1:1, 1:18, 3:2, 4:15, 4:19, 4:24, 6:1, 6:4, 7:5, 7:10, 7:11, 7:13, 7:14, 7:17, 7:18, 7:19, 7:21, 7:23, 7:24, 8:1, 8:2, 10:5, 10:7, 10:12, 10:20, 11:2, 11:5, 12:11, 13:18, 14:6, 14:10, 14:12, 32:4, 32:7, 42:17, 43:20, 44:5, 44:13, 44:21, 48:4, 54:7, 56:14, 56:19, 56:22, 63:14, 63:17, 66:13, 67:1, 70:13, 70:16, 71:4, 71:24, 72:8, 74:23, 75:20, 76:1, 76:3, 76:4, 76:6, 85:2, 85:6, 85:8, 85:11, 87:2, 87:3, 87:5, 87:6, 87:9, 87:11
**theft** [2] - 36:4, 36:5
**themselves** [3] - 26:15, 28:24, 29:1
**thinking** [1] - 12:9
**third** [2] - 47:15, 47:16
**thoroughly** [2] - 6:19, 54:13
**threat** [10] - 5:4, 5:11, 40:13,

40:15, 55:15, 59:9, 59:15, 59:20, 59:23, 62:19
**threaten** [1] - 55:17
**threatened** [3] - 48:10, 48:16, 48:18
**threatening** [1] - 30:7
**threats** [4] - 40:8, 40:20, 48:17, 51:5
**three** [22] - 10:8, 23:24, 25:18, 26:5, 26:22, 27:9, 28:8, 29:20, 33:9, 34:25, 35:4, 39:7, 43:5, 45:4, 45:6, 46:9, 46:10, 46:16, 47:16, 47:17, 57:17, 83:8
**three-day** [1] - 35:4
**three-week** [1] - 46:9
**throughout** [1] - 51:13
**timeframe** [2] - 25:25, 39:12
**Title** [4] - 3:16, 3:19, 76:11, 82:12
**today** [8] - 6:2, 6:6, 7:25, 11:24, 70:21, 71:3, 76:13, 87:4
**today's** [2] - 9:19, 11:6
**together** [3] - 31:14, 49:20, 55:9
**tolerated** [1] - 80:5
**took** [5] - 16:20, 35:16, 40:15, 78:15, 81:11
**top** [8] - 28:24, 47:8, 62:17, 63:8, 63:22, 66:11, 72:18, 73:13
**topics** [2] - 28:2, 30:21
**total** [11] - 4:2, 4:8, 4:10, 9:9, 9:13, 9:16, 32:15, 33:9, 34:18, 59:3, 62:22
**touch** [2] - 51:21, 75:4
**town** [2] - 23:25, 35:7
**track** [1] - 56:25
**traffic** [1] - 47:20
**trafficked** [1] - 25:3
**trafficker** [2] - 25:18, 45:3
**traffickers** [3] - 15:6, 28:12, 45:19
**trafficking** [7] - 21:5, 21:6, 21:22, 26:2, 46:15, 49:4, 53:9
**tragedy** [1] - 66:23
**Trailblazer** [2] - 20:7, 20:8
**train** [1] - 85:21
**training** [3] - 43:9, 85:21, 86:4
**transaction** [2] - 53:13, 61:20
**transactions** [7] - 17:21, 23:19, 24:6, 24:24, 24:25, 37:6, 50:4
**transcript** [10] - 11:7, 11:11, 13:10, 13:11, 13:15, 44:9, 44:11, 44:14, 88:5
**Transcript** [2] - 1:21, 1:22
**transcription** [1] - 88:5
**Treatment** [1] - 83:4

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript.*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 100 of 101

**treatment** [1] - 83:5
**trial** [48] - 3:14, 6:11, 11:7, 11:8, 11:9, 11:10, 11:11, 13:10, 13:11, 13:14, 14:17, 15:15, 20:9, 25:16, 31:25, 38:5, 44:9, 44:11, 44:14, 44:15, 45:5, 48:24, 51:6, 51:13, 51:16, 54:13, 54:15, 58:4, 59:10, 59:15, 59:19, 60:3, 60:4, 60:7, 60:19, 62:13, 62:15, 62:17, 62:18, 63:9, 67:3, 67:11, 68:24, 71:2, 71:5, 77:7, 77:18
**tried** [3] - 49:22, 50:5, 66:3
**tries** [1] - 86:2
**trips** [1] - 18:7
**trouble** [1] - 78:24
**true** [4] - 37:22, 39:12, 41:5, 88:5
**trust** [2] - 6:2, 7:7
**truthfully** [2] - 55:23, 56:10
**try** [6] - 27:17, 64:9, 64:10, 78:10, 85:18, 85:24
**trying** [8] - 27:25, 57:6, 61:17, 69:12, 85:23, 86:4, 86:8, 86:9
**turn** [1] - 39:22
**turning** [3] - 76:14, 78:1, 79:4
**two** [25] - 10:2, 18:6, 24:4, 25:1, 25:18, 26:5, 26:21, 27:9, 28:8, 29:20, 34:20, 38:9, 45:4, 45:6, 46:12, 46:16, 47:17, 54:23, 57:17, 58:5, 58:11, 58:19, 60:4, 64:23, 79:6
**two-and-a-half** [2] - 24:4, 46:12
**two-year** [2] - 58:5, 58:11
**type** [4] - 36:17, 38:24, 55:7, 74:12
**typical** [1] - 26:14
**typically** [6] - 26:8, 26:10, 26:13, 27:13, 29:7, 29:9

## U

**ultimate** [2] - 12:19, 74:18
**ultimately** [1] - 57:9
**uncontested** [1] - 59:17
**under** [27] - 5:4, 10:5, 11:3, 28:25, 29:8, 53:22, 57:11, 59:22, 60:21, 60:22, 61:21, 66:17, 67:14, 67:22, 69:10, 69:15, 69:20, 74:17, 74:22, 79:24, 79:25, 80:3, 80:17, 81:4, 82:21, 82:23, 88:5
**underage** [1] - 78:22
**understating** [1] - 65:13
**unemployed** [2] - 74:1, 74:6
**unfortunate** [1] - 81:23
**UNITED** [2] - 1:1, 1:3

**United** [23] - 1:10, 1:12, 1:13, 1:23, 3:3, 3:5, 3:6, 3:9, 3:16, 3:19, 4:11, 44:7, 62:8, 70:16, 76:11, 82:12, 83:21, 84:1, 84:13, 84:16, 84:22, 85:4, 88:13
**University** [1] - 31:13
**unknown** [4] - 52:4, 61:4, 76:23
**unlawful** [2] - 79:16, 83:13
**unlawfully** [1] - 83:11
**unless** [3] - 33:7, 36:23, 54:3
**unpaid** [1] - 84:19
**unrealistic** [1] - 57:20
**unsatisfactorily** [1] - 79:7
**unstable** [1] - 78:3
**unverified** [1] - 76:20
**up** [36] - 3:25, 4:6, 4:7, 5:10, 8:16, 8:22, 9:2, 11:17, 11:21, 12:4, 12:13, 13:22, 14:7, 30:18, 33:9, 33:13, 34:4, 34:15, 34:19, 35:25, 36:3, 42:4, 52:7, 52:8, 53:13, 54:7, 54:21, 54:25, 62:13, 62:17, 63:22, 64:17, 64:24, 72:1, 78:2, 86:21
**upbringing** [2] - 78:7, 81:23
**upward** [39] - 5:21, 8:17, 9:4, 11:16, 54:5, 54:7, 60:20, 62:25, 63:1, 63:20, 66:8, 66:16, 66:24, 67:19, 67:21, 69:10, 69:11, 69:17, 69:18, 69:20, 69:21, 72:15, 72:17, 73:3, 73:12, 74:15, 74:17, 74:19, 75:1, 75:16, 80:12, 80:16, 80:18, 80:20, 80:22, 80:23, 80:25, 81:3, 82:15
**upwards** [1] - 72:21
**use** [7] - 64:2, 64:5, 65:7, 69:1, 69:14, 79:16, 83:13
**used** [5] - 17:16, 19:20, 22:12, 22:13, 47:6
**user** [5] - 16:4, 20:17, 20:18, 32:21, 64:1, 77:7
**users** [12] - 15:3, 24:9, 25:11, 26:8, 26:11, 26:14, 27:13, 28:18, 29:8, 33:2, 42:9, 56:25
**using** [6] - 1:20, 17:15, 17:21, 19:16, 68:5, 77:10
**utilized** [1] - 39:18
**utilizing** [1] - 37:19

## V

**variance** [22] - 7:2, 9:24, 11:15, 11:21, 12:17, 12:18, 69:13, 69:15, 69:17, 70:8, 70:9, 71:14, 73:5, 73:20, 74:13, 74:17, 74:19, 75:5, 75:13, 78:9, 81:7, 82:1

**various** [1] - 5:20
**vary** [2] - 82:3
**Vasquez** [1] - 53:16
**Vasquez-Rubio** [1] - 53:16
**VD** [1] - 2:3
**vehemently** [1] - 60:15
**vehicle** [4] - 18:21, 19:11, 20:12, 79:5
**verdict** [1] - 55:21
**verified** [1] - 19:10
**verify** [1] - 19:11
**version** [1] - 10:7
**versus** [3] - 3:3, 62:8, 70:17
**victim** [11] - 5:3, 12:5, 69:14, 69:25, 70:25, 71:6, 71:23, 72:4, 72:10, 79:12, 84:3
**victims** [11] - 11:24, 12:21, 70:2, 70:4, 70:20, 71:18, 77:20
**video** [1] - 31:24
**violate** [1] - 80:5
**violation** [4] - 3:16, 3:19, 3:21, 3:23
**violations** [1] - 80:4
**violence** [1] - 79:20
**visibly** [1] - 32:25
**visited** [1] - 85:16
**VS** [1] - 1:5

## W

**wait** [2] - 25:13, 42:12
**waive** [1] - 84:21
**Walgreen** [35] - 10:17, 19:20, 23:10, 24:13, 24:15, 27:4, 29:23, 30:6, 30:13, 30:17, 38:19, 39:1, 39:18, 40:8, 40:15, 48:11, 48:15, 50:22, 51:5, 51:17, 51:25, 52:5, 52:6, 52:7, 52:18, 52:22, 52:25, 55:17, 59:10, 59:16, 61:1, 61:17, 64:20, 68:17
**Walgreen's** [6] - 10:19, 51:20, 52:15, 61:13, 64:17, 64:25
**walked** [1] - 30:18
**walking** [1] - 30:10
**want** [10] - 7:4, 10:12, 11:18, 11:23, 13:22, 15:16, 56:17, 68:21, 69:12, 69:13
**wanted** [5] - 10:21, 12:2, 12:6, 33:22, 34:5, 65:18, 85:21
**wanting** [1] - 81:17
**wants** [1] - 46:14
**warned** [1] - 68:25
**warrant** [1] - 82:1
**warranted** [10] - 27:10, 66:10, 67:22, 72:17, 73:5, 73:7, 73:18, 73:19, 74:15, 74:22
**warrants** [1] - 35:24, 36:1,

36:2
**ways** [1] - 48:9
**weapon** [1] - 79:13
**week** [1] - 46:9
**weeks** [5] - 24:5, 39:7, 39:8, 46:12, 85:16
**weight** [5] - 8:8, 57:25, 59:3
**Welch** [1] - 62:19
**WHEREOF** [1] - 88:10
**William** [8] - 16:1, 32:21, 34:2, 34:15, 35:3, 41:4, 41:6, 61:1
**WILLIAMS** [1] - 1:18
**Williams** [1] - 88:3
**willing** [2] - 64:20, 81:20
**window** [1] - 30:12
**Wisconsin** [1] - 85:10
**wish** [16] - 11:24, 12:8, 12:21, 13:4, 13:6, 13:16, 44:18, 44:24, 48:2, 63:3, 63:4, 63:15, 70:3, 70:20, 70:23
**wishes** [1] - 70:10
**withdrawal** [4] - 32:24, 33:14, 33:18, 33:21
**withdrawals** [1] - 33:16
**withdrawing** [1] - 33:1
**WITNESS** [2] - 14:10, 88:10
**witness** [5] - 5:11, 8:12, 14:4, 21:14, 59:9
**WITNESSES** [1] - 2:1
**witnesses** [2] - 15:18, 43:12
**word** [1] - 47:6
**words** [2] - 28:13, 52:23
**work** [11] - 14:23, 17:24, 25:13, 36:7, 38:24, 45:2, 45:3, 45:6, 47:5, 78:10
**worked** [2] - 38:23, 50:19
**working** [9] - 31:5, 31:8, 41:20, 41:21, 49:11, 49:15, 49:20, 55:6, 55:9
**world** [1] - 65:14
**worst** [1] - 81:24
**wreck** [3] - 65:22, 66:3, 67:11
**written** [2] - 86:17, 86:20

## Y

**year** [5] - 26:8, 26:21, 58:5, 58:11, 58:13
**years** [26] - 4:1, 4:2, 4:5, 18:6, 25:18, 26:5, 26:22, 27:9, 28:8, 29:20, 34:20, 45:4, 45:6, 46:16, 47:17, 54:23, 57:17, 58:19, 76:18, 77:11, 79:7, 79:13, 79:23, 80:1, 80:22, 83:8
**yelled** [1] - 30:12

*Contact Patrice Murray at 319-286-2338 or patrice_murray@iand.uscourts.gov*
*to purchase a complete copy of the transcript*

Case 2:18-cr-01023-CJW-MAR   Document 123   Filed 11/01/19   Page 101 of 101